UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **JOHN E. HARRELL,** | ) | |
| | ) | |
| **et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | Civil Action |
| | ) | No. 1:20-0087-LO-MSN |
| **v.** | ) | |
| | ) | July 11, 2022 |
| **DOUGLAS M. DELUCA,** | ) | 10:00 a.m. |
| | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**VOLUME 1 (Pages 1 - 221)**
*TRANSCRIPT OF BENCH TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE LIAM O'GRADY,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the Plaintiffs:     **Thomas Ryan Lynch, Esq.**
Bradley Arant Boult Cummings, LLP
(DC)
1615 L Street, N.W.
Suite 1350
Washington, DC 20036
202-719-8228
Fax: 202-719-8328
E-mail: Tlynch@babc.com

**Lee-Ann Christine Brown, Esq.**
Bradley Arant Boult Cummings LLP (DC)
1615 L Street, N.W.
Suite 1350
Washington, DC 20036
202-393-7150
Fax: 202-719-8312
E-mail: Labrown@bradley.com

APPEARANCES:   (Cont.)

For the Defendants:        **Michael John Coughlin, Esq.**
                          Walsh Colucci Lubeley & Walsh PC
                          4310 Prince William Parkway
                          Suite 300
                          Prince William, VA 22192
                          703-680-4664
                          Fax: 703-680-2161
                          E-mail:
                          Mcoughlin@pw.thelandlawyers.com


For the Defendants:        **Eugene A. Burcher, Esq.**
                          Walsh, Colucci, Lubeley & Walsh PC
                          4310 Prince William Parkway
                          Suite 300
                          Prince William, VA 22192
                          703-680-4664
                          Fax: 703-680-2161
                          E-mail: Eaburcher@thelandlawyers.com


Court Reporter:           **Scott L. Wallace, RDR, RMR, CRR**
                          Official Court Reporter
                          United States District Court
                          401 Courthouse Square
                          Alexandria, VA 2231-5798
                          202-277-3739
                          scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

# C O N T E N T S

## EXAMINATIONS                                    Page

OPENING STATEMENT ON BEHALF OF THE PLAINTIFFS     15

OPENING STATEMENT ON BEHALF OF THE DEFENDANT      25

DIRECT EXAMINATION OF JOHN HARRELL                33
BY MR. LYNCH
CONTINUED DIRECT EXAMINATION OF JOHN HARRELL      98
BY MR. LYNCH
CROSS-EXAMINATION OF JOHN HARRELL                 185
BY MR. COUGHLIN

## EXHIBITS

Plaintiffs' Exhibit 497 admitted                  38

Plaintiffs' Exhibit 505 admitted                  43

Plaintiffs' Exhibit 1 admitted                    47

Plaintiffs' Exhibit 511 admitted                  54

Plaintiffs' Exhibit 505 admitted                  65

Plaintiffs' Exhibit 1029 admitted                 70

Plaintiffs' Exhibit 422 admitted                  71

Plaintiffs' Exhibit 2 admitted                    78

Plaintiffs' Exhibit 1022 admitted                 79

Plaintiffs' Exhibit 495 admitted                  80

Plaintiffs' Exhibit 990 admitted                  82

Plaintiffs' Exhibit 6 admitted                    84

Plaintiffs' Exhibit 1019 admitted                 85

Defendant's Exhibit 47 admitted                   86

Defendant's Exhibit 48 admitted                   87

Defendant's Exhibit 445 admitted                  88

*Scott L. Wallace, RDR, CRR*
Official Court Reporter

Plaintiffs' Exhibit 4 admitted                    95

Plaintiffs' Exhibit 5 admitted                    95

Plaintiffs' Exhibit 686 admitted                  103

Plaintiffs' Exhibit 688 admitted                  104

Plaintiffs' Exhibit 493 admitted                  107

Defendant's Exhibit 194 admitted                  110

Plaintiffs' Exhibit 529 admitted                  111

Plaintiffs' Exhibit 1006 admitted                 112

Plaintiffs' Exhibit 691 admitted                  113

Plaintiffs' Exhibit 530 admitted                  114

Plaintiffs' Exhibit 1049 admitted                 115

Plaintiffs' Exhibit 511 admitted                  117

Plaintiffs' Exhibit 455 admitted                  119

Plaintiffs' Exhibit 1046 admitted                 121

Plaintiffs' Exhibit 1046 admitted                 122

Plaintiffs' Exhibit 998 admitted                  124

Plaintiffs' Exhibit 998 admitted                  126

Plaintiffs' Exhibit 1010 admitted                 129

Plaintiffs' Exhibit 423 admitted                  132

Plaintiffs' Exhibit 532 admitted                  134

Plaintiffs' Exhibit 533 admitted                  134

Plaintiffs' Exhibit 424 admitted                  136

Plaintiffs' Exhibit 425 admitted                  136

Plaintiffs' Exhibit 1066 admitted                 138

Plaintiffs' Exhibit 919 admitted                  145

Plaintiffs' Exhibit 559 admitted                              147

Plaintiffs' Exhibit 562 admitted                              149

Plaintiffs' Exhibit 561 admitted                              153

Plaintiffs' Exhibit 500 admitted                              155

Plaintiffs' Exhibit 505, page 6876, admitted                  157

Plaintiffs' Exhibit 511, page 408, admitted                   158

Plaintiffs' Exhibit 496, pages 288 and 289,                   164
admitted

plaintiffs' Exhibit 1070 admitted                             168

Plaintiffs' Exhibit 516 admitted                              178

Plaintiffs' Exhibit 5 admitted                                178

Plaintiffs' Exhibit 517 admitted                              179

Plaintiffs' Exhibit 519 admitted                              179

Plaintiffs' Exhibit 520 admitted                              180

Plaintiffs' Exhibit 521 admitted                              180

Plaintiffs' Exhibit 549 admitted                              181

Plaintiffs' Exhibit 1031, pages 26531 and 26534,              183
admitted

Plaintiffs' Exhibit 1067 admitted                             184

Plaintiffs' Exhibit 1068 admitted                             184

Government's Exhibit 1069 admitted                            185

**MORNING SESSION, JULY 11, 2022**

(10:07 a.m.)

THE COURTROOM CLERK:  The court calls Civil Case Number 1:20-cv-87, *John D. Harrell, et al. versus Douglas M. Deluca*. This case is on for trial by the Court.  May I have appearances, please, first for the plaintiff?

MR. LYNCH:  Good morning, Your Honor.  Thomas Lynch for the plaintiffs.  This is Mr. Harrell.

THE COURT:  Good morning.

MR. LYNCH:  This is Mrs. Harrell in the middle.

THE COURT:  Okay.

MR. LYNCH:  This Lee-Ann Brown, my colleague.  She's entered into the case, entered an appearance, and this is Mr. Fitzhugh, our summer associate.

THE COURT:  All right.  Well, good morning to all of you.

MR. BURCHER:  Good morning, Your Honor.  My name is Andrew Burcher.  I represent Mr. Deluca, who sits on the end here.

THE COURT:  All right.  Good morning.

MR. BURCHER:  Along with my colleague, Michael Coughlin.

MR. COUGHLIN:  Good morning, Your Honor.

MR. BURCHER:  And with me in court today is Brooke West, who is our summer associate from George Mason University who will be starting her third year there this fall.

THE COURT:  All right.  Well, good morning to all of you.

MR. BURCHER:  And then we have some witnesses that are

also here pursuant to the subpoenas.

THE COURT:  Okay.  And we want a rule on witnesses, so our fact witnesses will remain outside of the courtroom and wait to be called, and as you testify, I'll remind you not to repeat anything that you have said in your testimony here in the courtroom to other factual witnesses, and the reason for that is that so your testimony will be your own and not based on what you have been told by another witness, and so please be mindful of that.  We've got witness rooms in the back, and please don't disappear while we're -- when we might be looking for you.

Mr. Burcher.

MR. BURCHER:  Your Honor, these are all of our witnesses that we subpoenaed for today at the start of the trial.  They won't actually be here until probably Thursday would be my guess, so if they could be excused until -- we'll coordinate with Mr. Lynch the time to try to get them, you know, a time closer to not have them sitting here for the entire duration of the trial.

THE COURT:  Well, I think it's going to be a lot sooner than Thursday, but you certainly can excuse them for today.  And you have the ability to reach them tonight and let them know?

MR. BURCHER:  We do.

THE COURT:  Okay.  Then you're excused for today, but you're still under the Court's subpoenas and must return when you're directed to by Mr. Burcher, all right?  All right.  Thank you, all.

MR. LYNCH:  Your Honor, I have a few preliminary matters to address if that's okay.

THE COURT:  Yes, sir.

MR. LYNCH:  So, what should we expect, on trial time, start/stop?

THE COURT:  We'll go 9 to 5:30, obviously not this morning, and if you've got a witness who is, you know, 15 minutes away from finishing up, we'll go until 6 if necessary.  We'll take a mid-morning break of 15 minutes.  We'll take an hour for lunch.  We'll take an afternoon break for 15 minutes, unless something else is necessary.  So we'll move along.

You've got a lot of exhibits, and I'm not sure how many are contested.  They seem to be -- I took a brief look at them. Most of them are the agreements between the parties, and they should be admitted without any contest.  You know, I've tried to focus the parties on -- in the summary judgment ruling on what's really at issue here, and it's really the intent prong of the fraud, and so I don't -- you know, we should have a focussed theme here and not -- I mean, I'm not interested in a blow-by-blow description of what the parties went through over a period of years.  I'm interested in the issues that I think are in dispute and the reasons why I allowed the case to go to trial, so let's be mindful of that and focus in on what's important during the case, and I don't know what exhibits you think are critical or not critical, but you focus on the ones that are

important and let's not belabor the entire history of the parties' negotiations, et cetera, all right?

MR. LYNCH:  Yes, Your Honor.

THE COURT:  What other questions do you have?

MR. LYNCH:  I'll make a point about the binders.  We're not going to have you flipping through all of those.  We're going to bring witness binders for each witness that they can flip through.

THE COURT:  Okay.

MR. LYNCH:  So another issue is post-trial briefs.  I don't know if you would like to decide that now or later.

THE COURT:  Yeah, the evidence is going to be a little protracted because we have a witness who's not available.  So what I would like is -- we won't have closing arguments.  We'll have a post-briefing with law and conclusions and facts in law, and I'll set that schedule up after testimony is done.

MR. LYNCH:  Thank you.  So, just a reminder, the legal fees portion of this, if necessary, is bifurcated from the -- and that's Docket 71.

THE COURT:  Correct.

MR. LYNCH:  Would you like to hear our order of witnesses?

THE COURT:  No.

MR. LYNCH:  One comment on Ms. Schiller, who is the remote witness.

THE COURT:  Yes.

MR. LYNCH:  She's a rebuttal witness.

THE COURT:  Okay.

MR. LYNCH:  She's been out of town.  She's a call-if-necessary, so how that's going to work out I'm not sure.  So it may be that we don't call her at all or we call her later.

THE COURT:  All right.

MR. LYNCH:  There's two witnesses we have an agreement on whereby the defendants can exceed the scope of my direct on cross.

THE COURT:  Okay.

MR. LYNCH:  That's Emad Elmagraby and Brendan Muha just so they come once and only once.

THE COURT:  All right.  I appreciate your working that out.  There's no reason to call them -- especially in a bench trial, there's no reason to call them back, so good.

MR. LYNCH:  Right.  So a related issue.  I proposed to the defendants that we do the same with the parties, that we call them once, ask all the questions you need to ask.  Defendants were not in agreement with that.

I have one more point there, and that is that the defendants on July 1st sent deposition designations for the very first time for my clients -- both my clients.  Those deposition designations are late under Rule 26(a)(3) by more than a year.  They're also late under Local Rule 30, which says if the transcript is available before the pretrial, you need to do the

deposition designation before the pretrial.

Practical point.  If they want to -- it is a very lengthy deposition designation.  I think it would be very cumulative if they, for example, called them in their case in chief, as they reserve the right to do, cross them, and then submit deposition designations with summaries that I will say are in a light most favorable to the defendant.  So just that issue.

So we have some deposition designations, too.  And I can address those.

THE COURT:  Have they been timely filed?

MR. LYNCH:  So the Bender designation, Mr. Bender, was timely filed with consent.  The defendants object that the designation is not relevant, but otherwise it's not objectionable, to my understanding.

We also have a Dashco -- it's Mr. Deluca's lender -- we did a stipulation that we negotiated with counsel -- they object to that as not relevant as well.

And then we've got this Lasertech -- we plan to present that by a business record certification.  So we had withdrawn our motion for remote testimony.  The question will be, is that floor plan a business record or not, and I have some citations here if you want to hear that now or later.

THE COURT:  Okay.  Bring it up when it comes up in your testimony.

MR. LYNCH:  All right.  That's all I have.

THE COURT:  Okay.  Mr. Burcher, what about the deposition designations?  How are we going to uses them when we have the parties here?

MR. BURCHER:  It all depends, Your Honor, on what happens when we have cross-examination and when and if we call those witnesses, you know, in our case-in-chief.

Those are -- you know, under the rule you're allowed to use party depositions for any purpose and --

THE COURT:  And impeach them.

MR. BURCHER:  -- and impeach them and all of those various different things, and so, you know, my experience is usually that date is done in the Rule 16(b) scheduling order.  In this case it was not.  We're replacement counsel.  We came in after the close -- it was well after the close of discovery, and so -- I think the answer on that is we'll see how it plays out.

Now, I would say that -- I could ask them the same question in the deposition and they could say the same answer, or we could be very efficient and submit those if we have not already gotten that information in cross-examination.  So we'll see how it comes up at -- you know, throughout the process, and I think we can raise that issue again, you know, when it comes up.

THE COURT:  Well, they're untimely, clearly, and you came into the case and you've been in the case for a while, and all you needed to do was file a motion to have the designations come in at a time, but to do it on July 1st is untimely.

You know, there's no prejudice that I can see right now because the depositions have been out there.  So let's just be mindful of not duplicating testimony.  I want live testimony to the extent it's relevant, and you can use the designations for impeachment purposes or prior statements that were made, but I want it to come out in the courtroom and I want -- you know, we're having a trial because of credibility disputes, and so --

MR. BURCHER:  Absolutely, Your Honor.  We'll try our best in cross-examination, and to the extent that that information does not come in, then we will --

THE COURT:  So why are we calling the Harrells twice, once in the plaintiffs' case and then subsequently in your case.  You obviously can segregate out what the testimony is for.  Why do you believe that it's --

MR. BURCHER:  Just don't know what he is --

THE COURT:   -- necessary to call them back?

THE COURT REPORTER:  I'm sorry, Counsel.

MR. BURCHER:  I'm sorry.  I'm sorry.

I don't know what he is going to present in terms of how much -- you know, the scope of direct in terms of how -- you know, he could ask one question and then that could, you know, be limiting what I can do on cross-examination, and so that's the issue that we're dealing with there.

My goal, Your Honor, our goal, is to not have them come back, but there may be other testimony that comes out throughout

the course of the trial that may require them to be, you know, to be called back for limited issues.

THE COURT:  All right.  I'm not going to preclude you from doing that, but to the extent that their testimony is fulsome, then your cross should be the same, and it's obviously -- you're at an advantage to have them on cross-examination for you.

MR. BURCHER:  Yes, sir.  We're prepared to do that.

THE COURT:  Okay.  All right.  Good.  All right.

MR. LYNCH:  May I address one thing in the deposition designations.  This is what I object to.  By the local rules, you have to do a summary.  They wrote this long summary about how they viewed that in the light most favorable to the defendant, all this testimony.  What I don't want is for the Court to get their summary of the testimony without us having a fair chance to counter designate that.

THE COURT:  I don't intend to look at the summary.  I think I tried to make myself clear that I'm going to decide this case based on live testimony and credibility decisions that are being made.

So did you want opening statements or do you want to move into witnesses?

MR. LYNCH:  We've prepared them, Your Honor, a brief five minutes, I think.

THE COURT:  That's fine, then.  Anything else we need to cover before we have opening statements?

MR. BURCHER:  Your Honor, we agreed on 15 minutes each.

THE COURT:  Okay.

MR. BURCHER:  15 minutes each, that's what we agreed on.

MR. LYNCH:  I agree.  They have up to 15.  I said that.

THE COURT:  Okay.  All right.  Then let's go.

### OPENING STATEMENT ON BEHALF OF THE PLAINTIFFS

MR. LYNCH:  Okay.  All right.  This is the key event timeline.  It starts with Mr. Deluca's purchase of the property in September 2018.

You can see shortly after that, construction begins, October 30th, 2018.  That's a stipulated fact.  The first two are both stipulated.  April 3rd, 2019, the sales contract is signed. July 3rd, closing.  The Post Closing Construction Agreement has a deadline of August 1st for the work that was incomplete under the sales contract, a deadline of August 15th for this new porch that the defendant was going to build, supposed to build under that Post Closing Construction Agreement.

September 26th, Mr. Deluca stops regular construction at the property.  December 2nd, 2019, contract is rescinded, and then finally March 16th, 2020, there is a letter which I'll show in my opening.

And let's call that up, Mr. Fitzhugh.  It's Exhibit 425.

Now, I will point out the defendants objected to this defendant as not relevant.  I'd just say it's in our timeline for a reason, and you'll hear why it's relevant.

So this is a letter from defendant's former counsel, Bean, Kinney & Korman.  The date is March 16th, 2020.  It matches our timeline.

Let's go to page 2, Mr. Fitzhuh.

All right.  So what this letter says -- actually, let's look at page 1 again real quick.  On page 1 he says, "Mr. Deluca will do the following in preparation for a final inspection," then he lists a number of items there.

The evidence will show there's more defective work and code defects and things that needed to be corrected, but this is his list.

And then let's go to page 2.

Okay.  Paragraph 2:  On this -- I'm sorry, paragraph 1 on that page.  It discusses how the defendant will exercise his discretion, and the defendants on summary judgment were arguing, "We were prevented.  I needed material inputs to complete the work."  And in this letter it says, I'll exercise my discretion on those questions.

Then in the next paragraph, taking some quotes, "Once the above work is completed, it will take approximately 21 days for the first inspection to occur, and then another 30 days for all final inspections."

And in this last paragraph it begins, "It is Mr. Deluca's expectation that completion of the above-listed items will result in a pass inspection and a certificate of occupancy."

This is significant for several reasons.

As I mentioned, the defendants have argued on summary judgment he was prevented from completing by material inputs. The evidence will show that the Harrells provided timely responses to Mr. Deluca's request for information.

However, at this time in March 2020, that issue is off the table.  He's saying he's going to exercise his discretion about these questions he has.  The evidence will show that this letter was issued by the defendant's counsel after a meeting between the parties and the County where the County said, in not so many words, it's time to put up or shut up.

And what happened after this letter?  He didn't finish. He didn't finish.  Not because he's waiting on more information; he said he's going to use his discretion.  He didn't want to finish.  He already had the money.  He had 4.5 million and change in his pocket.  Why would he finish?

So this letter puts the prevention issue in full relief. His excuses about material inputs were exposed for what they are, excuses.  I request that the Court consider this letter when the defendant makes arguments during this trial about how he couldn't complete because he's waiting on the Harrells.  There are materials sitting in the house.  You'll see pictures, right today, just materials sitting on the floor.

So anyway, second, this letter shows and other evidence will show that he has incomplete inspections.  The letter says,

page 2, second paragraph, 21 days for the first inspection, 30 days for the final inspection.

And I will point out, this letter was copied to the County on the cc's.  And why is that important?  The Virginia code, the Virginia building code, requires for safety of people, safety of buildings, that you apply for a permit, you tell the County what you're doing, the County inspects the work, and then you can occupy it.

And this homeowner, the plaintiffs, they don't have the assurances that their neighbor does, that the County's looked at the work, that the County's inspected the work because of what happened in this case with the permits.

All right.  Third, the last paragraph of this letter reference a certificate of occupancy.  This is a tacit admission at a minimum that the property cannot be occupied on this date, March 16th, 2020.

All right.  Now, one other exhibit.  This is a permit timeline.  Am I okay to point?  So the second thing here, if you could, is the carriage house and the main house.  On the carriage house, the permit happens way out there.  More than a year later he applies, applies for a permit.

Let's show Omaha 1, Mr. Fitzhuh.  And I'll toggle through.  This is a before-and-after clip.  This is the carriage house.  Toggle again.  If you notice the roof on the left, it's low; now it's brand-new roof.  The holes there, that's before it's filled

in.

All right.  Let's look at Omaha 2.

All right.  This is the front side of the carriage house.  Okay.  New garage opening there.

Let's look at 465.  The one with the -- there.

So this is the work during that.  That work was never permitted.  He didn't apply for it until sometime later, in November of 2019.

All right.  Let's look at Omaha 3.  Okay.  This is the inside of the carriage house.  This is the before.

Show the before again, please.

You can see new ductwork in there for HVAC.  The walls are all stripped.  There's Instagram posts where he says it's all new plumbing HVAC and electrical in these buildings.  You can see it all there.

Let's go to the next.

This is the after.  It's all closed in.  That happened before the County looked at any of it.

All right.  So on the main house, then it begins October 2018, and you can see significant work before he gets his first permit of any kind on April 3rd.  That permit is a kitchen and bath permit.  That permit says you can replace fixtures in the bathrooms and cabinets in the kitchen, nothing else.  You're going to see work, a lot of work outside of those areas before then, after then.

June 4th, he gets his next permit on the main house.  And that permit is also limited scope.  It's to construct an addition on the rear of the house which we'll see a picture in a second.  Yeah, this is Omaha 4.  So this is the main house, and you can read there.  He's -- this is Instagram post.  It's not objected to.  It's an admitted exhibit.  He talks about replacing all the mechanical, electrical, and plumbing.

Go to the next clip.

This is a before and after.  Lines up neatly.  This is now March of 2019.  On the permit timeline he doesn't have any permit issue.  None.  He's closing in the walls, it's all sorts of mechanical and electrical and plumbing being done.  Nobody's seen it.  Nobody's seen it.

All right.  Let's look at Omaha 9.  This is -- go to the before.

This is the before.  This is the main house.  It's a construction site.  This is before -- I'm pretty sure this is before April.  It's definitely before June.

Go to the next one.

It's all closed in.  And this, I know for sure, is closed in before June 4th.  The only permit he had when this is closed in is for the kitchen and bath.  He's closed it in.  Mechanical, electrical, and plumbing, nobody's seen it.

All right.  Now, the last item on here, December of 2019, the County requires Mr. Deluca to submit amended drawings showing

what work he did.  You cannot occupy the house until you show the County what you did.  You can't do it.  The evidence will show.  We're bringing in two code officials.

All right.  You may be asking, "So what?  He didn't file some paperwork."  The evidence will show that selling a house with unpermitted construction work, in and of itself, makes the house illegal to occupy.  The evidence will show that the Harrells were conveyed a ticking time bomb at the time this thing was sold.  At best, they had to spend time and money to make it legal.  At worst, you could face formal legal action by the County for having illegal work in your house.

Finally, the evidence will show that the lawful permitting inspection process has a point, and the point of the process is to make the house structurally safe and sound.  All of these things caused injury to the Harrells.

Finally, there will be evidence of intent.  The defendant was cited for notice of violation in Fairfax County twice.

MR. BURCHER:  Your Honor, I'm going to object to any reference to outside Fairfax County.  Irrelevant to this issue.

MR. LYNCH:  It goes to intent.  But I can skip it.

THE COURT:  Well, it may become relevant on cross-examination based on what his testimony is, but let's focus on the house permits for the --

MR. LYNCH:  Fair enough.  So the first claim for fraud is the permits.  Second claim, marble tile.  We'll hear a lot about

that.  The contract says that Mr. Deluca paid a final deposit. That got in there -- that's there because of what he was saying before the contract was signed.  The evidence will show, especially if Mr. Young is permitted to testify, that Mr. Deluca did not pay a single dollar towards that tile.

The evidence will show that Mr. Deluca's claim that he was prevented from finalizing this tile -- he said again on summary judgment he was prevented by material inputs, but then you look at the documents and he says it's coming, it's coming, it's coming, it's coming.  It never came.

Third claim, square footage.  There's some troubling evidence here.

Let's look at 561.

561 has two documents in it, a set of floor plans, and the floor plans are identical with one exception.  The first set here, the square footage totals were redacted.  The second document is the original, and the evidence will show through Mr. Muha that Mr. Deluca directed him to doctor the document before he sent it to the Harrells.

The evidence will show that the Harrells were told -- well, first, the evidence will show Mr. Deluca told the Harrells' lender in April that the main house was 7,000 square feet. That's in writing.  Meanwhile, the evidence will show at the time he said that, he had plans in his possession showing the main house was 5400 square feet.  The evidence will show that the

Harrells were told multiple times that the main house was 6500 square feet, and Mr. Deluca was present or copied on these communications.  He remained silent.  The evidence will show that the square footage actual is at least a thousand square feet less than 6500.

The fourth plank.

Let's put up Exhibit 418.

This is the roof.  That's the roof.  That's the original slate roof.  And what you're looking at right there is plastic and synthetic TruSlate.  And the evidence will show that to put in real slate, it's going to cost substantial money.

All right.  Breach, very quickly.  It will show that Mr. Deluca failed to pay for materials that -- or failed to provide materials that were paid for in advance, show that he performed defective work, show that the defendant's expert at deposition stated that he was required to comply with the building code.

The evidence will show that he breached expressed warranties in his contracts.  The evidence will show -- and this is Mr. Bender, that they objected to as irrelevant -- that his insurance expired.  And his Post Closing Construction Contract [sic], for good reason, says you need to have insurance.  He didn't.  In fact, the evidence will show his certificate of insurance was not correct.  And that's a first material breach, the minute he signed that Post Closing Construction Agreement.

All right.  The evidence will show that Mr. Deluca's experts on defects --

Let's look at 146, Mr. Fitzhugh.

-- concedes, and this number will go up, I think, when he testifies -- 64 items that need -- that's defendant's expert, 64 items.

Okay.  And then on damages.  This is really where the dispute is in my view.  The evidence will show Mr. Deluca's expert believes it will cost $135,000 to make the building code -- to make the building code compliant.  That's 145.  You can see the number.  That's defendant's exhibit in excerpt.

The evidence will show that the plaintiffs assert the damages are 1.2 million.  The main difference on damages.  The defendant's expert says, "I'm looking at the visible defects.  What the does it cost to fix the visible defects?"

My expert says, "I'm looking at all this work that nobody's seen behind the walls.  What's that going to cost?  What is it going to cost for me to put my warranty behind that when I finish?"

And that's the difference.  And Mr. Deluca's expert on damages, he'll tell you, he assumes in his number that all the work behind the walls is good.  He said you would have to be crazy to -- near quote, crazy to close in the walls without inspections.  We're going to -- the evidence will show that's exactly what happened.

All right.  Lastly, VCPA.  Accepting money for material and then not providing it, that's a violation of the VCPA.  The evidence will show that the defendant accepted money specifically earmarked for materials, including but not limited to, the tile.  The evidence will also show that the house was dishonestly sold to the Harrells in numerous aspects but, in particular, with respect to permits and inspections.  The VCPA dispute penal provisions are there for a purpose, to discourage this type of conduct.

Lastly, we've got attorneys' fees claims that I mentioned. Thank you, Your Honor.

THE COURT:  Thank you, Mr. Lynch.

All right.  Mr. Burcher.

MR. BURCHER:  Your Honor, may I take down his demonstrative?

THE COURT:  Yes, you can take that down.

**OPENING STATEMENT ON BEHALF OF THE DEFENDANT**

MR. BURCHER:  Your Honor, despite what you have just heard from the plaintiffs in their opening statement, this really is not a case of fraud over the Virginia Consumer Protection Act. This, instead, is a case of buyer's remorse and unrealistic expectations, in which the plaintiffs, who closed on a custom-renovated house, prior to completion, who have interfered, created a hostile work environment, and prevented the defendant from completing the work under the contract, have conflated their

claims because they have moved to Hilton Head and no longer want to move into the home which was customized to their liking.

There are a couple of additional key dates that I would like you to add to this particular key event timeline as the Court focuses on the evidence.

The first is on April 26th, the plaintiffs conduct an appraisal of the -- the contract in this case has an appraisal contingency, and on April 26th, the plaintiffs conduct an appraisal.  That appraisal has detailed measurements associated with the house, the size of the house, the square footage of the house.  It has -- if you add all of the improvements up on the property, it comes to over 7,500 square feet.  The plaintiffs were well aware of what the square footage of the house was before they closed.

The second date was May 2nd in which they waived that appraisal contingency.  They could have gotten out of this contract if wanted to.  If they felt that the square footage was not what they wanted on May 2nd, they could have gotten out of that.

On May 28th, the contract is amended again.  The contract was signed on April 3rd, ratified on April 5th.  It was amended. And in that amendment, in addition to the $170,000 of customizations that the plaintiffs had requested in the original contract, they added another $250,000 worth of customizations.

The next date, Your Honor, is the May 8th -- the June 18th

to June 20th time period in which the contract is amended again. This time, the pool which they had added was taken off, but there's still another $80,000 of customizations which are added to the contract.

Additionally, the parties changed the closing date, and they also have a limited list of work that needs to be done, so that's -- that date's important.

The next date that's important, Your Honor, is July 7th. After closing, the parties do a post-closing punch list.  This document was never attached to the Post Closing Construction Agreement, and as a result of that, the August 1st date that was in the agreement could not possibly have been met given the number of iterations that the Harrells keep adding to the punch list throughout the July, August, and then continuing on into September and October time periods.

The next date that's extremely important is on August 2nd, the plaintiffs and Mr. Harrell do a walk-through of the premises. Throughout the -- after closing, they had regular Friday meetings in which they went over the status of work.  There are certain things -- and you'll see when you see these punch lists, the Harrells are adding, mixing in things that is new work, old work, and additional work, and what's happening is, is that Mr. Deluca's trying his hardest to be able to get this house turned over to them.

They have a friendly meeting on August 2nd, but then on

August 6th, which is the date in which the plaintiffs stop work on the project.  In fact, it's about that time that Mr. Lynch gets involved, and it clearly -- the relationship on August 6th -- and we'll go through the e-mails on this -- the relationship on August 6th deteriorates significantly.  It becomes litigious, hostile.

From that point on, there are cameras at the premises.  The Harrells have changed the locks, and Mr. Deluca no longer has access.  Access has to be coordinated through third parties.  Third party experts have to be at the premises to observe the work that is being done.  Clearly a litigious, a hostile environment in which it's very hard to get work done.

While Mr. Lynch showed you a March 20th letter, those were all attempts to try and get things done, but what it didn't say in there was that the Harrells still controlled the house and that it was still difficult for Mr. Deluca to even get into the house to do any -- to do any work.

So, Your Honor -- and we'll go back into -- you'll notice that the plaintiffs led with contractual issues and concluded with some slight references to fraud in Virginia Consumer Protection Act.

Again, as I mentioned in my opening, this is not a case of fraud.  And when we go through the facts and we go through the -- there are four things that you ruled on summary judgment that were still in play with regard to fraud.  There was building

size.  There was whether or not there was some fraudulent representation with regard to the slate roof.  There was questions about permits, and then there was questions -- there was a question about the -- I'm sorry.

THE COURT:  Tile?

MR. BURCHER:  Pardon me?

THE COURT:  The tile?

MR. BURCHER:  The tile.  Tile, yes, Your Honor.  And so we'll go through each one of those in detail, but when you look at these drawings -- when the evidence comes in, you'll see there was absolutely no definition of what square footage anybody was talking about.

You'll see that the drawings that were references that he said were altered -- or doctored, was his word, Mr. Deluca -- they were inaccurate.  The covered e-mail that he showed you actually says that these aren't exact figures, and the purpose of giving those to the Harrells was so that they could put furniture in there.  You'll see that the contract has no reference to building size square footage in any way, shape or form, and it's the Harrells' contract that was presented to Mr. Deluca, not Mr. Deluca's contract that was presented to them.

The evidence will show that building square footage was never a focus of the parties except for maybe furniture and/or insurance, you know, dimensions.

With regard to the slate roof, there's a clear e-mail,

text back and forth in June in which, you know, Mr. Harrell asks the question. Mr. Deluca says what it is. He says that some of these are new, some of these are old, and even says, "Come out and" -- and they should come out and take a look.

With regard to the tile, the evidence will show that Mr. Deluca on May 10th of 2019 placed an order for all of the tile. He placed a $26,000 order with marble tile, and it will show that as of the June 20th addendum to the contract, when was signed, less than about -- approximately $13,000 of that had been drawn down, so there was still $13,000 of tile that had not been accounted for with regard to -- or from an ordering perspective, so there's still $13,000 left in that.

And with regard to the permits, we'll have a completely different viewpoint. Mr. Deluca in October obtained and applied for, you know, a residential remodel permit. This is a unique project because Mr. Deluca actually owns the house. He's not a contractor in this context, so he's allowed to do a lot more, you know, under that context. Our experts will testify that there were -- all of the trades got all of the permits that were required, all of the mechanical, electrical, plumbing permits that were required for this project.

And it will show that there was rough-in inspections and then there was what they call concealment or close-in inspections. And then where we're at with all of this is that we're at the stage of final permits, final inspections, and as a

result of the deterioration of the relationship in August of 2019, that's been made extremely difficult to finish because not only did it happen on August 6th, the stop work in which Mr. Deluca was told to stop work in which he demobilized a large number of the subcontractors that were on this project, the Harrells reached out to the subcontractors and started contacting them directly.  Not only that, but the Harrells reached out to the County creating an environment which, as you can probably understand, was extremely difficult, too, to work in.

Some other points that I would like to show that are important, and we'll go through this when we go through the contract, Your Honor, because the contract between the parties is really important in this case, and the Court should focus on paragraph 10, which is the condition of property at closing.  The condition of the property at closing is very unique in this case because it says "as-is," and the Harrells waive the right to inspect the property.  They waived the right to inspect the property, and the condition is as-is as a final walk-through. And so, theoretically, Mr. Deluca could have closed on any date, and it would be acceptable under the terms of the contract that they entered into.

The contract's also important because it had no plans or drawings attached to it.

The contract has no warranty provision in it.  In fact, the contract says "no warranty."

The contract has no specification related to the building size or improvements standards.

The contract has no representations as it relates to building permits or licenses.

And the contract was prepared by the plaintiffs' agent and reviewed by the plaintiffs who are both attorneys, and no, virtually no edits were made by Mr. Deluca except for related to negotiating the price.

There's also an integration clause in the contract, paragraph 38, which basically says the parties are not relying upon any oral representations.

The evidence will show that at the time of closing, a Post Closing Construction Agreement was entered into by the parties, and this again was drafted by the Harrells, and, importantly, no exhibits were attached to that agreement when it was signed.

And despite all of the things that happened on August 6th, most, if not all of these issues, were never raised prior to that date.  There was never really any concern about building size, you know, by the Harrells.

Additionally, the evidence will show that Mrs. Harrell conducted an investigation prior to closing as relates to the permits, and she knew that those permits -- that there were open permits prior to closing.

Finally, Your Honor, you'll hear from experts for Mr. Deluca that will opine that the work necessary to complete

this job, as Mr. Lynch indicated, is in the neighborhood of $130,000.

And it would be completely unwarranted to completely strip this house down to its bare bones again and start over.  And this is not a case of fraud, Your Honor.  This is a case of how do we conclude this contract and how does this house get finished given the adversarial relationship between the parties at this stage.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

All right.  Mr. Lynch, call your first witness.

MR. LYNCH:  We call Mr. John Harrell to the stand, please.

(JOHN HARRELL, PLAINTIFFS' WITNESS, SWORN)

MR. LYNCH:  So we have some more.  Can I please hand one to the Court and the witness.

THE WITNESS:  Thank you.

DIRECT EXAMINATION OF JOHN HARRELL

BY MR. LYNCH:

Q.    All right.  Who are you, where did you come from, Mr. Harrell?

A.    I'm sorry.  Could you ask it again.

Q.    Who are you and where did you come from?

A.    My name is John Harrell.  I grew up in Alabama.  I'm a lawyer.  I -- I've been a lawyer for 20 years, but I practiced tax law the entire time.

THE COURT:  I'm sorry, tax law?

THE WITNESS:  Tax law.

THE COURT:  Okay.

BY MR. LYNCH:

Q.     Where do you live?

A.     I currently reside in Hilton Head, South Carolina.

Q.     Who is your family?

A.     My wife, we have two children, seven and nine.

Q.     All right.  What is this case about in a couple of sentences?

A.     The -- well, the openings did a good job, I thought.

Q.     Yeah, that's a -- strike that question.  Why did you start looking for a house for your family in the D.C. area?

A.     We were living in Connecticut.  We lived there for a number of years, and I had decided to change jobs for a variety of reasons, and I wound up taking a job at PricewaterhouseCoopers in their national tax office here in Washington, D.C. where my wife and I had lived before, and so we needed to move from Connecticut to D.C.

Q.     Tell us how the timing of your move -- what was involved in that?

A.     So I began the job in 2018, I think Octoberish, and we had kids in school, and so we wanted them to finish the school year into 2019 and then move in the summer.

Q.     Okay.  When did you first meet Mr. Deluca?

A.     So I met Doug Deluca in the fall of 2018.  We toured the

property that we're talking about in this case and also his personal home at that time.

Q.    Okay.  Let's look at Exhibit 497.  I'd like to admit this one.

THE COURT:  Any objection?

MR. COUGHLIN:  One moment, Your Honor.

MR. LYNCH:  I'm sorry.  I'll make one preface on this and this is going to be a repeat theme.  We have long text chains in this case, and this is one of them.  And what we've done in the witness notebook is try to pick out the applicable pages, but when ruling on objections, I think you need to keep that in mind.

THE COURT:  Well, are these between Mr. Deluca and the Harrells?

MR. LYNCH:  They are between Mr. Deluca and the Harrells, the Harrells and the realtor, who was a dual agent for the parties beginning, and then those are the primary ones between the Harrells -- and as a dual agent, Mr. Muha as a go-between oftentimes.

THE COURT:  Well, you enter them.

Mr. Burcher, do you have any objection to any of them? You raise it, but it seems to me that certainly the texts that the Harrells author are going to be authenticated, and I don't -- certainly the ones going between Mr. Deluca and the Harrells are going to be admitted, and the ones to Muha, unless there's some -- they're admissions -- they're statements by the parties,

right?  They're coming in.

MR. COUGHLIN:  Understood, Your Honor.  Just a point of clarification.  So this is a replacement exhibit, so the original exhibit had many more pages, so is this now a replacement?  This is what we should handle as Exhibit --

MR. LYNCH:  I can speak to that.  So we tried to capture key pages from the chains and put them here.

THE COURT:  Right.

MR. LYNCH:  Every once in a while we didn't -- we messed up and missed a page, we'll put it on the screen, but we'll be citing specific text messages, and I'm prepared to tell you what hearsay exemption applies if need be...

THE COURT:  Just, you know, just what's the exhibit you want to focus on now?

MR. LYNCH:  This one is 497, and this is a text between John Harrell, Dawn Harrell, and Doug Deluca, a long chain, 371 pages.  And we have, I don't know, ten in here, five or so.

MR. BURCHER:  Doug's not on this chain.

MR. LYNCH:  And this one was not objected to, I believe.  It was not objected to.

THE COURT:  I've got the exhibit, and, you know, ask Mr. Harrell to identify the exhibit and highlight what you want him to review in the exhibit.  If there's an objection, let me know.

The fact that this was, you know, a hundred pages long and

now it's ten pages long, if it turns out you've got something in the longer exhibit that you want to use on cross-examination, that hopefully will be available and you can use it, but Mr. Lynch has tried to focus the text on the ones that are relevant to his case, and that's a good thing, and let's see where we go.

MR. BURCHER:  Your Honor, just real quick for all of this, a lot of exhibits are like this, in that they are huge, literally hundreds of pages long, and --

THE COURT:  Right.

MR. BURCHER:  -- and the challenge for us has been, you know, what is the exhibit, right?  And so we just want to be clear that the things that you are admitting into evidence right now are specific pages associated with the exhibits that so that we can know what is being admitted --

THE COURT REPORTER:  I'm sorry, Counsel?  Say that again.

MR. BURCHER:  Just so that we can know what is specifically being admitted and what's not, or is the entirety of the exhibit being admitted?

THE COURT:  No, I'm going to admit what Mr. Lynch presents to me; Mr. Harrell authenticates and testifies about.  We're not going to do that.  All exhibits are in evidence and -- we're not going to hide the ball and also require the Court to go through 97 exhibits which are irrelevant.

So you've made some choices on what you want the Court to

focus on, and to the extent that there's something outside of these exhibits that you think is relevant, Mr. Burcher, and you want to put it in, then that's fine.  You may do so.

Go ahead.

(Plaintiffs' Exhibit 497 admitted into the record.)

MR. LYNCH:  Okay.  So let's go to page 89 of this exhibit.

THE COURT:  Ask Mr. Harrell to identify what these are.

MR. LYNCH:  Yeah, I'm sorry.

BY MR. LYNCH:

Q.     If what is Exhibit 497?

A.     This is a -- excuse me, this is a text chain between myself and Brendan Muha.

Q.     I'm sorry.  I was on a different page.  Okay.  So --

A.     Oh, I'm sorry.  Brendan Muha was the realtor at TTR.

Q.     All right.  What do you want to discuss about page 8 and 9 here?

A.     This is not a particularly -- we were lining up a visit for my wife to come down.  She had not seen or met with Doug, so we were scheduling this visit in December of 2018 to tour the property that's the subject of this litigation.  We also met him at his personal house.

Q.     Okay.  Tell me about the January meeting at the Ritz-Carlton?

A.     So after the -- after touring with Doug at his house, TTR had recommended -- we were going through a whole kind of process

with our kids and their school and where they were going to go in D.C., which is a very complicated subject, and, you know, where you live, and, you know, all these decisions about, you know, life and what's going to happen.

And TTR recommended if we were in town that we -- and we were interested in Doug that we let him know, maybe we could have a further conversation, so I reached out, I think and told TTR that we were going to be in town, we were staying at the Ritz-Carlton in McLean, and if Doug wanted to get together, that would be great. And I think I also said if Doug wants to bring his contract with him, you know, I would like to see that.

And so we had that meeting. That was on or about January 9th, I think, and it was a meeting with me, my wife, my two kids were there, Doug, and TTR, and we met to discuss Lee Highway, and we told him we were not interested in his personal house.

Q.    Okay. And tell me about the Great Falls property you looked at.

A.    Well, sorry, can I --

Q.    Yeah, no, I'm sorry. There's more on the meeting. Yep. Sorry.

A.    So when we met with Doug at that -- at that meeting at the Ritz-Carlton in McLean, Virginia, we -- you know, it was sort of a very friendly gathering. We had just come from Connecticut, and I was having a -- sort of a problem with my

house in Connecticut because it was being purchased by a relocation company as part of this whole move, and it turned out that a contractor who had done a little work at our house had not finished a permit, and I complained to Doug about it, and, you know, I was sort of saying, you know, it's just sort of such a hassle, and I expressed to him my concerns about buying, you know, a house, you know, that had any kind of issue like that, and, you know, I was asking him how he thinks about it in the construction industry, and he was explaining to me, you know, sort of all about his firm and sort of the way he thinks about things.

And, you know, we had a very specific discussion at that point about permits, and I was expressing my -- you know, my concern about permits and construction generally.  I don't know a lot about it.  And, you know, he was reassuring me that -- sort of the way, you know, an expert reassures someone who doesn't know about it, that, you know, look, this is just, you know, sort of the way it is and, you know, people deal with it all the time, and, you know, "I am, you know, a Class A contractor" -- that was a line he used a lot -- "and I always follow the permit laws, and, you know, it's really not a big concern, and you shouldn't sort of throw that in the mix of where your thought process is in terms of houses."

Q.    What did you want to mention about square footage, if anything, at this point?

**A.**    And at the same time my wife and I, we were -- I mean, these text messages, I mean, we don't need to go through them, but, you know, we were looking at a variety of houses, and, you know, my wife, more than me, I mean, I -- you know, I can't tell a square footage from anything, but she wanted a particular size house that was comparable to what we had in Connecticut because of furnishings and, you know, that kind of thing.  And so, you know, I was talking to Doug about Lee Highway Place, how big is it, and, you know, again, this is where the 6500-square foot main house began.

You know, he said he thought it was about 6500 square feet in the main house at that meeting.  You know, my wife and I -- you know, it was very hard to visualize when you tour because it's under construction and you can't really tell what's going on, that we requested floor plans reflecting the house, and, you know, there was no objection from TTR or Mr. Deluca for that.

**Q.**    Do you want to mention anything about the discussion of Mr. Deluca's company?

**A.**    I think I did.

MR. COUGHLIN:  Objection, leading, Your Honor.

THE WITNESS:  Sorry.

THE COURT:  Okay.  It's leading.  Rephrase it.

MR. LYNCH:  It's fine.  Sounds like we don't want to go further.

BY MR. LYNCH:

Q.    So tell me about the Great Falls property.

A.    So at some point, you know, again we kind of had narrowed down our choices between Doug's house and a house in Great Falls.  Those are two very different sort of scenarios in the D.C. area because of commute distance, where you go to school, all those kind of things, but we ended up pursuing the Great Falls property in February of 2019.

Q.    Okay.

A.    By "pursuing," we made an offer, it was accepted, that sort of thing.

Q.    Okay.  And then what happened with Great Falls ultimately?

A.    We had an inspection, home inspection.  There was -- you know, I guess -- my memory is kind of three major points.  One, the roof had a lot of damage.  We had the builder who built it out, and, you know, he was sort of throwing out numbers of what it would cost to fix.  It was a couple of hundred thousand dollars at the most; it was $50,000 at the least or something.

A lot of the appliances were out of date.  There was deferred maintenance, that sort of thing, and it was a really large house, much larger than we really needed.  And so the cost of kind of fixing all that just sort of swelled, and so we told them it was more than we could handle.  We didn't want to do it.

Q.    What kind of roof did Great Falls have?

A.     It was a slate roof.  I mean, I -- you know, it's sort of silly, but I sort of like the character of D.C. and, you know, this was more of a modern house, but they had, you know, a very fancy roof, and some of it had fallen off, as we found out -- I mean, it's a lovely house, but it had a slate roof, and I was very interested in that, and, you know, we'll get into that later.

Q.     Okay.  So let's look at Exhibit 505.

       MR. LYNCH:  I would like to admit 505.

       (Plaintiffs' Exhibit 505 admitted into the record.)

BY MR. LYNCH:

Q.     Again, this is a text chain.  The pages we're going to look at are the very first ones in this tab, and, Mr. Harrell, identify what this text chain is.

A.     This is a text chain between Doug Deluca and Brendan Muha at TTR.

Q.     Okay.  And describe briefly what's going on in the first page there, 6636.

A.     The -- I had -- you know, I had forgotten to mention one thing that I would like to go back to, if it's okay.

Q.     Go ahead.

A.     One of the difficulties with Doug's house for us -- the house that is the subject of this litigation, is that I discovered it's very difficult to finance an acquisition of a property that's kind of in flight.  What I mean by "in flight,"

that it's not finished.  The financial institutions don't like to do that because the collateral is more questionable.  They would rather write a construction loan.

So, you know, I talked to kind of, you know, the usual people I talked to, and they were like, you know, you have to wait until it's done and then you can advance it.  So I told Doug that.  He introduced me to a local bank, MainStreet Bank, who I think very highly of, and, you know, they were more comfortable in doing kind of a deal where you could get pre-approved and you could have a contract and then close when the house was finished, which most financial institutions I was talking to, anyway -- I mean, you know, maybe it was the people I was talking to, but they weren't that interested in.

This text chain reflects, I think, two things.  One, that Doug and Brendan are following up on my --

MR. COUGHLIN:  Objection, Your Honor.

THE WITNESS:  Sorry.

MR. COUGHLIN:  Sorry to interrupt.  This is a text chain between someone other than Mr. Harrell, and I don't think it constitutes party admission just because Mr. Deluca is on it, so I'm not sure why it's Mr. Harrell --

THE COURT:  It's his just going through the conversation that is the text and the subject matter of the -- and Muha is going to be a witness as well?

MR. LYNCH:  He will be a witness, yes, Your Honor.

THE COURT: All right. Overruled. I'm going to allow it.

THE WITNESS: So this is just them following up on kind of these two points. "Chris" is referred to, Chris Brockett. That's the MainStreet connection. And I was telling Doug and Brendan that, you know, I wanted a hard financial underwriting, so we submitted our financial documents.

BY MR. LYNCH:

Q.    Who is MainStreet? Did you cover that already?

A.    I thought it did.

Q.    Okay. Sorry.

A.    I'm a little nervous.

THE COURT: You did.

THE WITNESS: And then they were talking about getting floor plans through a company called HomeVisit, which TTR uses a lot, to, you know, draw floor plans for properties that are for sale. So those are -- they're just sort of following up on these points that are coming out of the January meeting.

BY MR. LYNCH:

Q.    Let's go to the next page of this exhibit, Bates label 6650, 505 exhibit.

A.    Right. So, you know, again we're requesting more information about Lee Highway. We had expressed interest to Deluca. I mean, he's very, kind of, passionate about his career and his job, and he's a very creative guy, and, you know, we had -- you know, like I said, we had -- I'm sort of repeating

myself -- we had a difficulty of how do we know what we're buying?  You know, it's under construction.  And so they began to send us some things.

This is a text message Deluca sent to Brendan sort of outlining the features and specs.  We don't need to read them all, but it's just sort of -- you know, he's sort of responding to kind of our request, and he's telling us, as he's told us before this point, that he has a one-year warranty and all the other warranties transfer.

Now, this obviously wasn't sent to us like this.  This was between Doug and Brendan, but this became something that was sent to us.

Q.    So let's go -- you've now moved on from Great Falls.  How did you end up selecting Mr. Deluca's property?

A.    So our kids -- you know, again, the school was sort of a driving force.  Our kids ended up going to a school in D.C. -- or we wanted them to go to a school in D.C. called St. Patrick's Episcopal Day School, which is in Foxhall, and so it limited kind of the universe of places we were going to live because, you know, we didn't want them commuting long distances in D.C. And so we were looking in D.C. and in sort of the surrounding Virginia area close in, which, you know, Doug's property is.

Again, we liked Doug at the time and his property, and we kind of narrowed it down, again, to two properties, one on Hoban Street in D.C., one being Doug's property, and in March, around

March 22nd -- I think it was March 22nd -- the -- there was a -- there was -- well, we toured Hoban, and we toured Doug's property at that time, and we ended up selecting Doug's property.

Q.    Okay.

A.    I mean, that's the short.

Q.    Let's go to Exhibit 1.

MR. LYNCH:  I would like to admit Exhibit 1.  This is not objected to.  This is the contract.

(Plaintiffs' Exhibit 1 admitted into the record.)

THE WITNESS:  Right.  This is the contract.  This is a contract with all of the exhibits from the beginning to the end.

MR. LYNCH:  We will refer to this as the sales contract as opposed to the post-closing contract which came at closing.

BY MR. LYNCH:

Q.    All right.  Who drafted this contract?

A.    I did not draft this contract.  This was drafted by the -- you know, Brendan Muha and TTR who were representing both parties in this transaction.  I did not draft it.

Q.    Okay.  What was the idea generally -- what was the idea about designer's responsibility under this document?

A.    Well, again, Doug had started this project where he was, you know, refurbishing kind of a historic home in Arlington. Prior to ever meeting me, he had plans, he said, and when we came in to the deal -- and one of the big selling points for us

was that he was excited about allowing us to, you know, select tile or faucets.  You know, I don't want to be in Federal Court talking about tile and faucets, but it was a major consideration in the deal that we were allowed to do that versus buying a house where that had already been done.  He was at a stage where he had not, you know, put any of that in, and he -- you know, he was very clear that we could select that and that he would charge us, you know, to do so.

And so we entered into a process where -- and if you look at the first addendum to this contract, which is on -- this doesn't have page numbers unfortunately but it's --

Q.    It has Bates.

A.    -- Harrell 14208.  You know, it lists kind of two sections of the contract.  Section 1 is -- it's not labeled Section 1.  It's Exhibit B, and it has a list on it, and the list is things that are -- what we always talk about as being in a base contract; that is, I'm paying money, this is stuff that's, you know, coming with the money I'm paying, and he's listing them out.  I think TTR helped Doug put this list together with our input.

And the second sort of piece of the contract is what we call the upgrades.  Again, this doesn't have page numbers but it's on Bates label 14212, and those are the -- in the original April 3rd contract that was ultimately signed, these here are them, so, you know, you can read them, what they are.  They're

sort of options, if you will, that Doug sold us.

Q.    Cover 14218 very quickly, please.

A.    Right.  So Brendan Muha is a agent for both, both parties.

Q.    Okay.  When was that signed?

A.    April -- well, it's signed by me on April 3rd and my wife on April 3rd and Doug on April 5th.

Q.    Okay.  And then just take us quickly through the amendments.

A.    I'm sorry?

Q.    The amendments.

A.    Sure.  So there were -- well, we're going to go through some of these in a little detail but --

        MR. LYNCH:  Do it later?

        THE COURT:  Yes, let's just do it one time.

        MR. LYNCH:  Fair enough.

        I'm sorry, Judge O'Grady.

        THE COURT:  Just do it one time thoroughly versus introducing and then going back --

        MR. LYNCH:  Thank you.

        THE COURT:  -- through it.

        MR. LYNCH:  Thank you.

        THE COURT:  Sure.

BY MR. LYNCH:

Q.    So, I mean, take us through beginning on 14242 -- I'm

sorry, the May addendum, which is --

A.    I thought we were going to go through them later.

Q.    He said do --

THE COURT:  Well, you can do it whenever you choose to do it.  I just don't want you to do it twice.

THE WITNESS:  Okay.

MR. COUGHLIN:  Your Honor, I would just ask counsel to ask a specific question that the witness would respond to rather than a -- what he --

THE COURT:  Well, it's a bench trial, and, you know, the rules normally get a little more lenient, but I don't mind transition statements that "Let's go talk about this now," and "Let's talk about that."  Those are fine.  So --

THE WITNESS:  Okay.  Sorry, Judge, I didn't hear.

BY MR. LYNCH:

Q.    Just what they are generally, 14225.

A.    14225, so this was a May addendum.  Doug was going to put a pool in, but, as we'll discuss, that didn't work out, and then there was another addendum and -- on June 18th at 14242.  It was removing the pool, and we'll go through that in a little bit more detail.  And then the final addendum on June 20th, which is the last addendum, so that's the contract.

Q.    All right.  So what happened during the time between offer and acceptance?

A.    Well, it's what I was saying, that, you know, we went

back and forth on customizations, understanding what the house was going to be like and putting it in this contract.

Q.    Okay.  What happened -- so the contract is executed.  What happened in May through June of 2019?

A.    May through June, I mean, you know, it was just near daily conversations between the parties.  That's why you have these enormous communication binders, you know, about any numbers of things.  You know, Doug would have ideas, "What if we did this?"  We would have ideas, "What if we did that?"  That sort of thing.  And, you know, Doug was very excited about the project.  He -- you know, he would -- we would hear from him almost every day.  It may not have been every day, you know, I haven't gone and looked, but it was very frequently we would hear from him; and he would update us on what was going on and kind of his sort of thoughts about, you know, how to make it better, better, better, better.

Q.    Okay.  In June, what did Mr. Deluca indicate was the teaming of completion?

A.    So in June the house -- so the original closing date was June 26th of 2019, and in June it became clear I think to Doug that he was not going to meet that date, and he wanted to close anyway in June, and this caused concern.  Again, my financial proposition, as I've explained, it was that we were buying a finished house, it's difficult to finance an in flight house.  He was financing all these upgrades with his construction

lender, I was not financing any of them, and he complained to me that it was driving up his costs because, you know, he was, you know, paying interest on the expenditures, and that it was unfair, and, you know, I had some sympathy for that, you know, I did.

So that's what happened.

Q.    So let's go to Exhibit 497.  This exhibit is not objected to at all.  497, page 35.  So just for pagination on this, there's a light-colored page, 8058, and then there's Bates.  The light-colored number is the page, page 35.

THE COURT:  What is it?

BY MR. LYNCH:

Q.    Yes.  Mr. Harrell, what is this document?

A.    I just want to make sure I don't mess this up.  This is a text message between Brendan Muha, my wife, and myself.

Q.    Okay.  So, this is discussing the idea of --

THE COURT:  What is being discussed here, Mr. Harrell?

THE WITNESS:  Sure.  Sorry.  So the -- again, the financial proposition, in our view, was a completed house.  Our bank was not, you know, told that they would be financing an incomplete house, and so there began to be conversations around, is there a way to satisfy kind of Doug's problem that he's financing construction upgrades longer than he anticipated with our problem which is we can't close on a house prior to, you know, completion, which is sort of what we expected.

And so we -- you know, we -- there were two kind of things that were suggested.  One is I offered to kick in, I think, $10,000 to cover financing charges.  I don't know what his financing charges were.  I said there's a limit to what I could do.  And the other thing, which is being discussed here, is an escrow so that the bank had collateral so if there were problems, you know, there was a path to fix those problems, and maybe the bank would be more comparable with that because they had a great relationship with Doug.

Now, at this particular time the kitchen wasn't finished, you know, there was a lot more finish, and Doug was kind of on a timeline where construction was going on, and so as construction went on, obviously the amount of money it takes, what we thought, to finish would go down, you know, the closer you got to where you were.

And we're living in Connecticut at the time.  You know, I toured the property, I don't know, three times, four times during this period.  I don't really remember exactly -- the exact number, but I wasn't there every day.  My wife was not there at all.  And so we were very anxious about, you know, how do we determine the amount that's left to be done for the house and how do we value that and how do we assure ourselves that, you know, there's collateral for the bank and security for us.

BY MR. LYNCH:

Q.    Okay.  How did you feel about closing over the unfinished

work?

A.    Well, again, I didn't want to do it, but I was -- you know, I also had sympathy for Doug's problem, and you know, I mean, it's sort of my profession to -- you know, I'm a transactional lawyer, my profession is to solve those problems, and so that's what we were trying to do.

MR. LYNCH:  Okay.  Let's go to Exhibit 511, please.  And in 511 we want to look at pages 68 to 69.

I would like to admit this 511.

(Plaintiffs' Exhibit 511 admitted into the record.)

BY MR. LYNCH:

Q.    Please tell us what it is, Mr. Harrell.

A.    I'm sorry, Tom, I don't appear to have 68 or 69.  Oh, I do have it.  They're out of order.

Q.    Okay.  68 to 69.  All right.  Well, we have a version on the screen.

A.    So this is a text message between -- it is a text message between Brendan with TTR and Dawn and myself.

Q.    Are you able to read the screen?

A.    Yeah.  I don't know -- I don't need to.  I can --

Q.    Okay.

A.    This is just documenting what I was saying, and communicating -- we were communicating that, you know, I really needed to -- in order to kind of do this, I needed to know what was left to be done exactly at closing and how much it was going

to cost and if there's an escrow that needed to be sufficient to cover whatever that is.

And I was also concerned about, you know, all of the complexities of a construction project. Do I need insurance if, you know, the construction burns down the house? I didn't want that exposure, so, you know, I was thinking through kind of those kinds of things and to -- you know, could we close at a certain point and retain sufficient cash to finish the house and also meet kind of Doug's problem.

And, you know, we were very -- we were very anxious about it. I mean, we really were. The bank was, you know, also -- I mean -- well, they're not here, but -- okay.

Q.    All right. Do you have any -- did you have anything more to say about the message beginning with, "Doug just sent me this," or is that it?

THE COURT:  Where are you, Mr. Lynch?

MR. LYNCH:  I'm on page 70 of Exhibit 511.

THE WITNESS:  Well, that's -- yeah, so there is a different text message earlier on page 7 of 511.

BY MR. LYNCH:

Q.    Page 70, in the light numbers in the top, says, "Doug just sent me this." Not in your book?

A.    No, it is, I'm just -- I just would like to say I don't -- I don't know the date precisely this is because we don't have it, but it's around this time. I remember it. So

this is a list Doug is sending saying, you know, what he's saying about, you know, this problem we're having about identifying kind of the work that's left to be completed.

Now, in the answer to the complaint, he says that he was the one who identified the work left to be completed, so, you know, we don't need to probably go through it, but, you know, he was communicating with us what's left, you know, closets, the owner suite tile, you know, which everyone talks about and which we've talked about a lot about, you know, he -- in early June -- well, we're going to go through tile later so we'll save that.

But the -- that's what was going on was, you know, what's left to be done, how much is it going to cost, and how do we finish?

Q.    Okay.  What did these discussions about how much is left -- to finish that story, what ended up happening.

A.    So we wound up with a $75,000 escrow, and when we discussed it with the bank, they rejected it because the house was not, in their view, far enough along.

Q.    Okay.  So let's look at Exhibit 505, and the page in the bottom right corner is 6826.

A.    I'm sorry.  Could you say that one more time?

Q.    6826 in 505.

A.    So this is, again, the text message between TTR and -- I'm sorry, between Brendan Muha and Doug Deluca.

Q.    Can I just for the record -- so there's a from and

there's Brendan Muha, and then do you recognize the phone number there that's AC KID?

A.      Yeah.  I looked yesterday to confirm that was the number I had for Doug.

Q.      Okay.  So, I'm sorry.  On this page, what is being discussed?

A.      Well, you know, Doug was fairly upset about this, and he started telling us that we were going to -- we were trying to back out of the deal, and we had a call with him that was -- you know, I kind of -- I had a view that he was just really stressed out.  I mean, he's more of an artist than anything, and you know, he was expressing emotion about the uncertainty of, you know, a project of this size and what it may mean to him, and he was saying, you know, he was very concerned we might back out of the deal, and that's what he was saying, and you know, this reflects it.

        You know, we had no intention of backing out of the deal, and so from here on out, the process was to try to, you know, assure him that I was that I was going to live by my contractual obligations but that I -- you know, I needed a resolution of this sort of dual problem of, you know, closing over -- you know, at a certain point versus closing, you know, where you can't -- you know, it's just too much -- too complicated for anybody to figure out what needs to be done and whether we were setting the escrow right or wrong, and that sort of thing.

Q.    Okay.  Let's go back to Exhibit 497, and it's going to be page 37.

A.    497.  Okay.  Oops, I'm on the wrong page.  Okay.

Q.    And please orient people to who's pink, who's blue when we're looking at this text.

And for the record, the pink one says, "I think that makes perfect sense," on this page.  And then the blue, "I'm willing to kick in Doug some for financing cost."

A.    Yeah, I just -- I know the blue is me and the pink is Brendan.  I just can't recall whether my wife's also on this chain.  I just -- I don't see her, but maybe that's something we could ascertain.  I just --

Q.    On the top left there's only one phone number listed there.

A.    Okay.  So it's just me and Brendan.  Yeah, so we're -- you know, this is shortly thereafter and Doug is on this timeline of construction where the unfinished work, you know, at least as we understood it, was, you know, shrinking, and so the difficulty we were having was shrinking, and, you know, he wanted to set a firm date.  He was, I think concerned for some reason that we were going to back out and didn't maybe believe us, but he was also, I think, under financial pressure or, if not financial pressure, just very annoyed about, you know, financing kind of our customizations, which were part of the deal from April 3rd.  I mean that's not a, you know, a new thing

or anything, but I -- you know, again I was sympathetic, so this is what we were doing, so this is, you know, the discussion -- this is an example -- there were a lot more discussions, but this is an example of them.

Q.     And then we -- let's look at Exhibit 1.

A.     Exhibit 1.

Q.     And this is the contract.  And we want to go to Bates number ending 256.

A.     Okay.

Q.     Okay.  So tell us about this new addendum at this time.

A.     So the major change -- I mean, I -- I'm not going to -- I'm not going to go through all the -- the major change was the elimination of the pool, which, you know, reduced the cost because that was a significant expensive item that came out so it was very lumpy, and so we're replacing kind of the -- again, the Exhibit B in the contract that I referenced in kind of the orientation of the contract earlier with this Exhibit B, and then we're reflecting kind of our conversations about what was left to be done or what we expected to be left to be done on July 3rd, which is a new -- and I think there's a little bit of complexity when July 3rd was selected, but it was selected.

The -- and so there "First floor half bath," and so $12,000 is his estimate of what that cost.  That number came from Doug.

"Front Gates deposit is paid for - to be installed."

The "master bath tile, deposit is paid for."

And we're going to discuss what that language means in a minute, but Evan's -- my son Evan's, who was five at the time, this is his bathroom, you know, and then, you know, hanging mirrors or selecting fixtures to be completed, touch-up paint.

And then if you flip to the next page, there are two items there.  The first one is -- so one of the conditions that was driving all of this is we wanted -- we had to be able to live in the house because we were moving to D.C., and we had to be able to live in it, and so the fixtures had not yet been installed in all the bathrooms, and, you know, we had said the house has to be livable, the bank had said the house has to be livable.  And so to solve that problem Doug ordered sort of temporary fixtures from -- I mean, that may not be the correct way to describe them, but that's the intent of them, to sort of fill the gaps so that the bathrooms were working when we showed up.  And TTR paid for those fixtures out of -- you know, by cutting their commission because they wanted the deal done, and so Doug ended up installing those, and, you know, but we had selected different fixtures, you know, and again, I don't really want to be in Federal Court talking about fixtures, but, you know, we agreed to put the ones we wanted in, and so that's what that is about.  And that's -- that never happened.

But the -- and then the second one is the punch list that would be agreed upon on walk-through.  And the walk-through,

we'll talk about later, was on July 2nd.

Q.    Okay.  So let's go to Exhibit 505 --

THE COURT:  Why don't we take a break now.  Let's take 15 minutes, and we'll come back and we'll continue, and then we'll go to 1:00 and break for lunch at 1, all right?

MR. LYNCH:  All right.

THE COURT:  We're in recess.

(Thereupon, a break was had from 11:42 a.m. until 12:02 p.m.)

THE COURT:  All right.  Mr. Harrell, please come back to the stand, sir.

Let's talk for a second about how to handle exhibits and their admission.  I indicated I would give you a chance to look at them while we're going through Mr. Lynch's commenting.  There's no objection to this; there's no objection to that.  I'll give you a little time to make any objections you want to.  You made the one objection earlier, Mr. Coughlin, but we need to -- you know, by lunch time, all exhibits that have been sponsored so far, if you have objections, let me know or they'll be admitted, but we need to do that somewhat contemporaneously so we don't lose sight of them.  Okay.

All right.  Thanks.  Go ahead, Mr. Lynch.

MR. LYNCH:  Thank you.  And, Your Honor, this is a housekeeping.  Should I wait for a ruling when it's a new one?  Should I do that?

THE COURT:  No, you're moving -- you remember to move for the admission of the exhibit, and I'll give them a little time to object.  I mean, like, you know, the contract and that kind of stuff, there's obviously not going to be any objections, but some of the e-mails which you've now condensed, I'm going to give them a little time to look at them, okay?

MR. LYNCH:  Thank you, Your Honor.

THE COURT:  Okay.

BY MR. LYNCH:

Q.    Where we left off, we were on -- about to go to Exhibit 505 page 6832, and when you get there, Mr. Harrell, what is this documenting and who's speaking?

A.    This is, again, a text chain with Doug Deluca and Brendan Muha.  The first part my wife is having some health problems at this time.  Doug I think was very frustrated with us.  I don't think he believed us that we wanted to close for some reason, and these were the conversations that he was having with Brendan Muha about that.  He wanted to make sure that, you know, the bank didn't think poorly of him, and he has a relationship with them, as I understand it, and Brendan was just communicating that, you know, we're going to close and the house is not that far from finished, which was our understanding at the time.

Q.    I would like to flip the page to 6833.  Look at the message on the bottom.  Says, "I'm done, Branden [sic]."

Who's sending that message?

**A.**    That's Mr. Deluca.

**Q.**    Let's go to same exhibit, page 6839.

THE COURT:  Well, what did you -- you received this "I'm done, Branden [sic]?"

THE WITNESS:  No, sir, we were unaware that -- we knew that Doug was very upset, but we were unaware that he had communicated this.

THE COURT:  Okay.  All right.

THE WITNESS:  I didn't --

BY MR. LYNCH:

**Q.**    -- feedback were you getting on your end to this effect?

**A.**    I'm sorry, I didn't hear you.

**Q.**    What feedback through Brendan were you getting on your end about Doug at this time?

**A.**    I believe he told us that Doug was disheartened.  I thought -- again, I thought it was just a stressful time for Doug, lots going on.  I kept reiterating that we weren't going to walk away, that we just needed to figure out how to, you know, if -- the house was close, so there was no reason to become concerned about us.  I had a preauthorization from a financial institution.  I had the cash that I had moved into escrow.  I had other cash sitting to fund 30 percent of the purchase price, et cetera, which was all true, and so I -- my reaction was that, you know, it was -- he was upset about, you know, kind of what was going on, but I thought his insistence on

closing was a little unreasonable, but I was also sympathetic to his perspective about financing our upgrades.

Q.    Okay.  Staying in the same exhibit, let's go to page 6839, the very next page.

A.    6839.  Okay.

Q.    In particular, I would like you to look at that message on the top and explain what's happening there.

A.    Well, again, this is -- you know, he had admitted in his answer that the list came from him in paragraph 32 and 85, I think, but you know, he's coming up with lists of what we were going to have left at closing.  Again, I didn't see this text message until --

MR. COUGHLIN:  Objection, Your Honor, the witness just acknowledged he didn't see this text.  I'm not sure why he's testifying about a communication between Mr. Muha and Mr. Deluca.

THE COURT:  Sustained.

MR. LYNCH:  It's a party admission, Your Honor.  The green is Mr. Deluca.  It's a party admission.

THE COURT:  Well, the green is Mr. Deluca?

MR. LYNCH:  Yes.

THE COURT:  Okay.  All right.  I reverse myself.  What does it mean to Mr. Harrell?  Is that the question?  I mean --

MR. LYNCH:  Well, yeah, I mean this is -- again, Mr. Muha is a dual agent, all right?  So --

THE COURT:  All right.  I'll admit the exhibit.  Go ahead.

MR. LYNCH:  Okay.

(Plaintiffs' Exhibit 505 admitted into the record.)

BY MR. LYNCH:

Q.    So, again, looking at the message from Mr. Deluca, on 6839 at the top, you had been discussing it.  What do you make of the line, what were you hearing from Mr. Muha or Doug at the time about this line that says, "Remove all escrow"?

A.    That was never -- well, the only way to remove all escrow was to complete the house, that was -- at least that was my perspective.

Q.    Okay.  We've got one more page in here, and that's 6859.

A.    The green bubble at the top?

Q.    Yes, sir.

A.    So the -- I can't recall if it was the bank or if it was me, but we were requesting the dates for, you know, when things were arriving, you know, because again the -- this sort of -- I mean, I think of it as like a tail on a transaction where there's a critical path with, you know, items arriving, construction being finished and it's sort of whittling down and so we were asking, "When is all this going to happen?"

So here's -- this isn't everything, but he throws out July 15th for the gate, the owner suite floor on August 1st, and, you know, the powder room and punch -- I messed that up -- the powder room and porch permit on July 15th was estimated, and he was saying at this time, August 2nd -- August 7th completion.

Q.     Okay.

A.     And this is while we're negotiating, I think, the -- yeah it's while we're negotiating the last addendum, the June 20th addendum, which became the last part of the contract that we discussed earlier.

Q.     Okay.  So at this time in June, you have loads of text messages.  What is the end arrival -- what points are important at the end of this?

A.     The from the -- I'm sorry, from the text?

Q.     To what extent was the livability discussed at this time, the livability of the house?

A.     Well, again, the -- we -- you know, our sort of the concept was the house had to be livable, you know, you're stalling fixtures on a temporary basis so we could move in. That was important for a number of reasons.  You know, we discussed when we could move in and he was going to do some -- you know, stain some hardwood floors and things that, you know, you wouldn't want to be there with and we didn't want to live in construction, but we needed to know we had a place to live with his desire to, you know, to close.  So we were balancing those two issues and trying to solve them.

Q.     Okay.  Is there anything further you would like to say about the allegation in the complaint that you were deceived about the status of work left to be done?

MR. COUGHLIN:  Objection, Your Honor.  Do we have a

specific question?  The question is very --

THE COURT:  Overruled.  It's a question.

THE WITNESS:  Well, I mean, we're going to discuss throughout this trial that we didn't know that there was a bunch of work that was done without any permit, that we didn't know that inspections hadn't occurred, that we didn't know the materials that he told us had been ordered had never been ordered, and, you know, so as we're trying to balance this -- I mean, our perspective on this is that what he's telling us is not true, that there's much more that is unfinished than we fully understood, and certainly with respect to the materials, there were very specific definitive statements about, you know, things that were arriving that never arrived.

And, you know, the dialogue from there -- and this was in summary judgment motions -- is, you know, who's fault is that, but that's our perspective on it, you know, certainly looking back at this time period.

MR. LYNCH:  I would like to admit trial Exhibit 1029.

THE COURT:  Why don't you identify it and then move to admit it so Mr. Harrell knows what you're talking about.

MR. LYNCH:  Okay.  Sure.  So --

THE WITNESS:  Sorry, just give me half a second.  Moving as fast as I can.

MR. LYNCH:  It's not objected to.

THE WITNESS:  Okay.

THE COURT:  Well --

MR. LYNCH:  Fair enough, I'm sorry, Your Honor.

THE COURT:  Okay.  Here's Mr. Grumpy Judge.  Just go to 1009.  Give me a chance to look at it.  Give counsel a chance to look at it.  You go, "Mr. Harrell, let me show you Exhibit 1009.  It's a letter from yourself to Ms. Ferguson."

Is that it?  Is that what we're looking at?

THE WITNESS:  No, sir.

BY MR. LYNCH:

Q.    Yeah.  So what is this document, Mr. Harrell?

A.    Oh, I flipped to the wrong document.  I'm sorry.

Q.    This is an e-mail from Sandy to Angelo to Michael Jackie dated Thursday, June 20th.

THE COURT:  What's the exhibit number?

MR. LYNCH:  Sorry, 1029.

THE COURT:  '29.  Okay.

THE WITNESS:  Okay, I was at the right one.

THE COURT:  All right.

BY MR. LYNCH:

Q.    So what is this document, Mr. Harrell?

A.    So -- and this is a reference in the opening statements. The bank, you know, had been sort of apprised of what was going on.  They'd seen the -- you know, we hadn't spoken about the escrow, but there's an escrow, you know, and I had been discussing my understanding of where things were, and they sent

the appraiser in this case back out, and the appraiser met with Doug Deluca, as I understand it, and, you know, they requested the appraiser get a certificate of completion, which is beyond my expertise in terms of whether that's a term of art, but I believe -- my understanding of it was that it was to satisfy them that the house was far enough along to be sufficient collateral for what they were doing.

Q.    What did the bank inspection mean to you and your decision-making?

A.    Well, again we had all these conversations about the critical path and, you know, where we are on that in terms of how much construction is left to do, and, you know, it was -- you know, we were -- I mean, Doug was anxious, I was really anxious.  I really was -- the bank sending a third party out to walk-around and make an independent assessment for the bank, it made a big difference to me, as particularly an appraiser who looks into -- you know, I don't know what all they look into, but they're, you know, evaluating the collateral, and if it's not good collateral, then, you know, we weren't going to close, and if it is good collateral, then, you know, whatever problem that may exist was probably solvable.

That was my perspective, and it meant a heck of a lot to me.

Q.    Okay.  All right.  So what happened on July 2nd?

A.    So on July -- we alluded to this, but on July 2nd we did

a walk-through, and I'm getting a little ahead of myself in terms of where we are in the testimony, but there was a punch list that had a lot of blanks on it, and it had some things that were filled in, so some things that we knew were typed up and -- you know, on a computer and some things had, like -- so it went -- well, I mean, we have it, but the -- we walked around with Doug and Brendan, and we tried to kind of capture what was left to be done based on our walking around.

Q.    Okay.  I'd like to show you Exhibit 422.  What is this?

A.    I'm sorry, Doug, I'm trying to get there.  Whoops, wrong one.

MR. LYNCH:  Before we start, I forgot to say on the last exhibit with the -- about the inspection, I'd like to admit 1029.

THE COURT:  Okay.

MR. BURCHER:  No objection, Your Honor.

THE COURT:  All right.  It's received.

(Plaintiffs' Exhibit 1029 admitted into the record.)

THE WITNESS:  This is just, you know, the federal mandated closing statement, the sale of the house.  We paid -- I don't want to misstate the number.

THE COURT:  It speaks for itself.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Questions about the document?

MR. LYNCH:  No, Your Honor.

THE COURT:  Okay.

BY MR. LYNCH:

Q.     What else happened on July 3rd?

A.     We entered into the Post Closing Construction Contract.

Q.     Okay.  I spoke too soon.  On 422, tell us about the escrow amount briefly.

A.     Yeah, so the -- based on where we were on the critical path, we believed that the -- you know, the biggest piece of remaining construction on the sales contract was the powder room which was not finished -- it was not started, and some other work that we identified.  We had had -- Mr. Deluca and, again, I think it's an admitted fact, but that Mr. Deluca identified all the materials that were on order that were not on-site and whether they were paid for, and he identified a few that were not paid for, he said deposit only or something, and we arrived at a number of $20,000 for that, which was more than -- it was not a lot more, but it was more than, you know, he was saying was left to be done, excluding those materials that he paid for that are on the order.

        MR. LYNCH:  I'd like to move to admit Exhibit 422.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No objection, Your Honor.

        THE COURT:  It's received.

        (Plaintiffs' Exhibit 422 admitted into the record.)

BY MR. LYNCH:

Q.     All right.  Let's talk about the Post Closing

Construction Agreement.  I'd like to show you Exhibit 2.

A.      Okay.

Q.      The title of this document is "Post Closing Construction Agreement."  What is this document?

A.      So this document is just a very simple agreement that reflects that Doug had been paid in full except for the escrow for, you know, the work described in the sales contract, and that he also agreed to do some incomplete -- I'm sorry, some new work that we had commissioned to do.

That was -- so the incomplete work is defined in the recitals, you know, "Contractor has receive payment pursuant to the Purchase and Sale Agreement for work that has not been performed and for goods and equipment that have not been acquired or installed (hereinafter, the 'Incomplete Work'."

And that was reflecting kind of our, you know, understanding that was defined broadly in case we missed anything.  And then the new work was this porch extension, which we'll talk about later, but it was $35,000.  That was originally in one of the earlier addendums to the contract, but, again, because the bank did not want to finance construction, you know, as I understood it, we pulled it out and we said we'll just do that separately after closing.  So that's the new work.

So there are two pieces, the incomplete work and the new work.

Q.      Okay.  How is the idea that you were moving down to D.C.

reflected in this contract?

**A.**    Well, again, you know, the dates that were selected for the completion of the incomplete work is August 1st, 2019, which was, you know, before we were moving down, Doug had told us in June that, you know, he thought he could finish in July, and so we picked August 1st as kind of a cushion.

The 15th, that was the date he gave me for the porch extension, which is the new work.  The major point is, you know, we needed to move in.  Our kids were going to St. Patrick's, we were moving from Connecticut, et cetera.

**Q.**    Could you walk us through the point of Clause 4.12?

**A.**    Oh, 4.12?  Yeah.  So, the -- in order to do that successfully, you know, you need to accept the premise that the term "work" is defined to include incomplete work and new work, which is in Article 3 of the contract, which defines incomplete work and new work as "the work."

And then when you flip to -- and that term is use other places, but when you flip to the warranty in 4.12, you know, he warranted that "all Work will be in accordance with the scope of Work and will not be defective," and then it has a term, and then it has, you know, some other provisions, you know, about what happens if this or that happens and what his liability is for correcting rejected work that's removed or replaced, including paying all direct, indirect, consequential costs of such removal and replacement, including fees, charges of

engineers, attorneys and professionals, will be paid by Contractor.

This was --

THE COURT:  You need to slow down --

THE WITNESS:  Oh, I'm sorry.

THE COURT:  -- as you're reading through that so we can get it.

THE WITNESS:  I apologize.

THE COURT:  Okay.  Did you get that, Scott?  Were you able to --

THE COURT REPORTER:  Yes.

THE COURT:  Okay.  Thank you.

THE COURT REPORTER:  Thank you.

THE WITNESS:  I won't do it again.

BY MR. LYNCH:

Q.    Let's go to the last page of Exhibit 2 --

A.    I wasn't -- do you mind if I just --

Q.    Okay.  Yeah, yeah.  Finish, yeah.

A.    So the point of this, this warranty was to capture work that was incomplete on the sales contract that was going to occur after closing, including the new work, so work that was unfinished work that was going to occur after closing that this would -- this warranty was supposed to capture.

Q.    And then turning to the last page of Exhibit 2, this is dated July the 2nd of 2019.  Tell me what this document is.

A.      You're talking about 14279?

Q.      Yes, sir, Bates label 14279.

A.      So this -- all along Doug had told me that he had a standard warranty that he gave that covered all defects, and we discussed what that meant at various points.  And shortly before, he had told me his real estate attorney was not around or out of town, but that, you know, he would get the document and deliver it to me, and -- you know, but I wanted it in writing that I had this warranty, and this warranty was like a wraparound warranty, not just for work that was going to occur after closing, it was for all the work he had done at the property.

And here, you know, this just recites our understanding of our agreement with respect to that particular item, and it was signed, you know, on July -- I don't think it was signed on July 2nd.  It was dated on July 2nd, but, anyway, it doesn't matter.

Q.      What -- if you notice, on Bates Label 14278 at the top there's a DigiSign number that ends in 79973, and then if you look at Bates 14279, you see the same number.  What significance does that have?

A.      Well, this is just part of the package that, you know, was signed together with the Post Closing Construction Agreement at the same time, reflecting, you know, our agreement.

THE COURT:  The warranty that's in the exhibit, the Post

Closing Construction Agreement, was meant to synchronize his separate warranty to you that probably was signed the same date? Is that -- what's the significance of the two different warranties to you?

THE WITNESS:  Sure.  Well, had we received his -- you know, he said he had a standard warranty that he gave with all of his home sales, but we didn't receive that.  And also, we had working ongoing.  I wanted to make sure that the work ongoing was all warranted, and so the ongoing work -- I hope I'm answering your question --

THE COURT:  The warranty in the Post Closing Construction Agreement specifically addresses the work that hadn't been done as well as the general warranty for the work that had already been done?  Is that what you are saying?

THE WITNESS:  No, I don't think 4.12 addresses -- my own view is 4.12 does not address work that was completed prior to closing.

THE COURT:  Okay.

THE WITNESS:  It only addresses work that was not completed prior to closing.  And the second document at the end was meant to be the wraparound warranty that addressed all of the work, including work that was completed prior to closing, because I wanted assurance that I had a warranty for everything.

THE COURT:  Okay. All right.  Thank you.  Go ahead.

BY MR. LYNCH:

Q.    Okay.  So I want to talk about the exhibits to the Post Closing Construction Agreement, a disputed topic.

So let's go to Clause 1.1 and tell us what Exhibit A to this contract was?

A.    Exhibit A.  I'm sorry.  Did you ask me to go to an exhibit?

Q.    Yeah, we're still in Exhibit 2.  Go to Clause 1.1.

A.    Okay.  Exhibit A was supposed to be the sales agreement and all of its -- you know, as it sits in Exhibit 1 in this document -- or trial Exhibit 1.  I mean, it was the whole thing. The purpose of this agreement was to make sure that all work described in the sales agreement he had an obligation to complete because he had been paid in full except for the $20,000 escrow.

Q.    Okay.  And what was Exhibit B to this document that's also referenced in 1.1?

A.    Was a punch list, and we didn't look at the punch list, but we have them here.

Q.    Okay.  You can look -- let's look at -- well, let's just finish now.  We can look at some of the -- Okay.  So, all right, moving -- we have Exhibit A, we have Exhibit B --

THE COURT:  Where is the punch list?  What exhibit is that?

MR. LYNCH:  Yeah, so let's do it.  That's Exhibit 1022.

THE WITNESS:  Right, this is -- oh, sorry.  There wasn't a

question.  I forgot.

THE COURT:  Go ahead.  That's the punch list?

THE WITNESS:  Yes, sir.  This -- if you recall my testimony, we walked around with some blanks, so if you flip this open, you'll start seeing, you know, blanks for -- we're like, okay, we're going to write down, and, you know, we just -- Doug was there and we agree.  I have some critical items up front, home warranty, which we discussed a little because I was saying, "I need the warranty, I need the warranty"; square footage, which we'll discuss; utilities, which, you know, just transferring utilities.

And evidence of insurance, I was very concerned about, you know, I was uninsured and the house would burn down and then I was really up a creek, so that was kind of what that was about.

But this is a version we had in our hands.  I believe this is the version we had in our hands at the walk-through with the blanks, and we're walking around, meeting, talking about this.

MR. LYNCH:  So for the record, I would like to admit Exhibit 2, which is the Post Closing Construction Agreement.

THE COURT:  Any objections to 2?

MR. COUGHLIN:  No, Your Honor.

(Plaintiffs' Exhibit 2 admitted into the record.)

MR. LYNCH:  And I would like Exhibit 1 introduced -- admitted, I'm sorry, Exhibit 1022.

THE COURT:  All right.  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  All right.  That's admitted.

(Plaintiffs' Exhibit 1022 admitted into the record.)

MR. LYNCH:  So there's one more version of the punch list I would like to show.  That is trial Exhibit 495.

BY MR. LYNCH:

Q.    So what is this document?

A.    This is attached to a note that I -- this was an attachment to a note I sent at least Doug Deluca on the date indicated, and --

THE COURT:  July 7th?

THE WITNESS:  Yes, yes, sir.  On July 7th.  And so the closing had happened on July 3rd.  The walk-through had happened on July 2nd, and I typed up what I thought the results of our walk-around was.  I deleted the critical items because we had discussed those and we will discuss those later more, but they had been cleared.

And then, you know, I didn't get rid of all the blanks, I guess, but this was what I thought was our sort of result of our walking around.  And so I typed it up and I sent it to him, and I think I said, "Let me know if you disagree or anything," and I never heard back, but this is my view of what the agreement of the parties was on July 2nd.

THE COURT:  Okay.  Some are in red and some are in black. Is there any significance to that?  Are those the ones that were

filled in or --

THE WITNESS:  The red -- we -- I believe that they're all safety related, and then we were sort of pointing out that there were a few safety-related issues that -- you know, like we have a dog and there was a gap in the fence and we didn't want the dog running in the street or stuff like that, so we were just highlighting it, emphasizing them as safety issues.  I believe that's all the red.  I haven't gone -- I think they all say safety.

THE COURT:  You're right.

THE WITNESS:  Okay.

BY MR. LYNCH:

Q.    All right.  So we haven't covered Exhibit C yet to the Post-closing Construction Contract.  Let's go back to exhibit --

THE COURT:  Any objection to 495?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  All right.  It's received.

(Plaintiffs' Exhibit 495 admitted into the record.)

BY MR. LYNCH:

Q.    Let's go to Exhibit 2 again, please.  When you get in we want to look at Clause 2.1 and explain what Exhibit C is.

A.    Well, 2.1 is we -- you know, I like to watch football outside under a screened porch and there wasn't enough room to do it, so, I mean, I asked Doug if he could just extend the porch so I could put a couch, put a TV out there, and watch

football.  I mean, that's what this porch extension was all about.  And Exhibit C was he had drawn that -- it subsequently became reflected in other documents, but he had drawn kind of a sketch of that with a price on it of $35,000, and, you know, that was my understanding of what Exhibit C was, and we have that document.

Q.      That document, let's go to trial Exhibit 990.

        Okay.  So we have a supplement.  This one is missing. But in the pocket part, there is this little supplement. (Indicating.)

        And if you go to tab 10, you can see Exhibit 990.

A.      Right, so this was a drawing, as I recall, that Doug did as part of the sales contract when we had this porch extension in the sales contract where he describes what it was and he drew a little thing.  I mean, it's not a very detailed drawing, but he said he had plans -- I mean, not physical plans but he had -- what's the word -- he had a vision, I guess, you might say, of what it would look like, and he has, you know, $32,000 without the thing on the top of the roof -- I'm going to mispronounce it -- the copula -- copula -- where 35,000 with the copula, and, you know, there's blowups of that on the next couple of pages, but I had told Brendan, you know, we need to just sort of put that document in as Exhibit C, which was, you know, the intention of the parties with respect to what -- you know, the new work under the Post Closing Construction Agreement was where

there's, you know, i.e., the porch extension.

THE COURT:  Okay.

BY MR. LYNCH:

Q.    Okay.  I'd like to show you a text message regarding Exhibit C.  This one is not in the book.  Yeah.  Oh, I'm sorry.

MR. LYNCH:  I would like to admit trial Exhibit 990.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 990 admitted into the record.)

BY MR. LYNCH:

Q.    Let's do this one.  The next exhibit is trial Exhibit 497, page 43.  And what is this document when you get there, Mr. Harrell?

A.    I'm ready whenever.

Q.    I'm sorry?

A.    Page 43 of 497?

Q.    Yes.

A.    This is, you know, the negotiations -- this is on the 1t of July.  This is a message Brendan Muha sent, I believe, just to me.  And he's saying that -- you know, this is what I was saying -- that he's waiting to hear back from his real estate attorney on signing it, you know.  He had purchased insurance, which we'll discuss later, and that, you know, the -- this is sort of what I was talking about, that I had concerns about

where the warranty was, and he was saying his attorney would give it to me, and then he said, "But, you know, look, if it's important to you, I'll sign whatever you want," and that's what happened.

Q.    Okay.  Let's look at trial Exhibit 6.  This is an e-mail.  It's an e-mail dated June 30th from John Harrell to Brendan Muha and Dawn Harrell.  What is this document, Mr. Harrell?  What's being discussed here?

A.    Again, these are the -- I had the critical items on the July 2nd version of the punch list with the blanks.  I'm talking about those, I'm talking about the warranty, and then I give instructions for what we had discussed being exhibits to the Post Closing Construction Agreement.  It's a contract with all three exhibits.  Exhibit A would be complete copy of the final contract.  Exhibit B would be the agreed punch list following the walk-through.  Exhibit C would be a description of the work to be performed on the $32,000 porch.  I need something from Doug on Exhibit C, which, you know, again, my opinion is -- based on my conversations is that the document we showed you was that document.

Q.    What's being discussed in paragraph 4 there?

A.    Yeah.  So, the other thing, you know, I'm -- I may be a little melodramatic about the insurance of the property, but I was very concerned about it.  I don't -- I'm not knowledgeable about construction, and I wanted proof that there was insurance

in my hands before I closed.

MR. LYNCH:  I'd like to admit Exhibit 6, please.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 6 admitted into the record.)

BY MR. LYNCH:

Q.    All right.  So we're talking about the warranty.  Did you ever make warranty claims to Mr. Deluca?  And let's show a document before you answer that.  I'd like to go to trial Exhibit 1019.

And I would like to apologize for the numerosity in these documents, but there are a lot of pictures, Your Honor.

THE WITNESS:  We're kind of -- I'm sorry.  Do you want me to answer the question asked?

BY MR. LYNCH:

Q.    2019 is an e-mail from Mr. Deluca to Mr. Harrell dated August 27th, 2019.  What would you like to say about this document?

A.    Well, I'm -- I'm so linear.  I'm troubled by the lack of -- you know, we're skipping out of chronology, which is fine, but I'm just grabbing my hair on that.

This is after kind of some -- a bunch of things happened, and we're going to discuss that.  We paused this construction and had third parties come inspect it, and we provided those

inspections to Mr. Deluca as we received them, and this is him saying, "I've gotten your lists," and, I mean, he kept referring to them as punch lists, but, you know, we can debate what the right term is.  We didn't view it as a punch list.  It was far more major than that.  And, you know, he had our list and said he was working on it.

MR. LYNCH:  Okay.  I would like to admit trial Exhibit 1019.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 1019 admitted into the record.)

BY MR. LYNCH:

Q.    I would like to show you Deluca Exhibit 47.  It's in the back of these binders.

A.    This is -- oh, sorry.

Q.    Go ahead.

A.    This is the first one.  We had like -- the same fellow who did our inspection in Great Falls came and did this and he -- I mean, he didn't -- you know, he -- well, I'm not going to characterize what he did, but this is one of the --

Q.    What is this document?  What was the point of it?

A.    It was to identify, you know, things that were wrong.  That was the point of it.

Q.    Who created the document?

**A.**     The inspector.

**Q.**     Okay.  Is this document communicated to Mr. Deluca at any time?

**A.**     Yeah.  I mean, it's in his trial -- I mean, yes, he got it.

        MR. LYNCH:  I would like to admit Deluca Exhibit 47.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No, Your Honor.

        THE COURT:  Received.

        (Defendant's Exhibit 47 admitted into the record.)

BY MR. LYNCH:

**Q.**     I would like to look at the very next tab, which is Deluca trial Exhibit 48.

**A.**     All right.  So we had met with a builder, too, to get advice on what to do during this period.  Again, we're out of chronology so it's a little hard to locate, but the -- that builder's name was Horizon Builders.  They're a D.C. builder, and they referred us to a mechanical engineering firm who came and did a, you know, a report on stuff they saw, and we gave that to Doug as well.

        THE COURT:  This is Exhibit 48?

        THE WITNESS:  Yes, sir.

        THE COURT:  Okay.

        MR. LYNCH:  All right.  I move to admit Deluca Exhibit 48.

        THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Defendant's Exhibit 48 admitted into the record.)

BY MR. LYNCH:

Q.    Okay.  I'd like to on show you trial Exhibit 445.  And this is an e-mail from Mr. Deluca to J Ferguson, which is counsel of record at one time for Mr. Deluca, and Shahriar Amiri and Emad Elmagraby.  Who is Shahriar Amiri and Emad Elmagraby.

A.    Shahriar Amiri is the head building code official for Arlington County, and Emad Elmagraby -- I hope I'm not mispronouncing his name -- is the -- I think his title is the head inspector, but anyway, they're both at Arlington County in the building, you know, code/permit/inspection department.

Q.    All right.  And you'll notice a -- in the second paragraph it begins with, "Working off the Falcon report."

What is the Falcon report?

A.    So Falcon -- so the difficulties -- the difficulties we had were getting our arms around what all was wrong, and we hired a specialist who does forensic engineering and construction kind of stuff, and they came in and wrote a report.  They're our expert -- one of our -- assuming they're qualified, one of our expert witnesses in this case, and Doug is referring to the draft of that report that he's working off of.

Q.    About how many pages was that report, if you recall?

A.    It's a long report.  I'm sorry, I don't recall.

Q.      All right.  I'd like to show you Exhibit 5 --

        MR. LYNCH:  Okay.  I'm sorry.  I need to move to admit Exhibit 445.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No, Your Honor.

        THE COURT:  It's received.

        (Defendant's Exhibit 445 admitted into the record.)

BY MR. LYNCH:

Q.      I'd like to show you Exhibit 543.  This one is in the pocket part again.

A.      543.

Q.      It's tab 4.

        THE COURT:  Tab what?

        MR. LYNCH:  Tab 4 of the pocket.

BY MR. LYNCH:

Q.      So this is -- it says at the top left, "Energy One America."  What is this document, Mr. Harrell?

A.      Chronologically, this occurred well after any event that we've discussed, but these are photographs taken from the Falcon report that Mr. Deluca gave to the company that installed the insulation, so all these photos -- yes, all these photographs are from the Falcon report, and he used it -- he had not paid the spray foam company as of, I guess, this date, which is September 2nd, 2020, and he's using it to negotiate a reduction in what he owes them.  They also provided a lien waiver.

MR. COUGHLIN:  I'm sorry to interrupt.  I'm going to object, lack of foundation for his knowledge related to any negotiations between Mr. Deluca and the spray foam company.  Also, this document he's testified to was derived from an expert report which in and of itself would be hearsay.  This document is, therefore, hearsay within hearsay, so -- and I --

MR. LYNCH:  I'd like to respond to that.

THE COURT:  Yeah, sure, go ahead.

MR. LYNCH:  We're not offering it for the truth.  We're offering it for what was communicated, and Mr. Deluca's contended he's not on notice.  Here he is, he's taking pictures from our expert report and giving them to his subcontractor, Energy One America.

THE COURT:  Well, I don't know where -- where does it say that this is Mr. Deluca sending this to a third party?  Maybe I'm missing it.

MR. LYNCH:  That's a fair point, Your Honor.  This is an Energy One America document, you are correct, but Energy One America didn't get these documents off the Internet.

THE COURT:  You've got an expert who's going to testify about this?

MR. LYNCH:  Yes.

THE COURT:  Did you receive this?  You received the report at some stage?  Is that --

THE WITNESS:  The Falcon report, yes, sir.

THE COURT:  Okay.  And when are we talking here?

THE WITNESS:  We received a draft in the -- it was in 2019 in -- you know, towards the end of the year.  I would have to research the date.  I don't --

THE COURT:  Okay.

THE WITNESS:  And we received -- you know, these documents were just provided in discovery along with the lien waiver, which is in the next document, reflecting, you know, what I discussed.

THE COURT:  Okay.  All right.  I'll sustain the objection.  At this stage, it's not relevant, and it will be more fully described in the report.

I mean, you can testify about having received the Falcon report and what highlights you would want to identify that you think are important, but --

MR. LYNCH:  Sure.  That's fair enough, Your Honor.  These are just to show that he received notice of the warranty issues.  That's why we're going through it, and then the prior documents are direct communications.  They're all admitted, so we can take this one.

THE COURT:  Okay.  All right.  Let's move on.

BY MR. LYNCH:

Q.    Okay.  So we looked into the future on some of these discussions about warranty, but this all came up in relation to the Post Closing Construction Agreement of July 3rd.  Tell me what happens in July 2019.

**A.**      In July?

**Q.**      Of 2019.

THE WITNESS:  Oh, I'm sorry.  I lost my train of thought.

THE COURT:  Yeah, we're back to July of 2019.

THE WITNESS:  Right.

THE COURT:  And Mr. Lynch's brain and your and my brain work a little differently so we're skipping around, but let's re-focus on July 2019.

THE WITNESS:  Right.  So in July -- we were going through a hard time with my wife, and it was -- I'm sorry.  It was a very hard time, and Doug and us were having phone calls during this time.  I was mostly in Connecticut, and, you know, her health was fairly serious, and we would have weekly calls with Doug -- I'm sorry.  Can I just have a second to collect myself?

We would have weekly calls to discuss the status of the house, and, you know, he would update us on what was going on, you know, here's when things are arriving, you know, when this was going to be finished, when that was going to be finished, et cetera, et cetera, because we were all sort of trending towards this August 1st completion date, and I visited the property a couple of times during this period because, again, I was ping-ponging back between Connecticut and D.C. because my family lives in Connecticut, and I had an office down near the White House in D.C.

And, you know, one night I stayed there and there was no

hot water in the house, and, you know, I didn't know that.  And another night I stayed there, and, you know, I had the AC turned on, and, you know, I think Doug has since said that I didn't know how to operate the AC, but, I mean, I've been operating AC for a very long time in my life, and it would not cool the house down, and I had to leave and go to a hotel.

And during those visits, I did not witness a significant amount of activity at the house, just -- again, maybe I was there on the wrong day.  I mean, I wasn't there every day, but, you know, I became very concerned about where we were headed with this.  I think I told TTR that, you know, we may need to rent something during this period.

But at any rate, you know, I didn't want to get over my skis or -- you know, I was going through a whole lot personally, and I just kept, you know, having the calls with Doug, kept getting updated from him, kept, you know, being told when, you know, things were going to arrive, when construction was going to be completed.  That's sort of the thumbnail of what happened in July.

BY MR. LYNCH:

Q.    All right.  So what happened in -- on August 2nd, 2019?

A.    So on August 2nd was the beginning of really this whole thing.  We -- Doug wanted to settle up on a change order, which is the only executed change order in this contract, and it was a change order pursuant to the Post Closing Construction

Agreement.  That agreement has a change order provision in it.  And we --

Q.    Yes.  So let's look at Exhibit 4.  This document says "Federal Construction Company, LLC" on the cover.  What is this document?

A.    This is the change order that we signed on -- well, it's not signed but we paid on August 2nd.  If it's okay, I would like to walk through it.

Q.    Yes, sir.

A.    So "Evans Bath" -- so Evan is my five-year old son.  I have a very limited role in what kind of tile or whatnot is selected for bathrooms and such, but my wife knows all about that one.  I'd like to -- I mean, I'm happy to talk what I know, but it's really not my kind of area of expertise.

Doug had suggested we put a sink -- we had a bar in the carriage house.  I was going to have an office over the garage, and, you know, we were putting a bar -- not a drink -- well, I guess, you know, if one wanted a drink, but there was going to be a sink up there.

The "Owner Suite Sinks" for the owner suite, you know, we were a little annoyed by this one, I would say, because, you know, why doesn't the house come with, you know, the sinks we, you know -- but apparently we were buying more expensive sinks, so okay.

"Door Stops," you know, I don't care about door stops,

but we wanted door stops in the house.  Those were subsequently returned to him.

The "Kitchen Table Retrofit."  So the contract required some refrigerator drawers in the kitchen, and they were -- at closing they were sitting in the kitchen, and there was nowhere to put them because of the way the kitchen was designed, so, you know, Doug charged us this amount of money to put the refrigerator drawers in the kitchen island; otherwise, they would just be sitting in the kitchen in a box, or we would have some other thing to do with them.

Some "Library Doors."  Doug had suggested that we put some doors on the library, these -- I don't know, they're these pocket doors, and we paid him for that.

The "Wine Refrigeration."  So, again, I'm not going to turn back to the contract, but the contract, in Exhibit B, has wine refrigeration that we paid for and there was nowhere to stick it in the kitchen design, so we had to kind of work that out with this hall cabinet where it goes, so Doug charged us that amount of money to put the wine refrigeration that we paid for in the contract in the kitchen.

The "Barn Door Opening" and the sauna -- the "Sauna Relocation" is part of -- it's a plug, it's an electrical plug. That's all it is.  And anyway, that was -- that change order -- sorry.  I'm done.

THE COURT:  So you paid this amount of money; is that

right?

THE WITNESS:  The next exhibit has my check.

BY MR. LYNCH:

Q.    Let's look at Exhibit 5 --

MR. LYNCH:  I'm sorry.  Let's admit Exhibit 4, please.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  Okay.  It's admitted.

(Plaintiffs' Exhibit 4 admitted into the record.)

BY MR. LYNCH:

Q.    What is that document in Exhibit 5?

A.    So that's the check.

Q.    Okay.

A.    I don't know why -- I mean, I noticed that it says the 12th, but if you'll notice, that it was drawn out of my account on the 2nd.  So I don't know why I wrote the 12th, but it's misdated, but it came out on the 2nd.

THE COURT:  Any objection to 5?

MR. COUGHLIN:  No.

THE COURT:  All right.  It's received.

(Plaintiffs' Exhibit 5 admitted into the record.)

THE COURT:  All right.  It's 1:00 now.  Why don't we take a break for lunch, and we'll come back at 2:00 and continue hearing testimony, all right?

MR. LYNCH:  Okay, Your Honor.

THE COURT:  Thank you.  Would we're in recess.

(Thereupon, a luncheon recess was had beginning at 1:04 p.m.)

**AFTERNOON SESSION, JULY 11, 2022**

(2:04 p.m.)

THE COURT:  All right.  Mr. Harrell, please come back.

Mr. Lynch, I understand you need to set a foundation on the exhibits that are relevant for the rule moving forward, but let's remember that -- what you said in your opening statement, that this is a case about fraud, and the focus of the testimony should be about the specific frauds that have been identified. So let's -- of course, when we first started talking about a possible Thursday testimony, I went back, and my notes from the last time we chatted suggested this was going to be a three-day case, and I'm available on Thursday if necessary, but I don't really think that it should be necessary, but Friday I'm unavailable and I've got a lot going on, so let's focus on why we're here.  All right, sir?

MR. LYNCH:  I understand.  For sure, Your Honor.  You know, can I comment on the schedule?

THE COURT:  Yeah, you can comment on the schedule.

MR. LYNCH:  So we have the County code official come tomorrow.  We have got an expert witness.  We have four experts, one on the code, one on defects, one on damages, and one who's waiting in the wings right now about structural defects.

THE COURT:  Okay.

MR. LYNCH:  So -- anyways, we'll do our best.  Understood, Your Honor.

THE COURT:  Well, are any of those objected to?  I haven't gotten any in limine motions or motions that I recall that they are not qualified to testify.  Mr. Burcher.

MR. COUGHLIN:  No, there's none in that regard, Your Honor.  I would just say with regard to the schedule, I think that the scheduling order has us for five days, and the parties were -- the reason I mentioned Thursday was because we -- in planning and organizing our witnesses, we have it as a five-day thing.

Now, my side of it is not going to take -- you know, I think we can be pretty fast, but if Mr. Lynch is -- he's planning to go I think through Wednesday afternoon -- sometime Wednesday so that would give us no time if you aren't going to be hearing us on Thursday.  So that's my issue.

THE COURT:  I said I would hear you on Thursday if necessary.  I just don't know why we can't move along and -- my notes of our -- not the order, but our conversation over the telephone -- or I think it was over the telephone -- about how long this case would take to put on, as I recall, was three days.  So in any event, let's move along.

MR. LYNCH:  Okay.  Understood.

THE COURT:  Thank you.

CONTINUED DIRECT EXAMINATION OF JOHN HARRELL

BY MR. LYNCH:

Q.     All right.  Where we left off, we had gone through the change orders on August 2nd, we went through the check, and now we're on August 5th.  What happened on August 5th?

A.     On August 2nd, Doug and I had a very unpleasant conversation.  I was insisting that things be accelerated, finished.  He indicated to me that he -- you know, I wasn't really moving in the house any time soon since I didn't have my house in Connecticut on the market yet, which is true, I didn't, but we were moving.  I left in kind of disarray a little bit.  I was a little bewildered by that.

I came back on August 5th and spent the night there.  I was in town for work, and I toured the property, and the conditions I found were not good, in my opinion.  Those have been documented in various conversations.  You know, I'll just sort of refer to those documents and say that was my opinion, they were not good.  There was some stuff damaged and things like that.

In addition, he and I had had a conversation on the 2nd about the porch and powder room permit, which he told me would have been filed, and he told me prior to -- between August 2nd and August 5th that he had installed the gym floor, and I walked in the gym and I wasn't installed.

And so I -- at this point I just woke up on August 6th,

and I was upset, and I felt like I didn't really understand what was going on, where things were, and I called the bank, and I said, "I don't think, you know, what we told you was correct.  I think the house is further away from being finished than it is, and you should come down here and look at it," because I did not want to be responsible for misleading the bank.

And so they came down.  Doug's mother was there.  TTR was there.  There was a lot of activity that day, more than I had seen before, but Doug wasn't there.  As I later found out, he was applying for the permit for the porch and powder room, which we went through a document earlier, what he said, it was estimated July 15th.  He told me he had already applied for it, but that was the first time that he actually did apply for it that we know of.  And we were very upset about that.

And then during the day we also got an e-mail from Brendan Muha with a punch list attached reflecting kind of the status of things --

BY MR. LYNCH:

Q.    Let's look at that very quickly.  So this is Exhibit 686.

MR. LYNCH:  And, Your Honor, this is relevant to the pause.  This is a suspension of work.  That's why we're talking about August 6th.

BY MR. LYNCH:

Q.    So Exhibit 686 is an e-mail from Brendan Muha to John Harrell dated August 6th.

**A.**      So we got this document.  It's an e-mail with a punch list attached it's a version of the 7-07 punch list that we discussed earlier, which was again my attempt to type up what I thought our agreements were with his handwritten comments on it. So this document was created after July 2nd, and it was based on the written version of my July 7th punch list, and there are things on here that I just know weren't done or --

**Q.**      Let's go to the last page, please.

**A.**      -- that are wrong.

Sure.  And if go to the last page of that document, which is 16325 in the Bates, the finalized completion for the master bath, "Tile is set to be in next Thursday."

And again, he had been telling us that the tile was on order, it was coming, it was coming, it was coming.  He's saying it again here, you know, but there's a delay, or, you know, it's not coming until next Thursday now.

THE COURT:  Whose handwriting is in this?

MR. LYNCH:  Mr. Muha will testify and has testified in deposition that's Mr. Deluca's handwriting.

THE COURT:  Okay.

MR. COUGHLIN:  We don't deny that it's Mr. Deluca's handwriting.

THE COURT:  All right.  So it's Mr. Deluca's handwriting. Fine.

BY MR. LYNCH:

Q.    Okay.  Anything more you wanted to say about that exhibit?

A.    No.  I mean, there's a lot of details that's important to me that --

THE COURT:  Well, if there were -- if there are statements in here that you believe are fraudulent, you ought to point them out.

THE WITNESS:  Well, we're about to hit the fraud stuff. This document is more about the conditions for why I reacted the way I did on August 6th that -- I don't think it's fraud because these statements were made post closing and they don't relate to preclosing activities.

The tile, we had been told prior to closing, had been ordered, and it's saying it's coming, so that one is relevant to fraud which is why we're pointing it out, but the point that this document reflects to me is that there are things on here that are just either -- they were bewildering.  This is painted, and you would go and look at it and it's not painted, and it was just sort of two different realities.  It was very disorienting to me.

That plus the porch permits and other things that happened that day, we were very upset, and so we told him we need to lock down construction, we need to get some third parties in here to tell us what's going on, and I asked him for -- "I need a list of materials, where they are.  I need receipts.  I need a copy of your insurance" -- or if I didn't ask for a copy, I asked for

confirmation that he continued to have insurance, and I told them while he was off to Bermuda, we were -- because he was going on vacation, because he had planned to finish before he went on vacation.  I mean, everybody knew that.

And, you know, "We'll look into this house, and, you know, we'll" -- you know, I was like, "I'm not releasing you from your contract, but I don't understand where we are, and this was supposed to be done by August 1st and here we are and we're a long way away."

So that's sort of the short thumbnail sketch of that.

BY MR. LYNCH:

Q.    One more comment on this.  There a section called "Family room," item number 1, "Powder Room."  That's on the -- Bates page is ending in 317.

A.    Yes.

Q.    And just tell us about that.

A.    That says, "Waiting on County."  He had applied that day for that permit.  So it's true, he's waiting on the County, but he had just applied.

THE COURT:  Okay.

MR. LYNCH:  Okay.

BY MR. LYNCH:

Q.    I'd like to show you Exhibit 688.

A.    I'm sorry.  Can you say that again?

Q.    688.  It's the very next tab.

**A.**    Okay.

MR. LYNCH:  So before we start, I would like to admit 686, please.

THE COURT:  Any objection?

MR. COUGHLIN:  No, sir.

THE COURT:  It's received.

MR. LYNCH:  Okay.

(Plaintiffs' Exhibit 686 admitted into the record.)

BY MR. LYNCH:

**Q.**    So 688 is an e-mail from John Harrell to Mr. Deluca dated August 7th.  Please explain what is happening in this document.

**A.**    Well, this chain is the -- you know, the parties refer to this as the pause, just for reference.  So the August 6th one at 11:02 p.m., that's me pausing construction.  I go through all that.

And it says -- I mean, I haven't captured everything it says, but the general idea is what I just said.

And then -- I'm sorry, what was your question?

**Q.**    We're talking about 688.  There is an e-mail in here. Why did you pause the construction?  That's what we're talking about here.

**A.**    Right.  Well, it's for all the reasons I said.

MR. LYNCH:  All right.  That's that.  I would like to admit Exhibit 688.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 688 admitted into the record.)

BY MR. LYNCH:

Q.    What happened during the pause?

A.    We sort of skipped -- we sort of skipped chronological order, and then we talked about the warranty, and we were talking about the inspections that we had given to Mr. Deluca. That's what happened.  We got some advice from, you know, those people.  We talked to a builder, and we learned kind of a few things.

One, it's very difficult to switch horses in the middle of a construction project.  The horse you rode in has the permits.  There's NOSHA..  you bring someone else in, you pay overhead, you pay all these other things as a general matter, and it's just much cheaper.  So it was -- you know, recommended to us, we get our arms around the permits, where it is.  In the event that Mr. Deluca was not going to finish, we needed to understand that for a lot of reasons.

We discovered defects that were, you know, more than we knew.  We communicated those to Deluca, and, you know, we started requesting receipts for what we paid for, accounting for the money I had given him, and, you know, we asked for, you know, continued confirmation that he was insured prior to coming back on the property.

Q.     What were the arrangements for project supervision during this time?

A.     Well, Mr. Muha told me that Mr. Deluca's mother would be overseeing it had we let him -- had we not paused him, but, I mean, I don't know that for sure, so...

Q.     Let's go to Exhibit 493.

MR. LYNCH:  And before we do, I would like to admit 688.

THE COURT:  Any objection?  I think we -- it's admitted.

BY MR. LYNCH:

Q.     493.

A.     Okay.  Page 52?

Q.     We saw a version of this earlier.  This is an inspection report for the Lee Highway.  This is the complete version.  And what was the significance of this document to you?

A.     Okay, flip to page 52 of that document, and I'll tell you what this document is.  So this is the complete report that's in Deluca Exhibit --

Q.     47?

A.     -- 47, from one of the inspections that we identified and discussed earlier.  On page 52 one of the things we learned and is relevant to his setoff claim, we learned that the boiler was from -- and if my reading is correct, in the left-hand box, 1983.

Now, it's difficult to read, but the point is that it was an old boiler, it was not a new boiler, and, you know, we had

been told when we bought everything listed on Exhibit B, if you remember the photos, everything's ripped out of the house and, you know, all new this, all new that.  Everything on Exhibit B, we thought was new.  We did not know there was an old boiler in the house, and so this is one thing we learned.  We learned other things, but this is what we're pointing out here.

Q.    What was -- when did you receive this document?

A.    It's dated.  It's in, you know -- August 12th.

Q.    If you were looking for the picture of the boiler date, I think it's on 52.

A.    Yeah, I think I said --

Q.    You got it?

A.    Yeah.

Q.    Okay.

THE COURT:  Yeah, he just testified about that.

MR. LYNCH:  I'm sorry.

BY MR. LYNCH:

Q.    Did you speak to anyone else?

A.    I think we covered this, but we spoke to Horizon Builders; we spoke to EBL, we looked at their report; we spoke at a roofer; and we spoke to a brick mason.  I think that's all we spoke to.

Q.    Did you move down to D.C. at some point?

A.    Right.  So, school is starting so we moved down and we rented an Airbnb with ply kids, my dogs, two Guinea pigs, et

cetera.  We put our stuff in storage, and my kids started school, and, you know, that's what happened.  We moved into a temporary housing.

Q.    Okay.

THE COURT:  When was that?  Sometime in August?

THE WITNESS:  That was around September 1st.  It was around September 1st.

THE COURT:  Okay.  You referenced other inspectors, and are you going to put those exhibits in evidence or...

MR. LYNCH:  We would like to admit Exhibit 493.  But outside of the Harden report, which we just looked at, an EBL is also in evidence.

THE COURT:  Any objection to 493?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  All right.  It's received.

(Plaintiffs' Exhibit 493 admitted into the record.)

BY MR. LYNCH:

Q.    Let's look at Exhibit 194.  And, I'm sorry, this is Deluca Exhibit 194, which is at the very back.

THE COURT REPORTER:  I'm sorry?

BY MR. LYNCH:

Q.    Deluca Exhibit 194, which is at the very back of the binder.

So this is an e-mail from Mr. Deluca to Mr. Harrell dated August 27th, and I would like to bring your attention to the

paragraph beginning "Not correct" in the middle of the page and describe what's going on there.

A.      Well, there are a couple of things going on with this very quickly.

You know, I was panicked.  It was a difficult time for us, but, you know, I was asking, "When can we move in?  When can we move in?  When can we move in?  When are you going to be done?"

And Muha told me -- PTR told me, "September 30th is what Doug is saying," and I was delighted with that answer, and Doug was saying, "No, you can move in right now."  I mean, he had always told us prior to closing, the house is livable, we could move in, that, you know, if you don't want to live with the construction, okay, but, you know, there's nothing that would prevent you from doing that.

And during this -- this e-mail also documents something else that happened, which is the powder room and porch extension, which had been applied for on August 6th, we cancelled those because the powder room had an opening to the outside that was with plywood because it was going to go out on the outside of the house, and the porch extension had -- I don't know how you describe it, but it had a similar issue with the way the roof was, and we just wanted the house sealed up so that we could move in, and, you know, we couldn't wait for those things.

You know, my monthly cost of having to get duplicate living at the time was more than -- you know, I was paying for those things over -- you know, if you added up a few months, and so, you know, I was just like, you know, let's just stop.  Let's just wrap everything up and stop.  And so I said, "Please don't do that."

He's acknowledging that, you know, you asked me not to do that.  I asked for the escrow money back to cover my duplicate living, and, you know, that never worked out, but that's sort of -- this e-mail kind of, you know, hints at all of those issues.

Q.    Okay.  So we looked at the pause of construction August 6th.  Describe to me the resumption of construction.

A.    Right.  So we had the keys changed, the locks changed, you know, as you often do when you buy a house.  We didn't know who had a key, so we directed Brendan Muha to give him a key, which he did, and Doug came back from his vacation -- I don't remember when that was, it was in August -- and he was back on-site.  And he had the EBL report -- well, I may be jamming a few dates together, but he had the Harden report, and then he got the EBL report, and you know, he said he was going to fix everything, and he was going to finish, and all of that.

He began to ask for direction about certain things, which is an issue that continues in the case at that point, but, you know, that's what happened.  He sort of came back on-site, and

by the middle of August -- you know, I think there's an e-mail on August 23rd where he says, "I've been back on-site for five days," so that would mean the 18th, but if it's not the 18th, it's, you know, around there he was back on-site.

MR. LYNCH:  Okay.  Before we show a document on this, I like to admit Deluca Exhibit 194.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Defendant's Exhibit 194 admitted into the record.)

BY MR. LYNCH:

Q.    Let's look at Exhibit 529.

THE COURT:  520 what?

MR. LYNCH:  529.

THE WITNESS:  This e-mail is just documenting that we directed him to get a key through Brendan Muha.  That's really it.

BY MR. LYNCH:

Q.    Please explain the entry at the top of Bates label 6399 dated August 14th at 7:56 a.m.

A.    I mean, "We swapped out keys since it was empty and we're not sure who had one.

"Brendan can give you access.  Just" -- I said, "let home know," but I meant let "him" know.

And Doug says, "Thank you."

Q.     So Mr. Muha had keys at this time; is that right?

A.     Yes.

Q.     All right.  Let's look at Exhibit 1000 --

       MR. LYNCH:  I'm sorry, I would like to admit Exhibit 529.

       THE COURT:  Any objection?

       MR. COUGHLIN:  No, Your Honor.

       THE COURT:  It's received.

       (Plaintiffs' Exhibit 529 admitted into the record.)

BY MR. LYNCH:

Q.     Let's go to Exhibit 1006, please.

       Okay.  This is a letter dated August 15th, 2019.  What is being --

A.     Well, we're upset about two things.  One, you know, he's late -- well, we declare him in breach.  We requested that he finish the work by -- August 31st, which is on the last page of this document, the second page.  It's under the paragraph "Notwithstanding the foregoing" --

       THE COURT REPORTER:  I'm sorry.  I lost you.

       THE WITNESS:  Am I going to fast?

       THE COURT REPORTER:  Yes.

       THE WITNESS:  Sorry.

       THE COURT REPORTER:  "Notwithstanding" --

       THE WITNESS:  My apologies.

       The -- the other thing we were very worried about was in addition to, you know, just sort of the conditions and the things

we were finding, you know, where our money was that we had given him for materials.  And so that's what this document is.

BY MR. LYNCH:

Q.    And so you're asking him to continue performance in this letter?

A.    Yes.

Q.    Okay.

MR. LYNCH:  All right.  So I'd like to admit trial Exhibit 1006.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 1006 admitted into the record.)

BY MR. LYNCH:

Q.    Let's go to trial Exhibit 691.

This is an e-mail from Mr. Deluca to me dated August 19th, 2019, and please describe what's happening in this e-mail, Mr. Harrell.

A.    It's just confirmation that he said, yep, I want to finish.  "Amen.  That's all I want," 18, 2019 -- I'm sorry, August 18, 2019 at 3:22 p.m.

Q.    All right.  At the bottom he says, "Amen.  That's all I want."  And --

A.    That's responding to your comment, you know, "get the work done."

Q.      "Get the work done."

A.      "No more excuses."

Q.      Okay.  And there's no mention of the key as far as you can tell in this e-mail?

A.      No.

Q.      All right.  Let's look at Exhibit 5 --

        MR. LYNCH:  I'm sorry, let's admit Exhibit 691.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No, Your Honor.

        THE COURT:  It's received.

        (Plaintiffs' Exhibit 691 admitted into the record.)

BY MR. LYNCH:

Q.      Exhibit 530, this is an e-mail from Mr. Harrell to Mr. Deluca, August 27th, 2019, and looking at the e-mail by Mr. Deluca on August 27th at 11:02 a.m., what do you find significant about that e-mail?

A.      Well, Doug was out, you know, taking the things we identified and said he was creating a list to consolidate, and he would work through it and fix everything.  That was my understanding.

Q.      Okay.  So this line in that e-mail that says, "This has been updated on August 23rd after regaining access and allowed to resume work for 5 days."

        What do you make of that?

A.      Well, I think -- well, I guess in my testimony, I'd say I

thought this e-mail was on August 23rd, but I stand corrected.
It's on August 27th.  So he's saying he's been there since five
days before that.

MR. LYNCH:  I would like to admit trial Exhibit 530.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 530 admitted into the record.)

BY MR. LYNCH:

Q.    So I'd like to move to Exhibit 1049.

A.    Yeah, I know this e-mail.

Q.    This is an e-mail from Doug Deluca to you on August 19th,
2019.  This e-mail relates to the boiler.  Please tell us what
is significant in this e-mail.

A.    We had told Doug -- we had told Mr. Deluca that we were
upset about the boiler that I described earlier, and he says,
"The current boiler is working but I originally wanted to
replace it so all systems were new and under warranty.  That has
always been my plan" -- no, I was -- anyway it goes on.

The significance of this is he has since suggested that
there's a setoff claim for this boiler.  Nowhere did anybody
ever tell me I was paying again for a boiler.  It's not a
tremendous amount of money in the context of this case, but
it's -- you know.

Q.    Do you ever remember Mr. Deluca saying to you, "Hey,

John, give me another -- pay me more money for" --

A.      Nobody ever suggested to me I was paying for the new boiler.  My understanding, that it was -- pursuant to the PCCA, it was unidentified, incomplete work.

Q.      So we've seen the e-mail where he's regained access, the key is returned.  What was Mr. Deluca doing after he regained access?  What kind of communications were you receiving at that point?

Why don't I show you a document.  Let's look at Exhibit 511, page 223.

MR. LYNCH:  I'd like to, before we get into there one, admit Exhibit 1049.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 1049 admitted into the record.)

BY MR. LYNCH:

Q.      So a 511 on page 223.

A.      So these are -- you know, I'm not in the best state of my life during this period.  I was pretty freaked out.  The -- you know, I want the house so I can move in.  That's what I want.  And, you know, the permits are an enormous obstacle to that, so he's saying all -- you know, this is Doug -- I'm sorry, not Doug, this is Brendan Muha telling me what Doug said.  "All permits will be inspected this week," but two bathrooms, the

master because, you know, we're waiting for the tile.  "I think the entire house cannot pass final without these being completed."  That's --

Q.    So --

A.    I don't know if that's Brendan saying, from my understanding -- I don't know, but the point is that this is what we were being told.

Q.    Okay.  Let's slow down one second.  So, blue --

A.    Is me.

Q.    -- is you, and pink is Muha, right?

A.    My -- am I reading the wrong -- mine is not pink.

Q.    233 of Exhibit 511?

A.    If that's pink, I need to go see the doctor.

Q.    Okay.  Sorry.  So you're not -- so who's not blue?

A.    That's Brendan Muha.

Q.    Okay.  And then this message at the bottom of 233, "all permits will be inspected this week but Evens and master.  I think the entire house cannot pass final without those being completed."

A.    Correct.

Q.    Okay.

A.    But we thought, you know, he was going to get all the permits finalized.

Q.    Okay.  So let's go to -- staying in Exhibit 511 but moving forward to page 245.  So I want you to explain the

message at the top of page 245.

**A.**     This is -- in quotations is a note that Brendan Muha forwarded from Mr. Deluca, and it was in early September or late August -- we don't have the date -- but the -- it says, "'Brendan I am still to update the last inspection report," which are the ones we were referring to with respect to the warranty, EBL, Harden, et cetera.  "We called in a final and the inspector requested the electrical amendment for the sub panel as well as each trade calling their finals for each discipline Mechanical, electrical, plumbing prior to us calling in the Building Final.'"

**Q.**     So let's go to Exhibit 455, page 2.

THE COURT:  Any objection to 511?

COUGHLIN:  No, Your Honor.

THE COURT:  Okay.  It's received.

(Plaintiffs' Exhibit 511 admitted into the record.)

THE WITNESS:  Okay.  So, you know, I'm a little -- I'm pretty freaked out.  I mean, I'm asking him over and over again, "When are the permits?  When are the permits?"

He said -- I say, "I was hoping to get a response on this."

"Please resend 'this' or items."

He says in the first part of that page -- you know that made me angry because I thought my e-mail was clear.  "I was hoping to get a response on this," which is, "Any update on when

the inspections are going to be scheduled?"

Because he had been telling me they were going to be scheduled, and, you know, I was trying to make plans.  We were in an Airbnb, which is like -- I can't remember how long we rented it for.  It was two weeks or one week or something, but, you know, we had to make plans and we didn't know where we were going to live.  Our stuff was in storage.  My family was in disarray, and so I -- I mean, you know, you can tell, I'm asking him like three times in, like, three minutes this day, you know, to answer this question, which is rude, but I was -- you know, I thought I was justified, but, you know, it wasn't the sort of thing I normally do, but I was pretty upset.

BY MR. LYNCH:

Q.    Okay.  And on page 3602 at the bottom there's a discussion of permits.  You're asking questions about what permit the Carriage House is under and what permit the mudroom is under.

Can you briefly explain those messages?

A.    Right.  So as part of our investigation during this period, you know, we were trying to get ahold of the permits. We ended up forwarding them from Arlington County around this time.  There's a FOIA rule that doesn't allow someone to -- it's complicated, but they won't just give it to anyone.  You have to own the property.  So once we owned the property, we could FOIA them.  We did.  But prior to getting them, you know, Mr. Deluca

had always told us that the carriage house was always part of the main house permit; in other words, there was one permit that covered all the work in the carriage house and all the work in the main house, and then he's saying it's "all existing and been replaced down to the exact bathroom."

Well, when I read that I knew that wasn't true because I had been on the property and had seen that he moved doors -- you know, he moved the garage door around, he put a new roof on one area, and it's not -- it's not all the same.  It's a lot of new stuff.

So, I mean, you know, that's consistent with what he told us.  That's also a judicial admission.  It's in their answer, so, you know.

MR. LYNCH:  There's a judicial admission in the answer that the defendant told the plaintiff that the carriage house work was permitted.

THE WITNESS:  As part of the main house permit.

BY MR. LYNCH:

Q.    Yeah, as part of the main house permit, right.

MR. LYNCH:  Okay.  So I would like to admit Exhibit 455.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 455 admitted into the record.)

BY MR. LYNCH:

Q.      So let's go to Exhibit 1046.

A.      All right.

Q.      So this is an exhibit -- this is an e-mail from Mr. Elmagraby to Mrs. Harrell on November 21st and what is -- what happened at this time with respect to the carriage house?

A.      This e-mail -- the point of this e-mail, to me anyway, is on page 31177 -- no, I'm sorry, 31179, which is two pages later, Doug is just telling us, you know, everything is ready for final.  I think we covered this point.

        And then subject not only to that, on -- and we're skipping out of order, but on November 21st, 2019, Emad Elmagraby lets us know that the carriage house -- the plans for the carriage would apply --

        MR. COUGHLIN:  Objection, your Honor, hearsay.

        THE COURT:  I'm sorry?

        MR. COUGHLIN:  Objection, hearsay.  He's testifying as to what a County individual is saying who is not a party to the case.

        THE COURT:  Well, he's paraphrasing the e-mail, I think, right?

        MR. COUGHLIN:  Well, the e-mail at the top --

        THE COURT:  "Revise plan for the house," "new permit for the carriage house has been submitted yesterday."

        MR. LYNCH:  It's also a public record.

        THE COURT:  Yes, it is a public record.

MR. COUGHLIN:  I'm having a hard time.  I thought we were talking about 31179, the top, that's an e-mail from Mr. Lynch where Mr. Elmagraby is -- he --

THE COURT:  Yes, and Mr. Harrell went -- we're a little out of order, on November 21st.  I think he's looking at the page before, but your objection's overruled.  They'll be received.  These are public documents, and they're also offered for Mr. Harrell's state of mind.

(Plaintiffs' Exhibit 1046 admitted into the record.)

THE COURT:  Go ahead.  I'm not sure --

THE WITNESS:  Right.  So this is the first time that any permit was applied for -- this correspondence is regarding to the fact that he's applying for the permit for the first time for the carriage house and that there was never a permit -- there was never a permit covering work in the carriage house at the property, which is different than what we had been told, you know, prior to April 3rd, prior to anything, so --

BY MR. LYNCH:

Q.   Okay.  And who is assisting you -- well, I'm sorry, strike that question.  How did you first get copies of the permits?

A.   I think I covered that before.

Q.   All right.  Who was assisting you then?

A.   We hired the retired head of building for the City of Alexandria, Virginia, John Catlett, who is kind of testifying in

this case, to assist us in getting our arms around the permits. I invited Doug to meet him. I suggested Doug work with him, you know, he's a very knowledgeable -- you know, my opinion is he's a very knowledgeable guy on permits.

John Catlett scheduled a meeting with Arlington County and had him out to the house, so he had Emad Elmagraby and his team out to the house and he met with him. I mean, I assume these folks all know each other -- I think they do -- and, you know, we walked the property. We invited Doug to that meeting, but we were informed that he would not attend if my wife and I were there.

Now, I understand why Doug was upset. You know, right after the pause, Doug wanted to meet with me and I said no because I was scared what I would say to him, and maybe he was in the same condition so I let that go, but, you know, he didn't attend that meeting, and the County subsequently determined, you know, a lot of things that will be discussed in this case.

Q.    Okay.  So let's go to the Exhibit 998, page 2.

MR. LYNCH:  And while we're moving there, I would like to admit 1046.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  All right.  It's received.

(Plaintiffs' Exhibit 1046 admitted into the record.)

THE COURT:  What exhibit are you moving to?

MR. LYNCH:  I'm sorry, 998.

THE WITNESS:  So the bottom of the page, October 21st, 2019, Doug is sending me a note -- he had a subsequent meeting with the County after the meeting I referred to where John Catlett and the County and us got together, and he -- he's reporting out, per my request, what happened at his meeting with the County, and, you know, so there's a lot -- I mean, we can't read this whole thing, but there's just, you know, garage and carriage house and these plans, and there's all this stuff.

They determined that -- if you flip over to the next page, "Gym Stairs," down towards the bottom, existing steel steps have even rises and more head clearance on landing 1.

They're determining that they're not code-compliant stairs, so they say -- you know, Doug is saying here, "Demo stairs and replace with a circular staircase kit."  It can "come with wood treads."

We -- I think there's a word missing, but anyway, the stairs in the carriage house had to be ripped out.  There was an issue with the bar that I had talked about in my office in the carriage house.

The front steps, on the next page, have "inconsistent risers" that he built that violate the code, I'm told.  And other things.

So this is just -- you know, they're beginning to uncover work that's not code compliant and work that was done without a

permit, and they're making him apply for permits and fixing work that's not code compliant, and he's sending a note, documenting what happened at his meeting.

MR. LYNCH:  For the record, Your Honor had asked the question about the EBL report.  That's in this exhibit beginning with the Bates 733.

THE COURT:  Okay.

MR. LYNCH:  I would like to admit Exhibit 998.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 998 admitted into the record.)

BY MR. LYNCH:

Q.    Okay, so you have your initial meeting with the County, then Mr. Deluca's meeting with the County in October, we see, and then what happened next with the meetings with the County?

A.    Well, just the thumbnail of it is we were threatened with legal action by Arlington County if we couldn't figure this out because we had a house that couldn't be lived in.  We kept telling Doug, "Please finish, please finish, please finish."

I told the County that if they were going to take legal action, that, you know, I would step in and hire someone to fix it, because I -- you know, my job, I can't -- I can't -- I mean, I work for a major accounting firm, and, you know, if I am subject to some kind of legal action, I mean, it's a big problem

because we do SEC financials and things like that.  It's a huge problem for me.  And so I was really freaked out about that, and, you know, I didn't create these problems, and -- you know, but that never happened, but, you know, maybe I was too dramatic about it, but I was really worried about it.

And anyway, so, you know, the meetings kept going on, you know, we discussed the carriage house, that, you know, none of that have work had been permitted.  And we discovered when we looked at plans that there were structure elements missing from the engineering plans that were submitted by to the County. What I mean by that is -- and I'm not -- I can't read building plans.  I don't know what they say.  So take this with whatever grain of salt you like, but when I look at the building plans you know, they have roof rafters and something called collar tags, which I subsequently learned what they were, and those are not in -- they're not installed.  And those are structural members, and --

Q.    Let's cover the drawings with the experts.

A.    Okay.  Sorry.

Q.    So let's look at exhibit -- I'm sorry.  I've got to admit the one that we were on.  I think I already did it.  I move to admit 998.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection.

THE COURT:  It's received.

(Plaintiffs' Exhibit 998 admitted into the record.)

BY MR. LYNCH:

Q.    So Exhibit 444.  This is an e-mail recording a meeting in March with the County dated March 6th from Emad Elmagraby to Michael Campbell, and in the bottom half of the page, first paragraph in the e-mail from myself, what does that record?

A.    I'm sorry, can you tell me the exhibit number again?

Q.    444.

A.    This is just -- I'm just looking for the date.  So this is a March 2020 meeting.  This was like the put-up-or-shut-up meeting with the County.  I wasn't there but Deluca -- Deluca and his attorney were there.  I'm sorry, Deluca was not there.  His attorney was there and my attorney was there.

Q.    And you were there, too; is that correct?  And Mrs. Harrell?  Do you recall who was present at the March meeting in 2020 with the County?

A.    I don't remember if I was there.  I went to several meetings with the County.  I just don't remember if this was one of them.  But at any rate, this is just, you know, the County saying, you know -- we're saying to the County, "You told us that if we can't fix this" --

MR. COUGHLIN:  Objection, Your Honor.  Mr. Harrell said he doesn't recall being at the meeting, and he's also recounting what people at the meeting supposedly said.  Mr. Emad Elmagraby is a witness.  Let's have him testify as to what occurred at the

meeting.

THE COURT:  I think he was saying, "This is what I interpret this e-mail to be."

Is that what you are saying or not?

THE WITNESS:  Yeah, I --

THE COURT:  Yeah, I agree with your objection, but let's rephrase the question, then.

MR. LYNCH:  Okay.

BY MR. LYNCH:

Q.    What was the significance -- have you seen a copy of this e-mail before?

A.    Yes.

Q.    What was the significance of this e-mail?  And you would have filed -- when did you see the e-mail, roughly in time, the e-mail from me to the County?

A.    This was just -- you know, this is just what I was saying.  I was panicked about legal action taken against me, and I -- I wanted to stay in touch with the County.

Q.    Okay.

A.    It says, "you would issue a notice of violation to both the Harrells and Mr. Deluca," if you can't figure this out.

MR. LYNCH:  Okay.  And this is the public record.  I move to admit this, Exhibit 444.

THE COURT:  Any objection to 444?

MR. COUGHLIN:  Yes, Your Honor.  So if you look at the

bottom, it's an e-mail from Mr. Lynch recounting the details of a meeting that Mr. Harrell was not at, summarizing what County officials supposedly relayed to him.  It could be a mischaracterization of what they said.  We think that those witnesses who are going to be testifying should be the ones to recount the details of that meeting rather than relying on this e-mail, so we do object.

THE COURT:  Yeah, sustained.  You can introduce this through Mr. Elmagraby.

MR. LYNCH:  Fair enough.

BY MR. LYNCH:

Q.    Okay.  Let's look at Exhibit 1010.  This is from myself to Mr. Ferguson, Mr. Deluca's attorney at the time, at the beginning.  I would like to direct your attention to page number 61058.

A.    I'm sorry, what page?

Q.    058 is the ending.

A.    Okay.  Yeah, this is just -- the point of this is they were opening up the slab in number 1, there were steps in the main house that were not code compliant.  They were opening up the mudroom.  There was insulation missing, et cetera.

MR. LYNCH:  Okay.  I move to admit Exhibit 1010.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 1010 admitted into the record.)

BY MR. LYNCH:

Q.    Okay.  So, let's talk about your daily log.

A.    Okay.

Q.    What was the daily log that you kept on this job?

A.    So Doug installed cameras on the house, and I wanted to know what was going on in the house, so every day, at the end of the day, I spent an hour looking in 15-minute increments of who was at the house, whether anyone was there and whether there was any construction going on.

     And, you know, it's one of those things when you're feeling helpless, it made me feel not helpless to do that, so I did, and I recorded it in a log every day, whether I saw someone and, if I saw someone, what I saw and what I thought they were doing.

Q.    And would you be able to recall roughly when regular construction stopped?

A.    I would have to consult the log.  I mean --

Q.    Okay.  So let's look at Exhibit 423.

A.    I'm sorry, what's the exhibit?

Q.    423.

A.    423.  Okay.  Yep, this is it.  So the green means someone was there; the pink means it was just painters; the blue means inspections occurred.  It begins on September 16th, and there's work going on.  There's an inspection.  You know, I note the

result of that, that the inspection failed.

So on 9-24 there was a plumber on-site.  There were parents the next three days, and then you skip down to 10-17, there were three full days with plumbers and other people there. And then on the right-hand column I was tracking, to the extent I could, whether Deluca was coming or whether it was just people showing up.

Q.    Let me ask this.  How many days did he work in September according to this log?

A.    One.  Well, I didn't go all the way back to the beginning of September, so I can't answer that question.  Sorry.  But between 9-16 and 10-28-'1, he was on-site one day according to what I have.  I could be wrong, but I was pretty careful.

THE COURT:  How often were you there during the day when you would have noted someone was there or not?

THE WITNESS:  Never.  The cameras have a recording feature --

THE COURT:  Oh, this is off the camera?

THE WITNESS:  Yes.

THE COURT:  Okay.  All right.  Thank you.

THE WITNESS:  And if you flip to the next page, according to what I have, there was two days of work, and between 10-29 and 12-16, there were some inspections, Deluca met with the County, and then -- 1-15 -- I'm sorry, on 12-17 to kind of the end of January, there were a few more days.  Deluca was on-site with the

County again and, the writing in the blue, on or about looks like the 7th.

And then, you know, nothing after that really.  He met -- I have it when his expert met with him.  And then I sort of stopped tracking, you know, routinely at some point in 2020.

MR. LYNCH:  Okay.  I move to admit this Exhibit 423.

THE COURT:  Any objection?

MR. COUGHLIN:  I'm not sure that he laid a proper foundation yet, Your Honor, just in terms of how these notes were compiled on the right.  They're statements -- I'm assuming they're his.  I just would like a little more information.

THE COURT:  Yeah, I will --

THE WITNESS:  Yeah, they're all my statements.  I was looking at -- so I -- you know, this is the last thing I did before I went to bed.  I rewound the tapes on the cameras he installed, which you can do on the Website, and, you know, I would look 15 minutes, and if I -- you know, if I saw someone painting, they were a painter; if I saw someone I knew was a plumber, they were a plumber.  Is it possible I got it wrong, yeah.  Is it possible I missed someone, yeah.  If I saw Deluca on-site, I recorded it, but this is what I observed through that process.

THE COURT:  Okay.  And where were the cameras located in the house?

THE WITNESS:  They're on the exterior of the house.  Doug

could probably tell you better than I because I can't recall right now, but there's one looking into kind of where you park on the side.  There's one on the back.  There's one on the other side.  There's maybe four or five cameras that look kind of around the property, so you can kind of see if cars are there, if people are walking around, stuff like that.

THE COURT:  Okay.  And so you noted what you saw and if you recognized somebody as a painter, and they may have been going inside of the house.

THE WITNESS:  They may have been going inside the house, right.

THE COURT:  Okay.  All right.  It's admitted.

(Plaintiffs' Exhibit 423 admitted into the record.)

THE COURT:  Go ahead.  Let's move on.

BY MR. LYNCH:

Q.    All right.  Exhibit 532.

A.    All right.  So -- I'm sorry, you didn't ask me a question.  I forgot.

Q.    Is there anything you want to say on this record?

A.    Yes.  If you recall, I said I thought there was an inspection on January 7th.  This is an e-mail from Doug Deluca to Emad Elmagraby, and he was saying that he didn't have a key to the property anymore, it had been moved, which, you know, was news to me, but the -- anyway, you know, one of the contingents is that we didn't give him a key, and so my response to this was

to send a key to his lawyer, and we had Brendan Muha, who helped change the locks all the way back in August, take his key, which is back from August, and put it in a FedEx envelope and send it to Doug Deluca's counsel, who subsequently sent a note acknowledging receipt of the key shortly after this.

THE COURT:  Had the locks been changed again since you changed them in August and Mr. Deluca had received a key back in the third week in August, I think you testified to?

THE WITNESS:  Right, he was on-site after that, so yes.

THE COURT:  Okay.  And was the key kept in a hidden spot at the house or in a lockbox or where was the key?

THE WITNESS:  I just gave him the key.  I don't know what he did with it.

THE COURT:  So you personally gave him the key.

THE WITNESS:  I'm sorry, I didn't.  Brendan Muha did.

THE COURT:  Back in August.  The same key would open the house in January; is that correct?

THE WITNESS:  Today the same key will open the house.

THE COURT:  Okay.  All right.  Thank you.

MR. LYNCH:  And then let's look at Exhibit 533.

And before you launch in, Mr. Harrell, I would like to admit 532.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  Yeah, it's received.

(Plaintiffs' Exhibit 532 admitted into the record.)

THE WITNESS:  This is just what I was saying Deluca's counsel is saying, "I just received the key," which is what I was testifying about.

BY MR. LYNCH:

Q.    Yeah.  So this is an e-mail, Juanita Ferguson, Mr. Deluca's counsel, to me, on January 14th at 2:03 a.m.  I'm sorry, at 18:46 a.m.  "FYI, I just received the key."

Do you see that?

A.    Right, that -- yeah, it says, "FYI, I just received the key."

Q.    All right.

A.    So Brendan Muha had put a key in the FedEx, sent it to her, she said, I got the key.

Q.    Okay.

MR. LYNCH:  I move to admit 533.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 533 admitted into the record.)

BY MR. LYNCH:

Q.    I'll move to Exhibit 424.  And this one is actually in the pocket part, and it's tab number 1.

A.    All right.  So this is a legal document reflecting our decision to rescind the contract on December 2nd, 2019.  We list

out a number of reasons for that.  It's a stipulated fact that we did that and that Mr. Deluca rejected it.

Q.    Can you speak briefly to the timing of this?

A.    Sure.  So -- I guess the point is it was an onion, and we kept finding stuff that was wrong or missing or code defects, and once we kind of had confirmed that, you know, the carriage house permit, which we talked about, we kind of knew that for certain on November 21st -- you know, we suspected it earlier -- we knew there were structural problems in that building.  We suspected at this time, and, you know, I think -- you know, it's true that the materials we identified were never ordered.  There was, you know, questions about structural stuff in the main house that was not permitted.

You know, that was far beyond what we thought was fair, in addition to some of the other misrepresentations that are identified in that contract.  I'm not going to go through them all, but that was the point, that, you know, originally we were, "Finish the house, finish the house, move in"; but then when nothing happened, none of the material showed up and we started uncovering more and more work that was done out of permit and there were structural problems, you know, that was not something we signed up for, and I felt strongly it was unfair and you should just take it back and give me my money back and move on with his life, and so that's why we did it.

MR. LYNCH:  Thank you.  I move to admit 424.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 424 admitted into the record.)

BY MR. LYNCH:

Q.    Let's turn to Exhibit 425.  This was used in the opening.

What is this document, very briefly?

A.    Oh, this -- you already read this in your opening.

MR. LYNCH:  Yes, it's a party admission.  We'd move to

admit it.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 425 admitted into the record.)

BY MR. LYNCH:

Q.    This is letter dated December 19, 2019.  What was the

purpose of this letter?

A.    I wanted the money back for my materials.  These are --

this letter is pursuant to Virginia Code 18.2-200.1, which is a

Virginia Construction statute.  I demanded that he return the

money I advanced him for the identified materials.  I will say

that the outdoor sprinklers did get done after this letter, and

I'm sure I will be corrected if I'm wrong, but I don't believe

any of the rest was performed and none of the money was

returned.

This was sent Certified Mail, Return Receipt requested, as required by the statute.  And I think Doug's signature is -- well, we don't know that that's -- I don't know that that's Doug's signature, but anyway, that's it.

Q.    Okay.  To get a completely accurate list of 1 through 24 would you like to see your affidavit?  Strike that.  We'll cover that later.

A.    Okay.  We'll cover it later.

MR. LYNCH:  I'd like to refresh it now.  We have his declaration for summary judgment, Your Honor.

THE COURT:  To the best of your knowledge, is this a complete list of what you were asking for in payment for those tasks that --

THE WITNESS:  We put a lot of work into this list.  You know, I know that the porch extension deposit, I never got back.  I'd asked him to cancel that.  Some of this is sort of covered in our contract damages that a we're going to talk about.

The loft sink I never got, et cetera, et cetera.  The tile for the owner suite, which, you know, is a subject we're going to cover.

So a lot of this is we're going to cover in a minute in terms of our damages.

THE COURT:  Okay.

THE WITNESS:  The outdoor sprinklers, they were installed after this letter, so this is -- this is at my time -- this is at

the time what I thought were missing materials and things that we identified that we felt comfortable with.  Doesn't include code defects and things like that because we rescinded the contract, and we just were trying to get some of our money back pursuant to -- you know, that was advanced for construction and then have the rest be returned as rescission of contract.

So yes, I -- you know, we put a lot of work into this, and at the time it was -- I was very confident of it, and on many of these items that I just went through that we're going to go through later, they remain outstanding and I've never received any money.

THE COURT:  Okay.  All right.

MR. LYNCH:  And we move to admit this Exhibit 1066.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 1066 admitted into the record.)

BY MR. LYNCH:

Q.    So -- and then where did you move after the Airbnb?

A.    So we -- the long and short is that the Airbnb, we couldn't stay, our stuff is in storage, we had to move, so we rented a house in Spring Valley in D.C.

Q.    And what market research did you do before you rented that house?

A.    We looked at anything we could rent that we would take,

and this house is, you know, a little larger than the house, I think, as we found out in Arlington. It's older. It was very difficult to find anything, you know, for our family, you know, close in like that to St. Patrick's elementary school that was, you know, less than 7,000 -- unless you were going to be really cramped and it wasn't going to be kind of a, you know, comparable existence, so we rented that. It was $10,000 a month, and we signed a one-year lease.

MR. LYNCH: Okay. So that's the end of the story, the chronology, and we're going to touch on some subtopics now of different things.

THE COURT: Go ahead.

BY MR. LYNCH:

Q. And one of one of the subtopics is insurance.

THE COURT: Hopefully, the specifics of the fraud? We're going to cover those now?

MR. LYNCH: Yes.

THE COURT: Okay. And the damages, as Mr. Harrell has said.

MR. LYNCH: Okay, okay.

BY MR. LYNCH:

Q. So, before you entered into the contract, what was said to you about Mr. Deluca about permits?

THE COURT: About what?

MR. LYNCH: Permits.

THE WITNESS:  So I covered -- I covered some of this, and --

THE COURT:  At your first meeting, you had talked about permits and they were important to you because of your experience in Connecticut.

THE WITNESS:  Right.  And then on March 22nd when we met with Doug at the property, he told us the day before that he had some inspections coming that day and he couldn't meet with us. There's text messages that say this.  I don't know if we need to get them, but -- but then he said, "I'll cancel them."

And so when I showed up, I said, "Oh, how were the inspections?"

And he said, "Oh, I canceled them."  I guess I had forgotten.  And we talked more about permitting, you know.  He said -- this is the time when -- one of the times he told us that the carriage house was on the main house permit, which again he admit in the answer and so it's not a contested fact.

And so we sort of walked through my anxieties, you know, and his competencies in this area that, you know, he would comply with all the permits.  And this was on March 22nd, 2019, and it was a fairly clear discussion.

BY MR. LYNCH:

Q.    Okay.

A.    I remember he had the building plans out that he had drawn, some of which he had drawn from his engineer, sitting on

the thing, and I remember he was flipping them open and we were talking about them.

Q.    Okay.  So that's March.  What discussions did you have with Mr. Deluca prior to closing?

A.    Prior to closing -- you know, we were planning on buying a house that was finished with everything final, and so when we kind of shifted gears, as I've discussed, to sort of closing and then, you know, finishing, we looked into the permits -- well, I didn't.  I mean, my wife looked into the permits, so, you know, she can testify about her conversations, but, you know, we couldn't get ahold of the permits because we weren't the owner so Arlington County wouldn't give them to us.

We discussed them with Deluca and Muha, and, you know, Doug took great offense, "I'm a Class A contractor.  I would lose my license.  There's no way you should be worried about this.  Everything is taken care of.  Everything's been inspected, and all I've got to do is get a few things like the master bathroom tile, and I can finish the master bathroom tile.  Everything's -- you know, we'll just call the building final and we'll all be done."

And I agreed to live with his promises on this because, you know -- I mean, I had no reason to suspect otherwise.

Q.    Okay.  Let's go to --

A.    Indeed -- I'm sorry, can I make just one final point?

Q.    Yes, yes?

A.     One thing that really comforted me was, the powder room, he kept saying, "I can't start that until I get the permit."

And, indeed, there was a hole in the house where the powder room was supposed to go.  And he's like, "I can't start that until I get the permit."

And that made a lot of sense to me, you know, you can't start without the permit, so, you know, I didn't -- I find that kind of stuff and, "I'm getting inspections.  I can't meet with you because I have an inspector coming."

I found all that to be atmospherically just credible.

Q.     Okay.  Let's look quickly at 511, page 94.  This is not in the packet.  Just bring it on the screen.  Is it on the screen?

Did Mr. Deluca ever say anything was not permitted to you before closing?  Did he ever say certain things are not permitted?

A.     No.

Q.     So this is 511, page 94.

A.     Right.  The this is just in the blue -- I'm not a very good typist on text on phones, I guess, but "Probably not going to happen."  I meant, "Unfortunately, I think we have to live with his promise all permits, will be OK.  He carries" -- misspelled "contractors" -- "insurance for such things.

"And his license is on the line.

"So there's plenty of incentive there."

So that was me just saying, okay, I believe him.

Q.    Okay.  Do we have a date on this text message?

MR. LYNCH:  Will you scroll up, Mr. Fitzhugh -- there -- down, down, down.  I'm sorry.  We were on 94.  Can you scroll up until you see a date.  There we go.  Down.  Nice.

A.    6-20.

BY MR. LYNCH:

Q.    June 20.  Okay.

MR. LYNCH:  All right.  We'd like -- this is a text message, but we move to admit Exhibit 511, page 93 to 94.

THE COURT:  So I think 511 is already in, but without this, so this is a separate --

MR. LYNCH:  It was not objected to.

THE COURT:  511A, any objection to 511A?

MR. COUGHLIN:  Your Honor, I don't have it in my binder that has been provided.

THE COURT:  Okay.  Well, take a look and we'll reserve ruling on it.  It's his state-of-mind statement, but I'll give you a chance.

MR. COUGHLIN:  Right.  I just would like to have a copy of it for my binder.

THE COURT:  Right.  Okay.  Well, it's evidently part of the big 511 that's been narrowed.  All right.

MR. LYNCH:  For the record, it wasn't objected to, but we're going to move on.  So the -- it wasn't objected --

THE COURT:  511 you mean?  The long --

MR. LYNCH:  It's admitted.  Exhibit 511 was never objected to.

THE COURT:  All right.  And I've already told you --

MR. LYNCH:  Yes --

THE COURT:  -- that I'm going to give him an opportunity to look at stuff now that you have narrowed the scope of the exhibit, okay?

MR. LYNCH:  Yes.

THE COURT:  All right.  Go ahead.

MR. LYNCH:  I'm sorry, Your Honor.

BY MR. LYNCH:

Q.    So, so -- okay.  All right.  That's permits.  Let's talk about the roof.

I'd like to introduce trial Exhibit 919.  This is an Instagram post dated March 11th, 2019.  What is the significance of this document, Mr. Harrell?

A.    It's just what Doug would always say about the roof. It's a charcoal slate roof.  He and I discussed it in March.  I wanted a slate roof for some reason, and, you know, he was explaining to me that it was an original roof and that he was fixing it, that slate roofs last forever because their construction is sort of like Theseus' ship or something, you just replace a piece of it and it kind of continues on forever, and he admitted this in the answer, so I think it's -- you know,

it is what it is.

MR. LYNCH:  I move to admit Exhibit 919.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 919 admitted into the record.)

BY MR. LYNCH:

Q.    Okay.  Let's look at Exhibit 496, and we're going to look at specifically page 288.  You see it's a text message alluded to by the defendants in summary judgment in their opening argument.

A.    Right.  So I work for a Big Four accounting firm, and we have what we call independence issues.  We're not allowed to have a financial interest or financial relationship with anyone that we audit and, oftentimes, even people we don't audit, so there's -- you know, the number of insurance companies I can deal with, the number of things like that I can deal with are extremely limited, and it's a real pain.

So I was -- I was really just sort of asking Doug, Can you help me talk to this insurance company?  You know, they want to know how -- because I'm trying to get homeowners insurance -- they want to know how big the roof is.

And he says, "2 additions new.  1 porch new.  3 sides of carriage house new.  "The front half, I'm not sure.  They should come out."

So we got on the phone subsequently with the insurance company and, you know, he described, you know, whatever he described. My reading of this e-mail, my reading of this text message and what I thought at the time was the "3 sides of the carriage house new" and the "front half not sure" --

THE COURT:  Slow down.

THE COURT REPORTER:  Slow down.

THE WITNESS:  I'm sorry.

"The 3 sides of the carriage house new" and "The front half of the front not sure" was the carriage house.

We discussed -- you know, we discussed the age of the main house roof as being an original 1930s roof or things like that. He says that this means that the front half of the front of the house, he's not sure about.

That wasn't my understanding. That's not what we discussed, so I mean, we just have a difference of opinion on that, but --

BY MR. LYNCH:

Q.    Describe your conversations with Mr. Deluca about the slate roof.

A.    I think I did.

Q.    And sort of was there ever a time when you and Mr. Deluca stood in front of the roof and looked at it and had a discussion? The main --

A.    Yeah, on March -- in March, you know, I -- you know, he's

walking his round of the property and he's pointing to the main house roof, which in the front is a facade that you can see kind of the slate on, and he's like, "That is all, you know, gold. You know, it's original slate roof.  We're going to keep this charcoal slate roof, and then the stuff behind, you know, is going to be different.

And, you know, I was like, "Wow, I really like the way that looks," and -- you know, that it's really -- I don't know, it was just important to me, so that's it.  I mean --

Q.    Okay.  Let's talk about square footage and look at Exhibit 559.

A.    Right.  So this is the February 9th e-mail where they're passing along the square footage of the house after our January meeting, and that's what they say.

Q.    Okay.

A.    I'm sorry.  I should say 6700 square feet including the carriage house.

MR. LYNCH:  Okay.  I'd move to admit Exhibit 559.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 559 admitted into the record.)

BY MR. LYNCH:

Q.    All right.  Let's look at Exhibit 560 -- well, I want to make sure I give you a chance to cover this.  What was discussed

on March 22nd about square footage?

A.    We were comparing Hoban, the -- I'm sorry, the house in D.C. with the house in Arlington and we were asking Mr. Deluca, you know, how big the house was, and we were comparing what we were being told about Hoban, and, you know -- my recollection is very clear that Brendan Muha told us the main house was 6500 square feet and that that was understood by everybody in the room.

My recollection of what Mr. Deluca said at that point is not as clear, but my recollection of what Mr. Muha said is very clear, and, you know, we didn't really care about the carriage house as much because the trading value of the house is in the house.  The carriage house is like other stuff, you know, and we wanted the house to be, you know, a significant size, so that's my testimony.

Q.    Was Mr. Deluca within earshot of Mr. Muha's statement?

A.    Mr. Deluca was aware of these statements, yes.  I mean, he was there.

Q.    All right.  Let's look at Exhibit 562.

A.    And this is just an example of -- this is Doug Deluca sending a note to my bank, MainStreet Bank, saying the house is 7,000 square feet.

MR. LYNCH:  We move to admit this as Exhibit 562.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  Okay.  It's received.

(Plaintiffs' Exhibit 562 admitted into the record.)

BY MR. LYNCH:

Q.    Okay.  Let's look at Exhibit 560.

This actually -- it's a set of e-mails and also a set of floor plans, and those are e-mails between Mr. Muha and this company, HomeVisit, with various dates.  Briefly describe this document.

A.    Well, I think Mr. Muha probably --

Q.    I already covered that.  I'm sorry for taking you there.

Let's move to Exhibit 561.

A.    So this is in June of 2019.  We had been asking for plans so we could have a furniture plan, which is one of the things you do when you move, and they -- Brendan sent us this note, and he attached these plans.  As you can tell, there's no -- there's no summary square footage on them, but if you compare them to the note he sent himself on February 7th, 2019, which begins at TTR 5707, they are the same plans, but they have a square footage total on them, and it says "6049" on each page, and that includes -- I got turned around.  That includes the carriage house.  That includes the lower level, the main level, the upper level, the upper level garage, the excluded area.

MR. COUGHLIN:  Objection, Your Honor.

THE WITNESS:  I'm sorry.

MR. COUGHLIN:  I'm not sure where he's referring to.  This

document is an e-mail from Mr. Muha.

THE COURT:  Well, I'm looking at --

MR. COUGHLIN:  Mr. Harrell, are we at 561?

THE COURT:  The last -- Exhibit 561, and if you look at the last page -- well, actually, if you look at the bottom of each of the drawings, it has "Gross Internal Area."  It goes down the -- each "Carriage," "Lower Level," "Upper Level," "Excluded," "Reduced," and you wind up with 6049.

MR. COUGHLIN:  Understood.  But he has not laid down a foundation for how he is able to interpret these numbers and --

THE COURT:  I think he said he was --

MR. COUGHLIN:  -- how they relate to the square footage of the property and whether they're accurate or not.

THE COURT:  Well, this is just -- this is what he's getting from Brendan Muha, right, who explains what he's done in the -- some additional measurements that he's done; is that right?

THE WITNESS:  Well, these measurements were not provided to me.  The plans that were blank that come before it were provided to me, but the plans that were blank that come before it have a text box in them that covers up what you were just reading, the gross square footage.

THE COURT:  And when did you receive that, earlier or --

THE WITNESS:  Well, I never received this -- I received the plans with the -- they're blank that go from 5710 through

TTR 5716, and during discovery -- this is after, you know, all this happened -- I was flipping through on a screen and you could see a flicker, and beneath the flicker is what's on 5719 and the rest of them that have the square footage numbers on it, and so the point is that I was given plans that masked this information from me.

THE COURT:  Okay.  And when were you given those earlier plans that did not have the discretion of this -- of the measurements?

THE WITNESS:  June --

THE COURT:  June of 2019?

THE WITNESS:  June 14, 2019.

THE COURT:  Okay.  All right.  Well, I'm going to receive it.

MR. COUGHLIN:  Your Honor, the objection is that this merges two documents into one, so if you look at Bates-stamped 5717 of 561, that's an e-mail from Brendan Muha to somebody who's not a witness in this case, and Mr. Harrell didn't receive these documents, as he just testified, until discovery proceedings.  So all he received are the first pages, and we don't have an objection to 5707 through 5716 being received, but we do object to the rest being received at this point in time.

THE COURT:  Okay.  So this is just an exhibit which you think has been cobbled together, but it's not -- the plans don't follow the e-mail in the following two pages; is that correct?

MR. COUGHLIN:  There's two sets of e-mails, one in February of 2019 and then the one that he actually received in June, and he's making suppositions, speculating as to why there's differences between the two documents.

THE COURT:  Well, I think he's compared the actual plans, floor plans, and they're the same floor plans that he received in June of 2019.  Is that what he -- I thought that's what Mr. Harrell just testified to.

MR. COUGHLIN:  No.  He --

THE COURT:  Absent the notation of the dimensions.

MR. COUGHLIN:  Yes, and the total square footage, correct.

THE COURT:  Right.

MR. COUGHLIN:  That's the difference.

THE WITNESS:  Well, what I can testify to -- if I may?

THE COURT:  Yes, go ahead.

THE WITNESS:  Is this diagram has blanks.  The PDF version, when you scroll through it, I saw it flicker.  That flicker had the box on the next page.

THE COURT:  Okay.

THE WITNESS:  With the square footage in it.

THE COURT:  And where did the -- this -- where did 509 -- or 510 to 517, where did that come from?  That was just something that was produced in discovery?

MR. LYNCH:  By TTR, yes, Your Honor.  You can see the consecutive Bates label.  This is a document that they produced.

Not to be overly technical, the defendant did not object to this in their pretrial disclosures.

THE COURT:  Well, I'm just trying to determine why it's in 5 -- Exhibit 561 versus it being a separate exhibit.

MR. LYNCH:  It was for the comparison's sake.

THE COURT:  Okay.  All right.  Well, I'm going to allow it for that purpose.  So your exception is noted.

(Plaintiffs' Exhibit 561 admitted into the record.)

THE COURT:  Go ahead.  Move on.

BY MR. LYNCH:

Q.    Okay.  So we are now on Exhibit 500, page 20 to 21.

A.    Which page?

Q.    20 to 21.

A.    Yes, so this is a text message with Doug Brendan, my wife, and I on June 10th, 2019, and I'm asking for the final square footage because my homeowners had asked me, and I am a little OCD about things a little, I guess, and I asked, you know, I need you to tell me the exact number, and Brendan says, "Roughly 6500 square feet."

And Dawn says, "Is that just the main house?"

And Brendan says, "We never with updated master space, additional carriage house space.  I think it's probably close to 7000 square feet."

And Doug says, the job's -- "Dawn's gym is 350 square feet" --

THE COURT REPORTER:  Sorry, say that again.

THE WITNESS:  Dawn -- I'm sorry.  I'm -- let me just take a little water.

"Dawn's gym is approximately 350 square feet I'll do a rough measurement in the morning."

And I say, okay, you don't have to -- "Don't worry about it tonight," it "can wait."

And, you know, this was significant to me because they said, I never completed a precise calculation, and I wanted to know what, you know, the number was, and so this kind of set off a chain of events.

BY MR. LYNCH:

Q.    Looking just at the three texts in a row, "Roughly 6500," "Is that just the main house," and then Mr. Muha' reply, what impression were you left with with the size of the main house after those -- receiving those three messages?

A.    So it was roughly 6500 square feet.

Q.    All right.  And then in terms of the next page, and there's a message there that says, "My recollection when we asked before buying that the main house was going to be approximately 6500 square feet and the carriage house was 1500," that's a message from Dawn?

A.    Right.

Q.    Do you recall anyone at any time in the text messages saying, in response to that, that that was incorrect or wrong?

A.    I don't recall any, no.

Q.    Do you recall anyone verbally saying that understanding is wrong?

A.    From here on out, I focused on the main house, you know, how big is the main house, and so I'm focused on that 6500 number and nobody told me it was wrong.

MR. LYNCH:  I move Exhibit 500 be admitted.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 500 admitted into the record.)

BY MR. LYNCH:

Q.    Let's go to Exhibit 505.  Let's look at page number 6876.

A.    Yep.

Q.    Okay, who's speaking in the messages on this page?

A.    This is between Doug Deluca and Brendan Muha.

Q.    And then what was significant to you about the message in the middle, "only time sensitive question is square footage for John & insurance within 150 -- 100 square feet.  I said roughly 6500."

What's that significance --

A.    I must be looking at the wrong page.

Q.    Am I?

A.    I mean -- I'm sorry.

Q.    Are you on --

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

THE COURT:  6876.  At least that's what's up on the screen.  And I don't have that in my binder, no.

THE WITNESS:  I see.  They're out of -- the portion of the binder, they're out of order, I guess, the 505, 6876.  It's towards the end of the '5 chain, so it's the last couple pages of the 505 chain.

So in the blue, "Hey, Doug, only time sensitive question is square footage."

And so I began -- yeah, I mean, I said, look, forget about -- you know, just tell me, is it within 150 square feet of 6500?  I was good, you know.

And Doug says, "I need to measure measure."

BY MR. LYNCH:

Q.    And the punch list listed square footage --

A.    Right, if you recall, one of the critical items I had was square footage -- there were four critical items on the July 2nd version of the punch list.  One of them was square footage.  And I wanted confirmation of the square footage prior to closing.

Q.    Okay.

MR. LYNCH:  We move -- I'm sorry, did I already move 505?

THE COURT:  505, no.  Is there any objection to 505?

MR. COUGHLIN:  505, page 87.

MR. LYNCH:  So it's just the one page.

THE COURT REPORTER:  I'm sorry.

THE COURT:  All right.  6876 is received.

(Plaintiffs' Exhibit 505, page 6876, admitted into the record.)

MR. LYNCH:  Thank you.

BY MR. LYNCH:

Q.    Let's look at trial Exhibit 511, page 408 and, in particular, the message on the bottom of that page.

A.    408.  This is an -- this is after closing in September, and, you know, I'm not at the best I have been in my life, but I began to question everything, and I -- you know, I don't remember why exactly I thought I was coming up with a lower number, but it didn't seem plausible that it was 6500 square feet based on my walking around the property and stuff and doing some, you know, hand tape measurements of my own.

Q.    And that's your message at the bottom, right?

A.    Yeah, so I'm like -- you know, because they -- I mean, we kind of skipped over that on July 2nd, you know, I had the critical item, you know, I was told it was at least 6500 square feet.  Brendan Muha told me that.  Doug was there.  The words did not come out of Doug's mouth; they came out of Brendan Muha's mouth, who was Doug's agent.  And so I just began to question everything, and I began to say, "Well, you know, maybe I was lied to about that."

MR. LYNCH:  We'd move to admit Exhibit 511, page 408.

THE COURT:  The exhibit's already in, but it will be received.

(Plaintiffs' Exhibit 511, page 408, admitted into the record.)

BY MR. LYNCH:

Q.    All right.  Let's look at trial Exhibit 511, page 462, and we'll have to go to the screen for this one.

A.    Yeah, this is long after closing.  This is Brendan Muha and my wife and I -- sorry, I'm not talking into the mic.

He's just saying what -- telling us about HomeVisit for the first time, that -- I'm sorry, I can't do -- I can't --

Q.    That's okay.

MR. LYNCH:  So can we -- is it possible to move the screen or can you use --

THE COURT:  No, unfortunately -- you know, you can move the --

THE WITNESS:  He says, The HomeVisit plans are about 6,000 square feet, but Doug said it was wrong and he would measure it himself.

And he attached -- I'm sorry, and he sends them to us.

BY MR. LYNCH:

Q.    What are those two PDFs that are sent to you at this time on this message?

A.    Those are the HomeVisit plans with the square footage results on them that we...

Q.    Unredacted square footage, right?

A.    Right.

Q.     That's the first time you ever saw an unredacted version of these HomeVisit plans?

A.     Right.

THE COURT:  And when is that?

THE WITNESS:  It's well after closing.

MR. LYNCH:  Scroll up, Mr. Fitzhugh, to find the date.

BY MR. LYNCH:

Q.     So if you look at page 461 of Exhibit 511, there's a date of December 17th, 2019.  You can see a message there saying, "Did HomeVisit actually prepare a report/calculation on the house?"

Does that refresh your recollection as to the time you received the HomeVisit plans?

A.     I mean, I defer to the text message, but that's -- I mean, I recall it being well after closing, many months.  So...

THE COURT:  Okay.  All right.  Let's take our mid-afternoon break.  We'll take 15 minutes and we'll come back and continue.

All right.  We're in recess.

(Thereupon, a break was had from 3:48 p.m. until 4:06 p.m.)

THE COURT:  Please.

MR. LYNCH:  I tried to tighten it up as much as we could, Your Honor.  I'm trying to see how fast we can do it.  We're close.

BY MR. LYNCH:

Q.      Okay.  So, we want to talk quickly about the insurance, and to do that we'd go to Exhibit 754.  And when you're there, Mr. Harrell, tell me about this document.

A.      So, the PCCA requires Deluca to maintain certain insurance.  The clause in a PCCA is repeated in this "Description of Operations" box below on this document.  It's also in Section 5 of the -- Article 5 of the PCCA, and this is the builder's risk policy you are supposed to have.  So we requested evidence of insurance prior to closing, and we were provided this certificate of insurance.  Brendan Muha forwarded it to us from Mr. Deluca.

It reflects a builder's risk policy "with the mortgagee's loss payable clause in favor of John and Dawn Harrell and the Main Street Bank and with a physical loss" endorsement, dot, dot, dot, and it continues on, and this insurance never -- this insurance never existed in the sense that --

MR. COUGHLIN:  Your Honor, I'm going to --

THE WITNESS:  I'm sorry.

THE COURT:  Let him explain.

MR. COUGHLIN:  Okay.

THE WITNESS:  This insurance -- the policy that exists which has been provided to me and I've reviewed does not have a mortgagee's loss payable clause in favor of John and Dawn Harrell, and the certificate of insurance for the builder's risk

policy that's described in here does not insure the property at all post July 3rd, 2019 because under the way that policy is written, Mr. Deluca did not have an insurable interest in the property.

We requested, numerous times, confirmation that Mr. Deluca had insurance after August 6th.  Those were between counsel and sometimes by Mr. Deluca himself, and I was always assured that he did have builder's risk insurance, but he did not.

BY MR. LYNCH:

Q.    What about general liability insurance?

MR. COUGHLIN:  Your Honor, may I state an objection?

THE COURT:  Yeah.

MR. COUGHLIN:  I'm not sure of the relevance of this. That's the basis of my objection.  There's no insurance claim here.  They're not filing a suit against Mr. Deluca's insurance company or against him related to insurance.  There's no claim of damages related to whether there's insurance or not, so I'm just not sure of the relevancy of the insurance policy.

MR. LYNCH:  Your Honor, Clause 5.1 of the Post Closing Construction Contract says, "Contractor will purchase and maintain and provide evidence of the following insurance policies:"  All -- builder's all risk insurance, public liability insurance, workmen's comp compensation insurance.

And so we had -- we had paid on this contract $17,500 -- we had at least partially performed.  There are cases in Virginia

which say failure to have insurance is a material breach, and if we had known this at the time -- and we didn't -- but if we had, we could have called them in breach and finished the work with someone else.

THE COURT:  So this is evidence of present intent to defraud?  Is that your theory?

MR. LYNCH:  I mean, that's part of it, and it's also a material breach.  And the facts on this are the Bender designation.  We took the deposition designation of a person who works for a company that bought the original issue -- issuer of certificate.  And if you look at the certificate, it's got the name of a name of a man named Daniel Giredew on it, and he reports to Mr. Bender.  And Mr. Bender describes in this deposition designation, which is filed with their consent subject to a relevancy objection, he describes the inaccuracies in the certificate of insurance.

THE COURT:  Okay, all right.  The exception is noted. I'll allow it for purposes of the violation of 5.1 in the material breach, and we'll see what Mr. Bender's testimony reflects.  Your exception is noted.

Go ahead.  Move on.

BY MR. LYNCH:

Q.    Okay.  So I want to go touch on one more text message on square footage.  It's page 496 -- Exhibit 496, I'm sorry, page 289.

There's a message on page 289, Mr. Harrell, that begins "Sorry about this."  Who wrote that message?

A.    I did.  I was just reminding Doug that I needed the square footage.  I looked in the appraisal which is, you know, the diagram people point to that I should have known about.  I looked at the appraisal.

We can put it up or -- or I understand the appraiser may testify, but it's -- I found it very confusing.  It's got numbers here, there, and everywhere.  I didn't understand it, and I had told Doug and Brendan I didn't understand it at the time.  And that's what this text message is about.

Q.    Okay.  So the page prior to this is on the screen now, so page 288 and it's actually -- if you flip one more you can see a date.

A.    June 10th.

Q.    In your book you have 288, so what was the date of your message approximately?

A.    June 10th.

Q.    Okay.

A.    2019.

Q.    Okay.  Let's go to page 5 -- I'm sorry.

MR. LYNCH:  I want to admit these two pages of 496 into the record.  That's, for the record, page 288 and page 289 of Exhibit 496.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  All right.  They're received.

(Plaintiffs' Exhibit 496, pages 288 and 289, admitted into the record.)

BY MR. LYNCH:

Q.    So let's go to Exhibit 511, page 96, and we are talking about the tile.

A.    All right.  So just sort of cutting through the tile discussion down to, you know, what happened briefly in a thumbnail, I received this note from Brendan Muha on June 21st. "Doug has a clarification on the addendum, the gates and the tile have a 50% deposit paid.  He doesn't pay the rest of the deposit until they arrive and he checks for damage."

And that got -- you know, this was what I was talking about earlier, that I was told it had been ordered, Doug was representing, you know, everything had been ordered, that it had been paid for, and then he came back and, says, "Well, this only has a 50 percent deposit."

My understanding of this text message at the time was it had been ordered, he continued to say it's been ordered after closing, but it had had a 50 percent deposit.  That language ended up in the final Exhibit B, as well, in a form we read earlier, and so I closed believing that the tile had been ordered and that he had paid a 50 percent deposit for it.  And that's, you know, that's it on the tile.

MR. LYNCH:  We move to admit Exhibit 511 --

THE COURT:  511 is in already.

MR. LYNCH:  Okay.  Thank you.

BY MR. LYNCH:

Q.    Okay.  So, if you had known that Mr. Deluca performed work, construction work, without permits, what effect would that have on your willingness to close on this contract?

A.    I -- I would have been very upset about it.  I would not have closed if I had known there was a lot of unpermitted work.

Q.    And would you have entered into the contract on April 3rd if you had known there was unpermitted work?

A.    No.

Q.    No?

A.    No.

Q.    Okay.  If you had known that the main house roof was not real slate, what effect would that have on your willingness to close?

A.    I -- I don't think I would have been interested in the property when comparing to the other property I was looking at.  I would not have been interested in the property.

Q.    And the same concept applies with entering this sales contract, right?

A.    Correct.

Q.    Okay.  If you had known the true square footage, what effect would that have on your willingness to close on the

contract?

**A.**    We never would have looked at the house, if we had known it was, you know --

**Q.**    Okay.  If you had known that materials had not been ordered, like the master bath tile, now or in June, if you had known that, it was never ordered, what effect would that have on your willingness to close?

**A.**    Well, we wouldn't have closed when we did, certainly, and if they were never ordered, we would not have closed at all because we were looking for a place to live, and the whole purpose of confirming the status of materials in June was to assure ourselves that they were on the way, they would be installed, and we could move in.

**Q.**    Okay.  If you had known -- well, okay, let me ask this question:  What do you have to say about and what comparison have you done between the amount Mr. Deluca drew from his lender for construction from Dashco versus what he spent?

**A.**    Well, this just goes to -- I mean, that's a long, complicated topic.  We don't have receipts for most anything. We went through an exercise with his prior counsel where we stipulated that he had a certain number of receipts.  We attached those in a court finding.  Those were, depending on how you count them, between 300 and $350,000 of receipts.

I believe closing, when I was paying off the Dashco loan, which was $1.2 million of draws for construction, that all of

that money had been spent on the house, you know, I can eyeball it and see that he has numbers that he drew money from Dashco --

MR. COUGHLIN:  Objection, Your Honor.  He's speculating at this point in time.  He's not an expert in this case related to forensic accounting or anything along those lines.

THE COURT:  All right.  I'll sustain that objection, but you can make specific -- you can identify specific items that you believe were not properly priced.

THE WITNESS:  He drew around $88,000 for kitchen millwork, and I don't know where that money was spent.  There's a cabinet invoice from a company called NVS that was produced in discovery.  I believe that is the kitchen millwork, and that -- and there are two invoices there approximately 25 -- it's a little less than $25,000 or a little more than $25,000, but ti was right around $25,000.

He spent quite a bit on his electrician that -- and the only documents he have on his electrician are checks that he wrote, and there's a, you know, significant gulf between those two numbers.

So just going -- just going through the documents I do have versus what the draws say he spent on these things, you can't -- you can't total the two, and, you know, in the kitchen millwork case, you know, I just don't know what $88,000 of kitchen millwork would be, you know, in that kitchen.

So anyway, I closed believing, when I was paying off the

Dashco loan or his construction financing, that that was all money spent in the house, and we just don't -- we don't have evidence that it was.  And, you know, we don't have sufficient record of receipts.  They weren't provided to us ever to document exactly what was the level of construction, what was drawn, what was spent, where the upgrades came from, et cetera.

MR. LYNCH:  And we have on this a stipulation with a declaration from Dashco, and the only objection that the defendants have to admitting that into relevance is that it's not relevant.  It details the draws.

THE COURT:  Okay.  Well, you present the stipulation and I'll rule on it.

MR. BURCHER:  Your Honor, we'll waive our relevancy objection, so it can come in.

THE COURT:  All right.  It can come in?  What's the exhibit number, or does it have an exhibit number?

MR. LYNCH:  It does not, Your Honor.

THE COURT:  Okay.  Well, we'll mark it -- what should we mark it, Paulina?

(Discussion had off the record.)

MR. LYNCH:  We're at 1070.

THE COURT:  1070.  All right.  Mark it 1070 and we'll receive it.

(Plaintiffs' Exhibit 1070 admitted into the record.)

MR. LYNCH:  Okay.  Now -- the document speaks for itself.

We're not going to cover that, Your Honor.

THE COURT:  All right.

BY MR. LYNCH:

Q.    So if you had known that the house could not be legally occupied, how would that affect your willingness to close?

A.    We would not have bought a house that could not be legally occupied.

Q.    Okay.  Did Mr. Deluca ever tell you that there's an active crack in the masonry on the carriage house at any time?

A.    No.

MR. LYNCH:  We have agreed to damages.  We would like to go through damages.  I'm going to start with Exhibit 488, but we have a package --

THE COURT REPORTER:  I'm sorry, Counsel.  I can't hear you.

MR. LYNCH:  We're going to start with Exhibit 488, and we're going to pass out a package, damages documents.  I would like everyone to turn to tab 4 of this document of the packet we just handed out, and that is Exhibit 488.

This is a demonstrative exhibit, Your Honor, detailing our damages.

THE COURT:  Okay.

BY MR. LYNCH:

Q.    Mr. Harrell, walk us through Exhibit 488, please.

A.    So this package has the receipts, the checks, the

invoices related to each of these, so as you go through it, you know, it has my insurance in different tabs and things.

This document is a summary document, and, you know, I'm not testifying about the cost to remediate. Someone else is. But that's the cost to remediate that we have. There are things that are not in the cost to remediate, principally because they're just kind of not appropriate to it, and these are listed here.

The gate motor and controls, there is something on the property, there's gates that you push a button and you come on. And there's something there, but they don't work, and I don't know where they're from. I paid $20,600 for them. I don't have a receipt. I don't have any kind of information about them. They don't appear to work at all. I had asked Mr. Deluca about them, and he referred me to his gate company. I called them and he didn't -- they didn't call me back to discuss it.

The outdoor customization budget, we never used that. I can talk more about that, but I'm not going to unless it's needed.

There was a built-in desk. There was --

THE COURT: This is -- is this the only testimony you're going to have on this subject? So tell me why the $8,000 is due back to you, then.

THE WITNESS: Oh, I'm sorry. I was trying to hurry, I guess.

THE COURT:  No, this is important.

THE WITNESS:  So the there was -- in the final Exhibit B there's an $8,000 outdoor customization budget.  And it was originally 10,000, and we had a bit of a disagreement about that, and Doug told us that -- because we were also -- I mean, this is all refrigerator drawers and stuff.  There were refrigerator drawers that were supposed to go outside, and he already had a refrigerator there, and so he said, "Look, I'll move the refrigerator there up to your bar in the carriage house, and, you know, that's going" -- you know, my understanding was that was going against the $8,000, and we never got the refrigerator drawer.

To the best of my knowledge, we never used this 8,000.  I can't identify where we used it.  If someone shows me where we used it, I will acknowledge it, but I've been through this a lot and I don't see how we spent this 8,000.  And we certainly never got refrigerator drawers, and the refrigerator that's there wasn't what we picked out.  It was supposed to be moved upstairs for this.  So it depends on how you score-keep it, but my view is I never got that money.

BY MR. LYNCH:

Q.    Okay.  To what extent did this budget function like an allowance?

A.    That's what it was.

Q.    Okay.

**A.**     The built-in desk for my daughter's room.  That's in the contract.  I don't think it's disputed that it wasn't done.

The dining plate rack, I asked him to move that to the garage on August 6th so that we could do inspections.  He did move it to the garage, and we have a picture of it.  I'm probably not supposed to --

**Q.**     So it was a damaged plate rack; is that your understanding?

**A.**     Well, it started being used to store stuff for workers in the garage.  My perspective is -- I mean, it was never finished and then it was used for material storage.  You know, if he's owed an offset for the work he did, fine, but I never got any benefit out of it, and now it's sitting in the garage with materials stored in it.  I paid him $4,500 for it.

The Post Closing Construction Contract porch deposit.  You know, this is a classic contract damage question.  He began work without a permit.  He did a certain amount of work related -- and if you add up his schedule from Exhibit C, that's about $10,000.  And we can go through that if you want, but the work he did was basically laying the foundation and the outdoor stone, and if you add that up, that's $10,000.  It was done without a permit.  The County said they need to inspect the slab.  We went through that e-mail.

My view is it has to be ripped out because I have no confidence in it.  If he's owed, you know, money for work in

place, then, you know, he gets $10,000 of that money and I get 7,500 -- although, I would have to check the math on what exhibits he says. I don't have it in front of me. But whatever he said in Exhibit C for that work, which I think is around $10,000.

The -- the door stops we never got. We returned them. He told me that he would buy me a membership at the Overlee pool, which is next door to our house. That's in the sales contract. He never did that. I did it. I think it's -- yeah, it's definitely in Exhibit 1031. I'm probably not supposed to do that. Sorry. It's in our damages.

So those are just things that are not in the bid that we paid him that, you know, we would like our money back on.

That's what that is. The bid is what the bid is.

The other thing we did was -- and these are real estate taxes we paid in Arlington. You know, we have two lines here because we added, you know, taxes after the pretrial date, so through the pretrial -- roughly through the pretrial date we were at $63,075 and then after we were at 35,262 through June 22, so that's $98,338.25.

I carried insurance on the property. So far that's $9,322.

And then duplicate living expenses, the Arab from September to October was 14,000 -- I rented a house at about 10,000 -- or at $10,000 a month at 4965 Glenbrook Road,

Northwest in Washington, D.C.  I paid $116,000 for that.

And then after we -- so we bought another house because we had to.  And COVID hit, and my work lets me work anywhere now, and so we decided to move to the beach and improve our attitude in life a little bit, so we did.  We moved to Hilton Head, we bought a house, but I continue to carry this house, and we'll talk about, in a second, how that relates to our damages, but this is the total and the periods of the costs with respect to which I've carried the house, as well as my rent at Glenbrook and the Airbnb.

And so those are the broad categories of damages that are in this packet.  Anyway, that's it.

Q.    Okay.  And we'll quickly authenticate some of these documents in here, but to get the concept first, what damages are you seeking for rescission?

A.    For rescission, to me the appropriate -- duplicate living and all that goes out the window.  I would have paid to live somewhere if the contract is rescinded.  So those are on me. I'm not asking for those.

I think prejudgment interest is the appropriate way to compensate me for my loss of capital with respect to that, and if I were to get duplicate living, that would be duplicative. The money I had to spend out-of-pocket to pay taxes and ensure the property that can't be lived in on a rescinded house, I have no choice but to pay the taxes or the government will take it

from me, and of course I have to ensure it for liability reasons, so that money we are asking for in rescission.

Q.    Okay.  What damage are you seeking for breach?

A.    For breach, it is the -- you know, the big number is the bid, and then duplicate living, and, you know, the debate is going to be at what point do you cut off duplicate living.  You know, I mean, our view is, you know, the most aggressive view is until he finishes, you know, they're going to say you racked up all these damages, you sat there, and, you know, you're going to sue him for those.

It's a difficult question, I think.  The -- some amount of them, you know, are on him, and I believe certainly the rent at Glenbrook and the Airbnb are, you know, fairly and squarely within his domain because he kept saying he's going to finish. If we're in breach land, you know, at what point it became clear that he was abandoning -- in, you know, in March 2020 he said he was going to continue to finish, and from my perspective -- and I think this is true -- is it's cheaper to have the horse you rode on unfinished by a multiple of these numbers than it is to kick him out and get a bid.

So exactly how one thinks about that in terms of what's fair is the question to me.  But those are the damages I incurred.  I feel strongly that, you know, the place I didn't have to live during 2019, you know, that he should pay me as damages under -- as for breach of contract.

The caring cost for the house, I think I will -- you know, at some point when it's clear he's not coming, you know, maybe those are, you know, unfairly assigned to him.  Exactly when that is is a complicated question, but certainly it's up through March 2020, and, you know, we've sort of picked -- pick up mortgage interest only in November 2020, so anyway, that's the way I feel about that.

Q.    All right.  So what damages are you seeking for VCPA?

A.    VCPA damages are -- you know, it's kind of --

Q.    Difficult question.  What --

A.    It --

Q.    Go ahead.  I'm sorry, I cut you off.

A.    My perspective is, you know, all of the materials that I paid him for that he said he bought, you know, he should pay either under contract or under that.  All the permanent work that I'm having to pay to fix under a nonrescission scenario, that's all, in my view, squarely within dishonest conduct of the VCPA, and that also rises there, as do the consequently damages from having to carry a house that can't be lived in.

And so we're seeking principally, I think, the cost for, you know, remediate if it's not contractual, and the missing materials, as well as the real estate taxes and the insurance and my duplicate living under VCPA sort of covers the waterfront in my view.

MR. LYNCH:  Okay.  The last question on damages.  We

looked at the VCPA letter listing a number of materials. I would just like the hand up Mr. Harrell's summary judgment declaration to refresh his recollection as to what items on that VCPA letter were never provided.

THE COURT: Okay.

BY MR. LYNCH:

Q.    To do this you're going to have two things in front of that's 1066 and this declaration, especially for you, Mr. Harrell.

A.    I'm sorry. So we went through some trouble when we put this declaration together to confirm what we thought, what we knew. And the first floor half bath is not complete. The sub-zero grill refrigerator with drawers are not there. The bathroom fixtures to be replaced was not done. The powder room is not done. The outdoor selection budget that I discussed. The marble tile flooring that we discussed extensively, the built-in desk for my daughter's room is not done. The laundry room cabinet is not done. The bathroom heated floors is not done. The owner suite bathroom is not complete at all. And those are ten things that are not done from the Exhibit B that I paid Mr. Deluca for that I want my money back for, and I know they weren't done.

Q.    All right. The last thing to do is to authenticate the rest of the damages package beginning at tab 6. What is Exhibit 512 [sic]?

**A.**      I'm sorry, I have to get -- I'm sorry, what was your --

**Q.**      Tab 6 is where you start.

**A.**      Okay.  Tab 6, these are the real estate taxes for Lee Highway and the proof -- these are printouts from my account at Arlington County as well as, if you continue to flip through it, the checks or other evidence that I paid those taxes.  For my records, for the period indicated on the first page of 516, there are four lots of the property, so each of the lots has its own tax account number, so these are the amounts for 10-5-2019, 6-15-2020, 10-5-2020, and 6-15-2021, they add up to $63,000.

         MR. LYNCH:  I move to admit Exhibit 516.

         THE COURT:  Any objection?

         MR. COUGHLIN:  No, Your Honor.

         THE COURT:  It's received.

         (Plaintiffs' Exhibit 516 admitted into the record.)

         THE COURT:  You actually have Exhibit 5 up on the screen which is the piece of furniture that was moved out to the garage and then is now occupied by the workers' tools.  Did you want that in?

         MR. LYNCH:  Yes, sir.

         THE COURT:  Any objection to that?

         MR. COUGHLIN:  No, Your Honor.

         THE COURT:  All right.  It's received.

         (Plaintiffs' Exhibit 5 admitted into the record.)

BY MR. LYNCH:

Q.      Tab 7, Exhibit 517.  What is this document?

A.      That's the same with my insurance company.  These are just evidence that I paid insurance for the property to Cincinnati Insurance Company.

        MR. LYNCH:  Okay.  I move to admit Exhibit 517.

        THE COURT:  Any objection.

        MR. COUGHLIN:  No, Your Honor.

        THE COURT:  It's received.

        (Plaintiffs' Exhibit 517 admitted into the record.)

BY MR. LYNCH:

Q.      Tab 8, Exhibit 519, what is this document?

A.      This is the receipt for the Airbnb for $14,323.

        MR. LYNCH:  Move to admit mid Exhibit 519.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No, Your Honor.

        THE COURT:  It's received.

        (Plaintiffs' Exhibit 519 admitted into the record.)

BY MR. LYNCH:

Q.      What is tab 9, Exhibit 520?

A.      This is the lease for 4965 Glenbrook Road Northwest, as well as the payments -- let's make sure I've got the payments. Yeah, all of the payments are in here for $116,315.

Q.      Did you pay that amount?

A.      Yes.

        MR. LYNCH:  Move to admit Exhibit 520.

THE COURT: Any objection?

MR. COUGHLIN: No, Your Honor.

THE COURT: All right. It's received.

(Plaintiffs' Exhibit 520 admitted into the record.)

BY MR. LYNCH:

Q.    Tab 10 is Exhibit 521.  What is that document?

A.    I'm sorry.  These are mortgage -- these are carrying costs for my mortgage for the debt piece of the, you know, the -- I'm sorry, let me -- can I start over?

Q.    Yes.

A.    These are my carrying costs for Lee Highway for the periods ended, $65,040, as well as the statements from MainStreet Bank reflecting that.

MR. LYNCH: Move to admit Exhibit 521.

THE COURT: Any objection?

MR. COUGHLIN: No, Your Honor.

THE COURT: It's received.

(Plaintiffs' Exhibit 521 admitted into the record.)

BY MR. LYNCH:

Q.    Tab 11, Exhibit 549.

A.    This is the only document we have reflecting, to my knowledge -- after extensive review, but to my knowledge -- the gates at the property, and I testified that I paid $20,600 for gate motor controls, and, you know, we did buy gates and they are there, but, you know, I just don't know what that 20,600 I

paid for, and it doesn't seem -- this is the only document we have, so, you know, we're just sort of mystified by it.

Q.    So Mr. Deluca paid this invoice to New England Woodworks; is that right?

A.    Yes -- well, I mean, I don't have personal knowledge of that, but it was produced and we agreed with his prior counsel that this was an invoice of his that he paid related to the property.

Q.    Okay.

MR. LYNCH:  Move to admit Exhibit 549.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 549 admitted into the record.)

BY MR. LYNCH:

Q.    Okay.  Exhibit 902 will come in through another expert. This is the 1.2 million.

What is Exhibit 13 -- I'm sorry, tab 13, Exhibit 1031?

A.    These are -- so the first, one, two, three, four -- so up through -- up through -- well, okay.  26502 through 26509 are payments I made on a lease, but they're -- at Glenbrook Road, but they're duplicative of what we've already talked about.

THE COURT:  Right.

THE WITNESS:  And we have -- this was put together before we bifurcated attorneys' fees, so -- I was about to say we don't

need this, but I just want to make sure.  Yeah, we don't need this.

The only thing we need from this is 26534, which is the construction -- the $17,000 I paid for the porch, and the change order, 26,000 -- I'm sorry, $22,680 that we discussed, as well, which is on 26531.  Those are the only two documents that we need on this.

MR. LYNCH:  Move to admit Exhibit 1031.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

MR. LYNCH:  Is it already in?

MR. COUGHLIN:  Just to the two exhibits that were identified that Mr. Harrell testified are needed?

THE COURT:  Well, I think what Mr. Harrell is saying is that the checks to Mirat Yavalar are duplicative because he's already testified in an earlier exhibit that he paid the $10,000, and that is not in dispute, so they're cumulative, but they're not irrelevant.

And J.D. Catlett Consulting, is that --

THE WITNESS:  Judge, this is my fault.  We put this together before we bifurcated attorneys' fees out of the case, and so, unfortunately, all these are combined in one, including our expert and attorneys' fees.  You know, given the separate --

THE COURT:  Okay.

THE WITNESS:  -- thing, they don't need to be in here.

THE COURT:  So just repeat again, which two --

THE WITNESS:  The two exhibits that I think we need in here are 26534 -- I'm doing Bates labels -- and 26531.  26534 is the check reflecting the payment of $1,750 for the construction of the porch, which is defined as the new work under the Post Closing Construction Contract.

THE COURT:  All right.

THE WITNESS:  That's a 50 percent deposit that I paid on July 3rd, 2019, and the other exhibit is 26531, which is the $22,680, the change order paid on August 2nd, 2019.

I think this is already admitted, so...

THE COURT:  All right.  Any objection to those two?

MR. COUGHLIN:  Just so I'm straight, Your Honor, it's 26531 and 26534?

(Plaintiffs' Exhibit 1031, pages 26531 and 26534, admitted into the record.)

THE COURT:  Correct.

MR. COUGHLIN:  No objection.

THE COURT:  All right.  They're received.

BY MR. LYNCH:

Q.    Let's go to tab 14, Exhibit 1067.

A.    These are further evidence of carrying costs for the period stated from my mortgage with MainStreet Bank.

Q.    Okay.  And you paid the amounts reflected on this?

A.    Yes.

MR. LYNCH:  All right.  I move to admit Exhibit 1067.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

(Plaintiffs' Exhibit 1067 admitted into the record.)

BY MR. LYNCH:

Q.   Let's go to tab 15, 1068.  What is this document?

A.   It's also just continuing, you know, as time rolls on to document carrying costs with MainStreet Bank.  I paid all these amounts.

MR. LYNCH:  Move to admit 1068.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 1068 admitted into the record.)

BY MR. LYNCH:

Q.   Last but not least, tab 16, 1069, what is this document?

A.   This document is a statement of my account from Arlington County, Virginia, beginning on 6-15-2019 through the date listed, reflecting the payments I made on my real estate taxes. It reflects a balance due because at the time this document was prepared, the $18,313.36 was not yet due.  It was not due until June.  I paid that in June of this year.  But, you know, I don't have the payment with me, so, you know, at some point...

MR. LYNCH:  Okay.  So we move to admit Exhibit 1069.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  Okay.  It's received.

(Government's Exhibit 1069 admitted into the record.)

MR. LYNCH:  Your Honor, we have no further questions for Mr. Harrell.

THE COURT:  Okay.  Cross-examination?

MR. COUGHLIN:  Yes, Your Honor.  If I could have a brief moment to set up.

THE COURT:  Sure.

MR. COUGHLIN:  May I proceed Your Honor.

THE COURT:  Yes, sir.

CROSS-EXAMINATION OF JOHN HARRELL

BY MR. COUGHLIN:

Q.    Good afternoon, Mr. Harrell.  Mr. Harrell, I just want to back up regarding your professional background in education. You graduated from college, correct?

A.    Right.

Q.    And you graduated from law school from Yale University, correct?

A.    Correct.

Q.    You were an associate attorney in tax at Vinson & Elkins, correct?

A.    That's correct.

Q.    And at Paul, Weiss, Rifkind, Wharton & Garrison, correct?

A.    Rifkind, yes.

**Q.**    And then you went to work in the tax department for General Electric?

**A.**    Correct.

**Q.**    And eventually became the tax director at GE Capital, correct?

**A.**    Right.

**Q.**    And you're now a principle at PricewaterhouseCoopers, correct?

**A.**    Correct.

**Q.**    Are you still operating in the capacity as an attorney there?

**A.**    No.

**Q.**    What capacity are you operating in?

**A.**    The -- I'm a tax expert.  We don't provide legal advice. We help people prepare returns.  We review financial statements. We do consulting work.  I bring to bear a knowledge of tax that feeds into those disciplines the same way your accountant -- or maybe not your accountant but hypothetically your accountant would prepare your tax return.  They know about the tax law, so people -- well, I could go on and on.  Did I answer your question?

**Q.**    Yes.  So is it fair to say you're a numbers guy?

**A.**    No.  No, I mean, I'm not a numbers guy.  I'm -- I have a philosophy degree and a law degree, and I spent my entire career as a lawyer.  To the extent there's a lawyer that's a numbers

guy and maybe a tax lawyer, but I don't -- I don't run numbers all day long.  I write opinions and help people with the tax law, what the tax code means.  I, you know, deal with policy issues with the IRS and the U.S. Treasury Department, things like that.

Q.    And you took contracts in law school, correct?

A.    Sure.

Q.    And you've had to deal with contracts in your professional career, correct?

A.    For sure.

Q.    Okay.  And you understand the importance of specificity in contracts, correct?

A.    Sure.

Q.    Okay.  You testified earlier you met Mr. Deluca in the fall of 2018 for the first time?

A.    Correct.

Q.    And it was Mr. Muha that introduced you to Mr. Deluca, correct?

A.    That's right.

Q.    And then you visited his personal residence and 6122 Lee Highway in the fall of 2019, correct?

A.    That's right.  We went through those dates.  I mean, I guess I could get them out of my head, but yes, roughly, that's right.

Q.    Okay.  And when you first visited Lee Highway, it was --

and this is the fall of 2018, correct?

A.    Right.

Q.    Not 2019, it's 2018?

A.    Did we get the wrong date?  I'm a little tired, I'm sorry.  Yes, it was 2018, correct.

Q.    Okay.  And when you first visited the property, it was under construction, correct?

A.    Yes.

Q.    And during that first site visit there was no conversation with Mr. Deluca regarding the square footage of the house, correct?

A.    Definitely not, yes.

Q.    Okay.  And eventually you received marketing materials regarding the property, correct?

A.    Are you referring to the February 9th e-mail?

Q.    Not a particular e-mail, just you received a brochure that said "Honeysuckle Hill" on the cover, correct?

A.    I just want to make sure I'm answering the right question.  I received an e-mail on February 9th which is what I think you're asking me, and yes, I did receive that e-mail.

Q.    Okay.

       MR. COUGHLIN:  Could we pull up Plaintiffs' Exhibit 986.

       We're going to refer, Your Honor, just to the exhibits electrically rather than referring to the binder.  We did not create a separate binder.  It might be easier than going through

the binders.

THE COURT:  Sure, that's fine.  Are you going to put it up on the screen now?

MR. COUGHLIN:  Yes, Mr. Burcher is getting it up.  Yes.

THE WITNESS:  Sure, this is -- I'm sorry.

BY MR. COUGHLIN:

Q.    So is what's up on the screen, Plaintiffs' Exhibit 986, the written marketing materials that you received for this property, 6122 Lee Highway?

A.    These were attached to a February -- I would like to see the e-mail to make sure I'm not getting the date wrong, but I'm pretty sure it's February 9th, right.

Q.    Okay.  But you received these --

A.    These were attached to an e-mail I received on or about February 9th.

Q.    Okay.  And if you could turn to the next page, is square footage identified anywhere on this page?

A.    Not on this page, but it is in the e-mail that transmitted it.

Q.    But on these written materials, there's no square footage reference, correct?

A.    I mean, I don't mean to sound argumentative, but it is in the e-mail that transmitted this.  But it's not on these pages, I agree, but it's in the e-mail that transmitted it.  That's all I'm saying.

Q.    Fair enough.  Okay.  And there nothing about any structural elements of the property mentioned, correct?  There's no reference to a kitchen beam --

A.    No.

Q.    -- on this marketing materials?

A.    Correct.

Q.    No reference to a garage door lintel, correct?

A.    Correct.

Q.    Nothing about the supports for the carriage house roof referenced, correct?

A.    That's correct.

Q.    And there's no reference regarding permits on these marketing materials, correct?

A.    Correct.

Q.    And nothing about the subcontractors being used at the property at all on these marketing materials?

A.    No, no, obviously not.

Q.    And nothing about the roof material mentioned on these materials?

A.    I don't think so.

Q.    And you didn't make an offer in 2018 to purchase the property?

A.    I received this in 2019.

Q.    But just stepping back --

A.    No, I didn't.  I'm sorry, I thought you were -- I

misunderstood your question.

Q.    Okay.

A.    You are correct.  I did not make an offer to purchase this property in 2018.

Q.    Okay.  And so let's go to that February 9th e-mail.  This is Plaintiffs' Exhibit 559.  So now we're in 2019.  You testified earlier about receiving this e-mail from Mr. Muha, and it states that the property, including the carriage house, is 6,700 square feet, correct?

A.    That's what it says, right.

Q.    And there's no statements by Mr. Deluca in this e-mail, correct?

A.    I think it depends on what Brendan says he was told to say but --

Q.    I'm just talking about this particular e-mail.  There's no statements by --

A.    Doug and I --

Q.    -- Mr. Deluca --

      THE COURT REPORTER:  I'm sorry.

      THE WITNESS:  I did not mean to interrupt you.  I apologize.

      THE COURT:  You can't speak across each other, so we don't -- we can't --

      THE WITNESS:  I really apologize.

      THE COURT:  -- do that so...

All right.  Mr. Harrell, finish your answer, if you would, sir.

THE WITNESS:  I agree that Brendan Muha sent this e-mail.

BY MR. COUGHLIN:

Q.    Okay.  And Mr. Deluca didn't make any comments in this particular e-mail?  This isn't a long thread of e-mails where Mr. Deluca responds; it's just one e-mail from Mr. Muha to you, correct?

A.    That's right.

Q.    And when talking about the 6,700 square feet Mr. Muha uses the term "approximately," correct?

A.    He does.

Q.    And he doesn't use the term "livable" in this e-mail to characterize the square footage, correct?

A.    I don't -- I'm not sure I understand your question, but I don't see the word "livable" on this document.

Q.    Okay.  And there's no breakdown in this e-mail between the size of the main house and the carriage house, correct?

A.    Correct.

Q.    There's no definition of "square footage" in this particular e-mail at all, correct?

A.    Well, I don't know -- are you asking me what they thought the definition was?

Q.    No, not what they thought, but reading this e-mail, there's no definition of "square footage" provided in this

e-mail, correct?

A.    You mean written down?  No, I agree, that's right.

Q.    And you never asked Mr. Deluca to define what was included in the square footage of the property at any point in time?

A.    I'm sorry, are you asking me whether I ever asked Mr. Deluca to tell me the square footage of the property?

Q.    No.  Did you ever ask Mr. Deluca whether the interior walls were included in the size of the property's calculations?

A.    I mean, I'm not sure what -- no, I asked for the square footage.

Q.    And did you -- did you define -- you didn't define for Mr. Deluca what "square footage" meant?

A.    Me?  No, I'm not a building expert.  I thought he would know.

Q.    Mr. Muha, as of February 21st, 2019, was your agent, correct?

MR. LYNCH:  Objection, it seeks a legal conclusion.

BY MR. COUGHLIN:

Q.    Well, you signed an agreement with him dated February 21st for him to represent you in the real estate transaction involving Great Falls, correct?

A.    I signed a contract -- well, I mean, I signed a contract with TTR to represent me, and they identified Brendan Muha as the -- whatever they call it in the contract.  The date of that

contract, you may be right about.  I don't -- it's around that time.  I don't remember the date precisely.

Q.    Okay.  So as of roughly February 21st, 2019, TTR was your real estate agent, correct?

A.    Yeah.

Q.    And you never rescinded their status as your real estate agent through your negotiations with Mr. Deluca, correct?

A.    Right.

Q.    They remained your real estate agent through the execution of the contract and through closing with Mr. Deluca, correct?

A.    Right.

Q.    Okay.  So let's turn to some of the other exhibits that were referenced.  Plaintiffs' Exhibit 561.

      MR. COUGHLIN:  Your Honor, may I move around so I can see the exhibit as well?

      THE COURT:  Yes.

      MR. COUGHLIN:  Thank you.

      THE COURT:  As long as we can hear you.

      MR. COUGHLIN:  Yes, thank you.

BY MR. COUGHLIN:

Q.    So you testified earlier that you received these floor plans, correct?

A.    The e-mail on June 14th, 2019 was sent to me with the attachment, if that's what you mean by "these floor plans."

Q.     And those floor plans that you actually received on that date had no square footage identified, correct?

A.     That's correct.  I'm sorry.  I forgot I'm not supposed to nod.

Q.     Turn to Exhibit 500, please.  I'm sorry.  Go to Exhibit 505.  We'll get back to that, Mr. Harrell.

       Mr. Harrell, in February 2019, you entered into a contract to purchase 626 Philip Digges Drive, correct?

A.     Yes.

Q.     And that was obviously not a house owned by Mr. Deluca, correct?

A.     No.

Q.     And at this point you have no contractual relationship with Mr. Deluca, correct?

A.     Right.

Q.     In that contract you requested a home inspection contingency?

A.     Correct.

Q.     And you ultimately terminated that contract because of the results of the home inspection, correct?

A.     That was my testimony, yeah.

Q.     Okay.  And then in March of 2019, you restarted your discussions with Mr. Muha to purchase the Lee Highway property from Mr. Deluca?

A.     Correct.

**Q.**      You looked at some other houses, though, before making an offer with Mr. Deluca?

**A.**      Correct.

**Q.**      Could we turn to Plaintiffs' Exhibit 7.

Before making an offer to purchase Lee Highway, there was draft contract that was prepared, correct?

**A.**      Sure, yeah.  TTR prepared one, right.

**Q.**      Could you please look at Plaintiffs' Exhibit 7.  We'll scroll through it.  Is this the draft contract -- the first draft of the contract for the Lee Highway property?

**A.**      I can't say for sure whether it was the first, but it was one of the first for sure.

**Q.**      And originally, there was a May 29, 2019 settlement date, correct?

**A.**      You know, I didn't recall that, but I do see it says that.

**Q.**      Okay.  And in the first draft of the contract related to Mr. Deluca's property, there's no home inspection contingency referenced, correct?

**A.**      In the first draft?  I mean, I don't recall, but if you tell me that, I don't disagree with you.

**Q.**      And in Section 10 in the first draft, the term included an as-is condition, that the property would be as-is as of the final walk-through, correct?

**A.**      Um, the as-is is for -- right, for -- are you talking

about "electrical, plumbing, existing appliances, heating, air conditioning, equipment and fixtures shall convey" --

THE COURT REPORTER:  Slow down.

THE WITNESS:  I'm sorry, I forgot.  I did it again.

Are you talking about the clause that says, "Buyer acknowledges that except as otherwise specified in this Contract," that clause that continues on to say, "including electrical, plumbing, existing appliances, heating, air conditioning, equipment and fixtures shall convey in its AS-IS condition as of the date as specified above"?

BY MR. COUGHLIN:

Q.    Yes, that's the provision I'm referring.  It also references the property, correct?

A.    Yes.

Q.    Meaning the entire property under this draft was to be conveyed as-is as of the date specified above, correct?

A.    I don't know what "Property" is defined as, as a defined term, but okay.

Q.    Let's go to the earlier part of the agreement.

A.    I don't want to quibble with you.

Q.    So, do you see in Section 1 there's a definition for "Property"?

A.    Yes.

Q.    And it's defining the entirety of 6122 Lee Highway, correct?

A.      Correct.

Q.      Okay.  Going back to Section 10, "the date specified above" is written in as "Final Walkthrough," correct?

A.      The date specified above is written -- oh, right.

Q.      Okay.  So, you had an opportunity to review this draft and make changes, correct?

A.      Sure.

Q.      And ultimately, you and Mr. Deluca negotiated a final sales contract, correct?

A.      Correct.

Q.      Could we turn to Plaintiffs' Exhibit 1.  In exhibit -- there's an Exhibit B to this agreement, correct?

A.      This is our -- this is the final agreement?

Q.      Yes, this is Exhibit 1.

A.      Yes, there's an Exhibit B.

Q.      Yes.  And you and Mrs. Harrell made selections that showed up in Exhibit B, correct?

A.      Yeah, together with Doug, right.

Q.      And so Mr. Deluca had plans for the house?

A.      Right.

Q.      But then ultimately you and Mrs. Harrell were allowed to modify those plans with customizations and upgrades, correct?

A.      The ones listed on -- if you keep going down, yes.

Q.      Well, would you agree that Evan's room with the rock wall and a bunk bed with a staircase was one customization?

A.    Where are you -- could you just point me where you're reading?

Q.    See "Evan's Room"?

A.    Is this --

Q.    So you see how it says, "Built-In Desk/Rockwall," "Bunk Bed with Staircase"?

A.    Yes.

Q.    That was something that you and Mrs. Harrell customized about the house, correct?

A.    Can you show me where we're picking out our selections?

Q.    So, zooming in, "Evan's Room" --

A.    No, I see that, but can you -- okay.  I don't know what question you're asking me, but okay.

Q.    Sir, all I'm asking is --

A.    Fine.  I agree.

Q.    -- for Evan's room, it lists "Built-In Desk/Rockwall," "Bunk Bed with Staircase," correct?

A.    It does.

Q.    And those are customizations that you and Mrs. Harrell asked to be placed in the contract correct?

A.    Well, it was more collaborative than that.  I mean, Mr. Deluca sent us pictures of bunk beds he had done before for children and said, "I think these would be great for your room. What do you think?"

        And we said, "Terrific."

That's the way that happened.

Q.    Okay.  It wasn't something, to your knowledge, that Mr. Deluca was originally intending to do in th house, correct?

A.    I never asked him that question.

MR. LYNCH:  Can I ask just one housekeeping question, Your Honor.  Is he allowed to use the notebook if he wants in terms of viewing these exhibits?

THE COURT:  Sure, he can look at what --

MR. COUGHLIN:  Yeah, if he needs --

MR. LYNCH:  Do you have one up there, Mr. Harrell?

THE WITNESS:  Oh, I do.  Thank you very much.  Okay.  Go ahead.  Sorry.

BY MR. COUGHLIN:

Q.    And then for certain items, you had to make selections, correct?

A.    We did make selections, yes.

Q.    And the contract contemplated that, that you would make selections.  Like for the his-and-her bath, you had to pick out the tile.

A.    If it says we were making selections, then I agree we were making selections.

Q.    Okay.  And then you made upgrades as well?

A.    If by what you mean as upgrades the things we separately paid for?

Q.    So it lists upgrades in the end of the contract, end of

Exhibit B, correct?

A.    Yes.

Q.    And those upgrades totaled $175,639?

A.    In the final contract or in the --

Q.    In the first version of Exhibit B, which is what we're looking at.

A.    Oh, I'm sorry.  If you say so.  I don't disagree with you.  I don't recall.  If you want me to look, I will.

Q.    If you could just look at the --

A.    Sure.

Q.    This is going to be Bates Number 14212.

A.    14212?

Q.    Yes.

A.    14212.  Okay.

Q.    Do you see the section that says "Upgrades"?

A.    Yeah.

Q.    Do you see how it says 175,639 --

A.    Yeah, I mean, I believe you, yeah.

        THE COURT REPORTER:  I'm sorry.

        THE WITNESS:  Sorry.

BY MR. COUGHLIN:

Q.    Do you see how it says $175,639?

A.    I do.

Q.    Okay.  And this contract was executed last by Mr. Deluca on April 5th, 2019, correct?

**A.**    According to the timestamps, that's correct.

**Q.**    And it had a closing date of June 26th, 2019, correct?

**A.**    Again, I believe so.  I believe you if you say that.
That jibes with my memory.

**Q.**    And so as of April 5th, there was anticipated $175,000
plus in upgrades with a closing date of June 26th, correct?

**A.**    Right.

**Q.**    There were no plans attached to the first version of the
contract that was ratified by the parties, correct?

**A.**    You mean building plans?  What do you mean by "plans"?

**Q.**    Yeah, building plans for the carriage house --

**A.**    -- agreed --

**Q.**    -- were attached?

**A.**    He was building a spec house.

**Q.**    And there was no building plans for the main house,
correct, attached to the contract?

**A.**    There -- undeniably no plans of any kind whatsoever were
attached to these contracts at any time.

**Q.**    And the square footage of the house is not set forth in
the contract, correct?

**A.**    That is correct.

**Q.**    And there were no discussions with you and Mr. Deluca
about including the square footage of the house in the sales
contract, correct?

**A.**    I've never seen square footage in a residential sales

contract myself, but, no, we did not -- that never occurred to me to put it in there, right.

Q.   And you didn't have any discussions with Mr. Deluca about including square footage in the contract, correct?

A.   I don't think it occurred to anybody to put it in here. I did not have any discussions.  We didn't talk about it.  It did not occur to me.

Q.   Okay.  And at this time there was still active construction going on, correct?  When you signed the contract --

A.   At this time.

Q.   -- in April --

A.   In April of 2019?

Q.   Yeah.

A.   Oh, yeah, I mean, the house was just under -- you know, I think we went through -- I'm just trying to remember what the dates of our pictures were, but I think we all agree that there was a lot of open rooms, a lot of, you know, unfinished space, lots of construction going on, et cetera, et cetera.  Agreed.

Q.   Okay.  And the version of the contract that's by and between the parties still has the as-is provision in it, correct?

A.   Correct.

Q.   That didn't change?

A.   Correct.

Q.   Okay.  And the final version of the contract that was

executed by the parties doesn't include a home inspection contingency, correct?

A.    The final version -- you mean the -- the April 3rd -- I just -- when you say --

Q.    Did any -- well, no version --

A.    No version --

Q.    -- no version had a home --

A.    Other than a lead inspection contingency, agreed.

Q.    So there was no home inspection contingency in the agreement between the parties, correct?

A.    Right.

Q.    And there were no requirements written into the contract stipulating that permits had to be applied for and obtained, correct, not in the sales contract that we're talking about, Exhibit 1?

A.    Right.  No contractual language to that effect, correct.

Q.    All right.  So let's turn back to Exhibit 505 and go back to -- do we have -- Exhibit 505 is in front of you?

A.    Yes.

Q.    Could you turn to Bates 6839?

THE COURT:  Why don't you try the hard copy?

THE WITNESS:  Sure.

505 -- could you give me the page number again, please?

MR. LYNCH:  6839.

THE WITNESS:  Okay.

MR. COUGHLIN:  It's the text exchange that you --

THE WITNESS:  I'm sorry.  I'm still --

Go ahead and ask your question.  I got it.

BY MR. COUGHLIN:

Q.    This a text between you and Mr. Deluca, correct?

A.    Okay.  I must be on the wrong exhibit.  Is this 505?

Q.    Yes.

A.    No.

Q.    Okay.

A.    This is between Brendan Muha and Doug Deluca.

Q.    Yes, this is a text between Brendan and Mr. Deluca.  You didn't receive this text until after the lawsuit was filed, correct?

A.    That's correct.

Q.    And then turning to 6859.

A.    68 -- of the same exhibit?

Q.    Yes.

A.    Okay.

Q.    This is also a text between Mr. Muha and Mr. Deluca, correct?

A.    It's the same text chain, yes.

Q.    And you didn't receive this text until after the filing of the lawsuit, correct?

A.    Which piece of this?  Part of this was communicated to me.

Q.      Well, did you receive the text?

A.      I believe the green box at the top was forwarded to me, on page 6859.

Q.      Do you know when that was forwarded to you?

A.      We can certainly research that for you and -- but I know there's a text message that has this information in it.

Q.      Okay.

A.      The rest of it was not.

Q.      Thank you.

        MR. COUGHLIN:  Your Honor, I see we have about 7 minutes.
Do you want me to just cover one more topic and then take a break for the day?

        THE COURT:  Well, yeah, keep going for a little while.
We'll see when you have a natural breaking point.

        MR. COUGHLIN:  Okay.  Well, I'll take a cue from you when you're --

        THE COURT:  Well, we may go a little bit longer just because things are kind of coming in slow here today, so let's -- you know, let's go for another 15 minutes, all right.

        MR. COUGHLIN:  Thank you, Your Honor.

BY MR. COUGHLIN:

Q.      In the contract, Mr. Harrell, there was a financing contingency, correct?

A.      Right.

Q.      And it had an appraisal contingency, correct?

A.     Correct.

Q.     And you've referenced that MainStreet Bank was your bank?

A.     That's right.

Q.     And you had an appraisal prepared, correct?

A.     The bank did, right.

Q.     Well, in order for you to get financing, there had to be an appraisal of the property, correct?

A.     Right, the bank appraised the property, correct.

Q.     And you ultimately paid for the appraisals, correct?

A.     I assume so.

Q.     Could we please turn to Plaintiffs' Exhibit 1030? Mr. Harrell, could you please --

THE WITNESS:  I'm sorry.  Let me just turn a little bit. Sorry.

BY MR. COUGHLIN:

Q.     Could you look through this document.

MR. COUGHLIN:  And, Mr. Burcher, just take him through page by page, maybe zoom out a little bit.

BY MR. COUGHLIN:

Q.     I would like you to identify this document after you've had a chance to review it.  And if he's going too fast, just let me know.

A.     You want me to identify every page?  This is the appraisal, I agree.

Q.     Okay.

A.    The April -- I don't know the date of the appraisal, but it's probably on here.  There it is.  Okay.

Q.    So this is the appraisal of the property as of April 26th, 2019, correct?

A.    Just to be clear, just for one of the lots for the house on it, I think, but -- because it says pending a value 2665, which I don't understand, but maybe you could clarify.  I don't recall, but there were four lots that appraised for 4 something, and this is 2665, so why the document doesn't say that, I don't know.

Q.    But this includes the improvements on the property, correct?  This appraisal appraises those improvements?

A.    I believe so.  So I just -- I'm a little -- well, it's not important.  Okay.

Q.    So you agree that it appraises the improvements on the property, correct?

A.    Well, I believe if we continue down, the appraisal -- oh, boy.  That is hard to read.  Can I ask you a question or is that -- no.

Q.    No, I'm sorry?

A.    Okay.

Q.    Let's turn to page 3 --

A.    I can't --

Q.    -- of this document, but before we get there, you received and read this appraisal, correct?

**A.**     I received the appraisal, right, yes, and I read it. The -- well, yes, okay.

THE COURT:  Is it in hard copy?

MR. COUGHLIN:  Yes, it's in --

THE COURT:  What is the exhibit number?

MR. COUGHLIN:  1030.

THE COURT:  Do you want to look at the --

THE WITNESS:  I don't think we have it in our exhibits.

MR. COUGHLIN:  It's not in the little binder; it's in the binders there.

THE COURT:  Oh.

MR. COUGHLIN:  It's also in Defendant's Exhibit 14, so defendant's exhibit binder should be available.

So, if you don't mind, Mr. Harrell, the bailiff is going to hand it to you.

THE WITNESS:  Oh, sure.

MR. COUGHLIN:  It might be easier to locate.

THE COURT:  It's a little harder to sit an 8-inch binder on your lap than a 4-inch binder.

MR. COUGHLIN:  Right.

BY MR. COUGHLIN:

**Q.**     Could you please turn to Defendant's Exhibit 14?

**A.**     Yes.  Okay.  Much better.  Thank you very much.

**Q.**     Is this the same document that's Plaintiffs' Exhibit 1030 that we were just looking at on the screen?

A.      I assume so.  If you represent to me it is, I will not disagree with you.

Q.      Is this the April 26th, 2019 appraisal?

A.      Yes, it says that it is.

Q.      And this is the appraisal that you received?

A.      Yes.

Q.      Okay.  And could you please turn to page 3.

A.      Using the pagination, page 2 of 6, 3 of 6, like that?

Q.      Yes.

A.      Okay.

Q.      Do you see about a third of the way -- or halfway down, there are some measurements included in here, correct?

A.      Are you reading the -- I'm concerned I'm reading the wrong page.  Are you reading the "Cost Approach to Value (not required by Fannie Mae)."

Q.      Correct, yes.  If you look --

A.      Okay, yes, there are.

Q.      -- in the right-hand column --

A.      Agreed.

        THE COURT REPORTER:  I'm sorry.  I didn't hear your question.

BY MR. COUGHLIN:

Q.      If you look on the right-hand column it says, "Dwelling." Do you see that?

A.      Yes.

Q.      Do you see a size next to "Dwelling"?

A.      I do.

Q.      What size is provided?

A.      4756.

Q.      And is there then another size provided below of 1,169 square feet?

A.      I think it says 89 --

Q.      I'm sorry.

A.      -- or a maybe it's 69.  Whatever.

Q.      1,189 square feet?

A.      Yeah, there is, agreed.

Q.      And is there a size for the garage carport of 600 square feet provided?

A.      There is.

Q.      And if you added those up that would total 6,545 square feet, correct?

A.      Is it on here anywhere?  Do you want me to do the math?

Q.      I would like you to keep an eye --

A.      -- we have a calculator.  May I use it?

Q.      -- on that particular point --

A.      We have a calculator.  May I use it?  4756 plus 1189, plus 600 is -- did I get the same number you did, which is 6545?

Q.      Correct.

A.      I'm sorry, I know I'm not supposed to ask you questions. I apologize.

Q.      And I took your leading question as a good question.

So would you agree that as of -- that you received an appraisal that provided the size of the property as 6,500 -- size of the improvements on the property as 6,545 square feet?

A.      These measurements reflect that I agree.

Q.      And you received this appraisal?

A.      I already testified I did, yes.

Q.      And that does not, to your knowledge, include the porch, correct?

A.      The porch.

Q.      The screened-in porch.

A.      I can't answer that with a yes-or-no question [sic] without flipping through this.  I'm happy to answer your question.

Q.      So on page 1 there's a list of additional features.

A.      I'm sorry, on page 1?

Q.      Yes.

A.      Sure.

Q.      Do you see how it provides the size of the porch as 41 by 10?

A.      I'm really not trying to be difficult, I just honestly don't see.

Q.      It says, "Additional features," about a third of the way through -- two-thirds of the way down.  Do you see how it says "Additional features (additional energy efficient items, et

cetera"?

A.    Additional features?

Q.    If you look on the screen, it's highlighted up there.

A.    It is?

Q.    Do you see how it says "Additional features"?

A.    Oh, yeah, okay.  All the way down at the bottom.  Got it.

Q.    And it says "Screen porch (41 by 10)"?

A.    Yes, that's what it says.

Q.    So that would be 410 square feet, correct?

A.    I think that's right.

Q.    What's that?

A.    I think that's right.

Q.    Okay.  And then there's other rooms provided there, correct, such as "finished room behind garage"?

A.    Yes.

Q.    15 by 18?  I'm sorry, "(18 by 18)"?

A.    Right.

Q.    So that would an additional 324 square feet?

A.    Do you want me to do the math?  I'm not as -- okay.  Sorry.  324, agreed.

Q.    The right.  And then there's also studio above the garage, "(12 by 30)"?

A.    Sure.

Q.    And that would be an additional 360 square feet?

A.    I think that's right, yep.  That's correct.

Q.    So we originally had 6,545 square feet, correct?

A.    You know, if you -- I agree if that's what you say.

Q.    And then there's a screen porch, 410 square feet, correct?

A.    I didn't write threes numbers down.  Yes, okay.

Q.    And then we had the room of 324 square feet, as well. That was the 18 by 18 room, correct?

A.    Yes.

Q.    And then we had --

A.    Oh, wait a minute.  18 by 18.  Yes, sir.

Q.    And then we had the room that was 12 by 30, which would be an additional 360 square feet, correct?

A.    That's right.

Q.    So if you were to add all of those up 6545, plus 410, plus 324, plus 360, what's the total?

THE COURT:  What is the total?  What number do you get?

MR. COUGHLIN:  7,639 square feet.

THE COURT:  Assume that's the total.

THE WITNESS:  I don't disagree with the math.

THE COURT:  Okay.

BY MR. COUGHLIN:

Q.    Okay.  So all of the improvements that were reflected in the appraisal where dimensions were provided and square footage was provided totaled 7,639 square feet, correct?

A.    Based on the numbers you just went through, I agree with

your math.

Q.    Okay.  And after you reviewed the appraisal prior to closing, you didn't know Mr. Deluca that the square footage was less than what he had told you, correct?

A.    No.

Q.    And ultimately on May 2nd, 2019, you removed the appraisal contingency, correct?

A.    I don't remember the date, but we removed it.

Q.    Prior to closing you toured the house several times, correct?

A.    I would -- I think maybe four, five times.

Q.    And you were never prohibited from visiting any particular areas of the home, correct?

A.    That's right.

Q.    You were provided access to the house generally when you wanted to see it, correct, prior to closing?

A.    Yeah, I mean, nobody -- I would just -- sorry.  Yes, that's right.

Q.    Okay.  And you mentioned that you were receiving regular updates from Mr. Deluca after the contract was signed before closing, correct?

A.    Right.

Q.    There were additional Exhibit Bs added to the contract, correct -- or replacement Exhibit Bs, correct?

A.    Amendments, right.

**Q.**    All right.  Could we turn to Plaintiffs' Exhibit 1 and go to the May 28th addendum.

**A.**    May I put this down?

**Q.**    Yes.

**A.**    Okay.

**Q.**    So we're now on Plaintiffs' Exhibit 1 which is in the binder or it's up on the screen, whichever is easier for you, sir.

**A.**    Thanks.

**Q.**    You added -- this is the addendum where the pool was added?

**A.**    I'm sorry, I must have missed your page number.  Would you mind repeating it?

**Q.**    We are on Bates Number 14225.

**A.**    14225.  Got it.  Yep, that's right, pool.  Agreed.

**Q.**    And the pool cost was estimated at 2 -- well, not estimated.  It was contracted for $250,800, correct?

**A.**    Yes.

**Q.**    And there was also some built-in carpentry that was added as a part of this amendment, correct?

**A.**    I must be losing my mind.  I don't see what you're talking about.  Oh, yeah, it says "certain built" -- it says -- yeah, it's all on Exhibit B, right.  It's all on the upgrades, correct.

**Q.**    Okay.  In -- so the purchase price was ultimately

increased by the amount of the upgrades, correct?

A.   Yes.

Q.   And at this point in time, closing still remains on February 26th, 2019, correct?

A.   No.

Q.   You believe that the closing date changed -- not February, I'm sorry, June 26th.

A.   Correct.

Q.   Okay.  So, closing is less than 30 days --

A.   Mm-hmm.

Q.   -- away, and you entered into an agreement to add a pool to the property, correct?

A.   Correct.

Q.   That's unrealistic to anticipate that a pool would be completed in 30 days, correct?

A.   Well, Mr. Deluca told us it was four weeks.  That's what he told us.

Q.   Okay.  You added some additional upgrades at this -- in this agreement, correct?

A.   Correct.

Q.   Like an irrigation system?

A.   Correct.

Q.   A Rohl tub filler?

A.   That's a faucet.

Q.   What's that?

A.      It's like a faucet.

Q.      Okay.  And there were tile upgrades of $21,100?

A.      Is that added in this one?

Q.      I believe so.

A.      Okay.  Sure.  I believe you.  We did add tile upgrades, I agree.

Q.      And now we've added a desk into Harper's room as a part of this, correct?  Let me help.

A.      Yes.

Q.      So if you look at revised Exhibit B, it's attached.  It's Bates 14235.  There's "Add" and then the list of added items follows, correct?

A.      '235?  I'm looking at 14253.

Q.      Look at 14235.  Because we're still in --

        THE COURT:  It's on the screen.

BY MR. COUGHLIN:

Q.      May 28th, and it is on the screen as well.

A.      Okay, I'll look at the screen.  Go ahead.

Q.      So do you see "Add" on that Exhibit B?

A.      "Add"?

Q.      On the left-hand side, three-quarters of the way down?

A.      Yeah.

Q.      Everything below that, those are new items that have been added to the contract, correct?

A.      Correct.

Q.    And at this point in time --

A.    Well -- sorry, I didn't mean to interrupt you.

Q.    At this point in time, for all of these upgrades, Mr. Deluca is covering the costs, correct?

A.    I'm agreeing to pay this cost.  He's financing it.

Q.    But he's moving forward with the work at his cost prior to closing, correct?

A.    He's financing it, I agree.

Q.    And the owner suite layout is changing at this point in time, correct, from what he had originally designed?

A.    What's the date of this?

Q.    May 28th.

A.    No, I don't agree with that.  It depends on what you mean by that, but I don't think I agree with that.

Q.    Did the owner suite layout change prior to closing?

A.    Would you like me to tell that story?

Q.    Just a yes-or-no answer.  Did the owner suite layout --

        THE COURT:  If you can answer it yes or no, answer it yes or no; if you can't, then say you just can't answer that yes or no.

        THE WITNESS:  I can't answer that because I'm not sure what his original plan was.

BY MR. COUGHLIN:

Q.    Okay.

        THE COURT:  Why don't we stop here, if that's okay with

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

you.

MR. COUGHLIN:  Yes, Your Honor.

THE COURT:  Okay.  All right.

Let's end for tonight.  We'll start at 9:00 tomorrow morning and continue on with Mr. Harrell's cross-examination.

How much more do you have?

MR. COUGHLIN:  Probably at least another 45 minutes, Your Honor.

THE COURT:  Okay.

MR. LYNCH:  Just a scheduling point.  We have the code official for Arlington County coming at 10 a.m.

THE COURT:  Okay.  Well, this should kind of dovetail in well, and he can wait for ten minutes.  I know they don't like to.  I've heard that many times, but he can wait, and yes, he is probably the most important person in all of Arlington County, but he can wait for half an hour if necessary.  All right.  Thank you, all.  We're in recess.

(Proceedings adjourned at 5:45 p.m.)

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

**C E R T I F I C A T E**


        I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


 /s/ Scott L. Wallace            8/2/22
 -----------------------------     -----------------
  **Scott L. Wallace, RDR, CRR**       **Date**
    **Official Court Reporter**