UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

JOHN E. HARRELL,                    )
                                    )
        et al.,                     )
                                    )
        Plaintiffs,                 ) Civil Action
                                    ) No. 1:20-0087-LO-MSN
        v.                          )
                                    ) July 12, 2022
DOUGLAS M. DELUCA,                  ) 9:00 a.m.
                                    )
        et al.,                     )
                                    )
        Defendants.                 )

**VOLUME 2 (Pages 222 - 472)**
*TRANSCRIPT OF BENCH TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE LIAM O'GRADY,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the Plaintiffs:        **Thomas Ryan Lynch, Esq.**
                           Bradley Arant Boult Cummings, LLP
                           (DC)
                           1615 L Street, N.W.
                           Suite 1350
                           Washington, DC 20036
                           202-719-8228
                           Fax: 202-719-8328
                           E-mail: Tlynch@babc.com

                           **Lee-Ann Christine Brown, Esq.**
                           Bradley Arant Boult Cummings LLP (DC)
                           1615 L Street, N.W.
                           Suite 1350
                           Washington, DC 20036
                           202-393-7150
                           Fax: 202-719-8312
                           E-mail: Labrown@bradley.com

APPEARANCES:   (Cont.)

For the Defendants:        **Michael John Coughlin, Esq.**
                          Walsh Colucci Lubeley & Walsh PC
                          4310 Prince William Parkway
                          Suite 300
                          Prince William, VA 22192
                          703-680-4664
                          Fax: 703-680-2161
                          E-mail:
                          Mcoughlin@pw.thelandlawyers.com


For the Defendants:        **Eugene A. Burcher, Esq.**
                          Walsh, Colucci, Lubeley & Walsh PC
                          4310 Prince William Parkway
                          Suite 300
                          Prince William, VA 22192
                          703-680-4664
                          Fax: 703-680-2161
                          E-mail: Eaburcher@thelandlawyers.com


Court Reporter:            **Scott L. Wallace, RDR, RMR, CRR**
                          Official Court Reporter
                          United States District Court
                          401 Courthouse Square
                          Alexandria, VA 2231-5798
                          202-277-3739
                          scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

| EXAMINATIONS | Page |
|---|---|
| CONTINUED CROSS-EXAMINATION OF JOHN HARRELL BY MR. COUGHLIN | 228 |
| DIRECT EXAMINATION OF EMAD ELMAGRABY BY MR. LYNCH: | 284 |
| CROSS-EXAMINATION OF EMAD ELMAGRABY BY MR. COUGHLIN | 353 |
| REDIRECT EXAMINATION OF EMAD ELMAGRABY BY MR. LYNCH | 380 |
| CONTINUED REDIRECT EXAMINATION OF JOHN HARRELL BY MR. LYNCH | 381 |
| DIRECT EXAMINATION OF JOHN CATLETT BY MR. LYNCH | 388 |
| CROSS-EXAMINATION OF JOHN CATLETT BY MR. COUGHLIN | 429 |
| REDIRECT EXAMINATION OF JOHN CATLETT BY MR. LYNCH | 443 |
| DIRECT EXAMINATION OF MATTHEW FURLONG BY MS. BROWN | 450 |

## EXHIBITS

| | |
|---|---|
| Defendant's Exhibit 1028 admitted | 237 |
| Plaintiffs' Exhibit 689 admitted | 263 |
| Plaintiffs' Exhibit 426 admitted | 290 |
| Plaintiffs' Exhibit 430 admitted | 295 |
| Plaintiffs' Exhibit 439 admitted | 298 |
| Plaintiffs' Exhibit 428 admitted | 304 |
| Plaintiffs' Exhibit 433 admitted | 305 |
| Plaintiffs' Exhibit 437 admitted | 313 |
| Plaintiffs' Exhibit 431 admitted | 316 |
| Plaintiffs' Exhibit 438 admitted | 317 |

|                                    **EXHIBITS** | **Page** |
|---|---|
| Plaintiffs' Exhibit 448 admitted | 320 |
| Plaintiffs' Exhibit 440 admitted | 321 |
| Plaintiffs' Exhibit 450 admitted | 324 |
| Plaintiffs' Exhibit 449 admitted | 325 |
| Plaintiffs' Exhibits 24, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 428, 461, 462, 464, 465, 466, 467, 468, 471, 473, 478, 479, 480, 570, 571, 572, 609, 915 admitted | 330 |
| Plaintiffs' Exhibit 5A through 5K admitted | 332 |
| Plaintiffs' Exhibit 429 admitted | 339 |
| Plaintiffs' Exhibit 427 admitted | 342 |
| Plaintiffs' Exhibit 1010 admitted | 342 |
| Plaintiffs' Exhibit 435 admitted | 345 |
| Plaintiffs' Exhibit 436 admitted | 345 |
| Plaintiffs' Exhibit 1004 admitted | 346 |
| Plaintiffs' Exhibit 452 admitted | 347 |
| Plaintiffs' Exhibit 444 admitted | 348 |
| Plaintiffs' Exhibit 445 admitted | 350 |
| Defendant's Exhibit 183 admitted | 362 |
| Defendant's Exhibit 184 admitted | 363 |
| Plaintiffs' Exhibit 34 (CV portion) admitted | 390 |
| Plaintiffs' Exhibit 46 admitted | 407 |
| Plaintiffs' Exhibit 47 admitted | 407 |

| **EXHIBITS** | **Page** |
|---|---|
| Plaintiffs' Exhibits 61 through 80, 84 through 129, 131 through 136, 140 to 141, 143, 145 through 154, 156 through 162, 165 to 187, 188 to 195.  197, 200 to 208, 211 to 222, 223, 225 to 226, 229, 231 to 232, 237 to 255, 257 to 261, 263 to 267, 269 to 273, 276, 279 to 281, 283, 286 to 308, 312 to 323, 325 to 344, 346 through 354, 356 through 369, 371 to 404, and 406 admitted | 458 |
| Defendant's Exhibit 14 admitted | 228 |
| Defendant's Exhibits 181 and 182 admitted | 362 |

**MORNING SESSION, JULY 12, 2022**

(9:05 a.m.)

THE COURTROOM CLERK:  Court calls Civil Case Number 1:20-cv-87, *John E. Harrell, et al. versus Douglas M. Deluca.* This case is on for trial by the Court.

May I have appearances, please, first for the plaintiff.

MR. LYNCH:  Thomas Lynch for the plaintiffs.

THE COURT:  Good morning, Mr. Lynch.  I see all counsel are here.  Good morning to all of you and Mr. Deluca and Ms. Harrell.

So are we ready to continue?  Let's have Mr. Harrell come back to the witness stand.

MR. LYNCH:  Your Honor, can we pass up the notebook that we used just for hard copy purposes?

THE COURT:  Sure.  Is that volume whatever?

MR. LYNCH:  Yeah, volume 1, direct exhibits.

THE COURT:  Okay.  In case it's needed.

MR. LYNCH:  Yes.

THE COURT:  Please proceed.

MR. COUGHLIN:  Your Honor, one preliminary matter.  If we wanted to move exhibits in while he's testifying, would that preclude us from raising a motion to strike --

THE COURT:  No.

MR. COUGHLIN:  -- per se?

THE COURT:  No I'll allow you to do it.

MR. COUGHLIN:  I'm sorry?

THE COURT:  I will allow you to do that.

MR. COUGHLIN:  Okay.

THE COURT:  We're much better off doing that contemporaneously so we don't lose track of exhibits.

MR. COUGHLIN:  Right.  Can I go back and move in one exhibit at this time?

THE COURT:  Yeah, sure.

MR. COUGHLIN:  So we referenced the appraisal, and that is Defendant's Exhibit 14.

THE COURT:  All right.  Any objection to that?

MR. LYNCH:  No, Your Honor.

THE COURT:  All right.  It's received.

(Defendant's Exhibit 14 admitted into the record.)

MR. COUGHLIN:  All right.  Thank you, Your Honor.

CONTINUED CROSS-EXAMINATION OF JOHN HARRELL

BY MR. COUGHLIN:

Q.    Mr. Harrell, we're going to go back in time -- or -- yes, certainly back in time to January 18th, 2019.

On that date, there was another amendment to the original sales contract that was drafted, correct?

A.    January -- we didn't sign -- January --

Q.    I'm sorry.  June 18th, 2019.

A.    Yes.

Q.    Okay.  Thank you.  And that was ultimately ratified on

June 19th of 2019, correct?

**A.**    I don't remember the exact date, but it was around that date, yes.

**Q.**    And the purpose of that amendment was to reduce the purchase price by $142,400 because the pool was eliminated, correct?

**A.**    That's my memory, right.

**Q.**    And there was one, or at least one, additional modification, though, to the original plans that Mr. Deluca had, and that was the addition of a screened-in porch with a cupola, correct?

**A.**    That's correct.  That's -- sorry.  Yes, that's correct.

**Q.**    And ultimately, Exhibit B2 was updated and attributed $32,000 to the screened-in porch?

**A.**    It was either 32 or 35.  Without looking at the document I couldn't say, but it's around there, yes.

**Q.**    Okay.  And at this point, with closing still on June 26th, we're seven days from closing, correct?

**A.**    Yes.

**Q.**    And it was unrealistic to expect that screened porch to be completed before closing, correct?

**A.**    Well, look, our belief at the time was that Doug had a very large contracting operation with a lot of people, and when we discussed these sort of things, he would say, "No problem," and I would say, "Fine."

Q.    Okay.  But ultimately on June 20th, the closing date was moved back, correct?

A.    On June 20th, the closing date was moved back to July 3rd.

Q.    Thank you.  And that's because another addendum to the contract was executed, correct?

A.    Correct.

Q.    And that addendum -- and if you could turn to Plaintiffs' Exhibit 1, the June 20th, 2019 addendum.

A.    Do you happen to have the Bates label?  If you don't, I'll find it.

Q.    Should be --

A.    Okay.  I got it.

Q.    You have it?

A.    Yes.  It's 14256.

Q.    That addendum identified post-closing items, correct?

A.    Correct.

Q.    And so at this point in time, there's an acknowledgment by the parties that there's work that needs to be completed that is going to follow closing, correct?

A.    Correct.

Q.    And there's a list included in the addendum itself, correct?

A.    That's what it says, I agree.

Q.    And that list originated from an e-mail that Mr. Muha

sent you, correct?

A.    That was originated from a lot of conversations about what was left to be done.  I mean, I had a lot of testimony about the critical path and where we were, and this was the distillation of that list, excluding materials that had already been paid for that were not on-site.

Q.    Okay.  And the addendum continues on the next page --

A.    Correct.

Q.    -- 14257.  And it indicates that there's to be a punch list of items prepared and agreed upon prior to closing after completion of a preclosing walk-through, correct?

A.    Correct.

Q.    Regarding the list of items on the previous page, those are items that the bank wanted identified, as well, as outstanding prior to going to closing, correct?

A.    The bank wanted to know how much was left, and we were trying to document it.

Q.    Okay.  And this is the documentation, right?

A.    This plus, you know, the punch list and the other things I told the bank, correct.

Q.    Okay.  And then what follows is exhibit -- revised "Exhibit B #3," correct?

A.    Yes.

Q.    And this is the final version of Exhibit B to the sales contract, correct?

A.    Correct.

Q.    And on this final version, if you could look at the list of "Basic Features."

A.    Sure.

Q.    Do you see a line item for "Heat System"?

A.    I'm sorry, what --

Q.    If you go --

A.    Could you give me a Bates number.

Q.    It's the first page of Exhibit B3, and you go down on the left-hand column to "Heat Systems."

A.    Oh, I'm sorry, I'm on the wrong page.  Yeah, got it.

Q.    If you go all the way over to the right you see the word "Boiler" right?

A.    Correct.

Q.    You don't see the word "new" next to "Boiler," correct?

A.    Agreed.

Q.    And as of this date the contract states that the property is being purchased as-is, as a final walk-through, correct?

A.    It does.

Q.    But in the end, Mr. Deluca installed a new boiler, correct?

A.    Correct.

Q.    Okay.

A.    But -- well, I'm sorry.

Q.    So you already indicated that closing was moved to

June -- or July 30th, 2019, and so next on June 27th, 2019, there's a second appraisal of the property, correct?

A.    Well, again, the date, I'm going to have to look at the document.  If you tell me that, I don't disagree with you, but --

Q.    So this is going to be easiest in our exhibit binder, Defendant's 29.

A.    I'm willing to accept your date unless you want me to look at the document.

Q.    And you received the second appraisal, correct?

A.    Yes.

Q.    And the second appraisal did not change any of the square footage specifications of the property as compared to the appraisal we went over yesterday, correct?

A.    (*Sotto Voce*.) I'm sorry, I just -- what do you -- what do you mean by that?

Q.    The square footage listed in the property that we went over yesterday --

A.    Oh, you mean --

Q.    -- is the same in the --

A.    I was thinking of specification --

Q.    -- second appraisal --

THE COURT REPORTER:  I'm sorry.  Can you repeat your question?

THE WITNESS:  Sorry, my bad.

BY MR. COUGHLIN:

Q.    The square footage in the second appraisal listed for the property and its improvements is the same as what was shown in the appraisal we went over yesterday, correct?

A.    I don't think they remeasured the house, if that's your question, but I don't know.  I would have to look at the document.  If you tell me that's the truth, I believe you.  I'm willing to agree to that.

Q.    So this is exhibit, Plaintiffs' Exhibit 1030.  We can turn to page 3 of 6 --

MR. BURCHER:  Actually 1028, I'm sorry.

BY MR. COUGHLIN:

Q.    I'm sorry, 1028.  Sorry, 1028.

MR. LYNCH:  I mean, I would just object.  He's asking him to say are these two documents the same.  He should have an opportunity to have the documents in front of him.

THE COURT:  Yeah.  Would you like to see the documents?

THE WITNESS:  I'm not terribly troubled by agreeing that there was no changes to the square footage between the two documents.  I don't think that's --

THE COURT:  Well, he's asking you to confirm it --

THE WITNESS:  Okay.

THE COURT:  -- so perhaps you should look yourself.

THE WITNESS:  Okay.

BY MR. COUGHLIN:

Q.      So this is the second appraisal, Exhibit 1030.

A.      And the first one.

Q.      I'm sorry, Exhibit 1028.  Exhibit 1028, this is the second appraisal that shows the square footage that we went over yesterday.  This is page 1.  This goes into the additional features, including the screened porch.

A.      Uh-huh.

Q.      Does this appear to be the same as the appraisal we went over yesterday?

A.      Oh, yeah, I would have to see it.

THE COURT:  Is it in a different format?

MR. COUGHLIN:  Let's have Exhibit 1030 which -- pulled up. Go to the same page.  Start at page 1.  "Additional features."

BY MR. COUGHLIN:

Q.      Does the text appear to be the same on Exhibit 1030, which is --

A.      It does.

Q.      -- the earlier appraisal?

MR. COUGHLIN:  Could we go to page 3 now?  Let's stay on this exhibit.

BY MR. COUGHLIN:

Q.      So this is the earlier appraisal.  Do you recall this square footage summary on the right-hand side?

A.      I do from yesterday, yes.

Q.      Okay.

A.    I'm sorry, this is the original?

Q.    This is the original.

A.    Okay.

Q.    And then we're going to pull up the second appraisal, page 3.  Do the figures here appear to be the same?

A.    Glancing at them, yes.  I mean, I haven't done an extensive analysis.

Q.    So the appraisal didn't change, as far as you can tell, between the original appraisal we went over yesterday and the measurements and the final appraisal dated June 27th, 2019, correct?

A.    It didn't change with respect to these numbers, correct.

Q.    Thank you.  And then on July 2nd, leading up to closing, there was a walk-through of the property?

A.    Correct.

Q.    And you were there.  Your wife was there as well.

A.    Yes.

Q.    Mr. Deluca was there?

A.    Yes.

Q.    Okay.

A.    And Mr. Muha.

Q.    And Mr. Muha, okay.  All right.  And then later that night you sent Doug a text, correct?

A.    If you say so.  I would have to see it.

Q.    Okay.

MR. COUGHLIN:  Could we pull up Defendant's Exhibit 35.

Your Honor, I would like to move into evidence Government's Exhibit 1028 as well.

THE COURT:  Any objection?

MR. COUGHLIN:  I'm sorry, Plaintiffs' Exhibit 1028.

MR. LYNCH:  No objection.

THE COURT:  Okay.  It's received.

(Defendant's Exhibit 1028 admitted into the record.)

BY MR. COUGHLIN:

Q.    Is what we're looking at, which is marked as Defendant's Exhibit 35, a text that you sent to Mr. Deluca the evening of July 2nd?

A.    Which part of the text are you asking about?  I believe the blue bubbles before the date 7-2-19 are on 7-1-19.  The stuff that comes after is on 7-2-19.  Does that make sense?

Q.    Okay.  So the text above 7-2-19 is from 7-1 actually?

A.    I think so from this document.  I can't tell you from my memory.

Q.    Okay.  So on the 1st or 2nd of July, you texted Mr. Deluca, "The house is great.  Thanks for all the work.  It has been quite a journey.  Will advise when the closing is done tomorrow.  Oddly enough, my favorite room is the dining room," correct?

A.    Correct.

Q.    And then on July 3rd, 2019, closing occurs.

A.    Correct.

Q.    And that's when the parties drafted -- or that's when the Post Closing Construction Agreement came to be, roughly around that date, correct?

A.    Well, a draft of it had been provided prior to closing.

Q.    And that's a draft that you had mostly put together, correct?

A.    Oh, correct.

Q.    And that's Plaintiffs' Exhibit 2.  And in the original draft, there were actually no exhibits attached, correct?

A.    Well, we went through that extensively yesterday.  The -- no, I stand by my testimony.  There was an agreement for what those documents were, and why they didn't get included in the DigiSign I don't know.

Q.    But the E-sign didn't have any exhibits?

A.    That's what we learned, yeah.

Q.    And Mrs. Harrell didn't sign the Post Closing Construction Agreement until July 8th of 2019, correct?

A.    I -- if that's what the document reflects.

MR. COUGHLIN:  If we could pull up Plaintiffs' Exhibit 2.

A.    I'm willing to accept what you say.

MR. LYNCH:  I'm just going to, you know, object.  If you're going to ask him to --

MR. COUGHLIN:  Yeah, show him the --

MR. LYNCH:  -- concede --

THE COURT:  Yeah, show him the document.

MR. COUGHLIN:  Sure.

THE COURT:  You're doing that persistently and hoping maybe to get a better answer, but, you know, let's forego that and ask -- and show him the documents.

MR. COUGHLIN:  Understood.  It's more to try and move it along, but I appreciate it.

BY MR. COUGHLIN:

Q.    Does this signature line reflect that Mrs. Harrell didn't sign the document until July?

A.    It does.

Q.    Okay.  Thank you.  And in the agreement there is a defined term of "Incomplete Work," correct?

A.    That's correct.

Q.    And that incomplete work needed to be completed by August 1st, 2019, correct?

A.    That's correct.

Q.    And then there was "New Work" that was referenced. That's the addition and expansion of the existing porch, correct?

A.    Plus the work under the change order, correct.  I guess it didn't -- the change order didn't exist at this time, so maybe I'm skipping what you're saying, but anyway --

Q.    Well, the --

A.    I'm not really disagreeing with you.

Q.      If we go to the agreement and definition of "New Work,"
it just references the expansion of the existing porch?

A.      That's correct.

Q.      And that's, therefore, beyond the screened-in porch,
correct?

A.      The new work was like jutting out the screened-in porch.
Does that -- is that responsive?

Q.      So the addendum we spoke about added the screened-in
porch and then the Post Closing Construction Agreement
contemplates expanding that porch even further.

A.      No.

Q.      I'm confused.

A.      The -- if we go back to what you were talking about in
the contract, on -- oh, boy, what -- the first May addendum I
think you were talking about.

Q.      The May 28th addendum?

A.      Wherever we put that in --

Q.      I think the screened-in porch came to be on June 20th
2019?

A.      Do you happen to have the Bates label?

Q.      That's 14256.

A.      Thank you.  Let me just make sure that's right.
        Can you point me to the language?  I'm having trouble
finding it.

Q.      Trying to find it myself.

MR. COUGHLIN:  Court's indulgence.

BY MR. COUGHLIN:

Q.      This is on June 18th.  That's 14242.

A.      14242.  Right.  So, if -- when I said I did not agree with you, I believe this right here, "screened-in porch with copula" is removed from Exhibit B on June 20th, 2019, in the next addendum.

If it was not, it was intended to be.  And then it was pushed into the Post Closing Construction Contract [sic] as Exhibit B because the parties acknowledged at this time that it couldn't be finished in time for the closing date of July 3rd. So if I could just look at this for a minute and see if we did that correctly or incorrectly.

Well, it says the revised Exhibit B is replaced entirely with the attached revised Exhibit B3, right?

Q.      Yes, it says that.

A.      And I don't think that porch is on Revised Exhibit B3.

Q.      Okay.

A.      Anyway, that was the whole point, that that porch that we're talking about, the jut-out of the porch as I'm calling it, we said, "Look, you know, we can't -- we can't finish that, and it violated kind of the boundary dear condition that we were working with, so we pushed it into the Exhibit C of the post-closing -- the post- -- I can't say the word.  -- the Post Closing Construction Contract as Exhibit C, which was the same

as we were talking about in the base contract, and said we'll just do it after closing.

Q.    Okay.

A.    And, you know, I had said the same thing about the pool, which we never got to, but that was sort of the -- at one point the plan for the pool as well.

Q.    Okay.  And so, in terms of the payment terms for, then, the expansion of the existing porch, there was a payment of 17,500 to be paid when work commences, and then the balance once it's complete?

A.    I believe those are the terms of the contract.

Q.    Okay.  Could we turn back to Exhibit 2?

A.    The Post Closing Construction Agreement?

Q.    The Post Closing Construction Agreement, Bates 14276.

A.    14276.  Okay.

Q.    You testified earlier that the original sales agreement didn't include any written reference to permits at all, correct?

A.    Correct.

Q.    The Post Closing Construction Agreement, though, has a provision related to permits, correct?

A.    Correct.

Q.    And it says that the "Contractor will obtain and will pay for all construction permits," correct?

A.    That's correct.

Q.    And there's also a warranty section in that contract as

well, correct?

A.     That's correct.

Q.     That's Section 4.12?

A.     Correct.

Q.     And this is the warranty from Mr. Deluca to you, correct?

A.     It's one of the two, correct.

Q.     When you say "one of the two," what's the other?

A.     14279, which is in Exhibit 2.

Q.     Well, this is dated July 2nd, correct, this letter that you're referring to, page 14279?

A.     Um, it's -- he dated it July 2nd, correct.

Q.     And it says that he will deliver "a customary builder warranty," correct?

A.     It says, "I will deliver ... a customary builder warranty on or before September 1st, 2019, covering defects in any work performed by be in renovating 6122 Lee Highway," dot, dot, dot.

Q.     Okay.  And then after the date of that letter, the Post Closing Construction Agreement is executed, correct?

A.     This was signed at the same time.  Isn't it -- what is the date that this is signed?  So this is signed at the same time as the Post Closing Construction Contract.  The fact that it says July 2nd, is a typo, I guess.  I mean, I don't know what that means.  He dated it July 2nd; it was signed it on July 3rd.

Q.     But in the Post Closing Construction Agreement there's clearly -- in the body of it itself, there's clearly a warranty

provision, correct?

A.    For the work, correct.

Q.    And the work is divided into incomplete work and the new work, correct?

A.    Correct.

Q.    And the requirements of that are that he wants that -- the "Work will be in accordance with the scope of work and will not be defective," correct?

A.    Correct.

Q.    In this agreement there's no other standard identified for the workmanship other than defective, correct?

A.    Well, I stand by whatever the contract says, but it says "the scope of Work and will not be defective."

Q.    Okay.  And then there are requirements in terms of exercising rights under the warranty, and those are that if the "Work is found to be defective, Contractor will promptly, without cost to the Homeowner," dot, dot, dot, "promptly either correct such defective Work," or reject it, "remove it from the Property and replace it," correct?

A.    That's what the contract said.

Q.    And then if the contractor doesn't do that, then you as the homeowner may have the defective work corrected or the rejected work removed and replaced, correct?

A.    You're just reading the contract, which I agree that's what it says.

Q.    Okay.  In addition, in the sixth whereas clause -- that's Bates Number 14274 -- there's an acknowledgment by the parties that "goods purchased but not yet installed or other items constituting the Incomplete Work substantially exceeds $20,000," correct?

A.    Correct.

Q.    And ultimately, $20,000 from the sales proceeds were placed in escrow?

A.    Correct.

Q.    And there was some debate between you and Mrs. Harrell regarding the size of that escrow, correct?

A.    Well, what point in time?  I mean, there was a -- it was -- if you're looking back earlier in June as we get closer to closing, it depends on what time you're asking me that.

Q.    Well, originally Mrs. Harrell wanted the size of the escrow to be a hundred thousand dollars, correct?

A.    More than that.

Q.    And you at one point were considering $75,000, correct?

A.    The parties agreed to 75,000 at one point --

Q.    Okay.

A.    Well, or orally agreed -- I mean, or in writing, but we didn't put it in an agreement.

Q.    But ultimately, the bank dictated that the escrow be $20,000, correct?

A.    The bank dictated that we needed to be able to move in

the house and that they were comfortable at $20,000.  You know, it -- could we have gone to 24,000 or 25,000, I don't know, but their point was they didn't want to finance major construction, so --

Q.    And so the bank, Mr. Deluca, and you agreed that the escrow amount, at least, would be $20,000?

A.    Well, we agreed and we told the bank, right.

Q.    But there was an acknowledgment that there was substantially more than $20,000 worth of work to be done as of July 3rd, correct?

A.    No -- well, the -- what this is intended to say, and this is what I told the bank, is that there was a lot of materials on order.  There were gates that were not there when I wrote this, and those gates, according to Exhibit B, were, you know, whatever.  It was an expensive item.  And there were other things.  And I had been told that everything had been -- anything that hadn't been paid for in full that was coming in -- you know, material is coming in -- I didn't try to go through and list all of those.

Anything that we knew about that wasn't paid in full, we tried to grab, so that's why the tile says 50 percent deposit.  That's why something else says 50 percent deposit.  So we're trying to say there are all these materials coming in, if they've already been paid for we're not going to escrow, we're going to trust him.  Everybody knew that.

And then the point of the $20,000 was, was what would it cost to kind of take those materials and kind of finish, you know.  That was sort of what we were trying to do.

Q.    But yet you wanted a higher escrow amount, correct, at one point in time?

A.    Again, you have to look at the critical path of where the construction is.  When we were talking about getting a higher escrow amount, the kitchen wasn't finished, there was all kind of stuff that wasn't finished.  We just -- we were living in Connecticut, we really had no idea, and we were very anxious about it.  And so we're throwing out numbers trying to figure out where we are in this critical path and how reasonable it is to pick this number or that number.  And so we went through a process to try to assure ourselves that this was a reasonable thing to do.

Q.    Okay.  After closing, a punch list was created, correct punch list?

A.    There was -- well, I would like to see the document you're talking about.  There was there was a punch list that we walked around with prior to closing, and, you know, we walked around together, and then I typed it up.

Q.    Could we turn to Plaintiffs' Exhibit 1022.  There's no date on this document, correct?

A.    I don't know.

Q.    You don't see a date at the top?

A.    I'm sorry, I'm just looking.  Yeah, no, I don't.

Q.    But is it fair to say this is the first fully typewritten punch list that was created after closing?

A.    This was -- this was not created after closing.

Q.    This was created on the date of closing?

A.    This was created before closing.

Q.    Okay.

A.    Because it says, "Checklist for Closing," "Critical," "Home Warranty," this, that and the other.

Q.    And in this punch list you're identifying work that's incomplete, correct?

A.    Yeah, we're walking around saying, "Let's wrap this baby up."

Q.    You're also making some changes, correct?

A.    What changes?

Q.    Well, let's go to the living room.  So turn to the next page.

A.    Yep.

Q.    Do you see "Living Room," and we're now on Bates 27112?

A.    I see it.

Q.    Do you see number 2, proposal -- "Need proposal for hidden bookcase"?

A.    Yes.

Q.    So that's something that's being added to the project, correct?

A.    Well, this is not a contractual obligation of anyone.  We were walking around and there this little library, and Doug said, "I have this really cool idea to put in these" -- I don't know what you call them, but these hidden doors or something, and, you know, he thought it would it would really be cool, you know.  I mean, that's the sort of thing he has a lot of passion about.

And we said, "Okay.  Well, give us a proposal."  That proposal wound up in a change order on August 2nd.  And they're doors.

Q.    And that work was completed, correct?

A.    It was mostly completed, yes.

Q.    And then some selections were needed from you and Mrs. Harrell for certain items, correct?

A.    Could you be more specific?

Q.    Sure.  Go to the "Mud Room."  That is 27124.

A.    27124.  Okay.  Sorry.  Yeah, got it.

Q.    Is there -- do you see line item 2, "Julianne to design built ins"?

A.    Yes.

Q.    Julianne is your interior designer from Connecticut, correct?

A.    That's right.

Q.    And this is indicating that she's going to design the built-ins for the mudroom, correct?

**A.**     Well, on the walk around -- just, do you mind if I just peek at the contract before I answer this question?

**Q.**     Sure.

**A.**     I'm trying to find the mudroom on Exhibit B3, just so you know what I'm doing.

I believe on the mudroom it says there's going to be something -- you know, another difficulty with Revised Exhibit B3 was it got printed weird in DigiSign and so there are these pages that are supposed to be part of an Excel spreadsheet that end up -- there's a mudroom on here.  I just can't find it.

MR. LYNCH:  Can I suggest a page number?  14260.

THE WITNESS:  So this is one of the -- yeah, so, this is just a terrible print job in the DigiSign, but I suppose we could argue about this, but the "Mud Room" on 1260 and you have to -- because it's supposed to be over on the right, it has this thing on page 1262 [sic] "Built Ins/Hooks."  Do you see that?

So when we walked around, we discussed it with Doug, he said he didn't know what he was going to do for that.  I mean, this mudroom is tiny, and so we wanted just a place to throw our stuff when we walk in the door, and so Julianne was going to put something together and he was just going to throw it in there.

BY MR. COUGHLIN:

**Q.**     Okay.  So third-party Julianne was needed to provide the design for the built-ins, correct?

**A.**     It wasn't -- she wasn't needed.  We offered, because he

had a lot going on and we offered just to do something simple to build it.  It never happened, so --

Q.    Could we go to the master suite.

A.    I'm sorry, was that for me or --

Q.    That is going to be back in the punch list, which is Exhibit 1022.

A.    Sure.

Q.    That is 27127?

A.    27127.  271 -- yeah, got it.

Q.    Line 2, again, says, "Install built suite closet per Julianne Sterling [sic] designs."

So Julianne here is, again, to provide Mr. Deluca a design for the closet in the master suite before he can complete the work, correct?

A.    Um, again, the -- I mean, if you want, I can turn back to Exhibit B and show you where in the contract it comes with stuff in the closet.

Q.    Understood.

A.    And so -- I mean, I had a limited involvement in this, but I had confirmed that it was no big deal for houses to convey without, you know, closets built in.  It's done routinely.  And so I didn't really care too much about the closet myself, but Doug had worked at Ralph Lauren, and he had long explanations of the importance of a closet.  He was very excited about building a closet.  It was being delayed.  We thought it might be helpful

to, again, give him a sense of what we had in mind from Julianne.

You know, at this point we had a very collaborative relationship with Doug and we were not terribly worried that -- you know, what he would put in or whatever, so we did -- you know, we did that, and we gave him plans in September, I think, from Julianne reflecting the -- maybe I have the date wrong, but we gave him plans at some point reflecting plans from Julianne for the interior, the interior of the master closet.

Q.    Okay.  And then if you could turn to the family room that is 27123.

A.    I'm sorry, on the punch list?

Q.    Yes.

A.    Oh, okay.  Got it.

Q.    It says, "Powder Room.  Estimated completion to be agreed.  When will permit be obtained," and then, in parenthesis, "(application not made)," correct?

A.    Correct.

Q.    So as of the date of closing, you were aware that an application for the powder room had not been made with Arlington County, correct?

A.    Correct.  That was the reason we were told that it was -- had not been started.

Q.    And after this first punch list there were additional punch lists -- or the punch list was modified, correct?

**A.**      How do you mean?

**Q.**      So let's turn to Exhibit 495, Plaintiffs' Exhibit 495. That's in the binder.

**A.**      495.  Yes, got it.

**Q.**      And there's a date in the upper left-hand corner, correct?

**A.**      It is.

**Q.**      And it's July 7th, 2019, so this reflects an update and the red are the new additions to the punch list that we just went over, correct?

**A.**      My testimony on this is that we walked around on -- before closing with -- I apologize, I don't remember the exhibit number, but the one we went through before that we were debating what date that was signed or that was created, and we filled stuff out, and then my testimony is -- and I believe there's an e-mail that reflects this -- where I took what I thought -- you know, when we walked around and we said, "Oh, we forgot" -- it's just very hard to walk around a house and say what's -- you know, "What about this; what about that?"  It's a very hard thing to do.  I don't know anything about construction.

So we're walking around.  You know, we trust this guy; we have a great relationship with him.  We're walking around saying "What about this; what about that?"  And we're writing it down. This -- and we're having conversations about it while we're writing it down.  Some things he's like "No," you know,

"that's" -- or some things he's like, "Yeah," you know, whatever, and so this is my version of memorializing that walk around.

MR. COUGHLIN:  I think we have a witness, Your Honor.  Do we want to have him in the witness room?

THE COURT:  Is he a fact witness or is this our inspector.

MR. COUGHLIN:  Yes.

THE COURT:  All right.  Good morning, sir.

MR. ELMAGRABY:  Good morning.

THE COURT:  I'm going to ask you to wait in the witness room, which is right around -- when you exit, go around to the right, and we'll call you in a little while.  All right, sir?

MR. ELMAGRABY:  All right.

THE COURT:  Thank you.

THE WITNESS:  I can't recall where I was in my testimony but --

BY MR. COUGHLIN:

Q.    Just --

A.    Sorry, go ahead.

Q.    This is the punch list as of July 7th, 2019, correct?

A.    This is my attempt to memorialize what we agreed to prior to closing, what was to be on the punch list.

Q.    Okay.  And then moving forward, on August 2nd, 2019, you met with Mr. Deluca at the property, correct?

A.    Correct.

**Q.** And you testified that you signed a change order that date, correct?

**A.** That's correct, there is a change order on that date.

**Q.** Can we turn to Plaintiffs' Exhibit 4? This is the change order that was provided to you on August 2nd, correct?

**A.** That's correct.

**Q.** And all of this work --

**A.** Yeah, I believe we -- oh, I'm sorry.

**Q.** All of this work was complete as of August 2nd, correct?

**A.** No. I will be happy to give you the rundown, if you would like.

**Q.** Well, the owners' suite sinks were put in, correct?

**A.** I don't remember what day they were put in. They were put in eventually.

**Q.** Okay. And you paid for this change order, correct?

**A.** Agreed.

**Q.** And you paid for it voluntarily, correct?

**A.** Absolutely.

**Q.** Okay. And then on August 5th, 2019, is that roughly the date that you retained Mr. Lynch?

**A.** No.

**Q.** Okay.

**A.** I -- I retained Mr. Lynch some time after August 6th, 2019.

**Q.** Okay. Then let's go to August 6th. August 6th begins

with a series of texts from you to Mr. Deluca very early in the morning, correct?

A.    That's right.  Well, the -- I don't remember the time of the text.  I mean, I was walking around the night of August 5th in a fit -- I was having a fit -- and at some point I texted him, and it carried over into the early morning of August 6th. I agree with you.  I don't remember the time, but to me it was nighttime on August 5th.

Q.    And Mr. Deluca responded to those texts, correct?

A.    In an e-mail, I believe.

Q.    Could we turn to Plaintiffs' Exhibit 684.  I don't think this is in the binder.  And these exhibits that aren't in the binder should be able to be seen on the screen without having to go through 500 or so pages.

      If you could just look at the screen.

A.    Sure.  Just give me half a second.  Yes.

Q.    Is this the e-mail from Mr. Deluca responding to your texts?

A.    I believe so, yes.

Q.    And if we could go down.  Go down.  So there's bold text here, correct?

A.    Yes.

Q.    That bold text, those are Mr. Delurca's responses to your texts, correct?

A.    I don't remember what exact -- they're responding to my

fit, yes.

Q.    And so the unbolded -- on this page, once we get to Doug, the unbolded text, those are your words from your text, correct?

A.    I believe so, yes.

Q.    And at this point in time in Mr. Delurca's responses, he indicates that he needs direction related to Evan's bathroom tile, correct?

A.    Where -- I believe you.  I just --

MR. LYNCH:  This is just confusing.  Let's see the document in front of you, please.

THE WITNESS:  I believe you.  I just -- I just don't see it.

BY MR. COUGHLIN:

Q.    So, ultimately, though, he responded to each of your items in the text, correct?

A.    I don't know.  He responded.

Q.    And then there was then another response where Mr. Muha sends a text -- or sends a punch list with comments from Mr. Deluca later that day, right?

A.    Yeah, I testified about that, right.

Q.    That was Plaintiffs' Exhibit 686.

MR. COUGHLIN:  If we could just pull that up quickly.

BY MR. COUGHLIN:

Q.    Is this the --

A.    Yes, this is it.

Q.      Scrolling down, the punch list that's up on the screen, the two pages back into Exhibit 686, it's the July 7th, 2019 punch list, correct?

A.      Yep.

Q.      And the handwriting on the right is Mr. Deluca's, correct?

A.      I've always believed it was him or his mother.

Q.      Okay.

A.      I don't -- I mean, I -- I understand there's no contention about it.  I don't -- it isn't really important to me whose it is.

Q.      And then that evening you send Mr. Deluca an e-mail as well.

        MR. COUGHLIN:  If we could pull up Plaintiffs' 688.

A.      I did, I paused -- I paused his construction.

BY MR. COUGHLIN:

Q.      So your e-mail at 11:02 a.m. starts at TTR -- p.m., sorry -- at 1868.

A.      Right, at 11:02 p.m. on August 6th, I sent an e-mail to Doug from my work e-mail.

Q.      And it says, "We are scheduling inspections and opinions from experts in construction regarding the status of our house at 1622 Lee Highway."

A.      Right.

Q.      And then you go on to say, "Please immediately as of

tonight pause your construction activity there until those inspections and conversations are complete," correct?

A.    I -- the e-mail is clear.

Q.    So you told him to stop all work?

A.    I did.

Q.    You terminated him as your --

        MR. LYNCH:  Objection, legal conclusion.

        THE COURT:  Yeah --

        THE WITNESS:  Well, I didn't --

        THE COURT:  -- sustained.

        THE WITNESS:  Later on I --

        MR. LYNCH:  You don't have to answer.

        THE COURT:  Stop.  I sustained the objection.

        THE WITNESS:  I apologize.

BY MR. COUGHLIN:

Q.    In addition, going on, you asked for him to send you "invoices for each upgrade, with the date of the order, the amount, and the location and vendor with the name," correct?

A.    I did.

Q.    There's nothing in the contract that required Mr. Deluca to do that, correct?

A.    I mean, you know, whether there's an accounting, whether you can demand an accounting under a contract, I don't know Virginia law.

Q.    Well, it's not in -- it's not in the Post Closing

Construction Agreement?

A.    Is it written, no, it's not written, I agree.

Q.    And then you also asked him to send a list of all of his subs, other than the AV sub, correct?

A.    I did.

Q.    And there no requirement in the contract for him to do that either?

A.    That's correct.

Q.    And this date of August 6th is prior to the August 5th deadline to finish the new work, correct?

A.    August 15th.

Q.    August 15th deadline, correct?

A.    That's right.  And it's after the August 1st deadline to finish the incomplete work.

Q.    Okay.  And from this point forward, communications with Mr. Deluca were almost exclusively in writing, correct?

A.    They were exclusively in writing, and then at some point exclusively through counsel, pretty quickly thereafter.  By October, you know, he had directed us at some point to only speak to his counsel.  You know, he and I both violated that rule routinely for some period of time, and then in October I think we were both fed up with each other, and we haven't spoken since.

Q.    Okay.  Could we turn to Exhibit 688.  This is not in the binder.  And page 1867 -- it is in the binder.  Sorry.  Yeah,

we're in -- yeah, just turning to 1867, this is -- this is now on August 7th. This is Mr. Delurca's response, correct?

A. There are --

Q. The bottom --

A. -- two e-mails on this --

Q. -- e-mail.

A. Are you talking about the 7:49 a.m. e-mail?

Q. Yes.

A. Yeah, that's right.

Q. And a few lines down Mr. Deluca says, "This 'Pause' is very disruptive to our workers and subs as it is very difficult to schedule. Please note that this requested pause by you will cause delays in the completion of this project as there are multiple staff that are scheduled to work throughout my planned vacation."

That's in this e-mail, right?

A. That is --

Q. Mr. Deluca warned you that pausing the work would cause delays, correct?

A. He warned me, yes.

Q. On August 9th -- this is Plaintiffs' Exhibit 689 -- it's not in the binder but should be viewable on the screen. Turn to page Bates 21752.

A. Which piece is this?

Q. So in the middle there's an e-mail from you to Doug on

August 9, 2019 at 1:37 p.m., correct?

A.    I'm sorry, which e-mail?

Q.    I have it --

A.    I'm just trying to make sure I look at the right thing.

Q.    -- on the screen.

A.    Oh, yeah.

Q.    And here you say, "Doug, on Monday we will have possible replacement contractor at the house."

A.    That's right.

Q.    See that?

So as of August 9th, you were contemplating having a replacement contractor at the house?

A.    We didn't know what we were going to do.

Q.    But one of the things you were contemplating was a replacement contractor, correct?

A.    Well, we didn't know what we were going to do.  We had Horizon Builders down to get advice, you know, how -- you know, if Doug isn't going to finish this house, we need a place to live, and, you know, for somebody who -- other than me, who knows nothing about construction, give me some idea what I'm dealing with.

MR. COUGHLIN:  Your Honor, I would like to move into evidence Plaintiffs' Exhibit 689.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  It's received.

(Plaintiffs' Exhibit 689 admitted into the record.)

BY MR. COUGHLIN:

Q.    And then on August 15th, you have your counsel, Mr. Lynch, send a letter to Mr. Deluca, correct?  It's Plaintiffs' Exhibit 1006.

A.    I think that's the date.  There was a letter sent around that date.

MR. LYNCH:  It's in the binder.

MR. COUGHLIN:  It is in the binder.

THE WITNESS:  Yeah, we testified about this.

BY MR. COUGHLIN:

Q.    Right.  You authorized this letter to be sent, correct?

A.    This is my attorney sending the letter, yes.

Q.    And in this letter Mr. Lynch claims, in the second paragraph, "You have materially breached this Contract"?

A.    That's right.

Q.    And then at the end of the next paragraph, you through counsel claim that Mr. Deluca was "guilty of criminal larceny and civil fraud," correct?

A.    That's correct.

Q.    And then at the bottom of the next paragraph, you through counsel claimed that Mr. Deluca was guilty of the violations under the Virginia Consumer Protections Act, correct?

A.    Correct.

Q.      And then turning to the next page, the third full paragraph, states, "If you fail to meet these deadlines, Owner will hire a replacement contractor at your cost and commence immediate legal proceedings," correct?

A.      That's correct.

Q.      And then there's a reservation, in the next paragraph, of your right to hire a new contractor to complete the work, correct?

A.      Yeah.  You're talking about the last paragraph?

Q.      Yes.

A.      Yeah.

Q.      And so -- but as of August 15th, you did not hire a replacement contractor?

A.      As of August 15th, no.

Q.      You've never hired a replacement contractor for the work at the property, correct?

A.      It's really difficult to do that, no.

Q.      Moving on to August 19th, despite receiving this e-mail -- let's turn on Plaintiffs' Exhibit 722.

A.      722?

Q.      If you could take a second and read Mr. Delurca's e-mail from you on August 19th.  It's in the middle of the page.  It shows up in blue.  You'll have to look at --

A.      I'm sorry, I'm looking for my --

Q.      -- the screen.

A.      It's not in here.

Q.      You'll have to look at the screen.

A.      Okay.

Q.      And let me know when you're finished reading the text in blue.

A.      Yeah.  I've read it.

Q.      You've read it.  In this e-mail -- in this e-mail, August 19th, Mr. Deluca commits to installing a new boiler, correct?

A.      That's right.

Q.      Which was ultimately installed?

A.      It's not -- I don't think the permit has ever been finalized and some things like that, and we talked about that I think but -- or we will talk about it, I guess, but I leave that to the experts, but there's a boiler there, yes.

Q.      A new boiler?

A.      A new boiler.

Q.      In addition to the punch list, you provided Mr. Deluca other lists, reports, correct?

A.      Are you referring to the Harden report, the EBL report, that sort of thing.

Q.      Yes, so the Harden report was provided to Mr. Deluca on or about August 12th, correct?

A.      I would have to review the date, but that sounds about right to me.

Q.      And then the Harden report -- or, I'm sorry, the EBL

report came later?  That came on about September 20th?

A.    I would have to review the date.  They followed Harden.

Q.    That's Plaintiffs' Exhibit 716?

A.    Sure, agreed.

Q.    Okay.  So there's a punch list we looked at dated September -- I'm sorry, July 12th -- I'm sorry, July 7th, 2019 that was prepared?

A.    Right.

Q.    And then the Harden report was provided on August 12th --

A.    Right.

Q.    -- to Mr. Deluca, and then on September 20th, or thereabouts, another report by EBL was provided to Mr. Deluca, correct?

A.    Right.

Q.    Could we turn to Plaintiffs' Exhibit 1019.

A.    In the book?

Q.    Yes.  There are 2-e-mails on this first page.

A.    I'm looking at the wrong thing, I'm sorry.  Okay.  I got it.

Q.    1019.  It should have a Bates number of 31339 at the lower right-hand.

A.    Yeah, okay.  I apologize, I got it.

Q.    There are two e-mails.  The second e-mail on this page is from Mr. Deluca dated August 27, 2019, sent at 12:29 p.m., correct?

Well, actually, going back, here Mr. Deluca is again taking your e-mail and then responding to it in bold, correct?

A.    The --

MR. LYNCH:  Which page are we on now?

MR. COUGHLIN:  31339.

THE WITNESS:  I think it's very clear, yes.

BY MR. COUGHLIN:

Q.    Okay.  So -- and then the bold text three-quarters of the way down, Mr. Deluca says, "I need direction as it is not my intent to not live up to these agreements," correct?

A.    He does say that.  But, you know, at this point we can't meet with him.  You know, we don't have a relationship.  You know, at some point we tried to reinvigorate sitting down through his counsel.  That never happened.  So no work happened, even though he said that.

Well, no.  I'm sorry, I have exaggerated.  I have documented the work on that daily log thing I did to try to not exaggerate, but from early September through January of 2020, which he -- in January of 2020 he removed the stairs in the master suite or going up to the master suite and then the carriage house, and to the best of my knowledge that's the last work that was done, and the rest of the work is all outlined on my observations on the punch list -- on the daily log.

Q.    Okay.  Let's turn to Plaintiffs' Exhibit 714, which is not in the binder.  Mr. Deluca wrote you at 9:04 p.m. on

September 14th, correct?

A.    Yep.

Q.    If you could read the body of that e-mail from him to you.  Let me know when you're through.

A.    Right.  I read it.

Q.    So here he proposes a release of the escrow and a release of the improvement contract as well as one list with a timeline, correct?

A.    He proposes a "release of the escrow," which we never received, a "release of the improvement contract' -- I don't know what that means -- and where is -- where do you see one list?  (Sotto voce.)

Q.    Second to last sentence.

A.    Yeah.

Q.    Starts, "Further."

A.    Mm-hmm.

Q.    Okay.  And he also indicates that his attorney should talk to your attorney, correct?

A.    It was required.

Q.    And let's turn to your video log.  That's Plaintiffs' 423.

A.    What's my -- oh, my daily log.  Sorry.  Yep.

Q.    So this starts on September 16, 2019, correct?

A.    Right.

Q.    And that's after the date that Mr. Deluca had received

the letter from Mr. Lynch of August 15th, obviously, correct?

A.    Correct.

Q.    And it's just after this e-mail from Mr. Deluca, correct, that we just went over?

A.    I don't remember the date of that e-mail you just showed me, but if you say so, I believe you.

Q.    Yeah, it was September 14th, 2019.

A.    Okay.

Q.    And yet work was performed, according to this log, on the 16th, 17th, 18th, 19th, and 20th at the property, correct?

A.    Right.

Q.    And then on September 20th, you sent another list that we discussed, the EBL report, to Mr. Deluca?

A.    That was the report of an inspection that had been done prior to that date, right.

Q.    But you sent it to him on September --

A.    My view as I would send him anything I got.

Q.    And then in the September time frame, you contacted Först Consulting Group through its Website, correct?

A.    Först Consulting Group?

Q.    Mr. Furlong's --

A.    Falcon.

Q.    -- company?

A.    Falcon.  Oh, it was Först; is that right?

Q.    I believe so.

**A.**      I don't know.  I contacted Mr. Furlong.

**Q.**      Through his Website?

**A.**      I don't know.  Maybe.

**Q.**      And now Mr. Furlong is an expert that will be testifying later in this case, correct?

**A.**      That's right.

**Q.**      So --

**A.**      You know, you're right, Mr. Furlong worked somewhere that was acquired by Falcon.  I just don't recall the name of it but...

**Q.**      Okay.

MR. LYNCH:  For the record his résumé will say Först and Falcon.

THE COURT REPORTER:  I'm sorry, Counsel, I can't hear you.

THE COURT:  All right.  All right.

MR. LYNCH:  I'm sorry.  Strike it.

THE COURT:  Strike that.

How much more do you have?

MR. COUGHLIN:  Not much longer, Your Honor.

THE COURT:  Thank you.

MR. COUGHLIN:  Could we turn to Plaintiffs' Exhibit 998.

THE WITNESS:  Is that in my book?

BY MR. COUGHLIN:

**Q.**      Yes.

**A.**      Got it.

Q.      This is an e-mail from Mr. Lynch to Ms. Ferguson, correct?

A.      It is.

Q.      And in bold at the bottom it again reserves your right as the owner to complete the work through another contractor, correct?

A.      It does.

Q.      And this is dated October 22nd, 2019?

A.      Right.

Q.      Let's turn to Plaintiffs' Exhibit 424.

A.      424.

Q.      This is going to be in one of the smaller books.  We can also pull it up on the screen.  This is Exhibit 1 in the smaller add-on?

A.      I'm sorry, it's in the pocket part?

Q.      It might be easier to just have it --

A.      Sure.

Q.      -- up in front of you.

A.      That's fine.

Q.      Do you -- this is a letter dated December 2nd, 2019 from your counsel to counsel for Mr. Deluca, correct?

A.      It is.

Q.      And you authorized this letter to be sent, correct?

A.      It is -- yes, it is the rescission letter, correct.

Q.      And this is your rescinding the purchase agreement,

correct, and the Post Closing Construction Agreement?

A.   Yes.

Q.   And in this letter there are accusations of misrepresentations by Mr. Deluca made, correct?

A.   Yes.

Q.   Related to permits?

A.   Yes.

Q.   The roof?

A.   Yes.

Q.   And the square footage?

A.   I believe so.  Is that on this first page?  Yep.

Q.   And then on July 27th, 2020, you filed the lawsuit against Mr. Deluca, correct?

A.   Not July, January 27th.

Q.   I'm sorry, January 27th, 2020.

A.   That's right.

Q.   And the March 2020 letter from Ms. Ferguson that you testified about earlier, that obviously, then, is after the lawsuit was filed, correct?

A.   March 20 comes after January, I agree.

Q.   Okay.  So I just want to cover at the end a couple subject matters.  Related to permits, there's no -- prior to closing, Arlington County told you all, you and Mrs. Harrell, that there were permits in place and that they had been having inspections, correct?

A.    I never spoke to Arlington County prior to closing.  My wife did.  My understanding is that -- well, I don't know what the substance of that conversation was exactly, but I will agree with you that we knew there were open permits on the property, if that's your question.

Q.    Okay.  Let's go to -- on to square footage.  Let's go to Plaintiffs' Exhibit 500.  So pages 54831 and 58432.  In this -- so read through this text exchange and then --

A.    I'm very familiar with it.

MR. COUGHLIN:  Mr. Burcher, you're going to have to go to the next page as well.

BY MR. COUGHLIN:

Q.    The end of the text exchange from June 10th is on this next page, correct?

A.    I'm sorry, what's your question?

Q.    So between these two pages, that's the entirety of the text exchange from June 10th, 2019, between Mr. Deluca --

A.    Yeah.

Q.    -- and you and Mr.  Muha?

A.    You asked me to confirm that?  Yes.

Q.    Okay.  And nowhere in that text exchange does Mr. Deluca say -- does he provide a square footage for the improvements, correct?

A.    Can you flip back up one page?  Thank you.

I was freaked out by this because it says something like,

"We never completed a precise calculation," which I was shocked by because I had -- I had thought we knew what the square footage of the house was in April, but he never says here, I agree.

Q.    And the text you're talking about, that's from Mr. Muha, correct?  "We never completed."

A.    Right.

Q.    Okay.  And then on June 27th, you earlier testified the appraisal had the square footage of the improvements in it?

A.    We went through the numbers in the appraisal.

Q.    And you really only needed the square footage for your insurance company, correct?

A.    Well, at this point I didn't have any contractual right to complain about the square footage.  You know, I needed it for my insurance company, and I was filling out these forms for my insurance company, and, you know, I was -- I didn't know exactly what to write, so I remember talking to my broker and saying, "What do I do," and she was like, "Well, just make it up and find out, and then we can fix it."

That was sort of the thing, and I went back and forth with her about whether that was an inappropriate or appropriate thing to do, and she said, "Well, use your best judgment.  You know, don't just make it up.  You know, take a swag [sic] at it."

So I'm asking them, what do I write down on there, but

I'm highly annoyed at this point privately, and I think there are some text messages that indicated that, you know, we don't know the precise square footage, but I trusted him and I said, "Look, he's got a lot going on at this point.  Can you just confirm it prior to closing?"

Because I believe that, in my heart of hearts, that we had asked this question before closing and that we were told about it and that, you know, between this time, you know, maybe whatever kind of went into that disappeared and then it would reemerge, and so that was my thinking about all this at the time.

Q.   Okay.  So, moving on to slate roof, there's no written statement by Mr. Deluca that uses the term "original slate roof" correct?

A.   We had to pull up what he said in his answer.  He admitted in his answer he said something.  I don't know if it's written or oral.  I would have to go research that.

Q.   But other than maybe the answer, there weren't any texts or Instagram posts that used the term "original slate roof" correct?

A.   What does his Instagram say?  It says something about charcoal under -- I --

Q.   We could pull up --

A.   I would have to get the document out.

Q.   -- Plaintiffs' Exhibit --

THE COURT REPORTER:  Sorry?

BY MR. COUGHLIN:

Q.    Plaintiffs' Exhibit 919.

A.    Okay, "charcoal slate roof," right, but my discussions with him, that it was original, that it was, you know, some antique amazing thing.

Q.    This particular Instagram post uses the term "charcoal," correct?

A.    It speaks for itself.  I agree with that.

Q.    And you never asked Mr. Deluca to define what "original" meant, correct?

A.    Well, I think I knew --

Q.    If he -- if he said it --

A.    I think I knew what it meant.

Q.    Okay.  And then turning to Plaintiffs' Exhibit 496, this is at Bates 58302.

A.    Is that in my book?

Q.    Yes.  58302.

A.    496.  Ah, yes.

Q.    Let me know when you're there, Mr. Harrell.

A.    Yeah, I'm very familiar -- we obviously had a skirmish about this, so I'm familiar with it.

Q.    So the -- you asked him how old the roof is, correct?

A.    Right.

Q.    And this is in June -- on June 10th of 2019?

**A.**    Right.

**Q.**    And he responds, "2 additions new."

The additions were to the main house, correct?

**A.**    Right.

**Q.**    And then --

**A.**    Well, there's an addition to the carriage house. These -- there's a greenhouse that became livable space, so I don't know if he means that or -- there's one addition on the -- there's one addition on -- I don't know what "addition" means here, but it could mean the main house, it could mean including part of the carriage.

**Q.**    And then the picture in this text is of the main house, correct?

**A.**    It's on the back side of the main house, right.

**Q.**    And after this text was sent by Mr. Deluca to you, you never asked him for any further clarifications of what was meant in this text, correct?

**A.**    Not exactly true.  We got on a phone call to my insurance company right after this because I asked him for assistance in answering their questions about, you know, whatever was going on with their underwriting of the roof.

**Q.**    Okay.

**A.**    And we discussed that various pieces of the roof, you know, that most of it was new, and that the original front was not new, but it was, you know, installed in the 1930s or

something.  We don't have the exact date, it had been updated, et cetera, et cetera.  That's my recollection of that phone call.

Q.    And did you make those statements?

A.    No, I don't believe.

Q.    You believe those statements came from Mr. Deluca?

A.    That's my memory.

Q.    What date did that phone call take place?

A.    Oh, I don't recall.

Q.    Turning on to your letter that you sent to Mr. Deluca -- this is 1066.

A.    Yep.

Q.    This is a letter you sent to him dated December 19th, correct?

A.    I'm just getting it open.  Yep, that's right.

Q.    Number 7, you missed "The unfinished/plate rack, $4500," correct?

A.    I'm sorry, what page are you on?  Oh, you're on the list?

Q.    Yes.

A.    Right.  I see that.

Q.    All right.  So you stated earlier that the outdoor sprinklers were complete, correct?

A.    The -- I'm sorry.  Is the point of your question when they -- I'm not aware of that so...

Q.    Well -- so this letter is your summation of work that was

not purportedly completed that you paid for?

A.    That's right.

Q.    And in the end, though, the outdoor sprinklers were completed, correct?

A.    I think as it turns out -- and this is the difficulty I have with not having any documents at this point and very few documents even today.  As it turns out -- and this is based on my recollection that I'm not paying -- you know, I can't -- I can't swear to this, but as it turns out, I think the sprinklers had been done by this point, but they weren't turned on because of some issue I didn't understand.  And when I wrote this letter, I believe -- I believed that they had not been installed.

Now, I don't remember if that happened after this, before it.  I don't know, but at some point I learned that there were sprinklers there.  And I can't remember if it was in response to this letter or if potentially they were sitting there and they just are not installed because of some issue that I don't understand.

But I had asked a number of questions about where the outdoor sprinkler was, and I was never getting any response, and so it was my assumption, given that Mr. Deluca was saying he was going to put together all the receipts and send them to me and I never got them, and, you know, I didn't believe I had sprinklers, that this along with the other things had not been

done, and, you know, that I had paid for it.

But this one, I agree with you, there are sprinklers on the property today.

Q.    Okay.  Then let's move on to Plaintiffs' Exhibit 549.

A.    549.

Q.    I believe this was in one of the add-ons.  It's not in the main binder, but it's put up on the screen.

A.    Sure, I'll just look at it.  That's fine.

Q.    Okay.  This, I believe, relates to your damage claim.

A.    I agree.

Q.    And this reflects $12,725 for the gate?

A.    Right.

Q.    By Mr. Deluca?

A.    Right.

Q.    Wouldn't -- and there's gates on the property, correct?

A.    There are gates on the property.

Q.    And there had to be labor in addition to this number in order to install those gates, correct?

A.    I don't -- I mean, I have no idea.  If you say so.  It's not an unreasonable thing to say.

Q.    Okay.  So, wrapping up, Mr. Harrell, earlier you said that you met with Horizon Builders at the property in early August time frame, correct?

A.    Yeah, we met with them for, I don't know, 45 minutes, an hour at the property, right.

Q.     And they're a general contractor that does remodeling work?

A.     Yeah, they're a very good general contractor, right.

Q.     And through multiple letters and e-mails you indicated to Mr. Deluca that you were either meeting with or reserving the right to hire a replacement contractor, correct?

A.     And demanding that he finish work at the same time, correct.

Q.     And you first communicated that you were meeting with a replacement contractor on August 9th of 2019, correct?

A.     Oh, boy.  If that's what the document we just went through reflects -- I mean, I agree the documents are the documents.

Q.     Okay.

A.     But I --

Q.     And you --

A.     -- can't possibly do that without looking at the documents.

Q.     And you testified earlier that you never hired a replacement contractor, right?

A.     That's right.

Q.     And you never listed 6122 Lee Highway for sale, correct?

A.     It's not saleable.

Q.     You ended up moving in 2020, September time frame?

A.     Yeah, we bought a house in the late summer -- or, oh,

gosh. I'm not going to do this off memory. We moved in the fall of 2020, right.

Q.    You moved to Hilton Head, South Carolina?

A.    We did.

Q.    And you paid $2,375,000 for that property, correct?

A.    Something like that. I mean --

Q.    And that home is 5,886 square feet at the time you purchased it, correct?

A.    I don't know. I think that that number you're quoting doesn't include the first floor because in flood zones, none of the first floor gets included. So just like you don't include the basement in Arlington, as I found out, in square footage. So it depends on what, you know, you mean. In the total, I would say it's bigger.

Q.    Okay. And you financed that transaction, correct?

A.    Partially, yeah.

Q.    And then you paid the rest in cash, correct?

A.    Correct.

Q.    Okay.

        MR. COUGHLIN: I have no further questions, Your Honor.

        THE COURT: All right. Well, let's do this. Let's take a 15-minute break at this time, and then we'll interrupt redirect so that we can get our inspector on the stand and off the stand.

        How long is it going to take for the inspector's testimony?

MR. LYNCH:  He has a lot of facts, Your Honor.  I think he would be -- it may be two hours.

THE COURT:  Okay.  All right.  Let's not keep him waiting, and then we can go back to Mr. Harrell for redirect.  All right.  So let's take 15 minutes and let your inspector know that he'll be next up.  All right.  We're in recess.

(Thereupon, a break was had from 10:39 a.m. until 11:05 a.m.)

THE COURT:  Let's get our inspector.

MR. LYNCH:  He went to pay for parking.

THE COURT:  He what?

MR. LYNCH:  He went to pay for parking right after the break, so we could, if you want --

THE COURT:  How do we know when he gets back?  Is he going to come into the courtroom?

MR. LYNCH:  Um...

THE COURT:  Is he going to come into the courtroom when he comes back?

MR. LYNCH:  Good question.  We didn't expressly say --

THE COURT:  I saw somebody out just a second ago.  Let's check.

(Brief pause in proceedings.)

THE COURT:  There we go.  All right.  Good morning.

THE WITNESS:  Good morning.

(EMAD ELMAGRABY, PLAINTIFF'S WITNESS, SWORN)

DIRECT EXAMINATION OF EMAD ELMAGRABY

BY MR. LYNCH:

Q.    Can you please state your name for the record.

A.    Emad Elmagraby.

Q.    I would like to hand up some exhibit binders.

      MR. LYNCH:  We have one for the Court and one for the witness.

BY MR. LYNCH:

Q.    How long have you held your professional engineering license?

A.    Um, since 2007.

      THE COURT:  Let's -- Mr. Elmagraby, if you would just spell your first and last name for us for the record, please.

      THE WITNESS:  Sure.  Emad, E-M-A-D, Elmagraby, E-L-M-A-G-R-A-B-Y.

      THE COURT:  Thank you.

BY MR. LYNCH:

Q.    And how long have you held your Class A contractors' license?

A.    Some time, 2006 to 2007.

Q.    Okay.  Who's your employer?

A.    Arlington County.

Q.    What department do you work in?

A.    CPHD.

Q.    You said CPHD?

A.    Yeah.  CPHD.

Q.    And then, what is CHPD stand for?

A.    It's Community Planning Housing Department.

Q.    What are the responsibilities of that department?

A.    The department have several division.  One of the division is my division, ISD, Inspection Service Division.

Q.    Okay.

A.    Which includes receiving building permits on trades, reviewing it, and inspecting it, for both new and for existing -- it's a different section.

Q.    Okay.  So, your job involves inspecting buildings for building code compliance?

A.    Correct.

Q.    And it involves issuing building permits?

A.    That's a different section.  That's the planning section.

Q.    All right.  And who do you report to?

A.    The building code official.

Q.    Okay.  Now, you were involved in the building permits on the project at issue here, 6122 Lee Highway; is that right?

A.    Yes.

Q.    Now, when you say that's a different department, how did you get involved?

A.    So I don't say different department, a different section.  So we have in our division, inspection services division, have several sections.  The planning section to see if the plan,

review it, and then issue the permit.

We take it from there.  We do the inspection, and then when the building is done, we final the permit.

Q.    Okay.

A.    This portion is just an inspection.

Q.    Okay.  And who do you report to?

A.    The building code official, Shahriar Amiri.

Q.    Okay.  Can you give us the spelling for that, please. Can you give us the spelling for Shahriar --

A.    Yeah.  Shahriar, S-H-A-H-R-I-R-A-R.  Amiri is A-M-I-R-I.

Q.    All right.  I'd like to show you tab 60 in your binder. Six-zero.  It should be in the front.

A.    Six-zero?  Oh, yeah, I got it.

Q.    How are you familiar with the construction on the home shown in this picture?

A.    This is an existing house that had some renovation and work.  We've been there several times.

Q.    Okay.  The construction on the project at the home shown in this picture would be under your department's jurisdiction; is that correct?

A.    The inspection portion.

THE COURT:  Let me interrupt you for a second.  I have a witness binder, but it just has deposition transcript information in it, so if you want me to follow along, then I'll need a binder.  -

MR. LYNCH:  Okay.

THE COURT:  Great.  Thank you.

MR. LYNCH:  Mm-hmm.

BY MR. LYNCH:

Q.    So, looking at the picture in Exhibit 60, the construction on the project shown in this picture would be under your department's jurisdiction; is that right?

A.    Correct.

Q.    Okay.  Who is the contractor on this project?

A.    Mr. Deluca.

Q.    How many times have you been to this property roughly?

A.    Four or five times.

Q.    Okay.  And about what period of time did you visit?

A.    I think, if my memory serves me right, I started in 2019.

Q.    Okay.  Does fall of 2019 sound accurate to you?

A.    Yeah, I think so, yeah.

Q.    September, October?  You have to answer...

A.    Correct.

Q.    Okay.  And did you have several meetings with the contractor and owner in the fall of 2019?

A.    Correct, correct.

Q.    And there was also a meeting between the attorneys and the County in March of '20?  Do you remember that?

A.    I remember the meeting.  The date I can't really remember.  I think that's right.

Q.     Fair enough.  All right.  Just explain the process of you open a building permit and then you have inspections, and then how you close out the permit.  What's the life span of the building permit?

A.     So the permit itself goes through a review process, I think maybe probably a couple of review cycle.  It depend on the communication between the reviewer and the applicants, and then once this is done, the permit is issued and ready for construction.

Q.     For a plan review?

A.     That's number -- step number 1.

Q.     But step 1 is you have to submit some plans first?

A.     Correct, yeah.

Q.     And then you review the plans?

A.     Correct.  Then we issue the permit, our section -- the review section, then we approve and issue.  Then we start doing an inspection.  The inspection is really occur when the contractor reach out to us and schedule an inspection with us.

The life span is the project life span.  There is no life span.  There is a life span for the permit to expire if there is no activity, but as long as there is an activity, the permit is active.

Q.     Okay.  So if there's no activity, the permit can expire?

A.     Correct.

Q.     If you pass an inspection then the permit closed?

**A.**    If I pass the final inspection.

**Q.**    Final inspection.  Okay.  All right.  What drawings are required to be submitted with a permit application?

**A.**    Depend on the application.

**Q.**    For a building permit application?

**A.**    For residential, if you're doing work, renovation, brand-new addition, that's all required draw.

**Q.**    Okay.  What is a closing inspection?

**A.**    A closing inspection, this is -- this is before final to make sure that before you put in your drywall, you see behind the drywall, electrical wiring/mechanical will be looked at.

**Q.**    Okay.

**A.**    Rough-in station.

**Q.**    So it's an inspection that happens before the drywall is put up?

**A.**    That's why it's called closing in.

**Q.**    Okay.  All right.  How do the -- in those instances where permit drawings are submitted, how do the drawings aid or play into the inspection process?

**A.**    An inspection is usually done as per the approved drawing so any --

THE COURT REPORTER:  Sorry.  Say it again.

THE WITNESS:  Inspection is done as per the approved set of plan, approved drawing, so the inspection -- building inspection as per the plan.

BY MR. LYNCH:

Q.    So he uses the -- when the inspector is going through the property, he will be referencing the plans submitted with the permit applications; is that right?

A.    Correct.

Q.    Okay.  What is the purpose of the permitting and inspection process?  Why do we go through that?

A.    Safety.

Q.    All right.  I'd like to show you Exhibit 426 in your binder.  What is this document?

A.    This is several permits issued for the property at 6122.

Q.    Okay.  Is this a County document?

A.    Yes.

MR. LYNCH:  I'd move to admit Exhibit 426.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 426 admitted into the record.)

BY MR. LYNCH:

Q.    And this chart relates to 6122 Lee Highway; is that correct?

A.    Correct.

Q.    And are these the permits pulled by Mr. Deluca on this project?  Is this a list of them?

A.    Yeah, these are the permits issued.

Q.   So, as I -- in determining how this chart works, what information is in the "Number" column?

A.   What's that?

Q.   What information -- there's a column at the top that says "Number."

A.   Yeah, the number is the permit number.

Q.   Okay.  When an entry in that column begins with a B, what does that signify?

A.   It's a building permit.

Q.   Okay.  And when an entry begins with a P?

A.   Plumbing.

Q.   Plumbing.  When an entry begins with an M, what does that mean?

A.   Mechanical.

Q.   Another word for mechanical is HVAC; is that fair?

A.   It's part of the mechanical.

Q.   Okay.  And if an entry begins with an E, what does that signify?

A.   Electrical.

Q.   Okay.  All right.  What information is in the "Type" column?

A.   "Type" is the type of the permit.

Q.   All right.  What information is in the "Status" column?

A.   That is the permit status.

Q.   Okay.  And when you're looking at that column, if there's

an "Active," what does that mean?

A.    The "Active" mean the permit is active, you can schedule an inspection and permit -- he can do whatever he wants with it.

Q.    All right.  This is an obvious one, what does "Expired" mean?

A.    This mean that the permit, there is no activity for six months.

Q.    Okay.  And what does it mean when it says "Finaled"?

A.    "Finaled" mean that we did the final inspection and the permit has been closed.

Q.    Okay.  And then if it says "Canceled," that means the permit was canceled?

A.    Correct.

Q.    Okay.  So there's one on here that is different from all the others -- well, it's in a category unto itself, I would say. It says "Approve" under "Status" on the first one.

A.    "Approve," that's the status on the plan review process.

Q.    It's in the plan review process.

A.    It's been approve in the plan review, but I'm not sure if it's been issued.

Q.    Okay.  And that one on the top, that's the record for the carriage house work; is that right?

A.    Yeah.

Q.    Yes?

A.    What was the question?

Q.    The entry on the top, permit "B190336," what work does that --

A.    Correct.  That's in the approve.

Q.    -- permit concern --

THE COURT REPORTER:  Sorry, can you repeat your question?

BY MR. LYNCH:

Q.    What permit does that -- what work does that permit concern?

A.    That's the garage door replacement, second floor roof, and rebuild the stair.  The description is there.

Q.    On the carriage house building, right?

A.    Correct.

Q.    Okay.  And what information is reflected in the "Applied" column?

A.    That's the date when the permit been applied for.

Q.    What information is in the "Approved" column?

A.    That's the same information.

Q.    Okay.  And the "Issued" column covers when the permit is issued; is that right?

A.    Correct, correct.

Q.    And if there's a blank in the "Issued" column, what does that mean?  There's no date written there.

A.    Most probably, the permit has not been issued.

Q.    Okay.  And then what is the date of this document?

A.    January 28, 2021.

Q.    I'd like to show you -- now, if you move through this --
you might want to pop that out of your binder because we're
going to be moving around, but we'll be referring back to it.

MR. LYNCH:  May I set up a demonstrative, Your Honor?

THE COURT:  Certainly.

BY MR. LYNCH:

Q.    This is 426 that we just looked at.

MR. LYNCH:  Can I put it on the chair?  Is that possible?

THE COURT:  I can't read it from here, so it doesn't
matter.  And I've got it on the screen --

MR. LYNCH:  Fair enough.  I was going to make some marks
on this as we went, but, you know what, it sounded good in
theory.  We can just use the -- we can just use the sheet here.

THE COURT:  Okay.

BY MR. LYNCH:

Q.    Okay.  So turn to Exhibit 430, tab 430.  What is this
document at 430?

A.    That's the permit application.

Q.    And for which building permit does this application apply
to?  By number, just by number.

A.    The building permit in the top right corner, B1803016.

Q.    B1803016, right?

A.    Yes, correct.

Q.    Okay.  And what is shown on the first page -- well, let
me back up.  Is this a public -- is this a record of Arlington

County?

A.      Correct.

        MR. LYNCH:  I move to admit Exhibit 430.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No objection, Your Honor.

        THE COURT:  Received.

        (Plaintiffs' Exhibit 430 admitted into the record.)

BY MR. LYNCH:

Q.      What is shown on the first page of this document?  That's the application itself, right?

A.      Correct.

Q.      Okay.  So flipping through this document, what are the -- what comes after the permit application?

A.      So this permit application for "Demo for Existing Bathrooms and Kitchen and Replace Same."

Q.      Okay.

A.      It's showing.

        Okay, bathroom -- are you talking about the drawing?

Q.      Yeah, the drawings.  There are drawings that follow the application, right?

A.      Correct, the next page and the page after.

Q.      And what's the purpose of those drawings?

A.      This indicates the plan that's going to be demo.

        THE COURT REPORTER:  Your Honor, excuse me.  You might have to move the mic back from your mouth.  I can't hear you.

THE WITNESS:  Would you like me to get closer to the microphone or --

(Discussion had off the record.)

BY MR. LYNCH:

Q.    Okay.  So what is the purpose of the drawings that go with the permit application?

A.    The drawing is detail what does the permit entail, what is the is permit about.

Q.    Okay.  Now, going forward to Bates page -- there's a little number -- it's depending how you're looking at it, but it says 1432, is the ending number on this, and it has a note on the right it says "Kitchen pull and replace."

Can you find that?

A.    Uh-huh.

Q.    Okay.  So what does that note there say that begins "Kitchen pull and replace"?

A.    "Kitchen pull and replace" -- what is it?  Can't read. Bring it down.

-- "cabinets" --

Q.    "Cabinets"?

A.    -- "fixtures exact same location."

Q.    Okay.  And so this permit with respect to the kitchen, it covered replacing cabinets and fixtures and putting them back in the same exact location, is that right?

A.    Correct.

Q.    Okay.  And then on the next page there's a note that begins "Permit scope of work."  What does that note say?

A.    That is what is the scope of work for the permit.

Q.    Okay.  And so it says, "Permit scope of work is for all bathrooms to pull and replace all fixtures in exact same location."

      Is that a fair reading?

A.    Correct.  Yes, that's correct.

Q.    So in addition to what he could do in the kitchen, he could also go into the bathrooms and pull and replace all the fixtures and put them back in the same location; is that right?

A.    Right.

Q.    Okay.  And then look at the next page.  There's a note that says -- and I'll read it, you tell me if I got this right -- "Permit scope of work is for all bathrooms to pull and replace fixtures in exact same location."

A.    Correct.

Q.    Okay.  And then on the last page it says, "Permit scope of work does not include any structural work."

      Do you see that?

A.    Yes.

Q.    Okay.  So under this permit he was allowed to change out the cabinets and fixtures in the kitchen, and he was allowed to pull and replace the fixtures in the exact same location in the bathrooms, and nothing else, right?

A.    Correct.

Q.    Okay.  All right.  So orienting ourselves now to what we just looked at and comparing it to the chart at 426, this is -- the permit we just discussed is the permit at the very bottom of this chart that says, "Demo existing bathrooms and kitchen replace same," right?  And you can look at the number, too.  It says "3016."

A.    Correct.

Q.    Okay.  I would like to show you Exhibit 439.  Is this a County document, when you get there?

A.    Yes.

MR. LYNCH:  I would like to admit Exhibit 439.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 439 admitted into the record.)

BY MR. LYNCH:

Q.    All right.  What is this document?

A.    So this is the comments from the review -- the reviewer.

Q.    Review comments, right?

A.    And inspection comments, yeah.

Q.    Right.  So there are a number of sections, there are the "Review Comments."  That's for comments by the County reviewing the plans, right?

A.    Correct.

Q.    And then there's a section that says "Inspection Comments," and that's comments by the County on the inspections of this permit; is that right?

A.    By the inspector, yes.

Q.    All right.  And then there's an "Event Log," which describes certain events on the permit, right?

A.    Correct.

Q.    And then the "Locks, Holds and Notices" comment, what's in that section?

A.    This is the status of the permit, but this says the "Permit is Expired."

Q.    Okay.  And just going to the first page and looking at the top, I'm going to reiterate some dates that are in Exhibit 426.  So it has an "Applied," "Approved," and "Issued" date.  What date was this permit applied for?

A.    October 29, 2018.

Q.    And are those -- in the "Approved" date, when was this permit approved?

A.    April 3, 2019.

Q.    And it was issued on April 3rd, 2019, correct?

A.    Correct.

Q.    So was the defendant allowed to do any work -- even on the kitchen and bath, all the stuff we talked about, replacing the fixtures, he was not allowed to do that until April 3rd; is that correct?

A.      Correct.

Q.      All right.  Let's go to the "Review Comments" section, and there's an entry dated October 29th, 2018, and the "Action" says "rejected" on that date.  Explain what that "rejected" entry means.

A.      This is a comment from the plan reviewer, so they did the rejection, which is like they need to revise this one by adding a rejection.

Q.      So it was initial application was rejected on or about October 29th, is that right?

A.      Correct.

Q.      Okay.  And then in the April 3rd, 2019 entry, there's a -- it says, "1st floor demo/cap bathroom only."

        What does that mean?

A.      Where it says, "Approved"?

Q.      Yeah, right.  Right next to that note, "1st floor demo cap/bathroom only."

A.      Yeah, first they explain what does the work entail, "1st floor demo," and "cap/bathroom only, kitchen," and then they describe what is the work is for that permit.

Q.      So, to the extent demolition was allowed, it's still only in the bathroom and kitchen areas; is that right?

A.      Correct.

Q.      Okay.  So, looking at the "Inspection Comments" section, can you explain the August 30th entry?

A.    Yeah, the inspection was canceled.  It was "Canceled on-site, no inspection made."

Q.    Okay.  And from this document, is it fair to say there were not normal inspections of this work prior to August 30th?  Or are you not comfortable saying that?

A.    "Need to schedule all trade permits for work."

Q.    This is the -- August 30th is the --

A.    Yeah.

Q.    -- forwarded inspection, at least in this document, right?

A.    Correct.

Q.    Okay.

A.    There will be no official inspection, no.

Q.    Okay.  So -- and then September 18th, explain that entry.

A.    "Kitchen and basement bath only."

Q.    So they were approved -- what does it mean when it's approved?  Is that a final inspection?

A.    Depends on the scheduling final, but the inspection show if it's been approved.

Q.    Okay.  And then on the November 19th, 2019 entry, it says "BY" "EAE"; is that you?

A.    Yes.

Q.    Why did you -- is this entry overturning, essentially, or cancelling out the approval on September 18th?

A.    The inspection for the bathroom would be scheduled later,

yeah.  I think we -- if I remember something right, we went there and we find some issues, so we wrote rejection, that we're going to go back and make sure that it's complying with the plan.

Q.    Right.  And the effect of that would be, is that that approval on September 18th was -- what's your word?  Rescinded?  Overturned?

A.    Yes.

Q.    Okay.  And then in the "Event Log," explain how those entries work.  It says, B/P Sets RECEIVED," "B/P Sets OUT," "B/P Sets BACK."  Those are all recording when you received drawings.  Explain what those mean.

A.    So this is -- when you submit your plan for review, this is the log in the system.  This is giving the date the review had been issued, been released, so this is all description on the date that the plan sets, received, set out, set back, and then released.

Q.    The so just to -- I think I understand this, but the County got a set of plans on October 29th about, right?

A.    Um-hmm.

Q.    And then they were sent out for revision on April 2nd; is that right?

A.    Correct.

Q.    And then when -- did you get another set or --

A.    The same -- whenever plan reviewer comment came back for

*303*

review, so I assume they fixed the comment.

Q.    Okay.  And then 4/3, it says, "Released const," C-O-N-S-T.

A.    For construction.

Q.    He's released to start construction then, right?

A.    Yes.

Q.    Okay.  I don't know if you answered that.  He's released to start construction on April 3rd?

A.    Correct.

Q.    Okay.  And then on the "Locks, Holds, Notices," what information is recorded there?

A.    This says the permit is expired.

Q.    And is that still the status of this permit, it's expired?  Or...

A.    Which permit are we talking about?  Is this --

Q.    So this one is the kitchen and bath, ends in "3016" on the very bottom of the chart.

A.    Yeah.  Correct.

Q.    And we discussed this in reference to this permit, but as a general proposition, it is true that you cannot start work until a permit is issued?  Do you agree with that?

A.    Correct.

Q.    Now, for what work, if any, on this project did Deluca have approval to do prior to April 3rd?

A.    None.

Q.    I would like to show you Exhibit 428.  So, is this a County document?

A.    Correct.

MR. LYNCH:  I move to admit Exhibit 428.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 428 admitted into the record.)

BY MR. LYNCH:

Q.    So what are we looking at on the first page of Exhibit 428?

A.    This is the permit application.

Q.    Okay.  For which permit number is this an application for?

A.    This is 1901108.

Q.    Okay.  And flipping through this exhibit again, we see some letters from Soil & Structure first, and what is the significance of those letters, why were those letters submitted?

And let me suggest, it seems like they're responding to comments from the County regarding the initial set of plans; is that fair?

A.    Yeah, May 31st, I'm assuming, yeah.

THE COURT:  Ask your next question.

MR. LYNCH:  Okay.  I'm sorry.

BY MR. LYNCH:

Q.    So what scope of work was -- what type of work was allowed under -- was the permit applicant requesting to be allowed under this permit?

A.    It's in the application.  It's rear addition and screen porch.

Q.    Rear addition and screen porch.  Okay.

Let's go to tab 433.  And is this a County -- Arlington County document?

A.    Correct.

MR. LYNCH:  I move to admit Exhibit 433.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 433 admitted into the record.)

BY MR. LYNCH:

Q.    And this document relates to the permit application we just saw, B1901108; is that right?

A.    Yes.

Q.    Okay.  And just reading through the top, are all those dates for "Applied," "Approved," and "Issued" correct dates?

A.    This is the system dates, yeah.

Q.    Okay.  So those are the official County records of the approved, issued, and applied dates, correct?

A.    Yes.

Q.    So was the defendant -- this was issued on June 4th, and

we saw that on or about April 3rd he was allowed to do work on the kitchen and bath.  So before June 4th, there's no -- still no other work he's allowed to do on the main house; is that right?

A.    Correct.

Q.    Okay.  All right.  Now, we've got to look at the "Review Comments" section, and I'm going to skip those entries in May. And I'm going to skip June, and let's go to the December entry for "Rejected."

And let me just say, as we said on the last one, the set of plans was approved -- the initial set of plans attached to his application, with some modifications, was approved on June 4th, right?

A.    Um-hmm, yes.

Q.    And then what happens here on December 2nd?

A.    So, this is all the items we discussed that need to be revised to include the building permit.

Q.    Right.  So -- okay.  Prior to December 2nd, was the County looking at a brand-new set of plans now?  And you can look at the "Event Log" and see what plans were on file. There's new plans on file now that you're looking at, the County is looking at on December 2nd?

A.    I wouldn't say new plan; it's a revised plan.

Q.    Revised plans.  And when did you get the revised plans, the County?

I think if you look at the events log, you'll see an entry of November 21st.

A.    Yes.  They received the active revision November 21st, yes.

Q.    So did the County receive a new -- when we're talking about this 12-2 review, the County at that time was looking at a revised set of plans received on November 21st; is that right?

A.    Well, I wouldn't say new plan.  I said revised to the original submittal so --

Q.    I'm just trying to figure out --

A.    So new items.

Q.    What?

A.    New items have been added to the approved plan.

Q.    Right.  And when did you get the new items?  I'm just --

A.    That's in November 21st.

Q.    Okay.  So then going back to the 12-2 entry, explain item 9.

And it begins, "At sheet A-1, and A-3 as well as the structure sheets S-1, and S-2 the new mud room."

What is going on there?

A.    So the manager stated, "as well as the structural sheet S-1, and S-2, the new mud room at the rear right is called an existing room, as per field inspection this room is built as new, please call all framing plans, and all structure design to be reviewed and to be inspected."

Q.    So, this new mudroom was not shown on his initial permitted approved plans, right?

A.    Correct, that was part of the finding.

Q.    And this was un -- the work on the mudroom was unpermitted work; is that right?

A.    Correct.

Q.    Okay.  And then let's go to comment 10.

A.    "At sheet A-2 at the proposed basement floor you are calling for existing crawl space at the front left, under the existing sunroom, as per inspection that crawl space" --

      I disagree with that.  {Indiscernible} -- verified there was a crawl space there.

      THE COURT REPORTER:  I'm sorry -- I can't --

A.    The inspector verified there was a crawl space existing there.

BY MR. LYNCH:

Q.    Okay.  So I guess this comment just relates to the County was questioning whether this work he did in the crawl space was new or existing?

A.    Correct.

Q.    Okay.  And let's look at comment 11.  What is reflected in that comment?

A.    "At sheet A-2, and sheet A-3 there is an added closet as a pantry room to the left rear room, please show the new pantry on your plans."

Q.    Okay.  So there was a pantry built at the property for which there was no permit; is that correct?

A.    Correct.

Q.    Okay.  And then let's go to comment 14.

A.    "Please provide the new barbeque [sic] grill at the rear new screen porch manufacturer's specification to be inspected."

Q.    Now, what is -- why was the County concerned about this area?

A.    So, this is actually an inspection item.  Shouldn't be plan review.  We -- some items have to be inspected by the -- by the manufacturer.

Q.    Okay.  Did this have to do with gas lines connecting to the grill?

A.    Not necessarily.  It could be the venting.  It could be anything else, but we need to look at the manufacturer specification, and we have to make sure it's been installed as per the manufacturer's specifications.

Q.    Okay.  So comment 15, it references a laundry room.  Did he build a laundry room without a permit?

A.    "At sheet -- a new laundry room is added at the second floor, please show the new room on your plans."

      Yeah.  Correct.

Q.    Explain comment 16 to the best of your ability.

A.    "As well at sheet A-4 a new large bathtub was added, pleases coordinate with the framing plans to provide an adequate

floor support."

Q.    So I guess, let me see if this is right.  At this time you're reviewing it, and his original plans did not show any sort of structural support for the added weight of a big bathtub.  Is that fair?

A.    That's what the plan reviewer is saying.

Q.    Okay.  All right.  Let's move forward to the "Inspection Comments" section.

And the first entry here is June 10th.  No inspection of the framing occurred on June 10th, according to this document; is that right?

A.    It's canceled, yeah.

Q.    Okay.  And then on June 11th, what does that reflect about the framing inspection?

A.    Inspector has "Partial Approval," a partial inspection.  He said, "All framing is okay less the fireplace."

Q.    Okay.  And then there's a note that says, "Need plumbing inspection/approval and firestop all penetrations."

So does that mean that they're saying any plumbing work is not approved in that inspection?

A.    This is mean that they didn't inspect the plumbing.

Q.    They did not inspect the plumbing, right?

A.    As far as I understand what is the inspector say.  "Firestop all penetrations"; he need to look at both.

Q.    All right.  And then the August 30th entry, there's an

approval where they come back, and that approval relates to framing work at the fireplace; is that right?

A.    This is what is noted.  There is a note, "For area around 2nd floor framing at fire place only at interior.  Note rear porch area already enclosed."

Q.    Right.  So the way I read this -- tell me if I'm wrong -- is, there was some approval, the framing at the fireplace, that came out, but they said the porch area is already enclosed so there's nothing to -- they can't do an inspection, right?

A.    "Note rear porch area already enclosed," yeah.

Q.    Is that a fair reading of what happened in there?

A.    This is my understanding what the inspector tried to say.

Q.    Okay.  Now, going back to page 4 of this document, there is an entry on December 16th.

A.    Where did you read it?

Q.    There's -- it's December 16th.  It's towards the top of page 4, again in the "Review Comments," the initials SSS, "Approved as Noted."

A.    Yeah.  December 16, right.  This is like in '20 you're talking about?

Q.    Well, my question is, it says, "Approved as Noted."  What are the caveats, if any, being expressed here?  Why does it say "Approved as Noted" instead of just "Approved"?

A.    Sometimes you put a note in the plan if you want to make sure that it's approved as noted.  So -- sometimes they mark

notes so they want us to know that there's a note in the plan and we need to look at it.

Q.      Okay.  And there is also -- he performed work on a deck without a permit; is that right?

A.      Correct.

Q.      And if you want to look at the previous page -- I missed this one -- you think it's -- that's reflected at comment 6.

A.      "Sheet A-1, A-2 and sheet S-2 please show the new rear left side modified deck built with no permit, architecturally, and structurally, footers, posts, beams, floor joists, extra..."

Q.      So in plain English, that's just recording that he built the permit without a deck, right?

A.      No, there was a deck -- if my memory serve me, there was a deck, existing deck.  It was demolished and they like shrink it with a new deck, small deck --

Q.      Okay.

A.      -- a brand-new small deck.

Q.      All right.  So -- and then the "Events Log," we covered. In the "Lock, Holds and Notices," what's the notation -- is it correct there at the very end as of May 8th, 2020, this permit expired?

A.      Yes.

Q.      There's been no final inspection?

A.      Any permit with no activity for six months the system will automatically expire.

Q.    Right.  And there's been no final inspection --

A.    No.

Q.    -- on building permit 1108?

All right.  Let's look at Exhibit 437.  Okay.  And I want -- first of all, at the top, it says, "From:  Emad Elmagraby," to a number of people.  Is this e-mail a County document?

A.    Correct.

MR. LYNCH:  I move to admit Exhibit 437.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 437 admitted into the record.)

BY MR. LYNCH:

Q.    So, this is the -- go to page 2 and there's an e-mail by you at 5:17 a.m., and it starts with, "Revise plan for the house and a new permit for the carriage house has been submitted yesterday."

Do you see that?

A.    Correct.

Q.    Okay.  That's November 21st.  And then if you look at your chart, what is the applied date for the permit on the carriage house?

A.    Where is the carriage house?

Q.    The carriage house is at the very top, actually.

A.    Yeah, correct.  That was in November 20th.

Q.    Okay.  So I think what happened here -- and if you don't know you don't know -- he essentially made a permit application by e-mail by submitting these plans; is that right?

A.    I can't remember -- this e-mail -- this is my e-mail.

Q.    Right, but you say --

A.    I said that "After review the submittal form yesterday" or the -- he submitted a form yesterday.  Yeah.

Q.    That's close enough.

A.    Yeah, "has been submitted, the revision submittal for the original house was missing the original copy," yeah.  Okay.

Q.    I mean, having reviewed this document, do you know how -- are you clear on -- clearly he submitted something on November 20th.  Are you sure what he submitted?

A.    "The new plan for the carriage house permit number" so-and-so "has been submitted, the revision submittal for the original house was missing the" -- so resubmit the carriage house.

Q.    Okay.

A.    The permit for the carriage house.

Q.    Okay.  All right.  So let's look at 431.  So, this is an e-mail from Mr. Deluca to you.  What is he submitting at this time in October?

A.    If I understand the e-mail, he's submitting attachments to the e-mail showing the -- for the original structural drawing

for the garage/carriage house.  Also submitting the calculations structural in the main house.

"We have also located the construction photos" --

So he submitted like an attachment for the structural drawing for the carriage house.

Q.    Okay.  So this is a submission of carriage house drawings, and then in November he submits revised drawings; is that right?

A.    The October, what he submitted, this is like courtesy, this is what I'm going submit; if you guys have any objection or if you see something odd, please let me know.

Q.    Okay.

A.    And he went and submit as per what the attachment he submitted.

Q.    All right.  This submission was outside of the official --

A.    Yes.  Correct.  You do that most of the time.

Q.    Let me finish the question.  This submission was outside the official permitting process?

A.    It's not a submission.  It's an e-mail.

Q.    Yeah.

MR. LYNCH:  Okay.  So I move to admit Exhibit 431, party admission.

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  It's received.

          (Plaintiffs' Exhibit 431 admitted into the record.)

BY MR. LYNCH:

Q.     So let's now look at 432.

A.     What are we looking for?  I'm sorry.

Q.     That's okay, 432.  So to orient you to this, it looks like there's "Approved" stamp by the County in the bottom right. Is that right?

A.     Correct.

Q.     And we have big versions of this, but can you tell when that approved stamp was applied?

A.     It is -- is that December?  I can't really see it.  It says "DS," right?

Q.     Well, looking at your chart, when was the -- well, there's a different document that we need to look at.

A.     If I read it correctly it says, "DS," December.

Q.     We'll come back to the date.

A.     Yeah.

Q.     But this is a -- now, a set of the carriage house plans that at some point in time was approved by the County?

A.     Correct.

Q.     And if you flip through them, you can see some bubbled revisions.  Strike that question.  Let's keep moving.  So -- but you looked at the plans.  Is it fair to say -- well, what type of work was allowed under these plans?

A.     So I see a roof here.

Q.    And the shorthand, maybe, way to describe this maybe on the chart says, "New garage door, replace second floor roof, and rebuild stairs"; is that roughly an accurate --

A.    Correct, yeah.

Q.    Okay.  So let's go to Exhibit 438.  Okay.  Is this a County document?

A.    Correct.

MR. LYNCH:  I move to admit Exhibit 438.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 438 admitted into the record.)

BY MR. LYNCH:

Q.    So, on the first page the "Issued" entry is blank.  Was this permit ever issued?

A.    I don't know.  I don't think so.

Q.    According to the County system, this permit was never --

A.    It's not showing, no.

Q.    -- never issued?

MR. LYNCH:  You got --

THE COURT REPORTER:  No.

BY MR. LYNCH:

Q.    So according to the County system, this permit was never issued; is that right?

A.    Correct.

Q.    Okay.  Now, on the date question, I think we can answer that under the "Review Comments" section as to the date you finally received approved plans for the carriage house, and there's an entry there that says, December 16th, 2019, "Approved as Noted."

A.    Where is that?

Q.    It's on the next --

A.    The next page?

Q.    Yeah, next page.  Look for the 12-16 entry.

A.    Yeah, "Approved as Noted," correct.

Q.    Okay.  So that would have been the approval date for the revised carriage house plans?

A.    Correct.

Q.    Okay.  Now, on December 2nd, can you briefly explain what the -- what is going on there in the "Rejected" entry?

A.    So this is a plan review comments about the first submittal.  He rejected it for those items, several items now.

Q.    Okay.  And I'm -- I want to make sure of something before I keep going.  The applied date for the carriage house permit is November 20th, 2018; is that right?  On page 1?

A.    Yes.

Q.    Okay.  So the first plans, at least the set that were submitted sometime prior to June -- to December 2nd, 2019, were rejected, correct?

A.    Correct.

Q.    And looking at the "Event Log," does that rejection relate to plans that were submitted on November 20th?

A.    Correct.

Q.    All right.  The "Inspection Comments" section is blank. According to the County records, there's been no inspections under this permit; is that right?

A.    No official inspections, yes.

Q.    No official inspections, because you personally looked at this building yourself in the fall of 2019, right?

A.    Correct.

Q.    And in the "Locks, Holds, and Notices" -- well, it doesn't say.  Is this permit active or expired to your knowledge?

A.    Most probably expired.

Q.    What's that?

A.    Most probably expired.

Q.    Okay.  All right.  I would like to show you Exhibit 448. It's upside down.  Is this a County record?

A.    Yes.

       MR. LYNCH:  I move to admit Exhibit 448.

       THE COURT:  Any objection?

       MR. COUGHLIN:  (No response.)

       THE COURT:  It's received.

       MR. COUGHLIN:  I'm sorry, Your Honor, I was was just checking for a second.  I apologize.

THE COURT:  That's okay.

(Plaintiffs' Exhibit 448 admitted into the record.)

BY MR. LYNCH:

Q.    What is this document?

A.    It's a permit application.

Q.    It's a permit application for which permit number?

A.    B1902167.

Q.    Okay.  2167.  And in looking at your chart, what kind of work was covered by this permit?

A.    8 by 7 room bump out [sic].

Q.    Let me ask you -- it's a little clearer on this one.

A.    Oh, okay.  Yes, "Bump out powder room, extend existing screen porch."

Q.    And what is the date of this application?

A.    This is applied on August 6th, 2019.

Q.    So I want to show you drawing sheet A-1.  And if you look at this drawing, on the left-hand side there is an "N" next to "Crawl Space."

A.    Uh-huh.

Q.    Okay.  What is the significance of an "N" or an "E" when next to work?

A.    "N" mean new; "E" mean existing.

Q.    Okay.  So at least in these drawings, Mr. Deluca is saying he constructed a new crawl space; is that right?

A.    According to the drawing, yes.

Q.     Okay.  And is that a foundation that we're looking at on the left there that says "Crawl Space"?  Is that foundation level?

A.     Yes, that is the revised plan.

Q.     Okay.  So, does this -- I mean, does this permit application also, in addition to bumping out the powder room and extending the existing screen porch, is this permit requesting permission also to do new work on a crawl space foundation?

A.     Yes, according to the plan.

Q.     Okay.  All right.  Let's look at Exhibit 440.  I think we're missing this one.

       It's on the screen.  So this one, yeah, you have to crane your neck a bit there.

A.     That's fine.

Q.     Is this a County document?

A.     Correct.

Q.     Okay.

       MR. LYNCH:  I move to admit Exhibit 440.

       MR. COUGHLIN:  No objection, Your Honor.

       THE COURT:  It's received.

       (Plaintiffs' Exhibit 440 admitted into the record.)

BY MR. LYNCH:

Q.     Okay.  These comments in Exhibit 440 relate to permit number B1902167, the porch and powder room permit; is that right?

**A.**    Correct.

**Q.**    And the porch and powder that we confirmed earlier was applied for August 6th, 2019 according to this document?

**A.**    Yes.

**Q.**    And then the "Issued" column has a blank, right?

**A.**    Yes.

**Q.**    Is so, according to County records, this permit was never issued?

**A.**    It's not issued, no.

**Q.**    It's not issued.  Was defendant allowed to do any work on this porch and powder room ever?

**A.**    No.

**Q.**    He was not allowed to, right?

**A.**    Correct.

**Q.**    And does that include the work in the crawl space if there's any new work in the crawl space?

**A.**    Correct.

**Q.**    Okay.  And then on the -- there's an entry in the Comments section on August 14th, 2019, and it's item number 3.

**A.**    "Need to indicate crawl space access size and location for the powder room addition, see code section" so-and-so.

**Q.**    And if you can explain that entry, please do.  If you're puzzled by it, let me know.

**A.**    So he's just saying you need to -- the crawl space, you need to indicate the size, the access size.  And the location

for the powder room addition -- for this new area.

THE COURT:  I'm sorry, I can't hear you.

THE WITNESS:  What I understand from the plan reviewer, he need to show the -- the access size and location at the powder room area for the crawl space.

BY MR. LYNCH:

Q.    Okay.  And comment number 7 is making some observation about the roof slope.

A.    Yeah, this is a generic comment.  If the slope exceed that number, then you need to go two layer on underlayment.

Q.    And on the August 9th entry, it says, "The plant doesn't show current/existing conditions," and in comment 3 it asks for elevation drawings.

      Was this work -- can you tell from this record if it was already underway as of August 6th?  Do these comments indicate to you that that was the case?

A.    Are we talking about the powder room.

Q.    Yeah.

A.    Yeah, I know that it was built already.

Q.    So the work was already begun --

A.    Yeah.

Q.    -- before August 6th, right?

A.    Correct.

Q.    What inspections occurred under this permit?

A.    Nope.

Q.     No inspections, right?

A.     Can you hear me?

Q.     You have to answer that one.  There were no inspections at this --

A.     No, there was no inspection.

Q.     Okay.  All right.  And this one didn't expire.  It looks like it was canceled.  When was it canceled?  Under the "Locks, Holds and Notices" section.

A.     Says, "Permit canceled by permitholder/contractor (see letter in offlink."

Q.     So the permit holder canceled this permit on December 4, 2019; is that right?

A.     Correct.

Q.     And clearly, there's been no passing final inspection -- strike that question.

       I'd like to show you Exhibit 450.  Is this a County document?

A.     Yes.

       MR. LYNCH:  I move to admit Exhibit 450.

       THE COURT:  Any objection?

       MR. COUGHLIN:  No objection, Your Honor.

       THE COURT:  Okay.  Received.

       (Plaintiffs' Exhibit 450 admitted into the record.)

BY MR. LYNCH:

Q.     Okay.  So, if you look through this document, there's the

Comments document that we've been looking at and also the application, all in one.  So what type of work was requested to be authorized by this document?

A.    Swimming pool.

Q.    And there's no pool at the property, right?

A.    No.

Q.    And it was -- in looking at the drawings, just to confirm, there is no powder room work authorized under this; it's just for a pool, right?

A.    I'm sorry, I didn't hear you.

Q.    This application did not request permission to build a powder room; rather, it only requested permission to build a pool?

A.    Correct.

Q.    Okay.  And this permit was canceled, right, according to the review comments?  Strike the question.  Strike the question.

So I want to show you Exhibit 449.  So was this a County document?

A.    Correct.

MR. LYNCH:  Move to admit Exhibit 449.

MR. COUGHLIN:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 449 admitted into the record.)

BY MR. LYNCH:

Q.    Okay.  On page 1 of this document, the electrical permit

application, what is this document?  The?

A.      This is an "Electrical Permit Application" related to the building permit number in the top.

Q.      Okay.  Right.  So I was going to ask you that.  There's a building permit number in the top left.

A.      Right.

Q.      What's -- so what does that mean?

A.      Electrical permit has to be related to a building permit.

Q.      Okay.  So this electrical work -- well, let's check.  Do you remember what 3016 is?

A.      I'm sorry, what?

Q.      It's at the very bottom.

        Page 2 of 2, demo --

A.      Yeah, this is the demo existing bathroom, yeah.

Q.      So this electrical permit was related to the kitchen and bath, right?

A.      Correct.

Q.      Okay.  And then I want to look at the next page, "Mechanical Permit Application."  And similar to the one we just looked at, this has a building permit number entry in the top left?

A.      Correct.

Q.      And so this -- so what type of work was requested to be authorized under this permit?

A.      The same, mechanical for the bathroom and kitchen.

Q.      So, this is a request to -- so the work requested to be authorized under this permit related to the kitchen and bath, right?

A.      Yeah, the mechanical permits, yes.

Q.      Okay.  And to move faster, the next one is "Plumbing," Arlington 1420.  Same thing?

A.      Correct.

Q.      This plumbing work is only for the kitchen and bath, right?

A.      Correct.

Q.      Okay.  And then the next page, Arlington 1421, this is "Plumbing."  Again, this work is only related to the kitchen and bath, right?

A.      Correct.

Q.      And then the next one, Arlington 1422.  The plumbing work requested to be performed in this permit only related to the kitchen and bath; is that right?

A.      Correct.

Q.      And then not until June, looking at Bates 1423, do we start getting an application for work outside of the kitchen and bath.

        Let me ask it a different way.  On page 1423, what permit was this plumbing work related to, what building work was this plumbing work related to?

A.      This is the 1101108.

Q.      Right.  So if you look at page 2 --

A.      The two-story addition and one-story screened porch.

Q.      So this now, here in June 4th, 2019, this plumbing work is related to the two-story addition and screened porch that the defendant constructed on the rear of the house, right?

A.      Correct.

Q.      Okay.  If you keep scanning through this, it looks to me like there's no trade permit applications any time prior to June 4th.  Make sure you agree with that, please.

A.      For the two-story addition, right?

Q.      Yeah, well, there's no trade -- correct.  With respect to the -- with respect to -- outside of the kitchen and bath there's no trade permit --

A.      Correct.

Q.      Okay.  We have to, for clarity of the record -- prior to June 4th, the only trade permit -- the only trade permits he pulled all related to the kitchen and bath?

A.      Correct.

Q.      Okay.  Now, just out of curiosity here, the very last permit on this is a mechanical permit.  That seems to relate to a boiler; is that right?

A.      Plumbing permit, yeah -- mechanical permit.

Q.      All right.  Strike the question.  So at the risk of belaboring these points, but I do want to just wrap up what we see here in this permit chart.  So Mr. Deluca, with respect to

the carriage house, did not have any permission to perform any work of any type to this day, right?  It's never been issued?

A.   Correct.

Q.   Okay.  All right.  On the main house -- on the main house he was not allowed to do any work before April 3rd -- well, he was not allowed to do any work on any building before April 3rd, right?

A.   Does that include the kitchen?

Q.   The kitchen was -- I think the very first time a permit was ever issued of any type was April 3rd.

A.   Correct, you're right.

Q.   Okay.  So, I have a photo notebook, and it contains a number of exhibits that were not objected to, and I would like to read them into the record and then hand out the notebook.

THE COURT:  Okay.

MR. LYNCH:  So we can hand out the notebook now.

THE WITNESS:  Thank you.

MR. LYNCH:  So I'm going to read this slow.  This may take a minute.  Again, none of these exhibits are objected to. Exhibit 24, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 428, 461, 462, 464, 465, 466, 467, 468, 471, 473, 478, 479, 480, 570, 571, 572, 609, 915.

THE COURT:  Any objection to any of those?

MR. COUGHLIN:  Court's indulgence.

THE COURT:  Certainly.

(Brief pause in proceedings.)

MR. COUGHLIN:  Just for the record, Mr. Lynch, all of those exhibits are found in this binder you just handed to me.

MR. LYNCH:  That's correct, and also -- that's a good question, Mr. Coughlin.  I have two notes here.  So Exhibit 412 is in here in full.  It's in tab 5.

In tab 1 we only included a couple photos out of that exhibit, but the entire exhibit is in.  To organize it topically in one section, we have just two pages out of 412.

On Exhibit 428, that's also in here in full.  In tab 6, we took one page out of order for demonstrative purposes.

MR. COUGHLIN:  Understood.  No objection.

THE COURT:  All right.  They're received.

(Plaintiffs' Exhibits 24, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 428, 461, 462, 464, 465, 466, 467, 468, 471, 473, 478, 479, 480, 570, 571, 572, 609, 915 admitted into the record.)

BY MR. LYNCH:

Q.    Okay.  So, starting with tab 1, just very quickly, all the work in tab 1 shown in pictures 471, 412, the second page of 412, Exhibit 473, and 571, none of that work was permitted, right?

A.    No.  No.

Q.    It was not permitted, correct?

A.    Correct.

Q.     Okay.  And then in tab 2 --

       MR. COUGHLIN:  Your Honor, I'm sorry, I'm going to provide a late objection.  I'm not sure what dates are provided on these photographs, so, you know, just, I think the witness has to be able to identify when these photographs were taken, if he had firsthand knowledge, and do they accurately reflect what he recalls.

       THE COURT:  Yeah, all good objections.  What's the purpose of this testimony?  He's already testified that the permits were not -- did exist on such-and-such main house and the carriage house.  He's identified when work had started on these different units.  You haven't identified any dates for any of these photographs, and I think they're superfluous at this stage, and so, tell me why I'm wrong about that.

       MR. LYNCH:  You're not wrong, Your Honor.  We'll skip the carriage house.

       THE COURT:  All right.

       MR. LYNCH:  So tab 5, now we start seeing dates.  The first two are Instagram photos.  And then what comes after that are e-mails between Mr. Deluca and his lender.  These e-mails were stipulated as authentic in the Dashco stipulation, and between each e-mail is a set of photos.  And that's tab 5 goes chronologically from November 2018 all the way to June 3rd, 2018 -- 2019, June 3rd, 2019.

       THE COURT:  So, the purpose of these exhibits, 5A through

K, is to establish that work was being done on the premises without permits; is that correct?

MR. LYNCH:  Yes.

THE COURT:  Okay.

MR. LYNCH:  And in particular, the main house.

THE COURT:  All right.

MR. LYNCH:  We talked about the deck, we talked about the powder room, but this shows some other things.

THE COURT:  Okay.  All right.

MR. LYNCH:  I'm not going to go through every one, Your Honor, I promise.

THE COURT:  All right.  Go ahead.

MR. LYNCH:  Okay.

THE COURT:  You're just asking him whether this work was permitted by the County or not, is that what you are saying?  Is that what the answer to that is?

MR. LYNCH:  Yes.

THE COURT:  All right.  Any objection to 5A through K? Have you had a chance to look at them?

MR. COUGHLIN:  I've had a chance.  No objection.

THE COURT:  Okay.  They're received.  You don't need to go through them with this witness.  I can look at them myself.

(Plaintiffs' Exhibit 5A through 5K admitted into the record.)

THE COURT:  They're either allowed or they're not allowed

by the permit.  He's already testified they're not allowed because the permit hadn't been pulled yet, correct?

MR. LYNCH:  Correct.

THE COURT:  Okay.  Then we're not going through each one of these just so you can show them.

MR. LYNCH:  And this is -- this is why it's not cumulative -- and if you think it is, that's fine -- there's probably 10, 12 of these pictures where before June 4th the walls are getting closed in, the walls are closed in.  And as I said in my opening, the difference between the damages experts is they say the work behind the walls is good, and we say it isn't.

THE COURT:  Okay.  You may go through those.  That's fine.

MR. LYNCH:  Okay.

THE COURT:  Go ahead.

BY MR. LYNCH:

Q.    All right.  Let's look at Exhibit 414 and --

A.    Where are we?

Q.    That's tab G.

A.    G.

Q.    Tab G.  So what is the date of the e-mail on the first page?  You can see it's March 2019.  And there's an entry there that says, "Have 3 inspections."

      Do you see that?  It's the second sentence of the e-mail.

A.    Okay.

Q.    There's no County inspections prior to April 3rd,

correct?

A.     So which one are we talking about now?

Q.     So this is just Mister -- there's no -- okay.  Skip that.
I just want you to note he's going to "full drywall and final
finishes."  And I want you to note that.  In August --

THE COURT:  He just wants --

MR. LYNCH:  That's fine.

THE COURT:  Ask him, is that what the -- is that what this
e-mail says?

MR. LYNCH:  Right.

THE COURT:  You're just asking him to acknowledge that
that's what the e-mail says.

MR. LYNCH:  Okay.

BY MR. LYNCH:

Q.     Do you see the "full drywall and final finishes"?  Is
that what this e-mail says?

A.     It says, "Have 3 inspections and will be going into full
drywall and final finish."

Q.     Okay.

A.     (Sotto Voce) I don't know what does this mean, you know.

Q.     All right.

A.     So basically the inspection have nothing to do with the
drywall.

Q.     Fair enough.  Let's keep going.  So look at pages -- and
they say -- you can see the little "Dashco."  Look at pages 275

to 284.  While you're on 275 and 276, does that look like new electrical is going in?

A.    You have to refer to the date in the electrical wiring, you know.

Q.    All right.  Pages 281, 282, do you see new plumbing pipes there?

A.    It seems to be new.

Q.    Okay.  And then on the last page, 284, do you see a closed-in wall?

A.    Yep.

Q.    That's a "yes"?  Is that a "yes," Mr. Elmagraby?

A.    Yes.

Q.    Okay.  Let's go to tab H.  This e-mail is dated April 17th, 2019, and I want you to look at page 294.

A.    Okay.

Q.    This room is torn apart, but you can -- do you see closed-in walls in that photo?

A.    Yes.

Q.    What building is that, main house or carriage house?

A.    I would assume it's the main house.

Q.    Okay.  And then look at 297.  Are those walls closed in?

A.    Correct.

Q.    Okay.  Look at 303.  Are those walls closed in?

A.    Sure.

Q.    And 304, closed-in walls, right?

A.      Yeah.

Q.      Okay.  We have a --

        MR. LYNCH:  Can we pull up Omaha 7?

        So this is just a before and after, if Your Honor is interested, of this area.  We have two of them.  If Your Honor wants me to skip it, I'd be happy to skip it.

        THE COURT:  Go ahead.

BY MR. LYNCH:

Q.      So this is before -- that's the before, I'm sorry.  You see that armoire, all the walls?  Even the ceiling there is exposed.

        And then go to the after.  Closed in.  We just looked at that picture in this tab, the after.

        MR. LYNCH:  Okay, call up Omaha 8.

BY MR. LYNCH:

Q.      Okay.  That's the before.  That's the after.  And that picture is in here also.

        All right.  Let's go to tab I, and I want you to look at page 20.  If you go to pages 20 in, I'll give you the cite right.  It's Dasco 334.

A.      33 --

Q.      334.  Closed-in walls, right?

A.      Correct.

Q.      Okay.  One more demonstrative and we're done with this book.  Omaha 9.

**A.** What is the number?

**Q.** Oh, I'm going to show the before and after again.

**A.** Okay.

MR. LYNCH: Go to the before.

BY MR. LYNCH:

**Q.** All right. That's the before. I believe if you match it up, it's February of sometime, and here's the after. All right. So, for -- okay. He received approved plans for the main house addition in December of 2019. Do you agree with that?

**A.** (Nodded head affirmatively.)

**Q.** So before those plans were approved, it was impossible to get a final inspection on the main house, right?

**A.** No.

**Q.** He could not get a final inspection --

**A.** Correct.

**Q.** -- until the plans were approved?

**A.** Yeah.

**Q.** I'm sorry, just for the record, he could not get a final inspection before -- of the permit 1108 before his revised plans for permit 1108 were approved; is that correct?

**A.** Correct.

**Q.** Okay. And to what extent is a passing final inspection from the County required prior to occupancy of the main house? You need to have a final inspection before you can occupy the main house addition; is that correct?

A.    Yeah, addition, not the main house.

Q.    Okay.  So, what is the County's position as to whether the main house addition can be occupied today?

A.    You need to get a final.

Q.    You cannot occupy the main house addition today, right?

A.    The main house addition, yeah.  You need to get a final permit, yeah.

Q.    Now, in light of what we saw in those photos, if that work was on the existing main house, not the addition, would the County have concerns about occupying the whole thing?

A.    So, if the existing house had some work done, permitted -- because we have so many residents who live in the house who work there, so we allow them to live in the house while they do some work over there, but the addition is brand-new.  You have to have it approved for the final.  You can't just move in there without getting the approval.

Q.    All right.  And then the carriage house could not be legally occupied currently --

A.    No.

Q.    -- correct?

A.    No.  Cannot be occupied, yes, you're right.

Q.    It cannot be currently -- it cannot be legally occupied today, correct?

A.    Correct.

Q.    Okay.  You can go back to the other book.

Just to follow up on that, the main reason or at least a reason the carriage house cannot be occupied today is because there's unpermitted work in it; is that right?

A.    Correct.

Q.    Okay.  So let's look at Exhibit 429.  Is this a County record, a County document?

A.    429?

Q.    Yeah, four two nine.

A.    It has the approval stamp from the County.

Q.    Right.

A.    It's not a County document, but it has an approved stamp.

Q.    The approved stamp is an Arlington County stamp --

A.    Correct.

Q.    -- right?

A.    Sorry.

MR. LYNCH:  I move to admit Exhibit 429.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 429 admitted into the record.)

BY MR. LYNCH:

Q.    Okay.  Let's go to Exhibit 432.  We did this already.  Sorry.

If we look at Exhibit 427.  When you get there, please identify this document.

A.      Yeah, this is a document I wrote after our meeting with Mr. Deluca and Shahriar.

Q.      These are your notes of a meeting with Mr. Deluca on or about November 7th, correct?

A.      Correct.

Q.      Okay.  And there's a note maybe in the middle of the page that says, "Wall may have to be taken out."

        What does that note mean?

A.      When we do postinspection, when something has been done without our inspection, we don't accept pictures.  You have to move some area of the wall for us to verify the installation.

Q.      So to -- this is referencing the fact that you may have to open up some walls to look --

A.      Correct.

Q.      -- what's inside of them; is that right?

A.      Correct.

Q.      Okay.  And then there's a note that says, "The entire mechanical system was redone."

A.      Right.

Q.      Now, does that mean the entire house and the carriage house or do you know what that was a reference to, just one building, both, or you're not sure?

A.      Vague -- this is a vague comment from me.

Q.      Fair enough.  That's fair enough.

A.      I can barely tell.

Q.    That's fair enough.  We'll move on.  And then there's a comment at the very bottom that says, "Update information about a new beam.  Shahriar wants it open so he can verify it."

Do you see that?

A.    Yes.

Q.    Do you remember where that beam is located?

A.    This is within the house --

Q.    All right.

A.    -- the main house.  So the --

Q.    The existing main house, right?

A.    Correct.  Yeah.  They replaced -- I think they submit a --

Q.    Okay.

A.    -- a beam and there was another one.

Q.    We do have a picture of this.

MR. LYNCH:  Can you pull up Exhibit 462, Mr. Fitzhugh?

BY MR. LYNCH:

Q.    If you want to see it in your photo book it's in tab 4.

All right.  Does this look like the beam that is being questioned in your note here?

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    And what was the County's concern about this beam, if you recall?

**A.**     The concern was raised by the third-party inspector, not by us.

**Q.**     So we have one more for the screen, Exhibit 1010.

MR. LYNCH:  And I got messy here.  I would like to admit 427, Mr. Elmagraby's notes.

THE COURT:  All right.  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  They're received.

(Plaintiffs' Exhibit 427 admitted into the record.)

BY MR. LYNCH:

**Q.**     Okay.  So, I believe it's page 5.  There's an e-mail from Ms. Ferguson.

MR. LYNCH:  That one.

And it says, "For Settlement Purposes Only" there, Your Honor, but the counsel have agreed beforehand that this document can be used in this case.

THE COURT:  All right.

MR. LYNCH:  I move to admit Exhibit 1010.

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 1010 admitted into the record.)

BY MR. LYNCH:

**Q.**     Okay.  Focus in on -- so you just see the list of items -- well, before we do that.  This e-mail is from Mrs. Ferguson to -- I think Ms. Ferguson is Mr. Deluca's

attorney -- was.  So focusing on the list of items at the bottom there.

MR. LYNCH:  And then Zoom in on it so we can --

There we go.

BY MR. LYNCH:

Q.    Can you read that, Mr. Elmagraby?

A.    The "Main House"?  Yeah.

Q.    Yeah, it says, right, "Main House," and then above that, go ahead and read the paragraph before you get to the numbers.

A.    "Preliminary Response:  Federal and Mr. DeLuca have" --

Q.    You don't have to read it out loud.

A.    Oh.

Q.    Just let me know when you're done.

A.    Sorry.

Yeah.

Q.    So with respect to the first bullet on that list, did the County -- what did the County want to do, if anything -- well, let's start with this.  Is that an accurate description of what the County wanted with respect to item 1?

A.    Are you talking about all of them or just the first one.

Q.    So let me ask it this way.  This list, it says, "3 pilot holes to verify footer/structural slab thickness."  It talks about the terrace extension, talks about the powder room foundation, and what appears to be the mudroom foundation.

Did the County have concerns about the foundations at

those three areas?

A.    Well, if we didn't do the foundation inspection, we need to see it.

Q.    Okay.

A.    That's why we asked for any sort of exposed, like, two or three holes to look at.

Q.    Okay.  How does a pilot hole work, do you know?

A.    I'm not sure what is "pilot" mean, just, kind of, just holes.

Q.    Okay.  Let's move on.  Let's go to tab 435.

A.    Which book?

Q.    The main book we've been looking at.

A.    Yeah.

Q.    Okay.  This is an e-mail from you --

A.    Sorry, are we going to have it on the screen?

Q.    Oh, no, we can go in the book.

A.    Okay.

Q.    We're going to be in the book, I think, the rest of the way.

A.    What exhibit number?

Q.    435.

A.    Yep.

Q.    Okay.  And it's an e-mail from you to me and Mr. Harrell saying, "Confirm" -- is that an e-mail authored by you?  At the top.

A.    Oh, talk about the "Confirm." Okay. "The list we received from Mr. Deluca last night" -- "confirm that the list" -- yes, that's me.

Q.    Okay.

      MR. LYNCH:  I move to admit Exhibit 435.

      THE COURT:  Any objection?

      MR. COUGHLIN:  No, Your Honor.

      THE COURT:  It's received.

      (Plaintiffs' Exhibit 435 admitted into the record.)

BY MR. LYNCH:

Q.    And turn to tab 436.  At the top that's an e-mail from you to Mr. Deluca; is that correct?

A.    Which page you're looking at?

Q.    I'm sorry, 435, tab -- or now I'm at tab 436.

A.    Yes.

      MR. LYNCH:  Move to admit Exhibit 436.

      THE COURT:  Any objection?

      MR. COUGHLIN:  No, Your Honor

      THE COURT:  Received.

      (Plaintiffs' Exhibit 436 admitted into the record.)

BY MR. LYNCH:

Q.    Okay.  Let's look at tab 1004.  Is this an e-mail from you to Mr. Deluca at the top there on December 17th?

A.    Correct.

Q.    Does?

MR. LYNCH:  Move to admit Exhibit 1004.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 1004 admitted into the record.)

BY MR. LYNCH:

Q.    There's a little picture there says just -- from Mr. Deluca.  He says, "Hi Chief, Just checking in on the amendments that were turned in last week.  I am also copying you and Ms. Kalaha with the original photos showing what was existing and replaced."

I made a mistake and I want you to ignore that one.  Look at the very next one.  It says, "Replacement of existing roof after tree damage."

Do you see that caption and picture, it says, "Replacement of existing roof after tree damage"?

A.    Yes.

Q.    Did Mr. Deluca ever claim to the County that the reason he replaced the roof is because a tree damaged it?

A.    He told us that.  The --

Q.    He told --

A.    -- County.

Q.    -- the County that, right?

A.    One day he told, yeah.

Q.    Yeah, okay.  So let's look at Exhibit 452.  It's in the

tabs.

Okay.  So let's start with this:  It looks at the top there's an e-mail from you to Mr. Deluca on January 21st, 2020.  Do you agree that you sent an e-mail on that date?

A.    Correct, yes.

MR. LYNCH:  Move to admit Exhibit 452.

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 452 admitted into the record.)

BY MR. LYNCH:

Q.    So focusing on the bottom e-mail from Mr. Deluca, he says "Chief Elmagraby, We have gained access to the property and have begun our inspection list and punch list.  I am awaiting final installation of the new spiral stairs and owner suite entrance steps.  In addition, per your request I will be digging 3 observation holes at each location requested."

Describe for me what the County was asking Mr. Deluca to do with the observation holes, what the purpose of that was.

A.    So, if my memory is serving me right, this is above the carriage house, right?

Q.    Okay.

A.    So usually when we see work been done without inspection, we try to -- not to be very destructive so we ask for several holes.

Q.    Okay.

A.      And then if the inspection satisfy with us, then we're good.

Q.      And what if it doesn't satisfy you?

A.      Then you have to move all the wall.

Q.      Then you open all the walls?

A.      We have to.

Q.      Okay.  Let's go to Exhibit 444.  Is this an e-mail from you to Mr. Campbell and another -- some other people on March 6th, 2020?

A.      Correct.

        MR. LYNCH:  I move to admit Exhibit 444.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No objection.

        THE COURT:  Received.

        (Plaintiffs' Exhibit 444 admitted into the record.)

BY MR. LYNCH:

Q.      So an e-mail below from me.  It says, "At the meeting" -- well, let's start, "Thank you for your time today regarding 6122 Lee Highway.  At the meeting you stated that unless Mr. Deluca and the Harrells agree on a path forward by March 13, 2020, to make Mr. Deluca's construction code compliant, you would issue a notice of violation to both the Harrells and Mr. Deluca."

        Is that an accurate description of the meeting or is there another -- do you remember that?

A.      I think we discussed that, yeah.

Q.      Okay.

A.      I can't remember in detail, but yeah.

Q.      Is it fair to say that the County was trying to put pressure on the parties to resolve the permitting issues during the March meeting?

A.      Yes, that's the whole purpose.

Q.      Yeah.  Okay.  Now, in the bottom paragraph, it says, "Finally, per your request, I attach a nearly final (but not quite final) report from the Falcon Group detailing current issues with the property, for settlement purposes only.  Should you desire to speak with the author of the report, we would be happy to make him available."

        Now, you've seen that -- at least some version of the Falcon report, right?

A.      Yes.

Q.      Okay.  And is most of that report correct?

A.      Is it the first company or the second company, the Falcon report?  I'm sorry, was it first or second --

Q.      The Falcon report was the thick one.

A.      It's the second report, right?

Q.      Yeah.

A.      Most of -- yeah, I would say yeah, mostly.

Q.      Most --

A.      Most, yeah.

Q.      Just for the record, I cut you off.

**A.**    Most of the items was correct.

**Q.**    Okay.  Thank you.  All right.  Let's look at Exhibit 445. So this is an e-mail from Mr. Deluca to Juanita Ferguson, Mr. Deluca's former counsel, and you and Shahriar.

MR. LYNCH:  I'd move to admit Exhibit 445.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 445 admitted into the record.)

BY MR. LYNCH:

**Q.**    Okay.  So this is after the March meeting we just discussed, and Mr. Deluca says, "Working off the Falcon report I would like to start with the electrician as well as the companies' principal.  At some point I would assume exterior work could occur throughout."

He says, "Working off the Falcon" report here.  Whose idea was that, if you recall?  Did the County say, "Mr. Deluca, please use this report to fix the building code violations," or was he using it on his own?  Do you remember?

**A.**    So, if my memory serves me right, we read the report, went through all the items.  So there were some various items there, so we discussed with Mr. Deluca those items need to be fixed, and that's why we --

**Q.**    Okay.

**A.**    That's what I --

Q.     So then he says in the second to last paragraph -- I'm sorry, third to last paragraph, it says, "Lastly would be finishes but I would not want to start until the County Rough In/Close in inspections and their third party."

Do you see that?

A.     Yeah, I have no clue what that is.

Q.     Okay.

A.     Finish "but I would not want to start until the County" --

Q.     And then it says, "Finishes would take two weeks after close in which would be tile and hardwood floors."

A.     Okay.

Q.     You don't have a very clear recollection about this specific timeline; is that fair to say?  Or if you do, tell me what you think those lines mean.

A.     I think -- I wouldn't talk about this timeline, but back and forth with Mr. Deluca we will tried to close the permit, there was several conversation back and forth, "I need this time to do this and do that," so...

Q.     That's fine.  So what version of the Virginia Uniform Statewide Building Code applied to this job?  Was it the 2015 code?

A.     Yes, 2015.

Q.     Yes?

A.     Yes.

Q.    Okay.

A.    2015. (Sotto voce).

Q.    Last question.  Could installation of tile -- let's say the bathroom was complete but there's no tile flooring in it, could that hold up a final inspection?

A.    We wouldn't give him a final.

Q.    Okay.

A.    It's final, you have to have everything installed.

Q.    Okay.

A.    We don't inspect the tile, to be fair.  We don't need to inspect the tile, but we have -- the product has to be completely done.  That's called final inspection.

Q.    The product has to be completely done to pass a final inspection?

A.    Yes.

Q.    Correct?

A.    Correct.

Q.    Okay.

        MR. LYNCH:  No further questions.

        THE COURT:  Thank you.

        How much do you have on cross-examination?

        MR. COUGHLIN:  25 -- it will be a half hour plus, so...

        THE COURT:  Okay.  All right.  We're going to break now for lunch.  I'm sorry to keep you here, but we'll come back at 2:00 and we'll have cross-examination at that time, all right?

THE WITNESS:  Okay.

THE COURT:  Thank you, Mr. Elmagraby.

THE WITNESS:  Sure, no problem.

THE COURT:  We're in recess.

(Thereupon, a luncheon recess was had beginning at 12:59 p.m.)

**AFTERNOON SESSION, JULY 12, 2022**

(2:07 p.m.)

THE COURT:  All right.  Cross-examination?

MR. COUGHLIN:  Thank you, Your Honor.

CROSS-EXAMINATION OF EMAD ELMAGRABY

BY MR. COUGHLIN:

Q.    Good afternoon, Mr. Elmagraby.

A.    Good afternoon.

Q.    Mr. Elmagraby, were you aware that Mr. Deluca for a period of time owned in his own name the property at 6122 Lee Highway?

A.    Yes.

Q.    And therefore, he would be considered a homeowner, correct?

A.    Correct.

Q.    And a homeowner can undertake certain work in their own house without obtaining a permit, correct?

A.    Minor.  It's defined in the building code.

Q.    Okay.  So you could refinish floors?

A.      Yes.

Q.      You could repair drywall?

A.      Define "repair."

Q.      So, if there's a large hole in the drywall, you could repair that?

A.      Yeah.

Q.      You just -- you can't do structural work, correct? Meaning, you can't move a structural wall that supports the roof, for example, without a permit, correct?

A.      Right.

Q.      Okay.  And there were rough-in inspections and concealment inspections that occurred at the property, correct?

A.      There was some inspection, done.  I can't remember if it was concealment or not.

        MR. COUGHLIN:  Will you please pull up Defendant's Exhibit 182.

        It won't be in your binder, it's going to be displayed on the screen.

        MR. LYNCH:  They're in the binder also.

        MR. COUGHLIN:  It's not as legible.

        MR. LYNCH:  They are in the binder.

BY MR. COUGHLIN:

Q.      Okay, sorry.  So yes, you can pull them up in the binder.

        (Discussion had off the record.)

BY MR. COUGHLIN:

Q.      So, do you see Exhibit 182?

A.      Yes.

Q.      And this is an electrical concealment inspection, correct?

A.      I have a hard time to read, yeah.

Q.      Well, the box that's checked is "Electrical," correct?

A.      Correct.

Q.      And then in the "Type of Inspection," it said "Concealment," correct?

        In the box under "Type of Inspection," it says, Concealed [sic], correct?

A.      I'm trying to figure out where is it so...  Yes.

Q.      And then the date of this is April 30th, 2019, correct?

A.      Yes.

Q.      And this relates to the main house, correct?

A.      If the electrical permit is the one we discussed related to the building house, yeah.

Q.      I'm sorry.  I didn't catch the end of that.  Does this relate to the main house?

A.      I don't know the electrical permit, if that's the correct one.  We went through all the permits.  If that's the one attached to the building permit, then that's related to the house.

Q.      Okay.  Well, it uses the term "main level along rear of house."  Does that help?

A.    Yes.

Q.    Okay.  So this is for the main house.

MR. LYNCH:  Can I suggest that you put the document in front of him?  It's in the notebook.  He can look at this trade permit that's listed here.  It's under 449.

THE COURT:  I'm sorry.  Do you have an objection?  What are you -- what's going on here?

MR. LYNCH:  I'm sorry.

THE COURT:  If you have an objection, stand up, give me your objection.  If not, I don't need you on the sidelines talking to the witness when counsel is up asking questions, okay?

MR. LYNCH:  Thank you, Your Honor.  Yes.

THE COURT:  Okay.  Thank you.

Go ahead.  Ask your next question.

BY MR. COUGHLIN:

Q.    This is for the main house, correct?

A.    Yes.

Q.    Thank you.  Could you please turn to Exhibit 183.  This is a mechanical inspection?

A.    "Rough."

Q.    For the main house as well, correct?

A.    Correct.

Q.    And this occurred on April 25th, 2019, correct?

A.    Correct.

Q.    Could we please turn to --

A.      -- this is partial.  It's not the whole {indiscernible} --

        THE COURT REPORTER:  It's not what, sir?

        THE WITNESS:  This is partial.  Under the "Approved," say, "Partial" approved.

BY MR. COUGHLIN:

Q.      And then the note below says, "Less Addition," correct?

A.      "Less Addition," correct.

Q.      Could we please turn to -- it's in the smaller book of pictures.

A.      This one?

Q.      Yes.  And turn to Exhibit 5, tab I.

A.      5?

Q.      Yes.  You were shown this e-mail earlier.  This e-mail was sent on May 5th, 2019, correct?  This is Plaintiffs' Exhibit 416.  Mr. Elmagraby, please refer to your book, this book (indicating).  Do not look at the screen.  So, turn to tab 5.

A.      Okay.

Q.      And then I.

A.      Open up tab 5?

Q.      At 5.

A.      Okay.  Tap 5 and tab I?  Okay.

Q.      Do you see this e-mail from Mr. Deluca?  This is dated May 5th, 2019, correct?

**A.**    Correct.

**Q.**    And then, if you could turn to 334.

**A.**    I'm sorry.

**Q.**    It would be in the lower right-hand corner, 334.  It's numbered page 142.

**A.**    You said 334?  At 5.

**Q.**    At 5, I.  And then at the bottom of the page it will be 142, and it's on the screen as well.

**A.**    Okay.

**Q.**    Is it your understanding that this picture was taken around May 5th?

**A.**    I don't know.

**Q.**    You don't know.  You've been to the property, correct?

**A.**    I did.

**Q.**    And this picture shows walls in this particular room that have been closed in, correct?

**A.**    Correct.

**Q.**    And this is in the main house, right?

**A.**    Yes.

**Q.**    And that e-mail comes after the inspections that we just spoke about, correct?

**A.**    I'm sorry, what e-mail?  Can we --

**Q.**    The e-mail at the very beginning sent May 5th.  That's after the two inspections that you just referred to, correct?

**A.**    What was the date of the tickets?

Q.      I'm sorry?

A.      You talk about the original sticker dates, the e-mail after that?

Q.      Yeah, this e-mail came after the inspections, the date on those inspections, correct?

A.      Yeah, 4-25, yes.

Q.      Okay.  Thank you.  One thing to clean up.  Could you please turn to Exhibit 426, and that is going to be in the first binder that you were handed.  You may have taken it out.  Is it in the binder?  At the very top, there's a permit number B1903336, correct?

A.      Correct.

Q.      That is for the carriage house, correct?

A.      Yes.

Q.      And it says, "Status" "Approved," correct?

A.      Yes.

Q.      And then there's an approval date of November 20th, 2019, correct?

A.      Correct.

Q.      So, that -- when the status says "Approved," that means that the building permit for the carriage house was actually issued on November 20th, 2019, correct?

A.      Yes.

Q.      Thank you.  Going into Exhibit 44 --

A.      It didn't say "Issue" in the next one, so --

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

Q.     I'm sorry?

A.     The "Issue" date doesn't say any issuance, so I'm assuming it is approved, but I'm not sure if this was issued.

Q.     Okay.

A.     Because if you see the one next to it, the permit is issued, the plumbing, you have a date of issue.

Q.     Turning to Exhibit 447 in the book, 61249.  What is the document that you're -- first of all, let me know when you've found it.  This is going to be --

A.     Is this the one?

Q.     Yeah.  447 --

A.     This is the one?

Q.     Yes, that is the one.  What is the document that you're looking at?

A.     This is the -- what does the client or citizen see on the Website:  "Permit Manager," our permit system.

Q.     Okay.  And does this system accurately reflect the status of inspections?

A.     Yeah.

Q.     And does this relate to the main house -- I'm sorry, the addition permit?  You can turn back, if needed.  We might need to look at an earlier page, 61247.

       Is this a report of the status of certain inspections for the two-story addition on the property, permit number B1901108.

A.     This is an information, a detailed information.  There's

no -- I'm not sure what is in inspection status, yeah.

Q.    Well, we'll get to that in a second.  I just want to confirm.  This is for -- this is for --

A.    Yes.

Q.    -- the addition permit, correct?

A.    Correct.

Q.    All right.  And then turn to the next page.  And then turn to the next page.  Do you see the same permit number identified?

A.    Yes.

Q.    And it notes at the bottom that there was a framing inspection that occurred for the -- for the addition, correct?

A.    Correct.

Q.    And trade permits were issued, you testified earlier, and there were inspections that occurred, two of which we went over, correct?

A.    Correct.

       MR. COUGHLIN:  Your Honor, I would like to move into evidence -- wait.  Did you move in 181 and 182?

       MR. LYNCH:  I did not.

       MR. COUGHLIN:  Okay.  I'm sorry to have a colloquy.

       I would like to move into evidence 181 and 182, Defendant's 181 and 182.

       THE COURT:  Okay.  Is there any objection?

       MR. LYNCH:  No objection.

THE COURT:  Okay.  Admitted.

(Defendant's Exhibits 181 and 182 admitted into the record.)

MR. COUGHLIN:  And then I would like to pull up 183.

BY MR. COUGHLIN:

Q.    So I would like you to look at some additional permits, and these are going to be on the screen, sir.

I believe this was previously identified.  This is 183.

MR. COUGHLIN:  Your Honor, I move to have 183 admitted as well.

THE COURT:  Any objection?

MR. LYNCH:  No.

THE COURT:  Received.

(Defendant's Exhibit 183 admitted into the record.)

BY MR. COUGHLIN:

Q.    Mr. Elmagraby, the document you're looking at is Exhibit 184, Defendant's Exhibit 184.  Would you please identify this document?  It's going to be on the screen only.

A.    It's a partial approval, "Rough mechanic."

Q.    So this covers the addition, correct?

A.    "All framing okay less fireplace area.  Amended to add" -- no, I'm not sure.  Yes.

Q.    But do you see the permit's -- the permit's listed on the right, "Permit Number," and then there are a series of permits listed, correct?

A.      Yeah.

Q.      And the permit ending in 1108 is the permit for the addition, correct?

A.      I see the "Mechanical," "Electrical," "Plumbing."

Q.      Says B19.

A.      Yes.

Q.      Okay.  So on June 11th, 2019, there was -- for the addition there was an inspection for the framing, the -- and then there was a concealment inspection and rough mechanical, correct?

A.      Correct.

Q.      And after that permit, after those inspections occur, a contractor could then put up drywall, correct?

A.      Correct.

Q.      Okay.

        MR. COUGHLIN:  And then move to the next.

        Court's indulgence for just one second.

        THE COURT:  Yes.

        MR. COUGHLIN:  Your Honor, I would like to move into evidence Exhibit 184 as well.

        THE COURT:  Any objection?

        MR. LYNCH:  No.

        THE COURT:  Received.

        (Defendant's Exhibit 184 admitted into the record.)

BY MR. COUGHLIN:

Q.      I would like to go back -- or go to Exhibit 447 again. If could just find that page.  Could you turn in your book to 447?  And then it's going to be the second page, Bates-numbered 61248 [sic]?

A.      Which page?

Q.      61246 -- sorry, 61246.

A.      Okay.

Q.      We're now on a different permit.  We're back to the renovation permit.  That ends in 3106, correct?

A.      Yes.

Q.      And the document you're looking at, Bates Number 61246, this identifies the final inspections that have occurred, correct?

A.      Um-hmm, yes.

Q.      And a final inspection occurred and was approved on September 18th, 2019, correct?

A.      Yes, and this is for the kitchen, this one only, yes.

Q.      And then that -- I think you testified earlier, that inspection was --

A.      Rescinded.

Q.      -- rescinded and the permit was reopened.

A.      Yes.

Q.      But that doesn't mean that there was something wrong with the work necessarily, correct?

A.      We usually {indiscernible} to another problem.

Q.     Well, is it that you felt that you needed to inspect some of the work?

A.     Yeah.  When we went there, I remember there was -- kind of the plan was like flipped or something.  Some area was done, the work closed without we seeing it.  We saw some picture that was we need to do further inspection.

Q.     Okay.  Are you referring to the bathrooms being flipped?

A.     The bathroom flipped, and I think there was like some calking in the framing.  There was a picture referring to that.  I can't remember.  I really can't remember.

Q.     And that happens sometimes, correct?

A.     Yes.

Q.     And what you want a contractor to do when they change things in the field that are different from the plan, is update their plans, correct?

A.     (Nodded head affirmatively.)

Q.     And ultimately, Mr. Deluca updated his plans to reflect what you saw in the field, correct?

A.     There was the plan issue, and I think there was something else in the framing itself.  We need to see in the kitchen -- in the bathroom framing, need to be fixed.  I can't remember what was it.

Q.     Okay.  But you've inspected the property several times, correct?

A.     Yeah.  This is --

Q.      In the October timeframe, you were at meetings at the property with Mr. Deluca?

A.      Yes.

Q.      And so you saw the work that was performed in the field, correct?

A.      Correct.

Q.      And you provided input to the permit reviewers as to what you saw in the field?

A.      Correct.

Q.      And one of the things that was asked of Mr. Deluca was to update his plans, correct?

A.      Correct.

Q.      And ultimately, for the renovation work and addition work, revised plans reflecting the work that was done in the field were submitted to the County, correct?

A.      The work, yes, was in the field --

        MR. LYNCH:  I have an objection.

        THE WITNESS:  -- not per the approval --

        THE COURT:  Hold on.  Hold on.

        MR. LYNCH:  I have an objection.  He's using very vague terms here.  This permit...

        MR. COUGHLIN:  I'm sorry.

        THE COURT:  Reword the question.  Reword it.  You really have not tied the permits to specific work, and the inspections of the work.

BY MR. COUGHLIN:

Q.      There was a renovation permit that was issued, correct?

A.      For the main house.

Q.      For the main house.  And that -- is that the permit and the work that you believe had the bathrooms different than what were on the plans or was it the addition?

        THE COURT:  Why don't you show it to him.

        THE WITNESS:  There was two permits, one for -- you know, one for the bathroom and then one for the addition.  The revision was for the -- we need to -- the whole entire items, was not in the approved plan to be showing in the approved plan.  Did I confuse you?

BY MR. COUGHLIN:

Q.      No.

A.      So the item was done, not in the -- per the approved plan.  We asked him to come back and revise his plan, add all those items.  We had two meetings about that.  And then we're going to go to the job site and inspect.

Q.      Okay.  Thank you.  Could you please turn back to 426, and let me know when you are there.

A.      I'm there.

Q.      So, right under the carriage house permit, you see a P1902902.

A.      What is the carriage house.

Q.      It says, "1 Boiler."  No.  Under the carriage house, next

line.   Next permit.   Do you see that?

A.      "1 Boiler," yeah.

Q.      And that boiler had a permit issued and was ultimately finaled, correct?

A.      Yes.

Q.      So back to what you observed in the field, Mr. Elmagraby. You have testified that what you saw in the field was different than what you saw on the original plans, let's say, for the renovation permit?

A.      Correct.

Q.      Okay.

        MR. LYNCH:   I just want to object.   What is the renovation permit?   There is a kitchen and bath permit, there's an addition to the rear house, and there is a carriage house.   Renovation permit --

        THE COURT:   Okay.   Let's qualify it.   Thank you.

        MR. COUGHLIN:   Sure.

BY MR. COUGHLIN:

Q.      By "renovation permit," I mean --

A.      The addition --

Q.      -- the addition bath permit.

A.      Is that what you're referring to the kitchen or the addition?

Q.      So when I say -- I will say kitchen and bath permit.

A.      Okay.

Q.      Did the work in the field that you observed deviate from the -- for the kitchen and bath permit --

A.      Yes.

Q.      -- did it deviate from the approved plans?

A.      Yes.

Q.      And then for the addition, did it deviate from the approved plans?

A.      Yes.

Q.      Okay.  And the County has the ability to issue stop work orders, correct?

A.      Yes.

Q.      And you have the ability to issue building code violations, correct?

A.      Yes.

Q.      And for this property, to date you've never issued a stop work order, correct?

A.      Yeah.

Q.      Could you please speak up?

A.      No, we didn't.

Q.      And for this property, you've never issued a building code violation, correct?

A.      No, we didn't.

Q.      And your office, in part with the building official, are in charge of enforcing the building code, correct?

A.      Correct.

Q.     When a structural element to a house or structure is damaged, like a roof rafter, homeowners or contractors sometimes undertake emergency repairs, correct?

A.     They have to reach out to us and get an emergency repair, yeah.

Q.     So there's a --

A.     There's a process for that.

Q.     Okay.  In your experience, have you seen homeowners change plans for a house?  Meaning, they have an approved set of plans, work begins, and then the homeowner directs the contractor to make changes?

A.     Yeah, happen all the time.

Q.     Okay.  Have you seen in other instances a contractor build what the homeowner wants and then after the work is complete, update their plans to reflect what was built?

A.     Before inspection or?  Because if you change before an inspection, then --

Q.     Let's say before inspection.

A.     Yeah, yeah.  If it's different, the inspector show up, they'll ask them to go back and change the plans.

Q.     Okay.  Thank you.  And you've earlier indicated that you met with Mr. Deluca at the property?

A.     Correct.

Q.     And would you characterize the meetings with Mr. Deluca as -- well, was Mr. Deluca being cooperative during those

meetings?

A.    Yes.

Q.    Has Mr. Deluca, in terms of his interactions with the County, been cooperative the entire time this project has been ongoing?

A.    Yes.

Q.    Could we turn to Plaintiffs' Exhibit 435.  Let me know when you're at Exhibit 435.  And if you'd take a second to review it again.  You testified about this earlier.  Just let me know when you're ready my any question.

A.    Do you want me to read the entire e-mail or just...

Q.    Just become familiar with it.

A.    Okay.

Q.    This is an e-mail from Mr. Deluca summarizing his meeting with the County, correct?

A.    Yes, correct.

Q.    And you were a part of that meeting, right?

A.    Yes.

Q.    And that took place at the property?

A.    Yes.

Q.    And ultimately you confirmed that just these three pages, if you will, of items needed to be remedied, correct?

A.    Yes.

Q.    I want to turn to one item.  This is 181653.  It's at the bottom of the page.  It's just the second page of this document.

You'll see, bold, "Code Related Items."

A.     Um-hmm.

Q.     One of the items listed is "The Front Steps."

A.     Yes.

Q.     What's identified there is that there's a deviation in terms of the height of the steps from the first step versus the second step of just a half of an inch?

A.     Yeah, there was deviation when we went.  I think one of the step was very short.  Can't remember was it the first one, comparing to the rest of the steps.

Q.     Okay.  And that was a --

A.     Can't remember --

Q.     Sorry to interrupt.

A.     Yeah.

Q.     And that was something that could be remedied by several options?

A.     There is option, yeah.  You have to -- yeah, you have to -- you can fix.

Q.     Okay.  Could we turn to Exhibit 429.  You've seen this before?

A.     Yes.

Q.     This is -- is this document the final approved drawings for the main house covering both the kitchen and bath renovations and the addition?

A.     Yes.

Q.    And this set of plans is effectively an as-built set of drawings, correct, reflecting what you saw in the field?

A.    Yes.

Q.    And also what was required to have the property come into code conformance?

A.    Yes.

Q.    And it was approved on December 16th, 2019, correct?

A.    Was December of 2019, yeah.  I can verify the date, yeah.

Q.    Thank you.  So, could we turn to Exhibit 432?  It's up on the screen.

Is this a separate set of plans specifically for the carriage house?  And you can turn through it to answer that question.

A.    Yes.

Q.    And did these plans -- you inspected the carriage house as well, correct?

A.    Visually.

Q.    Well, I don't mean as an inspector, but you saw what was there?

A.    Yeah, we did like investigation, yeah.

Q.    And you provided feedback to the plan reviewers regarding what you saw at the carriage house, correct?

A.    Correct.

Q.    And Mr. Deluca was asked to submit a final set of plans for the carriage house reflecting what was built and what it

would take to bring it into code compliance, correct?

A.     Correct.

Q.     And this set of plans reflects what it would take to bring the carriage house into code compliance, correct?

A.     Correct.

Q.     And ultimately this was approved, as well, on December 16th, 2019?

A.     Yes.

Q.     Did you answer the question?

A.     Yeah, yes.

Q.     This -- this is what -- these are the plans that need to be implemented in order to bring the carriage house into code compliance?

A.     Correct.

Q.     Okay.  For work that was done -- if work was done prior to inspections at the property, the -- all of the walls in the house wouldn't have to come down, correct?

A.     We ask for certain location, and if the work confirmed the plan, we don't ask for the whole entire wall to come down.

THE COURT REPORTER:  We don't --

THE WITNESS:  I'm sorry?

THE COURT REPORTER:  I couldn't hear you.

THE COURT:  Yeah, repeat the answer.

THE WITNESS:  So, we -- we're -- we don't really punish.  We don't go there for punishment.  So we go, first step we ask to

cut several holes, and then we verify what is behind the wall. If it's complying with the plan, then we're good.  If it's not, then we ask to remove the walls.

BY MR. COUGHLIN:

Q.    Okay.  And using the mudroom as an example, there's no need to tear down the mudroom.  The plans just needed to show what was built and it needs to be inspected, correct?

A.    Correct, we need to verify the framing, yes.

Q.    And as for the rear deck, the options are remove the rear deck or submit plans that show the rear deck?

A.    That's what we told him, yeah.

Q.    Okay.  And then go through inspections to get a final?

A.    Right.

Q.    And that final, you were, I think, referring to an e-mail earlier, where it's talking about holes around a foundation, someone -- you might ask a contractor to dig a hole to expose the footer, correct?

A.    Correct.

Q.    Okay.  Regarding the structural beam in the kitchen, are you familiar with that element of the addition?

A.    Yes.

Q.    And -- that was ultimately -- that was shown on the -- there was a structural beam shown on the original plans, correct?

A.    Yes.

Q.   And what you asked ultimately is that a -- an engineer submit a letter certifying that what was installed was structurally sound, correct?

A.   Are you talking about if you put another beam, a different beam.

Q.   If there was a deviation in the field from what was in the approved plans.

A.   There's two approach.  Either advise the plan and put the new beam there, or get a structural engineer to verify the beam.

Q.   And in this case Mr. Deluca submitted a letter from a structural engineer, correct?

A.   Correct.

Q.   And ultimately, again, the main house and the addition plans were approved on December 16th, correct?

A.   I'm not sure if the new beam was in the approved set of plans.  That's a different letter.

Q.   All right.  You indicated that you received the Falcon report, correct?

A.   Yes.

Q.   And you didn't agree with everything identified in the Falcon report --

A.   Not everything, no.

Q.   -- correct?

     I'm sorry?

A.   Not everything.

Q.      Not everything.  The County doesn't allow third-party inspectors for residential construction unless they're pre-approved by the County, correct?

A.      Correct.

Q.      And the Falcon Group was not pre-approved by the County, correct?

A.      No, it wasn't.

Q.      Are you familiar with John Catlett?

A.      Yes.

Q.      And is John Catlett a former building official for the City of Alexandria?

A.      Yes.

Q.      Is he an approved third-party inspector for residential construction in Arlington County?

A.      No.

Q.      Okay.  Ultimately it's the County that has the final say as to whether there's a building code violation or not, correct?

A.      Yes.

Q.      Regarding the items that were listed in the Falcon report that you may agree with, would some of those items end up getting picked up in a final inspection and asked to be addressed by the County?

A.      Yes.

Q.      Just going back a second, in order to conduct an emergency repair to a structural element on a house, is there a

specific permit for an emergency repair, or is there sometimes the contractor does the work and then applies for a permit?

A.    So the process is they need to reach out to the County. We won't send an inspector or me -- but personally go there, and then we issue a damage assessment report.  And then in the damage assessment, if it's really severely damaged, we can ask him to start to do the repair while in the same time goes through the process of getting a permit.  He needs to do both in the same time.

Q.    Okay.

A.    But we're not holding the fix until you get the permit. You needs show us hoe that you apply for the permit, you work on the permit while doing the repair.  This is usually for a single-family home, if someone living there, we don't want them staying, like, two months in the street, so we try to expedite the process.

Q.    Thank you.  Let's turn to Exhibit 435.  I'm sorry.  Skip that.

Exhibit 425.  I believe you were copied on this letter and you testified about it earlier, correct?

A.    Yes.

Q.    So, as of -- is it accurate to say that as of March 16th, 2020, there were items A through H that needed to be addressed at the property?

A.    Yes.

**Q.**     For a remodel or addition, a certificate of occupancy isn't needed --

**A.**     No.

**Q.**     -- correct?  Does the County have any say one way or another whether a homeowner should terminate a contractor?

**A.**     No.

**Q.**     You don't like to get in the middle of contractor and a homeowner, correct?

**A.**     It's not our job.

**Q.**     Okay.  But if a homeowner decides to terminate a contractor, there's a standard process for transitioning any permits from one permit holder to the other, correct?

**A.**     Yes.

**Q.**     And that's a fairly straightforward process, correct?

**A.**     Yes.

**Q.**     Did you encourage -- strike that.  So, at this property, after work is completed that's consistent with the plans, the final step that would be needed would be a final inspection of the property, correct?

**A.**     Are you talking about the carriage house or are you talking about the --

**Q.**     The carriage house and the main house.

**A.**     The carriage house require all kind of an inspection, not just the final, rough-in and everything.  The addition, just require the final.  The addition and the main house was require

a final inspection.

Q.     Okay.

A.     But the carriage house, we didn't inspect anything.

Q.     Okay.

       MR. COUGHLIN:  I have no further questions.

       THE COURT:  All right.  Redirect?

       MR. LYNCH:  Just one.

              REDIRECT EXAMINATION OF EMAD ELMAGRABY

BY MR. LYNCH:

Q.     Is 425 still up there?  There was a list, A through H?

A.     Yes.

Q.     Is that a complete list of all the code defects at the
house?

A.     I think we have more than that, yeah.

Q.     I --

A.     So, the list was back and forth what is the major items.
Staircase, that was a major items.  You have to remove it.  So
some of the major item, but at the end of the day, we have to do
the inspection but of the approved plan.  So when we do the
inspection, we might came up with several items and then close
the permit.

       MR. LYNCH:  Thank you.  No further questions.

       THE COURT:  Okay.  All right.  May this witness be
excused?

       MR. COUGHLIN:  Yes.

THE COURT:  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  You're excused at this time.  Please don't discuss the testimony, again, with anyone until our trial -- all right.  Good.  Thank you.  Have a good afternoon.

THE WITNESS:  You, too, sir.  Thank you.

THE COURT:  Why don't we have Mr. Harrell come back to the stand for redirect.  Please, come forward.

You're already under oath, so please just...

CONTINUED REDIRECT EXAMINATION OF JOHN HARRELL

BY MR. LYNCH:

Q.    All right.  What was your view between August 6th, 2019 and the end of November 2019 regarding the missing materials you have testified about?

A.    We were somewhat hopeful in the beginning that they would arrive, that they were on back order or that we had incomplete information.  We asked Mr. Deluca to please provide receipts, you know, documents, things like that, and he would say he'd put that together for us.

We kept on uncovering things we didn't know about, and over time I think, you know, we just sort of faced the reality that these things had never been ordered and they weren't arriving, and by sort of -- after Thanksgiving in that year, you know, we had just concluded, at least from our own perspective, that, you know, that he did not intend to finish the house at

closing and that these materials were gone, and -- but you know, so I began to ask for my money back, the way we talked about, and we rescinded the contract in part because of that.  It was a confusing time for us.

Q.    What was your view and perceptions of the permit thing -- issues we've been discussing with Mr. Elmagraby?

A.    I mean, that was similar.  You know, in the beginning we -- you know, we don't -- we didn't know the first thing about permitting really, I mean, other than sort of incidental contact as a homeowner, and we were getting sort of a graduate school education and -- well, maybe that's an overstatement, but we were getting an education of some sort in permitting, and, you know, we would ask in the beginning, you know, "Is the carriage house permitted?"

And Mr. Deluca would respond, "It's all been replaced exactly as it was, and it's part of the main house permit."

And in October and November we learned at some point that wasn't true.  We didn't really understand the significance of any of that completely, and we didn't understand, you know, the extent of the code violations.  I'm not sure we still fully understand that, but we have at least what we know of.

And, you know, once the carriage house plans came out, by this point, you know, together with other things, that was in late November, and, you know, once again that wasn't what we were sold, in our view, and, you know, that wasn't just some

sort of slight thing; it was a more significant thing.  And so that was also a reason that at that point we said, okay, well this is not a small thing.

Q.    Okay.  So, how did your view of the things you were uncovering about square footage evolve over time between August and the rescission letter?

A.    Well, we didn't really have a handle on that until later. You know, we were very focused on permitting.  We -- yeah, we suspected square footage, you know, the insurance thing I mentioned, you know, and some other things, but it wasn't until really later in discovery in 2020 that we discovered that there were HomeVisit plans -- no, I'm sorry, we discovered in December of 2019 that there were HomeVisit plans, and we discovered in 2020 that the floor plans that we were provided were, in fact, those plans but had, you know, been altered to hide the square footage numbers from us.

So we had strong suspicions at that point, which together with some of the other things, you know, we were -- you know, we just didn't trust anything that was in front of us at that point.

Q.    Okay.  Why did you decide to not fire or terminate Mr. Deluca?

A.    I -- you know, I gave him a lot of chances in the fall, in my view, to fix everything.  You know, we've talked about plans he ordered.  That work has not been done.  The materials

never arrived.  And the complexity of, in my perspective -- I mean, it may be easy for a contractor or someone else, the code -- you know, code officials can say it's easy, but from my perspective, I don't want to manage a construction project.  You know, I thought I was buying a house close to being finished.

The cost that I was finding from having to switch contractors, you're paying a new overhead for a new contractor. You're talking about, do I get a warranty for this work, those sorts of things, I just didn't really understand what I was doing with -- I mean, I felt like I had already been taken advantage of.  I didn't -- you know, I didn't really trust the process anymore, and I just felt like I didn't agree to put myself in this situation.

And so I -- you know, we told Mr. Deluca, "If you would like to finish, to mitigate damages in the event you're right"; that this is just a breach of contract case, you know, or to abate code violations because I felt like I was, you know -- again, I didn't fully understand the legal ramifications of owning a property with code violations, what that might mean to me personally in terms of, you know, my liability, and so we can -- we can say, "As long as you have insurance, because I -- you know, I can't have the house burn down and be uninsured, and as long as, you know, nothing illegal happens at the property," you know, we would say -- you know, I think we were -- we tried to be very careful every time to say, "Go ahead."

MR. LYNCH:  No further questions.

THE COURT:  Mr. Harrell, you were shown a couple of appraisals on cross-examination, and those appraisals contained square footage numbers.

THE WITNESS:  Yes, sir.

THE COURT:  Did you consider those?  And were those something that you've looked at at the time in looking at the square footage, the actual square footage of the house?

THE WITNESS:  My testimony was and is -- and, you know, we put up a text message where I said this -- that I didn't understand the appraisal, or I didn't see the numbers in there or something.  I mean, I looked at the appraisal.  The computations we did with all these porches and things where we're multiplying numbers, that did not even occur to me.  You know, the building plans on the back with some numbers, there -- I just didn't understand what I had in front of me.

And, you know, at that time, you know, I was looking at the appraisal as just a value check.  I didn't have a walk right on a contract for square footage.  I guess I could have rescinded the contract at that point if I had determined, well, these are the numbers and it was different than what I was told, but, you know, that was sort of where I was with it.

You know, I looked at these numbers, I looked at the appraisal, I didn't really understand what I was looking at, and so I started asking for help.

THE COURT:  All right.  Thank you, sir.  You may resume your seat.  Thank you.

Next witness.

MR. LYNCH:  We would like to call John Catlett.  We need to grab him out of the witness room.

THE COURT:  Okay.

MR. COUGHLIN:  Your Honor, before we have the witness, I would like to make a motion in limine at this point.  So I move to have -- if I may have the Court's indulgence.

THE COURT:  Yeah, absolutely.

Come to the podium, please.

MR. COUGHLIN:  Your Honor, we just had testimony from a code official at Arlington County regarding the permitting process, the permits that were in place, the plans, the inspections, and the import of those.  Mr. Catlett, I understand, is going to testify about the same items, except as an expert. Mr. Catlett was the former building official in the City of Alexandria, but he does not work for the city of -- or for the County of Arlington, so I think the testimony would be cumulative at this point.  So on that basis, we move to exclude him as a witness.

THE COURT:  Okay.  Mr. Lynch, what's the --

MR. LYNCH:  Yeah, Your Honor, we're going to be brief, but there are two things here.  Mr. Elmagraby did not have the benefit of discovery when he's making contemporaneous decisions

in 2019 about what happened here.  He didn't have a dated photo book of Mr. Deluca's progress photos for eight months of construction.  So that record wasn't in front of him.  We only got it, and we had to fight for it, in discovery, and his opinions about that are definitely relevant and not cumulative.

And then I'll just give you another example.  These orange cards, Mr. Elmagraby is trying to make sense of them on the stand and without the documents in front of him, and Mr. Catlett -- as Mr. Coughlin said, he used to run the building permit department in Alexandria, so I think he has relevant opinions here about what occurred.

THE COURT:  All right.  I'll allow him to testify.  Your motion's denied.  Your exception is noted.  Let's get Mr. Catlett.

Mr. Harrell, would you get him?  Thank you.

MR. LYNCH:  So preliminary matters, while we're continuing.  I could go through his qualifications, but I would rather not.

THE COURT:  Just put his CV in, and that's all I need for many experts, just -- does he have a CV?

MR. LYNCH:  Yes, it's attached to his report.  And that relates to my second question.  We have -- I'm sorry.

THE COURT:  Do you want to -- let's swear Mr. Catlett.

Good afternoon, sir.

MR. CATLETT:  Hello, sir.

(JOHN CATLETT, PLAINTIFFS' WITNESS, SWORN)

MR. LYNCH:  So, continuing on, my second question is, the defendants didn't object to the expert reports being used for any purpose, including demonstrative.  I do not think that is efficient.  I think you have discretion under Rule 611 to allow them as demonstratives, and I can give you a 4th Circuit citation.

THE COURT:  It's discretionary whether I let the reports in or not.  They certainly can be used for demonstrative purposes because they're not even being admitted for that purpose -- not being admitted if they're just for demonstratives, so I'll take that on a come as we get to them.  You make an official objection when you feel it's appropriate to do so.  Okay.

MR. LYNCH:  Thank you.

So we have some notebooks to pass out.

<u>DIRECT EXAMINATION OF JOHN CATLETT</u>

<u>BY MR. LYNCH</u>:

Q.    Mr. Catlett, is Mr. Elmagraby's notebook still up there or nearby?

A.    Yes.

Q.    Okay.  Good.

All right.  State your name for the record, please.

A.    John David Catlett.

Q.    Okay.  And then starting with the beginning, Exhibit 34, what is this document?

A.      This document is the exhibits which I looked through and also contains my report.

Q.      And towards the back of the very first -- at the end of your report there's an Exhibit A.  What is that?

A.      At the back of my report?

Q.      Yes, the Exhibit A.  No, I'm -- so -- unless you've got the wrong book.

THE COURT:  What exhibit?  Thirty --

THE WITNESS:  Oh, I got you.

MR. LYNCH:  34, that's right.

THE COURT:  Exhibit 34, the back of the -- okay.

BY MR. LYNCH:

Q.      It's --

A.      Yes.

Q.      -- the last three pages, I think, or last four pages.

A.      Yes, sir.

Q.      What is that document?

A.      That is my CV, my résumé of experience.

Q.      Okay.

THE COURT:  And is it accurate as of today?

THE WITNESS:  Yes, sir, pretty much, except I have new clients, but this was done about three years ago.

THE COURT:  Okay.  All right.  Any objection to the CV coming in?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  Okay.  The CV portion of Exhibit 34 is admitted.

(Plaintiffs' Exhibit 34 (CV portion) admitted into the record.)

MR. LYNCH:  We have one more set of books to pass out.

BY MR. LYNCH:

Q.    So, let's start with the big billing code book.  Please identify for the Court the documents that we see there in tab 1.

A.    In tab 1 -- the pages are sticking.  The first is the Virginia Construction Code, the 2015 edition.  This is also known as part 1 of the building code.

MR. LYNCH:  Okay.  And this, for the record, Your Honor, has been filed at Docket 157; the remainder of this book has not.

THE COURT:  Okay.

BY MR. LYNCH:

Q.    What's at tab 2?

A.    Tab 2 is the 2015 Virginia Existing Building Code.  It's also known as part 2 of the building code.

Q.    Okay.  And how does this document relate to what's in tab 1?

A.    The Virginia construction code is the mother document. It is the document that contains all the administrative provisions that affect all the codes that we operate under, which adopts national standards like the International Code Council.

The Volume 2, actually I wrote the language in 2015 to bring this document into Virginia.  It was actually ahead of schedule.  This one was intended to be a document to help people that had existing buildings to comply incrementally with certain things, but it also covers alterations, repairs, additions, change of occupancies of buildings.  So anything and everything that happens after a building is constructed initially, then happens through this document.

Q.    Okay.  So, if you got tab 1 and tab 2, and you're looking at this project and you're trying to figure out administrative things like, is a permit required, which one would you look at and why?

A.    Well, I would start in existing buildings code because this is an existing building.  And I would go to Section 103.1, and this one would basically tell us this is an applicable code.  So we go a little farther in the document.  There is a provision in here, I'm not putting my fingers on it right away, but that basically says that when you're doing a residential modification to what Virginia calls an R-5, which is anything that's a single-family dwelling, two-family dwelling attached, or townhouses, that you then can go back and use the provisions of the International Residential Code.

Q.    Okay.  So if I'm trying to figure out if you need a permit on this job or not, would I look at tab -- the answer to that question is in tab 1 or tab 2?

A.    Both.  It actually is going to tell you that you need a permit under Section 103, but then, also, you're going to go back for the details for that and --

(Discussion had off the record.)

A.    -- because Chapter 1 is completely --

THE COURT REPORTER:  Your voice is -- "then also you're going to go back for the details of that and" --

THE WITNESS:  I'm sorry?

THE COURT REPORTER:  You said, "But then also you're going to go back for the details of that."

A.    Okay.  So once we go to the existing structures code, and then it says that all the applicable provisions of the Virginia construction code are applicable, then we're going to go back and then define some of the more specific details of what you have to submit, what you have to do, when you need permits, those types of things.

BY MR. LYNCH:

Q.    Right.  And so tab 2 refers you back to tab 1 for important questions like whether a permit is required?

A.    That's correct.

Q.    Okay.  And what's tab 3?

A.    Tab 3, this is something that is relatively new, probably about three or four cycles old in Virginia, but the International Code Council has offered to take state amendments or local amendments and put them into -- and actually marry it

in with the national code, so what the third tab is, is all the technical requirements that are in the code itself with any amendments Virginia has made in tab 1, and then it also would include any administrative change -- or any -- all the administrative sections have been changed, because Virginia is very specific, given the rule of law in Virginia.

Q.    All right.

MR. LYNCH:  So, Your Honor, this is probably over-cautious by me, but I purposely tried to find these things in Westlaw and it is not easy, so I would to the -- request that the Court take judicial notice of this book and we admit it, if you would like.

THE COURT:  All right.  Any objection to taking judicial notice?

MR. COUGHLIN:  No.

THE COURT:  I'll take judicial notice of the code and you direct us where -- you direct Mr. Catlett where you want him to look.

BY MR. LYNCH:

Q.    So, back to the direct exhibit binder, the small one.  Do you have this one, Mr. Catlett?

A.    I have that one, yep.

Q.    Okay.

A.    We need a bigger desk.

Q.    Okay.  How many site visits have you made to the property?

A.      I made two official site visits at the request of the Harrells.  I made one stop-by when I was doing some work in Alexandria, and I went over to check on the project.  And then we had one other scheduled inspection that we were going to meet with Mr. Deluca, but that one got canceled.

Q.      Okay.  And tell me a little bit more -- this is discussed on page 1 of your report -- I'm sorry, page 2 paragraph 1, meeting on November 25th, 2019.

THE COURT:  Well, have him testify from his recollection and if he can't remember what happened, then you can refresh his recollection, okay?

MR. LYNCH:  Sure.

THE WITNESS:  Sure.  I had been on-site this -- I had been contacted by Mr. Harrell.  I met him and Dawn Harrell on-site, and we kind of just walked the property.  We were looking at the various conditions and things that they wanted to point out to me as we walked, and then I made some definite direct observations.

I was very concerned with a few of the things that I had seen specifically in the carriage house, and then also there were some things that were of great concern to me after we started getting more information later on about what had been changed from the original documents.

BY MR. LYNCH:

Q.      Okay.  And did you get the impression at this meeting that the County was learning some of these issues with missing

inspections and permits for the first time at this meeting in September?

A.     The September meeting was just with the Harrells and so the County was not there.

Q.     Okay.

A.     We did have another meeting on October the 8th, and we did have the inspection supervisor, and I recall two other inspectors that were there as well, and we walked the property, and at that time, yes, they were just finding these things out.

Q.     What was the -- can you describe the universe of -- especially, like, things like photos at that time.  I mean, what kind of photo records were --

A.     There wasn't much.  Mr. Harrell had provided me some that I guess came from, like, Instagram.  I know at one point he had directed me to the real estate Website for the property listing, which kind of showed me all the existing conditions that were there.

       That was the first basis for me to determine what had been done subsequent to modifications being done to the property.

Q.     How does it affect your ability to figure out what happened if you can't see how -- if you can't see what work was done in a photo?

A.     It's very unclear.  At the time, the only problem I was aware of was the one that was taken for the kitchen remodel,

which was supposed to be replacement of cabinetry, and there was one for a bathroom and it was supposed to be for replacement of fixtures, and I found that odd because typically for both of those things you don't need a permit.  You can replace fixtures under the Virginia code without -- and cabinetry without getting a permit.

So that was the only permit there, but yet, I saw a magnitude of other work that had been done on the property, and that gave me concern about whether permits had been obtained.

Q.     In your career, have you seen contractors open what I'll call like a dummy permit to try to use that to do work that they're not allowed to do?

A.     Yes, many times.  Many times, yes, I have.

Q.     And do you have an opinion about the roof structure deviating "from the approved plans with a lower slope and different roof covering material"?  Can you tell me about that opinion?

A.     Yes, when I -- once we finally did have access to the original drawings, the original drawings showed a slope on that roof that was over top of that -- the second story addition as being a 4 and 12 with a shingled roof, and when we were there, I noticed that it was relatively flat, probably 1 and 2 or less, and then there was a rubberized roof on it.  So that changes the dynamics of the structural components and any elements that are down below it for a load-bearing capacity.  Once we go from a

moderate slope, which a 4 and 12 would be considered, down to low slope, and then there was an addition placed on the third story, and that created an area where you can get snow drifting, and so that was a concern to me -- very much a concern to me, especially there was a beam in the kitchen that was supposed to have been changed out and had not been, and so I was concerned about the load-bearing capacity of that beam.

Q.    Okay.  Do you have an opinion that the third floor addition was constructed without permits?  And on page 4 there's a little clip of the drawing which is in evidence.  Can you just identify what you mean by "third floor addition"?

A.    Yeah, there's kind of a clouded area.  If you look at the roof structure of the original house, there was kind of like a dormer created to the back, but it was actually -- if you were to turn that plan, that was a fairly -- I don't know the exact measurement offhand but it wasn't like just a small 2- or 3-foot dormer; it was a large area to expand rooms.

Q.    So it's like that little triangle that -- so if you look at just the -- on the far left there's a rectangle with a triangle for the roof, and then there's like a triangle on the right side of the roof.  That's what you're talking about with the third floor addition?

A.    Yes, sir, it's the clouded area.  That was -- that was additional work that ended up being put on to the structural drawings.

Q.    And why do you see that was constructed without a permit?

A.    The initial plans did not show anything being constructed there, and again the initial permit was not to do any structural work, so there were no permits on file for any of the work that proceeded at that point.

Q.    Okay.  And you have an opinion about "A plumbing vent opening located on the new second story roof."

      What do you find significant about that plumbing vent?

A.    Well, that plumbing vent, of course, is where the sewer gases from inside the plumbing system get vented to the outside. That's where all the -- we've all been there, we've walked by someplace and you get that stinky smell.  That's normally coming from the plumbing vent.  Those are supposed to be physically located from any windows openings by 10 feet, or they have to be a certain distance above any openings so that that smell and basically methane gas doesn't end up back into the structure if the window is open.

Q.    So it was too close to the window?

A.    It was too close to the window.

Q.    All right.  To the left of the structure -- so we're -- briefly describe for us what the issue was with the new deck?

A.    The new deck had never been shown on any drawings, was not on any construction drawings that were sent to the County. It had been put in place, to the best of my knowledge, without any inspections.  And that and the powder room on that side,

both of those had been -- the powder room was at the stage of being where the floor joists were being put.  It had not been framed yet.  So it was the foundations, the footings, which is the concrete that's placed below the block walls, and then the floor joists were there, and it seemed to have stopped at that point for some reason.  I don't know why.

Q.    Okay.

A.    But that's also where the deck was located, and of course the deck footings would have had to have been inspected before the posts were placed in, and the deck itself would require inspection.

Q.    Okay.  Briefly, very, on the mudroom, tell us about that and the permitting.

A.    Yeah, the original house, it was clear from the photos that I initially had gotten was that mudroom, and of course the powder room, weren't on the -- wasn't part of the original house, so I questioned, I believe Mr. Harrell at that point, and said, you know, "When was this constructed?"  And that's when I found out this was constructed as part of this remainder of work.

That room was never shown on the drawings, and, in fact, the first revision of drawings that came out from the engineer, that work was being shown as existing, and I questioned that to the engineer almost immediately, in which the changes were then made and then there was actually a structural drawing made for

those two locations.

Q.    Okay.  And --

THE COURT:  When you say "engineer," are you talking about the County inspectors?

THE WITNESS:  No, sir, it was actually Mr. Deluca's engineer.  I had been in contact with them.

THE COURT:  All right.  Thank you.

BY MR. LYNCH:

Q.    And then tell us what you observed, again briefly, in the carriage house, particularly with respect to the stairs and the mechanical, electrical, and plumbing.

A.    Yeah, the major issues that I saw, of course it was obvious that there was a new mechanical system that had been put in, electrical system had been predominantly, if not all, changed.

When I first walked in the rear portion of the carriage house, I noticed that they had a very steep-pitched roof, and I looked up and there was a single member going down through the middle of it.  I said to Mr. Harrell, I said, "Well, that should have a ridge beam or there should be collar ties in here," and later the engineer addressed the same thing and said the very same thing; that it had to be constructed with a ridge beam, which actually carries the load at the very top of the roof then so you're not worried about it pushing spread out on the walls.  The way it was designed it would have pushed out on those

outside walls.  Any time you put a snow load on it, and potentially a wind load, you would have been pushing out on those walls.

To what degree?  I'm not an engineer, but I can tell you that it was very concerning to me given the pitch of that roof.

And I also found a set of steps in there that -- let me get to my drawing.  On my page 8.  When I first looked at those stairs, it looked like a -- almost like a ship's ladder, but a ship's ladder has you alternating places for you to put your feet.  This was actually -- the tread and risers on this were so shallow on the treads and so deep on the risers, I had difficulty -- I do have bad knees, but I did have difficulties even utilizing the steps.  And then when I got to the first landing, I noticed the head room -- and I measured the head room.  It was 5-foot-9.  The code minimum is 6-foot-8.  This stair would not work.

And I guess the only other thing I could add was that there appeared to be an area where there was a stairway actually coming out of the front portion of the carriage house that served that upper level.  That had been removed.  We subsequently did get a picture that showed that stair.

And then I noted that the garage doors on the carriage house initially were on the left-hand side.  They were now on the front.

Q.    Okay.  So and then tell us about what you observed with

respect to the front steps in the riser -- the riser height on the --

A.    On page 11 was a picture that was on the real estate listing, and it showed the stairs at the bottom appearing -- obviously not putting a tape measure, but it appeared that they were very close in riser height and so forth.  Supposedly, these were rebuilt and then I guess a new patio area or driveway.  I'm not sure exactly how that all shook out, but then they -- it was subsequently found that they had rebuilt the stairs, and when they did, the lowest riser now was too short.  Instead of them being equal, the code gives you a very slight variance that you can have between each tread on the heights.  It now went from -- you know, it was like an inch and a half deficient from the other treads, which would exceed the code allowance.

Q.    Okay.  Do you know what the tolerances in the --

A.    Oh, goodness.  I have to remember.  It's --

Q.    It's okay.  I don't --

A.    It's like three-eighths of an inch tolerance, and only when you have an existing location like with an existing building, if they're sub par, like if you're on a slope while on a city street or something like that, does it give you some greater allowances.

Q.    Okay.  Tell us briefly about kind of the permitting issues that happened with the bathroom areas and the bathrooms being flipped and that particular issue.

A.    Yeah.  It was -- my understanding, I guess, there was supposed to be one bathroom that was going to be modified; however, when I was there, there were two bathrooms being modified.

One was predominantly complete.  I think there were some light fixtures to be set and some other items.  Off of what I believe is the master bedroom, it appeared that there was a new shower stall installed.  It was at the stage where what's known in the business at shower pan was in place.  It's a kind of a blue liner that's put over framing.  I don't recall if any tile work had even started at that point -- I don't believe it had -- so that basically that bathroom was predominantly incomplete.

Q.    Okay.  Speak to the overall permitting failure on this project and to whether -- the extent to whether you think it's an accident or not?

MR. COUGHLIN:  Objection, Your Honor, for him to speculated whether it's an accident or not.

THE COURT:  He can -- I'm going to -- overruled.  I'll allow him to begin his testimony and then we'll see whether he's -- don't speculate and don't guess.  If you, for reasons based on your experience in the field, believe that an act was done intentionally, then you may testify to that, okay.

THE WITNESS:  Okay, Your Honor.

THE COURT:  Okay.  Go ahead.

THE WITNESS:  Given that once we finally started getting

some discoveries back from the County on what was permitted and what was not, it was very obvious that the three exterior additions, the addition to the third floor, had not been gone through any kind of permitting process, and so that right in and of itself was a concern because that means it hasn't had the review by a claims examiner to verify a code's compliance.

We never found anything on the carriage house at all. The only permit that existed at the times that I were there was that one for the bathroom remodel and kitchen remodel, and so it was very clear this has gone beyond that scope.

I remember commenting at that time in the years of experience -- and I've been from small jurisdictions, Winchester, Virginia is where I started as a building official, Williamsburg, and then to Alexandria for the end of my career -- I had never seen this much work done in a nonrural area.

Sometimes in rural areas people tend to do things, they don't get caught for a long time, but this was a substantial amount of work, and it's -- given the fact having worked in Alexandria and being familiar with Arlington's process, this wasn't only a building code issue, but this was a zoning issue. They were located on a corridor that required them to meet certain exterior standards. This opened up a whole can of worms that you just wouldn't find building a house up on the mountain in Shenandoah County and not getting caught. I thought it was the most egregious situation I had seen.

BY MR. LYNCH:

Q.    So just focusing on objective red flags through your experience that might indicate an intentional act, what objective, not in the defendant's head, but red flags did you see?

A.    I saw a permit at some point, so that told me somebody knew there was a permitting process, so not even knowing who the contractor or the owner of the property was prior to the Harrells, that told me something, and then later found he was a Class A contractor and had built other homes and some other things.  I mean, part of the licensing requirement for the Department of -- or when you obtain your Class A license is an exam -- I'm not sure if he was exempted or not he may have been in business long enough to know, but in the -- the prohibited acts there says you must comply with the building code.

        And I just thought, "Wow, that's just an awful lot of work to have been done without building permits for someone who has built in the past."  And so that's why I came to the conclusion I thought that it was -- there had to be some knowledge that, you know, there was a permitting process, knew that you had to have permits, and probably built enough to know, and so that's why I felt that way.

Q.    Thank you.  So can you tell us -- I think we covered the foundations and footings, so let's skip that.  Well, no, you got a fair amount.  Just give us a rundown of the problems with some

of the foundations on exterior parts of the property.

**A.**     Um, I'm not sure if the County would have required a soil test or not, given the work.  I had not researched to see if they did or did not, but regardless, when you go out to do a footing inspection, one of the things you're looking for is the type of soil that's there, make sure that you don't see things that appear to be maybe expansive clay, which can cause problems.

You're also looking to make sure that you didn't have recent rain and you have muddy spots where there might be a concern that the soils themselves are going to be -- allow for a pocket to form underneath the footing, and so there was no footing inspections noted because there was no permit to associate them to.  So if any were done or happened, they were not associated with that work, and so I was very concerned that, just from the very beginning, if you -- the old saying about, you know, you build a good house and you start at the foundation, well, that's exactly right, right here.  We had to make sure that the foundations were correct.

MR. LYNCH:  Okay.  So to admit a couple of exhibits, all of the photographs that are in this report are in our trial exhibits.  I just want to admit a couple.  On page 5, it shows the mudroom.  That's Exhibit 46, and I believe that is not objected to officially, so I would like to admit Exhibit 46.

THE COURT:  Any objection?

MR. COUGHLIN:  Court's indulgence.

46?

MR. LYNCH:  It's on page 5 and -- yes, Exhibit 46.

That's a photo of the mudroom.  That's Exhibit 46.  You've got to look at 46.  That is the same picture, I believe.

MR. COUGHLIN:  You want to move in not this page, but the paragraph.

MR. LYNCH:  Correct.

MR. COUGHLIN:  Okay.  No objection to the photograph.

THE COURT:  Received.

(Plaintiffs' Exhibit 46 admitted into the record.)

MR. LYNCH:  So the same thing goes for these others.  I'm not moving in the page.

So, Exhibit 47 is a photo of the front steps, and that's shown on page 11 of the report on the top picture.

MR. COUGHLIN:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 47 admitted into the record.)

BY MR. LYNCH:

Q.    So let's look at the photo notebook.  As this one, we are just reviewing a few photos.

A.    I'm not sure if I have that one.

Q.    It says "Photo Highlights."  It's skinny.  That's not it.

A.    That's not it.  "Photo Highlights."  I have it.

Q.    All right.  So I want to direct your attention to tab 5G.

A.      5G.

Q.      What review have you done generally of the photos in this notebook?

A.      I have reviewed all of them.  Some of them were sent to me in advance, some of them I had seen at various points, some -- I'm very familiar with most of them but just recently.

Q.      Okay.  So, on the first page of tab G is an e-mail from Mr. Deluca to Mr. Burns, and he -- and Mr. Deluca says, "Have 3 inspections," and that's March 17th 2019.

        Knowing what you know about the permitting record in this case, those were not County inspections, correct?

A.      That's correct.

Q.      And you'll notice there he says, "going into full drywall and final finishes."

        What does that indicate to you?

A.      That work -- that the walls had been exposed, potentially work had been placed behind them, and now they were putting the drywall material back up and then finishing that so that it was ready for painting.

Q.      Okay.  So there were little numbers in the bottom right. I would like you to just look at -- just give us, you know, a very short thumbnail on 275 to 284.  And you can skip the air conditioning unit.

A.      275 shows recessed electrical lighting that had been installed in the ceiling area.  The same with 276.  There was

some new framing shown in that area.  You can see by the new studs that are there in the back.

On page 88, that's a new heating and -- or it looks like heat pump system.

On page 89, you can see where some new recessed lighting has been installed and the walls were opened up.

Q.    What is that -- is it closing in the ceiling there on the top of 278 or -- what's going on in the ceiling there?

A.    That appears that the ceiling had been removed so that the electrical work could be put in.  You can see that the recessed light -- you can even see the arrow marking to show where it was to be located.  And so it looked like that area had been opened up so that electrical work could commence.

The next page, on 90, very similar, seeing new electrical work, recessed lighting, studding out of the rear wall there, the rear brick wall.

On page 91, similar.  Appears to be some main plumbing work as well.  That's new PVC, given the age of the home, unless it had been done at some other point.

Q.    And let me -- just to stop you here.

A.    Mm-hmm.

Q.    These photos that we've been looking at, other than the HVAC units on the outside, is this -- where in the house is it? Is it the existing main house?  Is it the addition?

A.    It's in the existing main house.

Q.      Okay.

A.      Yes.

So moving forward, you can see the new PVC lines that were put in for bathrooms.  So in looking at the original permit that was taken for just the kitchen remodel and the bathroom remodel, that was to replace fixtures that would have involved getting in to replace any plumbing.  And if it was, it would have required modification of the permit to then -- either that or a new permit to put in the new plumbing lines because extension of or repair of or replacement of plumbing lines is not exempted from permitting.

Q.      Okay.  So what page are we on now?

A.      94.  That's the existing stairway.  I can't really tell you much from that photo.

The next one is 95.  That's obviously new drywall that's gone up, and in that particular area, I believe that was like the dining room towards the front right, and it's -- obviously everything had been dropped off and then was being refinished.

Q.      Okay.  Let's go to the next tab which is H.  On page 98, Dashco 297.  Is that some drywall there or no?

A.      On page 98, this was the kitchen, and, again, the original permit stated that it was going to be replacement of the cabinetry.  Obviously, this went beyond that.  They actually dropped off the ceilings, added new electrical.  There was a new stud wall there -- or, I'm sorry, that was furred out.  It

wasn't a new stud wall.  That wall was existing, but it had been floored out.

And then that is the steel beam, that was my greatest concern on this whole entire project, that was supposed to have been replaced.

Q.    Okay.  Let's look at 294, page 105.  Dashco 294.

And just for the record, we've been showing some befores and afters of this area, and this is the before, and we're in April -- this is the e-mail dated April 17th.  So what do you see in that photo?

A.    I see new drywall.  I can't tell, but it -- there is an appearance that it is just new drywall, meaning they went down the studs instead of just putting the material over top of existing.  You can see some new recessed lighting fixtures.  It looks like there's a plumbing drain line, if I can see it appropriately.  Yes, looks like a plumbing drain line, a couple of new ones that had been installed.

Q.    Okay.  So move forward to page 114 and 115 of the book. That's Dashco 303 and Dashco 304.

A.    114 -- I'm trying to remember my recollection of which room that was, but that room is obviously complete, has finishes on the walls.  There were new windows installed.

On 115 --

Q.    Can I stop you for one second because this --

A.    Yes.

Q.      -- little armoire, or whatever, that's on the left, this may help orient you.  We have a before and after.

MR. LYNCH:  Can we do -- is it hard to find Omaha 7?

BY MR. LYNCH:

Q.      It will orient you to what happened in this room prior to April 17th.

So this is the before.  Look, you can see the ceiling there.

A.      Yes.

Q.      The open.  You can see the armoire.  You can see the walls are open.

A.      That is correct, and obviously in this next picture, there were finishes on the wall.

Q.      Okay.  So -- and then you're about to speak about 304.

A.      Um, this area was the -- I'm trying to remember exactly. This was the -- if I recall correctly, it was behind the kitchen, so it was kind of like the great room.

Q.      The existing main house, do you think?

A.      In the existing main house, yes.

Q.      Okay.  And we're going to show, one last time, Omaha 8. This is just the before and after of this area, again before April 17, 2019.

A.      Yes.

Q.      Before, and there's the after.

A.      Yes.

Q.    All right.  So last picture I want you to look at is in tab -- the May 5th one.  If you go to Dashco 334.

THE COURT:  This is your last photo that you're going to --

MR. LYNCH:  Last one.

THE COURT:  So you're just about finished with this direct?

MR. LYNCH:  Yes, that's right.

THE COURT:  All right.

THE WITNESS:  334, yes.  You can see new drywall that had been taped and dimples finished in this picture.

BY MR. LYNCH:

Q.    Okay.  I just wanted to talk about the sort of --

THE COURT:  Let's take our 15-minute midafternoon break, then.  I wasn't sure whether you were done or not.

MR. LYNCH:  No.

THE COURT:  That's fine.  That's fine.

MR. LYNCH:  Okay.

THE COURT:  I just want to get a good time for our break.  So we're going to take 15 minutes and then we'll come back with further direct testimony.  All right.  We're in recess.

(Thereupon, a recess in the proceedings occurred from 3:48 p.m. until 4:05 p.m.)

THE COURT:  All right.  Please continue.

BY MR. LYNCH:

Q.      So just for clarity of record, we were looking at page 11 of your report, and -- I'm sorry, it's not page 11.  Page 4. And you were saying -- I just want to make clear that you're not contending there no permit pulled for the addition on the rear; it's just the little triangle part above the new addition; is that correct?

A.      This set of plans was the ones that were approved on December 16th, and as I noted early, this was a clouded area, this was added from any previous plans and so it had not been previously permitted.

Q.      It's only the third floor part that you're talking about?

A.      Correct.  It's that kind of dormer area that kind of kicks out.

Q.      Okay.  And then there have been some contentions made in this case that Mr. Deluca is somehow excused from the permitting obligations because he was an owner at the time.  Can you speak to that?

A.      Yes.  The only thing he would have been exempted from would have been the licensing requirements by the Virginia Department of Occupational and Professional Regulation.  You are exempted from that if you do work on your own property.  There is some contentions that you're intending to live in it for 24 months.  Now, I don't know if anybody's ever been challenged on that, but the building code is the building code, and it doesn't matter who does the work.  The work and the permitting

requirements and the planning requirements are the same no matter who does the work.

Q.    With the exception of the licensing point you just made?

A.    With the exception of the licensing, and typically jurisdictions get someone to fill out an affidavit saying that they're exempt from licensure, and they get that signed.

Q.    Okay.  Staying in the little book, let's go to tab 1. It's Deluca 182.

A.    The little book.  Okay.

Q.    You should see electrical permit dated April 30th.

A.    Okay.  It's in my --

Q.    I mean electrical inspection.

A.    Okay.  Let's see.

Q.    It's at the very back.

A.    182, yes.  Okay.

Q.    So tell me about this inspection ticket.  What do you call this thing?

A.    It's an approval/rejection ticket.  Typically, they're just posted on the job so that somebody can come by and look at it.  Most of the jurisdictions now, it's all done electrically, whether this was there or not.

But it normally indicates, if you called for an inspection, you would go back to look and see what the inspector's results were.

Q.    Okay.  So tell me what this inspection ticket indicates

to you about the extent to which the County inspected the work in the main house?

A.     The inspection occurred on 4-30-2018.  There was a note of a couple of things that needed to be added for the electrical system, a receptacle, a floor receptacle, and then to add a ground floor circuit interrupter in one of the bathrooms.  The note was probably the most catching thing.  It said, "Need to revise the plans prior to framing inspection, plans do not match" -- and I'm assuming that says "field."

Q.     And why does that alarm you?

A.     Because at this point there was other work that had been done that had not been sent in for permit.

Q.     Let's look at Exhibit 183, the next tab.  It's another ticket dated April 25th.

A.     Yes.  There are some notes that the mechanical inspection -- rough mechanical, that's going to be before things are concealed.  A rough mechanical inspection was performed on 4-25-19, but it says "Less the addition."

Q.     And what's significant about that note to you?

A.     Um, what's significant is probably at this point there was still no permit for the addition.  It could have been also that someone did not call for the addition, but given what we know at this point, there was no permit for the addition.

Q.     Okay.  So these two tickets we looked at, 182, the one from April 30th of '19; and 183, the mechanical from April 25th.

Based on your review of the record, what are the parent building permits for these two trade permits, the electrical and mechanical?

**A.**     I would have to go back and look at those two permits, but I believe it was the ones that were pulled for the --

**Q.**     Let's have you verify.

**A.**     Yeah.

**Q.**     You can do it.  We're going to have to do some notebook work here, but the Elmagraby notebook, if it's up there.

**A.**     Got it.

**Q.**     It's tab 449.  It's the very first two, the electrical and mechanical that we're looking at here, the first two pages.

**A.**     I'm sorry, I didn't catch the numbers.

**Q.**     449.

**A.**     449.  Okay.  So the electrical permit, which would have been the first one...

**Q.**     Electrical permit 1901071.

**A.**     That is 190 -- that was the building permit that was associated with --

**Q.**     In the top left corner you can -- it has the building permit number in the top left corner of the electrical permit application.

**A.**     The first one in this series is associated with the building permit 1803016.  That was the work that was the bathroom and kitchen, the original permit.

Q.      Okay.  So you just noted that the electrical permit B1901071 is associated with the kitchen and bath?

A.      Yes.

Q.      Okay.  And then the mechanical one.  The next page.

A.      That one is associated with 1900548?

Q.      Right.  That mechanical permit.  That's the April 25th ticket.

A.      Yep.

Q.      And what parent building permit is that associated with?

A.      That would have probably been the one issued in December.

Q.      In the top corner of the mechanical permit it says the building permit B1803016.  And you may not know what 3016 is, off the top of your head is?

A.      1803016.  Yep.  I got that one.  Maybe I'm missing one here.  Hold on.  I don't see any permits in here with that number.

Q.      With which number, the mechanical number?

A.      Under the --

THE COURT:  The building.

THE WITNESS:  The building permit number.

BY MR. LYNCH:

Q.      Okay.  I'll refresh your recollection.  You can -- it's clear that the mechanical permit is associated with the building permit ending in 3076, right?

A.      That's correct.

Q.    Okay.  And I'll just represent to you that's the kitchen and bath permit.  So, what's -- given that these two inspections were under trade permits associated with the kitchen and bath permit, how does that inform your opinion of the value of these inspection tickets?

A.    There was no building permit that covered the building permit work at this point, and even if additional work was done with the number of fixtures and so forth under these permits, you had no master building permit that was approved, so that would have been kind of a moving forward underneath without getting the building permit first for the work you're actually putting in.

Q.    Okay.  All right.  So, having looked at the inspection records on this project --

A.    Okay.

Q.    -- and I'm not just talking about the orange cards --

A.    Right.

Q.    -- you've seen Exhibit 433 where the County is reviewing -- it has comments reviewing.  And before I ask a conclusory sorry question, they're in your book.  Look at 443, Exhibit 438, and Exhibit 439, and just confirm to me that you've seen the inspection history in those documents.

A.    That's correct.

Q.    So having looked at these inspection records, what opinion do you have about the completeness of the inspections on

this property?

A.    It is very unclear, because of the fact that there were no building permits and no direct trade permits associated with the building permits, whether or not any inspections occurred for the work that was being concealed.

And the reason that I say that is because if you have not obtained the building permit, so everything ties back in -- because that's the way the County does it, they tie the sub permits or the trade permits back to the main building permit -- you don't have a record.  There's no record that these inspections may or may not have occurred.

And so even if ones did occur, there's no way to track them, and since the permits, building permits were subsequently issued later, there's no way to backtrack to be able to try to tie those inspections with anything.  It's a mess.  It's a real mess.  There's nothing in here that indicates that anything was inspected based on the work and the records that were there.

Q.    Okay.  Now, you know, just out of an abundance of fairness to Mr. Deluca, if you look at Exhibit 433 in the inspection comments.

A.    433.  Which tab are you under?

Q.    It's 433.

A.    433.  Got you.  Got it.

Q.    I got you, a lot of notebooks up there.

A.    Yeah, mine is coming apart.  Okay.  I have it in front of

me.

Q.    Okay.  So that's -- are you looking at page 3 of 7 in that document?

A.    Let's see.  433.  I'll go back a little bit.  Got it. I'm here.

Q.    Okay.  So there you see framing inspection recorded, it's canceled but beginning on June 10th, right?

A.    Correct.

Q.    Go to the next page.  So -- there was some inspections in June, clearly under the main house addition, right?

A.    There were.

Q.    Okay.  But just -- reading these records, even the one on June 11th has a note.  The one on August 30th has a note.  What do those notes mean to you?

A.    This one says, "All framing okay less fireplace area." And I noticed that they had -- when the plans had been submitted, the County had kicked back that they needed more details on the fireplace.  They obviously had not gotten them at that point.  This meant there was still outstanding issues that had to be addressed before they could complete inspections.

Q.    Okay.  All right.  So let's move to the effect of this record on occupancy.

A.    Okay.

Q.    Well, before we hit that, what percentage -- you were an inspector and you were trying to do a final inspection or even a

replacement contract to try to figure out whether this work was good or not, how many walls would you open up and how would you approach that to verify?

A.    Typically with the electrical system, I would go and see if there were new devices, which I assume in every location here they were new devices.  I would have someone open up several of those locations and see if new wiring was installed.  If new wiring was there, new boxes, new wiring, I would have them open up every location until we found where there wasn't that.  And I can't say for sure, but it appeared the predominance of the house had been rewired.

Q.    Okay.

A.    Same with plumbing.  If you see -- if you were replacing fixtures, typically you don't have to -- you're not replacing piping.  If you do, you have to go in for a permit.  So if you found like new PVC lines and new water lines that appeared to go in areas that were in concealed spaces, I would have them open up a small area.  If it appeared that all of that work had been new, you would have to open up because the joints and seams have to be inspected to make sure that an appropriate primer is put on to it, and then there should have been a test done on the waste and vent system to make sure that it holds with a certain amount of pressure onto it.

Q.    Okay.  And if you -- and I know this is rough, but if you had to say what percentage of the work behind the walls on this

property, including the carriage house, how much of that has been inspected?

A.    I -- there's no record indicating that anything beyond what was on the kitchen and bath permit had been inspected up to that time.  So, to my knowledge, there was no inspections, and so, again, every location would have to be looked at.

Now, obviously you would have to bring the inspectors together and say, "Did you see this, did you see this," you know, "Were you led to areas?"

But regardless, if there was no permits and there was no inspections being called on appropriate permits, there's no record, and so therefore it would be very difficult to be able to determine without opening up those areas and looking at them.

Q.    And when you say "no inspection," you're referencing the idea that the trade permits were pulled under the kitchen and bath permit?

A.    That's correct.

Q.    Okay.  All right.  Talking about occupancy.  On page 16 of your report, it states, "The Harrells cannot legally occupy the Property until the construction performed by Deluca has been final inspected and approved by the County."

Why is it -- and you can relate this to the building code -- that the Harrells cannot legally occupy the property based on the permitting violations here?

A.    I need to clarify that lots of homeowners have

renovations done to their homes and they don't have to move out, but in this situation, because there was so much concealed work, that there is no record of inspection, and so therefore there's no idea whether or not there's a hazard that exists with any of that work.  That puts the existing building in peril, not just anything else that had been done.

I mean, obviously all the carriage house had been completely reworked and new systems put in, but in areas where they were put in in other places inside the existing house, again you may find, you know, where a cable or, you know, nonmetallic cable was fed into a box and it got cut or something like.  That you don't know until you actually open up and physically see it.

So that would be my opinion as a code official, is that because of the amount of unpermitted, uninspected work that was behind those places that were opened and then concealed possibly without inspections, I would have to say that that's unsafe, too, until we know it's safe.  So, therefore, there would be no reason.

The code says that you have to have inspections. Section 113.1 establishes where you have to have permits and where you have to have the inspections before concealment, and it's very clear -- and then it also says you have to have a final inspection, and 113.8 also says that you must have a final inspection.  And then on an existing building, that final

inspection then can serve -- if it never had an occupancy permit, to be a considered complete, it then -- the final inspection -- you don't have to get a certificate of occupancy. It says the final inspection serves as a certificate of occupancy.

Q.    And for that last point you're referencing Section 113.8?

A.    113.8.

Q.    So you referenced this idea.  Let me make sure.  The carriage house is not legal to occupy because it's never been permitted, right?

A.    Correct.

Q.    The addition is not legal to occupy, the rear addition?

A.    Correct.

Q.    And you're saying also the existing main house is not legal to occupy?

A.    And again, based on if -- and I need to clarify that.  If the Harrells were living there and they hired contractors and they got appropriate permits and got appropriate inspections, they could've lived in that house as long as they had a bathroom, a kitchen, sleeping area, and a living space.  That's all the code requires.  It doesn't say you've got to have five bathrooms, but once that work was concealed behind those walls, as a code official I would say, "Don't occupy it until we've inspected," and that's why I feel that the existing house would have been unsafe for occupancy until we proved it was safe.

Q.    Okay.  All right.  So I want to talk about the consequences of the illegal work, and there are two ways to look at it:  What were the consequences or the potential consequences on July 4th, the day after closing, versus what are the consequences right now?

So walk me through what the consequences were of the permitting violations on July 4th.

A.    Well, when I first saw it in September, again, there was -- I questioned the beam sizing based on the plans that were there, which were not a set of approved plans, but they did show a much larger beam.  There were -- all the work that was done in the cottage [sic] house or the cottage location, again those stairs, the lack of appropriate roof structure, all of those things were unsafe.

I would have to say the consequences at that time were high and that it would be very difficult to advise an owner, "Go ahead and move into this," you know.  There is just too much unpermitted work.  It doesn't mean that other work couldn't have been continuing and what have you; it was the unpermitted work, and the simple fact of the matter is, once they stepped in there, the County then could come back to them and say, "Well, you moved into it, it's your property, and you accepted it with these additions," and they could have had the folks in the planning department come back and say, "You can't have the mudroom on the side or the powder room because it's visible from

the street and you didn't get it approved."

Now, it might have been approvable, but it could have been a thing where they came back and said, "No, we wouldn't have allowed that."  I don't know why, but they could have, and so therefore they may have been subject to even have to take something down.

Q.    Okay.  And today, Mr. Deluca has some approved plans, but tell me what it would require to get occupancy now.

A.    Well, given that the foundation systems for the additions were put in without inspections, unlike a very small area, maybe like a very small room where you might get somebody to open up two or three spots to kind of spot-check it, this was a very large addition on the back, and I would not go out and do a visual inspection as a code official, or allow my staff when I was in the jurisdictions I was in, to go out and do a spot-check inspection on something like that.

I would turn it back over to the builder and say, "You need to get an engineer to come out and certify your footings and foundations," and then the engineer is going to require probably, to do some soil borings to make sure that the soils underneath were appropriate and you're at the right depths and those types of things.  That's a major one right there.

I think, again, if it required you to have to go in and open up areas to see what was concealed, then I think you're looking at, you know, a pretty substantial amount of time and

effort to get those inspections satisfied.  So, you know, I think, again, you're kind of starting from scratch in a way, I guess would be the right answer.

Q.   You would have to pay a permit fee at the minimum if you're going to --

A.   You have to get permit fees --

Q.   A permit fee --

A.   Yeah, they would have to pay a permit fee.

Q.   I can go find the permits.

A.   Yeah, I would imagine if the permits had gone beyond six months and there had been no work, then the permits are expired.

Q.   And what do you -- what do you think about the idea that the Harrells could just assume Mr. Deluca is not going to finish it?  If they had to bring in a new contractor, could they just say, "I'm just going to use Mr. Deluca's plans"?  Would that work?

A.   No, because Mr. Deluca hired his professionals to design the plan.  A design professional owns it and sold them basically to Mr. Deluca, so he would have to agree that those plans could be used, and then we'd have to go back through the permitting process all over again.

And I would think it would be very difficult to find a contractor that would want to take on work where they don't know what's behind various locations.

MR. LYNCH:  No further questions.

THE COURT: Okay. Cross-examination?

MR. COUGHLIN: Yes, Your Honor. One moment.

THE COURT: Okay.

CROSS-EXAMINATION OF JOHN CATLETT

BY MR. COUGHLIN:

Q.   Good afternoon again, Mr. Catlett.

A.   How are you doing?

Q.   Mr. Catlett, you've never worked in Arlington County, but you're familiar with their process, correct?

A.   That is correct, yes.

Q.   And you wouldn't consider Arlington to be a rural jurisdiction, correct?

A.   Not at all.

Q.   Instead, like the City of Alexandria where you worked, they're a very thorough jurisdiction, correct, in terms of the permitting process and the inspection process?

A.   I only know what they require.  I can't tell you how thorough they are.

Q.   Okay.  But you have no -- you have no firsthand experience to say that when they issue concealment inspections, for example, that they just have no idea what they're talking about, correct?

A.   No, I would, again, have no knowledge one way or the other, no.

Q.   And ultimately, it's the local jurisdiction's building

code official in that jurisdiction that has the final say on whether something complies with the code or not, correct?

A.    Yes, although in a major jurisdiction like that, seldom does the building official get involved.  Most projects are mainly handled underneath of them.  They're more of the administrative person.  I found that out when I went to Alexandria, how much more of an administrative job versus a building code job it was, but, no, yeah, I mean, they're ultimately responsible for the actions of all the people that work for them, and so they would be the ultimate person.

Q.    And you're aware that there are no -- there were no stop work orders issued to Mr. Deluca for this work at this property, correct?

A.    To my surprise.

Q.    And in addition, there were no notice of code violations issued to Mr. Deluca by Arlington County for work at this property, correct?

A.    To my surprise.

Q.    So I want to go over the permitting process, and this is really just to make sure I understand your testimony.  You don't mean to say that when you were on the property in September that there was only one permit that was issued, correct?

A.    To the best of my knowledge, that was it, yes.

Q.    Okay.  Well, could we turn to Exhibit 426.  That's going to be in, I believe, Mr. Elmagraby's binder.

A.    Okay.

Q.    We'll pull it up on the screen as well.

A.    That might be simpler.

Q.    And I want to work backwards just in terms of the way this has been presented.  Have you reviewed this document before?

A.    It appears to be something I -- yeah, I looked at the inspection records up to the point of where I issued my report, and if I could, just briefly, just look at my report.  Yes, okay.

Q.    Is this a summary printout of the permits, building and trade permits issued at that 6122 Lee Highway?

A.    It appears to be, yes.

Q.    And so starting at the bottom -- well, first of all, do you know how to interpret this document in terms of the columns, what they mean by "Approved" and "Issued"?

A.    I would assume this means that they have approved a permit and it had been issued, someone had come in and obtained it.

Q.    So let's start at the bottom.  We have B1803016.

A.    4-3-2019.  That was for the bathroom and kitchen.  Same for same.

Q.    Is that the permit that you referenced that you were familiar with?

A.    At the time of my initial inspections when I went on the

site, yes, that was the only permit that was posted.

Q.    Okay.  Could we then go up to the next B letter?  That's B1901108.

A.    Yes, it shows an expired permit.

Q.    Does it also show that it was approved on June 4th of 2019?

A.    That is correct.

Q.    And this is for the "Two story addition and one story porch in rear."

A.    That's correct.

Q.    And so, therefore, on the date that you were on the property in September, you now know that there were, in fact, two permits issued for the work in the main house, correct?

A.    That is correct.

Q.    And there were, as well, some trade permits that were issued as of September when you were on the property, correct?

A.    Yes.  The only ones that I had seen at my first inspection would have been the ones for the -- associated with the bathroom and the kitchen area.

Q.    So, is it -- when you're on the property in September, you just hadn't at that point looked at all of the permits, correct?

A.    That is correct, and we then had done a search and requested from the County that all -- that all the records be provided to us.

Q.      So maybe to expedite this, so you would agree that ultimately, there were mechanical permits issued before September, correct?

A.      Correct.

Q.      Plumbing permit issues, multiple plumbing permits issued?

A.      Correct.

Q.      Multiple -- and electrical permit as well, correct?

A.      Correct.

Q.      Okay.

A.      And they were specific to, at that point, the two-story addition and the screen porch at the rear.

Q.      Okay.  Well, we know that 3016, that is the kitchen and bath permit, right?

A.      Correct, and then that document stated it was replacing same for same.

Q.      And so if we look at the individual trade permits, and they identify that permit, that's the mother permit, correct?

A.      Yeah, the building permit would be the mother permit unless a building permit didn't exist, and then each one would be stand-alone.

Q.      Okay.  And so if the trade permits identified that permit number, they would be then for work done under that building permit, correct?

A.      That's correct.

Q.      Okay.  Could we turn to Plaintiffs' 430, and we'll get

this up on the screen.

MR. BURCHER:  Your Honor, the witness, I think, marked the --

THE WITNESS:  Yes, I apologize, that was my mark.  I didn't realize it was a touchscreen.

THE COURT:  Yeah.  There we go.

BY MR. COUGHLIN:

Q.    Have you before today reviewed the building permit application for the kitchen and bath?

A.    I saw this permit record, yes.

Q.    Okay.  Could we turn to Bates 1433?  Earlier I believe you testified that the kitchen and bath permit was only for one bathroom, but you see a note here that says, "scope of work is for all bathrooms," correct?

A.    I do now, yes.  I had not seen this drawing.

Q.    Okay.  And ultimately, the permit for the renovation for the kitchen and bath was approved on April 3rd of 2019, correct?

A.    That's correct, based on this drawing, um-hmm.

Q.    Could we please go to Defendant's Exhibit 183.  So this is a mechanical inspection, correct?

A.    Yes, it is.

Q.    And the date of this inspection is on April 25th of 2019, correct?

A.    That's correct.

Q.    And this mechanical permit was tied, ultimately, to the

kitchen and bath permit, correct?

A.    I would have to go back to look to verify that again, but I believe it is, yes.

Q.    Okay.  And so it seemed earlier that you were suggesting that, you know, there's trade permits are having -- trades are having inspections done, but there's no permit that's been issued.  I mean, that's just not the case, correct?  I mean, there was a building permit issued for the kitchen and bath, and then now we have a mechanical inspection occurring after that permit is issued, right?

A.    Yes.  I wouldn't know what the scope of that work was considering that it was only supposed to be for the kitchen and bathrooms.  I would assume it would just be the ductwork associated with vent fans and those types of things.

Q.    Okay. Fair enough.  And ultimately, for the main house there were plans that were approved on December 16th, 2019, correct?

A.    Correct.

Q.    And earlier you indicated that, regarding any work that hadn't received an inspection, that depending on a series of events, you may require the entire wall to be opened, correct?

A.    Yes.

Q.    But there are times where the inspectors or the inspection office will also allow pictures to be provided by the contractor if -- as long as the pictures are thorough and show a

sequence of the work that's performed, correct?

A.    I have not seen anything to the level of work that's done in here --

Q.    I'm not asking here, I'm just -- sorry to be asking in general, but I'm asking in general.

A.    In general, I have approved it if somebody was, for example, trenching to put in a replacement water line and they had to do it on a weekend, I would allow them to take photographs so we could verify the depth.  They would show locations where they would show the depth.  Typically, anything that required concealment behind a wall, we would not do that.

Q.    Okay.  And you never spoke to -- did you speak to the actual inspector who inspected the work at the project?

A.    I did not.  I spoke with Mister --

Q.    Elmagraby?

A.    -- Elmagraby, thank you, and there was two other inspectors.  One of them I did know.  We had some conversations that were kind of going on while we were doing the rest of the walk-through, but as for the actual inspectors, I wouldn't know who they were.

Q.    Okay.  So you don't, therefore, know what they saw or didn't see?

A.    No.  All's I know is what was being represented back to me from the individuals I was speaking with, and it was concern about the entire project and whether what inspections had

occurred.

Q.    Okay.  I'm going to move now back to building permit B190118.  I would like to pull up Plaintiffs' Exhibit 447, and we'll have to get to that specific page, and I'll give you a Bates number in a sec.  But that's also in the Elmagraby binder --

A.    Okay.

Q.    -- so you can turn to 447.  So, if you look in the lower right-hand corner, there's a Bates number, 61247.  Just let me know when you're there.

A.    61247?

Q.    Yes.

A.    Okay.  I'm there.

Q.    Have you looked at the printouts of the Arlington County Permit Manager Website prior to today?

A.    I had seen more on the inspector -- not the actual permits up until today.

Q.    Okay.

A.    Yes.  This record I had not -- I had seen the listing records that showed both permit, permit comments, and inspections.

Q.    But this is not a document that you've seen prior?

A.    It's not a document I've seen.

Q.    Is it similar to something that the City of Alexandria uses to reflect the status of permits?

A.      Um, it would be something similar, yeah.  Yes, I would assume it would be something similar.  We're in a completely different system.  The way things looked might have been different.  I'm not sure where you're going with your question, so I'll let you go with it.

Q.      So if you could turn a couple of pages --

A.      So this one was showing the status as expired at this point, so in 2019 -- 04-22 of 2019 this permit was considered expired.

Q.      Well, that's the file date that you referenced and then the status is expired.  That's as of the date that this was printed, I believe; is that fair?

A.      Yeah, and I believe, if I recall correctly, and it's been a little over three years, the permit had been found, but one had not been either issued or it had been issued and then it had expired.

Q.      Which -- if there's not enough activity after six months of inactivity on a permit, it expires, correct?

A.      It expires, right.

Q.      Okay.

A.      I thought you no longer have a permit.

Q.      So could we turn to Bates Number 61249?

A.      61249.  Okay.

Q.      Do you see at the bottom, "Completed Inspections," "Framing," and it's dated 8-30-2019?

A.      Yes.

Q.      So that's stating that a framing inspection has been approved for the addition, correct?

A.      For the addition, um-hmm.

Q.      And an inspector wouldn't approve the framing if they hadn't seen the foundation work, correct?  I mean, that would be unusual, right?

A.      That would be unusual if it was the same inspector who was monitoring the project, yes.

Q.      Okay.  So earlier you talked about there being deviations related to the roof slope for the addition.

A.      Correct.

Q.      And by your observation, you thought that it was a slope that was ultimately less than, meaning flatter, than 4 to 12, correct?

A.      That's correct.

        MR. COUGHLIN:  Could we please pull up 429?

BY MR. COUGHLIN:

Q.      And that's actually in your binder -- the Elmagraby binder, I believe.

A.      429?  Okay.  "Soil & Structure," um-hmm.

Q.      If you could just page through all of the pages of this exhibit, and then let me know when you're finished so I can ask you some questions.  And the letter is not as important.

A.      Okay.

Q.      Does Exhibit 429 appear to be the approved set of -- the plans for the main house, including the addition and the original kitchen and bath work that was approved on December 16th, 2019?

A.      This appears to be -- yes, which would have been post construction, yes.

Q.      Okay.  Could you go to sheet A-4A.

A.      A-4A.  Okay.  I'm there.

Q.      There do you see on A-4A where the slope of the roof is identified -- it's small, but do you see that the slope of the roof is identified?

A.      It is.

Q.      And it's identified as 1 to 12, correct?

A.      Correct.  My report was based on the documents that were shown to me prior to this submission, and so the original plan showed a 4 and 12 roof with shingles.  After raised issues about the permitting and after the County raised issues, then these drawings were developed.  This was post the County getting involved and my involvement.  Then this was done.

        I had also noted that when the first one had come in from this engineer, it had shown the powder room and the mudroom as being existing.  He then modified that to show the appropriate details.

Q.      So ultimately, the approved plans reflected the actual work that was done at the property?

**A.** Ultimately, yes, but it was only after raising those issues and bringing the County in did these drawings get produced.

**Q.** Okay.

MR. COUGHLIN: Could we pull up Defendant's Exhibit 130?

BY MR. COUGHLIN:

**Q.** This won't be in any binder, so you're just going to have to look at the screen.

**A.** Okay.

**Q.** So before that's pulled up, what was the first date that you visited the property, just to get that clear?

**A.** September 18 -- let me get back to my record. I believe it was September 18th or 25th. 25th.

**Q.** Okay. And so, therefore, to understand what was at the property prior to that date, you would have to rely on the photographs, correct?

**A.** That's correct.

**Q.** And so when you were at the property was there a screened-in porch that was at the back of the house that was completed?

**A.** Yes.

**Q.** Could you please look at this photograph. Does this photograph show a screened-in porch that's been completed?

**A.** Um, I believe that was the original porch where the two-story addition now -- where the two-story addition now is in

place and the screen porch is behind this.

Q.    So this photograph predates your site visit, correct?

A.    That's correct.

Q.    And do you see at the top of the main house a dormer off of the back of the house?

A.    I do see one.  I can't tell you how far across it goes.

Q.    But this photograph shows there was a dormer on the third story connected to the attic, correct?

A.    There was a dormer, yes, there.  That's correct.

Q.    Okay.  And so, therefore, there was an existing dormer on the third story that predated the submission of plans, correct?

A.    It appears to be one.  Obviously, it was reframed because it was included even on the revised drawings as being a new area.

Q.    Well, let's go back to Exhibit 429, and we're going to go to sheet A-6.

So does A-6 have an E pointing to that dormer?  At the very top.

A.    It has an E, yes.

Q.    And "E" means existing, correct?

A.    I would assume that it does in that point, yes.

Q.    And then you see an N with an arrow pointing to the right with the kind of face of that arrow being the addition off the back, correct?

A.    That's correct.

Q.    And the "N" indicates addition, right?

A.    New, yes.

Q.    I'm sorry, new, yes.

A.    Right.

Q.    So, therefore, the engineer represented on the plans that were ultimately approved by the County that the dormer was existing, correct?

A.    That is -- that's correct on this drawing, yes.

Q.    Okay.

MR. COUGHLIN:  I have no further questions, Your Honor.

THE COURT:  Okay.  Redirect?

MR. LYNCH:  Yes.  I'm just looking at these drawings real quick.

REDIRECT EXAMINATION OF JOHN CATLETT

BY MR. LYNCH:

Q.    So if you would like to look at the original drawings relating -- and you were shown sheet 4 of the December drawings.

A.    Correct.

Q.    Do you want to see sheet A-4 of the original permit drawing --

A.    Please.

Q.    -- those are in Exhibit 428.

A.    428 of?

Q.    Elmagraby.

A.    Okay.  I'm there.

Q.     What does this reflect about the roof's slope?

THE COURT:  And what page are you looking at?

MR. LYNCH:  We're looking at sheet A-4.

THE COURT:  Do you have A-4 in front of you?

MR. LYNCH:  The witness may be able to direct me to it, what he was relying on for the {indiscernible} in these rezone drawings.

THE COURT REPORTER:  I'm sorry, Counsel.

MR. LYNCH:  I'm sorry.  The witness may be able to direct us to what sheet he was looking at, what set of drawings.

THE WITNESS:  The original drawings that I looked at were ones that were located on the kitchen countertop, and then subsequently, prior to this approval, there was a -- there was a set of plans that showed a 4 and 12 roof with shingles.  That's what I originally based my comments on.

THE COURT:  Those were drawings that were at the house?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

THE WITNESS:  They were not County-approved drawings, but they were drawings, yes.

BY MR. LYNCH:

Q.     Last question is, do you have any other comments about the nonissuance of the notice of violation in this case?

A.     Yeah.  I specifically had a conversation with the County about that about six months into this.  I had some exchanges

with the inspection supervisor.  Suddenly, whenever I would text him, they started stopping.  I wasn't getting responses.

I contacted the County building official.  We'd agreed to meet in person.  Twice that didn't happen, and then I did make a stop by the office, and my specific purpose was to find out everything that would be needed to complete the job.

So I started in the permitting office and asked for Mr. Amiri.  He wasn't in.  He ended up -- was not in the office, got on the phone with me.  We had a conversation, and I specifically -- he specifically asked me -- he was rather agitated.  He asked me, he said, "What do you think should be -- I mean, what do you want at this point?"

I said, "It's been almost six months.  Why not issue a notice of violation so there is a clear path?"

I had never seen anything that was a written notice that had come to us that said, "Here are some compliance dates, and you don't do this by this, we're going to issue a notice of violation."

There was nothing in any records that it was anything other than supposedly phone calls that were going back and forth between the two.

Q.    And what was the rough timeframe of that conversation with Mr. Amiri?

A.    That would have been in March of 2020.  And then I went from that office, I went to the planning office and spoke with

folks there about what the ramifications were for that corridor protection area.

I had recorded my entire thing because I'm terrible about memory and I'm not good at making notes, so I recorded everything from beginning to end during that time period just so I could go back and make reference for myself.  So ...

Q.    Just so we're clear, you know, your original report -- well, strike that question.

MR. LYNCH:  I have no further questions.

THE COURT:  Okay.  Can Mr. Catlett be excused?

All right.  You're excused with our thanks, sir.

THE WITNESS:  Thank you, sir.

THE COURT:  Please don't discuss the testimony you've given with anyone until our trial is over, all right?

THE WITNESS:  All right, sir.

THE COURT:  All right.  You have a good afternoon.

THE WITNESS:  You, too.

THE COURT:  All right.  Next witness.

MR. COUGHLIN:  Your Honor, may I move some exhibits in that I did not do at the time of John Harrell's cross-examination?

THE COURT:  Yeah.  Yes.

MR. COUGHLIN:  Thank you, Your Honor.

THE COURT:  Mr. Lynch, do you want to get your next witness while that's happening?

MR. COUGHLIN:  So it would be Plaintiffs' Exhibit 1028. Was that --

THE COURT:  Is there any objection to that?

MR. COUGHLIN:  Has that been moved in yet?

THE COURT:  I don't know.

MR. COUGHLIN:  It was moved in.  Okay.  Defendant's Exhibit 35.

THE COURTROOM CLERK:  That was not.

MR. COUGHLIN:  That was not.  I would like to move that in.

THE COURT:  Any objection to 35?  What is it?

MR. LYNCH:  I actually don't have the exhibit.

THE COURT:  So let's step back.  Confer, after we finish here, about the additional exhibits you want admitted in with Mr. Lynch and with Ms. Miller, okay?

MR. COUGHLIN:  And then make a motion --

THE COURT:  And then we'll bring it --

MR. COUGHLIN:  Bring it tomorrow morning.

THE COURT:  Yeah, we'll do it tomorrow morning.

MR. COUGHLIN:  Okay.  Fine, Your Honor.

MR. LYNCH:  Ms. Brown is going to be handling this -- examination of this witness.

THE COURT:  Okay.

MR. LYNCH:  I know what's coming, and I want to go back to the demonstrative ruling.

THE COURT:  I'm sorry?

MR. LYNCH:  I would like to go back to the ruling about using the expert reports as demonstratives.

THE COURT:  I told you you can use the reports to refresh a witness's recollection, and you can use the demonstratives in it, and if you want someone just to testify from their report, then I'm not going to allow that.  I want them to testify from their memory, right?

MR. LYNCH:  Yeah.

THE COURT:  I mean, so that's -- I'm not going to change my ruling.  I don't understand why you would think that I would do something differently.  You know, I looked at the report from Mr. Catlett.  He testified to everything that is in his report.  If you want to move to admit the report now, then -- but that's the way we're going to go.

MR. LYNCH:  Okay.

THE COURT:  All right.

(MATTHEW FURLONG, PLAINTIFFS' WITNESS, SWORN)

THE COURT:  Those aren't going to fit up there, so why don't you leave them to the side there, please, sir.

What are those?  What's in the boxes?

THE WITNESS:  Plaintiffs' exhibits and rebuttal reports, expert report.

THE COURT:  All right.  Please, go ahead and have a seat.

MR. LYNCH:  I'm sorry, one more -- she didn't hear -- we

didn't know before Ms. Brown came here how the Court would approach things like the résumé and qualifications and the report, so we're just catching up a little bit here, Your Honor.

THE COURT:  Sure.

Good afternoon.  How are you?

MS. BROWN:  Good afternoon, Your Honor.

THE COURT:  Good.  So what I've said is I don't want to go over the CVS.  If they have a résumé, a CV, then we'll just put that in evidence.  Just have them identify it and say it's accurate, and then we'll move into their testimony, okay?

MS. BROWN:  Okay.

THE COURT:  Please, tell us your name, sir.

THE WITNESS:  Matthew Furlong.

THE COURT:  Okay.  How do you spell your last flame?

THE WITNESS:  F-U-R-L-O-N-G.

THE COURT:  All right.

MS. BROWN:  I'm sorry, Your Honor, just so I'm clear, you want us to go through his entire résumé?  Should I do an abbreviated version of his --

THE COURT:  No, I -- I'm sorry.  I don't want you to go through it at all.

MS. BROWN:  Okay.

THE COURT:  I want you to have Mr. Furlong identify it --

MS. BROWN:  Okay.

THE COURT:  -- and say, "This is my résumé, and it's

accurate," or "It was accurate six months ago," and then we'll move into his testimony.

MS. BROWN:  Okay.  Understood.

THE COURT:  Great.

DIRECT EXAMINATION OF MATTHEW FURLONG

BY MS. BROWN:

Q.    Mr. Furlong, can you --

MS. BROWN:  Oh, and did we give the binders back to him?

My apologies, Your Honor.

(Brief pause in proceedings.)

MS. BROWN:  I have one more housekeeping matter, Your Honor --

THE COURT:  Sure.

MS. BROWN:  -- that I would like to ask you about.  There are numerous photos in Mr. Furlong's report, each of which is a Trial Exhibit.  I was going to run through those after we start his testimony and seek to admit them into evidence.  None of them have been objected to.  I do have hard copies of them, as well, in the binders I just provided, and I have a chart in case -- everyone can follow along.

THE COURT:  Okay.  I'm more than happy to have you go through them, and, you know, they -- numbers 60 through 75, and you want Mr. Furlong just to go through them and ask him whether he reviewed them in preparation of his report?

MS. BROWN:  Yes, that's what I was planning on doing.

THE COURT:  You can do it.

MS. BROWN:  I thought it would be more efficient.

THE COURT:  Yeah, just do it just like that.  That would be fine.

(Brief pause in proceedings.)

MS. BROWN:  I'd like to look at page 217 to 221 of Exhibit 58, please.

BY MS. BROWN:

Q.    Mr. Furlong, can you tell me what that document is?

A.    This is a copy of my CV from 2020, when the report was written.

Q.    Okay.  And have there been any updates to your CV?

A.    Yes, I've taken continuing education classes, manufacture installation trainings.  I've testified in additional court proceedings and arbitrations and also received a promotion with my current employer, The Falcon Group.

MS. BROWN:  Your Honor, I would like to move pages 217 to 221 of Exhibit 58 into evidence as Mr. Furlong's CV.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  All right.  Proceed.

MS. BROWN:  Thank you.

THE COURT:  Ms. Brown, just so I understand this, photos in Mr. Furlong's report, there's a lot of them, and are you going to go over them during the course of the direct examination and

by identifying specific photos that you want him to look at?

MS. BROWN:  The majority of the photos, yes, we're going to go over, but we are, in the interest of time, skipping some of the sections in his report.  It's very voluminous.

THE COURT:  Do you have a copy of this -- I don't want you to go over them twice, is what I don't want to have happen, so -- all right.  So maybe what I need to understand is -- you're going to ask him about a subject, and you're going to go, "Did you look at photographs that are relevant to this subject of your report?"

MS. BROWN:  I was going to ask him if he has -- part of what he did was he documented his findings, his observations, by taking photos.

THE COURT:  Right.

MS. BROWN:  These are those photos.

THE COURT:  Okay.  All right, then.  Start his substantive testimony and then ask him whether he took photos and if they're -- you know, what exhibits they are, and have him quickly review them and go from there.

MS. BROWN:  Okay.  Thank you, Your Honor.

THE COURT:  Yes.

BY MS. BROWN:

Q.    Mr. Furlong, how and when did you come to know John and Dawn Harrell?

A.    In December 2019, they contacted me through my Website.

Q.    And what if -- and why did they contact you?

A.     They expressed potential concerns with the renovation they had at their property, and they wanted a third-party opinion consultant to look at the property and provide opinions on what was observed.

Q.     And have you -- what reports, if any, have you prepared in connection with this case?

A.     I've prepared two final reports.

MS. BROWN:  And may I have Exhibit 58 up on the screen. Can I have page 1 of that document, please.

BY MS. BROWN:

Q.     Can you tell me what this document is, Mr. Furlong?

A.     That's my opening expert report.

Q.     And can we take a look at Exhibit 59 as well?

A.     Okay.

Q.     And can you tell me what this document is?

A.     This is my rebuttal report in response to defendant's experts.

Q.     And if we go to page 216 of Exhibit 58, where in the report do you address the materials you considered in preparing your report?

A.     On page 216 in Exhibit A.

Q.     Okay.

MS. BROWN:  And Exhibit 59, if we could go back to that document, please and turn to page 5.

BY MS. BROWN:

**Q.**    Where do you address the materials you considered in preparing your rebuttal report?

**A.**    On page 5 in subpart 2.

**Q.**    And Mr. Furlong, how many times have you visited the property?

**A.**    Nine times.

MS. BROWN:  Go ahead and -- are we on page -- would we go to page 1 of Exhibit 58, please.

BY MS. BROWN:

**Q.**    When were the first times you visited the property?

**A.**    December 5th and December 12th, 2019.

**Q.**    What other dates do you recall that you visited the property?

**A.**    In January 2020; again in May of the same year, twice in that month; again in June; again in October; and again in December 2020.

**Q.**    Okay.  And what site visits did you perform after December of 2020?

**A.**    I was there last week on July 6th.

**Q.**    And what was the purpose of that visit?

**A.**    Just to see if anything at the property has changed since my last site visit, and to confirm if some of the statements in Macdonald's reports were accurate about items being completed.

**Q.**    Okay.  And the site visits in 2019 and 2020 in general, what were the purpose of those visits?

A.      In 2019, that was the bulk of the inspection, what the report is generally based on, and then the subsequent site visits were just follow-up inspections and meeting other experts there.

Q.      So, based on your site visit last week on July 6th of 2022.  What changes have occurred to the condition of the property compared to the conditions that are reflected in your report?

A.      The stairs up to the master bedroom have been demolished, the steel staircase in the carriage house has been demolished. A bathroom tub has been removed.  Other than that, everything appeared pretty much generally the same.

Q.      And how did you conduct your inspections to prepare your report?

A.      I performed these inspections the same way at every job site.  I start up in the attic, I work my way down, and I go out to the exterior.  I take photos and document my findings along the way.

Q.      And what are you looking for when you're performing these inspections?

A.      I inspect for code violations, other defects, nonconformities, conformance to the approved plans, industry standards, quality of work.

Q.      Okay.  And about how many code violations and defects did you identify?

A.      Approximately 100.

Q.      In your experience, is it typical to see that many issues at one property?

A.      This is excessive.

Q.      Even in a house or a property where the work is disputed?

A.      Yes.  I've inspected homes where work was disputed in homes three times this size that did not have this excessive number of violations and nonconformities.

        MS. BROWN:  Let's look at page 10 of Exhibit 58, please.

BY MS. BROWN:

Q.      Can you tell me what your inspections entailed?

A.      So the inspections used -- when I do my inspections, I bring a number of tools with me, such as a thermal imaging camera, GCIF [sic] tester, ground pulse circuit interrupter tester --

        THE COURT REPORTER:  Just slow down, please, a little bit for me.

        THE COURT:  Just slow down just a little bit for him.

        THE WITNESS:  Yep.  Voltmeters, laser level, construction level, tape measure, other basic hand tools.  And I use those as part of my inspection process.

BY MS. BROWN:

Q.      And what -- what destructive testing did you perform?

A.      Very minimally destructive testing at this property, open up just a couple of areas of drywall, very small corners.

Q.    And why did you limit the destructive testing?

A.    We didn't want to destroy the house, and also, as part of this inspection and while I was generating the report, at that time it was approximately 200 pages of nonconformities and didn't feel the need to continue to dig farther to find more defects.

Q.    So I don't mean to beat the dead horse here, but other than the minimally destructive testing that we just discussed what inspections did you perform of concealed areas at the property?

A.    None.

Q.    Okay.  And how did you document your investigations?

A.    Visual observations, photographs, physical measurements.

Q.    Okay.  And the photographs, how did you use those?

A.    I selected certain photographs and imported them into my report to show the nonconformity or the code violation as essentially an exhibit in the report.

        MS. BROWN:  Your Honor, as discussed earlier, I would like to admit some exhibits.  These are photos and it's a fairly lengthy list, so I'm going to read through it and afterwards I'm going to ask Mr. Furlong some questions and give opposing counsel an opportunity to object.

        THE COURT:  Yeah.  Have you gone over these exhibits?

        MR. COUGHLIN:  Your Honor, we didn't object to any of the photographs that are on this list, so we can move things along

and have him and have him -- he can discuss them.

THE COURT:  All right.  Then they're received, and you may discuss those specific photographs you would like to.

MS. BROWN:  Thank you.

(Plaintiffs' Exhibits 61 through 80, 84 through 129, 131 through 136, 140 to 141, 143, 145 through 154, 156 through 162, 165 to 187, 188 to 195.  197, 200 to 208, 211 to 222, 223, 225 to 226, 229, 231 to 232, 237 to 255, 257 to 261, 263 to 267, 269 to 273, 276, 279 to 281, 283, 286 to 308, 312 to 323, 325 to 344, 346 through 354, 356 through 369, 371 to 404, and 406 admitted into the record.)

MR. LYNCH:  Should I give a list of those to the court reporter so --

THE COURT:  Yes.

MS. BROWN:  This is the list that I have.

BY MS. BROWN:

Q.    So, Mr. Furlong, these exhibits -- I'm just going to read through the list, and I'm still going to ask you questions even though they're admitted.  But Exhibits 61 through 80, 84 through 129, 131 through 136, 140 to 141, 143, 145 through 154, 156 through 162, 165 to 187, 188 to 195.  197, 200 to 208, 211 to 222, 223, 225 to 226, 229, 231 to 232, 237 to 255, 257 to 261, 263 to 267, 269 to 270 -- I'm sorry, 273, 276, 279 to 281, 283, 286 to 308, 312 to 323, 325 to 344, 346 through 354, 356 through 369, 371 to 404, and 406.

What are these documents?

A.    These are the exhibits in the report.

Q.    Okay.  And who took these photos?

A.    I did.

Q.    All right.  Let's get into your opinions.  What is your overall opinion of the work at the property?

A.    Substantially deficient, numerous code violation, several nonconformities, does not conform to the approved plans.

Q.    And what is your opinion as to whether the home is safe?

A.    In my opinion the home is not safe.

Q.    Can you explain generally what kind of life safety hazards you observed?

A.    Several live and unsecured electrical cables were found. There's tripping hazards, there's fall hazards from the lack of guardrail, missing handrails.  There's life safety issues with the drywall ceiling in the garage and the HV systems with that same place, as well as children's bed frame was broken, and there was in the front a gas lantern post which had water supply connections connected to the gas supply lines.

Q.    What is your opinion as to whether the home is fit for habitation?

A.    My opinion is it's not fit for habitation.

Q.    Based on your experience and what you know about Mr. Deluca and his experience and qualifications, to what extent do you think Mr. Deluca knew or should have known that the work

was in violation of Virginia building code and industry standards?

MR. COUGHLIN:  Objection, Your Honor, calls for a speculative response.

THE COURT:  Overruled.

MS. BROWN:  Thank you.

THE COURT:  Well, lay a foundation.  Does he --

BY MS. BROWN:

Q.    Mr. Furlong, what is your --

THE COURT:  -- know?

MS. BROWN:  I'm sorry, I didn't mean to cut you off.

THE COURT:  Go ahead.  Ask him about what he knows about Mr. Deluca and the work he's done in the past.

BY MS. BROWN:

Q.    Mr. Furlong, what -- can you explain what you know about Mr. Deluca and his experience as a contractor?

A.    According to the Virginia DPR Website, he's been a licensed contractor since 2006.  According to his Website, he has over 20 years of construction experience.  There's been publications and articles written about him and his projects that are in the media that I've researched and reviewed.

THE COURT:  All right.  You may answer the question.

BY MS. BROWN:

Q.    So, based on your experience and what you know about Mr. Deluca and his experience and qualifications, to what extent

do you think Mr. Deluca knew or should have known that the work was in violation of Virginia building code and industry standards?

A.     Based on the length he's been a licensed contractor and his experience, he should have known that code violations and nonconformities to this extent existed.  It was -- it should also be noted that, even someone with minimal construction experience would be able to point out some of these most egregious code violations and nonconformities which have been observed and documented.

Q.     And what is your opinion of work in concealed spaces that you did not inspect?

A.     There's a highly likely probability that if destructive investigation --

MR. COUGHLIN:  Your Honor, objection.  This is speculative.

THE COURT:  Sustained.

BY MS. BROWN:

Q.     What concerns do you have -- about other code violations and deficiencies do you have at the property that are not documented in your report?

A.     Based on the number --

MR. COUGHLIN:  Objection.

THE COURT:  Hold on.  Based on his observations or -- lay a foundation as to why that's not speculation as well.

MR. COUGHLIN:  Sorry to interrupt, Your Honor.  The actual objection, as well, is that if it's not in his report then it wasn't disclosed to us, so it had to be disclosed --

MS. BROWN:  His opinion is --

MR. COUGHLIN:  -- long ago.

MS. BROWN:  -- in his report.

MR. COUGHLIN:  But you asked for observations and opinions not in his report.

THE COURT:  Don't testify to anything that's not in his report, and don't speculate, okay?

So can you answer that question without speculating?

THE WITNESS:  I do opine on her question in my conclusion of the report.  It's already been stated.

BY MS. BROWN:

Q.    Where in your report is that statement, Mr. Furlong?

A.    The conclusion, which is page 214 of the report.

Q.    And what paragraph number?

A.    The seventh paragraph.

Q.    So based on the code -- the conditions of the property that you observed, what would you anticipate would be found if additional destructive testing would be found?

MR. COUGHLIN:  Objection, Your Honor.  It's the same question that you just sustained the objection to.

THE COURT:  Yeah.

BY MS. BROWN:

Q.      Did you recommend to the Harrells that additional destructive testing be --

THE COURT:  Don't -- hold on.  Don't ask another question when there's an objection that's pending.

MS. BROWN:  Okay.  All right.

THE COURT:  You say that this is based on a reasonable degree of certainty.  How can you say that when you didn't do the actual destructive testing that was performed in these concealed spaces?  I mean, what's your basis?

THE WITNESS:  Yeah.  It's based on my experience in similar situations where there's been a number of visual code violations that you can observe, and when we have performed destructive testing, when I have performed destructive testing, generally we always find more concealed code violations.  Additionally, there's also --

THE COURT:  Give me an example.

THE WITNESS:  Well, I can use this house as an example.  So the County required that Mr. Deluca open up a ceiling in the back dining room next to the chimney at this residence because they wanted to inspect the framing around the chimney.  In doing so, it revealed that there was these electrical connections that were simply taped together, live, unsecured cables, not in boxes, concealed in these concealed spaces at his own property.  So that's why I feel that it is highly probable that if destructive testing were to be performed, we would find more of these

conditions.

THE COURT:  All right.  He's answered your question.  I'll allow it.

And you may cross-examine him on it.

MS. BROWN:  Thank you, Your Honor.

BY MS. BROWN:

Q.    Mr. Furlong, what building code applies to this project?

A.    Virginia Uniform Statewide Building Code.

Q.    And how does the fact that the work was not new construction but renovations and remodeling impact the applicability of the Virginia code?

A.    It still applies.

Q.    In general, what is the intent of the Uniform Statewide Building Code?

A.    It's to protect the health, safety, and welfare of the residents.

Q.    I want to -- in the pocket of everyone's -- in this binder that I handed out, there is a chart.  I would like for -- Mr. Furlong, can you pull that out.  What is this document?

A.    This is a portion of the report from Mr. Macdonald.

Q.    And can you explain how this chart correlates to your report?

A.    In the first column, middle of this chart, it shows "Furlong Report."  In the second column, these are my report sections that generally correspond with my report sections.

Q.     And why do you say "generally correspond"?

A.     There's a couple of typos and mistakes in his charting here.  It's generally close.

Q.     Could you provide an example of one of those discrepancies?

A.     For example, in the middle of this "9.1, laundry room receptacle," it's supposed to be 9.10.

Q.     Thank you.  Now, earlier you testified that you identified about a hundred code violations and deficiencies.

       According to this chart, how many of those items does Mr. McDonald agree are nonconforming to code or require correction?

A.     At least 75.

Q.     Let's talk about the electrical deficiencies and turn to page 5 of Exhibit 58 -- I'm sorry, page 15.

       THE COURT:  15?

       MR. LYNCH:  15.

       THE COURT:  And we'll just finish this section and then we'll end for today, okay?

       MS. BROWN:  Okay.

BY MS. BROWN:

Q.     Mr. Furlong, how, if at all, does National Electric [sic] Code matter in Virginia?

A.     It's been incorporated by reference into the Virginia Uniform Statewide Building Code and has been adopted in all 50

states.

Q.   And in the -- with regard to the electrical work at the property, about how many code violations did you observe?

A.   Approximately 39.

Q.   And turning back to Mr. McDonald's chart, about how many of those electrical code violations you identified did Mr. Macdonald agree either need to be corrected and/or are nonconforming to code?

A.   All of them with the exception of two.

Q.   And which ones were those?

A.   "9.10, laundry room receptacle," and "9.20," exterior light.

Q.   Okay.  And --

MS. BROWN:  Your Honor, I just want to clarify your instructions.  So I was going to go into some of the examples of the electrical code --

THE COURT:  That's fine.

MS. BROWN:  Okay.

BY MS. BROWN:

Q.   Let's look at Section 9.1.  This is on page 15.  What is the issue with this item, Mr. Furlong?

A.   These are unsecured, unsupported, and live cables that had no wire caps on them, were not installed in the box, they were live when I went back into the attic and tested these. These are in violation of 334.30, and 300.15 of the National

Electrical Code.

Q.    And are there any safety issues with the way these wires -- the cables and wires are installed?

A.    There's a potential of arcing, which can also result in structure fires, worst-case scenario, but then there's also the possibility of electrical shocks to someone, as well as when cabinets and other fixtures in the building are being hung, fasteners can penetrate these unsecured cables.

Q.    And what can you tell me about whether you observed similar conditions in other locations at the property?

A.    Yes, I did.

Q.    Let's go to page 22 of this report.  This is Section 9.7. And what's the issue here?

A.    This is the same condition and same code violation.

Q.    And who removed these panels shown in the photo at the top left?

A.    This is a ceiling that, it's my understanding, the County made Mr. Deluca remove so they can inspect the framing around the chimney.

Q.    And let's go to page 35 of your -- of Exhibit 58, which is Section 9.19.  And what's the issue here?

A.    Unsecured and live cables were found in the crawl space, same code violations.

Q.    Page 42?

THE COURT:  Where were these crawl space wirings?  Where

was this found, do you recall?

THE WITNESS:  Throughout the crawl space.  I found one cable along the perimeter band board of the crawl space, and then there was an in-fill window where this window got filled in with drywall.  It's shown in -- you can kind of see it on page 35. It's the top left photo.  This was an existing window well.

THE COURT:  Okay.  Is that main -- this is all main house?

THE WITNESS:  Yes.

BY MS. BROWN:

Q.    Okay.  Let's go to page 42, Section 9.23 of your report. Can you describe what is shown here?

A.    And in a separate crawl space underneath of the sunroom of the main house, unsecured and unsupported cables.

Q.    And one more.  Page 302.  I'm sorry.  Page 178.  What is the issue here?

A.    Same condition and same code violations.

Q.    And these -- were these -- where were these photos taken generally?

A.    On page 178.  These were taken in the master bedroom.

Q.    Let's go to page 16 of your report.  This is 9.2.  Can you explain what the issue is with this item?

A.    This box installed in the ceiling is not rated to support luminaires in ceilings.  This is in violation of 314.27 of the National Electrical Code.

Q.    And what can you tell me about whether you observed a

similar condition in other locations of the property?

A.    Yes, I did.

Q.    Please turn to page 46.  Mr. Furlong, can you explain the issue shown on page 46.

A.    Same condition and same code violation in the garage.

Q.    Are there any safety issues with the outlet box that's installed in the ceiling?

A.    The manufacturer's installation instructions specifically state that it's not rated for fire resistance in ceilings. Furthermore, there's a potential that this type of box can collapse the drywall ceiling due to not having a required weight rating on it.

Q.    Let's go to page 19 of your report.  I apologize.  18. And what is the issue with this item?

A.    These are concealed light housings that were found in the bedroom ceilings which were intentionally nutted and taped over with drywall compound.  This is in violation of 314.29 of the National Electrical Code.

Q.    In what bedroom were these found?

A.    The second floor kids' bedroom next to their bed.

Q.    I'm sorry, what did you say?

A.    Next to their bed.

Q.    Okay.  Let's look at Section 9.4, page 19, of your report.  What is the issue with this item?

A.    Several boxes were recessed behind combustible materials.

This is in violation of 314.20.

Q.    And what, if any, life safety issues are there with how these boxes are installed?

A.    It's required that these boxes be flush to the combustible material or stick past from it.  The reason behind -- or the intent behind the code is in the event of an arcing or device fire inside of the box, you want it to be protected from the combustible materials and forward of that and not recessed behind it.

Q.    And what is the material surrounding the box on the wall there?

A.    In these three photos, shown on page 19, is wood.

Q.    Okay.  Let's go to the next page, page 20, Section 9.5. What's the issue of this item?

A.    The receptacle for the dishwasher is missing required ground-fault circuit interrupter protection.

Q.    And what is the acronym for ground-fault circuit interrupter?

A.    GFCI.

Q.    Thank you.  And what is the purpose of GFCI protection?

A.    It's for personal protection and helps prevent against shock.  This condition is in violation of 210.8 of the National Electrical Code.

Q.    And what can you tell me about whether you observed similar conditions in other locations at the property?

A.    Yes, I did.

Q.    Let's go to page 23.  What is the issue with this item?

A.    The outdoor receptacles were missing required GFCI, also in violation of the same electrical code.

Q.    And let's go to page 25 of your report.  And what issue is shown there?

A.    This is a receptacle in the laundry room also missing required GFCI, same code violation.

Q.    Page 40.  What issue is shown there?

A.    Receptacles in the garage missing required GFCI protection, also in violation of the same code.

Q.    And what is this yellow tool shown in the photos on page 40?

A.    It is a GFCI tester.

Q.    And how did you use that?

A.    You plug it into the receptacle and there's a button on top which would trip the GFCI, if there is one that exists.

Q.    Okay.  Let's go to page 24.  It's Section 9.9.  What's the issue with this item?

A.    The new outdoor receptacles, none of them were weather-resistant type rating.  This is in violation of 406.9 of the National Electrical Code.

      THE COURT:  Ms. Brown, why don't we call it an evening at this stage, and we'll pick back up tomorrow at 9:00.

      So we'll go all day Thursday and -- you'll go all day

tomorrow, and we'll go all day Thursday, if necessary.  Friday, we've got a lot going on, so we won't have court on Friday, but we can come back on Monday, if necessary.  So let's put that in your planner, but we'll finish the testimony in the case either by the end of Thursday or we'll go over into next week.  All right.

All right.  Anything before we recess for tonight?  Anything else?

Okay.  Then we'll continue with your testimony tomorrow, Mr. Furlong.

We're in recess.

(Proceedings adjourned at 5:52 p.m.)


**C E R T I F I C A T E**


I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Scott L. Wallace                     6/2/22
----------------------------     ----------------
**Scott L. Wallace, RDR, CRR            Date**
   **Official Court Reporter**