UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **JOHN E. HARRELL,** | ) |
| | ) |
| **et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) Civil Action |
| | ) No. 1:20-0087-LO-MSN |
| **v.** | ) |
| | ) July 13, 2022 |
| **DOUGLAS M. DELUCA,** | ) 9:00 a.m. |
| | ) |
| **et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**VOLUME 3 (Pages 473 - 701)**
*TRANSCRIPT OF BENCH TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE LIAM O'GRADY,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the Plaintiffs:      **Thomas Ryan Lynch, Esq.**
                         Bradley Arant Boult Cummings, LLP
                         (DC)
                         1615 L Street, N.W.
                         Suite 1350
                         Washington, DC 20036
                         202-719-8228
                         Fax: 202-719-8328
                         E-mail: Tlynch@babc.com

                         **Lee-Ann Christine Brown, Esq.**
                         Bradley Arant Boult Cummings LLP (DC)
                         1615 L Street, N.W.
                         Suite 1350
                         Washington, DC 20036
                         202-393-7150
                         Fax: 202-719-8312
                         E-mail: Labrown@bradley.com

*Scott L. Wallace, RDR, CRR*
Official Court Reporter

APPEARANCES:   (Cont.)

For the Defendants:        **Michael John Coughlin, Esq.**
                          Walsh Colucci Lubeley & Walsh PC
                          4310 Prince William Parkway
                          Suite 300
                          Prince William, VA 22192
                          703-680-4664
                          Fax: 703-680-2161
                          E-mail:
                          Mcoughlin@pw.thelandlawyers.com


For the Defendants:        **Eugene A. Burcher, Esq.**
                          Walsh, Colucci, Lubeley & Walsh PC
                          4310 Prince William Parkway
                          Suite 300
                          Prince William, VA 22192
                          703-680-4664
                          Fax: 703-680-2161
                          E-mail: Eaburcher@thelandlawyers.com


Court Reporter:            **Scott L. Wallace, RDR, RMR, CRR**
                          Official Court Reporter
                          United States District Court
                          401 Courthouse Square
                          Alexandria, VA 2231-5798
                          202-277-3739
                          scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
Official Court Reporter

## C O N T E N T S

**EXAMINATIONS**                                                        **Page**

CONTINUED DIRECT EXAMINATION OF MATTHEW FURLONG          479
BY MS. BROWN
CROSS-EXAMINATION OF MATTHEW FURLONG                     569
BY MR. COUGHLIN
REDIRECT EXAMINATION OF MATTHEW FURLONG                  587
BY MS. BROWN

DIRECT EXAMINATION OF MATTHEW BOWE                       592
BY MR. LYNCH
CROSS-EXAMINATION OF MATTHEW BOWE                        619
BY MR. COUGHLIN
REDIRECT EXAMINATION OF MATTHEW BOWE                     640
BY MR. LYNCH

DIRECT EXAMINATION OF BRENDAN MUHA                       653
BY MR. LYNCH
CROSS-EXAMINATION OF BRENDAN MUHA                        691
BY MR. BURCHER

## **EXHIBITS**

Plaintiffs' Exhibit 137 admitted                        491

Plaintiffs' Exhibit 654 admitted                        495

Plaintiffs' Exhibit 235 admitted                        500

Plaintiffs' Exhibits 233 and 234 admitted               501

Plaintiffs' Exhibit 236 admitted                        502

Plaintiffs' Exhibit 282 admitted                        504

Plaintiffs' Exhibit 144 admitted                        508

Plaintiffs' Exhibit 155 admitted                        514

Plaintiffs' Exhibits 163 and 164 admitted               519

Plaintiffs' Exhibits 197, 198 and 199 admitted          523

Plaintiffs' Exhibit 230 admitted                        528

**EXHIBITS**                                                    **Page**

Plaintiffs' Exhibits 256 and 262 admitted              531

Plaintiffs' Exhibit 268 admitted                       533

Plaintiffs' Exhibits 274 and 275 admitted              534

Plaintiffs' Exhibit 277 admitted                       535

Plaintiffs' Exhibit 278 admitted                       538

Plaintiffs' Exhibit 284 and 285 admitted               540

Plaintiffs' Exhibit 345 admitted                       543

Exhibit 309 admitted                                   562

Plaintiffs' Exhibit 901 admitted                       594

Plaintiffs' Exhibit 902 admitted                       616

Plaintiffs' Exhibit 505, page 6804 admitted            649

**MORNING SESSION, JULY 13, 2022**

(9:04 a.m.)

THE COURTROOM CLERK:  Court calls Civil Case Number 1:20-cv-87, *John E. Harrell, et al. versus Douglas M. Deluca.* This case is on for trial by the Court.

THE COURT:  All right.  Good morning to everyone.  I see all counsel and the parties are here, and so let's -- Mr. Furlong, let's come back.

Any preliminary matters?

MR. BURCHER:  Real quick, Your Honor.

THE COURT:  Yes, sir.

MR. BURCHER:  We were trying to go over a schedule. Mr. Lynch and I chatted, and the general plan is for him to finish either today or first thing tomorrow morning.  We do have a couple -- our plan is that we have a couple of nonparty witnesses that we've been trying to deal with scheduling and with the change in Friday, they're not going to be under a subpoena, so we're going to bring those in tomorrow morning and try to knock those out, and then we'll knockout our experts, and then wherever we end with that, then we will roll into Mr. Deluca, and then that will be our final witness.  So that's kind of the general plan --

THE COURT:  All right.

MR. BURCHER:  -- for things, and hopefully we can kind of stick to that.

THE COURT:  You're not sure whether you'll finish Thursday or not or likely it will go into Monday?

MR. BURCHER:  It will definitely go into Monday, Your Honor.

THE COURT:  Into Monday.

MR. BURCHER:  I don't think between Mr. Lynch's cross and my direct there's any way that we can get through all of our experts, those couple of witnesses -- we just have two experts, and they are going through --

I think your experts are going through their rebuttal of our experts in their -- in your case-in-chief.  You don't plan on bringing them in, you know, on Monday.

THE COURT:  Okay.

MR. BURCHER:  So I don't know what your rebuttal case is, but --

MR. LYNCH:  And the rebuttal case, we'll have to see Mr. Deluca's testimony, and --

THE COURT:  Sure.

MR. LYNCH:  -- realistically, if -- it will be short, you know, witnesses on certain things and probably not on Monday.

THE COURT:  Okay.

MR. LYNCH:  Mr. Young, for example --

THE COURT REPORTER:  I'm sorry.  Mr. Who?

MR. LYNCH:  Mr. Young.  He's going to have to be coordinated.  He was originally asked for Friday so that's the

problem.

THE COURT:  All right.  Well, I appreciate your working with the Court, and that sounds fine.  All right.  Then, Mr. Furlong.

Ms. Brown, whenever you're ready.

MS. BROWN:  Your Honor.

CONTINUED DIRECT EXAMINATION OF MATTHEW FURLONG

BY MS. BROWN:

Q.    We stopped on page 26 of Exhibit 58.  Mr. Furlong, do you have that page open?

A.    Yes.

Q.    This is Section 9.11 of your report, "Laundry room receptacles."

What's the issue with this item?

A.    The receptacle installed in the laundry room is not a tamper-resistant type.  And this is in violation of 406.12 of the National Electrical Code.

Additionally, this receptacle is rated for 20 amps, and is on a 15-amp circuit, and that is in violation of 210.21 of the National Electrical Code.

Q.    Why is it important to have tamper-resistant type receptacles?

A.    It helps prevent foreign objects from being inserted which could become energized by electricity.  It's really there for safety of children, personal safety reasons.

Q.      Thank you.

        MS. BROWN:  And for the record, on page 26 of Exhibit 58, the photo on the top left is Exhibit 64.  The photo on the top right is Exhibit 63.  They've both been admitted into evidence.

BY MS. BROWN:

Q.      Let's go next to page 27 of your report.  This is "Drywall opening around boxes."

        What is the issue with this item?

A.      Throughout the house and property, the openings around these boxes are in excess of 1/8 of an inch, which is a code requirement.  This is in violation of 312.4 of the National Electrical Code.

Q.      Okay.

        MS. BROWN:  And for the record, the photos on page 27 of Exhibit 58, the top left is Exhibit 66, and the one on the right is Exhibit 65.  They both have been admitted into evidence.

BY MS. BROWN:

Q.      We're going to skip 9.13 and 9.14 in the interest of time, and we're going to move on to Section 9.15 on page 30, which is "Lighting control."

        Mr. Furlong, what's the issue with this item?

A.      The top of the stair landing is missing a lighting control to control lighting at the top and bottom of each floor. This is in violation of 210.70 of the National Electrical Code.

        MS. BROWN:  And for the record, the photo on page 30 of

Exhibit 58 is Exhibit 70.  It's been admitted into evidence.

BY MS. BROWN:

Q.    Let's look at page 31, Mr. Furlong.  This is Section 9.16, "Basement panel working space."

What's the issue with this item?

A.    This water storage tank and expansion tank has been installed in the working space of the service panels in the basement of the main home.  This is in violation of 110.26 of the National Electrical Code.

Q.    Section 9.17 on page 32.  What's the issue with this item?

A.    This is the panel in the detached garage carriage house.  It's the same condition and code violation.

Q.    And what can you tell me about the grounding of this panel?  And while you're doing that, why don't we turn also to page 47 of your report.

A.    The service panel in the garage is missing the required grounding electrode system.  That is in violation of 250.32 of the National Electrical Code.

Q.    And why is it important for the system to be grounded?

A.    It's also for personal safety and protection.

MS. BROWN:  And going back to page 32, the photo on the top left is Exhibit 73, and the photo on the top right is Exhibit 72, and on page 31, the photo is Exhibit 71.  All of those have been admitted into evidence.

BY MS. BROWN:

Q.    Let's go to page 34, please.  This is "Arc-fault protection."  What's the issue with this item, Mr. Furlong?

A.    The main service panel in the house are missing required arc-fault circuit interrupter protection.  This is in violation of 210.12 of the National Electrical Code.

Q.    What is arc-fault protection?

A.    Arc-fault protection provides safety for potential arcing, which helps reduce potential fires in the house.

MS. BROWN:  And for the record, the photo on the top left of page 34 is Exhibit 75.  The photo on the right is Exhibit 74.

BY MS. BROWN:

Q.    What can you tell me about whether there was lack of arc-fault protection in other areas of the property?

A.    Yes, there is.

Q.    Turn to page 41.  This is Section 9.22.  What's the issue with this item?

A.    The service panel in the garage is also missing required arc-fault protection.  It is in violation of the same code.

Additionally, the unused opening at the top in the service panel is in violation of 408.7 of the National Electrical Code.

MS. BROWN:  And for the record, this is Exhibit 90, the photo on page 41.

BY MS. BROWN:

Q.     Let's look at exterior lighting.  Go to page 37.  What's the issue with this item, Mr. Furlong?

A.     This entry/exit door in the screened-in porch is missing required lighting outlet.  This is in violation of 210.70 of the National Electrical Code.

MS. BROWN:  And for the record, this is Exhibit 85.

BY MS. BROWN:

Q.     Moving on to page 38, what's the issue with this item?

A.     It is the same condition and code violation, the entry door of the garage.

MS. BROWN:  And this is Exhibit 86, the photo shown on page 38.

BY MS. BROWN:

Q.     Page 39, what's the issue with this item?

A.     It is the same condition and code violation at the entry door of the exercise room.

MS. BROWN:  And this is Exhibit 87.

BY MS. BROWN:

Q.     And going back to page 37, does the code exclude a screened-in porch entrance as an area that needs a lighting outlet?

A.     No, it does not.

Q.     I'm going to skip service receptacles in the interest of time as well as counter receptacles and mounting screws, and we are going to move on to Section 9.28 on page 47, which is

"Grounding and bonding."  And we've already discussed the issue at the top of the page, though.

Let's talk about the bonding issue, Mr. Furlong.

A.    In the picture of the middle of the page is a gas manifold and gas lines in the basement of the main house.  This condition lacks required bonding and is in violation of 310.1.1 of the International Fuel Gas Code as well as 250.104(B) of the National Electrical Code.

Q.    And what life safety issues are there related to this item?

A.    These gas lines are connected to appliances which are energized through their receptacles, and there's potential life safety hazards of the gas lines becoming energized from those appliances, which can cause house fires and potential explosions.

MS. BROWN:  And the photo on this page is Exhibit 98. It's also been admitted into evidence.

BY MS. BROWN:

Q.    Let's pull out the Macdonald chart, which is in the pocket of everyone's binders.  Look at page 2 of that chart, which references Section 9. -- or, I'm sorry, where is this -- where is the grounding and bonding referenced on this page, Mr. Furlong?

A.    It was one of Mr. Macdonald's typos under 9.27.

Q.    What, if any, response to the comments in Mr. Macdonald's

chart regarding Section 9.28 would you like to make to the Court?

A.      He agrees it's nonconforming with the code and requires remediation.

Q.      We're going to skip Section 9.29 as well as 9.30 in the interest of time.

Mr. Furlong, in your report at page 45, you discuss issues with "Mounting screws."  How difficult or expensive is it to replace mounting schools in these receptacles?

A.      It's not.

Q.      How expensive or difficult is it to install GFCI protection?

A.      It's not difficult.

Q.      And in Section 9.13 on page 28 of your report, you discuss a code violation related to cover plates on receptacles. How difficult or expensive is it to replace those cover plates?

A.      It's not.

Q.      Why did you include mounting screws, cover plates, and GFCI protection if they are items that are not difficult or expensive to replace?

A.      It demonstrates that the most minimum of building codes and industry standards were not followed or adhered to, and that it essentially supports my opinion that with these pervasive number of visual defects, it's highly likely that nonconforming or defective work also exists in concealed areas.

Q.    Would you have included these items in your report if they weren't so pervasive?

A.    No.

Q.    Let's talk about plumbing.  What numerical section in your report addresses plumbing, Mr. Furlong?

A.    Section 10.

Q.    Let's go to page 50 of your report.  I would also like for you to pull out Macdonald chart, page 2.

How many plumbing deficiencies code violations did you identify?

A.    Approximately 15.

Q.    And of those, how many does Mr. Macdonald agree are nonconforming to code and/or require correction?

A.    All of them with the exception of two.

Q.    And which items are those?

A.    "10.12, shut off valve" and "10.16, plumbing incomplete."

Q.    How about 10.6?

A.    Ah, sorry.  All of them with the exception of 3, including "10.6, vent pipe location."

Q.    Let's start at the beginning, "10.1, Protection against physical damage."

What is the issue with this item?

A.    These water supply lines were installed too close to the edge of the stud and, therefore, it requires -- required shield plates to protect from physical damage, and those are missing.

That is in violation of P26O3.2.1 of the Virginia Residential Code.

Q.    Were these pipes in a concealed location?

A.    No.

Q.    What can you tell me about whether this condition existed elsewhere in the property?

A.    Yes, it does.

Q.    Look at page 65.

MS. BROWN:  Oh, and for the record the photos on page 50, the one on the left is Exhibit 115, and the one on the right is Exhibit 116.

BY MS. BROWN:

Q.    Page 65, what is the issue with this item?

A.    The water supply lines for the master shower, same condition and same code violation.

MS. BROWN:  And the photo on this page is Exhibit 123.

BY MS. BROWN:

Q.    We're going to skip Section 10.2 and 10.3 in the interest of time, as well as 10.4, and we are going to move on to Section 10.5, which is on page 54.

Mr. Furlong, what is the issue with this item?

A.    All of the fixtures and toilets on the property were missing required watertight seals at wall and floor locations. This is in violation of P2705.1, number 3, of the Virginia Residential Code.

Q.      What can you tell me about whether this condition existed elsewhere?

A.      Yes, it does.

Q.      Turn to page 66.  Please explain what the issue is with this item.

A.      Same condition and same code violation.

MS. BROWN:  The photo on page 66 is Exhibit 124, and going back to page 54, the photo on the top left is Exhibit 134.  The photo on the top right is Exhibit 135.  The exhibit on the bottom left is Exhibit 132, and on the bottom right is Exhibit 133.  All of those have been admitted into evidence.

BY MS. BROWN:

Q.      Why is it important to seal these plumbing fixtures?

A.      It keeps out the transfer of water out of the walls, out of the floor locations.

Q.      And let's look at Section 10.6 on page 56.

MS. BROWN:  The photo on the top is Exhibit 136.  It's been admitted into evidence.

BY MS. BROWN:

Q.      Mr. Furlong, what's the issue with this item?

A.      The location of this vent terminal is too close to an operable window.  This is in violation of P3103.5 of the Virginia Residential Code.

Q.      And can you explain how the code applies -- how the code language applies to this?

A.      Yeah.   I'll summarize these locations.   So, as long as that vent terminal would have been 4 feet below the window, that would have been acceptable.   If it was 10 feet horizontally away from the window, that would have been acceptable, or 3 feet above the top of the window, that would have also been acceptable.

Q.      Let's go to page 57.   The photo on the top is Exhibit 140, and exhibit -- I'm sorry.

        MS. BROWN:   There is two photos on the bottom here. They're installation instructions, and those are Exhibit 137. They have not been entered into evidence.   I would ask that they be admitted, but I will lay the foundation with Mr. Furlong first.

BY MS. BROWN:

Q.      What's the issue with this item, Mr. Furlong?

A.      The installation of this steam generator for the steam shower in the master bathroom has several nonconformities.   It is undersized for the room volume.   It was not installed with required unions.   It was installed using PVC piping, and is in violation of M1307.1 of the Virginia Residential Code.

Q.      And what does that code section requires?

A.      It requires that appliances be installed according to their manufacturer's installation instructions.

        MS. BROWN:   Let's pull up Exhibit 137 on the screen, please.   That document should also be in your large binders, but

I don't think that you need to pull it up.

BY MS. BROWN:

Q.     What is this document, Mr. Furlong?

A.     The installation instructions for the steam generator.

Q.     And what review of those instructions did you perform?

A.     I reviewed it.

Q.     And how did you determine that the steam generator is undersized?

A.     In the installation instructions they provide design calculations that you complete.  You multiply the length, width, and height of the room to get the volume of the steam shower, and then they ask you to add these additional figures for -- if you have additional glass in the shower, if there's additional height of the shower, then you add essentially another percentage, and that is how I arrived at the required room volume of the steam generator.

Q.     Let's go to page 58 of Exhibit 58, please.  And what is this excerpt here at the top of page 58?

A.     That is the design calculations for the steam generator.

Q.     Okay.  Let's go to Section 10.8, page 59.  What's the issue with this item?

A.     This toilet has been installed too close to the vanity, which requires a minimum of 21 inches between toilets and a wall or vanity.  There is approximately 11 inches which exists, which is the length of a sheet of paper.  This is in violation of

R307.1 of the Virginia Residential Code.  The position and installation also does not conform to the approved plans.

THE COURT:  Ms. Brown, did you want to move in the steam installation instructions?

MS. BROWN:  Yes, sir.

THE COURT:  Okay.  What exhibit is that?

MS. BROWN:  Exhibit 137.

THE COURT:  All right.  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 137 admitted into the record.)

MS. BROWN:  Thank you.

BY MS. BROWN:

Q.    Can you please continue, Mr. Furlong.  The -- how does the condition of the toilet shown on the top of page 59 compare to the approved plans?

A.    It does not conform.

Q.    Okay.

MS. BROWN:  And the photo on the page -- on page 59 is Exhibit 141.

BY MS. BROWN:

Q.    Let's go to Section 10.9 on page 60.  What's the issue with this item?

A.    This bathtub shower stall in the carriage house is missing required diverter valve to change between the tub spout

and shower head, so only one of the fixtures works, and the other cannot without requiring demolition of this wall to change out the thermostatic valve with the diverter valve.  This is in violation of P2705.1 of the Virginia Residential Code, number 4.

MS. BROWN:  And the photo on page 60 is Exhibit 134.

BY MS. BROWN:

Q.    We're going to skip "10.10, Vacuum breaker" in the interest of time, and we're going to go to Section 10.11, which is "PVC primer."

MS. BROWN:  The photo shown there is Exhibit 119.

BY MS. BROWN:

Q.    What's the issue with this item?

A.    The PVC piping in the -- the section of the PVC piping in the crawl space was installed without required primer.  This is in violation of P2905.9.1.3 of the Virginia Residential Code.

THE COURT:  Say that over again, please, the violation.

THE WITNESS:  P2905.9.1.3.  Sorry about that.

BY MS. BROWN:

Q.    That's Virginia Residential Code?

A.    Yes.

Q.    Page 63.  This is "10.12, Non-accessible fixture valve."

MS. BROWN:  And the photo shown is Exhibit 120.

BY MS. BROWN:

Q.    Mr. Furlong, what is the issue with this item?

A.    This water shutoff valve has been installed and partially

concealed behind the drywall for the basement toilet.  This is in violation of P2903.9.3.

Q.   Can you demonstrate or explain where it's going into the drywall there?

A.   I'm sorry, can you repeat the question?

Q.   Will you explain where it's going into the drywall and why that's an issue?

A.   This water supply line to the toilet is a serviceable item and concealed behind the drywall, and in order to get access to that, you would have to damage the building to open up this wall.

Q.   Is this a typical defect that you would see?

A.   This is the first time I've seen a valve behind drywall like this.

Q.   Let's go to the next page, page 64.

MS. BROWN:  The photo on the left is Exhibit 122.  The photo on the right is Exhibit 121.

BY MS. BROWN:

Q.   Mr. Furlong, what's the issue with this item?

A.   These interior wall studs in the second floor bathroom have been notched in excess of 40 percent and is in violation of R602.6 of the Virginia Residential Code.  These pipes are also missing the required steel shield plates for protection and is in violation of P2603.2.1.

Q.   Let's go to page 67, "10.16, Incomplete plumbing - master

bath."

What is the issue with this item?  And before you do that, I'm going to call out the exhibit numbers.

MS. BROWN:  The photo on the top is Exhibit 125, and the photo on the right is Exhibit 126.

A.    So the photo on the left is taken in the master bathroom. This is an alcove where a new bathtub would be installed. However, there's been no plumbing supply or waste lines that are at this location; therefore, this is in violation of P2705.1, number 4, of the Virginia Residential Code.

BY MS. BROWN:

Q.    What are the pipes shown in this photo on the top right, which is Exhibit 126?

A.    That is taken inside of the vanity of the master bathroom, showing incomplete plumbing.

Q.    And what is Exhibit 1- -- pardon me.

MS. BROWN:  Let's pull up Exhibit 654, please.  And can you pull that up in conjunction with 125.  Can you fit them both on the screen?

BY MS. BROWN:

Q.    I would like for you to explain how Exhibit 6 -- first of all, what is Exhibit 654, Mr. Furlong?

A.    That's another angle of the same location with the bathtub pushed in place subsequent to the site visit when this photo was taken.

Q.      Who took that photo?

A.      I did.

Q.      And how does that photo correlate with Exhibit 125?

A.      So it's the same location, and the -- the bathtub was always on-site.  Subsequent, it was just pushed into place, but to say, again, there's no plumbing supply or waste lines available in this location; therefore, demolition of finished walls or flooring would have to be opened to move these plumbing supply waste lines to this bathtub location.

Q.      And what can you tell me about this excerpt from the approved plans at the bottom of page 67?

A.      Right.  So the approved plans show a new bathtub and water fixtures on the left side of this bathtub, which does not exist.

        MS. BROWN:  I'll represent to the Court that this is an excerpt from Exhibit 429, page 11, which is sheet A-4.

        Your Honor, I would like to admit Exhibit 654 into evidence.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No, Your Honor.

        THE COURT:  All right.  It's received.

        (Plaintiffs' Exhibit 654 admitted into the record.)

        MS. BROWN:  Thank you.

BY MS. BROWN:

Q.      Mr. Furlong, on page 53 of your report, you discuss

issues with "Galvanic corrosion" and how the copper pipes were installed.  Is that an issue that is difficult or expensive to repair?

A.    No, it's not.

Q.    In Section 10.2 and 10.3 on pages 51 and 52, this deals with lack of sealant for the annular space between the outside of the pipes and floor openings.

Is that an issue that's difficult or expensive to repair?

A.    No, it's not.

Q.    Why did you include these items, if they're not difficult or expensive to repair?

A.    I have the same opinion about these pervasive items regarding the electrical.  While these are maybe somewhat minor in nature, they're pervasive throughout, and it again shows a complete disregard for minimum building codes and standards in the industry.

Q.    And let's go to page 68 of your report.  What types of violations and deficiencies are addressed in this section?

A.    Generally building code violations.

Q.    And how many defects and Virginia code violations did you identify in this section?

A.    Approximately 44.

Q.    And looking at Macdonald's chart starting on page 2, about how many did Mr. Macdonald agree are nonconforming to code and/or require correction?

A.      All of them with the exception of 11.

Q.      Okay.  Let's go to 11.1.  So we're still on page 68.

        MS. BROWN:  The photo on this page is Exhibit 143.

BY MS. BROWN:

Q.      Mr. Furlong, what's the problem with this item?

A.      These penetrations through the floor-ceiling assembly are missing required fire-stopping.  This is in violation of R302.4.1.2 of the Virginia Residential Code.

Q.      Let's go to page 69.

        MS. BROWN:  I'm going to, in the interest of time, run through the photos to identify them as the trial exhibits.  On 69 we have, at the top left, Exhibit 195; top right, Exhibit 196; the bottom left, Exhibit 191; bottom right, Exhibit 192.

        On page 70, Exhibit 193; page 70, Exhibit 194 at the top. On the bottom left we have Exhibit 189; bottom right, Exhibit 190.

        Page 72 is Exhibit 188, and the excerpt from the approved plans is Exhibit 429, page 9.

BY MS. BROWN:

Q.      Going back to page 69, Mr. Furlong, will you please provide the Court a brief description of the issues you identified with the missing thermal insulation?

A.      On page 69 it shows photos of missing required thermal insulation in the third-floor attic space and ceilings.

        And on page 70, it also shows an inadequate thermal

insulation in the third-floor attic as well.

The approved plans did call for spray foam to be installed in these locations. While it did appear to exist in a small area of the third-floor attic ceilings, it is not installed in these locations of the house. It was further evident by the bottom left photo, when this photo was taken, that there is energy loss in this area, as based on the melting snow/ice on the roof.

Q.    Are you talking about the photo on the bottom of page 191 -- I mean page 69, Exhibit 191?

A.    Yes. On page 71 at the top, the picture is an image of a thermal imaging report generated from a thermal imaging camera?

Q.    Who took that photo?

A.    I did. It shows missing thermal insulation in an exterior wall of the bedroom. This is also one location where I did do minimally destructive testing, I put a small hole into the corner of the drywall to confirm my findings with the thermal imaging camera.

The bottom two photos are taken in the unfinished and unconditioned crawl space. There was missing thermal insulation around the perimeter in the crawl space as well as in the -- below the finished floor.

The following page, on 72, this is a new wall that was in-filled between the finished basement and crawl space. This area is also missing required thermal insulation. These

conditions are all in violation of N1102.2.2, N1102.4, and Table N1102.1.2 of the Virginia Residential Code.

Q.    And what part of the plans spoke to the required insulation?

A.    There is an excerpt from the approved plans regarding the energy efficiency and the thermal insulation, and I don't have that page number of the plans memorized.

Q.    It's Exhibit 429, page 10.

At page 74, what's the issue with this item?  This is Section 11.3.

MS. BROWN:  The photo is Exhibit 221.  I apologize.

BY MS. BROWN:

Q.    Please explain what the issue is.

A.    The air handler unit on the third floor attic space is missing the required drain pan.  This is in violation of M1411.5 of the Virginia Residential Code.

Q.    Section 11.4 on page -- starting on page 75.

MS. BROWN:  I want to walk through the photos quickly. The photo on the top of the page, 75, is Exhibit 240.  The photo on the bottom left, Exhibit 237.  On the right is 238.

On the following page is Exhibit 238.

And we have some excerpts from various manuals.  The one on the top is Exhibit 233, the bottom is Exhibit 234, and the one on page 77 is Exhibit 235.  233 to 235 have not yet been admitted into evidence so I'll request that at the end of his testimony on

this section.

And, I apologize, page 78 is another excerpt from the manual.  That's Exhibit 236, also not yet in evidence.

BY MS. BROWN:

Q.    Mr. Furlong, please explain what the issue is with the HVAC ducts.

A.    On page 75, these are pictures in the third floor attic space showing the installation of flexible ductwork.  The installation is very substandard.  There's excessive bends.  The ductwork is not supported and it's sagging.  It has not been fully stretched.  The barrier is torn and ripped.  Joints are not sealed.

On page 76 at the top, it's a similar condition showing unsupported and sagging ductwork.  This condition has -- will have serious performance effects on the system.

Additionally, the performance standards stated in the air distribution counsel manuals state that no bends should be more than a 1-foot diameter radius.

Q.    And can you -- which excerpt are you referring to?

A.    That is 235 on the top of page 77.

MS. BROWN:  I would like to move that into evidence.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 235 admitted into the record.)

THE WITNESS:  And the conditions are generally in violation of M1601.1 of the Virginia Residential Code, which requires the ductwork to be installed according to the manufacturer's installation instructions, other approved methods and ACCA manual.

BY MS. BROWN:

Q.    And what review of the ACCA manual manufacturer's installation did you perform?

A.    I reviewed them.

Q.    And what are the two excerpts on page 76?

A.    Those are also taken from the ADC installation performance standards.

MS. BROWN:  I would like to move Exhibits 233 and 234 into evidence.

THE COURT:  All right.  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  They're received.

(Plaintiffs' Exhibits 233 and 234 admitted into the record.)

BY MS. BROWN:

Q.    And the excerpt on page 78, Mr. Furlong, what is that?

A.    Also from the ADC manual.

MS. BROWN:  I would like to move that into evidence.

THE COURT:  Any objection.

MR. COUGHLIN:  No, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 236 admitted into the record.)

MS. BROWN:  Thank you.

BY MS. BROWN:

Q.    Besides the violations of code and general industry standards that you just went through with this HVAC system, what is your opinion of this ductwork?

A.    Substandard and nonconforming to any industry standard or standards of workmanship.

Q.    Let's go to 11.5, "Air supply duct" in the "master bathroom shower."

MS. BROWN:  This is on page 79.  The photo shown on this page is Exhibit 241.

The photo on page 80 is Exhibit 242.  They've both been admitted into evidence.

BY MS. BROWN:

Q.    Mr. Furlong, what's the issue with this air supply duct?

A.    This is a functioning air supply duct that has been covered over in the master bathroom steam shower.  The following page, 80, is a picture using a thermal imaging camera that confirms the findings.  This was taken when the heat was running.

This condition, having a duct inside of the master bathroom steam shower is in violation of the manufacturer's installation instructions for the steam generator.

MS. BROWN:  Can we look at Exhibit 282 and pull that up on the screen?

BY MS. BROWN:

Q.    While we do that, let's quickly take a look at page 51 -- 151.  Sorry, wrong page.  I'll just ask the question.

Mr. Furlong what does Virginia Code Section M1307.1 tell you about whether this condition violates code?

A.    Yes, it does.  It's in violation of the manufacturer's installation instructions.

Q.    What does that code section require?

A.    The code section requires that the installation of the appliance or the assembly of a steam shower or -- I should say the code says the appliance or assembly shall conform to the installation instructions.

Q.    And let's look at Exhibit 282, which is up on the screen. It's also on page 51, if you want to -- 151 if you want a closer view of it, Mr. Furlong.  And can you explain how this does not comport to the manufacturer's instructions?

A.    Number 6 states, "No heating, ventilation or air conditioning should be installed inside of the steam room."

MS. BROWN:  I would like to admit Exhibit 282 into evidence, please.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 282 admitted into the record.)

BY MS. BROWN:

Q.    How is this not -- so if we look at paragraph 6 of the steam room guidelines, it says, "No heating, venting, or air conditioning devices should be installed inside of the steam room."

How is this air duct not compliant with that instruction if it's blocked off?

A.    With it blocked off there's still potential for air leakage to get through.  This duct trunk is being pressurized with air from the air handler unit.  It's not a sealed system. So therefore, in the summertime when the air conditioning is running, this duct will have cold-conditioned air running to it. That will interact with the hot tiles in the steam room. There's a high probability of condensation to form inside of this ductwork location, which has the potential for microbial growth to form inside of the ductwork and then potentially circulate throughout the house.

Q.    What needs to be done for this air duct to comply with the manufacturer's intent?

A.    This vent outlet needs to be removed from the steam shower location.  It could either be possibly extended into the master bathroom itself or taken back shorter to the bedroom that's on the other side of the wall, are two options.

Q.    And page 80, what is the photo shown there?

**A.**    A thermal imaging of the ductwork while the heat was on.

**Q.**    And who took that photo?

**A.**    I did.

**Q.**    Let's move on.  We're going to talk about the bathroom exhaust ducts, page 81.

MS. BROWN:  The photo on the top left is Exhibit 245.  The photo on the top right Exhibit 246.  The photo on the bottom is Exhibit 244.

On page 82, Exhibit 243.

BY MS. BROWN:

**Q.**    And, Mr. Furlong, going back to page 81, what is the issue with this item?

**A.**    The photo on the top left, that ductwork connection has been installed in the reverse direction of flow.  It's reverse lapped.  The photo at the top right is an unsealed exhaust duct, and the photo on the bottom shows the exhaust duct from the basement bathroom exhausting into the crawl space.

The following page, 82, at the top, this is a blocked duct from an exhaust, bathroom exhaust in the second floor bathroom.

The picture at the top left of page 81 is in violation of M1601.4.2 "Duct lap" of the Virginia Residential Code.

The bottom photo on page 81, as well as the photo on page 82, is in violation of M1501.1, "Outdoor discharge," of the Virginia Residential Code.  And the photo at the top right of

page 81 is in violation of M1601.4.1, "Joints, seams and connections," of the Virginia Residential Code.

Q.    Page 83, this is Section 11.7 of your report, "Ductwork."

What's the issue with this item?

A.    The bathroom exhaust ductwork in the third floor attic is missing required supports.  It was putting strain on these joints.  The tape was also observed to be torn.  And this is in violation of M1601.4.4 of the Virginia Residential Code.

Q.    Okay.  Let's turn to page --

MS. BROWN:  I'm sorry, I don't recall if I called out the exhibit numbers, so I'm going to do it, in an abundance of caution.  The photo on page 83 is Exhibit 247.

THE COURT:  Okay.

BY MS. BROWN:

Q.    Moving on to page 84, "Stair risers," where were these photos taken in the house?

A.    This is at the top of the main staircase landing on the second floor.  These are the stairs going into the master bedroom.

Q.    And how has the condition of the stair risers in the master bedroom changed since you took these photos?

A.    They've subsequently been demolished.  There's approximately an 18-inch to 24-inch step up now into this master bedroom.  It's still a code violation.  This is in violation of R311.7.5.1 of the Virginia Residential Code.

Q.    And what is your understanding of who removed those stair risers?

A.    Mr. Deluca.

Q.    Let's go to page 86.  This is Section 11.9, "Hood exhaust duct."

      MS. BROWN:  The photo on the left is Exhibit 254.  The photo on the right is Exhibit 254.

BY MS. BROWN:

Q.    Mr. Furlong, what is the issue with this item?

A.    This hood vent has been installed using flexible exhaust duct.  This is in violation of M1503.2, which requires hood vents to be -- hood vent ducts to be constructed of galvanized steel, stainless steel, or copper.  The reason being is the flexible ductwork is a flammable material and, placed over an outdoor grill, could catch fire.

Q.    Section 10.10 on page 87.  This deals with flashing.

      MS. BROWN:  The photo on the top of page 87 is Exhibit 145.  Bottom photo is Exhibit 146.

      On page 88 we have Exhibit 147.

      On page 89, this is an excerpt from a -- the NRCA roofing manual.  That's Exhibit 144.  It has not yet been admitted into evidence, but after Mr. Furlong finishes this section I will request that it be admitted.

BY MS. BROWN:

Q.    Mr. Furlong, going back to page 87, what is the issue

with the flashing here?

A.    At this location of the roof-to-wall intersection, which is at the new mudroom at the side of the house, it's missing required kick-out flashing on each side of this hip roof.

On the following page, 88, at the top shows a picture of missing kick-out flashing at the garage carriage house roof-to-wall intersection as well.  This is in violation of R903.2.1 of the Virginia Residential Code.

Q.    Okay.  And what industry standards did this -- did these conditions violate?

A.    There's a trade organization manual from the National Roofing Contractors Association.  This publication also requires or recommends that kick-out flashing be installed at these locations as well.

Q.    And where is that -- is there an excerpt of that in your report?

A.    On page 89.

MS. BROWN:  Okay.  I'd like to move Exhibit 144 into evidence.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 144 admitted into the record.)

BY MS. BROWN:

Q.    Mr. Furlong, can you explain what kick-out flashing is?

A.     It's an additional piece of flashing that's installed on the sidewall which diverts the water at this location away from the wall and into the gutter.

Q.     Let's go to page 90, 11.11, "Front portico."  What's the issue with this item?

A.     This new steps on the front portico has excessive variations in the stair risers.  This is in violation of R311.7.5.1 of the Virginia Residential Code.

MS. BROWN:  And the photos on page 90, the one at the top left is Exhibit 148.  On the top right is Exhibit 149.  The photo at the bottom is Exhibit 150.

And on page 191 [sic], just in the interest of time, is Exhibit 151.  The photo on page 92 on the top left, again, that's Exhibit 151, and the one on the right is 152.

BY MS. BROWN:

Q.     Now, going back to page 90, Mr. Furlong, and I would like for you to get out Mr. Macdonald's chart and turn to page 2 and look at the bottom of that chart.

What, if any, response to the comments in Macdonald's chart regarding Section 11.11 would you like to make to the Court?

A.     He claims that the front steps are not a path of egress and, therefore, the code doesn't apply.

Q.     Do you agree with that analysis?

A.     No, I do not.

Q.    Why is that?

A.    The code is clear that the variation of risers cannot vary by more than 3/8 of an inch and also the code does the distinguish between stair locations.  Whether it's your basement staircase, a path of egress, your back door or front door, the same code applies.

THE COURT:  And so the -- you can't see the actual measurements here, but the point is that they differ in height beyond the three-quarters of an inch?  Is that the --

THE WITNESS:  Beyond the 3/8 of an inch --

THE COURT:  3/8.

THE WITNESS:  -- allowable, yes.

THE COURT:  Right.  Okay.

MS. BROWN:  And we can pull up a larger photo if you would like to see it.

THE COURT:  No, no, I just wanted an explanation and he's given it.  Thank you.

BY MS. BROWN:

Q.    Let's go to 11.2, "Front portico handrail."  11.12, pardon me.

What's the issue with this item?

A.    The code requires that flights of stairs with four or more risers have handrails, and this meets that condition.  No handrails were installed.  This is in violation of R311.7.8 of the Virginia Residential Code.

Q.    Let's turn to the next page, page 92.  This is Section 11.13, entitled "Guardrails."

What is the issue with this item?

A.    Left and right of the portico are these window wells with an excessive drop-off of more than 30 inches; therefore, a guard is also required at these two locations.  This is in violation of R312.1.1 of the Virginia Residential Code.

Q.    I'd like to turn to Exhibit 998.

MS. BROWN:  My understanding is that this exhibit has already been admitted into evidence.

BY MS. BROWN:

Q.    Look at the first page here.  There's an e-mail from Mr. Deluca dated October 21st, 2019, and that is on Bates page ending in 728.

How does this e-mail -- and I'll give you some time to flip through it, Mr. Furlong, but how does this e-mail impact your conclusion that the front portico violates code?

A.    It supports it.

Q.    And why is that?

A.    This e-mail is from Doug Deluca, and it states that he does intend to repair the risers on the front of the portico, as well as install handrails.

Q.    Okay.  Let's look at Bates page ending in -- well, first of all, let's give some context here.  So the e-mail, what does it read here on the bottom of page 729?

A.      Bottom of 729.  The "Code Related Items"?  Is that what you're referring to?

        MS. BROWN:  I believe this has been admitted into evidence.  Can I just make a representation that Mr. Deluca is explaining his recent visit with the Arlington County Permit and Inspection Department and recapping the meeting in this e-mail?

        THE COURT:  You can represent that, and if counsel disagrees, he can make that argument.

        MR. COUGHLIN:  I don't disagree.

        THE COURT:  Okay.

        MS. BROWN:  Thank you.

BY MS. BROWN:

Q.      Let's go to page 730, Bates ending in 730, and look at paragraph 1, Mr. Furlong.

A.      Okay.

Q.      What is your -- how does that impact whether your opinion that these stairs on the portico were not compliant with code?

A.      It supports it.

Q.      And towards the bottom of that paragraph beginning with, "I discussed your desire to have cover on the window wells as well as having handrails," how does that support your opinion about the requirement for handrails?

A.      It also supports it.

Q.      Okay.  All right.  Moving on.  So let's go to "Back patio."  We're going to go back to page 93.

What's the issue with this item?

A.      On the back patio there's an excessive drop-off of more than 30 inches.  This also requires a guardrail, which is missing.  This is in violation of R312.1.1 of the Virginia Residential Code.

Q.      Following page --

MS. BROWN:  Oh, and I apologize.  The photo on the top left of page 93 is Exhibit 153, and the photo on the right is Exhibit 154.

BY MS. BROWN:

Q.      We're going to move to page 94.  This is 11.15, "Thermal barrier," from your report.

MS. BROWN:  And the photo at the top is Exhibit 156. There's also an excerpt from a manufacturer's manual, which is Exhibit 155, that has not been admitted into evidence.  After Mr. Furlong finishes his testimony, I will request that it's moved into evidence.

BY MS. BROWN:

Q.      Mr. Furlong, please explain the issue with this item.

A.      The photo at the top of the page is exposed polyurethane spray foam in the basement exterior wall.

Being that it's exposed, it is a fire hazard. Polyurethane spray foam is very flammable.  Manufacturers of spray foam require it to be concealed using a thermal barrier as well as the code does.  That is in violation of R316.4 of the

Virginia Residential Code.

Q.    And what is this excerpt from?

A.    It's from spray foam manufacturer's technical document.

MS. BROWN:  I would like to move Exhibit 155 into evidence.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 155 admitted into the record.)

BY MS. BROWN:

Q.    All right.  I would like, before I move on to the next item, to look at Mr. Macdonald's chart on page 3, and 11.15 is up towards the top of that page.

What, if any, response to the comments in Mr. Macdonald's chart regarding the thermal barrier would you like to make to the Court?

A.    He claims that it's now in place; however, based upon my recent site visit last week on July 6th, it's still not existing.

Q.    11.16, "Outdoor deck," page 95.

MS. BROWN:  The photo at the top is Exhibit 161.  The photo on the bottom left is Exhibit 157.  The photo on Exhibit 1 -- I'm sorry, the photo on the bottom right is Exhibit 160.

Page 97, the photo on the top is Exhibit 159.

On page 98, the photo is Exhibit 158.

BY MS. BROWN:

Q.    And Mr. Furlong, can you briefly explain what the issue is with this item?

A.    This is a new deck on the side of the house that was constructed without required County permits or inspections, and there's a multitude of nonconformities and code violations which exists with the construction of this deck.

For example, on the bottom left is a photo showing that the opening in the guard is in excess of what the code allows. The photo to the right on the bottom of page 95 shows improper post-to-beam connections which do not conform to Arlington County technical deck details.

There's a summary of those details on page 96.

Moving on to page 97, at the top, that photo shows an access opening which also does not conform to Arlington County technical deck details.

Moving on to page 98, another photo, that does not conform to typical deck details.  There's excessive space between the bottom rail of the guard and the surface of the deck.  Additionally, the surface-mounted posts do not conform to the typical deck details.

Q.    And Mr. Furlong, can you give a brief summary of what Virginia Residential Code violations there are with the outdoor deck?

A.      These conditions are in violation of R507.7.1, Figure 507.7.1, R312.1.3, and R312.7.5.3 [sic].

Q.      I'm sorry, can you repeat that last one?

A.      R311.7.5.3.

Q.      And how did you know that this was a new deck?

A.      I observed historical photos of the house from a previous listing.  That was when it was sold.

Q.      Page 107 -- I'm sorry, page 100.  And this is Section 11.17.

MS. BROWN:  The photo is 162.

BY MS. BROWN:

Q.      What's the issue with this item?

A.      There's a missing saddle at this location, which is required to divert water away from the chimney.  This is in violation of R903.2.2.  It was the -- the saddle was also shown on the approved plans and it was not constructed.

MS. BROWN:  And I'll also represent that the excerpts from the approved plans can be found -- that are shown on page 100 can be found at Exhibit 429, page 12, and the one on the right is on page 14.

BY MS. BROWN:

Q.      Okay.  Let's talk about cedar siding.

This is a fairly long section, so I'm going to try to move through it quickly.  Turn to page 101.

And first of all, I would like to look at Macdonald's

chart at page 3 and, what, if any, response to the comments in Macdonald's chart regarding the cedar siding and wood trim would you like to make to the Court?

A.      He agrees it's nonconforming to the code and requires remediation.

Q.      All right.  What would you like to tell the Court about the cedar siding and wood trim?

A.      As a general overview, the installation of the exterior cedar siding and exterior wood trim was very substandard.  For example, the -- there's numerous pervasive unsealed end cuts, which is a requirement.

There's excessive splitting and damage to the wood siding, which was also installed and then repaired using caulk.

There's excessive gaps with the trim.

The window trim and window headers are missing required flashings.

Incorrect fasteners were used to install the cedar siding.

And there's clearance issues between horizontal surfaces and the wood.

Q.      Now, explain the --

MS. BROWN:  Call out the photos in this section.

On page 102, top left, Exhibit 165.  Top right, Exhibit 175.  Exhibit 176 is the bottom left.  Bottom right is Exhibit 177.

Page 103 at the top left, Exhibit 178.  Top right, Exhibit 179.  Photo on the bottom is Exhibit 180.

Page 104, photo on the top is Exhibit 181.  Photo on the bottom, Exhibit 182.

On page 105, the photo at the top is Exhibit 166.  The middle photo -- middle photo, it's Exhibit 167.  The photo on the bottom, Exhibit 168.

Page 106, the photo at the top is 1 -- Exhibit 169.  Exhibit 170 is at the bottom.

And on page 107, we have Exhibit 171 on the top left, Exhibit 172 on the top right, Exhibit 173 on the bottom left, Exhibit 174 on the bottom right.

BY MS. BROWN:

Q.    And going back to page 101, Mr. Furlong, what types of industry standards or publications did you rely upon to determine that this work is substandard?

A.    This technical document from the Western Red Cedar Lumber Association, as well as the Virginia Residential Code.

Q.    Okay.  So there are two excerpts here on page 101.  What are those?

A.    Those are taken from the publication titled, *How to Install Western Red Cedar Siding*.

MS. BROWN:  The excerpt at the top is Exhibit 164 and the excerpt at the bottom of page 101 is Exhibit 163.  They've not been moved into evidence.  I request that they be moved into

evidence.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  They're received.

(Plaintiffs' Exhibits 163 and 164 admitted into the record.)

BY MS. BROWN:

Q.    Can we look at Exhibit 169, which is on page 106 up at the top.  What does this photo tell you about the quality of the installation and how this siding will and is performing?

A.    It is very poor workmanship for the siding to already be deflecting and bowing and cracking within such a short period of time.

When I was on the project site in 2019, this appeared to be fairly new wood, just judging by the end cuts, looked fresh, there were still manufacturer's stickers on things, and for it to be failing and bowing so quickly is unacceptable.

Q.    Can you walk us through the code violations?

A.    So, for example, the required clearances where the locations of wood are too close to horizontal surfaces, those are in violation of R317.1 of the Virginia Residential Code.

The fasteners used were one-and-a-quarter-inch long galvanized statements staples; however, the technical publication requires stainless steel fasteners and the code requires 2-inch nails.

These galvanized staples do not conform to either of those standards.  The galvanized staples can disintegrate based on the natural oils which are in the cedar siding.  They can also call streaking, which is why they're not recommended.

Q.    And what code speaks to the fastener requirement?

A.    R703.3.3, and table R703.3(1) shown on page 108.

Q.    What other code violations did you identify in this section?

A.    R703.5.3 requires that horizontal wood siding be installed according to the manufacturer's recommendations and the end cuts to be sealed.

Q.    And did you review the manufacturer's instructions?

A.    Reviewed the -- in this case it would refer back to the Wester Red Cedar Association technical document.

Q.    Okay.  Anything else?

A.    And R703.4.

Q.    What does that require?

A.    Flashings to extend at trim projections, which was also missing.

Q.    Okay.  Section 11.19, "Master bedroom and third floor." Walk through the exhibits here quickly.

MS. BROWN:  The one on the top left of page 109 is Exhibit 183; top right, Exhibit 184; bottom left, Exhibit 185; bottom right, Exhibit 186.

The photo on the bottom right -- I'm sorry, the bottom of

page 110 is Exhibit 187.  The excerpt from the master bedroom
floor plan can be found at Exhibit 429, page 11, which is sheet
A-4.

BY MS. BROWN:

Q.    Mr. Furlong, what's the issue with the master bedroom and
third floor?

A.    The master bedroom floor slopes three-quarters of an inch
out of level and approximately 15-and-a-half feet.

Q.    And how did you measure for slope?

A.    I measured using a laser level and altimeter level.

Q.    And what, if any, code or industry standards speaks to
the levelness of the floor in a habitable space?

A.    The National Association of Home Builders has a
publication titled *Residential Performance Guidelines*, and in
Section 3-3-3 of that publication, it states that, "No floor
should slope more than one-half inch in 20 feet."

Q.    Let's go to 11.20 on page 11 [sic].  The photo at the top
is Exhibit 200.  That has been admitted into evidence.

        There are excerpts from the manufacturer's instructions
which are found --

        MS. BROWN:  The one on top of page 11 [sic] is
Exhibit 198.  The one on the bottom of 111 is Exhibit 197.

        The one on the -- on page 112 is Exhibit 199.

        Those have not been moved into evidence, but I will
request that they will be at the end of his -- Mr. Furlong's

testimony on this section.

BY MS. BROWN:

Q.    Mr. Furlong, what's the issue with the Wolf range, going back to page 111 here?

A.    The photo at the top is showing the appliance -- the flexible appliance connector is connected directly to a corrugated stainless steel tubing.  So to lay this out, the corrugated stainless steel tube piping comes off of the manifold, the gas manifold in the basement.  That goes across the basement, penetrates through this kitchen floor, and directly connects to this appliance gas connector.

The manufacturer's require, and so does best practice, that a solid rigid pipe be secured and installed to the appliance location.  That gets secured to the floor or the wall, and then from there you can put in your shut-off valve and the appliance connector.

That did not happen in this location.  So I did not observe any shut-off valve behind the gas oven range.  The only shut-off valve was in the basement at the gas manifold, and this installation fails to conform to the manufacturer's installation instructions, which is in violation of G2804.1 of the Virginia Residential Code.

Q.    Are those manufacturing instructions shown in Section 11.20 of your report?

A.    Yes.

Q.    Where?

A.    On page 111.  It's Exhibit 198 and 197, and at page 12 it's Exhibit 199 at the top.

        MS. BROWN:  I request Exhibits 197 through 199 be moved into evidence.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No objection.

        THE COURT:  They're received.

        (Plaintiffs' Exhibits 197, 198 and 199 admitted into the record.)

BY MS. BROWN:

Q.    All right.  11.21 on page 113, "Galvanic corrosion of drip edge."

        MS. BROWN:  This photo is Exhibit 201.

BY MS. BROWN:

Q.    Mr. Furlong, what's the issue with this item?

A.    There's a mixture of dissimilar metals at the gutters, so it has the aluminum drip edge and copper gutters, which will caused a galvanic action, which will eventually cause them -- the aluminum drip edge to corrode and disintegrate.  This condition is in violation of P2912.6 of the Virginia Residential Code.

Q.    All right.  Exhibit -- I'm sorry, going to page 114, this is Section 11.22.  Has the condition of the staircases in the garage changed since you took these photos?

A.      Yes.

Q.      And what if -- are there still code violations?  -- first of all, explain how those conditions have changed?

A.      That staircase has been demolished and removed.

Q.      And what is your understanding of who demolished and removed that staircase?

A.      Mr. Deluca.

Q.      And what remains?

A.      There's nothing there now.

Q.      Is there any other -- any way to get to the second floor in the carriage room?

A.      No, other than a ladder.

Q.      Staircase, page 116, it's 11.23, "Garage ceiling." What's the issue with this item?

A.      This is a life safety hazard.  Half-inch drywall has been installed on the garage ceiling which separates the habitable space above in the carriage house.  This is in violation of R302.6, which requires not less than 5/8 inch Type X fire-resistant drywall.

        MS. BROWN:  And the photo shown on this page is Exhibit 116.

BY MS. BROWN:

Q.      Let's move to 11.24, "Garage HVAC."

        MS. BROWN:  The photo on page 117 is Exhibit 207.

BY MS. BROWN:

Q.    What's the issue with this item?

A.    The HVAC for the carriage house, the exercise room, the garage, the habitable space above, they all share one HVAC system.  This is also a life safety hazard because there's the potential of carbon monoxide poisoning from your garden tractor, your car running in the garage, which can then circulate into your habitable space in the exercise room or the carriage house bonus room above.

Q.    And what --

A.    This condition is in violation of M1601.6, which requires separate systems from the garage and habitable space, living space.

There's also flexible ductwork that's been installed in this garage ceiling, and the code requires it to be sheet metal or other approved material.

This is in violation of R302.5.2.

Q.    Moving on to page 118, Section 11.25, "Garage air handler unit.

MS. BROWN:  The photo shown here is Exhibit 208.

BY MS. BROWN:

Q.    Mr. Furlong, can you briefly describe what the issue is with this item and the code violation?

A.    There's not enough required working space on the accessible panel side of the supply to service it.  This is in violation of M1305.1 of the Virginia Residential Code.

Q.     And we are going to skip past Sections 11.26 through 11.28 in the interest of time.  I believe Shahriar Amiri will be addressing those items to avoid duplicate testimony.

We're also going to skip, in the interest of time, Section 11.29, and we're going to go to -- oh, and 11.30, we're going to skip that, too, and go to "Safety glazing" on page 129, which is Section 11.31 of your report, Mr. Furlong.  Can you explain what the issue is with this item?

A.     This window in the third floor bathroom shower is missing required safety glazing.  It's in violation of R308.4.5.

Q.     And on the following page, page 130?

A.     This window in the bathroom of the carriage house in the second floor bonus room is also missing required safety glazing.

Q.     And what life safety issues are there with this item?

A.     Well, safety glazing is a code requirement for personal protection.  Standard, annealed, glass panes have a highly more potential to cause injury, cuts, to a person if they were to slip and fall or put their hand through the glass.

MS. BROWN:  And the photo on page 129 is Exhibit 225.

The photo on page 130 is Exhibit 134.

BY MS. BROWN:

Q.     Is there anything else you would like to cover with this section?  No?

Okay.  We'll go to 11.32, "Inaccessible radiators," and this is on page 131.

MS. BROWN:  The photo is Exhibit 226.

BY MS. BROWN:

Q.    Mr. Furlong, what's the issue with this item?

A.    These bookcases were constructed around the radiators in the second-floor bedroom which are the heat source for this location.  The radiators are now no longer serviceable and are in violation of 306.1 of the International Mechanical Code.

Q.    Let's go -- we're going to skip over 11.33 and go to Section 11.34, which is on page 133.  And what's the issue with this item?

A.    The manufacturer requires that in areas that may encounter water, that this boiler should be elevated on a concrete base, which it is not.  This boiler has been installed in the mechanical room of the basement where there's the water storage tanks, there's -- the main water line comes in, there's a potential that water could end up on this floor.  This is in violation of M1401.1 of the international -- Virginia Residential Code.

BY MS. BROWN:

Q.    And what does that code require?

A.    That appliances be installed according to their manufacturer's installation requirements.

Q.    And are the manufacturing -- the manufacturer's installation requirements, is there an excerpt from that on this page?

A.      That's shown in the middle of the page.

        MS. BROWN:  That excerpt is Exhibit 230.  I would like for that to be admitted into evidence.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No, Your Honor.

        THE COURT:  It's received.

        (Plaintiffs' Exhibit 230 admitted into the record.)

        MS. BROWN:  Thank you.  The photo on this page is Exhibit 231.

        11.35 on page 134, the photo is Exhibit 232.

BY MS. BROWN:

Q.      Mr. Furlong, what is the issue with this item?

A.      Hot water pipes that are part of a mechanical system, so that would include boilers, radiators, are required to be -- those pipes are required to be insulated, which they're not. That is in violation of R403.5.3 of the Virginia Residential Code.

Q.      And how did you determine that these -- or did you determine that these -- this piping is three-quarter inch or larger in diameter?

A.      Yes.

Q.      And how did you do that?

A.      It was measured with a measuring tape.

Q.      Why is it important for these pipes to be insulated?

A.      It's for energy conservation.

Q.      11.36 on page 135.  What is the issue with this item?

A.      The whole house lacks a mechanical ventilation.  There are three options available, neither of which exist.  This is in violation of R303.4 of the Virginia Residential Code.

Q.      Looking at page 3 of Mr. Macdonald's chart, what, if any, response to the comments in Macdonald's report regarding Section 11.36 would you like to make to the Court?

A.      He claims that mechanical ventilation is not required because it has operable windows in the house.

Q.      What response do you have to that?

A.      We disagree with that -- or I disagree with that.  The mechanical codes and residential codes are clear.  It requires mechanical ventilation in the house to exchange the stagnant air.

Q.      All right.  Let's move on to "Tile" and get through that section quickly.  Let's move to page 137.  How many code violations and deficiencies did you observe with the tile work?

A.      Approximately six.

Q.      And looking at the bottom of the chart, of the Macdonald chart, page 3, how many tile items did Macdonald agree were nonconforming or required correction?

A.      Half of them, three.

Q.      All right.  Let's look at 12.1.  The photo --

MS. BROWN:  I'm sorry, we're on page 138, and the photo at the top is Exhibit 257.  The photo at the bottom is 258.  Those

have both been admitted.

There is an excerpt on the following page, on 139.  That's Exhibit 256.  It has not yet been admitted, but I will request that it be admitted after Mr. Furlong explains this section.

And then moving on to page 140, the photo on the top left is Exhibit 259, the photo on the top right is Exhibit 260, and the photo on the bottom is Exhibit 261.

There are additional -- an additional excerpt from Durock on page 141.  That is Exhibit 262, which I have not yet requested be admitted into evidence but will at the end of this section.

BY MS. BROWN:

Q.    Mr. Furlong, can you explain what the issue is with this item?

A.    The Durock on the floor of the master bathroom was installed using one-and-a-quarter-inch fine-thread drywall screws which are intended to fasten drywall to metal studs. This is in violation of R702.4.2 of the Virginia Residential Code, which requires that backer borders be installed in accordance to the manufacturer's recommendations.

Q.    And where are those manufacturer's recommendations?

A.    On page 139 in the middle.  It states that backer -- tile backer screws or equivalent are required.

Q.    Anything else you would like to cover in this section?

A.    Oh, sorry, on the following page.

Q.    Okay.  We're on page 140.  The fasteners used to install

the backer board in the steam shower were countersunk beyond the surface of the cement board, which also violates the manufacturer's instructions, which are shown on the following page, 141.

MS. BROWN:  I'd like to move to admit Exhibits 256 and 262 into evidence.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  They're received.

(Plaintiffs' Exhibits 256 and 262 admitted into the record.)

BY MS. BROWN:

Q.    12.2, "Punctured liner."  Let's go through this section briefly.  What's the issue here?

MS. BROWN:  And let me go through the exhibits first before you get started.  I apologize.

Page 142, at the top, we have Exhibit 263.  The bottom of page 142, Exhibit 264.

On page 143, up at the top, we have Exhibit 265.  On the bottom of page 143, on the left, is Exhibit 266.  Exhibit 267 is on the right.

On page 144, up at the top there is a TCNA excerpt which is Exhibit 268, which I have not yet requested to move into evidence but will at the end of this section.

BY MS. BROWN:

Q.    Mr. Furlong, can you give a brief description of what the issue is with the punctured liner?

A.    So these photos on pages 142 and 143 are taken from the third floor -- oh, probably all of them.  I can't tell, with the exception of 262.  That might be the master shower.  I'm sorry for getting bogged down.

These are taken from the third floor attic bathroom. These show punctured liners that have -- they've driven the screws too low above the shower floor, punctured the liners, which will eventually cause water leaks in the shower.  The TCNA, the Tile Council of North America, states that no fastener shall be installed "lower than 3 inches above the finished curb" of the shower.

On page 143, it was confirmed -- at the top of the page, you see the photo -- the fastener was installed at approximately one and a quarter inches off of the finished floor.

And the other images below also show the punctured liner. This is observable through an accessible attic space on the back side of these two showers.

Q.    Okay.  And that TC -- what is that TCNA?

A.    The Tile Council of North America is a trade organization publication.  They essentially take standards from ANSI, which is the American National Standards Institute, they take it from ASTM, they take standards from manufacturers and so forth, and they compile it all into one publication for recommendations of

best practice, how to install tile and natural stone.

Q.    And is the excerpt from the TCNA guideline that you referred on for the punctured liner, is that shown on page 144?

A.    Yes.

MS. BROWN:  I'd like to move to admit Exhibit 268 into evidence.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 268 admitted into the record.)

BY MS. BROWN:

Q.    Let's quickly go through Section 12.3, "Required perimeter movement joints."

MS. BROWN:  Before you start, Mr. Furlong, the photo on page 144 is Exhibit 268.

The photo on the top left of page 145 is Exhibit 270.  The photo on the top right is Exhibit 271.  The photo on the bottom left is Exhibit 272.  The photo on the bottom right is Exhibit 273.

On the following page, page 146, there's a TCNA excerpt, that's Exhibit 274.

Another TCNA excerpt is on page 147; that's Exhibit 275.

Exhibits 274 and 275 have not yet been moved into evidence, but I will request at the end this section that they be admitted.

BY MS. BROWN:

Q.    Mr. Furlong, can you briefly explain what the issue is with the perimeter movement joints?

A.    The TCNA requires a flexible sealer joint be installed in the corners of tiles and other dissimilar materials.  That did not exist here.  These corners and dissimilar materials were installed with a solid grout in these locations.  As you can see from the photos, the grout has already cracked.  It's falling out.  It's failing.

The photo on page 144 at the bottom is taken from the kitchen.  This is between the backsplash and countertop.

On the following page, 145, this is taken in the bathroom.

On the following page, 146 and 147, these are the excerpts from the Tile Council of North America requiring that perimeter movement joints be installed in corners and changes of plane, and on 147 it shows essentially a picture of these required locations.

MS. BROWN:  I'd like for Exhibits 274 and 275 to be admitted into evidence.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  They're received.

(Plaintiffs' Exhibits 274 and 275 admitted into the record.)

BY MS. BROWN:

Q.      Section 2.4 is "Tile lippage."

        MS. BROWN:  The photo at the top is Exhibit 276.

        There is an excerpt from a -- well, I'm not sure.
Mr. Furlong will explain what it is, but the excerpt at the
bottom is 277.  That has not been moved into evidence yet, and I
will request that it is after he finishes explaining this
section.

BY MS. BROWN:

Q.      Mr. Furlong, what's the issue with the tile lippage?

A.      On the bathroom floor, the tile lippage exceeds industry
standards in several areas.  This was approximately to be 1/16
to an eighth of an inch of tile lippage, which is two-to-four
times industry standard of -- 1/32 of an inch of tile lippage is
allowed.

Q.      And what industry standard did you rely upon?

A.      That's shown in the Tile Council of North America, which
also references ANSI.

Q.      Is that Exhibit 277?

A.      Yes.

        MS. BROWN:  I would like to move Exhibit 277 into
evidence.

        MR. COUGHLIN:  No objection, Your Honor.

        THE COURT:  It's received.

        (Plaintiffs' Exhibit 277 admitted into the record.)

MS. BROWN:  All right.  We're going to talk next about marble tile.  There's an excerpt from TCNA on page 149 which has not yet been moved into evidence, but I will request at the end of this section that it is moved in.

Then on the following page, on page 150, we have, at the top, Exhibit 279.  That's the top left.  The top right photo is Exhibit 280.  The photo at the bottom of the page -- of page 150 is Exhibit 281.

BY MS. BROWN:

Q.    Mr. Furlong, what's the issue with the marble tile substrate?

A.    The marble tile on the floor has been installed directly over top of a single-layer wood substrate.  It appears to be plywood.  The TCNA requires that marble be installed on floors that are twice as stiff as your normal floors would be due to the deflection and softness of marble.  So a single layer does not provide those deflection limits, which is why they require a double layer of subflooring to get you to the maximum deflection limits allowed.

That excerpt is shown on page 149, which is an excerpt from the TCNA.

They also recommend an optional membrane which I'll address in this section as well.

So in these locations, the marble tile has been installed directly over the wood floor.  There's no waterproofing below

it.  You step out of the shower, the water is going to leak through the grout joints into the floor system, so, in addition to the missing membrane, it's also lacking the required substrate.

BY MS. BROWN:

Q.    And what kind of support would a thin set mortar bed or cement backer board over the subfloor provide to support the marble tile?

A.    Well, backer boards is not a structural panel, it's just there for bonding.  It provides a sort of similar material when you're bonding cement to cement.

Q.    And was the cement backer board used here?

A.    On page 150, at the top left, no backer board was used.  That's Exhibit 279.  The bottom photo, I guess -- I think that's the same location.  Top right, it's hard to say.  I didn't do any destructive testing at this location, but I would guess probably not.

Q.    Why would you guess not?

A.    Well, there doesn't seem to be a step up, so if you would have double-layer plywood plus the backer board, you'd have somewhat of a substantial step up or threshold at this location.

        MS. BROWN:  I'd like to move Exhibit 278 into evidence.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No, Your Honor.

        THE COURT:  It's received.

(Plaintiffs' Exhibit 278 admitted into the record.)

BY MS. BROWN:

Q.     All right, 12.6.  We're going to go to page 151, "Master bathroom steam shower."

MS. BROWN:  The photo on the right is Exhibit 283, and the "Steam Room Guidelines" is Exhibit 282.  That has already been moved into evidence, I believe.  If not, I would like to move it into evidence.

The following page is an excerpt from TCNA.  That's Exhibit 284, and that's, to clarify, page 152.

Page 153 has another excerpt from TCNA, which is Exhibit 285.

Exhibit 284 and 285 have not yet been moved into evidence, but I will request that they be moved after Mr. Furlong explains what's wrong with the steam shower.

BY MS. BROWN:

Q.     Mr. Furlong, what's the issue with this item?

A.     So to start with, the manufacturer of the steam generator requires that the steam room be fully enclosed.  The photo at the right shows that there's an 8- to 10-inch-tall gap of missing glazing.  That would have to be in-filled in.

Additionally, the manufacturer requires that the walls and ceiling be constructed of water-resistant material, noncorrosive surface.

And then, of course, we already reviewed number 6, no

heating or ventilation.

The TCNA guidelines on the following page, 152, require that the ceilings in steam showers, steam rooms, be sloped.  The intent is to take the condensating water on the ceiling, it drains back to the wall and down into the drain.  This bathroom has a completely flat ceiling which would rain down cold condensate water on you inside of a steam room.

Additionally, the -- being that the countersunk screws are too deep in there and the backer board and the waterproofing membrane does not conform to the TCNA guidelines as well, very special attention has to be paid to vapor transmission, penetrations into the -- the walls and ceiling have to be completely sealed, and in this location we saw holes in the ceiling, oversized holes in the ceiling that were housing light fixtures, oversized holes in the ceiling for a rain head for the shower.  All of that would have to be likely demolished and repaired at this point.  I would say the steam shower is a complete tear-out.

Q.    And what does Virginia Residential Code, Section M1307.1 tell you about whether the steam shower was constructed in accordance with Virginia code?

A.    That code section requires that these appliances and assemblies be installed according to their manufacturer's installation instructions.

Q.    And was it?

A.      In my opinion, no.

MS. BROWN:  I would like to move Exhibit 284 and 285 into evidence.

THE COURT:  All right.  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  They're admitted.

(Plaintiffs' Exhibit 284 and 285 admitted into the record.)

MR. LYNCH:  I believe Exhibit 282 was already moved in, but in case it wasn't, I would like to have it moved in.

MR. COUGHLIN:  It's already admitted.

MS. BROWN:  All right.  Thank you.

BY MS. BROWN:

Q.      So we have Section 13 of your report.  What generally did you cover in this section?

A.      Generally I observed defects and other nonconformities to standards of workmanship.

Q.      I'm going to move to page 191 to start out to talk about the roof.  And let's -- on page 191, the photo up at the top left is Exhibit 340.  The photo on the top right is Exhibit 346.  The photo on the bottom is Exhibit 347.  On page 192, the photo on the top left is Exhibit 348.  Top right, Exhibit 349, bottom left, Exhibit 350; bottom right, Exhibit 351.

Page 193, Exhibit 352.

Page 194, Exhibit 353.

Page 195, Exhibit 341.

Page 196, Exhibit 342.

Page 197 is Exhibit 343.

Page 198, Exhibit 344.  All of those have been admitted into evidence.

On page 199 we have an excerpt from the National Roofing Contractors Association.  That is Exhibit 345.  I have not yet requested it be moved into evidence but will at the end of this section.

BY MS. BROWN:

Q.     Mr. Furlong, let's go back to page 191, and can you explain to me what the problem is with the EPDM roof?

A.     The photo at the top left is taken on the low slope roof for the front porch portico.

The EPDM membrane was installed directly over a substrate without any fiberboard or protection below it.  There was a substantial amount of debris underneath of this membrane.  You can see one representative photo there at the top left where these, perhaps, hundreds of debris underneath of the roofing will wear that location thin and then cause holes in the membrane to appear.

Q.     And what generally is EPDM roofing?

A.     It's a black rubber membrane.  It's a rubber membrane roofing, essentially.  It comes in a sheet.

Q.     And what does code Section R903.1 say --

A.    It requires that the roof covering be installed according to the manufacturer's installation instructions.

Q.    Did you review the manufacturer's instructions for this roofing system?

A.    On this EPDM roofing, I don't know who the manufacturer as was.  There's only a handful of manufacturer's of this product -- Carlyle, Firestone, to name a couple -- but they're in agreeanace that debris cannot be installed underneath of these membranes.

Q.    And how would that debris impact any warranty there would be on the rubber roof -- EPDM roof?

A.    Well, if it doesn't conform to the manufacturer's installation instructions, which I'm not sure if debris is a specific exclusion, but if there was a warranty claim it would likely be denied.

Q.    Let's go to page 192.  What's -- what issues are shown here?

A.    On page 192, these are images from the standing seam metal roof on the back of the house.  Top left image shows unsealed fasteners and screws.

     Top right shows that the counterflashing, where it meets the house, has a negative slope to it.  It's actually diverting water back toward the wall of the house.

     The two images below on 192 are representative images of damage and scratches observed on the standing seam metal roof.

Q.    What are the consequences of the scratches on the surface of the metal panels?

A.    Removing the finish will cause the metal to oxidize, to rust.

Q.    And how about the unsealed exposed fastener?

A.    It's a possible source for water infiltration.

Q.    Okay.  Let's move to page 198.  What's the issue here?

A.    The metal roof against these windows doesn't have the required clearance.  The standard from the National Roofing Contractors Association states there should be approximately 4 inches of head flashing between the roof and -- well, there should be 4 inches of head flashing, and from there, then your materials can start.  This roof was installed directly below the windowsill, which measures approximately maybe an inch and three-quarters.

Q.    And that NCRA manual you referenced, is there an excerpt in your report?

A.    On page 199.

        MS. BROWN:  I'd like to move Exhibit 345 into evidence.

        THE COURT:  Any objection?

        MR. COUGHLIN:  No objection, Your Honor.

        THE COURT:  It's received.

        (Plaintiffs' Exhibit 345 admitted into the record.)

BY MS. BROWN:

Q.    Is there anything else you would like to discuss about

the headwall flashing issue, Mr. Furlong?

A.    (Shook head negatively.)

Q.    We can move on to page 196.  What is shown here?

A.    This photo is taken on the roof covering of the main house.  This product is called GAF TruSlate.  It's -- it's showing that the product is GAF TruSlate.

Q.    What's the difference between GAF TruSlate and a slate shingle roof?

A.    The difference between GAF TruSlate and a traditional slate shingle roof is that the GAF TruSlate relies on a plastic film or membrane underneath of these slate shingles as its primary weather-resistant covering.

With the GAF TruSlate, what you're seeing is merely aesthetic.  It's not there for the water resistance of the building.  It's installed using these two hangers, which are shown on page 197.  These slates are easily dislodged, as opposed to a traditional slate roof where they're actually fastened in to the roof substrate.

Q.    Is there any real slate shingles on this roof?

A.    Well, the GAF TruSlate is a -- it is a natural stone, but, again, it's not a traditional slate roof.

Q.    What's the cost difference between a GAF TruSlate roof and a traditional slate shingle roof?

A.    I haven't priced this, but it would be less than half -- the GAF TruSlate would be approximately half the cost or less

than a traditional slate roof.

Q.    Which lasts longer, the GAF TruSlate or a slate single roof?

A.    A traditional slate roof has been shown to last 200 years.  I mean, that's -- history has shown that.  A GAF TruSlate, I think their best warranty is 25 years using a certified installer.  Without a certified installer, their warranty documents set a 15-year warranty.

Q.    And what is your opinion as to whether this roof would even support a slate shingle roof?

A.    The construction of this home's roof and attic appears unlikely that it would have the structural capacity to support the weight of a traditional slate roof.

Q.    And what's that -- I'm sorry, go ahead.

A.    On GAF's own weapon site, the manufacturer of TruSlate, they acknowledge that to support a traditional slate roof, generally substantial structural modifications have to be done to roof systems.  I think that's why they sort of invented this product, is because you could have the look of a traditional slate roof, which from the street it looks similar to a traditional slate roof, especially to a layman, but up close you see the hangers and how easily dislodged they are.

Q.    And what safety issues are there with the tendency for these -- the GAF TruSlate shingles to become dislodged?

A.    In periods of high winds, it's not uncommon for these

shingles to dislodge and slide off the roof.

Q.    Let's look at page 193.  What's shown here?

A.    This is on the main house.  There is a mix of these plastic composite shingles from DaVinci mixed in with the GAF TruSlate roofing system.  It looks like a patch was done for some reason.

Q.    How does this mixing of materials -- in other words, the mixing of these plastic sheets -- shingles with the GAF TruSlate -- impact the performance of the roof system?

A.    Well, there's a potential for leaks because they're incompatible systems, they're different materials, and additionally, the DaVinci warranty documents and GAF TruSlate each have specific exclusions about modifications to their roofing systems.  You can't mix systems together.  It voids the warranties.

Q.    Did you review -- how do you know that?

A.    I reviewed both the warranty and installation manuals from DaVinci and GAF TruSlate.

Q.    Let's take a quick look at page 194 and just tell me what's shown there.

A.    194 is a picture of the same location, different angle, but also showing that extra shingles were just left on top of the roof.

Q.    And let's take a quick look as well -- is there any safety issue with those shingles being left on the roof like

that?

A.    These are the plastic shingles.  I would imagine, periods of high wind, that they would also fly off.

Q.    Page 195.  What's the issue here?

A.    This is also the main house.  It shows a mix of the GAF TruSlate and DaVinci plastic shingles.  The plastic ones are the two courses on the bottom, and then extra shingles were observed laying on top of the roof.

Q.    Let's talk about the garage carriage house roof.  Go to page 201.

THE COURT:  Are you just about done or do you have more?

MS. BROWN:  We will be done soon.  There's just a couple of sections that we have to go through in Section 13.

THE COURT:  Okay.  Then let's take 15 minutes now and we'll come back and we'll continue with direct examination.

MS. BROWN:  Thank you.

THE COURT:  All right.  We're in recess.

(Thereupon, a recess in the proceedings occurred from 11:03 a.m. until 11:26.)

THE COURT:  All right.  Please continue.

BY MS. BROWN:

Q.    So we left off, we were on page 201 of Exhibit 58, and we're about to start talking about the carriage house roof.

I do have one more question, though, about the roof on the main house.  Mr. Furlong, what year was the house

constructed?

A.    1938.

Q.    What is your opinion as to whether the GAF TruSlate roof was original to the house?

A.    Based on my research, GAF TruSlate came out at some point in the '70s and kind of became more popular within that decade into the '80s.  I don't see it too often these days.  So to answer your question, it would not be original to the house.

Q.    Thank you.  Let's talk about the carriage house garage -- I'm sorry, the carriage house roof.

MS. BROWN:  So the photos on this page, at the top left, Exhibit 356; top right, Exhibit 357; bottom is Exhibit 358.

The photo on page 202 is Exhibit 359.

The photo on page 203 is Exhibit 360.

And on page 204, that photo is Exhibit 361.

BY MS. BROWN:

Q.    And let's go back to page 201.  Mr. Furlong, what is the issue with the carriage house roof?

A.    At the top left, that image shows that this was a replacement of an extension of that garage that was performed as part of this renovation project.  So this addition or replacement, the slope of the roof does not match that of the existing garage.

On the right side, it shows incomplete installation.  It appears to be missing like an accessory end cap to conceal that

open edge to prevent rain and water debris from getting inside and underneath of those plastic shingles. Then the same condition exists on the photo below of the same page.

On the following page, 202, just confirming that this garage carriage house also has GAF TruSlate with a mix of plastic shingles, which is further shown on page 2 or 3 of the report.

At the top of page 203, we identified that the plastic shingles had been installed on this replacement, and the existing GAF TruSlate on the carriage house garage.

And finally on page 204, that image shows that the snow guards existed on the garage, however were omitted from the replacement addition over to the left side.

Q.    Why are those snow guards important?

A.    On slate roofs, the snow and ice has a tendency to slide very quickly off of the roof. It doesn't have the grip of, say, an asphalt shingle roof would have. Those snow guards really are for just personal protection, to prevent these sheets of ice from flying off the roof and even damaging the gutter.

Q.    And to clarify, you said they're important on a slate roof? Is that what you meant to say?

A.    Yes.

Q.    Is this a slate roof?

A.    Yeah, the -- the material covering is real slate, but it's not a traditional slate roof.

Q.    Okay.  What is the difference between the composition, then, of GAF TruSlate and...

A.    There's weight.  These GAF TruSlates are about half the height.  Because, again, it doesn't rely on the slate itself to be the primary roof covering of the building.  This is aesthetic.  It's what's underneath of this, is this plastic film that's lapped in a shingled manner underneath of this aesthetic slate, which is the building's primary weathered covering.

Q.    Let's go to page 175, Section 13.12.

MS. BROWN:  The photo at the top of this page is exhibit -- on the left is Exhibit 293.  The photo on the right is Exhibit 294.  There's also a photo at the bottom of this page, which is Exhibit 295.

BY MS. BROWN:

Q.    Mr. Furlong, what's the issue with the bed post here?

A.    During the inspection, it was discovered that this bed post in the children's bedroom was broken, so we've identified it as an additional deficiency.

Q.    Is there any safety hazard associated with that condition?

A.    Yes, that should be repaired or replaced.

Q.    Let's go to page 154.

THE COURT:  154?

MS. BROWN:  Yes, sir.  Yes, Your Honor.  I'm sorry, I have the wrong page.  Pardon me, page 189.

This is the Section 13.28, "Return air."  The photo on the left is Exhibit 334.  The photo on the right is Exhibit 335.

BY MS. BROWN:

Q.    Mr. Furlong, what's the issue with this item?

A.    Building cavity between the floor joists and the basement ceiling has been used as return air duct.  There's also these mechanical pipes and wires and a substantial amount of debris found in this return air duct.  This is in violation of R403.3.5 of the Virginia Residential Code.

BY MS. BROWN:

Q.    And let's take a look at the Macdonald chart on page 4, and what, if any, response to the comments in Macdonald's report regarding Section 13.28 would you like to make to the Court?

A.    He agrees it's nonconforming to the code and requires remediation.

Q.    Let's go to 13.31 on page 200, please.

MS. BROWN:  The photo at the top of this page is Exhibit 354.  The excerpt of the product specifications is Exhibit 355.  I have not yet moved it into evidence but will request that it be moved in after Mr. Furlong testifies.

BY MS. BROWN:

Q.    What's the issue with the outdoor grill?

A.    The outdoor grill is required to have its own individual branch circuit, which is another way to say it's required to have a dedicated circuit to it, but during the inspection, it

was discovered that this receptacle for the outdoor grill is on the same circuit as would be for this opening to the left, which is for, like, a beverage fridge or ice maker, and then that circuit also continues in this outdoor screened-in porch. Therefore, this is in violation of the manufacturer's installation instructions, as well as National Electric Code 110.3(B), "Listing and Labeling."

The installation also remains incomplete.  The gas line is not hooked up.  It's never been fully constructed inside the grill leader.

Q.    Mr. Furlong, did you say National Electric Code, 110.3?

A.    Correct, 110.3(B), "Listing and Labeling."

Q.    Let's go to page 207.  This is the, "Gas post lanterns."

MS. BROWN:  The photo at the top left is Exhibit 367; the photo on the top right, Exhibit 368; and the photo on the bottom of 369 -- I'm sorry, the photo at the bottom of page 207 is Exhibit 369.

BY MS. BROWN:

Q.    Mr. Furlong, can you explain what the issue is with this item?

A.    These are an incomplete installation of gas post lanterns installed at the motor court in front of the house, of the main house.

These gas connections, as you see in the photo at the top, to the right, you have your copper gas line coming in, and

there was a fitting design and intended for water supply line with an extension of a quarter-inch water supply hose coming out of this gas pipeline.  It appears that the copper is too short and the intention was to extend it using these unapproved fittings.

Q.    What do you mean by "unapproved fittings"?

A.    Well, they're only approved for water supply.  This is something you would have like in the back of your refrigerator for an ice maker.  This isn't for supplying gas to an appliance for fixture.  They have dedicated and special fittings just for gas.

Q.    And is there any safety issue with using water supply fittings instead of gas fittings?

A.    Yes.

Q.    Can you explain?

A.    I mean, there's a number of scenarios which could happen. I'll say that it is a life safety issue, though, to have these improper fittings on gas.

Q.    Have you ever seen anyone do this before?

A.    No, never.

MS. BROWN:  Okay.  So, we're going to just quickly go through some of the remaining items in this section.  Let's go to page 154, Section 13.1.

The photo at the top of page 154 is Exhibit 286, and the photo at the bottom is Exhibit 287.

I'm going to just go through the next two sections giving the exhibit numbers. That way we don't have to stop and we can sort of just float through the testimony a little bit quicker.

On page 155, the top left is Exhibit 312; top right, Exhibit 314 -- 313; bottom left, Exhibit 314; bottom right, Exhibit 315.

Page 156, top of the page, Exhibit 316; bottom of the page, Exhibit 317.

On page 157, top left, Exhibit 337; top right, Exhibit 339; bottom is Exhibit 338.

On page 158, the top photo is Exhibit 375, and the bottom photo is Exhibit 376.

BY MS. BROWN:

Q.    Let's go back to page 154 and can you just give a really short thumbnail version of what's going on with the bathroom vanities, Mr. Furlong?

A.    Yep.  At the top of page 154, that's a photo of a severely damaged vanity cabinet.  That top rail underneath of the countertop appears to be patched back together using silicone, but that rail is substantially broken and would require replacement of this vanity.

On the image below, this is the vanity top where it appeared to be approximately -- the side splash was an inch and three-quarter short, and so they spliced in an inch and three-quarter piece in the side splash.

Q.    Do you recall which bathroom this is in?

A.    This is the third floor guest bedroom bathroom.

Q.    All right.  Section 13.2.  Just very briefly explain what the issue is on page 155 through 157 -- or I'm sorry, through 156.

A.    Generally unacceptable door -- installation of door hardware installations that just really are unacceptable.

Q.    Let's go to page 157.  What -- just brief overview, what's the issue here?

A.    These window and door frames have not been sealed since their installation.

      These are Pella.  I reviewed their warranty documents. They require that the doors be finished within 24 hours of installation; otherwise, the warranty is void.

Q.    Next page, 13.4, we're on page 158, what's wrong with the basement tile, very quickly?

A.    Broken tile in the basement floor.

      MS. BROWN:  Okay.  We're going to skip the roof overhang, in the interest of time, and we're going to go to page 160, which is Section 13.6 of Mr. Furlong's report.

      And I'm going to call out some exhibits in the interest of time -- identify them, rather.  Top of page 160 is -- on the top left is Exhibit 379; top right, Exhibit 381; bottom left, Exhibit 382; bottom right, Exhibit 383.

      On page 161, the top is Exhibit 384; bottom left is

Exhibit 385, bottom right, Exhibit 386.

On page 162, the photo is Exhibit 382.

On page 163, the photo is Exhibit 388.

On page 164, the photo is Exhibit 380.

On page 165, the photo on the top left is Exhibit 389; the photo on the top right, Exhibit 390; photo on the bottom left, Exhibit 391; photo on the bottom right, Exhibit 392.

Page 166, photo on the top, Exhibit 393; photo on the bottom, Exhibit 394.

Page 167, Exhibit 395.

Page 168, Exhibit 396.

Page 169, top photo on the left, Exhibit 397; photo on the top right, Exhibit 398; photo on the bottom, Exhibit 399.

Page 170, photo on the top, Exhibit 400; on the bottom, Exhibit 401.

Page 171, Exhibit 402.

On page 172, Exhibit 403 is on the left top, and the photo on the right is Exhibit 404.

On page 173, the top photo is Exhibit 406.  On page 173 still, bottom left, Exhibit 288; bottom right, 289.

And page 174, the photo on the left is Exhibit 290; photo on the right is Exhibit 291; and the photo on the bottom is Exhibit 292.

BY MS. BROWN:

Q.    All right.  Let's go back to page 160.  Mr. Furlong, can

you just give a brief overview of the condition of the trim at the property?

A.    These are examples of unacceptable trim installations that were observed throughout the house.  Generally, the trim was cut short, and in many places -- in many places you see evidence of the trim being spliced in, adding half-an-inch piece here, half-an-inch piece there.

The following page, it essentially repeats.  There's some spliced trim.  There's mismatched trim on the bottom right page of that same photo -- same page.

On page 162, spliced-in trims.

163, different size wood paneling and styles and rails being installed in these locations.

164, paint on the hardware.

Q.    Mr. Furlong, are these conditions -- do they meet industry standards?

A.    No.

Q.    In your opinion, are they of a good quality?

A.    No.

Q.    Page 13.7, "Kitchen cabinets."  Just give me a brief overview of what the issue is in this section, starting on page 165.

A.    Very poor installation related to the kitchen cabinets.  Trim is falling off.  You have screws poking through the sides of the finished panels.  We have split rails from the

installation of the hinges.  Backsplash has excessive gaps.

Moving on to page 166, kitchen sink base is broken.
Bottom photo, the furniture leg supporting the cabinets are not
actually supporting them.  This is approximately a
one-quarter-inch gap between the leg and the floor.

On page 167, the light rail has approximately
one-quarter-inch gap between the backsplash.

On page 168, poor joinery between the hood vent and the
side kitchen cabinets.

Q.    Page 169 through 171 discusses the kitchen tile
backsplash.  Can you just give a brief overview of those
conditions?

A.    Yep.  Also unacceptable installation.  We have tile
lippage, incomplete installations of the backsplash shown on the
bottom of page 169.

And then on the following page, it really repeats the
requirement for the flexible ceiling joint in the corners and
the dissimilar materials.

Q.    So, for the interior trim, the hardware, kitchen
cabinets, the tile backsplash, those items, also the bathroom
vanities that we just briefly went through, how does the quality
of that work compare to what your expectations would be in a
high-quality renovation like this?

A.    It would not meet those expectations.  These deficiencies
were pervasive throughout the house.

**Q.** And I apologize, I mis-phrased my question. I was supposed to -- I meant to say a "high-end renovation."

Does that change your answer?

**A.** No.

**Q.** Okay.

**A.** Same opinion.

**Q.** I do want to look quickly on page 172. This is, "Additional kitchen items." There's -- at the top of page 173, you have something in here about a hood vent. Can you explain what the issue is there?

**A.** This hood vent has at least two speeds. It has two motors, and the left side fan motor was damaged. The shaft on it was bent, so when you turned on the fan on high, the fan motor or blades would rub the side of the shrouding. In some cases it would even stop the motor from spinning.

**Q.** Okay.

**A.** Also, I mentioned that it was confirmed. I was on the site when an appliance repair company was there and they confirmed that the hood vent was also damaged, and the fan motor required replacement.

MS. BROWN: Okay. On page 173 -- I cannot recall if I went through the exhibit numbers for this section, so I'm going to do it. For 173 at the bottom, Exhibit 288; on the right, it's 289.

On page, 174 the top left is Exhibit 290. On the right is

Exhibit 291.  The bottom is 292.

On page 175, top -- we already did that one.

On 176, the top left is Exhibit 296; top right, 297; bottom of that page is Exhibit 298.

On page 177, the top is to Exhibit 299.  The middle is Exhibit 300.  The bottom is Exhibit 301.

Page 178, the top photo is Exhibit 302; bottom photo, 303.

Page 179, the exhibit on the top is 304.  The -- the exhibit -- I'm sorry.  The photo on the bottom of page 179 is Exhibit 305.

On page 180, the photo on the top left is Exhibit 306; top right, 307; bottom left, Exhibit 308.

On page 181, the pergola, the top left is exhibit is 318; top right, Exhibit 319; bottom is 320.

And I'll stop calling them out for now.

BY MS. BROWN:

Q.    Can you briefly -- let's go back to page 173. Mr. Furlong, can you briefly explain what the issue is with the drywall finish that you discuss in Section 13.10?

A.    Unacceptable drywall finishes and taped joints was observed throughout the house.  This was on all three levels, where you had excessive bubbles in the finishing, cracked tape joints, excessive nail pops.

Q.    Next page, on page 174, what -- where is this shower niche located?

A.      The top photos are shown in the third floor bathroom.

Q.      And the bottom photo, Exhibit 292?

A.      Second floor bathroom.

Q.      Okay.  Going to page 176, can you explain, just brief overview, of the photos and the conditions you observed in section -- for Section 13.14, and 13.15.

A.      Yeah.  We were documenting just several locations of incomplete drywall and painting throughout, incomplete closets and millwork observed throughout.

Q.      And when you say "we," who do you mean?

A.      I'm sorry.  I meant me, Falcon.

Q.      On page 177, "Incomplete plumbing throughout," can you explain what the issues are here?

A.      This is from the master bathroom, incomplete plumbing was observed on that floor, and on the following page, the incomplete but live and exposed electrical also observed in the master bathroom and bedroom floor.

Q.      Okay.  Go to page 179.

A.      Okay.

Q.      13.18, "Vehicle garage."  What's the issue there?

A.      This is a newly constructed wall.  The vehicle door entrance used to be on this side, and it was subsequently changed to the front of the garage.  This new wall that was constructed now has a personal entry door there, but in building that wall, it leaks water underneath of the wall sill at the

concrete slab, so this isn't limited to just coming in underneath of the door or at the door; this is coming in underneath of the walls.

Q.    Okay, let's go to page 180 and talk about the exercise room.  What's the issue here, Mr. Furlong?

A.    The existing concrete slab in the exercise room, which is the replacement addition off to the side of the garage, it had a very poor concrete surface.  It was very rough.  And it appeared to be overlaid with a type of Portland cement; however, the thickness of it was inadequate.  It appeared to be approximately a half inch in some places which caused this overlay to debond and crack.

The excerpt on the same page is from the Port Planned Cement Association, and they recommend a minimum of 1- to 2-inch thickness depending on criteria.

MS. BROWN:  That excerpt from Portland Cement is 309.  I would like to move it into evidence.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  Admitted.

(Exhibit 309 admitted into the record.)

BY MS. BROWN:

Q.    Anything else on the exercise room floor, Mr. Furlong?

A.    These cracks also existed before the staircase was torn out.

Q.    Okay.  Thank you.

13.20, "Pergola," on page 181, can you give me a brief overview of what the issue is there?

A.    Very poorly instructed outdoor pergola between the main house and the garage.  It's not properly secured.  It's very wobbly.  The posts are, in some cases, one-and-a-half inches out of plumb.  Unacceptable product.

Q.    Is there a safety concern?

A.    Without knowing exactly how it's constructed, it's hard to say, but it could collapse.  It's very wobble, extremely wobbly, using one hand.

MS. BROWN:  Page 185, photo on the top left is 226.  The photo on the right is -- top right is 227.

BY MS. BROWN:

Q.    What's the issue there?

A.    This is the make-up air damper, which is in the kitchen. The way this system is supposed to work is when the hood vent is turned on, this damper automatically opens and brings in make-up air to maintain a neutral balance of air pressure inside the home so you don't have a negative pressure as the hood vent's exhausting; however, this damper was observed to be unoperable, and the damper was stuck in the open position, allowing energy to escape or cold, warm air to come in.

Q.    Let's skip to page 186, the photo on the top left is Exhibit 329.  What's the issue under cabinet lighting?

A.       In the kitchen of the main house, it has low-voltage lighting and this is showing under-cabinet lighting of the upper cabinets.  Somewhere in the kitchen or in a house, there's supposed to be an acceptable transformer which takes your line voltage of 120 volts A/C and knocks it down to 12 volts.

That transformer was not observed or found anywhere. This is in violation of 410.144 of the National Electrical Code.

I should also note that Mr. Macdonald's a report also agrees that it's nonconforming and agrees -- it requires remediation.

Q.       Page 190, Section 13.29.  What's the issue there?  Page 190.

A.       Confirming that the construction of the bathrooms are new and not existing, as according to the plans.

Q.       And what's your opinion based off of?

A.       There's manufacturer's dates on products, and the image shown on page 190 shows the gypsum board is from 2019.  And in other photographs not in the report, I have photos of the electrical cables also from 2019.

The wall studs looked very new; therefore, our opinion is that this is all new construction.

MS. BROWN:  The photo shown on page 190 at the bottom is Exhibit 336.

BY MS. BROWN:

Q.       Page 205, "Hardwood flooring."  What's the issue?

A.    This picture -- these pictures on 205 show generally a very poor finish of the hardwood flooring.  It was very splotchy and inconsistent in colors and had also pieces that were spliced in.  It was not a consistent and acceptable hardwood flooring or finish.

Q.    Following page --

MS. BROWN:  And I'm sorry, the photo on the top left -- I'm sorry, on the top of page 205 is Exhibit 362.  The photo on the bottom left is Exhibit 363.  The photo on the right is Exhibit 364.

And on the following page, on page 206, the photo on the top left is Exhibit 365.  The photo on the top right is Exhibit 91, and the photo on the bottom is Exhibit 366.

BY MS. BROWN:

Q.    Mr. Furlong, can you explain what the issue is in the sunroom crawl space on page 206?

A.    I observed water infiltration near the foundation into the crawl space.

Q.    And where do you see that?  How is that shown in these photos?

A.    It's shown at the bottom perimeter along where the foundation and footer would be.  This is the crawl space that is underneath of the sunroom.

We opined that this condition is a result of a poorly placed downspout and poor grading around the foundation on the

outside.

Q.    And who is "we"?

A.    I.

Q.    Let's go to page 209, "Driveway gate."

      MS. BROWN:  The photo shown on that page is 371.

      The photo on the top of page 210 is Exhibit 372.  The photo at the bottom of page 210 is Exhibit 373.

      The photo on page 211 is Exhibit 374.

BY MS. BROWN:

Q.    Mr. Furlong, what's the issue with the driveway gate?

A.    The lag bolts had stripped out from the driveway gate rendering it inoperable.  That's shown on the following page, and then on page 11 [sic], it shows an incorrect location of the hardware.

Q.    Let's go to page 212 of your report.  Let's talk about square footage.

A.    Okay.

Q.    And was there anything else in the defect section of your report that you wanted to cover?

A.    No.

Q.    Okay.  How did you measure the square footage of the property, the house?

A.    I used a laser measuring device.

Q.    Okay.  And how did you get to a total of 5100 square feet?

A.      Going room by room, I took the area square footage of the space, I backed out certain things where there was reduced headroom, and added up all of these.  The main building, backing out the utility and the mechanical room, came to 5100.

Q.      Is it 5100 or...

A.      5,101 to be precise.  And then plus the space of the detached garage and carriage house.

Q.      Why did you exclude the basement mechanical room?

A.      It's not considered livable or habitable space, and there's also reduced headroom in that location.

Q.      Are there any other spaces at the property that you excluded from your measurement?

A.      So for example, in the third floor bedrooms, there's a very low ceiling slope, so a section of that square footage was calculated to be backed out.

Q.      How about the screened-in porch?  Did you include that?

A.      The screened-in porch was not included, neither was the uninhabitable attic spaces, which are accessible but not livable.

Q.      Why you did you exclude areas that -- where the ceiling height was less than 7 feet?

A.      I based my measurements using an ANSI measuring standard, which has been adopted by Fannie Mae, to provide guidance and specifications which would give a uniform standard for measuring habitable space in dwelling units.

Q.     Do you recall what -- the citation for that ANSI measuring standard.

A.     ANSI Z765.

Q.     And how does the way you measured to determine habitable space of the house that's shown on 212 and 213, how does that differ from how one would measure if they were going -- measuring for the purposes of providing a cost estimate to renovate the property or perform construction?

A.     Well, if you're comparing a whole-house renovation, then that would differ.  Essentially, you would be including the labor and material costs and square footage to renovate the interior walls, possibly exteriors, windows, doors.  Even getting into the uninhabitable spaces would potentially require renovation, so -- as well as renovating concealed spaces.  So therefore, in a construction manner, we would generally go from -- or I would go from exterior wall to exterior wall and count everything in between.

Q.     And how did your calculation on 212 and 213 address interior wall spaces and concealed spaces?

A.     Those were backed out.  These are room measurements of habitable, livable space.

        MS. BROWN:  I don't have any further questions at this time.

        THE COURT:  All right.  Thank you.  Cross-examination.

CROSS-EXAMINATION OF MATTHEW FURLONG

BY MR. COUGHLIN:

Q.     Good afternoon -- yep.  Good afternoon, Mr. Furlong.
Mr. Furlong, first I want to cover your background.  I know your
résumé has been provided, but you -- you formed a company called
Forced Consulting Group, correct?

A.     In 2015, yes.

Q.     Okay.  And were you the only employee there?

A.     Yes.

Q.     And as a part of your work at Forced Consulting Group,
you were undertaking home inspections, at times, for homeowners
who were under contract to purchase a home, correct?

A.     Yes.

Q.     And you've done a little bit of that work for the Falcon
Group, correct?

A.     Yes.

Q.     Roughly 12 or so of those type of home inspections since
2015?

A.     Roughly, combined.

Q.     Okay.  And then -- but since 2019, though, the majority
of your work has been expert witness work in court cases, in
disputes?

A.     Not necessarily.  It's been owners' representative
services, general inspections of homes for clients that are
renovating or building, as well as then, as you mentioned,

construction defect inspections.

Q.    Okay.  And so in terms of, you know, what was inspected here, you're aware that in -- on August 6th -- or are you aware, on August 6th that Mr. Harrell directed Mr. Deluca to stop work at the property?

A.    I'm not familiar with that conversation.

Q.    But now you know that Mr. Deluca was told at some point, though, to stop work at the property?

A.    According to you.

Q.    You didn't know that until this conversation?

A.    No.

Q.    Did the house look -- it didn't look finished to you, correct?

A.    There are elements that are incomplete.

Q.    And it looks as if the work was interrupted, correct?

A.    It looks like the work was abandoned.

Q.    Okay.  Like, for example, the bathroom in the owner suite, that's not tiled, right?

A.    Correct.

Q.    And if it was complete, you'd see tile there?

A.    Correct.

Q.    And are most of your home inspection reports done after a home is completed, after the work in the home is completed?  Is that the typical scenario?

A.    Not necessarily.  As far as the owners' representative

services go, I'm involved -- hopefully involved by day 1 where they're breaking ground and they're performing either periodic site visits at certain milestones or weekly site visits, depending on the need of my services, so we -- I am inspecting the work as it goes along, but on occasion there are other times where I'm coming in after the home is completed or many elements are concealed and trying to inspect those as well.

Q.    Okay.  So breaking it up into two categories, we have the inspection work that you're doing as the work progresses, and that's not this type of project, right?

A.    Right.

Q.    And then there's the work where -- there's the inspection that you're doing when all of the work is complete, correct?

A.    Or getting close to completion.

Q.    Okay.  But that's not this project either, correct?  It doesn't fall into that category either, right?

A.    The completion of the project?

Q.    Correct.  The project is not complete and so this isn't a home inspection done on a completed project, correct?

A.    Correct.

Q.    Okay.  I believe you said you first were contacted by the Harrells in -- was it September of 2019?

A.    I stated September 2019 in my deposition with opposing counsel at the time, Juanita.  It was an omission.  I made a mistake.  It was actually December.

Q.    Okay.  Got it.  Going back to standards you've referenced, so one of them you referenced was the tile -- TCNA. What does that stand for again?

A.    Tile Council of North America.

Q.    And those standards are not incorporated into the building code, correct?

A.    The entire publication -- to say the entire publication is not incorporated is a correct statement.  There are standards in there which are incorporated into building code.

Q.    Okay.  Did you review any of the punch lists that were prepared by Mr. Harrell and provided to Mr. Deluca?

A.    No.

Q.    So you wouldn't know whether some of that -- well, I'll move on.

You originally prepared a report in February -- dated February 25th, 2020, correct?

A.    Yes.

Q.    And then your final report that we've been reviewing in court is dated November 17th, 2020, correct?

A.    Yes.

Q.    What's the difference between the two reports?

A.    There's been some grammatical changes.  There's also been some changes to the property that the Harrells asked me to document.  And then while I was at the property with either my colleagues or letting other experts in, I would observe another

code violation or deficiency, and then that would get added to the final report.

Q.    And then you also came up with a numbering system that didn't exist in the original report, correct?  Meaning, like 9.15, categories for various things?

A.    I don't recall, but I'll take your word for it.

Q.    Okay.  Let's get into the report.  Let's start with -- so we're going to go to Exhibit 58 and page 57.  This is item 10.7 related to the steam shower.

So earlier you testified regarding the sizing of the steam generator, and you didn't base that sizing taking into account the final finished product, including potentially a bench that would be installed in the steam shower?

A.    Do the plans call for a bench?

Q.    I ask the questions.

A.    Oh, sorry.

Q.    I don't mean to be rude?

A.    Okay.  Sorry.

Q.    So --

A.    If there was to be a bench, which I was not made aware of, it would not have been included.  However, even if a bench were to be installed, it would still not come close to the required size.

Q.    Okay.  Let's move on to 11.5, page 79.

Earlier you testified about the ductwork in the shower

and the original vent being covered up, correct?

A.    Yes.

Q.    The intent there appeared to be to abandon that vent, correct?

A.    Yes.

Q.    But this is not a finished space.  I mean, it's -- the contractor, Mr. Deluca did not finish this steam shower, correct?

A.    The steam shower is incorrect -- is incomplete.

Q.    Okay.  So...

A.    But I would also like to add that it does appear to be -- the intent was to permanently abandon it based on the mastic shown on the photo.

Q.    And then there would be tile put over it and potentially other surfaces put over it before it's finished, correct?  I mean, you don't know the intent of Mr. Deluca just looking at this photo, correct?

A.    Correct.  However, as I had testified to before, abandoning the duct in a steam room has the potential to cause the condensation issues mentioned.

Q.    Okay.  Moving on to 11.8.  That is on page 84.

I think you testified earlier that these stairs, in your opinion, were not code compliant and that they'd been removed by Mr. Deluca, correct?

A.    Yes.

Q.    Moving on to 11.11.  This is on page 90.

I think you testified about the steps and went over an e-mail from the County, and there's -- this is another item that Mr. Deluca has indicated that he would correct.  Is that your understanding?

A.    That's what the e-mail stated, yes.

Q.    Okay.  Let's turn to page 93.

Were you aware that the back porch was to be expanded further?

A.    Yes.

Q.    And so what we see here in terms of an elevated space without a handrail, that's the foundation for that extension of the screened-in porch, correct?

A.    That was the intention of that, yes.

Q.    So if the screened-in porch was allowed to be finished, then you wouldn't need a handrail because you would have an extension of the screened-in porch with, you know, four sides on it, correct?

A.    Yes.

Q.    Okay.  Moving on to 11.15 -- I'm sorry, 11.16, the "Outdoor deck."

Arlington County -- and this shows up on page 96 -- typical deck details are not a part of the Uniform Statewide Building Code, correct?

A.    Correct.

Q.      And do you see the railings, you have a ruler attached to the railings, and you see holes in the railing -- I'm sorry, in the bottom brace.  Do you see holes in the bottom brace?

A.      Yes.

Q.      The spacing for the railing is as provided by the manufacturer, correct?

A.      There appears to be a mix of systems here.  Either the holes are for a different picket system, because these pickets were very loose.  They would wobble about approximately a quarter of an inch.  The manufacturer wouldn't do that.  So this seems to be like two different types of products mixed together here.

Q.      Okay.  Do you know for sure whether it is or not, two different types of products?

A.      Well, based on my experience in construction, the pickets would never be loose.  They would fit tight into the holes and they would have the correct spacing which meets the code.

Q.      Okay.  Turning to 11.22.

        You indicated that the stairs were removed that are shown in these photographs, correct?

A.      Yes.

Q.      And that there were no stairs there, correct?

A.      Correct.

Q.      And did you review any communications between Mr. Deluca and the Harrells related to his request for direction as to what

type of stairs to put in?

A.   I recall some communication between Mr. Deluca and I don't recall who, the County or the Harrells, that the intention was to put in a spiral staircase.  I believe that the updated approved plans also show a spiral staircase in this location.

Q.   Okay.  Moving back to the front steps, were you aware that the front facade of the house was governed by Arlington County's ordinances related to historic preservation?

A.   Yes.

Q.   And that those guidelines restricted what a contractor can and can't do as it relates to improving stairs into a property and the front facade?

A.   I'm familiar with the regulations.

Q.   Okay.  Moving on to 11.32, page 131.

Did you remove the drawers in front of the radiators?

A.   Yes.

Q.   And aren't there access panels behind those drawers for the radiators?

A.   There are some small panels, but that doesn't satisfy the code.

Q.   But there are access panels, correct?

A.   There's panels, but it's nonconforming.

Q.   But that's not mentioned your report, right?  You don't don't mention in your report that there, in fact, are access panels; correct?

A.      No, because it's irrelevant.

Q.      Moving on to 11.34.  This is on page 134 -- I'm sorry, 133.

So there's an orange sticker on top of the boiler. That's the final inspection sticker for the boiler, correct?

A.      I don't know.

Q.      Did you see that Arlington County did a final inspection of the boiler?

A.      I don't recall.

Q.      You don't know one way or another whether the County finaled the boiler and, therefore, accepted its condition?

A.      I don't know either way.

Q.      Okay.

A.      I should also note, even with final approval, it still doesn't mean that it's conforming to the code.

Q.      Moving on, 11.3, please.

If I understand your testimony correct -- this is on page 135 -- you indicated that there was not proper ventilation for the house?

A.      Full-house mechanical ventilation.

Q.      But you do recognize that there was a make-up vent in the mudroom, correct?

A.      Yes.

Q.      And that can provide ventilation, if it's working, correct?

A.      That's not the intent of the system.  It only turns on when the hood vent is turned on.

Q.      The hood vent to?

A.      The range hood in the kitchen.

Q.      Okay.  Moving on to 12.6.  This is -- sorry, actually 2.5.  This is relating to the marble tile subfloor.

First, in order to determine that there -- what was underneath the marble floor, you had to remove a piece of trim, correct?

A.      Yes.

Q.      And then you had to demolish part of the tile, correct?

A.      It was a slight edge of the front of tile --

Q.      Okay.

A.      -- that would normally be covered by a threshold.

Q.      But if we look at this picture, it's now damaged.  That's Exhibit, I think, 271 in the upper left-hand corner.

A.      Yes, I removed the threshold and confirmed that it would not be visible once the threshold was reinstalled.

Q.      And then chiselled away at the tile a bit?

A.      Yes.

Q.      The industry standard that you cited here, that is not incorporated into the building code, correct?

A.      Correct.

Q.      And then the picture on the right for a separate bathroom, you did not do the same type of demolition work,

correct?

A.      Correct.

Q.      Okay.  So you don't know whether -- what's under that floor for certain, correct?

A.      Top of page 151, right picture?

Q.      No, I'm sorry, top of 150, upper right-hand corner, that bathroom.

A.      Okay.

Q.      You didn't do any demolition work in that bathroom, correct?

A.      Correct.

Q.      And so, therefore, you don't know for certain what's underneath the flooring in that bathroom?

A.      Correct.

Q.      Okay.  And moving on to the next page, exhibit -- page 151.

        There's a gap above the shower door.  You highlighted that earlier, correct?

A.      Yes.

Q.      Did you inspect the room at any of the times that you were in that bathroom to see if that, you know, missing piece of glass was in that room waiting to be installed?

A.      I don't recall the glass.

Q.      You don't recall seeing it one way or another?

A.      No.

Q.     Okay.  Or any other feature that might be there?

A.     No.

Q.     All right.  Let's move on to -- well, so, the next one I was going to go over was not mentioned in your -- in your testimony.

So there were a few things that are in your report, specific -- there are not only photographs but sections that you did not mention.  Are those things that we are now to understand you're not contending are defects?  And I can give you an example?

A.     Okay.  Give me an example.

Q.     So on 13.13, this is all the way -- I'm sorry.

MR. COUGHLIN:  Court's indulgence.  Sorry, Your Honor.

There we go.

BY MR. COUGHLIN:

Q.     So 13.13, "Toilet shut-off valve."  This is on page 175.  So you did not mention that in your testimony.  Are we to understand that, therefore, you are not contending that that's a defect?

A.     Everything that's in the report is nonconformity defect code violation or substandard of workmanship.  The reason why some of these items were glossed over was to save time in the interest of the Court.

Q.     Okay.  But for 13.13, we're looking at a shut-off valve for the toilet that is beyond where your feet would stand when

you're in front of a toilet, correct?

**A.**     Correct.

**Q.**     And there's no code requirement that requires that shut-off valve to be in any other location, correct?

**A.**     There's code requirements for location, but it's an unusual place, and I will say that it -- it probably conforms to the building code.

**Q.**     Okay.  Moving on to 13.14, you did testify about this, I believe.

So everything else I think I'm going over you have, I believe, testified about.  That's page 176.  You know, "Incomplete drywall and painting, throughout" the house.  I mean that's because this is not a finished project, correct?

At least in these photos, these are clearly -- you don't see final paint here, correct?

**A.**     We don't see final paint; however, it should be noted that defendant's expert, Catlett, states in his expert report that painting and drywall is complete.

**Q.**     All right.  He'll testify tomorrow.

And then -- sorry, skipping around to things that you hadn't testified about.

You're not any longer rendering any opinions regarding the kitchen beam and garage lintel, correct?

**A.**     I can't answer that.  Yet -- yes.

**Q.**     Well, I need an answer so --

A.    Yes.

Q.    Yes -- so, I'll ask the question.  If you could just answer yes or no.

Are you rendering any opinions any longer regarding the kitchen beam or garage lintel or, instead, are you deferring to the other expert for the Harrells?

MR. LYNCH:  May I jump in here and --

THE COURT:  Well, you can make a formal objection if you want, or you can -- you can make an objection.

MR. LYNCH:  I was going to tell the Court we are not offering him on that subject.

THE COURT:  Okay.  All right.  Well, then with that guidance, you're not offering an opinion on those.  Thank you.

THE WITNESS:  Yes, thank you.  I will not be providing an opinion on it.

BY MR. COUGHLIN:

Q.    Okay.  So, regarding appliances in the property, I think the -- if we characterize it as appliance, you believe that the hood range -- or I'm sorry, the range hood motor was not functioning, correct?

A.    Correct.

Q.    But your report does not include any other opinions related to the functionality of the appliances in the house in the kitchen, correct?

A.    I believe the report mentions a microwave that was not

properly installed.

Q.    Okay.

A.    It also discusses the installations of the Wolf range and the improper gas connections.  Well, those three.

Q.    So for the microwave and the Wolf range, your opinion is focused on the installation, correct?

A.    It was not focused on the operation because it seemed like an unsafe installation, and I didn't want to turn it on and operate it.

Q.    Got it.  All right.  You're aware that multiple County inspections took place at this property, correct?

A.    Yes.

Q.    And you generally agree that you can rely on the inspections performed by County inspectors, correct?

A.    Yes.

Q.    All right.  Let's go over the measurements.  So that is at the end of the report.  That is page 220 and 221.  So I believe you -- I'm sorry.  Page 212 and 213.

So earlier you talked about the various items that you excluded, so you excluded areas with reduced headroom, correct?

A.    Correct.

Q.    Areas -- you excluded the screened-in porch, correct?

A.    Correct.

Q.    You excluded the garage, right?

A.    The vehicle garage, yes.

Q.      And then you excluded utility rooms?

A.      Yes.

Q.      And then you excluded interior walls, correct?

A.      Yes.

Q.      And then you also would have excluded exterior walls as well, right?

A.      Yes.

Q.      Okay.  But you said that, you know, when a contractor does, you know, work for a home -- whole-home renovation, they're going to measure things differently, correct?

A.      Correct.

Q.      And you'd characterize the work in progress working toward a whole-home renovation at the Harrell property, correct?

A.      Can you rephrase the question?

Q.      You agree that the work that Mr. Deluca was undertaking at the property was a part of a whole-home renovation, correct?

A.      Yes.

Q.      Let's move on to -- Court's indulgence for a second.

        (Brief pause in the proceedings.)

        THE COURT:  All right.

BY MR. COUGHLIN:

Q.      Turn to page 197.  This is under Section 1330.

        Do you agree that for the main house, the vast majority of the shingles that were there appear to have been installed prior to Mr. Deluca purchasing the property?

**A.**    Yes.

**Q.**    And did you -- you didn't notice any leaks anywhere in the house from the roof, did you?

**A.**    There was evidence of water leaks in the accessible attic space of the third floor, but it was not confirmed if it was active or previous.

**Q.**    So, other than that, no other leaks, correct?

**A.**    Correct.

**Q.**    So, the -- back to the shingles.  So therefore, these shingles in the vast majority of the main house, they would have been original to what Mr. Deluca purchased, correct?

**A.**    Supposedly, I would assume, yes.

**Q.**    All right.  So, moving on to 13.33, this is page 205.

Did you have to move any furniture to expose any of the hardwood floors that we're looking at in these photos?

**A.**    No.

**Q.**    Okay.  Are you aware that Mr. Harrell directed Mr. Deluca to not complete the finishing of the hardwood floors?

**A.**    I'm not familiar with any of those conversations.

**Q.**    And so -- but the hardwood flooring, it looks like hardwood flooring that work needs to be done to finish them, correct?

**A.**    It looks like the hardwood flooring has to be completely stripped and started over again.

**Q.**    Lastly, moving on to page 170, I believe.

So in certain areas of your report, possibly shown on 170, you used the term "flexible joint" -- a flexible joint needs to be put in between corners and bathrooms, for example, and in areas like this, correct --

**A.** Flexible sealant joint.

**Q.** The common term for that is caulk, correct?

**A.** It depends.

**Q.** Caulk is one type of flexible sealant joint, correct?

**A.** Caulk is one type of sealant.

**Q.** And can it provide a joint -- a flexible sealing joint if properly installed in certain areas?

**A.** It depends on the caulk, but yes.

**Q.** Okay. All right.

MR. COUGHLIN: I have no further questions.

THE COURT: Thank you. Any redirect?

MS. BROWN: Very brief, Your Honor.

REDIRECT EXAMINATION OF MATTHEW FURLONG

BY MS. BROWN:

**Q.** So, Mr. Furlong, I want to start first with the measurements that you took of the square footage. And I apologize, I don't recall if we covered this in your original direct, but why did you exclude the screened-in porch?

**A.** It doesn't have solid walls. Essentially, it's a covered deck, it's a covered patio. You wouldn't include a deck when counting square footage of a house or a patio. Just because it

has screens on it, it doesn't change the situation.

Q.    Okay.

MS. BROWN:  Walter, can you put Exhibit 352, 353, and 341 on the screen all at the same time?  And just for reference, you can also -- everyone can be looking at page 193, 194, and 195 of Exhibit 58.

BY MS. BROWN:

Q.    Mr. Furlong, in your opinion, when was the -- when were the plastic shingles, when would they have been placed on the roof?

A.    While Mr. Deluca owned or renovated the home.

Q.    So, based on your experience and what you know about Mr. Deluca and his experience and qualifications and the work that was performed at the property, to what extent do you think he knew or should have known the roof was not a true slate shingle roof?

A.    A traditional slate shingle roof?

Q.    Right.

A.    Yes, he should have known.

Q.    Is there anything else you would like to tell the Court about your observations that you've made at the property that we didn't cover in your testimony today?

MR. COUGHLIN:  Objection, Your Honor.  That's a very open-ended question.

THE COURT:  Sustained.

MS. BROWN:  I have no further questions.

THE COURT:  All right.  Mr. Furlong, you may step down. Please don't discuss the testimony you've given with anyone until our trial is over.

Is Mr. Furlong going to be held for possible rebuttal testimony?

MR. LYNCH:  That is not the plan currently, Your Honor.

THE COURT:  Okay.  I'm just wondering whether to excuse him.  If not, we'll excuse him.

And unless you hear from counsel, you're done.  So thank you very much, sir.

THE WITNESS:  Okay.  Thank you, everyone.

THE COURT:  All right.  Why don't we break now for lunch a couple minutes early just so we don't get, you know, started and then stop right away with the next witness.  Who's your next witness?

MR. LYNCH:  Mr. Bowe, a damages witness.

THE COURT REPORTER:  I'm sorry, I didn't hear you.

MR. LYNCH:  Mr. Bowe, a damages witness.

THE COURT:  All right.  Then we'll get back about 10 minutes to 2 then, all right?  All right.  We're in recess.

(Thereupon, a luncheon recess was had beginning at 12:49 p.m.)

**AFTERNOON SESSION, JULY 13, 2022**

(1:59 p.m.)

THE COURT:  All right, Mr. Lynch, your next witness, or do you have any preliminary matters?

MR. LYNCH:  I don't, Your Honor.

THE COURT:  Okay.  Call your next.

MR. LYNCH:  We would like to call Mr. Bowe to the stand, please.

THE COURT:  All right.  Good afternoon, sir.

(MATTHEW BOWE, PLAINTIFFS' WITNESS, SWORN)

MR. LYNCH:  I'm sorry, Mr. Marshal, I would like to hand up a book to the Court and one to the witness also.

Your Honor, I would like to make a note here.  Can we switch the binders, please.  So, Mr. Bowe, while he was in the witness room, made some notations in his binder.  So, you know, I would be happy to let opposing counsel look at them, and that it's specially marked because he made some notations in the witness room.

THE COURT:  Well, how many notations -- now many notes did he make?

MR. LYNCH:  Eight, I guess.

THE WITNESS:  Maybe, yeah.

MR. LYNCH:  Yeah.

THE COURT:  Do you want to look at them?

MR. COUGHLIN:  Can I take a quick look?

THE COURT:  Yes.

(Brief pause in proceedings.)

MR. COUGHLIN:  May I ask the witness a quick question off the record.

THE COURT:  Yes.

MR. COUGHLIN:  Or, I guess, on the record.

Are the notations where your stickers are generally?

THE WITNESS:  They're going to be in those, so it's in the permit review sections.

MR. COUGHLIN:  Okay.  Got it.  Okay.

THE COURT:  That should be on the record, Mr. Wallace.

THE COURT REPORTER:  Yes, Judge.

MR. COUGHLIN:  Your Honor, I quickly inspected them.  I guess, if I may, all I'd ask is that when he's asked a question, if he could ask the question without referring to the document, that would be my preference, and then if he needs the document to refresh his recollection, then he refers to it rather than reading and it reading his notes from the --

THE COURT:  Right.  That's fine.  That's been my standing order, so that's fine.

MR. COUGHLIN:  Okay.

THE COURT:  Is that understood, Mr. Bowe?  You testify from your memory, and if you need to refresh your recollection with your report, you may do so.  Just indicate -- let us know that you're actually looking down and reading the report to

refresh your recollection.

THE WITNESS:  Thank you.

THE COURT:  Or ask -- better yet, ask counsel whether it's okay to refer to your report to refresh your recollection, okay?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  Good.

DIRECT EXAMINATION OF MATTHEW BOWE

BY MR. LYNCH:

Q.    Please state your name for the record.

A.    Matthew Bowe.

Q.    What licenses do you currently hold in Virginia?

A.    I hold a Class A contractors license, RBC and CBC.

Q.    And you spent some time as an appraiser?

A.    Yes.

Q.    Can you tell me about how long you did that and what that experience consisted of.

A.    I was a residential real estate appraiser primarily, for about ten years.  I did some commercial and land development work, but primarily residential appraisal in New York and here in Northern Virginia.

Q.    Okay.  Tell me about your Company, Matthew Bowe Build?

A.    So the original company was formed in 2005 with a partner.  I split with him in 2013, and it's been Matthew Bowe Design Build since then.  We are a residential design build firm

working primarily in Loudoun County, and we do primarily residential work although we have done occasional commercial projects as well, too.

Q.    Okay.  What awards has your company received?

A.    So, we have made the Remodeling 550 list, and also, since 2016, we've been recognized as best builder in Loudoun and best remodeler every year since 2016.

Q.    What experience do you have in construction estimating at your company?

A.    So, I've -- I've been the estimator since I started the company and prepared all project estimates.  About two years ago, year and a half ago, that was transitioned to an estimator, but I still oversee and approve all estimates.

Q.    Why is accuracy in preparing construction estimates important to your business?

A.    Sure.  Because, you know, we've got sort of two opposing needs.  We've got to -- we've got to price a job properly to make profit and have sufficient resources to complete the work, but we also have to be competitive in our bids in order to compete with our -- you know, with other builders in our market.

Q.    Have there been instances in your career or with your company where you have taken over an incomplete project or project with defective work and brought it to completion and final inspection?

A.    Yeah, there's four that come to mind immediately that

we've done that on.

MR. LYNCH:  Okay.  So, Your Honor, I would like to move into evidence Mr. Bowe's résumé.

THE COURT:  All right.

MR. LYNCH:  And that is Exhibit B to Exhibit 901, at the very end of Exhibit 901.

THE COURT:  Okay.  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  All right.  It's received.

(Plaintiffs' Exhibit 901 admitted into the record.)

BY MR. LYNCH:

Q.    Okay.  So let's turn to Exhibit 901, please, Mr. Bowe. So please just tell us what primary opinion you're offering in this case?

A.    So I'm offering an opinion for the cost of work to remediate deficiencies and to complete a scope of work as defined in the contract documents.

Q.    Okay.  And what type of -- what -- what are you looking at to figure out -- to figure out your scope?

A.    So I was provided with a copy of an inspection report that had been prepared by Falcon engineering that was a pretty detailed list of deficiencies, and I started with that and visited the site and walked through the report to confirm whether those were, in fact, present, and I was able to confirm that.

I also was provided copies of other inspection reports on the property by engineers, and I used that in my evaluation, and I also evaluated the permit history with the County for the work that was -- been completed or partially completed to date.

Q.    Okay.  And what is Exhibit A to your report in Exhibit 901?

A.    That is the cost estimate.

Q.    Okay.  And what is your conclusion as to the reasonable estimate of the cost to complete the construction in a home that -- at this home in a way that complies with the building code, industry standards of workmanship, and the contract?

THE COURT REPORTER:  I'm sorry.  Slow down.

MR. LYNCH:  I'm sorry.

BY MR. LYNCH:

Q.    What is your conclusion as to the reasonable estimate of the cost to complete the construction at this home in a way that complies with the building code, industry standards of workmanship, and the contract?

A.    It is 1.266 million.

Q.    Okay.  The as a shorthand term, I'm going to refer to that document as your cost to repair; is that fair?

A.    Fair enough.

Q.    Okay.  Referring to page 2 of your report, please tell us what visits to the property you conducted in forming your opinions in this case?

**A.**     So I visited the property in April of 2019 and again in September of 2019.

**Q.**     Okay.  And what did you do during those visits in order to inform your opinion in this case?

**A.**     Right.  So the April was my initial visit, and I walked the property with the Falcon report in my hand to visually observe everything that was in that report and confirm that.

In 20 -- in September, I went back out to, I guess, evaluate whether any work had been completed, if any conditions had changed on my April visit.

**Q.**     Did you observe any changed conditions or anything of note in that second follow-up?

**A.**     I did not.

**Q.**     Okay.  What destructive investigation did you do, for example, opening walls and ceilings, if any?

**A.**     I did not do any destructive investigation.

**Q.**     Okay.  So referring to page 1 of your report, just briefly walk us through some of the documents you have reviewed and due diligence you've conducted in forming your opinions.

**A.**     Okay.  So, as I mentioned before, I went through the Arlington County permit summaries, permit inquiry, the sales contract between the owner and Mr. Deluca, the post-closing construction agreement between the same, and the construction defects report prepared by Falcon.

I viewed six videos that were recorded by a roofing

contractor.  There was a Bates combined report, and then also I reviewed all of the project plans that I had at that time for -- by Soil & Structure Consulting, and I've kind of listed each of the versions of the plans and the date and the pages included.

There was also a Matterport file, a 3D file that we got a link to that -- she gave me 3D imaging of the house when it was fully gutted.  Like I said, that link is no longer active, but I have it in here because I referred to it at that time.

And then I -- for the three trades, the MEP trades, Falcon Heating & Air Conditioning, GLS Plumbing, and Southern Electric, they made site visits with me to give me budget quotes for their work.

Q.    Can I stop you just for a moment?

A.    Sure.

Q.    Can you explain if there's any relation between Matt Furlong of Falcon and Falcon Heating & Air Conditioning?

A.    There is no relation --

Q.    Okay.

A.    -- between the companies.

Okay.  And then I have my -- you know, I work primarily off of my internal cost database, and we use sometimes as a reference a software application called National Estimator.

Q.    So what review have you conducted of the Arlington County inspection records?

A.    What review?

Q.      Yeah.

A.      So I was able to pull up basically a record of all the permits that have been submitted and get a history of inspections that had been performed on each of those permits.

Q.      Okay.  And then you -- what review did you do -- there are three exhibits, 433, 438, 349, which have a plan review comments, inspection comments, the events logs and notices. Have you looked at throws documents?

A.      I have looked at those.

Q.      Okay.

A.      That was subsequent to my preparing this report, but I have looked at those.

Q.      Okay.  And what review have you done of the trade permits?

A.      Same thing.  I've been able to look through the trade permit applications as well, too.

Q.      Okay.  And what review have you done of the orange cards, those little orange inspection tickets?

A.      Again, I've had an opportunity to look at the cards that have been provided to me.

Q.      Okay.  What review have you done of the dated progress photos attached to the e-mails between Mr. Deluca and his lender?

A.      Yeah.  I spent a fair amount of time reviewing those because it helped create a timeline in my mind.

Q.      Okay.

A.      Of progress.

Q.      There's just a couple of photos I want to show you out of that book.  We're going to start at Exhibit 408.  We'll just put them on the screen.

THE WITNESS:  Do I have the ability to turn the speaker up in here?

THE COURT:  No, but you can get a little closer to the microphone.

THE WITNESS:  It's more my hearing.

THE COURT:  Ah, okay.  Can we...

MR. LYNCH:  I think if I speak louder, that will help.

THE COURT:  Okay.

BY MR. LYNCH:

Q.      So Exhibit 408, page 5.

MR. LYNCH:  I'm sorry.  Go back, Walter, again, again.  One more.  And then forward one more.  This one, page 40 --

BY MR. LYNCH:

Q.      Exhibit 408.  What observations have you made about this particular photograph?

A.      So, that photograph appears to have been taken prior to the screen addition being built on the house, and so I know that because that fireplace that has since been converted to a masonry fireplace is now internal to the building, and that tree doesn't exist there.

So at the time of this photo, the foundation for the screened porch, which is part of the approved -- eventually approved plans, was not installed at this time.

MR. LYNCH:  And for the record, the witness is looking at Dashco -- page Dashco 174 of Exhibit 408.

BY MR. LYNCH:

Q.   What inspections have been done of that area to your review?

A.   So I did not find any inspections of the slab and foundation that were ultimately poured there to support the screened porch --

Q.   Okay.

A.   -- that has since been built.

Q.   Let's look at Exhibit 410, please.  And it's page Dashco 200.  All right.  What is depicted in this photo?

A.   So this is a lead walk down the side of the building, and that little bit of fresh concrete that turns the corner there appears to be a slab poured for where the screened porch now sits.

Q.   You think it's the screened porch or the mudroom?

A.   No, I think that that's the screened porch.

Q.   Okay.

A.   The mudroom, if you're referring to the rear entrance, is now built on that existing -- looks like a sidewalk slab.

Q.   Okay.

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

**A.**     Right.  But I'm talking about the piece of concrete that turns the corner there that goes behind the house.

**Q.**     Right.

**A.**     It looks like the slab -- it appears to be the slab, to me, of the now screened porch.

**Q.**     Okay.  And in the foreground is the slab for the mudroom?

**A.**     Yeah.

**Q.**     Okay.  So some --

**A.**     I just want to be clear, by "mudroom," there's a rear entrance hall, if that's what we're calling the mudroom.

**Q.**     Yeah.

**A.**     Just so we're talking about the same area.

**Q.**     Okay.  So summarize how your review of the Arlington County permit and inspection records in the dated progress photos to Dashco informed your opinion about the cost to repair?

**A.**     So, what I found after viewing the -- all the progress photos here in this exhibit, which takes you up to close-in pictures, pictures of all the walls and stuff closed in, those images demonstrate a lot of work was done.  The building had been gutted, mechanical work had been installed, and everything had been enclosed, all, according to the date of this pictures, before permits were ever issued on the job.  So -- and there is not a corresponding inspection history for those -- for those trades whose work is now concealed.

**Q.**     How does that matter to your cost-to-repair estimate?

A.    Sure.  Well, so, you know, there's -- there's the report that was prepared by Falcon Engineering [sic] that really spelled out all of the things that were visibly deficient, that you could see without any demolition expiration, and that was a pretty extensive list, and so my assumption in my original report is that, with that much deficiencies and with all the gaps in the inspections, it probably wasn't prudent to assume that the work that was already concealed was to code or better, right, and so now this information became available to me after that and seems to have confirmed that because we can see from viewing this series of images how much work was done, when the building was gutted, and work was done that has now been covered up without -- I say covered -- is being concealed, been finished without any inspections, and so -- so it seems -- it confirms my opinion at the time, which is -- I think it's prudent to go back to a gut condition to make sure all the work is up to code and properly inspected.

Q.    So in formulating the cost to repair, how does it affect the number when a contractor like you has to put your name and warranty behind a job with this permitting and inspection record?

A.    Sure.  Really, I mean, as a builder, if I take on -- if I were to take on a project for a client, I really take ownership for that house and making sure that that house is durable and is going to serve them well, so putting good work over bad is never

a good idea because you own it the moment you touch it, right, so it's why, again, I -- I would not be willing to warranty all the work that I would be putting my work on.  And in order to feel that the work was done properly and code has been met, I think you need to open it back up and inspect all the work that was done without inspections.

Q.    Okay.

A.    And so that's reflected in my report when I refer to costs for gutting and replacing much of the finishes.

Q.    Okay.  And what review have you done of the licensing record of Mr. Deluca's subcontractors on this project?

A.    So I was provided a list of licenses of the subcontractors that I understand worked on that project, and in reviewing them, I noted a fairly large number that were unlicensed.

          MR. COUGHLIN:  Objection, Your Honor.  There's been a ruling in summary judgment, partial summary judgment granted excluding the licensing issue from the case.

          THE COURT:  Yeah, from being one of the grounds for the fraud, but I think it's relevant to -- and he can explain why, but your exception is noted, but I'm going allow this testimony in.  Thank you.

BY MR. LYNCH:

Q.    So, how did that review of the licensing information -- what effect does that have on your cost to repair?

A.    Well, I mean, I think it's reflective of the work that was, you know, that was noted or the deficiencies in the work that were noted.  If there -- if the subcontractor is not serious enough about their trade and their profession to become licensed, then it's oftentimes reflected in the quality of the work that they do, too.  You know, if they're fly-by-night or however you want to refer to it, but they're not serious about their business, and so if I see work that's done that's been unlicensed, I don't have faith in that work.

THE COURT:  You're not saying that they can't work on a location without -- under the general contractors' license, right.

THE WITNESS:  It's my understanding that they are not permitted to work under a general contractors license.  My understanding is that every trade on the site has to have a license.

THE COURT:  Okay.

THE WITNESS:  And if I my --

BY MR. LYNCH:

Q.    Yeah.

A.    -- it's a requirement I have for mine.  Nobody works under my license.  I require all of my subs, tile, paint, carpenters, they all must have a license and be insured.

THE COURT:  All right.

BY MR. LYNCH:

Q.      And you understand --

        MR. LYNCH:  I'm sorry.

        THE COURT:  Go ahead.

BY MR. LYNCH:

Q.      Is it your understanding you have a duty to check that?

A.      Beg your pardon?

Q.      Do you have a duty to check that?

A.      Absolutely.

Q.      Okay.  Let's talk about your methodology for putting together the Exhibit A.

        So let's look at the bottom of page 4 of your report. And there's a paragraph with a big bold "Exhibit A" -- it's actually the middle of the page right before "Summary of Opinions."  What can you speak to about that particular paragraph as far as your methodology?

A.      Well, I mean, I think, you know, the big question is -- here, is what extent does work need to be uncovered in order to be confident in that it's corrected, right?

Q.      And what data, what objective data did you rely on in putting this together?

A.      In preparing my cost estimate?

Q.      Yes.

A.      Okay.  So we have a long established internal cost database that we've been building since I started the company, and that is something that we update regularly since we are --

we're getting cost data from the market, you know, on a near

daily basis.

So primarily, I'm using my internal cost database and our

estimating templates that we built, and to the extent that we

need to call a sub or call a vendor for a quick number, we'll do

that, but for the most part, we relied on our cost database.

Q.    Did you use any estimating software in preparing this?

A.    Sure.  It's -- you know, it exists on a construction

management platform that we use that includes an estimating

module, which is essentially a database module.

Q.    What has happened in Virginia to construction costs since

the time you prepared this cost estimate?

A.    Right.  So, they have increased roughly, according NAHB

and my own personal experience, 20 percent per year since COVID.

They're probably up about 10 percent already this year.  So I

think -- I prepared this in October-November of '19, and it is

likely that costs are up somewhere on the order of 25 to

30 percent since then.

Q.    Okay.  So let's walk through your cost to repair, and I

notice first that the cost to repair is organized by different

divisions.  What do -- explain to me what the significance of

these divisions are.

A.    Yeah, so the -- the industry uses this format to just

organize your costs so they're just not all over the place, so

they're really segregated into categories kind of as they exist

on the project.  It's just a way to quickly organize your costs and know where you go and find them and to be able to build out your estimate in a sort of a coherent way that follows through the flow of a project.

**Q.**    Now, walk us through the columns at the top and how that works, how they tie into each other.

**A.**    Right.  So this is the estimating platform that's in our overall project management platform.  You have a description of the item down on the left, a "Quantity" as your second column, the unit -- the "Units," whether it's square foot or time or per unit, you know, are your third column.

There's a "Unit Cost."  That's our proprietary data that we maintain, our cost database.

The "Extended Cost" is the unit cost times the quantity.

That next column, which is not titled is the markup on that, builder markup.

And then the "Line Item Total Price," would be the extended cost plus the markup.

And then each of those categories, those will roll up to that number in the "Selection Total" column, and then all those numbers roll up to overall totals in the final column.

**Q.**    Okay.  So, noticing the second line item there, in quantity there, you have "183 days."

**A.**    Right.

**Q.**    How did you arrive at that number?

**A.**      How did I arrive at 183 days?

**Q.**      Yes.

**A.**      Yeah.  So I took this project and compared it to projects we performed of similar scope and complexity and derived a duration based on that.

**Q.**      Okay.  Looking at "Division 1," just walk us through what costs are included in that section and why they're included.

**A.**      Sure.  "Plan Reproduction" is just simple repetitive copies of plans that happens throughout the course of a project.

"Vehicles, Fuels and Travel" is a per diem we apply that covers the cost of those items to get our crews to jobs.

"Outside Storage Container" is for storing either tools and/or sometimes fixtures and finishes on-site so they're protected from the construction zone.

"Project Signage" is just all the marking and identification we have to do on each of our projects.

THE COURT:  If you could move -- I know this is difficult, but can you move the microphone closer to you while you're looking at that?  That will help.  I'm having trouble hearing you now.  Thank you.

THE WITNESS:  Okay.  The "Expediter" is a specialist who knows how to get permits through as quickly as possible in various jurisdictions, and so they are generally the most cost effective way rather than having a builder spend their time to do it.

"Construction Cleaning" is just interim cleaning on the project, which is necessary to keep a safe job site and a tidy job site.

The "Final Clean" is the deep clean we do before we deliver the house to a client, and that's -- everything gets -- everything gets a deep clean.

And then "Miscellaneous Tools and Sundries" are just the types of -- as I described, miscellaneous materials and/or small tools that are purchased specifically for that project.

BY MR. LYNCH:

Q.   Okay.  I want to -- one quick question before you move on to the next division.  I see there a square footage next to cleaning the house.

A.   Sure.

Q.   How did you determine that number?

A.   The square footage?

Q.   Yes.

A.   So of the same way -- sorry, that sounds loud.  I use a digital measuring tool, and I measure the plans digitally, so that's how I determined my square footages and volumes.

Q.   Is that something you do regularly in preparing bids or...

A.   Absolutely, yeah.  We always take our measurements digitally off the plans.

Q.   Okay.  I interrupted you.  Let's go through the next

division.

A.    "Project supervision and" --

THE COURT:  Let me stop you there.  Are you going to go through this item-by-item and just have him identify what the numbers are there?  There's no reason to do that.  They exist, he stands behind them, he can be cross-examined on them, and you can ask him on redirect why those numbers were justified, but we're not going to go through two hours of him just reciting what's on these pages.  There's no reason to do that, okay?

MR. LYNCH:  Yes, Your Honor.

THE COURT:  Okay.  If you have some highlights that you want to make of why a certain --

MR. LYNCH:  Yes.

THE COURT:  -- number exists, I'm happy to listen to that; but otherwise, let's have that done on cross-examination and redirect.

MR. LYNCH:  Yes, Your Honor.

BY MR. LYNCH:

Q.    So just on the "Project Supervision and Management," there is a significant number there.  I believe the math might be 150,000.  Can you explain why that's necessary?

A.    Sure.  I mean, our approach to managing a project this size is to, A, allocate enough time before we start the work to work out the specifications, document them, get them priced, get client approval, and those are your preconstruction categories,

and that means now you've got a plan and specs and you're ready to build.  You're not trying to build and just -- you're not trying to design while you build, which is inefficient and costly.

And then you go into the management of the project while it's in construction and, we allocate one-quarter of a project manager's time, one-quarter of an assistant project manager's time, and a full-time site superintendent for a project of this scale, and we do that because without -- for a project with this complexity and this widespread, without someone on the site all day watching and coordinating, it's left to the subcontractors to complete the work, and we have found that frequently it is not done to spec, it's not done per the design intent, and it usually ends up -- it always end up, quite frankly, delays in the project because there's not one person quarterbacking the whole team.  Everybody is just doing their own thing.  So it's our belief and our practice to provide full-time site supervision on a project of this scale.

Q.    Okay.  Let's move to Division 10.  And there's an "Appliances" number in Division 10.  And please tell us, and in particular, the kitchen appliance package, which I believe says 58,500, can you explain to the Court how you arrived at that number?

A.    Right.  So the unit cost is 45,000.  The 58,5 includes a markup, and it reflects a replacement of the kitchen appliance

package in total.

Q.    Okay.  So why is it necessary to put in new appliances?

A.    Right, because it was noted in the report prepared by Falcon that some of those appliances weren't installed to code or to manufacturer's specifications, and to my understanding, there's been no warranties provided on them, so they're -- without the warranties, the owners are left with -- I'm not sure what they're left with at that point in time.

Q.    If you were building a project and you provided appliances with no warranty documentation, how would that be received by your clients?

A.    They are demanding the warranties, as they should, as we're turning projects over.

Q.    Okay.  And why does that matter, practically, to a homeowner to have that?

A.    The warranties?

Q.    Yeah.

A.    Sure.  These appliances are expensive to maintain and to fix.

Q.    Okay.

A.    All right?  And you want it covered.  Most of these manufacturers have approved installers for these higher-end appliances, so it's always best to get an authorized installer to maintain the warranty.

Q.    So, there have been -- are four components of structural

parts of the building, which Mr. Amin will be testifying about as to the nature of their structural integrity.

One of them is what the -- is the steel beam opening above the carriage house garage.  The garage was on one side of the building, it moved to the front, and they took out the masonry in the carriage house and put a little beam over the new garage opening.

There's a steel beam in the kitchen.  There's been some pictures of Mr. Deluca's workers welding on that beam.

There is a masonry foundation in the crawl space.

And then finally, there are, the evidence will show, missing collar ties at the carriage house.

Have you reviewed the reports of Mr. Amin, and how did you deal with those issues in your cost estimate?

**A.**   Right.  So I have reviewed that report.  That report came to me after I prepared this, but at the time I prepared this, I was able to observe, myself, the incorrect installation of the steel beam across the kitchen opening, which, even after the inspection, there was more deficiencies to that installation than I had recognized at the time.

And I also knew that the steel beam, which is really an angle, that was installed over the new garage door opening, was not per the plans, and notwithstanding a letter from an engineer that verified something was there, it didn't certify that beam and that installation.

Then the piers, which you referring to as a foundation issue, there are block piers in the crawl space.  I had observed that the tops of those were, you know, kind of broken up, and there was an improper shim between the top of that and the beam, and so I put -- I did include some money in there to correct that, but after -- subsequent to that, after seeing Mr. Amin's report, you know, the corrective work was even more extensive than what I had accounted for in there, so -- so really, there's more money involved in correcting those as well.

And then, finally, on the roof structure of the -- over the exercise room behind the garage, it's been noted that the plans call for a 2-by-12 roof framing, it's 2 by 10, and they also are not -- that roof is not at an elevation as per the plans where it's all supposed to be in plane with the existing roof, and because of the way it's built, it's actually, if I recall correctly, there's asymmetrical pitch because it wasn't -- you know, the front pitch is different than the back pitch trying to accommodate the way it was built, which is, again, not per plans.

And then that roof structure is absent a structural ridge, as best I can see from the progress photos, which requires, you know -- and it calls for collar ties in the plans, and those collar ties are missing, and they are a structural element.

Q.    Okay.  And if you've touched this -- if you've touched on

this already, excuse the question, but I believe there may be some information you've seen about foundations at various areas of the house which may have affected this number since you drafted it.

A.     Yeah.  I think, as I mentioned before, when we were looking at that image before, the screened porch foundation is on the end.  I was not kind of aware or cognizant of the time of the -- the timing of everything, but it appears that that was poured.  There's no inspections for that foundation as it's shown on the drawings, and I don't have any cost in there for any remediation if there ends up being issues with that foundation.

Q.     Okay.

        MR. LYNCH:  Your Honor, this cost to repair is, in the -- our trial exhibits, stand-alone, as Exhibit 902.

        THE COURT:  Okay.

        MR. LYNCH:  I would like to admit that exhibit into evidence.

        THE COURT:  Is that the same figures as we've got here?

        MR. LYNCH:  It's the same one, yes.

        THE COURT:  Any objection?

        MR. COUGHLIN:  So long as we get the same treatment, assuming you would overrule my objection if I did make one, with our cost estimate.

        THE COURT:  Right.  All right, it's received.  And

hopefully I'll be balanced in my ruling.

(Plaintiffs' Exhibit 902 admitted into the record.)

THE COURT:  So are you going to get into what a new number is since this other -- the beams and the roof structure, et cetera, plus the increase in the costs since 2019?  Is Mr. Bowe prepared to testify about those or not?

MR. LYNCH:  He's not --

THE COURT:  It's a question.

MR. LYNCH:  He's not.  We didn't go back and prepare a new estimate.  I think it was -- you know, timely -- I'm not sure it would be timely in any event but...

THE COURT:  Well, damages experts have a kind of a different life, but we --

MR. LYNCH:  Right.  Well, let's --

THE COURT:  Now --

MR. LYNCH:  Let's just -- I'm sorry.

THE COURT:  I don't want you to do it by surprise today. I was curious as to whether it had been done and counsel had, you know, had a chance to look at something since damages reports are updated in certain cases, and obviously, we've been dealing with COVID and things have been sitting around for years in final form, so don't try and do it right now, please.  Okay?

MR. LYNCH:  Okay.

BY MR. LYNCH:

Q.    Let's talk briefly about Mr. Kiet Ngyuen's report.  So

that's actually in your binder at Exhibit 145.

And on page 2 of that report, Mr. Nguyen says, "The evidence suggested that a close-in inspection had also been approved and passed."

Just please tell us your opinion about that particular line.

A.   Sure.  I think the sentence before that is important, so -- he indicates he was not provided detailed inspections that had been concluded, and then reaches the conclusion, because the walls were closed in, that there must have been inspections.

Q.   Okay.

A.   Maybe generally a safe assumption, but I think that the inspection record and the progress photos that we have demonstrate that a lot of work was done and closed in without the commensurate inspections necessary for that work.  So I wouldn't agree at all that the fact that walls were closed in proves there was close-in inspections.

Q.   And from your review of Mr. Nguyen's numbers, is he accounting for, to your ability to discern this from a review of his report --

THE COURT REPORTER:  Excuse me?  Can you say that again?

MR. LYNCH:  Yes, I'm sorry.

BY MR. LYNCH:

Q.   From your review of Mr. Kiet's [sic] report, is he only accounting for the visible work or is he accounting for work

behind the walls from your review of the number?

A.      He seems to be just accounting for visible work and assuming that the work behind the walls, by virtue of his statement, has been inspected and is satisfactory.

Q.      What is your opinion about Mr. Nguyen's characterization of the remaining work as punch list type work?

A.      My concern there is that it diminishes the import and the significance of the work that needs to be done, both the corrective work of code violations and just completing the project, so generally in the industry, punch list are those lists of inconsequential items that are left after a project reaches substantial completion, which in the case of a project like this would be, you know, building finals.

And so the building with this space would presumably be habitable for its use -- or suitable for its use, intended use, and the remaining items would be generally cosmetic in nature, although in this day and age, it might be you're waiting on an appliance or something like that.

So to refer to the work as punch list, I think, really diminishes the seriousness of it and is probably reflected back to the notion that there's not much going on here, like there's not much to be concerned about, and I think I take the opposite position that the lack of a complete inspection history the and photographic evidence that a fair amount of work was done and closed in before inspectors ever walked into that house, would

make me prioritize and consider those big ticket items and important items to address.

Q.    And I'd like to ask you a hypothetical.  Assume that Mr. Kiet did not use any estimating guidelines, like RSMeans, industry standard, estimating guides, or historical a cost database, like you did.  How would that affect your opinion of Mr. Kiet's price?

A.    Well, I think that that estimate would be less reliable than an estimate based on proven cost data.

MR. LYNCH:  No further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION OF MATTHEW BOWE

BY MR. COUGHLIN:

Q.    Good afternoon, Mr. Bowe.

A.    Good afternoon.

Q.    Mr. Bowe, you testified that you are a Class A contractor, correct, and that you've done some renovation work, correct?

A.    I've done a substantial -- yeah, it's a big portion what have we do.

Q.    Okay.  And in some of that renovation work, you're going into a house, and you're not touching certain portions of the house, correct?

A.    That would be correct.

Q.    All right.  And so in that instance, you're only applying

your warranty to the work that you actually touch, correct?

A.     That would be correct.

Q.     Okay.  And have you done any work in Arlington County within the last ten years?

A.     Yes, I've probably done four or five projects.

Q.     When was the last one that you did, would you say?

A.     It's probably three, four years ago.

Q.     Okay.  As a part of your investigation in preparation of your cost estimate and reports, did you speak to the inspector who was at the property during the inspections that did occur at the property?

A.     I did not.

Q.     Okay.  And you mentioned that you reviewed the contract documents, correct?

A.     Yes.

Q.     Does the -- are you familiar with Exhibit B3 to the sales contract?

A.     Only in name.  I don't have a recollection of the details of each of those addendums.

Q.     Okay.  So you're familiar with the addendums?

A.     Yes.

Q.     And the fact that the parties used those to document the specifications for the home, correct?

A.     Yeah.  I'm not -- I don't know that I recall that there's a complete set of specs, but those addendums, as I recall them,

laid out certain items.

Q.     Okay.  And there are no plans attached to the -- any of the contracts between the parties, correct?

A.     Plans attached?  I don't know if there's any language I've read -- I don't recall any language, one way or the other, whether it was referenced in those contracts or not.

Q.     But you contend your estimate is an estimate based on the contract between the parties?

A.     Correct.

Q.     Okay.  So, I'll quickly cover licensing.  You would agree that the electrical contractor that did the work at the property that pulled the electrical permit is licensed, correct?

A.     I don't remember specifically which contractors were licensed and which weren't.  I could refer to the document, but I don't have a recollection of specifically who was and who wasn't licensed.

Q.     Okay.

A.     I'm sorry, are you talking about the electrical contractor I etched out or --

Q.     No, the electrical contractor that came to the -- that did work at the property.  They weren't --

A.     I could refer to the --

Q.     -- licensed, correct?

A.     I could refer to the licensing record here, but I don't know.

THE COURT REPORTER: I didn't hear the rest of your question.

BY MR. COUGHLIN:

Q. It's -- I'm asking about the electrical contractor who did the work at the property. They were licensed, correct?

A. Okay. Again, unless I refer to their licensing record here, I can't tell you specifically who was and who wasn't licensed off the top of my head.

Q. And what are you pointing to?

A. There's a listing here of all the subcontractors that worked on that job and their licensing status.

Q. Okay. And so just -- you made it sound earlier that the mechanical or electrical or plumbing contractors weren't licensed. I mean, some of the trades -- you were able to find that some of the trade contractors were licensed, correct?

A. That's correct, yep.

Q. Okay. And a painter doesn't need to be licensed, correct?

A. That's not my understanding. My understanding is if they're performing services, they need to be licensed.

Q. You think a painter, just a painter hired by Mr. Deluca on an hourly basis would need to be licensed in the state of Virginia?

A. That's my understanding.

Q. So everyone who comes to a job site has to be licensed?

**A.**      Well, I mean, clearly there's support -- there's employs, no, but the companies I engage all must be licensed.

**Q.**      And everyone that works for those companies has to have their own license?

**A.**      No.  No, no, just the company -- there has to be a license for the company.

**Q.**      Okay.

**A.**      Yeah.

**Q.**      Each individual --

**A.**      Not -- not each individual worker, no.

**Q.**      Okay.  Got it.  I'd like to turn to Defendant's Exhibit 181.  This is probably not in the book.  Actually, it is.  So this is in your book.

So let me know when you have 181 either up -- it's upon on the screen.  It might be easier for you.  Or you can get it in your book, whichever is your preference.

What we're looking at as Exhibit 181 is a rough plumbing inspection that was approved on June 12th, 2019, correct?

**A.**      Yes.

**Q.**      And turning to Exhibit 182, Exhibit 182 is an electrical concealment inspection that was approved on April 30th, 2019, correct?

**A.**      That's correct.

**Q.**      And the documents we're looking at pertain to the project in question, correct?

**A.**      It pertained to some portion of the project because there's multiple permits on that -- on that project.

**Q.**      Okay.  And then turning now to Exhibit 183, Exhibit 183 is a rough inspection for the mechanical that was approved, less the addition, on April 25th, 2019, correct?

**A.**      Correct.

**Q.**      And then turning now to Exhibit 184.  Exhibit 184 is a "Building," "Electrical," "Mechanical," "Plumbing" inspection for "framing," "concealment" and "rough mechanical" that was approved on June 11th, 2019, correct?

**A.**      That's correct.

**Q.**      And so on June 11th, all framing under this permit was approved except the fireplace area, correct?

**A.**      Ah, for that permit, which I believe ends in 1108, which is a two-story addition.

**Q.**      Okay.

**A.**      And there are some notes on there about the screened porch had already been in closed so that couldn't be inspected. Is there's notes on the County's record, not on this.  So the inspector noted that the porch had already been enclosed and so it wasn't capable to be -- it wasn't available to be inspected.

**Q.**      But they still -- here they say "all framing" approved, correct?

**A.**      That's what this document says, yes.

**Q.**      Okay.  And did you see that -- I don't have the stickers

handy, but did you see stickers for insulation being inspected as well in the house?

A.   I don't know if I saw a sticker.  I do remember in the permit reports and reporting you can pull off line, I do remember an insulation inspection.  It was a partial inspection.

Q.   And did you -- did you also end up seeing a foam certificate that was supplied to the County?

A.   I'm not sure if I have seen that.

Q.   Okay.

     MR. COUGHLIN:  Could we pull up Defendant's Exhibit 143.

BY MR. COUGHLIN:

Q.   Could you look at the screen and familiarize yourself with this document, and let me know when I may ask you a question?

A.   Okay.

Q.   Have you seen this document before?

A.   I don't recall seeing this document.

Q.   Okay.  Do you know how to interpret a foam spray certificate?

A.   Well, yeah, I mean, I -- yes, I do.

Q.   So it reports R-values, which is the rating of insulation in certain areas, correct?

A.   Yep.

Q.   And then this would be, therefore, the certification from the foam installer that -- after the job was complete, that the

R ratings are as noted in the certificate, correct?

**A.**    Okay, yep, yes.

**Q.**    Okay.  And so is it your understanding that the R rating shown here are what's required in these areas that are identified under the building code?

**A.**    Yeah, as reported, that meets code.

**Q.**    Okay.  And so as a result, the foam insulation doesn't have to be resprayed throughout the entire house, correct?

MR. LYNCH:  I would just like to extend an objection. Mr. Coughlin began his line of questioning stating that, Have you seen this spray foam certificate provided to the County.

THE COURT:  Overruled.  He can identify it.

If you can answer the question, answer the question, and if you can't, just say that you can't answer the question.  Thank you.

THE WITNESS:  Could you repeat the question?

BY MR. COUGHLIN:

**Q.**    Sure.  Well, I'll back up.  I mean, you have a line item in your report.  And let me find it just so the Court has it.

So under 700-L [sic] that's called "Insulation."  This is in your report.

**A.**    Would you please remind me again what my exhibit number is?

**Q.**    Yes, absolutely.  Yeah, if you can get your Exhibit A to your original report in front of you.

**A.**    Okay.

**Q.**    You have two line items here, one for $8,764.28, one for $22,629.10 for spray foam in the carriage house and then spray foam in the master bedroom, sunroom, mudroom, and part of the third floor roof.

Am I correct to understand that that is putting all new spray foam in those areas?

**A.**    Yeah, and that could be open to modification at this point with this information, but I will suggest that I'm also proposing that that roof at the exercise room behind the garage needs to be taken off and rebuilt, in which case you will be spray-foaming that entire roof.

**Q.**    Okay.  And you, yourself, never tested the R factor in the house, correct?

**A.**    I don't have the ability to do that, so no.  The answer is no.

**Q.**    Okay.  So in one of your past jobs, after you've -- you yourself have gotten a concealment inspection approved by the County, have you then decided, in that particular area that's been inspected, to just tear down the drywall?

**A.**    No.

**Q.**    That would be highly unusual, correct?

**A.**    Correct.

**Q.**    All right.  Let's go through elements of the report.

**A.**    And I said yes, regarding insulation.  There -- there is

this --

Q.   There's not a -- sorry, there's not a question pending.

A.   Okay.

Q.   So let's start in 5000.  You mentioned the kitchen beam, and did you say in your report, your rebuttal report that there should be an inspection by an engineer for that?

A.   Yes.

Q.   So are you aware that a civil engineer did undertake an inspection, did prepare a letter that certified -- I'm sorry, a structural engineer -- that certified that beam and that that was provided to the County?

A.   I was -- I don't know which one you're referring to.  I was provided with a copy of that, and I contested that he was not certifying the installation; he simply was stating that the beam size was adequate.

Q.   Okay.

A.   He does certify the -- my issue is with the installation, the bearing and the lack of welds, the lack of anchoring, those types of things.

Q.   Okay.

A.   And he did not certify that.

Q.   Just a little item.  So do you see the line item for "Guards/Grates At Window Wells @ Front Steps"?

A.   Yes.

Q.   Did you review any of the communications between

Mr. Deluca and Mr. Harrell in this matter?

**A.**    I didn't -- I don't recall seeing any communications about it.

**Q.**    Okay.  Any of the punch lists that were prepared between the parties?

**A.**    I don't have any of those in my files, no.

**Q.**    You don't know, then, whether Mr. Deluca asked for direction on some of these items, do you?

**A.**    I do not.  It's in my report because it's a code requirement.

**Q.**    Okay.  All right.  So let's go to item 6000-E.  So you'll turn the page.  It says, "Remove and Reinstall," "Fireplace"?

**A.**    Yes, "Mantels."

**Q.**    Mantel, right.  You relied in part on Mr. Furlong's report, correct?

**A.**    In part.

**Q.**    Okay.  And are you aware that Mr. Furlong did not reference the removal and reinstallation of the fireplace mantel?

**A.**    I am aware of that.

**Q.**    So in his opinion, at least, it's not a code defect, correct?

**A.**    No, the reason they would come out is if you're going to cut the walls, you've got to pull your mantels off to gut the drywall finishes behind them.

Q.    Okay.

A.    So it would be a remove and replace -- not a replace -- a remove and reinstall after you close the walls in again.

Q.    Okay.

A.    I mean, it's just an ancillary step that's required if you're going to gut the building, or gut that portion of the house.

Q.    Okay.  So "Cabinet Labor", moving down to 6000-I, is that cost also predicated on removing the -- you've got to get behind the wall so the cabinets have to come down?

A.    That's a part of it, but it's also to correct just poor installation, poor alignment, cabinets that are split and cracked because of the wrong screws, so it's a combination of reasons why we would be pulling cabinets.

Q.    Okay.  And then moving on to the next page, 6000-K, "Kitchen Quartz Countertops."

      Are those coming out because you've got to get behind the walls?

A.    Yeah, um-hmm, yes.

Q.    The countertops themselves, there's nothing noted in the text of your report that says these countertops are cracked or defective, right?

A.    That's correct.

Q.    Okay.  And then moving on to 7,000, you have "Slate Roof Shingle."

There's nothing in the contract documents between the parties that specified the roofing material, correct?

A.    That's correct.

Q.    And so therefore, I mean, this is being removed because of Mr. Harrell's contention that, you know, it's some other type of slate, correct?

A.    No, it had nothing to do with -- I hadn't had any interaction with the Harrells about that.  So a big chunk of it is going to be, again, the roof that's over the exercise area and the gym.  My contention is that roof needs to be demolished and reframed, which is of course going to necessitate new roofing there.

And then I would also fall back to workmanlike and what I believe is the builder's obligation to try to marry new work to old work as best as possible, and I found that the shingles that were installed were very dissimilar, and a better option could have been selected to make that work blend better option.

Q.    Okay.

A.    So that was my reasoning for having it in there.

Q.    Okay.  So then 9000, that's moving on to the next page. "Drywall in Main House," "Drywall in Carriage House," and that's because we've got to get behind those walls, according to you?

A.    Yeah, and in the main house, it's not reflective of the entire main house; it's just, I'm trying to estimate some portion that I think should reasonably be opened up and gutted,

so my gut -- my contention for gutting the house is not a proposition to gut the entire house.  I'm making some estimate at this time of some portion of the house to be opened up, particularly the original areas of the main house that were gutted and enclosed before inspections.

Q.    Okay.  And then you have, in 9000, all new bathroom tile being installed throughout the house, correct?

A.    If you give me a moment just to go through the...

(Brief pause in proceedings.)

A.    It appears that way, yes.

BY MR. COUGHLIN:

Q.    Okay.  Moving on to "Appliances," we're at 10000, this is the next page.  So you testified about this.  Did you operate the Wolf gas to see if it was working?

A.    I did not.

Q.    Did you operate the fridge to see if it was working?

A.    I did not.

Q.    Did you operate the microwave to see if it was working?

A.    I did not.

Q.    Did you operate the wine cooler to see if it was working?

A.    I did not.

Q.    Okay.  Did you -- did you see a book provided by Mr. Deluca in the house that had, you know, the appliances and their manuals and, you know, essentially what comes with the appliance when you open it up?  Did you see a book with that

information in it?

A.      I don't recall seeing a book like that.

Q.      Did you look in the drawers in the kitchen for something like that?

A.      I did not.

Q.      Moving on to "Plumbing," this is 15000.  And so maybe we can do this somewhat quickly.  15000 covers plumbing and HVAC.  Again, this is you taking out all of the plumbing and all of the mechanical systems in the house, correct?

A.      Yes.

Q.      Despite the fact that there was an approved mechanical inspection by the County?

A.      For a portion, for a portion.

Q.      And then for "Electrical," again you're taking all of the electrical out of the house.  Are you taking the panels out of the house as well?

A.      No, the panels would be reused.

Q.      Okay.  So then just all the wiring is coming out?

A.      Yeah, and there's -- there is some numbers -- so, obviously, since my trades can't see behind the walls, right, they're again making some assumption.  If this was a full rough-in and brand-new job, these numbers would likely be higher, so there is some art in their quotes to me, their budgets to me about the level of what they would expect their scope of work to be, but to be honest with you, because things

are concealed, that scope's not entirely clear.

Q.   Okay.  So I think, if I understood, you're not contending that literally the whole house has to come down to the studs, just portions of it have to come down to the studs.

A.   That's my -- yeah, that's my expectation.  I mean, I've done -- we've done a lot of renovation work in a lot of homes, a lot of older homes.  So what I tried to do is account for, without having enough information yet, that expectation that -- where we're going to need to open up, and I believe that -- you know, I know from the pictures that a lot of work was done in walls in the main house, not the addition, that was done and concealed without any inspections.  So -- and this could even be things like when plumbing drains are installed after the fact, I've seen joists cut to a point that it compromises them.

So we just don't know, but I just know from experience the types of things we find when we open up like that.

Q.   But in areas where there was a concealment inspection, you would agree that then -- are those the kind of areas that we can just leave the drywall intact and --

A.   Well, I'm not entirely comfortable with that because the inspector was inspecting work on sets of plans that weren't accurate.  They were updated and approved far after these -- a lot of these rough-ins were issued, so it's possible that the inspectors were not even clear about the scope of work that they were supposed to be inspecting because the plans that they were

working off of were not what was built.

Q.    Well, you've worked on a job where you've made an adjustment in the field, you then submitted a plan revision to the County, and it's gotten approved, correct?

A.    Yes.

Q.    And here, ultimately, in December, December 16th, the carriage house plans were approved and the main house plans were approved, correct?

A.    Correct.

Q.    And it's your understanding that those plans generally reflect what was in the field, correct?

A.    Generally, yep.

Q.    Okay.

A.    So the inspections were performed before those plans were approved.

Q.    Well, sir, let's go back to, then, the beginning of your Exhibit A, general condition -- or, sorry, "General Requirements," and "Project Supervision" are, in part, based on the scope of the work that needs to be undertaken, correct?

A.    Correct.

Q.    So if the scope goes down, then those costs will go down, correct?

A.    Potentially, yeah.

Q.    Okay.  And then you have, on 1000, "Permit Services and Fees," and there clearly was a period of time when there were

active permits that had not yet expired on the property, correct?

A.     There was a time, yeah.

Q.     Okay.  There were, I believe, three permits.  There was the permit for the kitchen and bath, correct?  Kitchen and bath work.

A.     Right.

Q.     Okay.  And then the permit for the addition, correct?

A.     A two-story -- it's titled, yeah, "two-story addition screened porch."

Q.     Okay.  And then there the -- there was a permit applied for and approved for the carriage house, correct?

A.     Correct.

Q.     And so if you had come in as a replacement contractor, you know, after all of those plans were approved, you wouldn't need to get another set of plans approved, correct?

A.     I'm not sure one way or the other whether I can -- well, I don't own those plans, so I would not be able to build off of those plans without the permission of the designer who developed those plans.  I don't have the -- I don't have the ability to pick up someone else's plans and use them to build.  So the first thing is I'd have to -- permission would have to be granted, the release by the original designer to use that plan, and the engineers as well, so I didn't make that assumption.

Q.     So you would have had to just call the engineer of record

who designed those plans and ask him, you know, "Can I contract with you to use these plans," right?

A.    That is the question you would ask.

Q.    Okay.

A.    "Will you release the plans to me?"

Q.    Okay.

A.    Typically what they'll do at that time is they'll release them and ask for an indemnification --

Q.    Okay.

A.    -- when they're no longer involved with the project.

Q.    And they may ask for a payment, right?

A.    Potentially, yeah.

Q.    And it's not going to be, like, hundreds of thousands of dollars, right?

A.    I wouldn't expect it to be, no.

Q.    And then regarding your percentage, in this exhibit -- so I want to make sure this is clear.  It's the one column that doesn't have a label on it, right?

A.    That's correct.

Q.    And so if I did the math correctly, that percentage is 23 percent of the estimated -- or "Ext." cost, correct?

A.    Yeah, it's -- right.  It's 23 percent of the -- you're correct.

Q.    What does "Ext." stand for?

A.    Extended cost.  So it's -- I'm sorry.  It's a 23 percent

margin; it's a 30 percent markup.  Markup is applied to the cost; margin is relative to the -- to the client price, to the sale price.

Q.    Where do we see the markup in this?  So how is that reflected?  Is that just --

A.    So all -- I mean, maybe you can rephrase that question so I answer it.

Q.    Well, I just -- I don't see markup identified in here, and so how do we know what the markup was and how you got to that --

A.    Well, that I -- what I'm stipulating right now is that column is my markup.  Each of those line items that follow the "Extended Cost" column -- so, if I -- I'll run through it quickly again.  You have a quantity, you have a unit, you have a unit cost.  The extended cost is the unit cost times the quantity.  That's your extended cost.  Then you add the markup, which is the unidentified column, and then that gives you your "Line Item Total Price" to the client -- to the homeowner.

Q.    So the total markup for markup of materials and contractor profit is 30 percent?

A.    Correct.

Q.    Okay.  Let me just go through my notes quickly.

Oh, yes.  So this should be the last questions.  You indicated that you provided in here, because you needed it for the estimate, square footages of the house and the garage,

correct?

A.    Um --

Q.    That's on "Division 1" under "Final Clean" for the house and then the garage.

A.    Correct, so that would be for all structures.

Q.    And the house is listed as 5,744 square feet, correct?

A.    Um-hmm.

Q.    And the garage, which would include the gym, the area above the actual garage, and then the garage, correct?

A.    Um-hmm.

Q.    So what we call the carriage house is 1,083 square feet, correct?

A.    Yes.

Q.    And the total of those two numbers is 6,827 square feet --

A.    Um-hmm.

Q.    -- correct?

A.    I mean, I'll take your word on the math.  I'm not doing it in my head, but that sounds about right.

Q.    I'd like you to just confirm it definitively, and if you need to do the math, that would be fine.

        MR. LYNCH:  We have a calculator, Your Honor.

        THE WITNESS:  So 6,827?

BY MR. COUGHLIN:

Q.    Yes.

A.      Okay.

Q.      That's correct?

A.      That's that correct.

Q.      Okay.  And that does not include the screened-in porch, right?

A.      No, it likely does.  I mean, I would have to go back and look at my notes, but it likely does because we've got to clean that as well when we're delivering it to the client, and it would include the basement.

Q.      Okay.

        MR. COUGHLIN:  All right.  I have no further questions.

        THE COURT:  All right.  Redirect?

              REDIRECT EXAMINATION OF MATTHEW BOWE

BY MR. LYNCH:

Q.      Can you turn to Exhibit 433 in your notebook, please.

A.      So, just so you know, this is one of those exhibits that I have a few handwritten notes on.

Q.      Okay.  I would direct to you a section.  I would like you to go to page 6 of 7.  And there's a section of this document that begins, in bold, "109 R: Insulation."

        Do you see that section?

A.      Yes.

Q.      Okay.  So there's an item number 1 in the comments that says, "provide foam certificate."

        Do you see that?

A.     Yes.

Q.     I would like to call up Defendant's Exhibit 143.  That a note that we just looked at, have you seen any County records that indicates to you that this foam certificate we're looking at here on the screen was actually received by the County?

A.     I'm sorry, are you asking is it a record of that certificate being issued with the County?

Q.     Um, yes.

A.     I don't see anything on the County's reporting here that would indicate that they have that.

Q.     Yes.  Okay.  So --

THE COURT:  I'm sorry, so there's nothing that you've seen that indicates the County has received Exhibit 143, is that correct?

THE WITNESS:  That's correct, Your Honor.

THE COURT:  All right.  Thank you.

BY MR. LYNCH:

Q.     Can you see any signature on this document that's on the screen here?

A.     I don't see any signature.

Q.     Is that significant in the value of this spray foam certificate to you?

A.     Well, I think it would probably provide some level of verification about who prepared it and who's taking responsibility for it.

Q.      Let's turn to the orange tabs at the end of this notebook.  And let's begin with 181, Defendant's Exhibit 181.

So, can you explain why or why not this certificate may or may not satisfy you as to the completeness of inspections in the main house?

A.      Well, I mean, they're specifying that the -- I don't know what -- I don't know which permit this is tied to, but I do know that all of the work done in the front portion of the house, the original portion, was closed in and there's no inspection record on that.  So in my opinion, this is a partial rough-in, because a lot of the work was enclosed without an inspector viewing it and approving it.

Q.      And do you recall when the Dasco dated progress photos, do you recall the date -- the latest date that those could possibly be from?

A.      My recollection is March, maybe April, but...

Q.      Let's look at Exhibit 418, please.  And I don't think that's in your --

A.      I don't think I have that.

Q.      -- binder.

Does that refresh --

MR. LYNCH:  Can I have the date, please, at the top?

BY MR. LYNCH:

Q.      Does that refresh your recollection as to the latest date of the Dashco dated progress photos?

A.    Okay.  So June, June of '19.

Q.    Okay.  And that predates the inspection card we're looking at in Exhibit 181, right?

A.    That's correct, and presumably those photos were work that was performed before that date.

Q.    Let's look at Defendant's Exhibit 182, and can you -- that's in -- this is in your notebook, Mr. Bowe.

And can you explain to the Court why or why not this orange card may satisfy you about the inspections that occurred at the main house?

A.    It's a concealment inspection with conditions, and of particular note -- and I mentioned it before -- is at the bottom it says, "Need to revise plans prior to framing inspection, plans do not match the field," and so I think there's a good possibility exists there that the inspector would not be fully aware of what they're inspecting because the plans that they're going to use to compare to the work in the field don't match.

Q.    Right.  So keeping this document in front of you, in your book, I would like Mr. Fitzhugh to call up on the screen Exhibit 449.

MR. LYNCH:  Zoom in, Mr. Fitzhugh, on the top -- the barcode on the top right so it can be read, the number.  A little more, please.

BY MR. LYNCH:

Q.    Okay.  Can you read that number at the top right by the

barcode?

A.    Yes.

Q.    Does that match the number of the electrical permit shown on Defendant's Exhibit 182?

A.    Yes, it does.

Q.    Okay.

MR. LYNCH:  Now, let's Zoom out a little, Mr. Fitzhugh, and look at the top left corner of this document.

BY MR. LYNCH:

Q.    And, Mr. Bowe, do you see in the top left-hand corner, Permit Number B1803016?

A.    I do.

Q.    Do you know what permit number -- what work relates to that Permit Number 3016 off the top of your head, or do you need to refresh your --

A.    If I recall correctly, it's the kitchen and bath permit.

Q.    That's right.  And so how would that inform the value -- your opinion about the value of this inspection ticket?

A.    It seems like the comments here indicate that the inspector was inspecting work for Permit 1108, the two-story addition, because he references aspects of that, but the inspection that was called in was for the kitchen and bath permits, which is a different part of the house.

Q.    Okay.  So it's difficult to make heads or tails of this.

A.    Again, confusion, leading to less certainty about what

was actually done there.

Q.    It's also possible he could have only looked -- this inspector could have only looked in the kitchen and bath?

A.    Possibly.

Q.    And the note that says, "Need to review plans prior to framing inspection, plans do not match field," what does that indicate to you?

A.    Well, again, everybody is working off the wrong set of plans, and the inspector doesn't have the proper set of plans to refer to when they're out confirming work that's supposed to be done according to the plans.

Q.    Okay.

A.    There would be, in my mind, no way to know that the inspector saw everything that was done if they didn't know what they were supposed to be looking for.

Q.    Right.  And based on your recollection of the photos -- and we can pull them up if you would like -- but do you recall evidence of walls being closed in before April 30th, 2019?

A.    Yes.  Yes, I do.

Q.    Okay.  Let's look at Exhibit 183.  So what is the significance to you of the note, "less addition"?

A.    Well, he's not approving a rough-in for the addition.

Q.    And again let's go back to Exhibit 449, only on the screen.  Keep this ticket in front of you, please.

        MR. LYNCH:  And let's go to page 2 and Zoom in on that

barcode, please, Mr. Fitzhugh.

BY MR. LYNCH:

Q.     Can you read that number, Mr. Bowe, on the screen?

A.     Yes, I can.

Q.     Does that match this ticket?

A.     It does.

Q.     What building permit is being referenced in the top left-hand corner of this mechanical permit?

A.     Kitchen and bathrooms.

Q.     Now, last but not least, let's look at Deluca Exhibit 184.  That's also in your binder.  And what is the date shown on this inspection ticket?

A.     June 11th, 2019.

Q.     And so this inspection ticket postdates the dated Dasco dated project photos; is that right?

A.     Yes.  Predates?  I'm sorry.  Ask your question again.

Q.     The Dashco photos end on June 3rd.  Does this inspection ticket postdate June 3rd?

A.     I agree, correct.

Q.     I would like to show you one more document on this issue. Let's look at Exhibit 439.  And let's go to page 2 of this document, the "Inspection Comment"?

A.     Just so you know, this is another page that I have a few marks and notes on.

Q.     Okay.  Is it in the "Inspection Comments"?

A.      It's on page 1.

Q.      So what do you make of these entries you see here under permit B1803016, "Demo existing bathrooms and kitchen replace same"?

A.      The question?

Q.      Well, the question is, there's three entries on this page, and in taking it as a whole and thinking about what it will cost to replace, I mean, what do you find significant, if anything, about these inspection entries here?

A.      "Inspection Comments"?

Q.      Yes.

A.      Well, the first one was canceled because of no previous inspections were in this -- I'm sorry.  The first one was canceled because "no previous inspections were in the system." "Need to schedule all trade permits," so no permits were in place for work done under this permit, and "reschedule for the building."

        And then in September of '19, they received an approval for just the kitchen and bath -- I'm sorry, kitchen and one bathroom, in the basement bathroom only.

        And then in 11-19, rejected.  There's a note there, "Like for like replacement," which in fact was not the case.  It was not a like for like replacement that was actually done there.

        Fixture removed, some bathrooms were moved all together, so that would be considered a like for like, which is what the

permit was pulled for.

Q.    So, as a -- in the shoes of a replacement contractor, you're standing in the shoes of a replacement contractor, you look at this document, and you see a permit that -- an inspection that is canceled, then approved, and then rejected, what is your confidence level in the work that's supposed to be covered by that permit being inspected?

A.    I just think that that supports or confirms my belief that the need is to go to a deep -- to gut -- to open up where work that was done that had not been inspected and make sure everything gets inspected before and not just trust that it was done or assume it was done right.

Q.    So let's go back to your report, "Division 9." Mr. Coughlin asked you some questions about the tile pricing.

A.    Okay.

Q.    So, what was the square-foot price that you used for tile in your estimate?

A.    So I had that broken out in two different categories.  So the first several on there -- or individual line item, is to do the mud pans for the showers.

And then I've got a material package for 1,096 square feet, at estimated $31.56 per square foot of tile.

Q.    Okay.  This exhibit is in your book.  It's at tab 505, the next exhibit I would like to show you.

A.    I'm sorry, what's the exhibit number?

Q.    505.

A.    Okay.

Q.    So, at the very top -- this is a text message chain.  At the top there's a text message in green.  Do you see that?

A.    I do.

Q.    Okay.  And then look at item 4, it says, "Owner Suite"?

A.    I see it.

Q.    And this message says, "We're dealing with tile that runs $150 per square foot."

Do you see that?

A.    I do.

Q.    That's significantly less than --

A.    -- it's not reflected in my estimate.

Q.    Yeah.  Okay.

A.    I did not have that information when I prepared it.

Q.    So Mr. Coughlin -- I'm sorry.

MR. LYNCH:  I move to admit Exhibit 505 to the extent it hasn't been already, page 6804, and that's it.

THE COURT:  Any objection?

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 505, page 6804 admitted into the record.)

BY MR. LYNCH:

Q.    All right.  Mr. Coughlin asked you about overhead and

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

profit.  Do you recall Mr. Kiet Nguyen's overhead and profit

number being 10 percent?

**A.**     I do recall that.

**Q.**     Let's check real quick.  That's tab 140 -- Deluca

Exhibit 145.  You've got to thumb through it.  It's not

paginated, but it's toward the back of Exhibit 145.  It looks

like the summary page, and his overhead profit is about five or

six pages from the very end of that exhibit.

**A.**     I'm there.

**Q.**     Okay.  So what's his overhead and profit?

**A.**     "Contractor Overhead and Profit" of 10 percent.

**Q.**     What's your opinion about accuracy of that number in the

marketplace?

**A.**     That's there's not a single contractor in the residential

modeling market I know that operates at that low of an overhead

markup.  It's more reflective of a commercial markup, but in the

residential market, it is substantially higher.

It has to do with efficiencies, how much work you can

bill over a period of time.  Commercial projects, you can

generate a lot more revenue in the same amount of time so your

markup comes down as a result.

**Q.**     Based on your experiences as an appraiser, can you

explain the difference between how a builder may look at square

footage versus how an appraiser may look at square footage,

using the screened-in porch as an example?

MR. COUGHLIN:  Objection, Your Honor.  He has not been offered as an expert appraiser in this case.

THE COURT:  Yeah, lay a foundation for the question.  Does he know how an appraiser does square footage estimates?  You just assumed that he did and --

MR. LYNCH:  Yeah.

THE COURT:  -- it's an assumption you shouldn't make.  So not so -- if he has personal experience in watching someone do that, I don't think it requires an expert, you know, testimony, but certainly he has to demonstrate he has that knowledge.

BY MR. LYNCH:

Q.    How long have you worked professionally as an appraiser prior to starting your company?

A.    I'm not currently an appraiser, but for 10 or 11 years I was a licensed and certified real estate appraiser.

THE COURT:  Okay.  Square footage was part of the work that you did in doing an appraisal routinely?

THE WITNESS:  Yeah, yeah.  So, I mean, for the appraisers -- from a builder's perspective, I'm looking at cost.  Every square foot of improvement has a cost to it.  So, everything is square footage to me, but built at different cost values.

An appraiser, when they look at square footages, break it out also between above-grade square foot, basement square footage, they value those differently, and then their porches and

decks are kind of also broken out separately.

THE COURT:  He's qualified to, if there are differences, to identify those differences.  You may inquire.

BY MR. LYNCH:

Q.    Yes.  So where, as a builder, you're, you know, potentially responsible for every nook and cranny of the whole property.

THE COURT:  Well, now you're just testifying.  Just ask him the question.

BY MR. LYNCH:

Q.    Okay.  As to the screen porch, as an example, would you typically see that included in the marketable square footage of a property?

A.    It would not unless it was stipulated.  So typically, the marketable square footage is, yeah, conditioned living space. It may or may not include the basement.  I don't include -- I break the basement out.

But when -- when trying to describe a house, you would not include a porch or a deck in the square footage.  That would typically just be conditioned living space.

Q.    Okay.  And to what extent are you reasonably certain that your cost to repair, at Exhibit 902, and included as Exhibit A to 901, is a reasonably accurate estimate of the cost to complete this work to the building code and the contract?

A.    I'm very comfortable with that cost as of the date I

prepared it, and it's my experience that costs would be higher now.

MR. LYNCH:  Thank you.  No further questions.

THE COURT:  Thank you, Mr. Bowe.  You're excused at this time.  Please don't discuss the testimony you've given here today until our trial is over, all right?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Is Mr. Bowe subject to recall?

MR. LYNCH:  We do not plan on recalling Mr. Bowe.

THE COURT:  Okay.  Unless they call you up, you're done.  And thank you very much.

All right.  Let's take our 15 minute mid-afternoon recess.  We're in recess.

(Thereupon, a recess in the proceedings occurred from 3:46 p.m. until 4:05 p.m.)

THE COURT:  All right.  Next witness.

MR. LYNCH:  Your Honor, we would like to call Brendan Muha to the stand, please.

(BRENDAN MUHA, PLAINTIFFS' WITNESS, SWORN)

THE COURT:  Good afternoon.

THE WITNESS:  Good afternoon, Your Honor.

DIRECT EXAMINATION OF BRENDAN MUHA

BY MR. LYNCH:

Q.   Can you state your name for the record please?

A.   Brendan Muha.

Q.      Who was your employer from 2018 through 2020?

A.      TTR Sotheby's.

Q.      I will call that entity TTR for shorthand from here out; is that fair?

A.      Yes, sir.

Q.      What was your role in the sales transaction for 6122 Lee Highway?

A.      I represented both Mr. Deluca and Mr. -- the Harrells.

Q.      Describe your involvement in the sales transaction between Mr. Deluca and the Harrells for Lee Highway and its aftermath.  Or what was your role?

A.      I introduced them, and I helped them through the process.

Q.      Okay.  How did you meet Doug Deluca?

A.      When I was a kid, he did some work for my parents around our house.

Q.      How long have you known him?

A.      Since then, so probably 15, 20 years.

Q.      Was he considered a friend of the family?

A.      Yes, sir.

Q.      How become involved with marketing 6122 Lee Highway?

A.      Mr. Deluca reached out to me when he was looking into the property, and I started providing him some comparable data for sales.

Q.      And about what time did that occur?

A.      I would say sometime in 2018, you know, prior to October.

Q.    Okay.  Do you recall where the first meeting was at least that you were present for between Mr. Deluca and the Harrells?

A.    The Ritz-Carlton in Tysons.

Q.    Okay.

A.    Actually -- I apologize -- it was McLean at Mr. Deluca's home.

Q.    And what time period, roughly, did that meeting occur?

A.    That would have been December of 2018.

Q.    Okay.  And what happened at that meeting, and what was its purpose?

A.    We were introducing the two of them so they could see Mr. Deluca's home, and they could see kind of his build style and, you know, the type of things he did with homes.

Q.    Okay.  On or about what date did the Harrells make and Mr. Deluca make their first visit to 6122 Lee Highway to your knowledge?

A.    I'm pretty sure it's the same day.  After we checked out his house, we then traveled to Arlington to see his future development.

Q.    Okay.  And what was -- strike that question.  What happened at the meeting at the Ritz, briefly?

A.    So the meeting at the Ritz was, I believe, after that to kind of discuss what his plans were with the property that we saw in Arlington and how he was going to develop it and what that would look like.

Q.    Do you recall Mr. Deluca discussing his abilities as a contractor at that meeting?

A.    Yes.  I mean, his home in McLean is very nice, and this property was of significant value and size, yeah.

Q.    What involvement did you have in putting together or drafting the sales contract for this transaction?

A.    I used the MDAL form, and then we added exhibits for the details discussed between the two parties.

Q.    Okay.  And what was your role in tracking and drafting the amendments?

A.    So pretty much we had the original plans that Mr. Deluca had spoken about, just beds, baths, certain appliances, certain features, and then in the future as we discussed changes, I would update that and, you know, color code it for an agreed upon time period and then everyone would sign the addendum for the updated changes.

Q.    So what was the concept or idea in the time period leading up to April 3rd, when the contract is signed, as to how construction would go from where it was at that time to a finished product?  What was the idea between the --

A.    Obviously, Mr. Deluca was gutting the home.  It was a very old home and he was completely, you know, refinishing it from its current state.

Q.    Okay.  And at the time the sales contract was signed in April 2019, what did you perceive was the understanding of the

parties as to who was responsible for making sure the construction was done in a workmanlike and legal manner?

A.     Mr. Deluca.

Q.     And the same question, but with respect to design responsibility.  Who was responsible for that?

A.     Mr. Deluca except, like, I think the laundry room, there was one other designer used for that.

Q.     To what extent were you involved in discussions or communications between the parties regarding the condition of the property and the details and mechanics of the transaction between the time you met the Harrells and closing on July 3rd?

A.     I was the intermediary between the two.

Q.     How long after closing did you remain as a go-between between the parties?

A.     Probably three months, four months.

Q.     Okay.  What was the overall scope of Mr. Deluca's construction on the main house to your personal viewing?

A.     He was redoing everything from its current status.  It was an older home, as I stated.

Q.     All four levels gut renovation; is that fair?

A.     For the most part, yes.

Q.     Did you ever witness at any time a tree falling on the roof of the carriage house or the aftermath of damage to the roof of the carriage house?

A.     No.  It was overgrown, but I never witnessed a tree fall.

Q.    Okay.  Did anyone, including Mr. Deluca, ever tell you that a tree fell on the carriage house roof?

A.    Not that I recall.

Q.    Being the realtor on this transaction and given your relationship with Mr. Deluca, would you expect he would have told you if a tree fell on the carriage house roof?

A.    If it was something of significance, yes.

Q.    Did you perceive Mr. Deluca or anybody during the course of this transaction tell the Harrells that there was an active crack in the carriage house masonry?

A.    No.

Q.    All right.  Let's look at Exhibit 1.

MR. LYNCH:  I'm sorry, I need to pass out the binders.

BY MR. LYNCH:

Q.    Okay, what is this document did Exhibit $1?

A.    This is the NVAR sales contract.

Q.    And holding aside the amendments, the NVAR form was drafted by TTR; is that right?

A.    By myself, yes.

Q.    Okay.  And can you tell me what the purpose of Exhibit B to the sales contract was?

A.    This was the details I was speaking about, you know, of the home.  This was revised, the one I'm looking at, but Exhibit B was the list I was speaking to before about the details of the home.

Q.    Okay.  So you would have drafted this document, as well, at this time; is that right?

A.    Correct.

Q.    And the amendments to Exhibit B that followed it; is that right?

A.    Yes.

Q.    Okay.  So, are you familiar with -- well, let's go to Clause 10 of the sales contract, please.  The clause is entitled "Property Maintenance and Condition."

A.    Yes.

Q.    And there's a box checked there that says, "Buyer waives the opportunity to make this Contract contingent upon home inspection."

      Do you see that?

A.    Yes.

Q.    What was the idea or discussions between the parties at the time as to why that box was checked?

A.    Because the home was under construction.  Typically in an NVAR contract, this would be for a finished home where you put like anywhere from seven days to as little as three days, you bring someone in, check the appliances, check the windows, check the plumbing, kind of do an overall home inspection, and then if you see any flaws, you can come back and address that with the seller, but as the property was under construction, you know, most of these inspectors aren't, you know, going through

pre-drywall, pre, you know, being built inspection.

Q.    Okay.  What communications or discussions did the parties have about a construction warranty in relation to this idea of the inspection contingency being waived to your personal knowledge?

A.    Mr. Deluca had always said he would provide a warranty. I don't know that it was necessarily specifically related to the inspection, but he had already said he would give a year-long warranty on his work.

Q.    All right.  Let's go to Exhibit 2, please.

Now, what involvement did you have in the -- well, I'll start with this.  What is in document?

A.    This is the post-closing construction agreement.

Q.    And what involvement did you have in the creation and execution of this document?

A.    I was involved in the execution, not the creation. Mr. Harrell drafted this document.

Q.    Okay.  And you put -- did you put together the DigiSign package?

A.    For the signing of the document, yes.

Q.    Okay.  And please review Clause 1.1, "Scope."

And my question will be, what did that clause referenced in Exhibit A, what did you understand and what did you perceive the parties' understood to be Exhibit A to the -- to this Post Closing Construction Agreement?

**A.**     The Residential Sales Contract.

**Q.**     And all of the exhibits?

**A.**     Yeah.

**Q.**     Is that a "yes"?

**A.**     Yes.

**Q.**     What was Exhibit B to the post-closing contract supposed to be?

**A.**     The punch list at the final walk-through.

**Q.**     Okay.  And what was Exhibit C supposed to be?  And I'll give you --

**A.**     Oh, I see it in Article 2.

**Q.**     2.1.

**A.**     That was the work that was to be done on the porch.

**Q.**     Okay.  And did you understand that Mr. Deluca was going to create a drawing of that work?

**A.**     Yes.

        MR. LYNCH:  Will you pull up Exhibit 990 on the screen, please?

BY MR. LYNCH:

**Q.**     Does this look like the drawing that would be Exhibit C?

**A.**     Yes.

**Q.**     Okay.  Let's please turn to the end of Exhibit 2, the last page, and this document, Bates label 14279, has the same, it appears to me, DigiSign number as the page before it at Bates label 14278.  Were -- was this document on the last page at

14279 part of the package that was signed by the parties at one time?

A.     Yes.

Q.     So when you created the DigiSign package and distributed it, this document at 14279 was part of that package; is that right?

A.     Yes.

Q.     Are you aware of Mr. Deluca ever delivering any additional warranty document at any time?

A.     No.

Q.     Now, what did you perceive was the intent of the parties as to what work would be covered by the warranty in the last page of Exhibit 2?

A.     Basically, it was a -- two at the end of year one, that he would come through, any cracking, any paint, any wood issues, any real material defects to the home, that he would stand by his work and fix them.

Q.     And is it your understanding it would cover work before closing and work after closing?

A.     I would imagine so, yes.

Q.     Let's look at Exhibit 1022.  And is this document the punch list that the parties walked through the property with on or about July 2nd, to your recollection?

A.     Yes.

Q.     Okay.  And is it your understanding that this would be

Exhibit B to the Post Closing Construction Agreement?

A.    Correct.

Q.    Okay.  All right.  Look at Exhibit 6, please.

A.    Is it 600?

Q.    6.  Sorry.

A.    I have it.

Q.    Okay.  What is this document?

A.    This is an e-mail from Mr. Harrell to me.

Q.    Okay.  Can you review paragraph 3, please?

A.    Yes.

Q.    Does this -- does that paragraph 3 accurately reflect your understanding of what the exhibits to the post-closing agreement were intended to be?

A.    Yes.

Q.    What happened between the date of this e-mail and July 3rd, as far as getting agreement by Mr. Deluca that these documents described in paragraph 3 would be Exhibit A, B, and C of the post-closing contract?

A.    We put together the contract, and then he proceeded to sign it.

Q.    Okay.  Um -- strike that question.  All right.  Let's look at 1025, please.  All right.  So what is this document?

A.    This is an e-mail and then the attached punch list.

Q.    Okay.  And what were -- well, let's start with this.  What was the purpose of this e-mail from you to the Harrells?

A.      I was providing them a digital copy from the punch list I took over to Doug, and he updated with kind of like a status update.  I went by the property, and he filled it out, so then I digitized it and sent it over to John and Dawn.

Q.      And then turning to the last page of this document, there's an item at the top that says, "Finalize date for completion of master bath."

        Who actually drafted that typewritten part?

A.      I believe this was a list from John and Dawn Harrell that they provided me via e-mail, and then I added it to the punch list.

Q.      Okay.  And then Mr. Deluca provided the handwritten information next to that item; is that right?

A.      Correct.

Q.      Okay.  What tile did you understand was being referenced in that comment?

A.      The master bath tile.

Q.      What other assurances do you recall or did you perceive Mr. Deluca -- strike that question.  What oral or written assurances did Mr. Deluca give to the Harrells that the master bath tile had been ordered prior to closing, to your knowledge?

A.      To my knowledge was that he had tried to order it or ordered it and it had not yet come in.

Q.      Okay.  Did the tile ever arrive at the property to your knowledge?

**A.**    I'm unaware, but I do not think that bathroom is finished.

**Q.**    Prior to closing on July 3rd, what communications did you observe between Mr. Deluca and the Harrells regarding construction permits?

**A.**    That they were under his, you know, jurisdiction and that they were under control.

**Q.**    Okay.  Did you ever observe Mr. Deluca communicate to the Harrells that he did construction work on the property without a permit?

**A.**    No.

MR. BURCHER:  Objection, leading.  I mean, that's --

MR. LYNCH:  I can change the question.

BY MR. LYNCH:

**Q.**    To what extent did you observe Mr. Deluca communicate to the Harrells that he did construction work without a permit?

**A.**    I did not observe that.

**Q.**    Let's look at --

THE COURT:  You can say, "Did you or did you not hear this, did you see this, did he or did he not communicate this," and that's not leading, for some reason, under our present rules, so, I mean, we've been leading for two days now without objection, so it's...

MR. BURCHER:  On this one particular area --

THE COURT:  Right.

MR. BURCHER: -- it's fairly sensitive and so the idea --

THE COURT: Yeah.

MR. BURCHER: -- of getting his testimony versus Mr. Lynch's testimony.

THE COURT: I agree. I agree. So let's not lead.

BY MR. LYNCH:

Q.   All right. Please turn to Exhibit 511 in your book, and then once you're there, turn to page 94.

A.   I don't know I have page numbers on this.

Q.   It's -- it's page --

A.   Oh, there they are. Sorry about that. Got it.

Q.   So the third message from the top in blue begins with the phrase, "Probably not going to happen." And then it says, "I think we have to live with his promise all permits will be okay."

Who wrote that message, to your understanding?

A.   I did. No, that is Mr. Harrell. I apologize. I wrote the first part.

Q.   Your phone number is the phone number that ends in 0939?

A.   Correct.

Q.   Okay. And to what extent was Mr. Harrell's comment, "I think we have to live with his promise all permits will be okay," how did that, if at all, reflect the understanding of the parties at that time as to what Mr. Deluca was doing with the permits?

A.      I think accurately.

Q.      And was that statement by Mr. Harrell consistent or not consistent with what you witnessed Mr. Deluca communicating to the Harrells about permits?

A.      Consistent.

Q.      All right.  Let's look at PDF -- I'm sorry -- 60848.  Staying in the same document, the big letters now, is a 60848, and in the light numbers it's page 205.

A.      I have a page 206.  Oh, here it is.  It's 206 in mine.

Q.      Okay.  It's a message with seven bullet points?

A.      Correct.

Q.      Okay.  206.  Yep.  All right.  What is the source of the information -- well, I'll start with this.  That's you writing this message with the seven bullet points; is that correct?

A.      Correct.

Q.      Okay.  And who is on this chain to your knowledge?

A.      Mr. and Mrs. Harrell.

Q.      Okay.  And the information you're communicating in these seven bullet points, what was the source of that information?

A.      Mr. Deluca.

Q.      What did you understand was being conveyed to the Harrells in bullet point 3?

A.      Permits will be filed with the exception of Evan's bathroom and the owner next week.

Q.      And let's look.  Let's look at this same document.  There

should be a page 216.  And go ahead and read pages 216 and 217, and let me know when you're done.

A.    Done.

Q.    Okay.  And focusing on the message at the top of 217 from you that begins, "Just spoke to Doug," what was the source of the information you're communicating in that message?

A.    Mr. Deluca.

Q.    Okay.  What do you recall about the degree to which Mr. Deluca pointed the master bathroom as an pediment to getting a final inspection?

A.    I think it was one of the larger remaining pieces that needed to be finished.

Q.    Did he point to the master bath tile -- strike that question.  All right.  Staying in this text message chain, Exhibit 511, go to page 223.

This one may not be in the book.  Focusing on the message beginning, "I called him before I had a chance to read it," are you able to see that message?

A.    I've read it.

Q.    Okay.  Who sent that message?

A.    This is me to John and Dawn.

Q.    Okay.  And when was this message sent?

A.    Looks like towards the end of August.

Q.    Okay.  And what was the source of the information you were communicating to the Harrells in the fourth paragraph of

this message beginning with the phrase, "All permits"?

A.    Mr. Deluca.

Q.    Is this another example of Mr. Deluca pointing to the master bath tile as a crucial sticking point to obtaining a final inspection?

A.    I think it was the overall bathroom that needed to be inspected, yes.

Q.    Okay.  And then let's look at the text message at 60885, the bold numbers on the bottom right-hand corner.  Specifically referring to the message beginning, "No, he said yes that the permits would be complete by 9/30."

       Who sent that message?

A.    I did.

Q.    To whom did you send that?

A.    To Dawn and John.

Q.    And when was that message sent?  I think you have to look at the page prior with the Bates labels --

A.    September 3rd.  Sorry.

Q.    And what was the source of this information you provided to the Harrells?

A.    It would have been Mr. Deluca.

Q.    Referring to the message that says, "I just sent him your question about making plans for October.  He just answered yes," on 60885, who sent that message.

A.    I would have sent that.

Q.    To the Harrells, right?

A.    Yes.

Q.    And can you explain the purpose of that message?

A.    I think he was saying yes, it could be completed by the end of September and that they would not need plans for October.

Q.    To your perception was Mr. Deluca aware of -- strike that question.  Based on your personal knowledge of what was communicated to Mr. Deluca, what knowledge did he have at the time of closing as to when the Harrells planned on moving to the D.C. area?

A.    They were trying to get in before the kids started school.

Q.    And sticking with this Exhibit 511, but looking at the light page number 242, and then review to 244, please.

A.    Done.

Q.    Okay.  So on the page 244, there are three messages.  One begins with, "We trusted Doug."  Another begins, "He does say he will finish."  Another begins, "I think he is clearly responsible."

Who sent those messages?

A.    I did.

Q.    To whom?

A.    Mr. and Mrs. Harrell.

Q.    And when?  And if you look at the Bates label 60884, that may help.

**A.** Yeah, it would have been 9-3-19.

**Q.** Do you stand by the statements in those three messages?

**A.** Yes.

**Q.** All right. Staying with this exhibit, but then turning to pages, again in the light numbers now, 269 to 272 -- they don't appear to be in the book.

**A.** I have it, I think, here.

**Q.** You don't have it?

**A.** I do have it.

**Q.** Oh, you do have it. Okay. So please review those messages. Actually, I can just shorten this up.

I want you to look at the Bates label that's 60914 and the message that begins "I'm just appalled."

Who wrote that message?

**A.** I did.

**Q.** To whom?

**A.** Mr. and Mrs. Harrell.

**Q.** When?

**A.** It would have been 9-10 or some day near then.

**Q.** Okay. Do you stand by that message?

**A.** Yes.

**Q.** All right. Referring to the phrase, "he's choosing to live in an alternate universe," who is the "he" being referred to there?

**A.** Mr. Deluca.

Q.      Do you stand by that message?

A.      Yes.

Q.      Okay.  Let's look at 407 to 409 and, in particular, Bates label 61051, and there's a message on that page, beginning, "We all trusted Doug."  It's at the very top of that page, I believe.

A.      Yes, I read it.

Q.      Okay.  So who sent that message?

A.      I did.

Q.      To whom?

A.      Mr. and Mrs. Harrell.

Q.      When?

A.      10-24.

Q.      Do you stand by the statements in that message beginning "At that time we all trusted Doug," do you stand by those statements as accurate?

A.      Yes.

Q.      Referring to the statement, "He promised he would take care of all permits and finish everything by August," who is the "he" being referred to there?

A.      Mr. Deluca.

Q.      Is that or is that not an accurate summary of the promises made by Mr. Deluca?

A.      Accurate.

Q.      And were these promises that were made before closing?

A.      Yes.

Q.      Okay.  And after closing, too, is that --

A.      Yes.

Q.      Tell me about whether you believe Mr. Deluca betrayed your trust in this transaction?

MR. BURCHER:  Objection, Your Honor.  His trust in Mr. Deluca is not at issue in this case.

THE COURT:  Yeah, sustained.

MR. LYNCH:  Okay.  We're done with the text messages.

THE COURT:  You can ask him whether he thinks he was truthful with him, if you want, not a trust question.

BY MR. LYNCH:

Q.      Okay.  Do you think Mr. Deluca was being truthful with you during this transaction or...

A.      I don't know.  I mean, I feel like not now, but at the time I did believe him and thought he was being truthful.

Q.      So, talking about the list of items to complete.  We're talking now about the period of time before the final Exhibit B or around the time the final Exhibit B3 was being put together. What was the Harrells' lender's position as to whether the property needed to be substantially complete in order to go to closing?

A.      It needed to be substantially complete.

Q.      Okay.  Let's turn to Exhibit 505, and then look for Bates label 6824.  And take a look through 6824 to 6825 and let me

know when complete.

**A.**    Done.

**Q.**    Okay.  Reviewing these messages, as between Mr. Deluca on the one hand and the Harrells on the other, who was providing information as to what work remained to be complete in late June and early July?

**A.**    I had only read 6824 here.

**Q.**    6824.  It's on the screen, the 6824.

**A.**    This is about the escrow?

**Q.**    Yeah.

**A.**    Yeah, this is a conversation between me and Mr. Deluca.

**Q.**    Okay.  So, independent of the text messages -- well, strike that question.  Let's go to 6858 and 6859.  Are those in your book?

**A.**    Yes.

**Q.**    Okay.  Just review those messages, please, also.

**A.**    Done.

**Q.**    Okay.  On the top of that page there's a list of dates. Who -- on the very top message beginning with "Gates," who sent that message?

**A.**    I believe that was Mr. Deluca to me.

**Q.**    And what is Mr. Deluca -- does Mr. Deluca's phone number match the phone number of 703362 -- I'm sorry.  Does it -- it says a phone number identified as AC Kid.  Is that Mr. Deluca?

**A.**    I believe so, yes.

Q.    After reviewing these messages and what you personally observed, as between the Harrells or Mr. Deluca, who was providing the information about how much work was left to be completed at this time?

A.    Mr. Deluca.

Q.    Okay.  So let's turn back to Exhibit 511, pages 96 to 97. And it actually looks like they're out of order, but do you see them on 96?

Okay.  So just review 96 and 97 and let me know when you're done.

A.    Done.

Q.    Okay.  There's a message that says, "Attachment stored in iCloud:  6122 Lee Highway Sales Addendum."

Who sent that message?

A.    I did.

Q.    And who -- to whom was that message being sent?

A.    John and Dawn.

Q.    And what was being sent in that message?

A.    A draft of the sales addendum and settlement extension.

Q.    Okay.  And then there's a message above that that says, "Doug has a clarification on the addendum, the gates and tile have had a 50 percent deposit paid.  He doesn't pay the rest of the deposit until they arrive and he checks for damage."

Who sent that message?

A.    I did.

Q.    And it's to the Harrells, right?

A.    Correct.

Q.    And the source of that information was Mr. Deluca?

A.    Correct.

Q.    All right.  Are you familiar with the escrow amount of $20,000 that was funded at closing?

A.    Yes.

Q.    What was the purpose of that escrow fund?

A.    For the remaining work to be completed.

Q.    What involvement did you have in discussions and communications between the parties about this amount?

A.    A decent amount.  We had started at 75,000.

Q.    But you were heavily involved in the escrow discussions?

A.    Yes.

Q.    Okay.  As between the parties, between Mr. Deluca on the one hand, the Harrells on the other, who was advocating for a higher escrow and who was advocating for a lower escrow?

A.    I think both parties were okay with $75,000.

Q.    Okay.  And were you also involved in discussions between the parties about the timing of closing?

A.    Yes.

Q.    Okay.  Going back to Exhibit 505 and, in particular, pages 263 and 264.  That's not going to help you potentially. I'm sorry, the numbers are 6827 and 6828.

So just review those messages and let me know when you're

done.

A.    Done.

Q.    Okay.  And I want you to review one more before I ask you some questions, and it's, staying here, 6833 to 6836.

A.    Okay.

Q.    Okay.  And in these serious of messages, who are they between?

A.    Me and Mr. Deluca.

Q.    And whose messages are blue versus green on this page?

A.    I am blue.

Q.    As between the Harrells on the one hand and Mr. Deluca on the other hand, what did you perceive as to which party was pushing for closing before the work was complete?

A.    Mr. Deluca was ready to close.

Q.    And there's a message on 6833 that says, "I'm done Brendan."

A.    Yes.

Q.    Do you see that?  Did he threaten to walk away from the transaction when it was proposed to extend closing?

A.    I think he was trying to decide what to do with the property.  He wanted to know if they were purchasing it or not or if he needed to move in a different direction.

Q.    Okay.  So let's look at Bates label page 60732.  I'm sorry, we're in a different chain now.  This is back to 511. 60732.  It's the first one in my book.

So there a message that begins, "Doug emphasized to me," and then it goes on to say, "He understands that we must meet the bank's standards.  He just wants to approach it urgently and not let it drag on."

Who sent that message?

THE WITNESS:  I did.

BY MR. LYNCH:

Q.    And this was to the Harrells?

A.    Correct.

Q.    Okay.  And the source of that -- what was the source of that information?

A.    Mr. Deluca.

Q.    Okay.  What did you perceive was through your -- what did you perceive was motivating Mr. Deluca's desire to close more quickly rather than wait for the work to be completed first?

A.    He had extended his own, you know, project debt to do a lot of customizations, and that he was concerned if they weren't going to purchase the home, he was going to be stuck with all of the customizations without a buyer.

Q.    Now, at this time, again between June 18 and closing, what was Mr. Deluca's proposal as to how the unfinished work that was not done by closing would be handled?

A.    He would finish it after closing.

Q.    Did he ever express in this time frame that he would not have enough time, any concern at this time that he would not

have -- strike that question.

All right.  Let's talk about square footage.  When did you first have the square footage of the property measured?

A.    When we first spoke and he had just purchased the property.  I think it would have been, you know, prior to or around -- I think it might have been November of 2018.

Q.    Okay.  And what was the name of the company that did that measurement?

A.    A third party, HomeVisit.

Q.    Okay.  Was it a regular practice of TTR to have the square footage of a property measured for a property that it was marketing?

A.    Yes.

Q.    How frequently or not -- or infrequently did TTR obtain square footage of measurements?

A.    Pretty frequently.

Q.    Whose idea was it to have the property measured for square footage?

A.    It probably was mine because I was preparing to market it.

Q.    Did Mr. Deluca have input into that decision?

A.    Yeah, I think he was encouraging about trying to get some type of paperwork ready to market it.

Q.    Okay.  Let's go to Exhibit 1027.  Okay.  What is this document?

**A.**      This is me sending an e-mail to Mr. Deluca.

**Q.**      Okay.  Why were you referencing calculating additional master suite in this e-mail?

**A.**      I was saying that we needed to because it was not included on these plans.

**Q.**      Okay.  So the document at page 2 of Exhibit 1027 is a version of the HomeVisit plan, right?

**A.**      Prior to construction, yes.

**Q.**      Okay.  And this was a -- and you were saying that the master suite needed to be added to these plans?

**A.**      Correct.

**Q.**      Okay.  And what were the primary areas of the main house that were not reflected in this January 30th set of HomeVisit plans?

**A.**      I mean, there's significant differences.  There's no mudroom, no screened porch.  There's no longer a bathroom on the first floor.  The kitchen's different.  Upstairs, there's only one bedroom on the right side.  There's a master suite.  And then the basement is slightly different as well.  The laundry was moved.

**Q.**      Okay.  Why did you send this document to Mr. Deluca?

**A.**      To show him a copy of the floor plans.

**Q.**      Okay.  Let's go to Exhibit 560.  What is this document on page 1, in particular the January 30th e-mail?

**A.**      A conversation between me and the edit team at HomeVisit.

Q.    Okay.  And what was the purpose of your e-mail to HomeVisit on January 30th?

A.    We were trying to get the floor plans fixed as they were not accurate representation.

Q.    Okay.  In Bates label 003 to 009, there appears to be a number of handwritten edits to the plan.  Who made those handwritten edits?

A.    Mostly Mr. Deluca, but there are many edits from me as well.

Q.    And what was the process for making these edits?  Did you have a hard copy, or how did you go about physically --

A.    It was an iPad.

Q.    It was an iPad?

A.    An iPad.

Q.    And where were you when these --

A.    We just walked through the house.

Q.    Walked through the house?  Okay.

      Was this the set of plans, the Bates labels 002 to 009, were those the set of plans attached to your e-mail to HomeVisit on January 30th?

A.    I believe so, yes.

Q.    Okay.  All right.  Going to Bates-labelled 10, Harrell 00010.

A.    Could you repeat that number?

Q.    It ends in 10, one-zero.

THE COURT:  Same exhibit.

BY MR. LYNCH:

Q.    You're still in 560 --

THE WITNESS:  Oh.  Thank you, Your Honor.

BY MR. LYNCH:

Q.    So, there's an e-mail from Lauren Beers, February 1st, 12:34 p.m., "Hi Brendan, I have attached the revised floor plans."

Are those floor plans that Mrs. Beers sending to you on February 1st, are those the floor plans at Bates label 11 to 17?

A.    I believe so, yes.

Q.    And then the message on February 6th, going back to Bates label 10, what was the purpose of your e-mail at the HomeVisit on February 6th?

A.    That the plans were still not ready and that, you know, it was taking an extensive amount of time to get accurate plans.

Q.    And who was the buyer referenced in this e-mail on February 6th?

A.    Mr. and Mrs. Harrell.

Q.    Okay.  Now, what are the documents at Bates label 18 to 25?  I'm trying to figure out if those documents are the attachment to your e-mail of February 6th.

A.    I believe so, yes.

Q.    In looking at 18 to 25, there's some more handwriting. Who's handwriting is on this set?

A.      On 19 is Mr. Deluca; on 21, it's a mixture; on 22, it is me.

Q.      And was this walking through the -- how were these edits applied, physically or the...

A.      Same methodology, yes.

Q.      So the iPad?

A.      Correct.

Q.      So let's look at Exhibit 561.  I actually only have one page in my book.

        Looking at Bates label TTR-5 -- I'm sorry, 5717.

A.      Yes.

Q.      Okay.  So this is an e-mail from you to yourself, it looks like.  What was the purpose of this e-mail?

A.      Probably just to send it to my work e-mail.

Q.      Okay.

A.      Or to send it to my home e-mail and save it on my computer, something of that nature.

Q.      Okay.  And it looks like the subject line is "Finalized" do you see that?

A.      Yeah.

Q.      Do you understand that the documents following Bates label 5717 were the final set of HomeVisit plans?

A.      I think it was the final edit we had made, but for the title it was simply -- because I had saved so many documents of the floor plans, I had edit 1, edit 2, edit 3, edit 4, so this

is mostly -- this is after the edits were made.

Q.    Okay.  Looking at the next page after this e-mail, what -- that page there.  What does this page reflect about whether or not the mudroom had been added to this set of plans?

A.    The mudroom had been added.

Q.    Can you circle that on the -- well, I won't ask you to do that.  Okay.  And staying on the same page, what does this page reflect about whether or not the master suite had been added?

A.    They had added the master suite, but the measurements were still not representative of the recreation room on the first floor.

Q.    Of which room?

A.    The main living room.

Q.    Okay.  And why do you say that?

A.    Mr. Deluca had already said the size of the master would match the floor below it.

Q.    So, in other words, that the first floor would be flush with the second floor if you're viewing the property?

A.    Prior to the screened porch, yes.

Q.    Okay.  Let's go to Exhibit 1 -- well, let's stay here.  So, going to page --

MR. LYNCH:  Excuse me, Your Honor, I'm missing this document from my binder.

THE COURT:  Well --

BY MR. LYNCH:

Q.    Looking -- again, staying on this section that you're on, there's a square footage total, and what square footage is reflected on the total line?

A.    6049.

Q.    And that total included the carriage house but not the garage, correct?

A.    Correct.

Q.    Total did include the basement; is that right?

A.    Correct.

Q.    So, do you recall what you said at deposition about whether the basements or garages should be included in square footage total?

A.    Since this experience, I have learned they are not.

Q.    Let's look -- now, in this document there is -- there's two versions of the HomeVisit floor plans.  The first pages from 5707 to the beginning of the -- there's a first set of pages that don't have the total on it, okay?

A.    Correct.

Q.    Now, those pages with no total, when were those sent to the Harrells?

A.    June 14th.

Q.    And who sent them?

A.    I did.

Q.    Okay.  And why did you not -- did you redact the totals from that --

**A.**     Yes.

**Q.**     And why did you do that?

**A.**     Because I spoke with Mr. Deluca because I had measured a couch that day, and I didn't want to keep going over there every day to measure for a different piece of furniture for the Harrells, and Mr. Deluca and I spoke and he said I could send them a redacted total because it was inaccurate.

**Q.**     Okay.  And when was the first time, roughly, you ever sent an unredacted version of these plans to the Harrells?

**A.**     I believe it was after closing.

**Q.**     Let's look at Exhibit 1065.  So, what is this document?

**A.**     An e-mail from me to Mr. Harrell.

**Q.**     What was purpose of you sending this e-mail to Mr. Harrell?

**A.**     To provide some more information about what the property would have.

**Q.**     Okay.  And what are the attachments to this e-mail?

**A.**     The details and then the drawings Mr. Deluca put together.

**Q.**     And those pages at Bates label 27142 to 27151 with attachments to your e-mail of February 9th; is that right?

**A.**     Correct.

**Q.**     Who provided you the features and sketches?

**A.**     Mr. Deluca.

**Q.**     And who asked you to send this e-mail to the Harrells?

**A.**    Mr. Deluca, I believe, asked me to follow up with Mr. Harrell and provide some details about the property.

**Q.**    Okay.  What discussions did you have at this time, on February 9th, with Mr. Deluca regarding what square footage number to provide to the Harrells?

**A.**    Again, we had the original plan that said it was like 5649.  He was adding in a thousand-square-foot addition, so 6700, approximately, square feet was what he had told me.

**Q.**    So the finalized HomeVisit plan with a total of 6049, but there was going to be more --

MR. BURCHER:  Objection, Your Honor.  He's already testified that those were inaccurate.  They weren't final.

THE COURT:  Yeah, I'll allow him to go over it one more time.

BY MR. LYNCH:

**Q.**    Okay.  So as the -- the number 6049, was Mr. Deluca communicating that there was an additional thousand square feet on top of that?

**A.**    No, he did not communicate that, but I did hire another floor plan company.

**Q.**    Okay.  And we'll talk about that in a moment.  Why didn't you provide the finalized HomeVisit plans to the Harrells at this time?

**A.**    Because Mr. Deluca consistently said they were inaccurate and not representative.

Q.      Right.  Okay.  So you -- what was the second company that measured the property?

A.      TruPlace

Q.      Okay.  And do you recall if the -- just speaking about the main residence, size only, do you recall whether the TruPlace plan showed a larger or smaller main house than the HomeVisit plans?

A.      I think it was roughly the same size.

Q.      Okay.  Do you recall Mr. Deluca or have any knowledge of him performing any square footage measurements of the property?

A.      I'm not aware of any.

Q.      Okay.  Let's look at Exhibit 511 again, and specifically pages 461 to 463.  Just take a moment to review 461 to 462.

A.      Done.

Q.      Okay.  So the PDFs on Bates label -- page 462, Bates label 61104, those are the -- is that the first time you sent the unredacted HomeVisit plans to the Harrells?

A.      Correct.

Q.      And to your knowledge -- strike that question.  Why did you say on Bates label 61105, "I didn't think Doug was trying to mislead you at the time."

A.      I didn't think he was trying to mislead them at that time.

Q.      Okay.  Did you have a change of opinion about that by the time December rolled around?

MR. BURCHER:  Objection, Your Honor.  He's already testified that he -- at the time the house was bought.  His opinion now is irrelevant.

MR. LYNCH:  We can strike that question.  I mean...

THE COURT:  I don't think that was the question.  Reask the question.

MR. LYNCH:  Okay.

BY MR. LYNCH:

Q.    So you said you didn't -- yes.  Did you have a change in opinion -- in December when this message was sent, did you have a change in opinion about whether Mr. Deluca was or was not trying to mislead the Harrells?

A.    I think those floor plans could have been correct.

Q.    Okay.  So let's look at Exhibit 562.  It's an e-mail from Mr. Deluca to Ms. Quackenbush and you.  Who is Ms. Quackenbush?

A.    I believe she's who worked with the Harrells to finance the property.

Q.    Okay.  What was, to your recollection, MainStreet Bank's roll in the transaction?

A.    They financed the Harrells.

Q.    They were the Harrells' lender?

A.    Yes, lender.

Q.    And in the second paragraph Mr. Deluca says, "I feel very good with the value given the 4 lots and a 7,000 square foot plus main residence."

To your knowledge in dealing with the marking up of the plans, what basis at this time did Mr. Deluca have for making that statement?

A.     He was the builder.  I think that is what he thought.

Q.     Okay.  Let's look at Exhibit 500.  Page 20 to 21.

A.     I think I'm missing this one.

Q.     Are you?  Okay.

A.     I can look at the screen.

Q.     All right.  So in this message, it begins, Doug says, "Mr. Muha, Do you have the final calculation for square footage?"

And you communicate, "Roughly 6500 square feet.

Do you see that?

A.     Yes.

Q.     And then you also say -- you also sent the message beginning you "never completed a precise calculation."

Is that also your message?

A.     Correct.

Q.     Okay.  And then if you turn to the next page, it appears that Mrs. Harrell sends a message beginning "My recollection."

Do you recall any communications with Mrs. Harrell correcting that understanding sent in that message?

A.     I do not.

Q.     And then on the first page, there's a, "Roughly 6500 square feet," and then the "7000" foot.  Is it -- was it

your understanding that the main residence was 6500 -- strike that question. As a result of this exchange, what impression was left on the parties as to the size of the main house?

**A.** 6500.

**Q.** Okay.

MR. LYNCH: All right. No further questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION OF BRENDAN MUHA

BY MR. BURCHER:

**Q.** Mr. Muha, I would like you to stick on that exhibit that you were just on. I would like you to clarify that. You said the 6500 was the main house, but in the next -- in your testimony -- it says, "We never completed a precise calculation with the updated master space and additional carriage house space. I think it is probably close to 7000 square feet in total."

Doesn't that leave the impression that the carriage house and the main house are 7,000 square feet? You never said in any of your texts that the carriage house and the main house was -- or the main house was only 7,000 square feet, did you?

**A.** No, I said combined.

**Q.** Okay. So just to clarify, what you just said there, the impression that the parties were left was that the totality of both the carriage house and the master house was 7,000 square feet.

A.      Correct.

Q.      Okay.  So I'm going to go through a lot of things on square footage.  Let's start out with Exhibit 559.

A.      I have it.

Q.      Okay.  In this e-mail, which you sent to Mr. Harrell dated February 9th, 2019, you had already gone now through this iteration of all of the different drawings.  You're left with the February 7th drawings that clearly did not include all of the square footage in them, but based on this representation here, you came up with 6700 square feet including the carriage house, right?

A.      Correct.

Q.      Okay.  And the way that you calculated that was you took the 5700-and-some-odd square feet that you knew what the original house was, back when you did your drawings, that you could do accurately, right?

A.      Correct.

Q.      And Mr. Deluca was acting -- and you thought that Mr. Deluca was adding about a thousand square feet, right?

A.      Correct.

Q.      And that thousand square feet was a bunch of various differently things.  There was at least, you know, the master suite addition that was being added, right?

A.      Correct.

Q.      And do you recall what the dimensions or the rough square

footage of that was?

A.      I don't remember the exact dimensions.  I know they were supposed to be close to the living room.

Q.      Okay.  So if the front of the house, or that length, is about 40 square feet -- or 40 feet in length and then you have, you know, an additional 15 feet -- those 15 feet, that's about 600 square feet, right?

A.      Correct.

Q.      Okay.  So that's 600 square feet that's being added.  We have a mudroom that's being added, right?

A.      Correct.

Q.      And that's about 10 by 15, right?

A.      Correct.

Q.      So that's another 150 square feet.  So -- and then we're adding in the screened-in porch, right?

A.      Yes.

Q.      Okay.  So if we add in the screened-in porch, and that's again about that 40 feet by 15, because that's about the same size in the back, that's another 600 square feet, right?

A.      Sounds correct.  I'm not doing the exact math.

Q.      Just -- these were rough estimates, right?  You're not -- throughout this time period, and you've even said in your deposition, that all of this was just rough, inexact -- it wasn't exact numbers that people were talking about, correct?

A.      Correct, it was under construction.

Q.    Okay.  And it's hard to measure the -- measure the square footage when it's under construction, right?

A.    Correct.

Q.    And why is that?

A.    Because things are constantly changing.

Q.    Well, and isn't it true that this is done by -- you know, some of this is done by laser, and if you have open walls, you know, it kind of goes through and you don't know where it's going to stop so you don't know where things can accurately be measured, right?

A.    Yeah, I mean, we measured it five times.

Q.    And in addition to that, isn't it true that when you're doing these January and February plans that are kind of -- you're just trying to get a guess for things, because the engineer was still working on the addition plans, right?

A.    I was unaware of where the plans were in status, but, yes, we're just trying to get an idea for marketing.

Q.    Okay.  All right.  So let's turn to Exhibit 560, if we could.

A.    I'm here.

Q.    All right.  So these are some e-mail exchanges between you and the HomeVisit folks, right?

A.    Correct.

Q.    And there is this box associated with -- and I'm looking at Harrell page 3, which is --

**A.**     Yes.

**Q.**     -- the third page in.  This square footage number that's down here is -- do you know how this is calculated based on their program?

**A.**     I would assume they did not add the master suite.

**Q.**     Right, and why is that?

**A.**     They just drew it in.

**Q.**     There's no dimensions on that, right?

**A.**     Correct.

**Q.**     So the idea that this number down here in the bottom section is anywhere accurate until all the dimensions are put in here, you know, clearly Mr. Deluca was being fair in saying that this was not accurate at this stage?

**A.**     I agree.

**Q.**     You agree with that, right?  Okay.

And additionally, in terms of all of this handwriting on the next couple of pages, there's a bunch of handwriting, which it's clearly not accurately reflecting the house, you know, at this time, correct?

**A.**     Correct.

**Q.**     Okay.  And so this is the -- this is the -- and I think that you have handwritten, in the upper left-hand corner of Harrell 002, the 1-30-19 attachment.  Do you see that in the upper left -- the --

**A.**     Oh, yes, yes.

Q.    Is that your handwriting?

A.    No.

Q.    Okay.  But I guess that reference is to the -- because there are two e-mails attached to this.  There's a January 31 e-mail, January 30 e-mail, but this looks like the attachment to that e-mail, right?

A.    Yes, that would make sense.

Q.    Okay.  So let's jump forward in the same exhibit now to Harrell 10, which is the February 1 -- February 6th e-mail, right?  And what follows after that are the -- some additional edits to these drawings, right?

A.    Correct.

Q.    And let's look at the -- I would like you to look at Harrell 22, which is the one where some dimensions are added here.

A.    Correct.

Q.    And it says, "Owner suite," it says "39 and 10 inches by" 16 and 3 -- "16 feet 3 inches."  If you take a little bit up to 40 and a little bit down to 15, you get about 600 square feet, right?  And that's about what you're adding on to the --

        You're going to have to answer the question.

A.    Yes, sir, yes, sir.

Q.    Sorry.  And when you add that on, that's about 600 square feet for the owner's --

A.    Correct.

Q.      -- owner's suite, right?

So -- and in these plans, it doesn't show the mudroom, right?

A.      Correct.

Q.      Okay.  And in these plans it shows no square footage for the screened-in porch in any fashion, right?

A.      Correct.

Q.      So that's clearly not added into that.

So your representation on February 9th that you sent to the Harrells, that said it's approximately 6500 square feet, do you feel that was an accurate representation?

A.      Yes, sir.

Q.      And if it was not accurate, you would have told the Harrells that you didn't think -- that it's not accurate, right?

A.      That's why I said proximate.  Obviously that -- it was not a precise calculation and that there was a lot of additions and changes going on.

Q.      All right.  So let's now turn to Exhibit 561.  And I would like you to turn to your e-mail to the Harrells on Friday, June 14th.  Do you see that?

A.      Yes.

Q.      So, wasn't the purpose of this transmittal of these drawings at this time to place furniture?

A.      Correct.

Q.      I mean, you know -- you say here -- it wasn't anything

related to actually trying to figure out the square footage of the house, was it?

A.    It had nothing to do with it.

Q.    Okay.  So removal of the inaccurate summaries that we have just discussed would be perfectly appropriate in that circumstance; don't you agree?

A.    I do not want to send a marketing document that misrepresented the property, as Mr. Deluca asked me not to.

Q.    Okay.  But you wouldn't have sent it either if it had been wrong, right?

A.    Right.

Q.    Okay.  And you don't think that you were trying to hide the wool over the Harrells with regard to square feet in any fashion by sending this without that information, right?

A.    No, sir, we had a lot of trouble with HomeVisit, obviously.

Q.    So let's turn to the attachment that is TTR-5717, which is the e-mail that you sent to yourself.

So you sent that to yourself just because you -- this was the current status and you wanted to get it from your personal e-mail to --

A.    Yes, I needed to save the --

THE COURT REPORTER:  I'm sorry.

MR. BURCHER:  I'm sorry, I'm mumbling.

THE COURT REPORTER:  Do you want to finish the question?

MR. BURCHER:  Yes.

BY MR. BURCHER:

Q.     Why did you sent it to your personal e-mail?

A.     I was just trying to save the PDF.  It was probably just via like Access on my phone or something.

Q.     Okay.  So let's look up at the top of 5718.

And there are dimensions in there, right?

A.     Correct.

Q.     But they're different than what Mr. Deluca had handwritten into the drawings a few days ago, right?

A.     Correct.

Q.     We had just gone over that.  That was, you know, the -- the 39 by 16, correct?

A.     Correct.

Q.     Okay.  So that's different than what Mr. Deluca said it should be, right?

A.     Correct.

Q.     And again, at this stage, on February 7th, the plans were not finalized; we had not received the plans from the engineer at this stage, correct?

A.     I would not know.

Q.     And on the right-hand side are there any dimensions on the mudroom in any fashion?

A.     No.

Q.     Okay.  So that possibly could be additional square

footage that is not included in this bottom calculation, correct?

A.    Correct.

Q.    So the idea of actually sending the Harrells these drawings, these -- and these were -- this is the last ones that you received from HomeVisit, right?

A.    Correct.

Q.    The idea of sending them these in accurate numbers would not be appropriate, right?

A.    Correct.

        THE COURT:  Mr. Burcher, how much more do you have on cross?

        MR. BURCHER:  I will probably go for a while, Your Honor, because he went through a lot of different --

        THE COURT:  Right.

        MR. BURCHER:  -- a lot of different things.

        THE COURT:  All right.  I was just curious as to whether we could finish him up tonight, but that doesn't sound like that's possible and I don't want to keep everybody much later, so let's break for today.  Are you done with the square footage or do you have some more on that.

        MR. BURCHER:  Mostly done, but I can clean it with a couple questions tomorrow.  It won't take that long, Your Honor.

        THE COURT:  All right.  Then let's adjourn for today, and we'll begin again at 9:00 tomorrow morning, all right, Mr. Muha?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Then we'll see you all at 9 a.m. tomorrow morning.  We're in recess.

(Proceedings adjourned at 5:33 p.m.)


**C E R T I F I C A T E**


I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Scott L. Wallace                      8/3/22
-----------------------------     ----------------
**Scott L. Wallace, RDR, CRR            Date
   Official Court Reporter**