UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**JOHN E. HARRELL,**                )
                                    )
        **et al.,**                 )
                                    )
        **Plaintiffs,**             ) Civil Action
                                    ) No. 1:20-0087-LO-MSN
        **v.**                      )
                                    ) July 14, 2022
**DOUGLAS M. DELUCA,**              ) 9:00 a.m.
                                    )
        **et al.,**                 )
                                    )
        **Defendants.**             )

**VOLUME 4 (Pages 702 - 960)**
*TRANSCRIPT OF BENCH TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE LIAM O'GRADY,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the Plaintiffs:        **Thomas Ryan Lynch, Esq.**
                           Bradley Arant Boult Cummings, LLP
                           (DC)
                           1615 L Street, N.W.
                           Suite 1350
                           Washington, DC 20036
                           202-719-8228
                           Fax: 202-719-8328
                           E-mail: Tlynch@babc.com

                           **Lee-Ann Christine Brown, Esq.**
                           Bradley Arant Boult Cummings LLP (DC)
                           1615 L Street, N.W.
                           Suite 1350
                           Washington, DC 20036
                           202-393-7150
                           Fax: 202-719-8312
                           E-mail: Labrown@bradley.com

```
APPEARANCES:   (Cont.)

For the Defendants:        Michael John Coughlin, Esq.
                           Walsh Colucci Lubeley & Walsh PC
                           4310 Prince William Parkway
                           Suite 300
                           Prince William, VA 22192
                           703-680-4664
                           Fax: 703-680-2161
                           E-mail:
                           Mcoughlin@pw.thelandlawyers.com




For the Defendants:        Eugene A. Burcher, Esq.
                           Walsh, Colucci, Lubeley & Walsh PC
                           4310 Prince William Parkway
                           Suite 300
                           Prince William, VA 22192
                           703-680-4664
                           Fax: 703-680-2161
                           E-mail: Eaburcher@thelandlawyers.com




Court Reporter:            Scott L. Wallace, RDR, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           401 Courthouse Square
                           Alexandria, VA 2231-5798
                           202-277-3739
                           scottwallace.edva@gmail.com



Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

704

# C O N T E N T S

**EXAMINATIONS**                                                    **Page**

CONTINUED CROSS-EXAMINATION OF BRENDAN MUHA            707
BY MR. BURCHER
REDIRECT EXAMINATION OF BRENDAN MUHA                   739
BY MR. LYNCH

DIRECT EXAMINATION OF SHAYAN AMIN                      746
BY MR. LYNCH
CROSS-EXAMINATION OF SHAYAN AMIN                       762
BY MR. COUGHLIN
REDIRECT EXAMINATION OF SHAYAN AMIN                    769
BY MR. LYNCH

DIRECT EXAMINATION OF MICHAEL JACKIE                   771
BY MR. BURCHER
CROSS-EXAMINATION OF MICHAEL JACKIE                    780
BY MR. LYNCH

DIRECT EXAMINATION OF DAWN HARRELL                     782
BY MS. BROWN
CONTINUED DIRECT EXAMINATION OF DAWN HARRELL           835
BY MS. BROWN
CROSS-EXAMINATION OF DAWN HARRELL                      841
BY MR. BURCHER

DIRECT EXAMINATION OF ANGUS WYMAN MACDONALD            872
BY MR. BURCHER
CROSS-EXAMINATION OF ANGUS WYMAN MACDONALD             907
BY MS. BROWN

CROSS-EXAMINATION OF ANGUS WYMAN MACDONALD             933
BY MR. LYNCH
REDIRECT EXAMINATION OF ANGUS WYMAN MCDONALD           950
BY MR. COUGHLIN

## EXHIBITS

Defendant's Exhibit 197 admitted                      710

Defendant's Exhibit 12 admitted                       719

Plaintiffs' Exhibit 20, PDF pages 25, 26, 27, and     747
28, admitted

Plaintiffs' Exhibits 9, 10, 11, 12, 13, 14, 15, 16,   749
17, 18, and 19, admitted

|                                                                                                                             | **Page** |
|-----------------------------------------------------------------------------------------------------------------------------|----------|
| Plaintiffs' Exhibit 500, pages 11, 12, 13, and 14, admitted                                                                 | 791      |
| Plaintiffs' Exhibit 762 admitted                                                                                            | 798      |
| Plaintiffs' Exhibit 502 admitted                                                                                            | 805      |
| Plaintiffs' Exhibit 790 admitted                                                                                            | 808      |
| Plaintiffs' Exhibit 496, pages Harrell 58167, Harrell 58168, Harrell 58169, and Harrell 58170, admitted                     | 810      |
| Plaintiffs' Exhibit 496, pages 58225 and 58226, admitted                                                                    | 814      |
| Plaintiffs' Exhibit 496, page 58295, admitted                                                                               | 815      |
| Plaintiffs' Exhibit 496, page 58300, admitted                                                                               | 817      |
| Plaintiffs' Exhibit 656 admitted                                                                                            | 817      |
| Plaintiffs' Exhibit 500, page 58445, admitted                                                                               | 823      |
| Plaintiffs' Exhibit 664 admitted                                                                                            | 824      |
| Plaintiffs' Exhibit 661 admitted                                                                                            | 825      |
| Plaintiffs' Exhibit 496, pages 58270, 58271, 58272, 58273, 58274, 58275, 58276, 58277, and 58278 admitted                   | 827      |
| Plaintiffs' Exhibit 5000, pages 58150 to 58186 admitted                                                                     | 829      |
| Plaintiffs' Exhibit 729 admitted                                                                                            | 831      |
| Plaintiffs' Exhibit 1005 admitted                                                                                           | 832      |
| Defendant's Exhibit 146, last five pages, admitted                                                                          | 874      |
| Defendant's Exhibit 143 admitted                                                                                            | 894      |
| Defendant's Exhibit 53 admitted                                                                                             | 903      |
| Defendant's Exhibit 146, five pages following report admitted                                                               | 951      |
| Plaintiffs' Exhibit 729 admitted                                                                                            | 798      |

*706*

<u>**MORNING SESSION, JULY 14, 2022**</u>

(9:06 a.m.)

THE COURTROOM CLERK:  Court calls Civil Case Number 1:20-cv-87, *John E. Harrell, et al. versus Douglas M. Deluca.* This case is on for trial by the Court.

THE COURT:  All right.  Good morning.  I see counsel are here and Mr. Harrell is here and Mr. Muha is here, so let's come back up to the witness box, please.

Any preliminary matters?

MR. BURCHER:  Just while Mr. Muha is coming up, Your Honor, we talked a little bit more about exhibits and some of the things that we're to do, and we want to put that on the record just for your benefit and for the record's benefit.

We're going to work over the weekend and reconcile them as best that we can, and to the best extent we can, we're going to skinny down some of those long text exhibits to the ones that have actually been discussed as opposed to the entirety of the exhibit, and we'll try our best to do that, but in the event that that can't be done and we need to rely upon the transcript, we've agreed that what we will do is, once we get the transcript -- because we'll be doing post-trial briefs -- we'll reconcile that through that process and we'll submit some sort of an agreed order having those come in.  That's our plan.

THE COURT:  Yeah, that's an excellent plan.  Thank you for working together to do that.  All right.

CONTINUED CROSS-EXAMINATION OF BRENDAN MUHA

BY MR. BURCHER:

Q.   All right.  Good morning, Mr. Muha.  How are you today?

A.   Good.  Good morning.

Q.   Good.  Now, last night you didn't discuss your testimony with anybody after leaving, just making sure?

A.   No, I did not.

Q.   Okay.  And you've never met me before, right?

A.   No, sir.

Q.   I didn't do your deposition, and this is the first time you've met me or Mr. Coughlin, correct?

A.   Correct.

Q.   And how much time did you spend preparing your testimony with Mr. Lynch?

A.   A couple hours, three, four hours.

Q.   Three or four hours you spent with Mr. Lynch preparing your testimony for this trial?

A.   Between, yeah, post-deposition, et cetera.

Q.   All right.  I would like to focus a little bit more on a couple of questions related to square footage.

You testified yesterday when you were looking at Plaintiffs' Exhibit 511 at page 463 --

MR. BURCHER:  If you could call that up.

BY MR. BURCHER:

Q.   This was in the -- it looks either in the -- the last

text on that is January 13th of 2020, and the text basically says that -- they're asking about square footage.  I think you texted them the floor plans at this -- or you sent them the floor plans at this time, and you say that, "I had HomeVisit out twice and another individual do them by hand.  Doug made edits, I sent them back to HomeVisit for adjustment but he still told me not to send them to you because they were too inaccurate with ongoing construction."

        Do you see that?

A.      Correct.

Q.      Okay.  And your testimony yesterday was -- and I'm paraphrasing, but I think it was something along the lines of: "I think those floor plans could have been correct."

        Do you remember that?

A.      Could have been, yes.

Q.      Okay.  Now that we've gone through those floor plans and you've agreed with me that they were not accurate, does that change your reference with regard to them being correct or not?

A.      I'm unsure of all the plans.

Q.      Okay.  So they also could have been incorrect, correct?

A.      Correct.

Q.      All right.  Now, if you could turn to Plaintiffs' Exhibit 500 -- strike that.  You talked a little bit about TruPlace and that you had TruPlace come out and do plans, and this was after the HomeVisit plans; is that right?

A.     Correct.

Q.     This okay.  And those are in your binder.  We don't have a copy of them in our electronically, but they're in the last tab of the Muha binder.

A.     Yes.

Q.     Okay.

MR. BURCHER:  And for the record, on page TRU 13 in that binder -- it's the very last tab all the way in the back.  Do you have that?

THE WITNESS:  Yes.

BY MR. BURCHER:

Q.     It says that the total -- at least with that service, the totaled square footage was 6900 square feet, right?

A.     Correct.

MR. BURCHER:  Your Honor, I would like to move TRU -- this exhibit in as the a Defendant's Exhibit, the next number in our list.

THE COURT:  Which is?

MR. BURCHER:  That would be Defendant's Exhibit 197.

THE COURT:  197?

MR. BURCHER:  197.

THE COURT:  Any objection?

MR. LYNCH:  I would like to get a copy of it.

THE COURT:  Well, it's in your book, I think.  It's in the book that you --

MR. LYNCH:  Okay.

MR. BURCHER:  It's the last --

THE COURT:  It's in your witness binder.

MR. BURCHER:  It's the last tab that's in it.

MR. LYNCH:  All right.  No objection.

THE COURT:  Okay.  Thank you.  It's received.

(Defendant's Exhibit 197 admitted into the record.)

BY MR. BURCHER:

Q.    Now, as you recall, a lot of these questions related to square footage in the -- you know, in the June time period related to two things.  The first was placement of furniture, right?

A.    Correct.

Q.    And the second was for insurance purposes, right?

A.    Correct.

Q.    Okay.  Did there come a time in which you were aware that the Harrells had obtained insurance for the house?

A.    Yes, I believe they did.

Q.    Okay.  And in your binder there is a Cincinnati Insurance tab?  It's the tab just before the TruPlace tab.  Are you familiar with this document?

A.    I would have never seen it until discovery.

Q.    Okay.  But you saw it in discovery?

A.    Yeah, I've seen it since.

Q.    Okay.  All right.  And have you reviewed the square

footage on that?

A.    I have not.

Q.    Okay.  Then I'm not going to ask you any questions.

All right.  So now if you could turn to -- this is Plaintiffs' Exhibit 500.  That's the tab in your book, and it's at page 20.

MR. BURCHER:  For everybody else it's Harrell 58431.

THE WITNESS:  I don't think I have 500, Exhibit 500.

MR. BURCHER:  Mr. Coughlin, if you could call that up.

THE COURT:  500 is in my book.

MR. BURCHER:  I think it's in all of our binders.  Oh, there's nothing in there.

THE COURT:  It's blank on yours?

THE WITNESS:  Yes, sorry, sir.

THE COURT:  That's okay.

MR. LYNCH:  I'm sorry.  I recall seeing this one on the screen.  I could be wrong.  Sorry.

MR. BURCHER:  All right.  Your Honor, I'll come back to that, just to move on.

BY MR. BURCHER:

Q.    Now, sir, you were hired as the -- you signed an exclusive agency agreement with the Harrells around the February 2019 time period?  Do you recall that?

A.    Correct.

Q.    And that was when you first formalized your relationship

with the Harrells in terms of having a contract and allowing you to be their real estate agent. Do you recall that?

A. Correct.

Q. Okay. And then prior to that time you didn't -- you had this sort of loose arrangement until you actually signed the agreement, because you can't be a real estate agent and get a commission until you have that agency agreement signed, correct?

A. Correct, but it also states that they can eliminate that contract for zero dollars.

Q. I'm sorry, I don't understand what you mean by that.

A. At any point in time, my representation can be ended for zero dollars on behalf of the Harrells.

Q. Right, but until that document is signed, you're not formally their agent; is that correct?

A. Correct.

Q. It's sort of a looser relationship?

A. Correct.

Q. Okay. And you don't owe a fiduciary duty to them at that point prior to the signing of that agreement, correct?

A. Correct.

Q. But once you signed that agreement, you are their real estate, correct?

A. Correct.

Q. And you owe them a fiduciary duty; is that correct?

A. Yes.

Q.    And in this February time period, and even up until the April time period, you did not have an agency agreement with Mr. Deluca; is that correct?

A.    Correct.

Q.    Okay.  And so that agency agreement was not signed until Mr. Deluca ratified the dual agency agreement on April 5th of 2019.  Do you recall that?

A.    Yes.

Q.    Okay.  All right.

      MR. BURCHER:  Can we go ahead and -- do you have that exhibit?

      MR. COUGHLIN:  Yes.

BY MR. BURCHER:

Q.    I'll describe the exhibit for you to move things along. This is the text exchange on June 10th of 2019 in which you and Mr. -- and Mrs. Harrell and I think that -- yeah, and Mr. Deluca are talking a little bit about square footage, and there is a reference that Ms. Harrell says, "My recollection was when we asked before buying was that the main house was going to be approximately 6500 and the carriage house was 1500."

      Do you see that?

A.    I'm listening.  I do not see it, no.

Q.    Okay.  It's on the next page.  Go down one page to 432. Do you see that?

A.    Yep.

Q.    Okay.  The Harrells have contended that Mr. Deluca owed them a duty to respond to this in correcting the -- this statement.  Do you -- did you respond to -- you were their agent at this time, correct?

A.    Correct.

Q.    And did you correct this -- did you feel it necessary to correct her comment that it was 6500 and 1500 square feet?

A.    I felt I had already answered the question.

Q.    Okay.  You felt that they had sufficient information that this was not something that you needed to follow-up on in this context?

A.    Correct.

Q.    And likewise, you don't think Mr. Deluca would be required to respond to this in any fashion, do you?

MR. LYNCH:  I'm going to object as a legal conclusion.

MR. BURCHER:  He's their agent, Your Honor.

THE COURT:  Yeah, overruled.

BY MR. BURCHER:

Q.    You don't think Mr. Deluca would be required to if you weren't required to, do you?

A.    No.

Q.    Okay.  All right.  So let's get into the contract.

So you used the Northern Virginia Association of Realtors' standard Residential Sales Contract for the purposes of this transaction; is that correct?

A.      Correct.

Q.      Okay.  And you sent that agreement on March -- end of March to the Harrells for review and comment, didn't you?

A.      Yes.

Q.      Okay.  And they had an opportunity to review it with you and go over it?

A.      Um, I think they just read through it.

Q.      They -- I'm sorry?

A.      They would have read through it.

Q.      But you would have gone -- as their agent you would have gone over it with them to the extent that they had any questions?

A.      Yes, if they had asked.

Q.      And with respect to how you approach what gets put into the contract, it's important, isn't it, that all the material terms between the parties get put into the contract; is that right?

A.      Correct.

Q.      Okay.  And to the best of your ability, you put those material terms in the contract, correct?

A.      Correct.

Q.      Okay.  And are you familiar with -- if you could, let's turn to the page 14 of 16 of Exhibit 1, which is the contract. And I'd like to focus your attention on paragraph 38.

        Are you familiar with what we call an integration clause,

"Entire Agreement"?

A.    Yes.

Q.    Okay.  And it says in there that the parties are not relying upon any oral representations or statements that are not contained within this agreement, correct?

A.    Correct.

Q.    And that's why it's important that the material terms of -- between the parties get put in writing, right?

A.    Correct.

Q.    Okay.  And so let's go through some of those material terms.

If you could turn to page 7 of 16, please.  I'm focusing on paragraph 10, which is the "Property Maintenance and Condition."  The closing, the condition of the property at closing would be as of final walk-through; is that correct?

A.    Correct.

Q.    Okay.  And my understanding of what that means is, is that whatever the condition of the property was at closing was accepted by the Harrells; is that correct?

A.    Correct.

Q.    Okay.  And in the paragraph that is at the end of that, it lists the condition of the property as and all the systems, it looks like, in an as-is condition.  Do you see that?

A.    Yes, sir.

Q.    So when the Harrells close, whatever the property was,

they accepted that in an as-is condition at that time, correct?

A.     Correct.

Q.     Okay.  Now, you discussed on your direct testimony that the buyer waived the opportunity to make this contract contingent on a home inspection; is that correct?

A.     Yes.

Q.     Okay.  Now, did Mr. Deluca have -- did Mr. Deluca tell them that they shouldn't get a home inspection?

A.     No.

Q.     Okay.  All right.  That was their decision to --

THE COURT:  I'm sorry.  Lay a foundation if you're going to say what Mr. Deluca personally told them in his presence.

MR. BURCHER:  Okay.

THE COURT:  Okay.

BY MR. BURCHER:

Q.     So you were both of the agents -- you know, you were working -- you were the agent for the Harrells at this time, correct?

A.     Yes.

THE COURT:  Well, the -- the permissible question is, to your knowledge, did Mr. Deluca tell them that they had to take this contract as-is, or did he tell Mr. Deluca to write that in there and that that was a condition?  Okay?

BY MR. BURCHER:

Q.     Did -- with regard to this provision, what, if any,

discussions did you have with Mr. Deluca regarding the home inspection contingency being removed?

A.    I don't recall any.  I think all parties agreed it wasn't really necessary with the status of the property.

Q.    Did Mr. Deluca ask you to have that removed in any fashion?

A.    No.

Q.    And if you go to paragraph 11 and you look at the second sentence of paragraph 11, "Access to Property," they were given access to the property throughout the construction time period; isn't that correct?

A.    Yes.

Q.    And they even had in the contract the ability specifically to make walk-through inspections within seven days of settlement or occupancy or otherwise agreed; is that correct?

A.    Yes.

Q.    So they could have brought any home inspector that they wanted to at any point in the process, right?

A.    If -- I think if Mr. Deluca agreed, yes.

Q.    Well, he didn't even have to agree.  In this particular paragraph, they had the absolute right to do that whether he agreed --

A.    Yes, the contract would not have been contingent upon it.

Q.    Right.  Okay.  And so -- and the Harrells had done that in the McLean property that they had put a contract in in

February; is that correct?

A.    I think it's Great Falls, but yes.

Q.    Great Falls, yes, thank you.

And that inspection had a large number of items that were highlighted, and even as a result of that, they terminated that contract; is that correct?

A.    Yes.

Q.    Okay.  And for the record, if you could turn to -- we're going to show you real quick Defendant's Exhibit 12.  Do you recall this document?

A.    Yes.

Q.    Is this the inspection where they report on the -- they received on the Great Falls property?

A.    Yes.

MR. BURCHER:  Your Honor, I would like to move Defendant's Exhibit 12 into the record.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  It's received.

(Defendant's Exhibit 12 admitted into the record.)

BY MR. BURCHER:

Q.    All right.  So going back to Exhibit 1 as far as the contract goes, if you could turn to page 11 of 16 which is -- I would like to focus your attention on paragraph 29.  Are you there?

A.    Yes.

Q.    Okay.  And this provision says that it is important that the buyer and seller read this and make sure that it accurately expresses their understanding as to their intentions and agreements, correct?

A.    Yes.

Q.    And it actually has a list of things that it recommends that they do as a part of this process, correct?

A.    Yes.

Q.    And that includes seeking counsel, reviewing the property condition, and various other different things; is that correct?

A.    Yes.

Q.    Okay.  So -- all right.  And so with regard to the specifics of the contract, I'd like you to turn to paragraph 14 -- page 14 of 16 and paragraph 34.  Do you see the "Home Warranty" provision?

A.    Yes.

Q.    And in this contract that was signed by the parties, it does not have a home warranty, correct?

A.    Correct.

Q.    Okay.  But despite that, you know, Mr. Deluca ultimately gave them a warranty; is that correct?

A.    Yes, he offered and gave them one.

Q.    All right.  So theoretically, under this contract he didn't have to give them a warranty; is that correct?

**A.**      Correct.

**Q.**      Okay.  All right.  So moving to paragraph 39 at the first item, it also says no home inspection contingency, correct?

**A.**      Yes.

**Q.**      All right.  Now, you helped create Exhibit B to this contract; is that correct?  Exhibit B is the list of --

**A.**      Yes.

**Q.**      -- additions.  So, first, in -- this list here on paragraph 39 of page 14 is not all-inclusive; is that correct? Of all the additions that were added.

**A.**      Correct.

**Q.**      All right.  So let's turn to Exhibit B, which is -- starts on page Harrell 14208.

**A.**      I'm there.

**Q.**      All right.  Do you recall this exhibit?

**A.**      Yes.

**Q.**      And this was an interactive process between you, Mr. Deluca, and the Harrells to get this as accurate as possible, correct?

**A.**      Yes.

**Q.**      Okay.  And if a feature wasn't contained on this -- a material feature was not contained on this document, it wasn't material to the parties based on your understanding of the interaction between them?

**A.**      Yes, that's why we revised it, if there were changes.

Q.    Okay.  But at this time, this is what the parties understood; is that correct?

A.    Correct.

Q.    Okay.  And there is nothing in Exhibit B that highlights a specific square footage that Mr. Deluca was required to construct the property to; is that correct?

A.    Correct.

Q.    Okay.  So that was not a material term of the contract between the parties?

A.    It was not.

Q.    Okay.  Now, there is nothing in Exhibit B that talks about a slate roof, to your knowledge?

A.    I do not believe so.

Q.    Okay.  It doesn't talk about the roof in any fashion, as best I can tell.

A.    No, it does not.

Q.    And so having Mr. Deluca deliver a slate roof was not a material term, as far as you know, to the parties as documented on the contract?

A.    Correct.

Q.    And there is no reference in the contract to the status of permits as it relates to the construction that's ongoing, is there?

A.    Not in the contract, no.

Q.    Okay.  All right.  And so that was not a material term as

contained in the contract; is that correct?

A.    Correct.

Q.    Okay.  So after the signing of this contract, there were a number of addendums that were done to the contract following April 3rd signing; is that correct?

A.    Yes.

Q.    And your involvement in that was you every once in a while kind of reconciled the parties and where things were at with regard to the Harrells' customization of the property; is that correct?

A.    It would mostly be a conference call, and they would go through what the changes were going to be.  I would record them, and then I would send around the adjusted document for everyone to sign.

Q.    Okay.  And those changes were being constantly made; is that a fair statement?

A.    Fluid, yes.

Q.    But at some point in the process you had to stop and put things in writing because it was constantly changing and you needed to have something in writing related to that, right?

A.    Correct.

Q.    Okay.  All right.  Now, nothing, to your knowledge, was ever added in the contract as it relates to the roof being the slate roof?

A.    No.

Q.    And nothing was added as it relates to square footage?

A.    No.

Q.    And in fact, nothing was related to the status of permits or inspections or any of that stuff in this particular document?

A.    No.

Q.    Okay.  It wasn't until closing that something -- that the Post Closing Construction Agreement addressed some of those issues; is that correct?

A.    Correct.

Q.    Now, you testified, related to the June time period, that closing became -- the closing date became sort of an issue between the parties; is that a fair characterization?

A.    It was just wondering when it was going to be, yes.

Q.    Okay.  Now, it wasn't -- isn't it true that closing in the context of when this was going to be done was always geared towards when the bank would agree that the house was at substantial completion?

A.    As the majority owner, yes.

Q.    Okay.  And so in other words -- in other words, this June 29th closing date wasn't hard and fast because if the project was not far enough along, the bank wouldn't, you know, close, and so, therefore, it was sort of fluid in that regard?

A.    Correct.

Q.    And, you know, the amount of construction that was added on to this certainly could have influenced the timing of

closing; is that correct?

A.    Any amount of construction can affect closing, yes.

Q.    Okay.  All right.  So you testified that in June, Mr. Deluca was getting concerned about the Harrells' closings; is that correct?

A.    Yes.

Q.    Okay.  And he was concerned for at least one reason, and that was because of the amount of the improvements that were coming in were -- he was funding that -- you know, that from a financing perspective?

A.    Correct.

Q.    And isn't it true that he was also concerned about closing, given the fact that the Harrells had backed out of the Great Falls property in March or February time period?

A.    I would imagine.  I -- he never spoke to me directly regarding that.  I think he was overall concerned if they did not close, he had spent a lot of money on customizations that he wouldn't have spent.

Q.    Okay.  And the Harrells were also concerned about closing; is that correct?

A.    Yes.

Q.    Okay.  And in fact, didn't you connect your father with Mr. Harrell to kind of try and, you know, work out things?

A.    Yes.

Q.    Okay.  And what was the purpose of connecting your father

with Mr. Harrell in terms of dealing with their concerns over closing?

A.    To let him know he had worked with Doug before and what that experience was like.

Q.    Okay.  So let's turn to Exhibit 2, which is the Post Closing Construction Agreement.

Now, in -- I would like you to look at the second page of that document, which is the one which actually has the written terms.

Did you review this document, you know, kind of go over it as their agent?

A.    I read through it briefly, but I was understanding it as an agreement they were making separate to the contract we had signed as the sales agreement.

Q.    Okay.  Was this sort of replacing the sales agreement?

A.    I think it was a separate agreement.

Q.    Okay.  All right.  And so you weren't terribly involved in the material terms that were in this?

A.    I did not draft it, no.

Q.    Okay.  But ultimately, there was a process whereby they went through and looked at the property with you and Mr. Deluca; is that correct?

A.    Yes.

Q.    Okay.  And that occurred a couple of times.  The first was the day before closing; is that right?

A.      We had final walk-throughs, yes.

Q.      Okay.  And when they went through the house -- and the text may show it -- they felt the house looked really good, didn't they?

A.      I think so.

Q.      Okay.  And how did you think the house looked?

A.      I thought they were very happy at the time.

Q.      Okay.  And from your observation, how did the house look?

A.      I thought it looked good.

Q.      Okay.  All right.  And so the lists that were created between the parties, you ultimately began a process of updating those lists as July went through; is that right?

A.      As previously -- you never want, you know, three or four separate lists.  I was constantly trying to keep, you know, one living document as it may be.

Q.      Okay.  And from your perspective, did you see progress on the lists?

A.      Yes.

Q.      Okay.  And was there substantial progress on the lists?

A.      There were many items, so that would be a judgment call. There was progress being made.

Q.      Okay.  And with regard to the lists, it seems to me that the lists merged from just punch lists to adding additional items that the Harrells wanted that were not necessarily punch list items.  Is that a fair characterization of the list?

A.    I think it was a very in-depth list.

Q.    Okay.  But it included things that were not necessarily something that would be a punch list, you know, something you needed to fix, but it was something that they wanted done; is that a fair characterization?

A.    I would have to review it closely.

Q.    Let's start with turning to Exhibit 1022 in your binder. Are you there?

A.    Yes.

Q.    So I'm just going to go through a couple items with you.

On page 1, an "Electric meter relocated."  That's not something that's necessarily a punch list item, it's something that they would like; is that a fair characterization?

A.    I think -- I can't recall with specificity, but I think we needed that to be moved in order for something to function. Something was not working because the meter had not been moved, and that was going to happen, so it seemed like a punch list item in this, you know, situation.

Q.    Okay.  Turn to the next page.  In a number of these locations, it says, Install light fixture to be provided by the -- by Harrells.  Do you see that?

A.    Yes.

Q.    So in order for Mr. Deluca to complete this item, they had to provide him the light fixtures; is that right?

A.    As stated, yes.

Q.    All right.  As to the family room, it says, "Powder room. Estimated completion to be agreed," and there's a question, "When will permit be made (application not made)."

Do you see that?

A.    Yes.

Q.    And so as of just before closing, they knew that the permit had not been applied for for the powder room?

A.    The powder room, yes, was being moved out of the interior of the home to the exterior, and they understood it was going to require an additional permit and different plan to function.

Q.    Okay.  But that really wasn't a punch list item, right? That wasn't something that was former construction; that was something that was new, right?

A.    Correct.

Q.    All right.  And let's look at the kitchen.  I'm just picking a few of these.  "Wine cooler installation," it says "(need design and shelves)."

A.    Yeah, I think in this circumstance that was a punch list. I think the wine cooler was there, but it needed to be like inserted into the fitting of the mold, like the built-in cabinetry.

Q.    But Mr. Deluca needed the design for something for that, right?

A.    Right.

Q.    And wasn't there -- the Harrells' interior designer,

Julianne Sterling, involved in that process?

A.    I can't recall, to be honest.

Q.    Okay.  And on the porch on page 4, there are a few things that talk about resolving "permitting issues with fireplace"?  Do you see that, item 5, page 4?

A.    Yes.

Q.    Okay.  Now, on the mudroom, it says, "Julianne to design built ins"; is that correct?

A.    Correct.

Q.    Does that refresh your recollection about Ms. Sterling being involved in some fashion about this?

A.    I recall the laundry room, I recall this, it was simply I don't recall the wine cooler, but I easily could just be forgetting.  This was while ago.

Q.    That's fine.  I'm trying to get your understanding of -- there was input from their interior designer that was necessary to complete some of the items on this list.

A.    Correct.

Q.    Okay.  Similarly, if you turn to page 7, "Master Suite," "Install built closet per Julianne Sterling design."

Do you see that?

A.    Yes.

Q.    And if you turn to Exhibit 1023, which is the next tab, you weren't involved in this update, were you?  This was Mr. Harrell that updated it on July 7th of 2019.

A.      I can't recall, to be honest.

Q.      Okay.  And if you could turn to the next exhibit, 1025.
Do you see that exhibit?

A.      Yes.

Q.      And it's an e-mail from you to the parties, including
Julianne Sterling?

A.      Yes.

Q.      And it has a bunch of handwritten -- it has the
attachment that we just discussed, that July 7th update, with a
bunch of handwritten notations on that; is that correct?

A.      Yes.

Q.      Now, you're the real estate agent.  Why are you involved
in -- you've already been paid your commission.  Why are you
involved in reconciling punch list items?

A.      I was trying to be nice.

Q.      Okay.  All right.  And the handwritten items to this
exhibit are Mr. Deluca's updates?

A.      Correct.

Q.      And it looks like a lot of various different things are
complete, and certain things are in progress, correct?

A.      Correct.

Q.      And there are things in here that says that he needs
direction; is that correct?

A.      Yes.

Q.      Okay.  And how did you reconcile these requests for

direction from Mr. Deluca with the Harrells as it relates to your involvement in this process?

A.    I sent them this document to provide an update, and obviously they were communicating with each other about a lot of these things at the time.

Q.    Okay.  But you didn't keep track of everything that needed direction; is that correct?

A.    Correct.

Q.    Okay.  All right.  And then at the end of that exhibit at page Harrell 34796, there is an additional list of things.

A.    Yes.

Q.    Okay.  Did you type this list out?

A.    I think this was sent to me by Mr. Harrell, but I can't precisely recall.

Q.    Okay.  So these are additional items that he's identifying on August 6th that he wants done in some fashion?

A.    Correct.

Q.    Okay.  It's fair to say that August 6th is a date in which the relationship between the parties significantly changes; would that be fair?

A.    I believe so, yes.

Q.    Okay.  All right.  And it significantly changes because, at least in part, Mr. Harrell directs Mr. Deluca to stop work. Are you aware of that?

A.    Yes.

Q.    Okay.  And as a result of that stop work, Mr. Deluca asked that, take all of the subcontractors off of the job; is that correct?

A.    Yes.

Q.    Okay.  And he has to remove all of the material from the premises; is that correct?

A.    I would not know what the specificity of that document said and what his responsibilities would be as a contractor.

Q.    Okay.  I'm just asking what your knowledge is.  Did you observe materials having to be --

A.    That would make sense, yes.

Q.    All right.  And are you aware that on August 15th, counsel for the Harrells sent a letter to Mr. Deluca basically threatening him with litigation and breach of contract?

A.    I was aware a letter was sent.  I'm not sure of the details of that letter.

Q.    Okay.  All right.  And you testified earlier with respect to how this relationship in the August, September, and October time period kind of was challenging?

A.    Yes, sir.

Q.    Is that a fair characterization?

A.    Yes, sir.

Q.    Okay.  And in part, was that because the Harrells had threatened Mr. Deluca with litigation?

THE COURT:  How does he know that?  If he had

conversations on it --

BY MR. BURCHER:

Q.     Did you have any conversations?

       THE COURT:  -- his personal -- personal knowledge.

       MR. BURCHER:  Okay.  Personal knowledge, thank you.

       THE WITNESS:  I know Mr. Deluca was worried they were litigious, yes.

BY MR. BURCHER:

Q.     Okay.  And the Harrells actually ended up suing you, didn't they?

A.     Yes.

Q.     Okay.  And that was part of the -- this case, actually. These cases were combined together; is that correct?

A.     Yes.

Q.     Okay.  And the Harrells claimed that you misrepresented a lot of things to them, didn't they?

A.     At the time, yes.

Q.     In the lawsuit they did?

A.     Yes.

Q.     And you denied that, correct?

A.     Yes.

Q.     And do you feel that you made any misrepresentations to the Harrells throughout the -- throughout this process?

A.     No.

       MR. BURCHER:  I'm sorry, Your Honor, I lost my outline.

Here it is.

BY MR. BURCHER:

Q.    Now, I'm going to go back to the Post Closing Construction Agreement and one term that I think you testified about earlier, and that is the amount of work that was remaining and the numbers that were discussed by the parties.  Do you recall that you had testified that $75,000 was the amount that was discussed at one point between the parties as to escrow?

A.    For escrow, yes.

Q.    So there was still a lot of work still left to be done post-closing, based on your understanding; is that correct?

A.    Yes.

Q.    Okay.  It was clear that in some fashion the permits needed to be final-inspectioned [sic]; is that correct?

A.    Yes.

Q.    Okay.  And you testified earlier that the -- there were a number of things after the Harrells had threatened litigation with Mr. Deluca related to Mr. Deluca trying to get those permits closed.  Do you recall that testimony?

A.    I'm not sure specifically what you're speaking to.

Q.    Okay.  So you -- there are some texts in here in which you testified that he was -- said certain dates associated with getting the permits closed out.  Do you recall that?

A.    Yes, he had sent me dates.

Q.    And so he was trying to get things done, and September

30th was one of the dates that he had tried to get that done?

A.    Yes.

Q.    But everything seemed to be linked to the inability to finish certain portions of the work.  Is that your understanding?

A.    Yes, that is my understanding.

Q.    Okay.

MR. BURCHER:  I think I'm just about done, Your Honor. Let me just review my notes.

THE COURT:  Yes, sir.

BY MR. BURCHER:

Q.    After the August 6th time period, the Harrells changed the locks on the property; is that correct?

A.    Yes.

Q.    Okay.  And they installed security cameras on the premises?

A.    I think the cameras were already in place, but they definitely activated the system.

Q.    Okay.  And they began a process of having a number of inspectors and contractors come to the property; is that correct?

A.    Yes.

Q.    Okay.  And in order for Mr. Deluca to do work, he had to either coordinate in some fashion through you, and he had to have some form of supervision on the property while he was doing

work that was a representative of the Harrells, is that a fair characterization?

**A.**     I'm unaware of supervision.  I was given a key to provide access.

**Q.**     Okay.  But you were given a key, and did you hold the key or did you give that key to Mr. Deluca?

**A.**     I had the key.  I would go over in the morning, open it up, come by at the end of the day, lock it up.

**Q.**     Okay.  So he had to schedule with you the ability to go to the house?

**A.**     Just to gain access, yes.

**Q.**     Okay.  And in order to -- so during the late August time period, can you recall how many times you were -- were you going there almost every day, what was the periodicity?

**A.**     Quite frequently.

**Q.**     All right.  And then how about into September, were you going there frequently?

**A.**     I would have to look back, but yes, I was going there quite often to provide access.

**Q.**     Okay.  And so -- and how about October?  Do you recall October?

**A.**     I can't specifically state, but yes, I was going to the property frequently in that time period of a couple months.

**Q.**     Okay.  And -- so but you never, during that time period, actually gave Mr. Deluca a key so that he could go and enter the

Q.   premises to get work done?

A.   I would have to look back, but I do not believe so.  I think, if I had, I would have had to ask Mr. Harrell or Mrs. Harrell, obviously.

Q.   Okay.  So there was a time period in the August -- end of August time period in which Mr. Deluca was trying to figure out how to deal with all of these lists that were coming in from the inspectors.  Is that a fair characterization of what he was trying to do?

A.   I think so, yes.  He was receiving a lot of reports.

Q.   Okay.  And at least in some of the e-mail exchanges, it references at least six different lists that he was trying to balance and handle and reconcile at this time period?

A.   I couldn't speak to a specific number, but yes, I recall the number you're speaking about.

Q.   Okay.  And so -- but at the same time he was trying to reconcile these lists, he was still doing work on the property, to your knowledge, correct?

A.   Yes.

Q.   Okay.  All right.  So he didn't abandon -- you wouldn't characterize this time period as him abandoning the project, would you?

A.   I think that is a judgment call.  He was doing work on the property, yes.  There was very long lists.

Q.   Okay.  But he didn't stop work at this time period?

A.      I would not say stop.

Q.      All right.  In one of your texts, you forward some information from Mr. Deluca to the Harrells.  I'm not finding it right here, but you said -- do you recall him offering that the Harrells could get a -- another bathroom contractor to come in and finish, you know, the master bath suite and he would give them a credit for that as one of the ways of reconciling this situation?

A.      Yes.

Q.      And that never happened, correct?

A.      No.

        MR. BURCHER:  No more questions, Your Honor.

        THE COURT:  Thank you.

        Redirect.

                REDIRECT EXAMINATION OF BRENDAN MUHA

BY MR. LYNCH:

Q.      During our meeting, do you or do you not recall that I said to you, "I just want the truth, good bad or indifferent"?

A.      Absolutely.

Q.      How did HomeVisit measure the property?

A.      I think with a 3D camera.

Q.      Okay.  And then you and Doug marked up the HomeVisit plans twice; is that right?

A.      Yes.

Q.      Do you agree that at that time period, that was a pretty

rigorous process to figure out what the square footage was?

A.    Yes.

Q.    And the only other measurements TTR had done, I think ever, is TruPlace and HomeVisit; is that right?

A.    And the handwritten ones, but I've never even been able to calculate that or I've never worked with handwritten prior to that experience.

Q.    Okay.  Did you or did you not provide the -- let me start over.  Did you or did you not provide the TruPlace plans to the Harrells?

A.    I did not.

Q.    Wasn't the HomeVisit plans and TruPlace plans the best information available about square footage, certainly before the contract was signed on April 3rd?  Correct?

A.    I would imagine, yes.

Q.    Are you aware of any other better information before April 3rd?

A.    The appraisal.

Q.    That's right.  But the appraisal wasn't available before April 3rd, was it?

A.    Not before April 3rd, no.

Q.    Okay.  So then you anticipated my question.  Before closing, the best information available on square footage was the HomeVisit plans, the TruPlace plans, and the appraisal; is that right?

A.      Yes.

Q.      Okay.  Whose interest was being served by not providing the Harrells the TruPlace plans and the HomeVisit plans?  Was that the Harrells' interest or was that Mr. Deluca's interest?

A.      I think it was to the interest of the accuracy.  I mean, that was really the concern at the time, and my opinion was that I was looking at them and they were not all accurate.

Q.      Don't you think that the Harrells should have had all of the information available to make a decision, not just one-third of it?

A.      I think the Harrells were fully aware that we had the place measured and that Mr. Deluca had said that they were incorrect.

Q.      Do you think that the -- but the Harrells didn't know about the HomeVisit plans or the TruPlace plans, right?

A.      They had known that I had tried to get the place measured a multitude of times and that they were being contested by Mr. Deluca.

Q.      Okay.  But they, of course, never saw either of these documents, the TruPlace or the HomeVisit?

A.      Correct.

Q.      So let's look at Exhibit 1 and turn to the dual agency contract.  It's Plaintiffs' Exhibit 1.  And that's at Bates 14218.  In paragraph C, there's a box that is checked that says, "One Existing Client One New Client."

Who was the existing client?

A.     It would have been the Harrells.

Q.     Okay.  TTR had Mr. Deluca as a client before the Harrells ever met you; is that right?

A.     Yes, but not existing at that moment.

Q.     To your -- well, who is Mark Lowham?

A.     He's CEO of TTR Sotheby's.

Q.     And Mr. Deluca and Mr. Lowham had a relationship prior to the Harrells ever meeting you?

A.     Yes, I think they live in a nearby area of McLean, Virginia.

Q.     And had they had some business transactions, to your knowledge?

A.     I would be unaware.

Q.     Okay.  Now, we talk about inaccuracy.  Did Mr. Deluca think that the square footage numbers in the HomeVisit and the true visit plans -- I'm sorry -- the HomeVisit and TruPlace plans were too low or too high?

A.     I don't know.  That would be his point of view.

THE COURT:  Well, did he discuss it with you and say anything?

THE WITNESS:  I think it was mostly that it wasn't representing even, like, the rooms correctly at times.

BY MR. LYNCH:

Q.     Okay.  But as to the total and what you received in your

interactions with Mr. Deluca, was he worried that the numbers in the HomeVisit plans or the True Visit [sic] plans were too low, and inaccurate because they were too low or were they inaccurate because they were too high?

A.    They were below the number that he had stated, yes.

Q.    Okay.  So was he concerned if they saw a low number they might walk away, to your knowledge?

A.    To my knowledge, I would not know.

Q.    Okay.  Let's look at the TruPlace plan in your notebook, please.  So page 13 is the relevant page.  So at the bottom of this page -- or I'm sorry, not the bottom.  There's a list of square footage totals.  The last two have to do with the carriage house.  Do you see that?

A.    Yes, sir.

Q.    Okay.  So those two numbers are not accurate, right? Well, let me ask it this way.  There are two levels to the main house; is that correct?

A.    Two levels to the carriage house, yes, sir.

Q.    Two levels to the carriage house, right.  And one of the levels, the top level, is significantly smaller than the ground level; is that right?

A.    It's a weird way to describe it, but yes, you have one room to the left on the main floor and then you have one room upstairs on the right.

Q.    That's right.  So -- and there's a ladder currently to

get to the upstairs part, the upstairs floor?

A.    Yes, sir.

Q.    The and that upstairs floor doesn't cover the entire carriage house, it's only a little part of it?

A.    It covers the length of the garage.

Q.    Right.  So when it says here 800 for the main and 800 for the upper, that can't be correct?

A.    As I stated, I'm unsure about all these plans.  Yeah, that's not correct.

Q.    There's no way that the top level is the same square footage as the bottom level.

A.    I agree, yes.

Q.    Now, from your personal perceptions about the powder room and discussions between the parties, was there an agreement to move the powder room from inside to outside?  When did that occur?

A.    That occurred like pretty early on, I think, because they wanted to make that main level room more open, and then they were going to like -- there was a deck there that was being removed, and they were planning on moving the powder room out to that space.

Q.    So if you had to pinpoint roughly when that -- you know the parties made that decision, April, May of '19 -- if you had to --

A.    It would be sometime around then, and I would have to

look back, but yes, it was early on.

Q.   Okay.  At least a month before closing?

A.   Yes.

Q.   After the pause on August 6th, did you personally observe any materials -- any materials being removed from the property?

A.   I don't specifically recall, but I believe, yes, things were being brought on and removed, both.

Q.   Okay.  And who was bringing the materials on and removing them?  Was that Mr. Deluca and his subcontractors or was that --

A.   Correct.

Q.   Okay.  Now, how would you go about scheduling?  You talked about the key.  How would you go about scheduling access with Mr. Deluca?  Was it that you'd say, "I need to get in and" -- how did that happen?

A.   I was always available.  I would go there almost every morning at 8 a.m. and open up.

Q.   Now, from what you personally observed, was Mr. Deluca's failure to complete the work caused by a lack of access due to the key or --

A.   No, it was not.

MR. LYNCH:  No further questions.

THE COURT:  All right.  May Mr. Muha be excused?

MR. BURCHER:  Yes, sir.

THE COURT:  All right, Mr. Muha, you're excused, sir.
Please don't discuss the testimony you've given with anyone until

our trial is over, all right?

THE WITNESS:  Yes, Your Honor.  Thank you.

THE COURT:  Have a good day.

All right.  Next witness.

MR. LYNCH:  The plaintiffs would like to call Shayan Amin.

THE COURT:  Okay.

MR. LYNCH:  We need to get him from the witness room.

THE COURT:  All right.

Good morning, Mr. Amin.

THE WITNESS:  Good morning.

MR. LYNCH:  Mr. Amin, I wouldn't bring your deposition transcript.  I'm just going to give you a blank binder.

THE WITNESS:  So I can borrow this?

MR. LYNCH:  Yes.

THE WITNESS:  Thank you.

(SHAYAN AMIN, PLAINTIFFS' WITNESS, SWORN)

DIRECT EXAMINATION OF SHAYAN AMIN

BY MR. LYNCH:

Q.    Okay.  Can you state your name for the record, please.

A.    Shayan Amin.

Q.    Okay.  Can you please turn to exhibit -- Plaintiffs' Exhibit 20 in your notebook.

A.    Yes, I'm there.

Q.    Okay.  And then in that exhibit move to the last three pages.  There's your résumé.

A.      Yes.

Q.      Is this a current résumé?

A.      No.

Q.      Okay.  What experience do you have subsequent to the time -- to providing this résumé with your report in November of 2020?

A.      Since this résumé, I have two more years of experience, and conducting forensic investigations on 20 to 30 more residential structures than the time this was given.

        MR. LYNCH:  So, Your Honor, I would move to admit the last four pages of Exhibit 20, Mr. Amin's résumé.

        THE COURT:  All right.  Any objection?

        MR. COUGHLIN:  No, Your Honor.

        THE COURT:  All right.  It's received.

        (Plaintiffs' Exhibit 20, PDF pages 25, 26, 27, and 28, admitted into the record.)

        MR. LYNCH:  Your Honor, I had a moment of paranoia last night.  I haven't been moving to qualify experts on certain topics.

        THE COURT:  Yeah, I think I had said on Monday, if there was no objection to experts testifying, I didn't want to go into their backgrounds, et cetera, and I just assumed that there was no objection to their testifying to the subject matter that they gave testimony, so I certainly think that the experts that you have put on so far have been qualified.

Is there any objection to their qualifications here?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  All right.  Then go ahead, sir.

MR. LYNCH:  Thank you.

BY MR. LYNCH:

Q.    What professional licenses do you have in Virginia?

A.    I have a professional engineer's license.

Q.    What type of engineering opinion are you offering in this case primarily?

A.    Structural engineering opinions.

Q.    And with respect to -- and what opinions under this structural engineering topic are you providing here?

A.    Structural integrity of the carriage house garage lintel, the carriage house collar ties, the main house kitchen beam, and the main house foundation pier of the crawl space.

Q.    The and referring to page 1 of your report, the very first paragraph, last sentence, it describes some site visits. What dates did you visit this site at 6122 Lee Highway?

A.    October 14th, 2020.

Q.    Okay.  So there's two other dates listed in that paragraph.  Why are those listed?

A.    Those were site visits that were conducted by an engineer that was with Falcon previously.  While that engineer was there, he took photos and I used those photos -- I reviewed those photos as part of my opinion.

Q.    Okay.  What did you do during your site visit in October?

A.    I met with my colleague, Matt Furlong.  He had previously been to the site, so he was already familiar with it, and he showed me around.  While I was there, I made visual observations and took measurements of structural issues that I observed.

MR. LYNCH:  Okay.  And I would like to take a moment.  There are some photographs in this report.  Those photographs are included in Plaintiffs' Trial Exhibits 9 to 19.  These photographs were not objected to in the pretrial disclosures.  I would like to move Plaintiffs' Exhibits 9 to 19 into evidence.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  They're received.

(Plaintiffs' Exhibits 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19, admitted into the record.)

BY MR. LYNCH:

Q.    Moving to page 3 of your report and looking at photo 1 of your report, which for the record is Plaintiffs' Exhibit 9, what is depicted there?

A.    That is the garage structure of the carriage house.

Q.    Okay.  Now, when you talk about the steel lintel, where is that on the photo?  And I think you can circle on the screen.

A.    The lintel is in this area right here (indicating).

Q.    Okay.  And you were going to discuss the location of some cracking in the masonry above the lintel.  Can you either --

MR. LYNCH:  And, Mr. Fitzhugh, can you Zoom in on that top photo?

BY MR. LYNCH:

Q.    Okay.  And can you indicate again by circling where you observed cracking?

A.    Yeah, there's a step cracking pattern occurring right here (indicating) between the lintel and the window.

Q.    All right.  Explain your opinion about -- well, explain what you observed with respect to cracks in the mortar joints.

A.    The type of cracking here, it's called step cracking.  It occurs when there's excessive deflection and then bricks can separate and then the crack propagates through the mortar joints.

Does that answer your question?

Q.    Yes.  So and then what did -- what did you observe or what opinion are you offering about the significance of the width of the mortar joints that you observed?

A.    They're much wider than standard.  A standard joint width is 3/8 to half an inch.  When I went there I took measurements that showed some of these joints were over an inch.

Q.    And what conclusion do you draw from this cracking and the larger-than-normal cracking in the mortar joints?

A.    I believe the excessive deflection caused those bricks to settle and then they had come back and repointed those bricks as a cosmetic fix, but the cracks still appeared during my visit

through the repointed mortar.

Q.    Explain what you mean by just the concept of deflection?

A.    Deflection it's a structural property where, under loading, a structural member can bend and then however far that member bends, that is called the deflection, the physical distance that it moves under loading.

Q.    And when you're talking about deflection in this area, is it the deflection of the lintel or --

A.    Yes.

Q.    Explain the difference between the -- well, let's start with this.  I want to get a drawing in front of you.

MR. LYNCH:  At the risk of more notebooks -- these will be the last ones.

Your Honor, may I provide these, Your Honor?

THE COURT:  Yeah.  This is a long one.

THE WITNESS:  Thank you.

BY MR. LYNCH:

Q.    So in this book in December -- the approved set of the carriage house from December, it's the very last tab.  This is for the carriage house, December set.

And this page we want to look at is drawing sheet SD-2.  Are you there, Mr. Amin?

A.    Yeah, I'm there.

Q.    Can you explain the difference between structural design in this area and the construction in the field?

A.    In the detail 5 on this sheet, it's labeled, "Detail at new opening in existing wall," the drawing on the right-hand side, that's the section, wall section of the garage lintel. You can see that it is an upside down T shape.  It's made up of two separate members called an angle, and those are two L-shaped members that are put back-to-back to create that upside down T.

So that's what's in this drawing.  The one that was observed in the field is a single L.  So it's two different shapes, the one that was in the approved drawing versus what's in the field.

Q.    Okay.  And can you explain -- how do the differences between what's in the field, versus what's in the drawings impact the structural integrity of this area?

A.    The two lintels have different stiffness properties, and stiffness is a structural property that's directly related to deflection.  And so when you change a member's shape, you're essentially changing how much it can deflect, so the lintel that was installed has lesser stiffness than the one that's shown here.  So it has -- it will deflect more under the same loading that's shown here.

Q.    Okay.  What calculations did you do regarding the structural properties of this lintel?

A.    I checked the shear capacity, the structural capacity, and also performed deflection checks of how much it would deflect under loading.

Q.      And what calculations of the structural properties of this lintel did you review?

A.      I reviewed calculations by Soil & Structure that -- it was a loading analysis for the garage lintel.

Q.      Okay.  And how recently did you review the Soil & Structure calculations?

A.      Earlier this week, on Monday, and several times throughout the past year.

Q.      Okay.  So what was the result of your review of the Soil & Structure calculations?

A.      Um, it was apparent that Soil & Structure had designed each of these angle members.  Each one of them was designed to carry half of the load of the wall.  Each part of it is carrying half.  So that's one thing that stood out.

So what that means is the one in the field is a single member, which is carrying twice the weight of each of these members.  So not only are they different members, but it has less stiffness and carrying twice the load.

Q.      What are your conclusions and summary about the structural integrity of this area?

A.      It's a concern.

Q.      Okay.  And what conclusions do you have about the cause of the cracking that we pointed out earlier?

A.      I believe it's in relation to excessive deflection from having installed the incorrect lintel.

Q.     Okay.   And in nonengineering terms can you summarize your opinion about this area?

A.     I would say it's like laying in a bed versus laying in a hammock.   The bed will have a little more stiffness, you're not going to sink down as much, but if you're in a hammock, you know, you're -- there's a lot more sag in it.

Q.     Okay.   Let's talk about the steel beam in the kitchen. So for this one we're going to stay in the drawings book, and let's look at tab 2, which is the December set for the rear addition.

And let's go to sheet S-3.

MR. LYNCH:  So, Mr. Fitzhugh, can you bring up Exhibit 429 on the screen, please?

BY MR. LYNCH:

Q.     So while he's doing that, this is a little difficult to find, but can you try to point out this beam on this drawing page?

A.     If you look towards the center of the rectangle, there's some writing that says "W8 by 67 steel beam (drop)."  That's the location.

Q.     All right.   It's almost in the middle of the drawing, "W8 by 67."

MR. LYNCH:  And, Mr. Fitzhugh, if you could find sheet S-3.   There we go.   And then just focus -- Zoom in a little more on the middle of the drawing on the left, please.

BY MR. LYNCH:

Q.    Can you just circle where you see this indication you just mentioned in your testimony?

A.    Yeah.  (Indicating.)

Q.    Okay.  So, what's the difference between what's shown on this drawing with W8 by 67 versus what was in the field?

A.    It's not the same as the one that I observed in the field.

Q.    Okay.  And what is the difference between the two?

A.    Based on measurements I took, it was most likely a W8 by 48.

Q.    Okay. Based on the building code, what problem is there with installing a structural member in the field that is different than the design structural member?

A.    Essentially it's a permitting violation and, therefore, illegal.

Q.    All right.  Let's talk about, what is the issue with the connections of this beam?

A.    There are no connections from the beam to its structural supports.

Q.    Okay.  Why does that matter to the structural integrity of this area?

A.    Generally, you have to have a positive connection between a structural element and its supporting members.  That doesn't exist here.  And also, in the approved drawing set, the engineer

of record had specified connections, and those were not -- those were not observed in the field.

Q.    So that's a second difference between design in field in that the design head connections and the field does not; is that fair?

A.    Yes, that's correct.

Q.    Okay.  Can you summarize your conclusions on the structural integrity of this area?

A.    I would say it's a concern, yeah, for the lack of connections.

Q.    Let's talk about the crawl space.

MR. LYNCH:  And to do that, Mr. Fitzhugh, let's go back to Exhibit 20, and in the notebooks, Exhibit 20, and turn to page 12 of Exhibit 20, please.

BY MR. LYNCH:

Q.    Are you there, Mr. Amin?

A.    Not yet.  Page 12?

Q.    Yep.

A.    Yes, I'm here.

Q.    What is shown on photo 12 of your report?

A.    This is a foundation pier within the crawl space under the main house.  It's showing that the foundation pier has lost basically half of its section.

MR. LYNCH:  For the record, photo 12 is Plaintiffs' Trial Exhibit 11.

THE COURT:  Yeah.

BY MR. LYNCH:

Q.     So you explained what you're observing here.  Can you explain why that is an issue?

A.     Well, the foundation pier, if it's lost half its section, it's not -- it doesn't have the same load-carrying capacity that it once had.  This pier also is responsible for carrying much of the floor loading above it, the floor joists, and if this pier were to collapse, then the entire floor structure above would collapse as well.

Q.     Okay.  And then let's turn the page to page 14.  And can you explain to me what is depicted in photo 14 and 15 on that page?

A.     On top of that foundation pier there is a single brick.  That brick is not attached to anything.  It's just simply resting there, and it's holding up two major wood beams that also support the entire floor structure above it.

Q.     Okay.

MR. LYNCH:  And for the record, if I did my homework correctly, photo 14 is Plaintiffs' Trial Exhibit 12, and photo 15 is Plaintiffs' Trial Exhibit 13.

THE WITNESS:  I would also like to add something, if that's okay.

BY MR. LYNCH:

Q.     Yes, please.

A.    Photo 15, it's showing that on top of this brick we're looking at the ends of two beams here, and there's very minimal bearing area of either of these beams on top of the brick.  The code requires that in this situation you have 3 inches of bearing and in this case it's about an inch.

Q.    Okay.  Can you summarize your conclusions about the structural integrity of this area in the crawl space?

A.    It's a structural concern.

Q.    All right.  Let's talk about the collar ties.  So let's turn to page 16 of your report, please.  What is shown in photo 15 on page 16 and photo 16 on page 16?

A.    Photo 15 and 16 are both of the carriage house ceiling area.  It's bringing attention to the fact that the collar ties are not present.  The way that the interior finishes are installed, you would be able to see the collar tie clearly and visibly within that top-of-the-roof area.

Q.    Okay.  What is a collar tie?

A.    It's a structural member that ties together two rafters. The rafters are the structural members that form an apex.

And they tie them together in order to resist wind uplifts and situations of unbalanced loading when there's snow on the roof, and that prevents -- that collar tie prevents those rafters from becoming unbalanced and collapsing.

Q.    Okay.  What is shown in photo 17?

A.    This is an opening within the ceiling where I took a

measurement of the rafter depth.  What I'm showing here is that the depth of the rafter is roughly 9 inches in the photo, and in the approved drawings, they were larger.  I think they were supposed to be a 12-inch nominal member.

Q.    Okay.  So this -- strike that question.

MR. LYNCH:  For the record, again, if I did my homework correctly, on page 16, photo 15 is Plaintiffs' Exhibit 10; photo 17 is Plaintiffs' Exhibit 16; and I believe photo 16 is Plaintiffs' Exhibit 15.

BY MR. LYNCH:

Q.    So let's look at the plans again.  We're on the December set for the carriage house, which is tab 5.  And then in that tab let's turn to drawing sheet S --

Would you like S-2 or SD-2, Mr. Amin?

THE COURT REPORTER:  I'm sorry?

MR. LYNCH:  Would Mr. Amin like drawing sheet S-2 or drawing sheet SD-2?

THE WITNESS:  Is this in relation to collar ties?

BY MR. LYNCH:

Q.    Right.  So you raise a good point.  Let's talk about the ridge board, ridge beam first.  I think that's S-2.

A.    This is tab 5?  Oh, sorry, I'm in the wrong tab.

I think SD-2.

Q.    SD-2.  Okay.  So, using sheet SD-2, explain the difference between the design and the field with respect to the

collar ties?

A.      I don't think this is the correct sheet.

Q.      On the screen or in the book?

A.      On the screen.

        MR. LYNCH:  Do you have 432 on the screen?  Oh, you're right.

        THE WITNESS:  Yeah.  That's the one.

BY MR. LYNCH:

Q.      Okay.  So the question was, can you explain the difference between the field and the December approved design with respect to the collar ties?

A.      Yeah.  So, detail number 3 on this sheet, it's labeled "Detail at Roof Rafter to Collar Tie Connection."  This member here is the collar tie (indicating).  And if you look at the photos from inside, that member does not exist.  And then these members here, these two, are the rafters.

Q.      Okay.  And what was the difference between the approved design and the field with respect to the rafters?

A.      The approved design had 2-by-12 rafters, and the ones in the field were 2-by-10s, which are roughly, you know, 9 inches actual dimension.

Q.      Given what you observed the absence of collar ties and the difference of the size of the roof rafters, what is your opinion about the structural integrity of this area?

A.      I think the structural integrity is in question.

Q.    Why do you disagree with Mr. Macdonald's opinion that the roof is structurally sound without collar ties?

A.    Well, so the collar ties don't -- let me start by saying the building code is prescriptive.  It gives you very explicit instructions on how to build a safe structure basically for a layman or a builder.

It also gives license to design structures that are not prescriptive or beyond the scope, but in those cases where a structure is being built that's beyond the scope of the code, it's required to be proven through calculations and approval of the design.  I have not seen such a -- such calculations to prove otherwise, and also the calculations that were done by Soil & Structure clearly show their design was not what Mr. Macdonald is implying.

Q.    Okay.  So let me see if I get this right.  The code specifically says you're allowed to build a roof with collar ties?

A.    Yeah.

Q.    And Mr. Macdonald is saying, even without collar ties, this roof is okay, but in order to do it in a way that's different from the prescribed method in the code, what needs to happen?

A.    You have to provide proof.  You have to provide calculations, and those calculations don't exist.

Q.    You'd have to provide those calculations to the County to

prove it.

A.      Right, that's correct.

Q.      All right.

        MR. LYNCH:  No further questions.

        MR. COUGHLIN:  Court's indulgence.  I'm a little overwhelmed.

        THE COURT:  Yeah.

        MR. COUGHLIN:  My son's bedroom.

        THE COURT:  Daughters are worse.

                CROSS-EXAMINATION OF SHAYAN AMIN

BY MR. COUGHLIN:

Q.      Good afternoon, Mr. Amin.

A.      Good afternoon.

Q.      I would like to start with the garage door lintel.  Are you aware that that opening was a new opening that previously that was a bricked-in portion of the garage?

A.      Yes, I'm aware.

Q.      And isn't it, therefore, possible that some of the step cracking that you observed could have occurred when that opening was created?

A.      I think the lack of stiffness is much more in play than anything else.

Q.      The lack of stiffness associated with the --

A.      Lintel.

Q.      -- lintel that is in place?

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

A.    Yeah.

Q.    When was the last time that you visited the property?

A.    October 14th, 2020.  That was my only visit.

Q.    October 14th of 2020?

A.    Yeah.

Q.    Did you, when you were there, reinspect each of the four areas that you testified about today?

A.    Yes, I inspected each of foes four areas, yeah.

Q.    Did you see in the crawl space area any remediation that had occurred since your earlier visits and your earlier reports?

A.    I would like to clarify that I was only there one time, so I didn't have previous visits.

Q.    The only time you were at the property was October of 2020?

A.    That's correct, yeah.

Q.    Okay.  So the pictures that are in your report are pictures you took?

A.    They're photos taken by another Falcon employee.

Q.    Okay.  Do you know when those pictures were taken?

A.    I believe the dates are in my report.  I think it was a few months before my visit.

Q.    So in the crawl space area, the pier that you testified about --

A.    Um-hmm.

Q.    -- had that been remediated when you actually visited the

property?

A.    No.  When I was there, the photo that -- I believe the photo that I shared is the one that I took.

Q.    Okay.  I just wanted to clarify that.

All right.  Let's go to the drop steel beam in the kitchen.  So, in your reports you make no mention -- well, first let's back up.  You prepared a report first that's been referred to.  It's their Exhibit 20.  That's dated November 16th of 2020, correct?

A.    Yeah.

Q.    And then you prepared a rebuttal report dated January 27th, 2021, correct?

A.    I would have to check the date, but yeah, I did submit a rebuttal report, yeah.

Q.    Isn't it true that in those actual reports in a written text you make no mention of there being a different size beam installed versus what's on the plans, correct?

A.    I can't recall.  I'd have to check the report.

Q.    Take your time.

A.    Okay.

Q.    If you could, go ahead and look through your original report.  And let me know when you're finished and let me know if you see any reference to a different sized beam actually being installed.

A.    It appears in the first report, Exhibit 20, I'm making

reference specifically to the approved plans, but I did not mention that the field beam was not a W8 by 57.

Q.      Okay.

MR. COUGHLIN:  And then if we could call up Plaintiffs' Exhibit 21 and turn to page -- well, first we'll have you identify that document.  I'm not going to move this into evidence but --

A.      This is a rebuttal report.

BY MR. COUGHLIN:

Q.      Oh, you have that in your binder.  I'm sorry.  I didn't know that it was in your binder.  So that's your rebuttal report, but if you could go ahead and look through that and see if you make any mention in that report regarding a difference between the field condition and the plan as it relates to the kitchen beam.

MR. COUGHLIN:  Your Honor, a witness has appeared who will be called once the Harrells' case concludes.  Could we have him excused to the witness room?

THE COURT:  Sure.

Good morning, sir.  We're going to ask you to wait in the witness room until you're called.

MR. JACKIE:  I apologize.

THE COURT:  Thank you.

MR. LYNCH:  Your Honor, in the interest of time, could I refer to where this issue is pointed out in --

MR. COUGHLIN:  No.  Sorry.

THE COURT:  You can't -- let him -- let him dictate things.  Thank you.

I think that was my call to say.

MR. COUGHLIN:  I know.  Sorry.  I can't help myself sometimes.

THE WITNESS:  So I don't mention that it's a W8 by 48 in this report, but the purpose of this report was to rebut specific statements by Macdonald -- Macdonald and the other engineer, TKDI.  So I was responding specifically to Macdonald's claims that the installed beam was certified by the engineer.

BY MR. COUGHLIN:

Q.    Okay.  So in your original report and in your rebuttal report, you don't make any mention of a difference between a field condition -- in terms of the size of the beam -- and the approved plans' size, correct?

A.    Can you repeat that, please?

Q.    In your original report, in your rebuttal report, you make no mention of there being a difference between the size of the steel beam as installed versus what's on the approved plans, correct?

A.    That appears to be the case, yeah.

Q.    And you're aware that an engineer certified that what was installed was a W67, correct?

A.    Do you have --

Q.      Yes.

A.      -- an exhibit here?

Q.      Defendant's Exhibit 52.  So take your time and just review what's on the screen.

        MR. LYNCH:  On this, Your Honor, just for the record, because this involves Mr. Fulambarkar, and just for clarity, I don't want this one to be into evidence because I think with Mr. Fulambarkar, this letter is -- not here, this letter is hearsay.  That's all.

        THE COURT:  The objection is hearsay?

        MR. LYNCH:  The objection is -- to admission of this exhibit is hearsay.

        MR. COUGHLIN:  I haven't moved to introduce it yet, Your Honor.

        THE COURT:  Yeah.

        MR. LYNCH:  Okay.

        THE WITNESS:  Yes, I reviewed this letter previously.

BY MR. COUGHLIN:

Q.      Okay.  And do you see how it says "existing W8-67"?

A.      Um-hmm.

Q.      Do you see it's sealed by a civil engineer?

A.      I do; however, W8 by 67 is not what's in the field.

Q.      Okay.  So there's a disagreement between at least what's in this letter and you in terms of what's in the field, correct?

A.      Correct, yeah.

Q.    So, the -- and I'm asking all this because it seems as if your -- the issue that you had with your report was actually how the beam was connected to the piers?

A.    Um-hmm.

Q.    That was an issue you observed, right?

A.    Yes.

Q.    Whether it's {indiscernible} or not --

A.    Yeah.

Q.    Okay.

THE COURT REPORTER:  I'm sorry?  I didn't hear you.

BY MR. COUGHLIN:

Q.    That was an issue that you commented on, correct?

A.    Correct, yeah.

Q.    Could you look in the binder at Exhibit 464, Plaintiffs' Exhibit 464.  This is in front of you.  Where were you in the house do you believe, based on this picture?

A.    It looks like the kitchen area.

Q.    And does this look like a welder welding something on the steel beam?

A.    I can't say what he's doing.  I can't see anything.

Q.    Well, do you see a person in this photograph that has a mask on?

A.    Yeah.

Q.    And it's more than just a mask that we've been wearing for the last three years; it's a welder's mask, correct?

A.    Appears, yeah.

Q.    So it's fair to say that this is a welder in front of a steel beam in the kitchen, correct?

A.    Yeah, you can't see what he's doing, though.

Q.    Is that in part because there are sparks flying out of a piece of equipment that he's holding in his hands?

A.    Yeah.

Q.    And that's what happens when you weld things, things get hot and sparks fly?

A.    Yeah.

Q.    Okay.  So in -- a welder would do that to attach a steel beam to something else, correct?

A.    Yeah, but there's no evidence what he's actually doing here.  He could be cutting the beam for all I know.

Q.    Okay.

MR. COUGHLIN:  I have no further questions, Your Honor.

THE COURT:  Thank you.  Any redirect?

MR. LYNCH:  Very quickly.

REDIRECT EXAMINATION OF SHAYAN AMIN

BY MR. LYNCH:

Q.    Can you look at Exhibit 22, page 3, please, Plaintiffs' Exhibit 22.  And when you get there, look at the top bullet.

Are you there, Mr. Amin?

A.    Yeah, I'm there.

Q.    Can you just explain, following up on Mr. Coughlin's

questioning about what Mr. Fulambarkar thought was in the field versus what you think is in the field?

**A.**    And which member are we talking about?

**Q.**    We're talking about the drop steel beam.

**A.**    And you're talking about the first page here?

**Q.**    No, page 3.

**A.**    Page 3.  In this report I mention that the field measurements indicated it was a W8 by 48 and not a W8 by 67. And this is -- this report was written after having reviewed the engineer of record's deposition transcript.

**Q.**    All right.

MR. LYNCH:  No further questions.

THE COURT:  All right.  Can Mr. Amin be excused?

MR. LYNCH:  Yes, Your Honor.

THE COURT:  All right.  You're excused with our thanks, sir.  Please don't discuss the testimony you've given with anyone until our trial is over, all right?

THE WITNESS:  Will do.  Thank you, Your Honor.

THE COURT:  Thank you.  Have a good day.

All right.  Let's take our morning recess.  We'll take 15 minutes -- I'm sorry.

MR. BURCHER:  Can I can a quick question?

THE COURT:  Yes, sir.

MR. BURCHER:  So the individual that came in is our one nonparty, nonretained individual, and to the extent -- I think

that Mr. Lynch is agreeable -- to the extent that when we come back after the break and there's an appropriate time -- he's only 15 minutes.  I don't think he's very long at all.  I don't want him to be sitting all day out there.  If we could find a way to accommodate him because he needs to leave at 1:00, if we can accommodate that.

THE COURT:  Let's take him after the break, then, if the parties are in agreement.

MR. LYNCH:  That's fine.

THE COURT:  All right.

MR. BURCHER:  Thank you.

THE COURT:  Sure.  All right.  We're in recess.

(Thereupon, a recess in the proceedings occurred from 10:59 a.m. until 11:22 a.m.)

THE COURT:  All right.  Do we have our next witness?

MR. BURCHER:  Yes, Your Honor.  We're calling -- the defense calls Michael Jackie, and Mr. Jackie is being called out of order to accommodate the schedule.

THE COURT:  All right.  The record will so reflect.

Good morning, sir.

THE WITNESS:  Good morning.

(MICHAEL JACKIE, DEFENDANT IN THE CASE, SWORN)


DIRECT EXAMINATION OF MICHAEL JACKIE

BY MR. BURCHER:

Q.    Good morning, Mr. Jackie, my name is Andrew Burcher.  I represent Mr. Deluca in this -- you know, in this case.

Could you state your name for the record, please.

A.    Yes.  My name is Michael J. Jackie, J-A-C-K-I-E.

Q.    Could you pull the microphone just a little bit closer to you, sir?

And, sir, how are you currently employed?

A.    I'm employed as a residential appraiser with the Bruce Reyle Company.

Q.    Okay.

THE COURT REPORTER:  What's the -- I couldn't hear you.

THE WITNESS:  I'm sorry?

THE COURT REPORTER:  I didn't hear the name of the company.

THE WITNESS:  Oh.  Bruce W. Reyle.  That's R-E-Y-L-E.

BY MR. BURCHER:

Q.    Okay.  And how long have you been employed there?

A.    Over 38 years.

Q.    And you've been employed as a residential real estate appraiser?

A.    That is correct.

Q.    Okay.  Now, you are familiar with the property at 6122 Lee Highway?

A.    I am.

Q.    Okay.  And how are you familiar with that property?

A.    I was asked by the lender to appraise the property.

Q.    Okay.  I would like you to turn to the binder in front of you.

MR. BURCHER:  And, Your Honor, I'll be using the skinnier Muha, Brendan Muha direct exhibits which have these exhibits in them.

THE COURT:  Okay.  Thank you.

BY MR. BURCHER:

Q.    All right.  And if you could turn to Exhibit 1028.  It's Plaintiffs' Exhibit 10 --  excuse me, 1030, one-zero-three-zero -- that's in that binder.

A.    Okay.

Q.    Do you see that document?

A.    Yes, I do.

Q.    Okay.  Ask could you identify that document for me, please?

A.    That is my estimated evaluation of the subject property given to the lender.

Q.    And, sir, I'm not asking you questions in your expert capacity; this is just to clarify some issues with regard to this, some questions with regard to this report.  What is the date of this report?

A.    This effective date was April 26th, 2019.

Q.    Okay.  And as part of the appraisal process, do you evaluate the size of the improvements on the property?

**A.**    That's correct.

**Q.**    Okay.  And so if you could, I would like you to turn to the page which is TTR 2596 and which is page 1 of 6 of your report.

**A.**    Okay.

**Q.**    All right.  And on that page at the bottom, there are a couple references to square footage.  Do you see that?

**A.**    Yes.

**Q.**    Okay.  In general, how did you go about measuring the square footage for this property?

**A.**    It was at the site inspection where I physically measured the property.  I was provided some information from Mr. Muha, I believe, who is a real estate who represented the builder, and that was calculated for the square footage of the main residence, the three levels above grade.

**Q.**    Okay.  And if you could turn to TTR 2615, which is a couple of pages back, it looks like there's some --

**A.**    2615?

**Q.**    2615.

**A.**    Okay.

**Q.**    Okay.  And if you could look at 2615 through 2618.

**A.**    Okay.

**Q.**    Are those generally your square footage calculations that were -- are those where -- how you kind of came up with the square footage, at least --

**A.**    Um, so the top part of that is the third level, which was included in the gross living area calculations, but there was an exercise room behind the garage that was not included in the GLA calculations.

There was also a studio home office above the garage that was finished, not included in the gross living area calculations.

**Q.**    Okay.  And what are the next couple of pages that are in the follow-on?

**A.**    Okay.  TTR 2616 is the main level included in the gross living -- gross living area calculations, 2617 is the second level included in the gross living area calculations, and 2618 is the basement, which is not included in the gross living area calculations.

**Q.**    Okay.  And so if we could turn back to the 2596 of which we identified some of those things.  The summary of those numbers, there's the basement area.  What did you calculate the basement area to be?

**A.**    1,189 square feet.

**Q.**    Okay.  And then in the next -- where you can see it says, "finished area above grade contains," what was your calculation for square footage?

**A.**    4,756 square feet.

**Q.**    And in the next narrative of this, you go through screened-in porch, and the room behind the garage, and the

studio above the garage, and you put some dimensions on those; is that correct?

A.    That is correct.

Q.    And those were not in the gross living -- above grade living area that you have in that 4,756 square feet?

A.    That's correct, not included.

Q.    So they would be additional square footage --

A.    Correct.

Q.    -- that relates to these buildings.

All right.  And that number, if you turn to 2597, which is the next page.

A.    Okay.

Q.    Some of those numbers are reflected in the left-hand column for the subject property; is that correct?

A.    That is correct.

Q.    Okay.  And with regard to the opinion of value, the opinion of value relates only to the main house.  Is that --

A.    Right, I value that separately, and that included the garage, the area behind the garage, the exercise room, the studio.

Q.    Okay.  But in -- this is just for clarification for us. The -- in the narrative on page 206, which is 2597, it talks about how you separated out the lots; is that fair?

A.    Yes.  They were valued separately.

Q.    Okay.  Now, this appraisal was dated April 26, and you

did a subsequent appraisal on the property?

A.    Yes.  The lender informed me later that there was some additional work that was proposed to be done, and they asked me to reevaluate the property based on these items.

Q.    Okay.  If you could turn to two pages -- two exhibits back.  It's Exhibit 1028, and this is Plaintiffs' Exhibit 1028. It's in the binder.

A.    Okay.

Q.    All right.  So could you -- I think on the second page of that document, which is REYLE 5, is a cover letter from you. Can you identify that document?

A.    Yes.  It's a synopsis, basically, of the valuation of the property based on an effective date of June 10, 2019.

Q.    Okay.  And I would like to turn to REYLE 11.  And this looks like an updated -- an update from your April 26 report. Is that what it is?

A.    That is correct.

Q.    Okay.  And if you could just skim over the pages talking about square footage.  Did they change between the April report and the June report?

A.    No.  This is three years ago.  To the best of my recollection, that the work to be done was adding a pool, in-ground pool, a water feature, some additional hardscape work, nothing affecting the main dwelling.

Q.    Okay.  And one page that I didn't point out on your

report that stayed the same, if you could turn to REYLE 14 in that exhibit.

A.    Okay.

Q.    And right inside there, there are three references to square footage.  Do you see that?

A.    Yes.

Q.    Okay.  And essentially, that is a translation of the same numbers that we had before, except in this case you add the garage square footage.  Is that right?

A.    But the garage -- yeah, it's -- but the garage is not included in the gross living area calculations.  It's treated as a separate item.

Q.    That's just -- so an additional 600 square feet is related to the garage?

A.    Correct.

Q.    Okay.  All right.  So if you were to -- and this is not a math exercise, but if you were to add up all of those square footages, would it be fair to say that the total improvements on the property are in excess of 7,500 square feet?

A.    I haven't calculated that out, but I guess it might be reasonable.  But, again, yeah, that -- it would be improvement, but that's an assortment, I think, of screened porches, garage, room behind the garage, different amenities.

Q.    Okay.  And we can do the math separately, so I'm not asking you to do the math, sir.

A.    Okay.

Q.    With respect to -- I would like you to turn to REYLE_0006, which is -- do you see that page?

A.    Yes, I do.

Q.    Okay.  Could you explain to the Court what you did and why you were doing it with respect to this particular update?

A.    Again, this is three years ago, but the lender, I believe, asked me to go out to reinspect the property and see what stage of completion it was in.

I went out there and the items looked to be done that I could see, with the completion of the powder room on the main level, which I was told at the time they were waiting for some authorizations from Arlington County to complete; and then there was -- the tile floor in the primary bath was back ordered.

The materials were on-site, and I was told everything's been paid for, there was -- materials were on-site, but they were waiting for the tile floor to come back, and then there was also some siding missing on the back of the house where originally a fireplace had been planned for, but later they decided not to move forward with that.

Q.    And as part of this process, did you come to a conclusion about how much the -- was remaining work needed to be done?

A.    I came up with my estimate, guesstimate, for the labor involved to complete that work.

THE COURT:  We have a new witness, I think, who's just

come into the courtroom.

BY MR. BURCHER:

Q.    And what if -- you made an independent determination of that amount?

A.    That is correct.

Q.    And what, if any, involvement did Mr. Deluca have in this process of determining what was remaining on the property?

A.    None.  I don't remember speaking with him again.  When the lender asked me to go back out to reinspect it, they gave me the name of Mr. Muha to go back to get access to the property.

Q.    So you interacted with Mr. Muha, not Mr. Deluca, in terms of coming up with this assessment of what was left?

A.    Yes, yes.

Q.    Okay.

MR. BURCHER:  No further questions, Your Honor.

THE COURT:  All right.

CROSS-EXAMINATION OF MICHAEL JACKIE

BY MR. LYNCH:

Q.    Mr. Jackie, at the time you did your April appraisal, construction was not complete at that time; is that right?

A.    That's correct.

Q.    Okay.  Is it your testimony that nothing changed the footprint of the building between the April appraisal and the June appraisal?

A.    It was the same basic -- the same house.  Again, the two

appraisals, as I remember, the difference was for an in-ground pool, some hardscape, a water feature, and items like that, not the footprint of the house.

Q.    I'm sorry, there was no change to the footprint of the house?

A.    Not to my knowledge, no.

Q.    Okay.  And when I say "footprint," that would include areas that are off the ground in terms of -- it's your testimony that there was no construction that would modify the square footage of the house between April and June; is that right?

A.    That is correct.

MR. LYNCH:  No further questions.

THE COURT:  All right.  Any redirect?

All right.  May Mr. Jackie be excused?

MR. BURCHER:  Yes, sir.

THE COURT:  All right, Mr. Jackie, thank you, sir.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Please don't discuss the testimony you've given here with anyone until our trial is over, all right?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Have a good day.

THE WITNESS:  You, too.

THE COURT:  All right.  Next witness.

MR. LYNCH:  We have Dawn Harrell, Your Honor.

THE COURT:  All right.  Good morning, Ms. Harrell.

THE WITNESS:  Good morning.

(DAWN HARRELL, PLAINTIFFS' WITNESS, SWORN)

DIRECT EXAMINATION OF DAWN HARRELL

BY MS. BROWN:

Q.    Good morning.

A.    Good morning.

Q.    Who are you and where did you come from?

A.    My name is Dawn Harrell, and I was originally born in Roanoke, Virginia.

Q.    Can you speak up a little bit or maybe move a little bit closer to the microphone so we can hear you?

A.    Can you hear me now?

Q.    Yep, perfect.  How did you meet Mr. Deluca.

A.    I met Mr. Deluca through Brendan Muha a real estate agent, and we did a tour of his personal residence and 6122 Lee Highway on December 21st, 2018.

Q.    And when did you sign the Residential Sales Contract?

A.    That I signed on April 3rd, 2019.

Q.    And how many times did you visit the property prior to executing the Residential Sales Contract on April 3rd?

A.    There were two visits.  One was the December 21st visit, and the second was the March -- was on March 22nd of 2019.

Q.    Okay.  And as of early June of 2019, when were you scheduled to close?

A.    Um, in early June the contract required that the closing

date was on June 26th, 2019.

Q.    And when did you ultimately end up closing?

A.    July 3rd, 2019.

Q.    And under the Post Closing Construction Agreement, what was Mr. Deluca's deadline to finish sales contract construction?

A.    August 1st.

Q.    How many times did you visit the property from April 3rd, 2019 through July 3rd of 2019?

A.    So I believe it was four times.  I visited on May 4th, 2019, June 9th, 2019, and I visited on the closing walk-through July 2nd, 2019 and then the following day, July 3rd, which is the date of closing, 2019.

Q.    And you said May 3rd or -- or, I'm sorry, you said May 4th?

A.    No, it was May 3rd.  My apologies.  May 4th was when we went to visit the tile place, so the day before I had visited the property, May 3rd.

Q.    And from July 4th, 2019 through August 6th of 2019, how many times did you visit the property?

A.    None.

Q.    And why was that?

A.    I was having health problems at the time and ended up having surgery, cervical spine surgery, on July 23rd, 2019, and I had a three-week recovery period following that.

Q.    And did you have any communications or contact with

Mr. Deluca during that time?

A.     Yes.  We continued to correspond by text message, and then post-closing we started having weekly status calls on Friday, and that would just give us a status update on work and materials.

Q.     Okay.  So now that we've sort of done a little bit of an overview about the site visits you've done, I want to hone in on a couple of those dates, and the first one is the December 21st 2018 site visit.

       During that site visit, what did Mr. Deluca tell you about the mechanical, electrical, and plumbing work he was doing at the property?

A.     He told us that all of the mechanical, plumbing, and electrical was going to be brand-new in the main house and the carriage house.

Q.     Can you make sure you're speaking up?

A.     I'm sorry.  Can you hear me now?

Q.     You're not close enough to the microphone.

A.     Can you hear me now?

Q.     Yeah.

A.     Okay.  Sorry.

       MS. BROWN:  Are you able to hear?

       THE COURT REPORTER:  Yes.

       THE WITNESS:  Can everyone hear me?

BY MS. BROWN:

Q.      During that site visit, what discussions or -- excuse me, what representations did Mr. Deluca make about the roof?

A.      Yeah, so during the time he was just walking us around the property.  It was under construction.  He was just telling us about how the roof was the original charcoal slate roof and there was a double brick construction on the main house.

Q.      Okay.  And was having a slate roof, a slate shingle roof important to you?

A.      It was important to my husband.

Q.      And how, if at all, was that relayed to Mr. Deluca, that your husband thought the slate roof was something really important to him?

A.      I mean, I think he just -- they both -- I think they had a conversation about it.  I probably zoned out because it isn't as interesting to me, but they were -- you know, he was talking about how construction these days doesn't have like the same materials and methods, and so the type of construction on the house was really superior.

Q.      Now, I want to talk next about the March 22nd, 2019 site visit, and when you were scheduling that site visit or tour, what discussions were there regarding County inspections?

A.      So we were in town, visiting, trying to make our final decision on the home that we wanted to purchase.  So we were doing tours and we wanted to tour Mr. Deluca's home at 6122 Lee Highway, and he had told us -- we were trying to do a Friday

afternoon, and he had told us that he had inspections and so he was trying to push it to Saturday.  Ultimately, he told us through Brendan Muha he had bumped the inspection.

MS. BROWN:  And I just wanted to make a quick comment that there's a text exchange with Mr. Deluca and Mr. Muha at Exhibit 511 on page 40, but we're not going to bring that exhibit up just in the interest of time so we can keep moving along.

THE COURT:  Is it already in evidence?

MS. BROWN:  Is that page in evidence, page 40 of 511 or the whole one?

MR. FITZHUGH:  I believe that 511 was --

MS. BROWN:  -- in its entirety?

THE COURT:  Yeah.

MS. BROWN:  Okay.  Great.

THE COURT:  Just ask the questions you want to ask without relaying -- you know, identifying other exhibits which may correspond with the testimony, okay?

MS. BROWN:  Okay.

BY MS. BROWN:

Q.    What representation did Mr. Deluca make about the electrical, mechanical, and plumbing during the March 22nd, 2019 tour?

A.    He just reiterated that it was all brand-new.  I think it was -- it wasn't finished but it was in process, and so that appeared to be consistent with what he was telling us.

Q.    And during that tour, what representations did he make about the permitting?

A.    So he had told us that the -- he had already filed -- or had a permit for the main house and that the carriage house was under the same permit.

Q.    And what did he represent to you about the owner suite permit?

A.    That one he told us was -- he hadn't filed yet, and he was going to be filing that soon.

Q.    Okay.  So what impression did you have about the status of the permitting after your conversations regarding the scheduling for the March 22nd, 2019 site visit and after the March 22nd, 2019 site visit itself?

A.    Well, I was under the impression he was in the inspection stage of his construction.  He had told us he was doing an inspection, you know, that day, so...

Q.    And what was your understanding of whether permits had been filed?

A.    Well, he told us that the permits had been filed other than the owner suite addition, which I mentioned, which hadn't been started at that point.

Q.    And what discussions did you have with Mr. Deluca about revising the permits on March 31st, 2019?

A.    So there was about a week, maybe a little longer, process after we decided to purchase Lee Highway.  We were talking about

the specific features and things that were going to go in the contract, and so Mr. Deluca had a scheduled -- I think it was a spring break trip with his family, and so he wanted to get the contract sign so he could update his plans with the County.

Q.    And how was that relayed to you, that he wanted to move forward with signing the contract so that he could update the County?

A.    Brendan Muha had told us that, and you know, that made sense to me because when we did the tour on March, the March 22nd date, there were two bedrooms that we wanted to combine into one for our son's bedroom, and we want -- a bathroom had to be eliminated as part of that combination.

Q.    And how, if at all, did Mr. Deluca himself relay that to you?

A.    I'm sorry, relay what?

Q.    Relay that he wanted to move forward with the contract and update the County permits.

A.    Well, we had some phone calls, And so I think it was very clear that we were all going to move forward and we were just going to go ahead and sign the contract.

Q.    Okay.  And in April, what discussions did you have with Mr. Deluca about the mudroom?

A.    So the mudroom was part of the -- we knew that the house was going to have a mudroom, so our question to him was where it was going to be located, and he told us that he was going to

apply for a bump-out with Arlington County, and it was going to be located on the carriage house side.

Q.    Okay.

A.    I think that actually ended up getting memorialized in the contract somehow.  I think there's a notation but...

MS. BROWN:  Walter, will you pull up Exhibit 500.  I don't believe this one has been admitted. (Sotto voce).

BY MS. BROWN:

Q.    All right.  So if we could go to page 11 --

MS. BROWN:  Can you scroll down some?  Could you blow that up and scroll down so we can see the date.  Okay.  Right there.

BY MS. BROWN:

Q.    So this is a text exchange starting on April -- is that April 3rd?

A.    April 3rd.

Q.    April 3rd, 2019.  And who is on this text exchange?

THE WITNESS:  Could you scroll up a little bit so I can see?  It's at the top of the page.

So this text exchange is between myself, Brendan Muha, Mr. Deluca and my husband.

MS. BROWN:  Okay.  And can we go to page 13 and take a look at the text that's third from the bottom of the page?  Around there, yeah.  Okay.

BY MS. BROWN:

Q.    So what was your impression of Mr. Deluca's compliance

with permitting at this point in time?

A.     So here he's telling us that there was a 4-foot rock wall he was going to be building and hadn't been started at that point, that it got approved by the County and he had one more step to get that, to obtain the permit.  And then I think if you scroll down --

Q.     Let's continue on to the next page, page 14 of this document.

A.     And then he tells us he's also updated the bathroom plans, and again, we eliminated a bathroom.  That made sense, and then he told us he would be submitting the addition, great room, so -- for our next -- the following week.

Q.     And what concerns did you have about closing before the construction was complete?

A.     Well, one of the concerns was having closing on a house with open permits.

MS. BROWN:  Okay.  Before I ask the next question, Your Honor, I would like to move Exhibit 500 into evidence.

THE COURT:  Any objection?

MR. BURCHER:  Is that the only page or this is -- are we limiting it to pages or are we -- you only --

MS. BROWN:  I would like to move the whole document into evidence.  It's a text exchange between the parties.

MR. BURCHER:  Your Honor, it's hundreds of pages, is my understanding but...  500 is -- Exhibit 500 is 250 pages' worth

of text, Your Honor, and we've only talked about one page.

MS. BROWN:  Okay.  Well, to start, we actually talked about three different pages, so as a --

THE COURT:  Move the three pages in for now.

MS. BROWN:  Okay.  So that's pages -- just to be clear in the record, pages 11 through 14.

THE COURT:  All right.  They're received.

(Plaintiffs' Exhibit 500, pages 11, 12, 13, and 14, admitted into the record.)

MS. BROWN:  Thank you, Your Honor.

BY MS. BROWN:

Q.     What discussions in early to mid-June did you have with Mr. Deluca regarding finalizing the permits prior to the anticipated closing date of June 26th, 2019?

A.     So the week of June 17th we had a lot of discussions about closing.  The contract at that time contemplated a June 27th closing date, and we were looking at, you know, the fact that the house would not be complete at that time, and one of the things -- we had some materials that were delayed, and so we were looking -- I was very concerned about the permits, as I said before, so we had a discussion about -- with Mr. Deluca about what he was going to do about the open permits, and he assured us that he was a Class A contractor, and that he was required legally to finalize all his permits, and he took that very seriously.

He did tell us that he couldn't finalize the permits until the owner's bath suite tile came in and was installed.

Q.    And what did Mr. Deluca say would happen if he didn't finalize his permits?

A.    He told us he could lose his contractor's license.

Q.    And earlier you just stated that the -- at that time the closing date was scheduled for the 27th.  Is that what you meant to say?

A.    26th.

Q.    Okay.  What did Mr. Deluca tell you about whether the house was habitable prior to closing?

A.    He told us that at that point, you know, at the closing date we would be able to live in the house, no problem.  It didn't -- there were no requirement that we had to have a finalized permit to live in the house and that the house was habitable.

Q.    Okay.  So in May or late June, what representations did Mr. Deluca make to you about when he'd have a permit for the powder room?

A.    So we -- so we -- I realized that the powder room permit had not been -- had not been filed, and the powder room wasn't built at this time.  And so when we realized that, he was -- we were saying -- asking him, "Well, when can you file this permit," so he can build it, because that was going to be one of the items in the -- that was escrowed for, and he told us that

he could do -- have that permit estimated July 15th.  And he told us it was a four-day billed.

Q.     And do you recall when he told you that he could have the permit by July 15th?

A.     That was told to us when we asked about dates on items. We were asking that on June 20th, which is when we were signing and finalizing the last sales addendum.

Q.     Okay.  Around June 18th of 2019, what additional steps did you take to research the status of the permits?

A.     So I looked online at the system, Arlington County system and, you know, noticed that there were, I believe it was eight permits that were outstanding, and, you know, I didn't know how to use the system, didn't -- you know, I don't know anything about permitting, so I decided to go ahead and call Arlington County to find out what we needed to do, if anything, to, you know, to purchase the house as relates to permitting.

Q.     And to what extent were you allowed to get copies of the permits at that time?

A.     So there is a law in Virginia -- I don't have the citation off the top of my head -- but it doesn't allow a nonhomeowner to obtain plans, building plans pursuant to a building permit.

Q.     And what did you find out about whether inspections had been performed at the property?

A.     So I spoke to a woman at Arlington County -- her name is

Allison Cooke -- who told me that inspections had occurred at the property, which made me feel good, about the -- it just collaborated what Mr. Deluca was telling us.

Q.     What details, if any, did Ms. Cook tell you about what the subject or results of those inspections were?

A.     Um, they just were mechanical and electrical, rough-in type inspections.

Q.     And what follow-up did you have with Mr. Deluca on permits after this conversation?

A.     I circled back with him.  There was -- the main -- sort of the one nonaddition permit was under his name, and so she had told me that he needed to transfer that to his contractor's license after the purchase.  So I just told him that that was something she had told me.  He reiterated his plan to finalize the permits after the owner's bath was complete.

Q.     And moving forward in time, what did you end up finding out about whether the work was properly permitted?

        MR. BURCHER:  Objection, Your Honor.  That calls for hearsay as well as -- it calls for hearsay as to what she learned.

        THE COURT:  Overruled.

        THE WITNESS:  Um --

        THE COURT:  It goes to her state of mind, what she did afterwards.

        THE WITNESS:  So the permitting story is kind of like

peeling an onion.  After the pause, we were very interested in getting the permits finalized because we wanted to move into the house, and we were living in a temporary housing, and so we viewed that as just a big hurdle to get over in moving into the house, and so we were asking multiple times, probably every day about the permits and getting those finalized.

We ultimately ended up hiring someone to help us, John Catlett, to help us navigate.  And then throughout that whole process, which went through December, I suppose, if you go through the timeline, we discovered that the carriage house had never been permitted, the mudroom, and then the scope of the work in the main house was not as described in the permit.

BY MS. BROWN:

Q.    Well, if you had known that there was unpermitted work performed by Mr. Deluca at the property, would you have contracted to purchase it?

A.    No.

Q.    And if you would have known that there was unpermitted work performed by Mr. Deluca at the property, would you have closed on the property?

A.    No.

MS. BROWN:  Your Honor, I would like to --

Well, first, Walter, will you please pull up Exhibit 729. And this is a --

BY MS. BROWN:

Q.    Mrs. Harrell, what is this document?

A.    So this is a license transcript -- license transcripts, I should say -- that I requested from the department, a Professional Occupational Regulation.  And I requested the names of the subcontractors that Mr. Deluca provided in his responses to our interrogatories.

MR. BURCHER:  Your Honor, I'm going to object to this line of questioning.  The licensing issue has already been ruled on as it relates to this case.

THE COURT:  Overruled.  I'm going to allow it.

BY MS. BROWN:

Q.    How did you obtain -- I'm sorry, my train of thought was a little cut off there, but how did you come to obtain this document?

A.    So I made a written request to the DPOR and paid a fee to get all of the licensed transcripts.

Q.    Okay.

MR. BURCHER:  Your Honor, I'm going to just note for the record that this is a document dated April 20th of 2021, you know, a year and a half after this lawsuit was filed, so it's not reflecting her present recollection of anything.

THE WITNESS:  It --

THE COURT:  You may cross-examine her -- Ms. Harrell -- on that.

THE WITNESS:  The period covered on the -- the report is

2011 through present.

MS. BROWN:  And can we look at Exhibit 762 as well?

BY MS. BROWN:

Q.    What is this document?

A.    So this is Mr. Deluca's responses to my interrogatories.

Q.    And looking at number 2, what is that --

MS. BROWN:  You'll have to scroll down some to go to --
beginning, I think, number 2.

BY MS. BROWN:

Q.    What is --

A.    Yeah, so this is his supplemental answer that identifies
all the subcontractors who worked at the property.

MS. BROWN:  Your Honor, I would like to move Exhibit 729
into evidence, and I'd like to note that it's a
self-authenticating public record.  We have, I believe, filed the
original sealed version with the Court.

MR. LYNCH:  It's not filed, but we have it.

MS. BROWN:  Oh, okay.  We have it.  I stand corrected.

THE COURT:  Your objection?

MR. BURCHER:  Relevance, Your Honor.  This is a document
that was created, you know, on April 21st -- or April 10th -- I
can't see it right now, but April 2021, and it has no present
relevance to the dispute between the parties.

THE COURT:  As I said yesterday, I'm going to allow this
line of testimony, given in conjunction with the report of the --

MS. BROWN:  Mr. Catlett --

THE COURT:  -- different -- Mr. Furlong's report about either different problems with the home, whether in fact they rose to a level -- you know, how important they were.  We can talk about that, and you can discuss that, but I thought that this is a separate issue from whether the subcontractors had to be licensed or they could operate under the general contracting license.

Now, I've got new evidence of that, frankly, that we heard yesterday, so it's a self-authenticating document, it's a public record from the state of -- from the Commonwealth of Virginia. I'm going to allow it.

And your exception's noted.

MS. BROWN:  Would you like the sealed --

THE COURT:  I don't need it.

MS. BROWN:  Okay.  So 729 is now admitted into evidence?

THE COURT:  Yes.

MS. BROWN:  Okay.

(Plaintiffs' Exhibit 729 admitted into the record.)

MS. BROWN:  We'd also like to admit into evidence Exhibit 762.

THE COURT:  Any objection to that?

MR. BURCHER:  No, Your Honor.

THE COURT:  That's received.

(Plaintiffs' Exhibit 762 admitted into the record.)

BY MS. BROWN:

Q.    Mrs. Harrell, will you please give me a few examples of some of the unlicensed subcontractors who performed work at the property?

MR. BURCHER:  Objection, Your Honor.

MS. BROWN:  I'll strike my question and restate it.

BY MS. BROWN:

Q.    Did you --

MS. BROWN:  Walter, will you go back to 729, please?

BY MS. BROWN:

Q.    Mrs. Harrell, did you review this document?

A.    I did.

Q.    And going back to Exhibit 762, did you review this document?

A.    I did.

Q.    And what list does interrogatory number 2 provide you?

A.    It provides me with the names of individuals who performed work at the property.

Q.    And in looking at the DPOR record at Exhibit 729, can you give me a few examples of subcontractors who did not -- were not licensed to perform work at the property -- examples of unlicensed subcontractors who performed work at the property?

MR. BURCHER:  Objection, Your Honor.  She hasn't laid the foundation to --

THE COURT:  All she's doing is comparing the interrogatory

response with what the Commonwealth of Virginia is stating.  That does --

MR. BURCHER:  That's what she's doing, but, Your Honor, not only were these people subcontractors, they were workers, day laborers, all those various different things.  And --

THE COURT:  You can cross-examine her on that.  All the question asked for is whether those names appear as licensed contractors.  At least that's the way I heard the question.

MR. BURCHER:  That question, I'm fine with that question, but to characterize them as subcontractors is a different connotation.

THE COURT:  Isn't that what the interrogatory response asks for?

MR. BURCHER:  The interrogatory was:  Who worked on the property?  I mean, the interrogatory --

MR. LYNCH:  It says:  Identify each person other than those intended to be {indiscernible} who has discoverable information.

(Discussion had off the record.)

MR. BURCHER:  That's not the answer -- that's not what the interrogatory --

THE COURT:  Then rephrase the question, then.  Thank you.

MS. BROWN:  Okay.

BY MS. BROWN:

Q.    Are you aware of whether Vanessa HVAC performed work at

the property?

A.    Yes.  Vanessa HVAC Services, LLC was the subcontractor who performed the HVAC services at the property.

Q.    And how did you come to know that?

A.    There were numerous problems with the HVAC system after closing, and we were at the property when the owner would arrive and perform maintenance work on the problems.

Q.    And did you review Exhibit 729, the DPOR record, and check to see if Vanessa HVAC is a licensed subcontractor -- or a licensed contractor?

A.    Yes, I did.

Q.    Are they?

A.    They are not.

Q.    What about -- are you familiar with Eagles Contracting?

A.    Yes, Eagles Contracting had some invoices that Mr. Deluca has for work that was performed at the property.  They're also unlicensed.

Q.    And how did you come to determine that they are unlicensed?

A.    I reviewed the DPOR report that -- for that company.  Their license transcript, I should say.

Q.    And what do you know about Brian B. Quick?

A.    So Brian B. Quick is the subcontractor who installed the boiler in September of 2018 after closing, and also unlicensed.

Q.    And how did you come to know about Brian B. Quick?

A.      Well, I knew that they were the contract -- subcontract who installed the boiler and so I requested a transcript for -- from the DPOR for their license, and there is none.

Q.      Okay.  Thank you.

Okay.  We're going to move into another subject now. We're going to talk about contract selections and upgrades.

In general -- oh, I'm sorry, before we move on to that, if you had known that Mr. Deluca had unlicensed subcontractors performing work at the property, would you have contracted to buy the property?

A.      No.

Q.      If you had known that he had -- Mr. Deluca had unlicensed subcontractors performing work at the property, would you have closed on it?

A.      Well, that would have been a little harder to back out of, but I would not have wanted to close, I would have had to rescind the contract.

Q.      Moving on to contract selections and upgrades.  In general, what process did you and Mr. Deluca have to make selections or upgrades that were included in the sales contract or in addition to it?

A.      So the whole idea of the contract, why we were so attracted to the property that Mr. Deluca was building, is we had the ability -- at this stage of construction, he was going to customize, and that was really exciting to us.  Mr. Deluca

seemed to have a passion and --

THE COURT REPORTER:  I'm sorry.  Slow down a little bit.

THE WITNESS:  Oh, sorry.  Was I speaking too fast?  Sorry.

So, the whole idea of the contract that we entered into with Mr. Deluca was that we could customize because he was at a stage of construction where that was possible, and so that was something that he had -- seemed to have interest in and was excited about.  It was a very collaborative process, and it was very informal.

BY MS. BROWN:

Q.    Now, I'm going to get a little bit more specific here. Before you executed the Residential Sales Contract in April of 2019, what exchanges did you have with Mr. Deluca about features and upgrades?

A.    So at that point we were still trying to finalize the contract, and we would generally write lists of things that we were interested in and then have follow-up phone calls to determine whether it's something we wanted to include or not include, and that was just how we did it at the beginning.

Q.    And what was your impression of whether this was still a, you know, collaborative process?

A.    It was always very collaborative.

Q.    And at that time how did you feel about your relationship with Mr. Deluca?

A.    We really liked him.  He was very friendly, he was very

engaging, he was very communicative.  He just seemed like a really great guy.

Q.    After signing the sales contract, what was the process for making selections and upgrades?

A.    So, generally, you know, you might have something in the contract that you were supposed to select.  It would just be something that we would just communicate informally over e-mail, generally -- I mean, I'm sorry, text message, not e-mail.

Q.    Okay.  And did Mister -- what can you tell me about whether or not Mr. Deluca would make suggestions about selections and upgrades?

A.    So, yeah, so he had -- he had -- he was very creative, which we also liked, and so things like -- like our kids' bunk beds, for example, he would send us photos of things he had done in the past, and that would be what we would use as the basis for including it in the contract.

        MS. BROWN:  Okay.  Walter, will you please pull up Exhibit 502.  This is one that has not been objected to.  That not yet been admitted.

BY MS. BROWN:

Q.    It's another text chain.  Who is on this text chain -- exchange?

A.    So this is a text message exchange between myself and Mr. Deluca.

Q.    Okay.  And what is going on in this text message?

MS. BROWN:  If you could just scroll down some, Walter.

A.    So here, I'd say -- included in the contract at the time was an amount of $6800 for a gym floor, and he was just asking me to confirm my selection so we can order it.

BY MS. BROWN:

Q.    Okay.  And what does it show?

A.    It just shows an example of how we would communicate about such things.

Q.    And what was the date of this e-mail exchange?

A.    June 10th, 2019.

MS. BROWN:  I'd like to move Exhibit 502 into evidence.

MR. BURCHER:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 502 admitted into the record.)

THE COURT:  You said "no objection," right?

MR. BURCHER:  No objection.

THE COURT:  Okay.  It's received.

MS. BROWN:  And to be clear, are we moving the whole thing in or just page 1?

MR. BURCHER:  That's fine, Your Honor.  It's 27 pages. It's manageable.

THE COURT:  Okay.  All right.  It's all received then.

BY MS. BROWN:

Q.    Let's talk about tile.  What was Mr. Deluca's process for obtaining approval for tile layouts prior to closing?

A.    So prior to closing, he would just send me a picture of the layout of the tile and I would approve it by text message. And that would be prior to installation.

Q.    And we're going to stay on Exhibit 502, but I would like to go to page 4 of that document.

And looking at page 4 and 5, what does this document -- how does it relate to the process of approving the tile layout?

A.    So here I'm just approving the layout of the backsplash behind the -- in the kitchen.

Q.    Okay.  And we're going to go to page 5.

A.    So this is just a picture of him laying it out and showing what it would look like.

Q.    Okay.  And can you walk me through just a brief timeline of the owner's suite tile selection?

A.    Sure.  So on May 4th, 2019, I came and visited from Connecticut to select tile at Marble Systems, so I met Mr. Deluca there that morning.  We were there to select tile for all the bathrooms.  I think we selected something for the laundry room, too.

And after that was -- that visit was completed, I was headed back to Connecticut and I was going on the train, so we had decided that I would just confirm all my selections on my way back from -- on the train.

Q.    And how did you do that while you were on the train?

A.    I would -- I texted him the selections that I made.  I

also was selecting fixtures at that time, and so I was doing it room by room.

Q.    Okay.

A.    And so during that trip, I selected all of the bathroom tile except for the owner's suite.

Q.    Okay.  Let's take a look at Exhibit 790.  Can you tell me what this document is?

A.    Yes.  So this is a document that I e-mailed two days later because I realized that, you know, there's so many items that were in the text message it was kind of hard to follow, because you had to go back in time, and so I thought it would be useful to have a summary file that was created that would keep track of all the selections, and so here I'm transmitting that document, which is draft form, but I noted that I did not select the owner's suite tile at that point and I would do it in the next -- in the coming days.

MS. BROWN:  Can you scroll through the document, please.

BY MS. BROWN:

Q.    On this page, is this where you start discussing -- this is your list that you had attached?

A.    Yes.  So that is the attachment that I had to create in Word.

MS. BROWN:  And what page of the PDF is that?

MR. LYNCH:  2.

MS. BROWN:  2.  Okay.

Your Honor, I would like to move Exhibit 790 into evidence.

MR. BURCHER:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 790 admitted into the record.)

BY MS. BROWN:

Q.    On May 15th of 2019, what discussions did you have with Mr. Deluca about tile selection?

A.    So, this was around the time we were trying to execute the second addendum -- or the first addendum, I guess -- to the contract because we were adding a pool, because that was one of the things that I discussed during my meeting on May 3rd, was the possibility of adding a pool to the contract, and so Mr. Deluca called me to ask me to confirm my owner suite selections because he wanted to add a dollar amount for the owner suite tile into the contract, and so on May 15th I sent him my selections for the tile.

Q.    We're going to look at Exhibit 496.  This is another text exchange, and we're going to go to page 153.  Can you tell me the --

MS. BROWN:  Scroll down some where the date is shown.

BY MS. BROWN:

Q.    Can you tell me the date of this text exchange?

A.    5-15-2019.

Q.    Okay.

MS. BROWN:  And keep scrolling.

BY MS. BROWN:

Q.     Can you tell me who's on this exchange?

A.     So this is a text thread between myself, Mr. Deluca, and my husband.

Q.     Okay.  I'm going to go to page 155 now, and we will look at 155 to 156, and can you tell me how this relates to your conversation with Mr. Deluca about the owner suite tile?

A.     So starting at the bottom of this page, I inserted a picture at the bottom, which is of the tile.

And then if you scroll to the next page, there's another picture of tile, and another picture, and I tell him -- I'm sorry, it's hard to see -- "Here the tile choices for the Owner's suite.  The first one is the shower floor, the second one is the floor and niches and the last one is the shower walls."

I think you asked about this yesterday.

MS. BROWN:  I would like to move Exhibit 496 into evidence.

THE COURT:  Any objection?

MR. BURCHER:  No.

THE COURT:  It's received.

MR. LYNCH:  Are we moving the entire document into evidence?

THE COURT:  Well, how long is it?

MR. BURCHER:  371 pages, Your Honor.

THE COURT:  Let's just -- we'll just include the pages that you've just reviewed.

MS. BROWN:  Okay.  153 to 156 of Exhibit 496, I would just like to confirm that's being moved into evidence?

THE COURT:  That's received.

MS. BROWN:  Thank you, Your Honor.

MR. COUGHLIN:  I'm sorry.  One thing, Your Honor.  I -- are we talking about the PDF page numbers or are we talking about the Bates numbers, because that will be easier for the record if we refer to the Bates numbers, easier on us.

MS. BROWN:  Okay, I apologize, I was referring to the PDF pages.  Walter, can you tell me what the Bates are?

(Discussion had off the record.)

THE COURT:  We didn't pick up any of that, so what are the Bates numbers?

MR. LYNCH:  So, Walter, start there.  153, okay?  This is in front of us now.  So the first page that's being admitted is Harrell 58167.

And go to the next one, please, Walter.  The next page being admitted under Exhibit 496 is Harrell 58170.

MS. BROWN:  And the next -- it's 153.

THE COURT:  It's 167 through 170.

Okay.  All right.  That's admitted.

(Plaintiffs' Exhibit 496, pages Harrell 58167,

Harrell 58168, Harrell 58169, and Harrell 58170, admitted into the record.)

MS. BROWN:  Can we backtrack and clear the record up on Exhibit 500, because I also provided PDF page numbers for that -- or I can do it afterwards.

THE COURT:  Yeah, we'll do it afterwards.  Thank you.

BY MS. BROWN:

Q.    Prior to closing, what did Mr. Deluca tell you about the owner's suite tile?

A.    So prior to closing, he told us that it was ordered, and that it was -- I knew it was about a four-week manufacturing process, because it was a special order tile, and he told us -- he clarified before we were signing the contract that he already made a 50 percent deposit on the tile.

Q.    Okay.  And how did he represent to you that he had made that 50 percent deposit?

A.    So it was a clarification that Brendan Muha came back and told us as we were finalizing the contract addendum.  So we communicated through Brendan Muha.

Q.    Did you have any -- what, if any, direct communications did you have with Mr. Deluca about that 50 percent deposit?

A.    With the 50 percent deposit, so he told us the tile was ordered, personally, in phone calls, and then he -- but the 50 percent deposit clarification was through Brendan Muha.

Q.    Okay.  When, if ever, did the owner's suite tile show up

at the property?

A.     It never showed up.

Q.     Are you aware of whether Mr. Deluca actually ordered the tile?

A.     So on about August 9th, I made a phone call to Marble Systems and spoke to José Shephard, and he told me he did not order it.

        MR. BURCHER:  Objection.  Hearsay, Your Honor.

        THE COURT:  Yeah, sustained.

BY MS. BROWN:

Q.     To date, have you obtained any knowledge that would lead you to believe that Mr. Deluca ordered that tile?

A.     I have no knowledge or information that would lead us to believe that he ordered it.  It never showed up.

Q.     If you would have known that Mr. Deluca didn't order the owner's suite tile, would you have closed on the property?

A.     No.  It was the basis for which he was telling us he was going to obtain final permits, and so you couldn't finish the owner's suite.

Q.     We're going to talk about preclosing.  What can you tell me about whether Mr. Deluca wanted to close prior to completion of the construction?

A.     So, the original contract before the June 20th addendum contemplated a June 26th, 2019 closing and he wanted to stick to that date.

Q.      And what, if any, reason did he provide you for that?

A.      So he told us he was incurring financing charges in our upgrades, and of course, some of the materials were delayed, as we were told, and the owner suite tile, for example, took four weeks, and so we were sympathetic to, you know, the fact that he was incurring those costs, and so we were looking for ways that we could compromise, and one of the ways we looked at was an escrow.

Q.      Okay.  And what was your position?

A.      So, I wanted an escrow that reflected an amount that we would have -- if for some reason he wasn't able to finish, that we would be able to go and pay someone else to finish all of the work, so I wanted it to be reflective of the remaining work that was left to be completed.

Q.      What did Mr. Deluca -- when did he start building the owner suite?

A.      Late May.

        MS. BROWN:  Go to Exhibit 496, page 211.

        Mr. Lynch, I'm going to read the PDF pages.  Would you read the corresponding Bates?

BY MS. BROWN:

Q.      So looking at page 211...

        MR. LYNCH:  58225 is the Bates number.

        MS. BROWN:  Can you scroll up a little bit?

BY MS. BROWN:

Q.      What are the photos on this page showing?

A.      So this is -- these are photos of the construction of the owner's suite.

Q.      And the following page, what is that?

A.      The same thing, just another picture of the construction.

MS. BROWN:  And what Bates page is that?

MR. LYNCH:  58226.

MS. BROWN:  I would like to move 58225 and 58226 of Exhibit 496 into evidence.

THE COURT:  Any objection?

MR. BURCHER:  No.

THE COURT:  Received.

(Plaintiffs' Exhibit 496, pages 58225 and 58226, admitted into the record.)

BY MS. BROWN:

Q.      Before signing a contract did Mr. Deluca provide you with any floor plans or layouts of the owner's suite?

A.      He did not.  The only thing that we were told about the owner's suite was that it would have a Jacuzzi tub and a steam shower and a laundry room, and that was just included in the features and specs that Mr. Muha sent to us on February 9th, 2019.

MS. BROWN:  Can we turn to PDF page 281 of Exhibit 496. What is the Bates number.

MR. LYNCH:  Bates label 58295.

MS. BROWN: Scrolling up right there, can we zoom in on that photo, the drawing photo? And was that the second image -- is it the second image on that?

BY MS. BROWN:

Q.    What is shown in the second image on page 58295?

A.    So these are drawings of the owner suite that Mr. Deluca -- hand drawings that Mr. Deluca made on June 9th, 2019 when I visited the property.

Q.    Okay.

MS. BROWN: I'd like to move this page, Bates ending 58295 of Exhibit 496 into evidence.

THE COURT: Any objection?

MR. BURCHER: No.

THE COURT: Received.

(Plaintiffs' Exhibit 496, page 58295, admitted into the record.)

BY MS. BROWN:

Q.    What design input did you provide Mr. Deluca for the owner's suite?

A.    So the only input that I had was related to the closets. About three days prior to my meeting with Mr. Deluca, he had proposed to my husband an open layout in the owner's suite where it was sort of more like a dressing area in the bathroom, where he was going to just use wood tile throughout the owner's suite and not really have separate walls for the closets, and I really

wanted separate walls.  I wanted a separate door and I wanted them to be separated, so I went down there, because it was in the framing process, to help identify where we might put those.

Q.    All right.  And to what extent was your input on -- input into the owner suite design incorporated into the drawings that are shown on page 4 -- Exhibit 496 at page 58295.

A.    So you'll see -- on the drawing on the top, you see the letter J, that's one of the closets that was -- he drew to be my husband's closet, and then at the bottom you see a letter D, and that was designed to be the location of my closet.

        MS. BROWN:  I would like to go to PDF page 286 of Exhibit 496.  What's the corresponding --

        MR. LYNCH:  It's Harrell 58300.

BY MS. BROWN:

Q.    And when did you approve the layout of the owner suite?

A.    So, the following day, on June 10th, Mr. Deluca asked us if we would approve the layout so he could frame it out, and my husband said it was okay, and I gave a thumbs-up, so we approved it on June 10th.

Q.    And where is that shown on this page?

A.    So at the bottom.

        MS. BROWN:  I would like to move page 58300 of Exhibit 496 into evidence.

        THE COURT:  Any objection?

        MR. BURCHER:  No, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 496, page 58300, admitted into the record.)

MS. BROWN:  Let's pull up Exhibit 656.

BY MS. BROWN:

Q.    What would you like to tell the Court about this document?

A.    This is a picture of the -- it seems to be -- this is a picture of the owner suite.  It's dated 4-29-2021, taken at the end of discovery, and it's a picture looking into the owner suite bathroom, and you'll see on the left there is a closet. That is the one that was labeled D on the layout, and to the right you'll see the opening of the one that was labeled J.

MS. BROWN:  I would like to move Exhibit 656 into evidence.

THE COURT:  Any objection?

MR. BURCHER:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 656 admitted into the record.)

BY MS. BROWN:

Q.    What changes did you make to the owner's suite after June 10 of 2019 and before closing?

A.    None.

Q.    What aspects of the owner's suite changed after closing?

A.    So we had hired our interior designer from Connecticut to

install the interior of the closets that Mr. Deluca built pursuant to the plans on June 9th, and she came to the property on July 1st to measure those closets in order to render drawings.

And then --

Q.    Were there any -- were there any changes to the laundry room opening?

A.    So, in a change order that we signed -- we paid -- I guess we didn't sign it -- it was presented to us on August 2nd, 2019.  There were two items on that that were related to the owner's suite.

MS. BROWN:  Can we pull up Exhibit 4, please.  This has already been admitted into evidence.

BY MS. BROWN:

Q.    Okay.  And besides the -- and excluding upgrades, we're just talking about changes here, was there another change that's reflected in this change order that related to the owner's suite?

A.    Can you scroll down?  So on the second page, there are two items.  One is labeled the "Barn Door Opening Laundry" for $900, and so that relates to -- during the walk-through that we did on July 2nd, we -- this is the first time the washer/dryer was located in the laundry room -- we noticed that there was not enough room to stand in front of the laundry facilities, so we discussed with Mr. Deluca, after closing, creating a larger door

opening in front of wash dryer so that we could stand in front of it, and we were planning on putting

barn doors, sliding doors in front of it.

And then the other item is -- it's really an electrical outlet. It's just an outlet that was for an infrared sauna that I was going to be purchasing, or I had purchased, that was going to be located at the property.

Q.   And was Mr. Deluca -- can you tell me whether you paid Mr. Deluca for these items?

A.   Yes, on August 2nd, 2019.

Q.   And were these items ever completed?

A.   The opening for the laundry door was completed, but the sauna outlet was never completed.

MS. BROWN:  Let's pull up Exhibit 658, please.

BY MS. BROWN:

Q.   And tell me about whether -- you already mentioned that you had a designer who helped you -- scratch that.  No Exhibit 658.  When did your designer come measure the closets?

A.   She came on July 1st, 2019.

Q.   And when did the designer provide drawings of the closet interior to Mr. Deluca?

A.   She provided the drawings to Mr. Deluca in a meeting, at the property, she had with him on August 3rd, 2019.

Q.   And what did Mr. Deluca say about the design she provided?

A.      He said that it was fine and he could build it.

Q.      And when did he tell you that?

A.      He told us twice.  I believe he told us the day she was there after she left and then he told us again on August 6th.

Q.      And what changes did she make to the openings of the closet doors that we looked at earlier on Exhibit 656?

A.      You know, she made some small changes to those openings that were made to accommodate shelves in the interior of the closet and one was a hanging shelf she wanted to put on the back wall of my closet.  My understanding is Mr. Deluca made those changes, and they're reflective of the design today.

Q.      Did he make any other changes to the closet that you're -- that were provided by your designer?

A.      No.

Q.      Okay.  How did her -- your designer's changes to the closet's interior affect the owner's suite bath layout?

A.      It did not.  The wood stop was beyond the doors of the closets, so the owner suite bath was completely separate.

Q.      Let's go to Exhibit 511.  We're going to go to page 68 to 70.

        MS. BROWN:  I believe this document has been admitted into evidence in its entirety.  And we're going to go to the text exchange on 6-16-2018, and what can you tell me about the decision -- Mr. Deluca's decision to eliminate the fireplace in the owner suite?

**A.**      So repeat to me what you're looking at?

BY MS. BROWN:

**Q.**      We're on 68 of the PDF.

        MS. BROWN:  And continue scrolling down.  Keep going.  Go to 70.  There we go.

        THE WITNESS:  Okay.  I see.

BY MS. BROWN:

**Q.**      What can you tell me about that fireplace in the owner suite?

**A.**      So here -- so first of all.  This text exchange is between myself, Mr. Muha and my husband.  And he's relaying some information that Mr. Deluca had sent to him, and it was a list of items, and this was before closing, and one of the items is the owner suite, and he's just reiterating that we had a $10,000 credit for the elimination of the fireplace, and that fireplace had been eliminated, I think it was June 6th.

        We had a meeting with my husband, and I don't really know all the details, but I know it was causing delays in the owner suite.  I think it was, like, a County approval that was required, and so they agreed together to eliminate it.

        And so as a result, he was giving us a $10,000 credit to use towards other items, and here he's looking at using it towards the tile in the owner suite, and so he's telling us that he's, like, doing the computation of what it's going to -- the amount of tile that's required and using that credit towards it.

Q.      Okay.  And let's go to Exhibit 500 next, and we are going to go to go to page 34.  It should be a text exchange dated June 20th, 2019.  Can you tell me who all is on this text exchange?

A.      So, this is a text exchange between myself, Brendan Muha, Doug Deluca, and my husband.

        MS. BROWN:  And, Mr. Lynch, what Bates is page 34 of the PDF?

        MR. LYNCH:  58445.

        MS. BROWN:  Thank you.

BY MS. BROWN:

Q.      What's going on towards the bottom of this text message?

A.      So this is -- was it June 20th, I think, the date of the text message, which is the date we're finalizing the sales -- the last sales addendum.

        Mr. Deluca texts us and said, he "did the tile roll up for the owner suite and the reframing/electrical there," and he said that there was $2,000 in our favor, and then he tells us that the wood stop of the tile in the owner suite looks thought out now.

Q.      How did this impact your understanding of whether he had ordered the owner suite tile?

A.      This message was for a -- confirming that what he was telling us, which is he had ordered the tile, that's what he represented in the contract that we signed that -- I think that day or it might have been the next day.

MS. BROWN:  I'd like to move Exhibit 500 at Bates page ending in 58445 into evidence.

THE COURT:  Any objection?

MR. BURCHER:  No, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 500, page 58445, admitted into the record.)

BY MS. BROWN:

Q.    Let's talk about "Evans Bath Remodel."  Who is Evans?

A.    Evans is my son.

Q.    Tell me about what kind of tile Deluca -- Mr. Deluca installed in Evan's bathroom?

A.    Yeah, so when we were looking earlier that Word document that we sent -- that I sent to him on May 6th, I laid out the tile, and the picture of the subway tile, which is -- I mean, it's just more of the style of the cut, it actually had a type of tile on it that said, I think -- snow white?  I can't remember.

Anyway, the tile I wanted on the wall was different than what he installed, and I think it was an honest mistake.  So after closing, we told Mr. Deluca that we wanted to swap out the tile so that it was the right tile, and then as we were thinking about doing that, there was a -- I didn't like the configuration of the shower because there was a wall that was blocking the window so we decided to change the configuration of the shower

since we were swapping out the tile, and he quoted us a price of $5,500 for that, and that was also included in the August 2nd change order that we paid.

Q.    And that was -- the August 2nd, 2019 change order, that's Exhibit 4 that we looked at earlier?

A.    Right.

Q.    So what happened next?

A.    About Evan's bathroom.

Q.    Um-hmm.

A.    So the work that was performed, that he did demo the bathroom, the tile was ordered and it's sitting there in my son's room, and then the tub that's intended to be installed is also sitting there.  This all was delivered in September of 2019.

MS. BROWN:  Can we pull up Exhibit 661 and Exhibit 664. What's this document?  What is this photo?

THE WITNESS:  So this photo is a picture of the tile that was intended to go on the walls and a picture of the tub that's intended to be installed.

MS. BROWN:  I would like to admit 664 into evidence.

THE COURT:  Any objection?

MR. BURCHER:  No, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 664 admitted into the record.)

MS. BROWN:  661, please.

BY MS. BROWN:

Q.      What is this photo?

A.      That was a picture of his demoed bathroom.

Q.      And has the condition of the bathroom changed at all?

A.      Not since the date of this picture, no.

Q.      Okay.  And how about the tub and tile that was shown in Exhibit 664?  Is that still sitting in your son's bedroom?

A.      Yes.

        MS. BROWN:  I'd like to move 661 into evidence as well.

        THE COURT:  Any objection?

        MR. BURCHER:  No, Your Honor.

        THE COURT:  Received.

        (Plaintiffs' Exhibit 661 admitted into the record.)

BY MS. BROWN:

Q.      Based on representations from Mr. Deluca, what was your expectation about when your son's bathroom would be completed before you moved in?

A.      Well, we knew it wasn't.  I mean, we paid for the work in the August 2nd change order, but we were told that once the tile arrived, it was going to take about a week to finish.

Q.      And who told that you?

A.      Mr. Deluca.

Q.      Okay.  Let's briefly go through lighting and your selections.  Let's go to Exhibit 496.

        MS. BROWN:  We're going to start on page 256, which,

Mr. Lynch, if you could tell me what the corresponding Bates label is.

MR. LYNCH:  58270.

MS. BROWN:  Okay.

BY MS. BROWN:

Q.    And can you tell me when the -- first of all, who is on this text exchange?

MS. BROWN:  Go to the top of that page, please, Walter.

THE WITNESS:  So this text thread is between myself, Mr. Deluca, and my husband.

BY MS. BROWN:

Q.    And what is the date of this exchange, starting in the middle of the page there?

A.    June 6th, 2019.

Q.    Okay.  Great.  And we're going to scroll through to page 264.

MS. BROWN:  Mr. Lynch, if you can tell me what that Bates page is.

MR. LYNCH:  58278.

BY MS. BROWN:

Q.    Okay.  Let's talk about whether you failed to provide Mr. Deluca with lighting and mirror selections.  What did Mr. Deluca tell you about lighting selections?

A.    So on June 8th, my husband is asking what lights we need to pick out.  If you scroll up.  He wanted to know how many

lights we had to pick out, so there was a discussion on that.  I think there's a list on the June 9th drawing, because I was visiting the following day.

And so he was telling us in this message that it wasn't a big deal if we didn't make certain selections because he can always put -- I think he calls it echelon plate, I may be mispronouncing it, but it's like a blank plate you put over the wires so they're still accessible, but you can still plate it and you can still pass inspections.

MS. BROWN:  I would like to move Exhibit 496 at Bates ending in 58270 to 58278 into evidence.

THE COURT:  Any objection?

MR. BURCHER:  No, Your Honor.

THE COURT:  They're received.

(Plaintiffs' Exhibit 496, pages 58270, 58271, 58272, 58273, 58274, 58275, 58276, 58277, and 58278 admitted into the record.)

BY MS. BROWN:

Q.    Exhibit 500, at page 39.  This is a text starting on 6-20-2019.  Who's on this text?

A.    This text thread is between myself, Mr. Muha, Doug Deluca, and my husband.

MS. BROWN:  Bates label?

MR. LYNCH:  58150.

BY MS. BROWN:

Q.      And what happened on June 20th regarding the selection of lighting and mirrors?

A.      Can you scroll down?  So in the middle of this page I was just texting Mr. Deluca and telling him that I was picking out lights and mirrors for certain bathrooms, and I was just confirming that he had actually ordered the wrong mirror that I had select on May 4th for my son's bathroom, and he was just confirming that it had arrived, and then he told me subsequent to that that I should wait to pick out the lights because he was cutting mirrors and the vanities hadn't been placed and he needed dimensions.

Q.      And going to PDF, page 174 to 175 --

A.      I think you just scroll down to see that part of the message there.

        MS. BROWN:  Okay.  Scroll down.  Further.

        THE WITNESS:  And then I guess on the same date I did -- I had already selected my son's lights, so I went ahead and sent those to him as well.

BY MS. BROWN:

Q.      Would you like to look at the following page as well?

A.      Yes.  Maybe you should just scroll up a bit.  I'm sorry. Keep going.  I'm sorry, go down.  Keep going.

Q.      We're going to go to page 174 to 175 next, of the PDF.

A.      So here, I'm selecting my daughter's lights on July 20th for the bathroom.

Q.     And what about on the following page?

A.     So the first one was the knobs, sorry.  This is the sconces for her bathroom.

MS. BROWN:  Okay.  I would like to move Bates ending in 58150 to 51, and Bates ending in -- well, if you don't have an objection, I would like to move 58150 to 86 into evidence.

MR. BURCHER:  86?

MS. BROWN:  Um-hmm.

MR. BURCHER:  No objection, Your Honor.

THE COURT:  All right, they're received.

(Plaintiffs' Exhibit 5000, pages 58150 to 58186 admitted into the record.)

BY MS. BROWN:

Q.     All right.  Let's quickly talk about circular stairs. What, if any, code issues were you aware of regarding the staircase in the carriage house?

A.     So we became aware of the fact that the stairs in the carriage house that were, I think -- {indiscernible} which was the exercise room --

THE COURT REPORTER:  I'm sorry, I didn't understand you.

THE WITNESS:  So we became aware that the stairs that were installed in the gym, or exercise room, were noncode compliant due to headroom space.  And so I think it was around the October time frame when Mr. Deluca had a meeting with the County, he -- we were told that they needed to be demoed and taken out and a

circular staircase needed to be installed.

BY MR. LYNCH:

Q.    And we're going to pull up Exhibit 998 quickly and look at page 3 and have you talk about that page of that document quickly.  What is this document?

A.    So this is communications between -- I think Mr. Deluca might have been the one who originated the bottom message, and I think Mr. Lynch was the person responding on our behalf.  And Mr. Deluca's message might have been forwarded by his counsel.

Q.    And what is -- what does this document reflect about the circular staircase?

A.    So this is where he's just outlining the results of his meeting with the County that occurred, and one of the items on this list says, "Demo stairs and replace with a circular steel staircase kit."  And he says, "They can come with wood treads."

      And we responded.  It was the next text.  You can't tell because it's not in color.  It says, "We agree to demoing the stairs and replacing with a new circular steel staircase."  And then we say, "We can mutually agree on a selection," and we ask him to provide us with the specifications and proposed location.

Q.    And who wrote that last part of that message, agreeing on the --

A.    That is from us, but it's being delivered by Mr. Lynch.

Q.    Okay.  Let's take a quick look at Exhibit 791.

A.    So this is a month later, dated November 19th.

Q.    Okay.  And this is an e-mail from Mr. Lynch to Juanita Ferguson.  And let's scroll down to page 1 where item number 3 is, and how does that paragraph relate to the circular staircase?

A.    Yes.  So at this point I think we started realizing there might also be a structural issue with the roof in the carriage house, and we were trying to understand that.  So we -- we confirmed, because they had sent what Mr. Deluca had called RFIs, which are, I think, requests for information, in separate documents that are attached here.

But one of the RFIs was demoing the current stairs and replacing with a circular staircase, and there was a photograph of a circular -- black circular staircase, and he wanted us to approve that.

And so here we're approving the black staircase, but we're also asking for information about how it interacts with the structural aspects of the carriage house.

Q.    Okay.

MS. BROWN:  I would like to admit Exhibit 791 into evidence.

THE COURT:  Any objection?

MR. BURCHER:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 729 admitted into the record.)

BY MS. BROWN:

Q.    Exhibit 1005.  And this is an e-mail from Mr. Lynch, Juanita Ferguson dated December 30th, 2019, and I would like to have you scroll down to page 2 of this document.  Item number 4, "Carriage House Stairs."

A.    Yeah, so to put this in context, we had rescinded the contract on December 2nd, 2019, so we're -- at this point we had received a letter on December 24th, 2019 from Mr. Deluca's counsel telling us that we're in breach of contract and that we needed to give him information, and one of the pieces of information in that letter was direction on the circular staircase.

And so in this response we're telling him that he is -- we're giving him permission to install a circular staircase as long as it was code compliant.

MS. BROWN:  I would like to admit Exhibit 1005 into evidence.

THE COURT:  Any objection?

MR. BURCHER:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 1005 admitted into the record.)

MS. BROWN:  Exhibit 110 [sic].  This has already been admitted into evidence.

BY MS. BROWN:

Q.    Let's look at page 2, and tell me how it relates to the carriage house.

**A.**    So this e-mail, I think -- if you scroll back up -- this is January --

MS. BROWN:  Let us see the date of this document.  Walter, can you go to the first page, please?

THE WITNESS:  So this is dated February 5th, 2020.

BY MS. BROWN:

**Q.**    Okay.  And how does this relate to the carriage house stairs?

**A.**    So in this letter we are responding again -- I think at this point -- at this point we had filed our lawsuit, but we were -- we had just received what were -- we'll refer to as change orders that Mr. Deluca had issued through his counsel to us that he wanted us to sign.

**Q.**    Okay.

**A.**    And one of the change orders related to the black circular staircase that he wanted to install.  At this point, though, he had already demoed the stairs in the carriage house. I think he did that sometime in January, but he hadn't installed any circular staircases, and so he wanted us to sign the change order in order to install the circular staircase.

So we wouldn't sign the change order just because we rescinded the contract and it just didn't make sense.  There are zero dollar change orders, just to be clear.  There were no dollar amounts associated.  So we're just, again, giving him permission to abate the code violations at the property, and one

of which is the lack -- the circular staircase.

Q.    So when did he install the circular staircase?

A.    It's never been installed.  Today you have to access the second floor by ladder.

Q.    Okay.  Let's talk about -- I'm sorry, one more exhibit on this subject.

MS. BROWN:  425, please.  This is a March 16, 2020 letter from Juanita Ferguson to Mr. Lynch, and this has already been admitted into evidence.  Scroll down a little bit, and -- right there.

BY MS. BROWN:

Q.    Explain to me how this relates to the steel staircase.

A.    So this is the letter where Mr. Deluca is telling us that he's going to abate all the code violations, and we're to get a final inspection on the property.  The first item that he intends to do pursuant to that plan is to install the steel circular staircase.

MS. BROWN:  Okay.  We're going to move on to the next subject which is square footage.

THE COURT:  Okay, let's do that after our lunch break.

MS. BROWN:  Okay.

THE COURT:  Let's take an hour at this time.  We'll come back at --

MS. BROWN:  I do only have probably 15 more minutes of testimony, if that in any way sways your decision to go to lunch

right now.

THE COURT:  No, it doesn't.

MS. BROWN:  Okay.

THE COURT:  Just because I answer to more people than myself or you and lots of people who are ready for lunch.

MS. BROWN:  Understood, Your Honor.

THE COURT:  All right.  So, we'll take an hour and we'll come back at 2:00.  All right.  We're in recess.

(Thereupon, a luncheon recess was had beginning at 12:59 p.m.)

**AFTERNOON SESSION, JULY 14, 2022**

(2:05 p.m.)

THE COURT:  All right.  Please, come back and take that little uncomfortable chair in the witness box that's too small for all the exhibits that we have.

Please, proceed, Ms. Brown.

CONTINUED DIRECT EXAMINATION OF DAWN HARRELL

BY MS. BROWN:

Q.    When we left off, we were about to dive into square footage, and I just have a couple of questions for you on that subject.

What measurements of the square footage have you had performed of performed after closing?

A.    I've had two measurements.  One is by laser tech and the other is by Matthew Furlong, one of our expert witnesses.

Q.    I would like to pull up Exhibit 489.  What is this document, Mrs. Harrell?

A.    So these are the results of the measurements taken by Lasertech.

Q.    And what did Lasertech determine the square footage was?

MR. BURCHER:  Objection, Your Honor, hearsay.  We've already talked about this.  We filed a motion on limine on this, and you said that I could cross-examine the person that prepared this, and this is not that individual.

THE COURT:  Well, I'm going to -- is there going to be a witness that testifies about the measurements?

MR. LYNCH:  Your Honor, we have -- we only have a business record certification.

THE COURT:  Right.

MR. LYNCH:  That's all we have.

THE COURT:  Okay.

MR. BURCHER:  This is not a business record, Your Honor.

MR. LYNCH:  I can cite some cases and respond to that.  First, I'm going to give you the Fourth Circuit, which is *Certain Underwriters of Lloyd's of London versus Sinkovich*.

THE COURT REPORTER:  Counsel, could you spell the citation?

MR. LYNCH:  *Certain Underwriters* --

THE COURT:  No, let's do this.  I'm going to hear the testimony, and I'll strike it if I'm not convinced that it's

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

admissible, but I'm not going to sit here and listen for 45 minutes and then you have cases that you want me to research, and I'm not going to do that now.

I'm not sure how it's a business record, whose business record it is.  Is it Ms. Harrell's business record.

MR. LYNCH:  In short, the Lasertech, if you look at their Website, "We measure buildings" --

THE COURT:  All right.  Well, I'll hear argument on it, but let's get the testimony out of the way.

BY MS. BROWN:

Q.   What is this document?

A.   So these are the results of a measurement that was taken by Lasertech at the property.

Q.   And what did they determine the square footage was?

A.   I need to take a look at the document.  I think it's on page 2.  If you scroll.  Stop right there.

So the main house was determined to be 5,485 square feet. Yeah, 5,485 square feet.

Q.   And on what date was this measurement performed?

A.   It was measured in February of 2021.

Q.   How did this influence your opinion as to whether or not Mr. Deluca misrepresented to you the size -- the square footage of the home?

A.   Well, it's always been told and represented to us that the size of the main house was 6500 square feet, and we relied

upon that as we entered into the contract and closed on the property.

Q.   And when you received this report from Lasertech, how did that influence your opinion of whether or not Mr. Deluca had misrepresented the square footage?

A.   Well, it's understated by over a thousand square feet if you compare the two numbers.  So, it's very -- I was very disappointed in that number.

Q.   And did you feel like you had -- he had misrepresented you?

A.   Well, absolutely because, like I said, we always understood the main mouse was 6500 square feet, and that was even when they were giving us approximations, we were always given assurances that the main house -- which is what we cared about, because the carriage house was just sort of, you know, gym, office space -- was 6500 square feet.

Q.   Okay.  And if you had known that the main house was less than 6000 square feet, would that have affected your decision to contract the property?

A.   Yes.

Q.   And if you would have received the HomeVisit plans in March of 2019 that stated the main house was less than 6000 square feet, would that have affected your decision to contract on the property?

A.   Yes.

MR. BURCHER:  Your Honor, I would move to strike the testimony related to that.  It hasn't -- these things are not authenticated by anybody.  They are --

THE COURT:  If the underlying document goes, this testimony will go as well.  If there's no testimony that -- you know, I don't know what the testimony is going to be -- we have Mr. Furlong's testimony, and that's come in, right?

MR. BURCHER:  That has, but this -- he doesn't have anything to do with this document.

THE COURT:  I understand that, but his -- he's independently -- has he independently done the square footage?

MS. BROWN:  Yes, Your Honor.

THE COURT:  All right.  And what was the testimony yesterday by Mr. Furlong?

MS. BROWN:  He measured it.  I believe it was I believe 5,101 square feet.

THE COURT:  Okay.  So this testimony will be dependent on whether Lasertech's measurements are allowed.  You certainly can ask about Mr. Furlong's testimony, whether she relied on that and whether it changes her opinion on what she would have done if she knew it was 5100 square feet, all right?

So why don't you rely on that instead if Ms. Harrell has an opinion about that, because that testimony has been received.

BY MS. BROWN:

Q.    Mrs. Harrell, are you aware of the calculations

Mr. Furlong did of the home?

A.      I've seen them.

Q.      And do you recall what his calculation was as to the square footage of the main house?

A.      Not off the top of my head.

Q.      Do you recall whether or not it was less than 6000 square feet?

A.      I do recall that, yes.  It was less.

THE COURT:  Why don't you just show her the -- I know you don't have it in front of you.

MS. BROWN:  It's Exhibit 58, page 200 and --

THE COURT:  I'm sure Mr. Lynch knows it by heart.

MS. BROWN:  I've been the one living...

THE COURT:  Just take a moment.

MR. LYNCH:  Walter, can you pull that up?

MS. BROWN:  212.  Continue on to the next page.  There you go.

THE WITNESS:  So I see here that the main building total was computed to be 5,203 square feet, and if I had known that that was the measurement of the house, I would not have entered into the contract on 6122 Lee Highway.

BY MS. BROWN:

Q.      Okay.  All right.  I would like to go to Exhibit 511.  Bates page 253 -- I'm sorry, PDF 253, which is Bates page 60895.

Mrs. Harrell, who is this text chain between?

A.      Can you scroll down so I can see the top?  This text message chain is between myself, Brendan Muha, and my husband.

Q.      The message that states, quote, "Doug has a key," who sent that message?

A.      Can you scroll so I can see it?  That was from Brendan Muha.

Q.      When was that --

        MS. BROWN:  Scroll up to page 249 of the PDF, which is page 60891.

BY MS. BROWN:

Q.      And please tell me when that message was sent.

A.      It's sent on September 5th of 2019.

        MS. BROWN:  I don't have any more questions for Mrs. Harrell.

        THE COURT:  Cross-examination.

                CROSS-EXAMINATION OF DAWN HARRELL

BY MR. BURCHER:

Q.      Ms. Harrell, you are a licensed attorney; is that correct?

        MS. BROWN:  Objection, relevance.

        THE COURT:  Overruled.

        THE WITNESS:  Correct.

BY MR. BURCHER:

Q.      And you're licensed to practice law in Connecticut?

A.      Correct, yes.

Q.    You graduated from Georgetown Law in 2004?

A.    I think it was 2005, but yes.

Q.    And you're a partner at Ernst & Young in the national tax practice and did tax planning for partnerships and join ventures; is that right?

A.    Yes, until I left after my son was born, so I've been out of practice for about six years -- or seven years now.

Q.    All right.  So -- and you've bought five houses and sold three; is that right?

A.    I would have to do the math.  Five, yes.

Q.    So you bought five, sold three?

A.    One, two, three -- correct.

Q.    So eight in total real estate residential real estate transactions; is that fair?

A.    Sure.

Q.    And you took classes in contract law --

A.    Yes.

Q.    -- while in law school?

       And you currently reside in Hilton Head?

A.    That's correct.

Q.    And you moved there in September of 2020?

A.    September of 2020, correct.

Q.    Okay.  And your kids are enrolled in school there?

A.    They are.

Q.    And you don't plan on coming back to this house, do you?

A.    No.

Q.    Now, you testified previously that you learned of this property through Brendan Muha; is that correct?

A.    That's correct.

Q.    Okay.  And you did some -- various different times you came to visit the property.  If I recall right, it was December that you visited and then March?

A.    That's correct.

Q.    And then you had a meeting with Mr. Deluca in January of -- so let me rephrase that to get the dates right.  So it's December 2018 you had a meeting at Mr. Deluca's house?

A.    December 21st I toured Mr. Deluca's house, and I toured the property at 6122 Lee Highway.

Q.    All right.  And then the next time you had a meeting with Mr. Deluca was in January of -- a few weeks later --

A.    January 9th of 2019.

Q.    All right.  And then the next time that you visited the property was after you had canceled the contract with the Great Falls property in mid- to late March of 2019?

A.    So I toured the property again on March 22nd, 2019.

Q.    Right.  So those are the time periods that you toured the property prior to signing the contract; is that right?

A.    Correct.

Q.    Okay.

A.    January 19th -- January 9th I did not.  That was a

meeting at a third location, not at the house.

Q.    Okay.  And during this time period, you never discussed building square footage directly with Mr. Deluca, you personally?

A.    I don't know what you mean by building square footage.

Q.    Well, square footage.  You just testified that you --

THE COURT:  Mr. Burcher, you're either going to identify a specific building or the main house or the property.  Use a different term, please.

MR. BURCHER:  All right.

BY MR. BURCHER:

Q.    So, did you discuss any form of square footage as it relates to the improvements on the property directly with Mr. Deluca prior to signing the real estate contract?

A.    No.

Q.    Okay.  It was all through Mr. Muha that you had these conversations?

A.    Mr. Muha, correct.

Q.    Okay.  And Mr. Muha in late -- mid- to late February became your real estate agent for -- as a real estate agent; is that correct?

A.    That's correct.  When we entered into the contract in Great Falls, he became our real estate agent.

Q.    Okay.  And he helped you draft the contract that was ultimately entered into by the parties?

A.    Yes.

Q.    The April 3rd contract?

A.    We just used the standard Residential Sales Contract that they use for all their properties at TTR.

Q.    And you worked with him to come up with the addendum to that contract?

A.    All the parties worked together to come up with the addendum.

Q.    Okay.  And that accurately reflected the understanding of the parties as to what was to be done with the property at that time?

A.    Well, I think there were certain things that you never get to define that was -- it was meant capture all the major features and specifications and upgrades of the property.

Q.    The material terms that --

A.    Right.

Q.    -- were important to you; is that right?

A.    Yes.

Q.    And it didn't include any reference to -- the contract of April 3rd didn't include any reference to building square footage, did it?

A.    It did not, no.

Q.    Okay.  It did not have any terms related to a slate roof, did it?

A.    It did not.

Q.    So you just testified that you got a report from your expert witness, Mr. Furlong, as it relates to square footage. And you said that that was -- indicated to you that you had been misrepresented the square footage of the property; is that correct?

A.    That's correct, I was always led to believe, even in communications where Mr. Deluca was a part, that the square footage of the main house was 6500 square feet.

Q.    Okay.  But we just established that there were no conversations directly with Mr. Deluca prior to the signing of the contract; is that right?

A.    There were oral conversations, but during the terms of the contract and prior to closing, there were.

Q.    Okay.  So we haven't gone through -- but for the time period of up until April 3rd, Mr. Deluca didn't represent the square footage of the property?

A.    Not to me.

Q.    All right.  Or to anyone else -- you said not to you?

A.    I can't speak for my husband because during the meeting at the Ritz-Carlton on January 9th, 2019, my kids were there and so I was in and out of the conversation so I didn't hear the entire conversations that occurred.

Q.    But you don't know of a conversation that occurred; you just know that one didn't occur; is that a fair statement?

A.    I think there were some discussions at the January 9th

meeting, which is why there were HomeVisit plans that were being prepared after that meeting.

Q.   Okay.  So I'm trying to understand what you know occurred in those conversations.  Did Mister -- you just testified that Mr. Deluca didn't say anything about square footage in that --

A.   Not to me.

Q.   Okay.  And you don't know what was said to your husband or anybody else?

A.   I don't, but I do know the takeaway was that we wanted to see the floor plans of the property, and that was the whole exercise.  I believe that was the purpose of the exercise with HomeVisit.

Q.   But there was no number mentioned?

A.   Not to me.

Q.   Okay.  All right.  And after the signing of the real estate contract, what do you recall are the conversations, oral conversations that you had with Mr. Deluca as it relates to square footage?

A.   The conversations that I was a party to were all via text message related to square footage --

Q.   Okay.

A.   -- where Mr. Deluca was a party to the text thread.

Q.   Okay.  But there were no oral -- the question was oral conversations?

A.   No oral conversations.  You just said before closing?

Q.      Yes.

A.      I'm sorry.  There was a conversation on the July 2nd, 2019 walk-through.

Q.      Okay.  What was that conversation?

A.      That was the date that we were asking -- my husband wanted to confirm the square footage.

Q.      Okay.

A.      And Mr. Muha was the one who confirmed that the main house was 6500 square feet.

Q.      Mr. Deluca didn't --

A.      He did not speak the words; he was present at the conversation.

Q.      All right.  And in all of these discussions associated with square footage, there was no definition of "square footage" that you identified to the parties that you were thinking that they were talking about; is that correct?

A.      We never defined it, but the understanding was that we wanted to know what the livable space was that we had to put our furniture and all of the things that bringing from our home in Connecticut.  So I didn't know until this case that there were many ways that you might be able to take into account square footage, but I certainly meant the livable space that would be conditioned and, you know, not the garage, not the screened-in porch, but the places where you would live inside the house.

Q.      But you didn't ask that specific question, did you?

A.      I did not.

Q.      And it's fair to say that that 5100 number that you saw from your expert reports does not includes those types of additional areas, the garage, the screened-in porch, the restricted headroom area, correct?

A.      That's correct.  That would be misleading to include those items.

Q.      Okay.  And it's also true that that area did not include the walls, both exterior or interior, in that number; is that correct?

A.      I don't believe so.

Q.      Okay.  And you'll agree with me that the walls in this house are relatively thick in certain areas because it's double brick; is that right?

A.      Correct.

Q.      So that could add significant square footage to the overall square footage of the improvements on the property; is that correct?

A.      Not the square footage that I was interested in because that's not a place that I can put my things; it's part of the inside of the walls.

Q.      But if you didn't clarify the definition of what you were looking for, it could include those areas if somebody was talking about the total improvements on the property; is that correct?

A.      I suppose.

MR. BURCHER:  So could you pull up the Bowe report, please.

BY MR. BURCHER:

Q.      Now, you engaged Mr. Bowe to be your expert witness in this matter, didn't you?

A.      Yes.

Q.      And Mr. Bowe calculated square footage as well as Mr. Furlong; is that correct?

A.      He calculated it for purposes of determining his cost numbers, correct.

Q.      Okay.  And he's a builder, right?  He looks at it from a different perspective than maybe Mr. Furlong; is that correct?

A.      He would have to testify to that.

Q.      Well, he did testify to that.  He said that he looked at it from the perspective of everything that he is working on. That's the square footage that he, as a builder, utilizes when he discusses square footage.

A.      I think -- okay.

Q.      And so it would be reasonable to think that Mr. Deluca, when he is discussing square footage, if you didn't give him a specific definition, would be utilizing the same metrics as your expert did; is that correct?

A.      I suppose.

Q.      And that number, if you will, if you could look at it, he

*851*

says that it is -- that the -- that it is approximately 6,800 and some-odd number -- 5,744 square feet for the house, and then 1,088 square feet for the "Garage/Guest Apartment/Gym"; is that correct?

A.     That's correct.

Q.     And you don't think he misrepresented that square footage to you?

A.     I think he's using it for a different purpose, and things like a garage and just the standard items you would include for purposes of selling a house would not include a garage or outdoor screened-in porch.

Q.     Okay.  And one of the purposes which you requested this square footage for was for insurance purposes; isn't that correct?

A.     That's correct.

Q.     Okay.  I'd like you to turn to -- and it's in the Brendan Muha direct exhibits.  I would like you to turn to the exhibit that is labeled "Cincinnati Insurance."

A.     I don't have any exhibits.

Q.     Oh, I'm sorry.

A.     I'm sorry.  What am I supposed to be looking at?

Q.     This is the Brendan Muha direct exhibits, the small binder that we were looking at.

        THE COURT:  What number?

        MR. BURCHER:  It is the second to last exhibit.  It is

"Cincinnati Insurance."

THE WITNESS:  What's the number?

THE COURT:  It just has the name on it.

THE WITNESS:  Oh, I see.

MR. LYNCH:  Just for the record {indiscernible} --

THE COURT REPORTER:  I'm sorry.

THE COURT:  He hasn't moved it into evidence.

MR. LYNCH:  Thank you.

MR. BURCHER:  We have two lawyers objecting.  I just want to make sure which one is objecting.

THE COURT:  Yeah, Ms. Wilson [sic] has done the direct, and she'll do the objecting.

MR. BURCHER:  Thank you.

BY MR. BURCHER:

Q.    All right.  Ma'am, I'd like you to identify this exhibit for me, please.

A.    What do you mean "identify" it?

Q.    What is it?

A.    Well, I would have to look at it.  I've never seen it.

Q.    You've never seen it?

A.    Is there a specific -- I mean, this is a very large document.  Is there something you would like me to look at?

THE COURT:  You've just been asked to identify --

BY MR. BURCHER:

Q.    I just asked if you could identify --

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

**A.**    Oh, just identify it?  It appears to be a homeowner's insurance for 6122 Lee Highway.

**Q.**    Okay, thanks.  And if you could turn to CIC 0120, the page 120.

**A.**    Okay.

**Q.**    And I'm sorry, before you go there, I hate to jump back, but this policy was issued on July 2nd of 2019.  Do you see that on the bottom of the front --

**A.**    I believe you.  I don't see it but --

**Q.**    It's at the bottom, right above the statement that says "Home office copy."

**A.**    Okay, I believe you.

**Q.**    Okay.  All right.  So this is prior to closing that your insurance company was able to issue this policy.  And on page 120 it goes over some of the square footage associated with the property.

**A.**    Can I just clarify something?  I believe these numbers were based on a visit from my insurance company in October or September of 2019.  I think the policy might have been issued, but they didn't do the site visit of the house until after closing.

**Q.**    Okay.  But they -- okay.  But they did a site visit, okay?

**A.**    Which is when they determined all of this information.

**Q.**    Okay.  Great.  So -- and they determined that the main

house, from a gross square footage, was 6,400 square feet.  Do you see that on page 120?

**A.**     What are you looking at?

**Q.**     Page 120.

**A.**     Yeah, I see the page, but what number do you want me to look at?

**Q.**     Gross square footage.

**A.**     Okay.  I see it.

**Q.**     The 6400?

**A.**     Yes.

**Q.**     And that is, if you add up those numbers under the main dwelling here, I'll just represent to you that all of those add up to 6400.  You can do the math if you like but...

**A.**     Okay.

**Q.**     All right.  And then in addition to the main dwelling, there are additional structures, which is identified as the garage of 610 square feet and the carriage house of 760 square feet.  Do you see that?

**A.**     I see that.

**Q.**     Okay.  So that is essentially what your understanding of the square footage was that you just bought; isn't that correct?

**A.**     At what time -- at what point in time?

THE COURT:  Just since she hasn't ever seen the document --

MR. BURCHER:  No, no, I understand --

THE COURT:  -- {indiscernible} could have started there --

MR. BURCHER:  -- that -- I understand that, Your Honor.

THE COURT:  You asked her personally, wasn't that her understanding of what the square footage was, and that's not a fair question.

MR. BURCHER:  No, not the 6500.  I'll rephrase the question Your Honor.

BY MR. BURCHER:

Q.     You personally understood that the --

THE COURT:  From this document?

MR. BURCHER:  Not from this document, no, but this is confirming, Your Honor -- this is consistent with her understanding.

THE COURT:  Well, if you want to try and admit it independently as -- no, it's not her understanding because she said she's never seen it before.

MR. BURCHER:  No, I'm not -- I'm trying to --

THE COURT:  You're asking her --

MR. BURCHER:  I'm not --

THE COURT:  -- about an a document she's never seen, and it's irrelevant.  What her insurance company may have done with this gross footage, you've got -- you haven't qualified it at all, and --

MR. BURCHER:  It's her insurance policy, Your Honor.

THE COURT:  It is her insurance policy.  She just said

she's never seen it before, and now you're asking her to verify the accuracy of the content of the document, and that's hearsay, and you don't have a sponsor for it, and it's excluded, okay?

MR. BURCHER:  Yes, Your Honor.

THE COURT:  Thank you.

MR. BURCHER:  I'll move on.

BY MR. BURCHER:

Q.    Mrs. Harrell, I would like you to turn to Exhibit 500, which is in the binder in front of you as well.

A.    Are they in chronological order, because mine goes from 496 to 505.

Q.    This is the same exhibit and it's the same problem as before.

THE COURT:  Can you put it up on the screen?

MR. COUGHLIN:  Where's our page?  What Bates number?

MR. BURCHER:  It's Bates Number 54831.

MR. COUGHLIN:  Okay.

MR. BURCHER:  We're going to pull it up on the screen.

THE COURT:  What page do you want her to --

MR. BURCHER:  54831, which is page 20 of 250 in the --

THE COURT:  Okay.

MR. BURCHER:  -- PDF.

BY MR. BURCHER:

Q.    Okay.  If you could review this document briefly and then we'll scroll to the next page.

A.      I'm familiar with it.

Q.      Okay.  And, ma'am, this is the writing that you referenced earlier about the post-signing of the sales contract communications as it relates to square footage; is that correct?

A.      Correct.

Q.      Okay.  And in this document Mr. Deluca doesn't say what the total square footage is, does he?

A.      He only makes a statement about the square footage of the garage/gym.

Q.      Okay.  And you made the statement about your recollection at the end of this; is that correct?

A.      I did.

Q.      Okay.  And did you ever follow up with this?

A.      We did on the July 2nd, 2019 walk-through.  If we could scroll back.

        The communications, if you look at them, in my interpretation of them were that they were confirming that the house was 6500 square feet because they're saying if you include this other space, it's 700.  Mr. Deluca says that the gym is 350, so I assumed that the understanding was that the main house was 6500 square feet and the remaining 500 was associated with the carriage house.  That's the impression I was left with.

Q.      Okay.  That impression, it turns out, based on your testimony not to be correct; is that right?

A.      That's correct.

Q.     All right.  Now, and when you signed the contract, there was no appraisal contingency -- excuse me, no inspection contingency; is that right?

A.     That's correct.

Q.     And the house was to be delivered as-is as of closing?

A.     That wasn't the intention of the parties because Mr. Deluca was providing a warranty, a comprehensive warranty on the property.

       THE COURT REPORTER:  A what?

       THE WITNESS:  A comprehensive warranty, and also he was getting the inspections from Arlington County, so it sort of seemed unnecessary to get a home inspection contingency as a result of all of those things.

BY MR. BURCHER:

Q.     But that wasn't my question.  My question was that the house was being delivered as-is.

A.     That was not -- it was being delivered because of the warranty that was being associated with the work that was performed by Mr. Deluca.

Q.     Ma'am, I would like you to turn to Exhibit 1 in that document -- in that binder, if you will.  And I would like you to turn to page 7 of 16 of the contract.

A.     I'm there.

Q.     Are you there?  And paragraph 10 deals with the "Property Maintenance and Condition."

Do you see that?

A.      I do.

Q.      Okay.  And the last paragraph of that document says that the "Buyer acknowledges that except as otherwise specified in this Contract, Property, including electrical, plumbing, existing appliances, heating, air conditioning, equipment and fixtures shall convey in its as-is condition as of the date specified above"?

A.      Correct.

Q.      And that was the terms of the contract between the parties; is that correct?

A.      That was, but there was also the post-closing agreement and warranty that was executed prior to closing on this contract.

Q.      I understand, but this is the sales contract that you signed, right?

A.      Correct.

Q.      All right.  And the property was delivered to you in an as-is condition as of the final walk-through, wasn't it?

A.      I'm not sure how to answer that.  We purchased the property, closed on it, and we had a continuing contractual obligation by Mr. Deluca under the post-closing contract.

Q.      Okay.  You testified about tile.  I would like you to pull up Defendant's Exhibit 186.  We can put it on the screen. It's just one page.

Could you identify -- we'll scroll through this.  Go ahead and -- we'll scroll through this, a couple of pages that are in this, and then I'll ask you to identify the document. Tell us when you're ready to go to the next page.

**A.**     Just keep scrolling.

**Q.**     Go ahead and go to the first page.  What is this?

**A.**     These are text messages to Mr. Deluca.

**Q.**     Are they text messages between the two of you?

**A.**     Yes, so the text thread is between myself, Doug Deluca, and my husband.

**Q.**     Okay.  And what's the date of these texts?

**A.**     5-3-2019.

**Q.**     And if you could scroll down to the next page.  You are identifying certain items?

**A.**     Those text messages were not from me; they're from Mr. Deluca.

**Q.**     So, are you represented in the second picture of --

**A.**     Mr. Deluca took a picture of me and sent it to me.

**Q.**     Go to the next page.  And the label on "owner" tile, is that --

**A.**     It was created by Mr. Deluca.

**Q.**     Right.  But is that what you had discussed at your meeting with Mr. Deluca at the tile shop?

**A.**     Yes.  And as I stated in my testimony, we decided -- I was to go back and confirm my selections, and if you see -- you

don't have it in here, on the same day, I confirmed selections for all of the bathrooms except for the owner suite.

Q.      But is this the same tile that you selected as the owner -- for the owner --

A.      It is on May 15th.

Q.      So you referenced the Post Closing Construction Agreement.  Could you turn to that?  That's Exhibit 2 in the binder that you have.

A.      I have it, yes.

Q.      I would like to refer you to the second page of the Post Closing Construction Agreement and the whereas clause that deals with the status of the work that starts, "Whereas the value of the goods."

        Do you see that paragraph?

A.      I see that.

Q.      You were aware, were you not, that the $20,000 -- that the work substantially exceeded $20,000 that needed to be done on the property as of closing?

A.      So what we were referring to here are the materials that are represented in the contract that were not on-site that substantially exceeded the $20,000, and those were represented to be paid for, at least a deposit, by Mr. Deluca.

        So if you take the gates, for example, I would have to look at the contract, but I know the gates were somewhere around 40,000 in total, and then the owner suite tile was something

around 14,000, I think.

Q.     Okay.  But that's not what this says.  It doesn't say --

A.     And then the refrigerator drawers as well.

Q.     But that's not what this says.  This says that "the value of the goods not purchased, the work not yet performed, the goods purchased but not yet installed or any other item constituting the in Incomplete Work substantially exceeds $20,000."

A.     But there was also work associated with those items, so there's installation of the tile, which can be quite expensive and also the installation of the gates and motor controls and the installation of the refrigerator drawers.

Q.     Okay.  So there was more than just $20,000 worth of work that needed to be done on the property after closing?

A.     Right, but those were the elements that were sort of identified in the misrepresentations in the sales contract.

Q.     Okay.  Now, you testified that you were unable to travel -- and I didn't hear the date, you know, from which you -- that time period started, but I think you testified that you couldn't travel for three weeks.  Is that -- in the July time period?

A.     So, I had surgery, cervical spine surgery on July 23rd, 2019, and there was a period of -- it was about a three-week recovery, but there were two weeks where I wasn't allowed to travel or get in a car.  I had a neck brace on.

Q.     Okay.  So you couldn't have moved into the property on August 1st under those conditions; you weren't even able to travel from Connecticut to the house; is that correct?

A.     That's correct.  We -- because of my surgery, we had to move our move date.  Our movers were originally scheduled for that week, but then when I got my surgery scheduled for July 23rd, which was after closing, I found a doctor that was able to fit me in who had a cancellation, and we decided to go ahead and have the surgery and then just push our move date by two weeks.

Q.     Okay.

       MR. BURCHER:  Give me a minute.  I might be done, Your Honor.

       THE COURT:  Yes, sir.

       MR. BURCHER:  No further questions, Your Honor.

       THE COURT:  All right.  Thank you.

       Okay.  Redirect?

       MS. BROWN:  No, Your Honor.

       THE COURT:  All right.  Ms. Harrell, you may go back to your seat in the courtroom.

       MR. LYNCH:  Your Honor, we're at the point where we are about to rest our case.

       THE COURT:  Okay.

       MR. LYNCH:  I would just like to make a couple of notes before I do that or ask some questions.

       THE COURT:  Certainly.

MR. LYNCH:  You know, if time were not an issue, we would probably call Mr. Deluca in our case-in-chief, but I would be -- and I think counsel is open this, to just wait until Mr. Deluca goes.

THE COURT:  All right.

MR. LYNCH:  We have one evidentiary issue on the Bender designation.  If the Court would like to resolve that later, that's fine, but I was not completely clear as to whether that's in or out.

THE COURT:  Bender deposition?

MR. LYNCH:  It's a Bender deposition designation.  It was filed with the Court, but it's been objected to as irrelevant.

THE COURT:  I haven't read it.

MR. LYNCH:  That's okay.

THE COURT:  So I'll take a look at it and give you a ruling on that.

MR. LYNCH:  Okay.  And then last but not least, we discussed this this morning, I was not as attentive as Ms. Brown was to admitting exhibits as we went, and we still have some exhibits that were used with witnesses like Mr. Bowe that were not formally admitted, but assuming we have an opportunity to work with opposing counsel on that, I would rest my case.

THE COURT:  Yeah.  Certainly.  We'll give you an opportunity to clear -- clean and clear that up.

MR. LYNCH:  Thank you.

THE COURT:  All right.  Do you want to call your first witness?

MR. BURCHER:  Your Honor, just for the record, I would like to make a brief motion to strike on some of the points.  I'm not going to belabor this.  We've already, you know, briefed most of the legal issues through our summary judgment motions.  I'm not going to change the arguments as it relates to any of those sort of things, but now that we've seen the plaintiffs' evidence, and granted, I know that Mr. Fulambarkar is going to be outside of that, but I don't think that Mr. Fulambarkar has anything related to do with the fraud counts that we are -- the fraud counts that we're dealing with.

Based on the evidence that has come in in the plaintiffs' case-in-chief, I don't think that they have shown by a clear and convincing evidence, you know, fraud on the part of Mr. Deluca as it relates to the four items that are at issue in the fraud counts as per the summary judgment motion.

Let's start first with building size.  It is clear that there are numerous ways of measuring building size.  There are many -- there are numerous numbers that every person has put in here.  From their own exhibits -- from their own experts to their own agent, Mr. Muha, it's clear that during most of this time period, this building was in flux, that the measurements that were taken were not accurate, things were not included.

There's simply no clear fact that was misrepresented, you

know, to the Harrells, as it relates to building size, coupled with the fact that they did multiple investigations associated with building size as relates to their appraiser.  He came twice, and sent them reports associated with it that contained building size.

The law is really clear on this, Your Honor, that if you -- once you undertake an investigation, you know, you're stuck with whatever the results of that investigation are, and the idea that even if somebody were to have made a fraudulent representation, that caused you to enter into a contract, if you undertake an investigation, that that -- that negates any, you know, fraudulent statement.

And so, given all of that fluidity associated with this, coupled with the fact there is no specific definition of building square footage that the parties defined, I don't think the plaintiffs have met their burden as it's associated with anything as relates to building size, and in order to probably skinny things down, you know, with Mr. Deluca's testimony, I think that summary judgment ought to be -- or a motion to strike should be granted as it relates to the claims of fraud as it relates to building size.

Similarly, there is no significant or material reference as relates to the slate.  The evidence shows that their own agent says that none of this was discussed, that it wasn't a material term of the contract, and the evidence shows that, you know,

after these statements supposedly were made related to slate, that the -- that the parties exchanged information as it relates to the slate -- the status of the slate roof.

In fact, their own expert testified that this is slate, and he even testified that it was original to the time period in which Mr. Deluca purchased the property.  The question is whether or not it was original to 1938, and there's been no evidence that has been submitted that shows that the statement by Mr. Deluca in any fashion ties that comment as it relates to "original" to the 1930 time period, and it's a reasonable interpretation even considering, you know, with the evidence that has been submitted, that this could not possibly rise to the level of clear and convincing evidence of a fraudulent statement intended to induce them to enter into this contract.  So, those are -- those are the -- those are, to me, clear and unequivocal.

The -- with regard to the only -- the two other elements that are left, the tile portion of this is -- deals with after the signing of the sales contract.  As it relates to permits, there is no testimony that there is any conversation that Mr. Deluca actually has obtained the permits.  The testimony of Mrs. Harrell was that it was filed, okay?  And there's a clear distinction between filed and obtained.

And so, you know -- and in the context of this, these conversations seem to be very general conversations.  They are not things that are -- would be something that you -- because

they're not -- they're not even included in the contract.  You know, these are not terms that were material to the parties.

You know, Brandon Muha testified that all of the material terms to the parties were included in the contract.  That is their agent.  Had those things been material to the Harrells, they would have been included in them -- in the contract.  It could have easily said, you know, hey, you have represented that you have obtained all permits and -- similar to slate.  You represent that the slate is original or building size, and all those things would have been clear and unequivocal, but at this stage, they just have not met their burden as it relates to fraud showing clear and convincing evidence that Mr. Deluca intended to defraud them.  I mean, it's the opposite.

I mean, what they say is it's that he constantly says he's getting permits, he's working on them.  I mean, there is no objective evidence that shows that there is an intent on Mr. Deluca's part to defraud the Harrells and have them enter into this, you know, into this contract.

And for those reasons, Your Honor, I think that the fraud counts, Counts 1 and 2, ought to be -- a motion to strike ought to be granted on them.  Thank you.

THE COURT:  Thank you.

Mr. Lynch, do you want to respond?

MR. LYNCH:  I guess briefly.  Square footage, the investigation point, there's clear -- there's a lot of law in

Virginia on diversion, and diversion, an argument can be made there's no such thing as reasonable reliance where you have diversion.  That may be an overstatement, but it's -- but not by much, and that's *Hitachi* in the Fourth Circuit.

The roof, there's testimony -- there's sworn testimony that Mr. Harrell was told that it was original slate, and Mr. Furlong and the pictures, I think, show that that was not true.

The permits, I'm not going to -- I don't think I need to respond to that.

And I think on the tile, he said he paid for it.  He told the Harrells he paid for it before they went to closing, and he didn't.  He didn't pay for it.  And we haven't cross-examined him on that yet, we haven't called our rebuttal witnesses, but that's the truth.  That's all.

THE COURT:  I'm going to deny the motion to strike.  I think there's evidence to support each of the claims -- I mean, the -- your recollection is a little different than mine as to what the testimony was, but clearly the tiles were important because it demonstrated whether they were going to be able to close and get a final inspection and occupy the home.  Occupying the home was critical to them for school year purposes for their children, so it was clearly something that they were focused on in the April through June and then August time period.

And the slate roof, as Mr. Lynch said, Mr. Harrell

testified that Mr. Deluca told him it was an original slate roof. He relied on it.  It was important to him.  Ms. Harrell commented on that as well.  So there's certainly evidence of a conversation about the importance of the slate roof.

The importance of the square footage is highlighted in Mr. Muha's representation.  Mr. Deluca is present, doesn't say anything about whether the main house is 6500 feet or less or more, but it's clearly important and it's brought up early on between the parties, and, as you correctly identified, it becomes a bouncing ball as to how much the square footage is and who relied on the appraisal or not, and so there are credibility determinations to be made there.

And the permits, you know, were they going to be able to occupy the home before the school year, and the permits of course are necessary, and if he's misrepresenting to the Harrells that he has permits or that the permits cover the work that he's doing, all of that is material to whether an inspection, final inspection and occupancy will be permitted, so I think there's evidence on each of them.  So the motion is denied.

So call your first witness -- or your second witness.

MR. COUGHLIN:  Mr. Burcher is going to get him.

THE COURT:  Okay.

MR. COUGHLIN:  Your Honor, I'm going to use the white board.  Is that your white board?

MS. BROWN:  Yep.

MR. COUGHLIN:  May I use your white board?

(Discussion had off the record.)

(ANGUS WYMAN MACDONALD, DEFENDANT'S WITNESS, SWORN)

THE COURT:  Good afternoon, sir.

THE WITNESS:  Good afternoon, Your Honor.

THE COURT:  Did we decide on the white board?  Are you going to write on it?

MR. COUGHLIN:  I'm going to write on it.

THE COURT:  Okay.  Then if you want to bring it closer. There's no jury here, so you can wander the well of the court, which otherwise is never allowed.

MR. COUGHLIN:  I just want to make sure that --

THE COURT:  And, counsel, if you need to move to see what he's writing, you're certainly free to do that.

MR. COUGHLIN:  Where has this been set up successfully in the past, Your Honor?

THE COURT:  Nowhere.

MS. BROWN:  I'll move myself somewhere.

MR. BURCHER:  Court's indulgence for a second?  I can just show him how to use the ELMO, and that might be the easier way to do all this, and then everybody can kind of see, and then he just kind of writes on a piece of paper instead of the board.

MR. COUGHLIN:  That will work.  Okay.  Let's do that.

THE COURT:  That is what we do.

MR. COUGHLIN:  Okay.

MS. BROWN:  Are we off the record right now?

THE COURT:  I'm sorry?

MS. BROWN:  Are we off the record, or are we on the record?

THE COURT:  Yes.  Well, you're always on the record, but if you want to --

MS. BROWN:  Can I walk away for five minutes while he sets that up?

THE COURT:  Sure.

DIRECT EXAMINATION OF ANGUS WYMAN MACDONALD

BY MR. BURCHER:

Q.    Good afternoon, Mr. Macdonald.  Could you please state your full name for the record?

A.    Angus Wyman Macdonald.

Q.    And how are you currently employed?

A.    I am self-employed as an architect.

Q.    And what's the name of your company?

A.    Macdonald Architecture & Technology.

Q.    And you've graduated from college, correct?

A.    Yes.

Q.    Where did you go to college?

A.    Yale University.

Q.    And did you receive any advanced degrees after college?

A.    Yes, I did.  I received a Master's of Architecture from the Yale School of Architecture.

Q.      And when did you begin working as an architect?

A.      In 1973 in Virginia.

Q.      And did you work prior to that in another state?

A.      Yes.  I've worked in New York, in Illinois, and in Jamaica, West Indies.

Q.      And since becoming licensed in Virginia as an architect in 1973, have you been continually licensed and active as an architect?

A.      Yes, I have.

Q.      I would like to pull up Exhibit 146, Defendant's Exhibit 146.

        MR. COUGHLIN:  I'm going to have him identify his curriculum vitae and move that in.

        THE COURT:  Fine.

BY MR. COUGHLIN:

Q.      In a moment your report will come up on the screen, and could you turn to the last five pages of that?

        Mr. Macdonald are the last five pages of your report, shown in Defendant's Exhibit 146, your curriculum vitae?

        You need to look at the screen.

A.      Oh.

Q.      There's one actually next to you.

A.      Okay.  Yes, it is.

Q.      And is it a current and accurate reflection of your employment history and your work and professional experience?

A.      Yes, sir.

        MR. COUGHLIN:  I move to have admitted the last five pages of Exhibit 146.

        THE COURT:  Any objection?

        MR. LYNCH:  No.

        THE COURT:  It's received.

        (Defendant's Exhibit 146, last five pages, admitted into the record.)

BY MR. COUGHLIN:

Q.      Mr. Macdonald, what type of projects have you worked on throughout your career?

A.      Well, I was the chief inspector for Wegmans stores in Virginia, and I have also worked doing houses, earth shelter buildings, one of the largest industrial renovations in Virginia, so industrial as well.  I've worked on hospitals, schools, and offices.

Q.      And could you either bring the microphone just a little bit closer or --

A.      That better?

Q.      That's better.  Perfect.

        And how many single-family or townhouse homes have you drawn as an architect in your career?

A.      Wow.  Probably 4 to 500.

Q.      Okay.  And have you ever testified as an expert witness previously?

A.    Yes, I have.

Q.    Roughly how many times?

A.    Four times.

Q.    And were you serving as an expert in the field of architecture in those cases?

A.    Yes, I was.

Q.    And as an architect, are you permitted to design structural features for a residential home?

A.    Yes.  I have what is called an AE license, which is architecture and structural engineering for residences and light commercial.

MR. COUGHLIN:  And Your Honor, I move to have Mr. Macdonald accepted as an expert in the field of architecture.

THE COURT:  Any objection?

MS. BROWN:  I object to the extent he will be offering an opinion as to the lintel and the kitchen beam as Mr. Macdonald specifically testified in his deposition that he would not be offering an opinion as to the lintel or the kitchen beam and that he hadn't performed any independent calculations.

THE COURT:  Okay.

MR. COUGHLIN:  Your Honor, in his report he discusses those two items specifically, and he's indicated that he can speak to items, so I mean -- I think if that differs from his deposition testimony, that's something that she can bring up in cross, but I think it's been disclosed, you know, adequately.

THE COURT:  If somebody says, I'm not going to testify about it, in their deposition, then they don't inquire any further and they haven't had the opportunity to test his opinion.

MR. COUGHLIN:  Fair enough, Your Honor.  I honestly don't recall seeing that, and that's an honest statement.  If there is an actual citation...

MS. BROWN:  I have the citations right here.

THE COURT:  Okay.

MS. BROWN:  I have something else.  May I?

THE COURT:  I guess -- I was going to say we could wait for a while and do it at the break, but go ahead.  Where is that in his deposition?

MS. BROWN:  While he looks at that, I also would note that it's not like there's any sort of intensive opinion in his report.  We just have the chart that we looked at yesterday -- well, we looked at excerpts of it, but there's minimal analysis in his -- in Exhibit 45.

THE COURT:  Well, you had the opportunity to depose him, and...

MS. BROWN:  Yes, Your Honor, and as I just stated, during at a time he -- okay, so lintel --

THE COURT:  You're saying he had minimal things to say about those two objects?  Okay.  Go ahead.  Show it to Mr. Coughlin.

MS. BROWN:  "You're not offering an opinion on the

lintel?"  165, line 5 through 14.

And on 166, 16 through 18, he says -- I'm sorry -- 165, 5 to 14.

MR. COUGHLIN:  Okay.

MS. BROWN:  And then if we --

MR. LYNCH:  Okay.

MS. BROWN:  161 through 18, that's where he says he didn't perform the calculations as to the lintel.

MR. COUGHLIN:  The garage, right.  For the garage, talking about.

MS. BROWN:  16 through 18 of 166.

MR. COUGHLIN:  All right.  Well, so we can go back to kitchen.

THE COURT REPORTER:  Your Honor, may I go off the record?

THE COURT:  Yes.  I'm sorry.  This is off the record.  Thank you.

(Discussion had off the record.)

MR. COUGHLIN:  Your Honor, there's I think agreement on the two issues that were ready raised.  They raised a third issue, and it relates to something else.  I'll let them make their objection and then respond.

THE COURT:  All right.  Ms. Brown or Mr. Lynch.

MR. LYNCH:  Just for this part, Ms. Brown will be handling.  May I use your transcript, please.

THE COURT:  I'm sorry if I called you Ms. Wilson a little

while ago.

MS. BROWN:  That's fine.  I've already forgiven you.

THE COURT:  All right.  Thank you.  I hope it doesn't happen again.

MR. LYNCH:  So I asked Mr. Macdonald at his deposition, and this is a quote from page 164 of his deposition transcript: "Are you offering an opinion that he complied with applicable permitting laws with respect to this project?

"I don't think I can make an independent opinion about that."

THE COURT:  Okay.

MR. COUGHLIN:  And, Your Honor, in his reports he references that he reviewed the permits that were issued and the inspections, and I will not have him testify as to, you know, a legal opinion as to the -- you know, whether those, you know -- whether the work and permits complied with, you know, Virginia law and the Arlington County ordinances, but I do think he can talk about the permits that he reviewed, when they were issued, the inspections that occurred, when they occurred, and his understanding of the work that they related to in this case.

THE COURT:  I'll allow him to testify to that and you can cross-examine him on his opinions further if you choose to.  All right.  You've worked out those remaining issues, the two items that he will or will not testify to?

MR. COUGHLIN:  Yes.

THE COURT:  And he won't --

MR. COUGHLIN:  Well, I will limit his testimony regarding the kitchen lintel, and of course if they think I haven't, then they can object, but I --

THE COURT:  All right.

MR. COUGHLIN:  -- commit to the Court that I will, and then we will not have him testify related to the garage lintel.

THE COURT:  All right.  All right.  I find that he's qualified to give the remaining opinions based on his report and qualifications.  So please proceed.

BY MR. COUGHLIN:

Q.    Okay.  Mr. Macdonald, have you assisted clients of yours in the -- in obtaining permits as an architect?

A.    Oh, yes.

Q.    And describe why you would be involved in that and your involvement.

A.    In submitting data, in order to get a building permit, very often there are application forms along with the drawings. Of course, we supply the drawings, but very often the application forms have technical data required, and that is something we help with.  So we help the client fill out the technical parts of the application, as well as provide the drawings for submission.

Q.    Okay.  And so you've assisted -- so you've assisted clients in submitting building permit applications?

A.    Yes.

Q.    Have you ever been involved in the inspection process for a project that you're working on --

A.    Yes.

Q.    -- meaning the local jurisdiction inspection process?

A.    Yes, that's right.

Q.    Describe that experience.

A.    Well, I design buildings using ferro-cement and galvanized steel studs as a very strong method of creating earthquake-, hurricane- and fire-resistant structures.  Local jurisdictions very often are not familiar with this kind of structure, and so I have guided inspectors through the job on their first visit to show them how it works and why it conforms to code.

Q.    Did you -- you prepared a report in this case giving your opinions as an architect, correct?

A.    Yes, sir.

      MR. COUGHLIN:  Could you pull up the beginning of this document?

BY MR. COUGHLIN:

Q.    Is the document up on the screen your report dated December 30th, 2019?

A.    Yes, sir.

Q.    I'm not going to have you read from it.  When did you first visit the property?

A.     Mid-December 2019.

Q.     And the property we're speaking of is 6122 Lee Highway?

A.     That's correct.

Q.     And was that the only time that you visited the property?

A.     Yes, sir.

Q.     And did you -- did you speak to Mr. Deluca about the work that he undertook at the property?

A.     Yes.  Mr. Deluca guided us through the building.

Q.     What's your understanding of the scope of the work that Mr. Deluca undertook at the property?

A.     It is a renovation of an historical home, and it includes an addition, second-story addition to the house, as well as a powder room on one side and an entry, I think it is, on the other end of the house.  So it is both a structural and an aesthetic renovation.

Q.     And did you -- did you ultimately review the permits that were applied for and issued with respect to this property?

A.     Yes, I did.

Q.     And did you review the inspections with respect to the property?

A.     Yes, I saw inspection cards as part of Mr. Deluca's exhibits.

Q.     Okay.  And going forward, you know, you're not to give a, essentially, legal opinion on, you know, the compliance.  We just want to talk about those permits.

MR. COUGHLIN: So could you please pull up, Mr. Burcher, Exhibit 426?

I'll go back to the white board because we need to have the exhibits up. Your Honor, I'm going to use the white board, giver it a shot. May I move it a little closer to me?

THE COURT: Yeah, sure.

MR. COUGHLIN: Thank you.

BY MR. COUGHLIN:

Q. Mr. Macdonald, could you please identify the document that is in front of you?

A. This is a search of the Arlington County records as to this project in terms of permits.

MR. COUGHLIN: And would you please, Mr. Burcher, go to the next page.

BY MR. COUGHLIN:

Q. Does this document work backwards and report the earliest permits that were filed?

A. That seems to be the case.

Q. What was the first building permit that was applied for? If you could give me, somewhat slowly, the letters and numbers associated with it so that I can write it down.

A. Okay, it is number B1803016.

MR. COUGHLIN: Can Your Honor see this?

THE COURT: I can see, yeah, and I can get up if I can't.

BY MR. COUGHLIN:

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

Q.      And when was that -- when was that applied for?

A.      The 29th of October, 2018.

Q.      And what's your understanding of what that permit was for?

A.      That permit is to demolish existing bathrooms and kitchen and replace same; in other words, rebuild the bathrooms and kitchen in the house.

Q.      All right.  What's the next building permit that was applied for?

A.      That would be B1901108.

Q.      And when was that applied for?

A.      And that was applied for on the 22nd of April, 2019.

Q.      22nd of April?  When was the permit ending in 3016 issued?

A.      It was issued on the 29th of -- I'm sorry, on the 3rd of April, 2019.

Q.      And when was the permit ending in 1108 issued?

A.      That was issued on the 4th of June, 2019.

Q.      And what was the permit ending in 1108 for?

A.      That was for adding a master bedroom suite to the second floor of the rear of the house.

Q.      So as of June 4th, 2019, there were two building permits issued, one to demo the kitchen and baths, and then one for the addition, correct?

A.      Yes, sir.

**Q.**     Were there any mechanical permits that were issued for the project?

**A.**     Yes, there were.

**Q.**     What is the number associated with the mechanical permit?

**A.**     It starts with M, and it's on page 1, I think.

**Q.**     If you could read the -- all of the numbers that go after the M.

**A.**     Oh, sorry.  It starts at the top of the page, page 2, and it's M1900548.

**Q.**     And when was that actually issued?

**A.**     It was applied for and issued on the 23rd of April, 2019.

**Q.**     And at the time that it was issued, what was the only building permit that was active at the property?

**A.**     That would be the B18030186 permit.

**Q.**     Okay.  Were there any electrical permits issued at the property?

**A.**     Yes.

**Q.**     And what electrical permit was issued for the property?

**A.**     E190017 -- sorry, 1901071.

**Q.**     And when was that issued?

**A.**     It was issued on the 4th of September, 2019.  I'm sorry. I got that wrong.  It was issued on the 9th of April, 2019.

**Q.**     All right.  And then were there any plumbing permits that were issued -- well, let me ask you this question:  At the time that the electrical permit was issued, what was the only active

building permit at the property?  So as of April --

A.      Again that was B1803016.

Q.      Okay.  And then were there any plumbing permits issued
for the property?

A.      Yes.

Q.      What plumbing permits appear on this page?

A.      P1901124 and P1901125.

Q.      And when were they issued?

A.      They were both issued on the 4th of April, 2019.

Q.      And again, the only active permit at the property was the
permit for the demoing of the kitchen and bath, correct?

A.      Yes, sir.

Q.      All right.  Did you also review the inspection cards
associated with the property?

A.      Yes, I did.

        MR. COUGHLIN:  If you could please blow up Defendant's
Exhibit 183.

BY MR. LYNCH:

Q.      Mr. Macdonald, please identify this document.

A.      This is the mechanical inspection.

Q.      And when did --

A.      And it -- I'm sorry.

Q.      Sorry.

A.      It approves the rough-in of mechanical.

Q.      And what mechanical permit number is identified there?

A.      M1900548.

Q.      So that was approved, you said, on 2019.  And this card says "Rough."  What does that mean?

A.      Services are first wired or piped through the walls and that is called rough plumbing or rough electrical or rough mechanical when the ductwork is in.  The fixtures are then part of the finish work.  So first you put in the skeleton of the service, whether it's electrical, plumbing, or mechanical, and then as a second project, once you have put in your drywall and your finishes, you put your fixtures on the wall or your plugs in the wall, that kind of thing.

Q.      And so is this an approved inspection for the rough mechanical associated with the kitchen and bath renovation?

A.      That's right, so the significance of that is that the drywall may now be put in place because the skeleton of the service has been approved.

Q.      And what part of the home did this relate to, this inspection, in reviewing this card based on your understanding?

A.      This is related to the same building permit that was in place at that time, which the permit for the kitchens and bath renovations.

Q.      All right.  Let's turn to Exhibit 182.  Did you also review an inspection card associated with an electrical component?

A.      Yes, I did.

Q.    Is the document in front of you, which is Defendant's Exhibit 182, that card?

A.    Yes.

Q.    And when did -- what is -- if you could say what this card, you know, means as it relates to this project.

A.    Okay.  This card shows an approval for "concealment" -- that's the note where it says "Type of Inspection" -- for the electrical work on the project.  So it signifies that the electrical skeleton is in place; that is, the wires and boxes for plugs, switches, and outlets are all in place, and that the drywall may be placed to finish out the building.

Q.    And when was this inspection taken --

A.    That was performed on the 30th of April, 2019.

Q.    And at that time, what was the only building permit that was in place?

A.    That would have been the 1803016 permit.

Q.    And do notes help you understand what portion of the house this related to?

A.    Yes.  The notes talk about, Add floor receptacles to the main level along the rear of the house, add GFCI, which means ground fault reset, to the master bedroom, and it says, "need to revise plans prior to framing inspection," because the "plans do not match field."

Q.    Okay.

A.    So it means there's a deviation in the framing.

Q.     So for this electrical permit, what portion of the house do you believe this si -- for this electrical permit inspection, what portion of the house do you believe this is pertaining to?

A.     I believe this is for the kitchen and bath renovations.

Q.     All right.  And then was there also a plumbing inspection that occurred?

A.     Yes.

Q.     Could you please turn to Plaintiffs' Exhibit 447?

MR. COUGHLIN:  Let's go to 6123 -- might have to back up.  See what that...

THE COURT REPORTER:  I'm sorry, Counsel.  I can't hear you.

MR. COUGHLIN:  Sorry.  Go to 61263.  447.  Go to 61263.

BY MR. COUGHLIN:

Q.     So, do you see that permit number -- well, first of all, what is this document that you're looking at?

A.     This is an inspection certificate from the Arlington County digital record of field inspections.

Q.     And does this relate to 6122 Lee Highway?

A.     Yes, it does.

Q.     And what permit number is it referring to?

A.     Plumbing permit 1901125.

Q.     And were there any inspections done under this permit?

A.     Yes.  At the bottom of the page it says, "Completed Inspections," "Rough Plumbing."

Q.      And what date is that?

A.      That is on the 5th of April, 2019, "Approved."

Q.      And what portion of the house do you believe that relates to?

A.      Again, this would be the kitchen and bath renovation permit.

        MR. COUGHLIN:  Can we turn to Exhibit 184.  Plaintiffs' Exhibit -- I'm sorry, Defendant's Exhibit 184.

BY MR. COUGHLIN:

Q.      Mr. Macdonald, would you please identify the card that appears at the top of exhibit -- Defendant's Exhibit 184?

A.      Yes.  This is, Framing, concealment for rough mechanicals.

Q.      And what -- what permit numbers are identified there?

A.      Okay.  This is three permits.  The mechanical permit, M1900548; electrical permit, E1901071; and building permit, 1901108.

Q.      So, were there separate mechanical and electrical permits issued associated with the addition, to your knowledge?

A.      No, sir, I think they considered it a single installation.

Q.      And -- so what portion of the house do you believe these inspections are related to?

A.      Well, based on the permit number and the previous permit, this would be in relationship to the kitchen and bath

*890*

renovation, as well as the master bedroom addition.

Q.    Okay.  Do you believe that these inspections related to the addition as well?

A.    Yes, I do.

Q.    And is there anything shown on this card that relates to -- I'm sorry, what date was this -- did this inspection occur?

A.    So this inspection was on the 11th of June, 2019.

Q.    Okay.  And then is there anything in the notes you can discern that speaks to any sort of plumbing inspection that occurred on this date?

A.    Yes.  So the reason I say that this particular inspection is a dual inspection covering both of the building permits in force at that time, is the first plumbing note says, "firestop all plumbing."

Q.    Okay.

A.    The second note says, "all framing okay less fireplace area."

Q.    Okay.  Was there a plumbing inspection that ultimately occurred in the addition?

A.    Yes.

Q.    Could you please turn to Plaintiffs' 447.  We're at 61268.  Start there.

A.    61268?

Q.    61268.  Was a new plumbing permit issued with a different

number for the addition?

A.   Yes.  This was issued on the 11th of June.

Q.   And what's the number associated with it?

A.   And the number is P1901861.

Q.   I'm sorry, when was that issued?

A.   11th of June, 2019.

Q.   And why do you say that it relates to the addition?

A.   Because the work in the description relates to the fixtures that were added to the master bedroom suite, "shower," "sinks," "tub," "washing machine," "water closet," and it says also "water pipes."

Q.   And could you turn to the next page.  Was a rough inspection, under this plumbing permit, did that occur?

A.   Yes, it did.  On the 12th of June, rough plumbing was approved.

Q.   Have you ever heard of the term "MEP" before?

A.   Yes, sir.

THE COURT REPORTER:  Say that again, please.

BY MR. COUGHLIN:

Q.   Have you ever heard the term "MEP" before?

A.   Yes.

Q.   What does it stand for?

A.   Mechanical, electrical, plumbing.

Q.   For the -- the original house, the kitchen and bath, were there complete inspections of the mechanical, electrical, and

plumbing that occurred?

A.     Yes.

Q.     For the addition, were there rough-in inspections that occurred for the mechanical, electrical, and plumbing?

A.     Yes.

Q.     Okay.  Thank you.  When those three trades have their inspections approved by the County, what then is a contractor to do next?

A.     The contractor may go ahead and place his insulation in the walls, and he may close in the walls, putting up drywall or whatever interior finishes are in the program.

Q.     Okay.  You mentioned insulation.  Could we turn to Exhibit 184, Defendant's Exhibit 184.

       Did an insulation inspection at the property occur and, if so, when?

A.     It occurred on the 14th of June, 2019, and it was approved.

Q.     And is there a note in that insulation inspection?

A.     Yes, there are two notes.  One says, "provide foam certificate."  That means the County wants a record from the installer of the R-values for the foam insulation, and two, it says, "weather seal around headers and porch studs."

       MR. COUGHLIN:  Your Honor, I'm not sure we moved in Exhibit 184 previously, so I would like to have that moved into evidence.

THE COURT:  Yeah.  It's already in, I thought it was.
Yeah, it's in.

MR. COUGHLIN:  It's already in?

THE COURT:  It's in.

MR. COUGHLIN:  Thank you, Your Honor.

BY MR. COUGHLIN:

Q.    Can we please move to Defendant's Exhibit 143.  Have you
reviewed the foam certificate for the property?

A.    Yes, I have.

Q.    What's the document in front of you?

A.    This is a typical insulation certificate, which is
required now in Virginia because of the new energy code.

Q.    And does this relate to 6122 Lee Highway?

A.    Yes, it says "6122 Lee Highway, Arlington, Virginia."

Q.    And what are we to take of this certificate as it relates
to the property?

A.    Well, this shows the approximate square footage of closed
cell and open cell foam applied to the structure for exterior
walls and roofs.

Q.    And is this -- is this consistent with the code, the
building code?

A.    Yes, sir.

Q.    So if one were to submit this to Arlington County, if it
hadn't been submitted, would that satisfy the comments on the
earlier card?

A.      Yes, it would.

        MR. COUGHLIN:  Your Honor, I would like to move that Defendant's Exhibit 143 into evidence as well.

        THE COURT:  Any objection?

        MR. LYNCH:  No objection.

        THE COURT:  It's received.

        (Defendant's Exhibit 143 admitted into the record.)

BY MR. COUGHLIN:

Q.      Were there some other kind of miscellaneous plumbing permits issued at the property?

A.      Yes.

        MR. COUGHLIN:  Could we turn to Exhibit 447.  Go to 61264.

BY MR. COUGHLIN:

Q.      Could you please identify the document in front of you? This is part of Exhibit 447 at page 61264.

A.      This is a page from Arlington County's digital inspection report regarding the property.

Q.      And is there a permit number identified?

A.      So, it talks about plumbing permit number 1901604, and that is for the "Building Sewer" and "Water Service."

Q.      And when was that applied for?

A.      That was applied for on the 16th of May, 2019.

Q.      And can you tell when it was approved?

A.      Maybe go to the next page.  I need to see the next page. Thanks.

So the sewer and the water service and the final plumbing, rough-in of final plumbing, were all approved on the 17th of May.

MR. COUGHLIN:  Okay.  And then we go to 61266.

BY MR. COUGHLIN:

Q.    Could you please review this document and then answer what type of permit this is for.

A.    This again is for plumbing.

Q.    And what's the permit number?

A.    And the permit number is P1901787.

Q.    And what does this appear to be for?

A.    This is for adding the water service to the project, as well as a backflow preventer and a sprinkler system to the lawn.

Q.    And when was this applied for?

A.    And this was applied for on the 4th of June, 2019.

Q.    And when was this approved?

A.    May I see the next page, please?  So this was approved -- rough-in final plumbing approved on the 23rd of September, 2020.

MR. COUGHLIN:  And then if we can go to page 61270.

BY MR. COUGHLIN:

Q.    What permit does this relate to on the screen?

A.    This is permit number 1902902, and it's for the boiler.

Q.    When was this applied for?

A.    And this was applied for on the 5th of September, 2019.

Q.    And when was it finaled?

A.      If you turn the page I can tell you.  So the rough-in final plumbing was approved on the 16th of September, 2019.

Q.      Thank you, Mr. Macdonald.

THE COURT:  All right.  Why don't we take a break now.  Does that work?

MR. COUGHLIN:  Yes.

THE COURT:  Okay.  Let's take our 15-minute mid-afternoon break at this time.  We'll come back at 5 minutes after 4.  All right.  We're in recess.

(Thereupon, a recess in the proceedings occurred from 3:52 p.m. until 4:00 p.m.)

THE COURT:  Please continue.

BY MR. COUGHLIN:

Q.      Mr. Macdonald, did you also review the plans that were ultimately approved on December 16th of 2019 for the main house?

A.      Yes, I did.

Q.      And did you look at photographs of the property during the course of the work?

A.      Yes.

Q.      How many photographs, roughly, would you say that you reviewed?

A.      Might have been 20.

Q.      Right.  And did that span over a period of time, showing the progress of the work in the property?

A.      That's correct.

Q.    Did you review any inspection reports that were provided by the Harrells to Mr. Deluca?

A.    I don't think so.

Q.    All right.  Did you ultimately review -- well, backing up, what was the status of the work when you visited the property in December?  I mean, just give a characterization of, you know, the status of the project.

A.    The rough framing was complete.  The services were in place.  The doors and hardware were in place.  The finishes were basically complete.  There were probably areas that were still being finished.

The exterior was complete.  I think the wall along the road was complete.

Q.    It looked, though, like a finished job?

A.    It was very close to being finished.

Q.    Okay.  And did you review the report of Matthew Furlong?

A.    Yes, I did.

Q.    And did you come up with your own action items, if you will, as compared to Mr. Furlong's report?

A.    Yes.  I tried to help by sorting out the items of the four reports that were made, as to which ones the builder should take action on regarding the building code.  Yeah.

Q.    Okay.  And how many items did you end up agreeing with as it relates to the {indiscernible} report?

A.    I think I --

THE COURT REPORTER:  I'm sorry.  Could you repeat your question.

BY MR. COUGHLIN:

Q.    How many items did you end up agreeing with as it relates to the Furlong report?

A.    As relates to all four of those reports, I found 67 items that required action by the builder.

Q.    When you say "all four," did you also review a report prepared by John Catlett?

A.    Yes.

Q.    Did you review a report prepared by Shayan Amin?

A.    Yes, I did.

Q.    And did you review a report prepared by Matthew Bowe?

A.    Yes.

Q.    Okay.  And so after reviewing all four of those, there were 67 action items, in your opinion?

A.    Yes.

Q.    And is that common -- a common number of action items for a project like this, a renovation project?

A.    If I were to compare it with another project, I'd say this is a large number of action items, and the reason I think that is, the items were specifically identified by professionals whose job it is to find errors in a builder's work.  That's one thing.

Another reason is there are four of those people working

on this project, so some of these items are redundant.

And the last reason is the job was unfinished at the time, and so naturally there are unfinished items in a project during construction.

Q.    Correct.  So I'm going to pull up just one item in particular.

MR. COUGHLIN:  In the Furlong report, item 12.5, tile.

BY MR. COUGHLIN:

Q.    There were items in the Mr. Furlong report ultimately that you did not agree with, correct?

A.    I did not feel that builder action was required on all the items.

Q.    Okay.  In a moment we're going to pull up one of the items I believe you disagreed with.  Do you remember seeing anything about marble tile installation in the report?

A.    Yes, I think there was one item that took exception to the marble tile being installed over hardwood flooring in a bathroom.

Q.    And did you agree or disagree with Mr. Furlong's opinion that the marble tile needed to be removed?

A.    I disagreed that it needs to be removed.

Q.    Why?

A.    Well, the reason for that is for one thing, it's not a code issue.  There's no reason that you cannot install marble tile over hardwood, but on the other hand, the industry standard

that was quoted shows almost an identical installation method as to what was used.  So the layers are the hardwood, sealed with waterproofing or some protective coating, and then waterproof cement, which is tile grout, and then the tile.

Q.   Could you --

A.   So the industry standard states this, which was shown by Mr. Furlong, but when you look at the installation, that's pretty much more or less what you see, so in some cases I just think these are nitpicking issues, not serious construction issues that require -- that have anything to do with the durability of the job or the safety of the occupants.

MR. COUGHLIN:  Could you please turn back one page.

BY MR. COUGHLIN:

Q.   If you could turn to the screen.  Is this the industry standard that you're referring to, item 12.5, page 149 of page Mr. Furlong's report, which is Plaintiffs' Exhibit 58?

A.   Yes, it is, yes, sir.

MR. COUGHLIN:  And then if you could turn to the next page.

BY MR. COUGHLIN:

Q.   Does the next page show the tile installation that you found acceptable?

A.   Yes.  So what this picture shows is hardwood floor that has been protected and coated with a grout and then marble tile laid, Thin-Set on the grout layer.

Now, if you turn back to the industry standard drawing, although they have a lot more ingredients there, they're showing this structure and the subfloor and all those things, but if you look at the requirements, there's basically -- in fact they're allowing you to do this on plywood, which is not nearly as resistant to expansion and contraction due to moisture, which would be the issue with the subfloor.

So if we have a hardwood floor that is protected against water, then we're much better off than we are if we put it on plywood, but anyway, the industry standard shows plywood, then the Portland cement mortar, then a backer board and then the membrane, which they say is optional, and then a bond code and the natural stone tile.  This is pretty much what you see in the photograph.

Q.    Okay.

A.    So what's the problem, is my issue with this?  It's not that I disagree with it, I just don't think that it's -- I don't think it needs action by the builder to increase the value or the quality of the project.

Q.    And did you also see in the reports opinions by the Harrells' experts related to a kitchen beam installation?

A.    Yes.

Q.    What comments, if any, do you have on -- in reply to the kitchen beam installation opinions of their experts?

A.    I think that Mr. Deluca did the correct thing when he

found that that was an issue.  He had the designer of the beam, which is a registered engineer, come back and look at the installation and make sure that it meets his requirements.

So he basically got a certification of the structure.

MR. COUGHLIN:  Can we pull up Defendant's Exhibit 53?  Defendant's Exhibit 53.

MR. BURCHER:  Sorry.

BY MR. COUGHLIN:

Q.    Please look at Defendant's Exhibit 53.

A.    Yes.

Q.    Is the top paragraph -- well, first of all, what is this document that you're looking at?

A.    This is a sealed certification letter by Andy Fulambarkar of Soil & Structure Consulting, who was the authors of the drawing set by which the building was built.

Q.    And what, if anything, does it say about the kitchen beam?

MR. LYNCH:  Your Honor, I'm going to object.  They claim to admit this.  This is hearsay.  You asked for Fulambarkar, so I object to the admission of this exhibit.

THE COURT:  Mr. Coughlin.

MR. COUGHLIN:  Your Honor, it's not being offered for the truth of the matter asserted; it's to indicated that Mr. Deluca took certain action in response to comments from the County.

THE COURT:  That Mr. Macdonald thinks that that was the

appropriate action to take?

MR. COUGHLIN:  Correct.

THE COURT:  All right.  So it's not being moved for admission?

MR. COUGHLIN:  Well, okay.

BY MR. COUGHLIN:

Q.    So is this the letter that you're referring to that you believe the builder needed to have in hand as it related to the kitchen beam?

A.    Yes.

Q.    Okay.

MR. COUGHLIN:  Your Honor, I do want to move it into evidence.

THE COURT:  Well, it's hearsay, right?

MR. COUGHLIN:  But it's not being offered for the truth of the matter asserted; it's being offered to indicate that Mr. Deluca took an action in response to a comment from the County, which, you know, has been discussed earlier in the case.

THE COURT:  All right.  I'll admit it for that purpose.

MR. COUGHLIN:  Thank you.

(Defendant's Exhibit 53 admitted into the record.)

BY MR. COUGHLIN:

Q.    So, going back to the permit board, do you find, as it relates to the main house, gaps or admissions as it relates to the permits and inspection of the property?

A.    No, sir, I do not.  I find that there is an optimum number of inspections and a great many number of permits, 14 permits, plumbing, building, mechanical, and electrical, and over seven inspections, so there very unlikely would be a gap.

And the reason I say that is, when an inspector comes to a property, he's not got blinders on looking only at the work under permit 0910; his eyes are all over the building.  He's an inspector.  His job is to find any deviation from building code, and so if an inspector comes to inspect the mechanical under one permit and there's work that's under another permit that is not suitable, of course he's going to say something.  That's his job.  He's there for that reason.

So I don't think there are gaps in fact.  There may be gaps in the paper trail, but the result is a fully inspected building.

Q.    Are you aware of any stop work orders being issued on the project?

A.    No, and that would be what an inspector would do.  If he found a deficit in one of the services in rough-in inspection or something and Mr. Deluca covered it over after he said not to, the work would be stopped.

Q.    And do you think it would be justified to tear down all the drywall in the house and rip out all of the mechanical equipment in the property?

A.    Absolutely not.

Q.    Why not?

A.    Because it's been inspected and covered over after an approved inspection.  We have an approved mechanical rough-in.

Q.    Is the same true for the electrical and plumbing facilities in the house?  Would it not be justified to rip all of those out as well?

A.    It would not be justified.

MR. LYNCH:  I object.  I mean, to the extent this touches on damages, he definitely was disclosed on that.

THE COURT:  He's being asked from the perspective of the permits and the inspections, so overruled.

BY MR. COUGHLIN:

Q.    How would you characterize the work -- the quality of the work that you observed in the house?

A.    I observed very high-quality work.

Q.    And what elements of the house finish did you find to be high quality?

A.    The trim, the finished surfaces, the design.

Q.    Okay.

A.    Doors and windows, hardware, things of that nature, all of high quality, appliances, fittings, and fixtures.

Q.    And does the inspection and permitting process inform your opinions at all relating to the quality of finish and the product that was, you know, in the process of being finished and delivered?

A.      Well, okay.  So my opinion is based on what I saw when I made the inspection in December 2019.  From what I've seen of the inspections made by the County and the permits issued by the County, I would say that my opinion is backed up by the reality, but I was not there to look at the mechanical, electrical, and plumbing skeleton that was showing at the time that they inspected and approved for rough-in -- I mean, approved the rough-in for concealment.

So I was looking at the concealed or more or less finished building at that point in December, and it was a high-quality finish, and the project looked good.

Q.      And with those inspections in place -- well --

MR. COUGHLIN:  I have no further questions at this point, Your Honor.

THE COURT:  Mr. Macdonald, did you look at the Furlong report that he did and the photographs that depicted the either code or other violations from the Falcon Group there?

THE WITNESS:  Yes, sir.

THE COURT:  And you looked at all those?

THE WITNESS:  I did.

THE COURT:  And did you not notice some finishing work that needed to be repaired?

THE WITNESS:  Yes, I looked at each one of those, and I evaluated each issue that was brought forward as to what work would be required by the contractor --

THE COURT:  Okay.

THE WITNESS:  -- to finish the job.

THE COURT:  All right.  Thank you.

Cross-examination?

MR. LYNCH:  Yes.  I just need a minute to prepare everyone.  I wasn't expecting testimony on this topic, but we're quite ready.  We just have to organize ourselves a little bit.

Just a question, Your Honor.

THE COURT:  I'm sorry, go ahead.

MR. LYNCH:  Ms. Brown handled the Furlong issues, whereas I handled the permitting issues, so is it --

THE COURT:  You can split it up, if you want.

MR. LYNCH:  Thank you.

THE COURT:  That's fine.

MS. BROWN:  Let me pull up Exhibit 58, please.  Is there one of the Virginia building code books --

THE COURT REPORTER:  I'm sorry?

MS. BROWN:  Is one of the Uniform Virginia code books located over there?  There's just a couple of excerpts.  I don't think he's going to find any secrets in here.  I think it will be okay.

CROSS-EXAMINATION OF ANGUS WYMAN MACDONALD

BY MS. BROWN:

Q.    Good afternoon, Mr. Macdonald.

A.    Good afternoon, Ms. Brown.

Q.    So, I just want to make sure that I understood your testimony correctly that you're of the opinion that the trim, hardware, and other finishes at the property are of a high quality?

A.    Yes, that is correct.

Q.    Okay.  So, please go to page 160 of Exhibit 58, which is Mr. Furlong's report.  And actually, I'm going give you a binder because I want to make sure you can see this.

MS. BROWN:  And I will represent to the Court that the photos in the Furlong report in that binder, there's just more notations on the -- it will say like Plaintiffs' Exhibit is the one in the corner.  That's --

THE COURT:  Okay.

MS. BROWN:  I don't think it's --

THE COURT:  The photographs are the same?

MS. BROWN:  Yes, everything is the same.

THE COURT:  Okay.

MS. BROWN:  There are just some minor notations.

THE COURT:  You want Mr. Macdonald to look at the hard copy versus the screen?

MS. BROWN:  He can look at both, whatever is easier for you.  I just know that that screen can sometimes be cumbersome to look at.

THE COURT:  Okay.

BY MS. BROWN:

Q.      But we are on page 160 right now.  Do you consider that to be high-quality work?

A.      Not what's shown in those photos.

Q.      Let's go to page 161.  Is that high-quality work?

A.      No.

Q.      Page 155.  Do you consider that to be high-quality work? The?

A.      I consider that to be unfinished work.

Q.      Page 156, top of the page.  Is that high-quality work, that photo of the door handle -- or doorknob?

A.      No, that certainly is not.

Q.      You were deposed in this case by Mr. Lynch on April 28th, 2021; isn't that correct?

A.      I don't remember the date.

Q.      Okay.  But you were deposed?

A.      Yes.

Q.      Now, there's a chart attached to a report, and I have one in the pocket of that binder there you can take a look at, and that version is highlighted.

        MS. BROWN:  Walter, could you pull up Mr. Macdonald's report, Defendant's Exhibit 146, and go to that chart.

BY MS. BROWN:

Q.      So the first column of the chart -- well, first of all, I just want to make sure that I understand.  If we go to page 1 of your chart, there's a section on the far left-hand corner that

says "Furlong Report."

A.    Yes.

Q.    And then the next column is labeled "item," and from that section of page 1 through page 5 are your responses to Mr. Furlong's report; is that correct?

A.    Yes.

Q.    And the "item" column, that directly corresponds with the sections in Mr. Furlong's report that we just looked at, Exhibit 58?

A.    Yes, um-hmm.

Q.    Okay.  And then there's a "description" column after that where you provide a brief description of the issue within that section of Mr. Furlong's report?

A.    Right.

Q.    And at times you'll make comments in that section, correct?

A.    Yes.

Q.    And then the following column is "category," and in that section you identify either the work is "nonconforming," "conforms to code," "incomplete at time"; you make various comments like that, correct?

A.    Yes.

Q.    And then "remedy" is the following column, and that indicates whether you think that item should be fixed?

A.    "Remedy" column describes what the remedy would be.

Q.    Okay.  And the last column is "action."  My understanding is if if there's a "Y," that means you think the builder should take action?

A.    Yes.

Q.    Okay.  So all of the items, which I believe are highlighted yellow in your chart, where the category says "nonconforming," you agree that those are items that do not conform to the Virginia building code?

A.    That's my opinion.

Q.    Okay.  And all of the items where there's a "Y" next -- a "Y," those are items that the builder should correct?

A.    Yes.

Q.    Okay.  I want to talk a little bit about Virginia building code.  The intent and purpose of the Virginia building code is public safety and welfare; is that correct?

A.    Yes, it is.

Q.    Virginia Residential Code also -- or Virginia code also requires that subs must be licensed to perform mechanical, electrical, and plumbing work for safety reasons, right?

A.    That is correct.

Q.    And it's important to have a licensed subcontractor because that helps ensure that somebody unqualified isn't endangering their own life or the life and safety of others by performing work that they aren't qualified to perform; is that correct?

A.      Yes, I think so.

Q.      Do you agree that Mr. Deluca as a Virginia Class A contractor had a duty to comply with Virginia building code?

A.      Yes.

Q.      Do you believe, as a Virginia Class A contractor, Mr. Deluca had or should have had a working knowledge of the building code?

A.      Yes.

Q.      And Mr. Deluca was required to comply with the Virginia building code by the sales contract, correct?

A.      I don't remember the sales contract.

        MS. BROWN:  Okay.  Can we pull up Mr. Macdonald's -- sorry.  Pull up Mr. McDonald's deposition, please.  I'm going to go to --

BY MS. BROWN:

Q.      Okay.  So I'm looking at page 112 of Mr. Macdonald's deposition transcript, starting on line 19.  "So I'm asking under Exhibit 3 what construction obligations did he have under the contract?

        "Answer:  Under Exhibit 3?

        "Question:  Yeah, can we bring that back up again?

        "MR. LYNCH:  Let's bring up Exhibit 3.

        "MS. FERGUSON:  Objection to form.  The witness can answer if he understands the question.

        "THE WITNESS:  I don't understand it, I'm sorry.

"BY MR. LYNCH:  Question, That's okay.

"TECHNICIAN:  Exhibit 3 is on the screen.

"BY MR. LYNCH:  Okay, then, let's go to page 70 of this agreement, and let's go to the next page.  All right.  This document we are looking at now --

"Answer:  Yeah --

"Question:  -- Exhibit 3, what construction obligations did Mr. Deluca have under this document?

"Answer:  So where in the agreement does it say that he has an obligation to complete the items shown here in Exhibit B, Number 3?

"Question:  I don't know.  You are the expert.  You are the expert.

"Answer:  I am not the lawyer.

"Question:  Yeah.  So you have offered an opinion about what the scope of his obligations were contractually to perform construction, and I'm asking you, as an expert on that topic, what obligations did he have under this document, Exhibit 3?

"Answer:  It depends on the relationship between this document and the post-contract for construction.

"Question:  Okay.  But before that post-closing construction document was executed, I mean, he signed this contract, and he was paid under this contract, isn't that correct?

"Answer:  If it is correct" --

MR. COUGHLIN:  Objection, Your Honor.  I'm sorry.  I'm kind of lost where we're impeaching a witness, or are we just reading a deposition transcript into the record.

THE COURT:  Yeah, agreed.

MS. BROWN:  Okay.  We'll let's just go -- skip to 115, line 7.

MR. COUGHLIN:  I'm sorry, Your Honor.

THE COURT:  115, line 7.  The question was -- I lost the question as well.  Why don't you reask the question.

MS. BROWN:  My question was whether under the sales contract he -- Mr. Deluca had an obligation to comply with Virginia building code.

THE COURT:  Okay.  And your answer to that today is what, Mr. Macdonald.

THE WITNESS:  Under the sales contract?  I'm not sure what that contract says in relationship to the building code.

THE COURT:  Okay.  Do you want to show him the sales contract?  You haven't established that he --

MS. BROWN:  Sure.

THE COURT:  -- hasn't answered it any differently than he did before.

MS. BROWN:  Exhibit 3, please.

(Discussion had off the record.)

BY MS. BROWN:

Q.    This is Deposition Exhibit 3.  And Walter can scroll down

for you so you can look through it.  Do you remember looking at this document during your deposition?

A.     No, ma'am.

THE COURT:  Mr. Macdonald, what are you looking for in the sales contract which would assist you in answering the question that Ms. Brown has asked?

THE WITNESS:  I think Ms. Brown has asked me what obligations Mr. Deluca might have in this sales crack -- this sales contract in relation to the Virginia building code.

THE COURT:  Correct.

THE WITNESS:  And I don't see a reference to it in the contract.

THE COURT:  All right.  Ms. Brown, if there's a reference, why don't you show it to Mr. Macdonald or just move on.

MS. BROWN:  Well, I would like to remind him of the answer that he stated in his deposition, and I have a pinpoint cite.  I unfortunately had to run through a little bit too much there earlier.  So if I could just read what he said after we asked him whether or not it applied.

THE COURT:  Okay.  If you asked him that question and he answered it in the deposition, you may impeach him with the deposition.

MS. BROWN:  Okay.

BY MS. BROWN:

Q.     So on page 15, Mr. Macdonald responded, "So in my mind,

he has an obligation to, one, build according to the building code or better; two, build according to the drawings or more; and 3, build according to the post contract for construction. If that document refers to this Revised Exhibit B, Number 3, then it would seem to me that these items, in whatever form he put them in, would be part of his job."

Now, if the construction specifications are silent as to --

THE COURT:  So what's the followed up question?  Is that -- is that the answer you gave in your deposition?

BY MS. BROWN:

Q.    Is that the answer you gave in your deposition?

A.    Apparently.

THE COURT:  And does that change your answer that you've given here today?

THE WITNESS:  I'm sorry, I don't think I've answered the question because I don't know the reference, what reference the sales contract made to the building code.

THE COURT:  Was that Exhibit B-3?  Was that the sales contract?

MS. BROWN:  Yes.

THE COURT:  Okay.  So the B-3 that was shown to you in the deposition is the sales contract.

THE WITNESS:  Well, glancing through it, as it was presented just now, I don't see any reference to the building

code in that sales contract.

THE COURT:  Okay.  All right.  Then let's move on.

BY MS. BROWN:

Q.     If construction specifications are silent as to how a material or piece of equipment is to be installed, a contractor is to install according to the manufacturer's installation instructions; is that correct?

A.     I would say so generally, yes.

Q.     And you agree the Post Closing Construction Contract required Mr. Deluca -- I'm sorry, scratch that.  You agree that any new material that was to be installed on the -- that was installed on the project by Mr. Deluca was to be installed in accordance with the manufacturer's directions, correct?

A.     I think that's what we just said.

Q.     So let's go to Exhibit 58 at page 149.  This is Section 12.5 of Mr. Furlong's report.  It's the marble tile.  This is an item that you just raised, and you agree that this --

MS. BROWN:  Please go to the page 150 so we can see the tile.

BY MS. BROWN:

Q.     You agree that Mr. Deluca installed this tile?

A.     I'm not sure if he did.

Q.     Is it your understanding that Mr. Deluca installed this tile?

A.     Yes.

Q.      Did you review the tile manufacturer's instructions in opining that this item did not need to be corrected?

A.      No, I did not.

Q.      You agree that the marble tile installation does not meet the industry standards set forth in TCNA; is that correct?

A.      I just testified that I'm not sure it doesn't.

Q.      I'm sorry, can you repeat that?

A.      I testified a few minutes ago that the installation looks very much like the National Tile Association's directions, except that a better quality of wood is being used as the substrate.

MS. BROWN:  Pardon me.  I'm shuffling around several different papers up here.

BY MS. BROWN:

Q.      So on -- in your deposition you stated on page 32, line -- starting on line 20, "Would" --

"Question:  Would installing tile on modern plywood substrate be construction that conforms to customary industry standards for workmanlike construction?"

"Answer:  Probably not, at least not according to the TCNA, and those are the guys that make the tile."

Do you know what is under that tile?

A.      No, only from the pictures that Mr. Furlong took.

MS. BROWN:  All right.  Let's go to 12.6.  That should be on Exhibit 58.  That's page 151.  Thank you.

BY MS. BROWN:

Q.    So I'm looking also at your chart here, and 12.6 is on page 4.

A.    Um-hmm.

Q.    And you state in the description, "steam shower, not in accordance with manufacturer," and the "category" you state "in conformance with code"; is that correct?

A.    Yes.

Q.    And then you state "no remedy required by code," and you indicate that "no action is needed;" is that correct?

A.    That's correct.

Q.    This is inconsistent with your opinion that manufacturer's instructions should be followed, isn't it?

A.    Not necessarily.  Let me explain the criteria which I used.  There were 267 items in these four reports, and I tasked myself with the job of trying to weed out or, let's say, simplify the actions required by Mr. Deluca because at that time we were considering some form of settlement, or the lawyers were considering some form of settlement.  So I was trying to help.

       And the criteria that I used -- the first criteria is, does it conform to building code.  In this case there is no building code conformance to tile substrate.

Q.    Okay.  Well, let's take a look --

       THE COURT:  Let him finish -- let him finish his answer, Ms. Brown.

**A.** Um-hmm.

**Q.** Since you -- you only visited the project site once; is that correct?

**A.** That's correct.

**Q.** And what was the date of that site visit?

**A.** I think it was in the middle of December.

**Q.** Okay. And since -- and that was December of 2020?

**A.** No, I think it was December 2019.

**Q.** 2019? Let's see if your report says it so I don't have to go back into the deposition transcript. What was the date of your expert report?

**A.** That's a good question. I don't have any papers with me.

**Q.** Okay.

MS. BROWN: Can you pull up Defendant's Exhibit 146, please, and you can look at the bottom of the page.

The first page, Walter. The bottom right-hand corner.

**A.** Okay. Well, I apologize, I'm mistaken. This was pretty long ago and I got mixed up.

BY MS. BROWN:

**Q.** No problem.

**A.** This is December 30th, 2020. So the visit was sometime during December 2020.

**Q.** Does December 17, 2020 sound right?

**A.** Yeah, it could.

**Q.** For the items -- I'm sorry. So since your December 17,

2020 site visit, you haven't gone back to inspect that the work
has been completed; is that correct?

A.     That's correct.

Q.     There are also numerous items in your report where you
state "inspect & confirm compliance" and you never went back and
inspected those items, right?

A.     No, I did not.

Q.     Okay.  So I want to talk a little bit about one of my
favorite topics, which is the roof.  Let's go to page 191.  Does
that look like high-quality work to you?

A.     No.

Q.     Now, your report says, "may not be code issues."

       Do you find this to be a code issue sitting here today?

A.     When you say "this" --

Q.     The EPDM roof.  I apologize.  If you look at the photo in
the top left-hand corner there's debris under the EPDM -- I
guess you would say membrane of the roof.

       There's also some odd lapping in the picture on the top
right-hand corner.

A.     You mean it looks like a place where it's not cemented
together --

Q.     Correct.

A.     -- at the top of the picture?

Q.     Yeah, the photo on the top left shows that there's debris
under the --

**A.**     Yeah.

**Q.**     -- EPDM roofing material.  Would you consider that to be a code violation?

**A.**     Possibly.  I'm not sure what the building code says about EPDM roof application --

**Q.**     I will --

**A.**     But it's certainly not a --

THE COURT:  Let him finish.

THE WITNESS:  -- application method.

BY MS. BROWN:

**Q.**     So let's take a look -- I apologize, but look at the big book that I gave you, and we can look at R904.3.  -- I'm sorry, R904.1.

And that section states, "The requirements set forth in this section shall apply to the application of roof covering materials specified herein.  Roof assemblies shall be applied in accordance with this chapter and the manufacturer's installation instructions.  Installation of roof assemblies shall comply with applicable provisions of Section R905."

Have you ever reviewed any manufacturer instructions -- manufacturer installation instructions for an EPDM roof?

**A.**     No, I have not.

**Q.**     In your opinion, would you anticipate that they would recommend that debris be left under the EPDM roof material?

**A.**     No, I would not.

Q.      Let's look at page 193.  Does that look like high-quality work to you?

A.      No.

Q.      Do you think that was installed according to the manufacturer's installation instructions?

A.      It looks as if several different types of tile were used in the same roof.  I don't know that there would be a manufacturer instruction regarding that, so I can't really say.

Q.      I would like to talk about the front portico.

        MS. BROWN:  If we could go to page 90, Section 11.11.

BY MS. BROWN:

Q.      And that's an item on your --

        MS. BROWN:  I'm sorry, yeah, page 90.

BY MS. BROWN:

Q.      That's an item on your chart that you disagreed was a code violation.  Have you changed your opinion on that item since preparing this chart?

A.      No, I haven't thought about it.

Q.      So in your -- your comment in your chart, this relates to riser variation at the front step, and you agree that there's a difference in the risers, correct?

A.      Yes.

Q.      And your reasoning for that not being a code violation is that it's not a required egress path?

A.      That's right.

*925*

Q.    Can you read the code section excerpt here, R311.7.5.1, and tell me whether that distinguishes that it has to be a required egress for the code to apply?

A.    Well, that section was taken from a part of the code titled "Exits," and so it is a misapplication of the building code in order to create a meaningless complaint about the building which is not a real complaint.  It's a nitpicking complaint.

Q.    So you think that looks nice?  That's high quality?

A.    Well, that's a different question.  So now that we've established that it is not a code question and the code issue was misapplied here, now we can go to appearance.  It doesn't have a great appearance, but it's not finished.

Q.    Well, first of all, I disagree that it's not a code violation, but --

THE COURT:  You're not testifying here.  That's not a question.

MS. BROWN:  I just want to clarify, we didn't establish that, we didn't.

BY MS. BROWN:

Q.    What makes you say that it's not finished.  That's not a comment in your report.

A.    Well, it looks unfinished to me.  I see debris around the bottom.  I see that the mortar has not been cleaned off the brick.

Q.    Okay.  All right.  Let's go to page 95.  This is the --
this is Section 11.16, and that item is on page 3 of your chart.
And you state in the category of your chart, "nonconforming to
code," and then your remedy is "no change part of the historical
house."  And you indicate no correction is necessary.  Have you
changed your opinion on this item?

A.    Yes.  At that time, Ms. Brown, I did not realize that was
a new deck, at the time I inspected the house.

Q.    Okay.  Thanks for clearing that up.

Okay.  10.6, page 56 of Mr. Furlong's report.  This is a
vent pipe issue.

Now, I read your deposition testimony and there was
some -- you testified there was something going on there about
30 inches, and I'd be happy to read it back to you, but do you
agree this is a code violation based on the code excerpt that's
here on this page?

A.    Yes, I think it might be.

Q.    Why do you say "might be"?

A.    Because the open vent terminal is within 4 feet of an
operable window.

Q.    Okay.  So that's a "yes," it is a code violation?

A.    Yes.

Q.    Okay.  So 13.19.  I would like to take a quick look at
that one.  That's page 180, the gym floor, I believe.

So, you state in this item "remedy, you say, "finish

flooring to be added," yet you don't state that there's an action item, so would you -- is your opinion that there is an action item associated -- that action should be taken with regard to the gym floor?

A.    Yes.  It's my opinion that that is not a complete installation.

Q.    So Mr. Deluca should fix that item?

A.    I think he would when he completes the house.

Q.    There's one item I wanted to clear up with you about grounding and bonding.  If we could take a look at page 47 of Mr. Furlong's report.  I think -- this report is rather long.  I think there's a section up at the top that you didn't comment on in your chart, and on your chart, Section 9.28 -- well, you refer to it as 9.27, "gas pipe grounding," but I think you mean 9.28.  It's on page 2 towards the top.

A.    I don't even see 9.28.

Q.    You say 9.27, but I believe you mean 9. --

A.    Oh, I see what you mean.

Q.    Okay.  So you say that the gas pipe grounding is nonconforming.  Up at the top of page 47 of Mr. Furlong's report, he indicates that there's a lack of grounding of the garage electrical subpanel --

A.    Um-hmm.

Q.    -- and that's a code violation?  Are you in agreement with that analysis as well?

A.    Oh, for sure.  Every subpanel has to be grounded.

Q.    Okay.  11.20 on page 111.  So my understanding is that you agree this is a code violation, but I wanted to clarify with you and confirm.  Did you see a shut-off valve by the gas range when you inspected, or what's shown in this photo?

A.    No, I did not.

Q.    And that would be an additional code violation?

A.    Yes.

Q.    Okay.  And would you say that's dangerous?

A.    Yes.

Q.    12.2, page 142 to 144.  This deals with the punctured liners, and I was just curious.  Could you tell me what code section you relied upon for that one to determine it's nonconforming?

A.    No, I'm sorry, I can't.

Q.    Okay.  Let's go to page 58, please.  I apologize, not page 58.  It's page 22 of Exhibit 58.

So this is another item -- well, this item you say is incomplete on your report.  Would you typically enclose unfinished electrical work in a ceiling with wood panels?

A.    No.

Q.    Okay.  Are you aware that Arlington County directed that these panels be removed and that's why these wires were exposed?

A.    No, I'm not.

Q.    Does that indicate to you that this is not an incomplete

item but just a straight code violation?

A.    It could be.  I'm not sure about that.

Q.    These items were stuffed up in the ceiling and covered up.  They likely were considered complete by the builder, right?

A.    I don't know about your testimony.

Q.    11.34, 133.  And I promise I'm not going through all of these.  I don't have much more.

And this item you say that -- 11.34.  I apologize.  You say the "floor seems level and dry," "no remedy required."

The manufacturer's instructions say that "For basement installation, provide concrete base if floor is not level or if water may by be encountered on the floor around the boiler."

Do you agree that it's common for basement mechanical rooms to experience moisture, flooding?

A.    I would like to say this in regards to this job.  This was pointed out to us during our inspection of the job --

Q.    Um-hmm.

A.    -- and it was noted that a complaint had been made about moisture, and there was absolutely no moisture around the boiler, and the floor was level at the time that we saw it.  So that's why I said, "floor seems level and dry."

Q.    Okay.  But you agree that basements, and mechanical rooms in particular where there are water storage tanks and HVAC equipment, there typically is a risk of flooding?

A.    Not if you put a drain in it, and we usually design

drains in ours, a floor drain.

Q.    Do you know whether there's a drain in this basement?

A.    No, I don't.

Q.    And the language from the manufacturer's instructions say "water may be encountered," not that it must be or will be encountered, correct?

A.    Yes, it says that.

Q.    Okay.

MS. BROWN:  Can we pull up Defendant's Exhibit 143?

BY MS. BROWN:

Q.    And I'd like to -- and I'm talking about, in Mr. Furlong's report, Section 11.2.  This is the "Missing Thermal" instruction -- "Installation?"

And in your deposition, one of the reasons you stated that -- you indicate on your report that the installation is now in places that you saw this certificate.

A.    Actually, when we inspected the house, the insulation was in place.

Q.    It was what?

A.    In place, it had been sprayed.  Some.

Q.    What insulation was in place?

A.    The insulation in the attic where that picture was taken.

Q.    On page 69?

A.    I'm not sure what page it's on.

Q.    On page 69 of Mr. Furlong's report.

**A.**     Uh-huh.

**Q.**     Do you see insulation there on the top of the page, on the left?

**A.**     69?

**Q.**     Yes, sir.

**A.**     Okay.  I'm lost on this.

**Q.**     Page 69 of Exhibit 58, which is Mr. Furlong's report.

**A.**     Oh.  Okay.  Yes.  At the time these photographs were taken, there was no insulation there, that's clear.  When we walked through the building, that whole area that's shown in the photographs at the top of the page had been insulated.

**Q.**     Do you know where this location is, specifically?

**A.**     Yes, it's part of the attic.

**Q.**     Where in the attic?

**A.**     I'm not quite sure of the exact location.

**Q.**     Did you inspect the area behind the exterior shower wall?

**A.**     Is that the line of studs we're talking about?

**Q.**     I'm asking you.

**A.**     I don't know.

**Q.**     Okay.  Did you review the insulation and confirm it was what the plans called for, the approved plans?

**A.**     You mean in terms of R-value?

**Q.**     Yes.

**A.**     No, I did not, but I did review it in regards to the code requirement for R-value.

Q.      So you looked at all of the insulation that you saw that was installed and confirmed it was in compliance with code?

A.      No, I looked at the -- what you have on the screen, "Installed Insulation Statement," and confirmed that the R-values of those building elements exceed the code R-values as required.

Q.      Why wasn't this document signed?

A.      I can't answer that.  And it's not dated either.

Q.      And you felt that's a record you could rely upon?

A.      Yes.

Q.      And you think that the County would rely upon an undated, unsigned document?

A.      No, they would probably require the signature and date.

Q.      Are you aware of whether or not this document was submitted to the County?

A.      No, I am not.

Q.      There's one more thing I want to cover with you.  13.35 of Mr. Furlong's report, the "Gas post lanterns."  I want to direct your attention to the photo in the top right-hand corner.

A.      Yes.

Q.      Is it appropriate to use a water supply line in lieu of a gas supply line?

A.      For gas?

Q.      Correct.

A.      Not to my knowledge.

Q.      As the expert here, is that a safe condition?

A.      No.  Well, maybe it's a safe condition, but it's not a durable condition.

Q.      I'm sorry?

A.      Maybe it is a safe condition, but it's not a durable condition.

Q.      In other words, that's going to wear out?

A.      I think the weather freezing and thawing might affect it.

Q.      Would you say that's high-quality work?

A.      No.

Q.      Okay.

          CROSS-EXAMINATION OF ANGUS WYMAN MACDONALD

BY MR. LYNCH:

Q.      Good to see you again, Mr. Macdonald.

A.      Thank you.

Q.      So, just clarifying a couple of things.  On the kitchen beam, and I think this is also to the garage lintel, you looked at those letters from Mr. Fulambarkar, right?

A.      Yes, sir.

Q.      You didn't do anything yourself to independently verify anything in that letter; is that right?

A.      That's correct.

Q.      Okay.  And with respect to the collar ties, we talked at your deposition about this theory that you dubbed "the folding plate."  Do you recall that?

A.    Yes.

Q.    Okay.  And I think if you look at the carriage house roof, it's a triangle like this (indicating) is that right?

A.    Yes, sir.

Q.    Okay.  And first of all, you agree that the currently approved plans require collar ties, correct?

A.    Those plans were redrawn, I'm not sure if the collar tries were in the redraw.

Q.    Sure.  So there's a big drawing book.  You might -- it's oversized.  The very first tab in this -- I'm sorry, the second tab is the December -- and I got it wrong again.  It's the fifth is the December --

       THE COURT REPORTER:  I'm sorry, what?.

BY MR. LYNCH:

Q.    The fifth tab in this book, Exhibit 432, is the December approved plans for the carriage house.  And I'd like you to go ahead and look at drawing sheet SD-2, please.

A.    Yes, it shows the collar ties.

Q.    That's right.  And there are no collar ties in that building right now, correct?

A.    I don't know what's in the building right now, sir.

Q.    When you saw it, were there any collar ties there?

A.    No, there were not.

Q.    Okay.  Do you have any reason to believe that collar ties have been installed subsequent to your visit?

A.      I have no idea.

Q.      So --

THE COURT:  Just ask him the question and get the answer, and I don't need your comments after he answers.

MR. LYNCH:  Fair enough.

THE COURT:  Thank you.

MR. LYNCH:  Sorry.

BY MR. LYNCH:

Q.      All right.  So you would agree that the folding plate -- well, first of all, the current condition of the construction is illegal unless collar ties have been put in there; is that right?

A.      I don't know about illegal.

Q.      It doesn't comply with the building code?

A.      It might indeed conform to the building code.  It would be up to an engineer to do analysis to see.

Q.      That's right.  So from a permitting perspective, until somebody proved to the County that the folding plate from a structural calculation's perspective works and then the drawings are amended, then it becomes legal work there in the carriage house.  That's correct, right?

A.      I think I promised not to testify whether or not work was legal.

Q.      Okay.

A.      You objected to that.

THE COURT:  Well, whose burden is it to allow -- before the County would find that this was in compliance with the code, would it be up to the builder to prove that the -- that these ties were not necessary?

THE WITNESS:  Your Honor, if the County inspected the project and cited a violation of code, then it would be up to the builder to prove that it does not violate the code or to change it to make it in conformance with the code.

THE COURT:  Thank you.  Go ahead.

BY MR. LYNCH:

Q.    Are you aware of any final inspections of the carriage house?

A.    No, sir.

Q.    Okay.  So if the County went into the carriage house today and there were no collar ties but the approved drawings called for collar ties, they wouldn't pass a final inspection, correct?

A.    I'm not the judge of that.

Q.    I thought you were a permitting expert.

A.    It's not up to me to say what the County would approve or disapprove.

Q.    Well, I'm asking your opinion.  You're an expert on permitting.

A.    I really don't have an opinion about that.

Q.    Okay.  So the crawl space, you agree -- and I'm just

reading your chart.  I think the phrase is it's a -- the crawl space has a masonry foundation pier that is damaged, and your chart says "category," "unsafe condition,"  "rebuild damaged pier portion."

Do you agree that that's an unsafe condition there in this crawl space?

A.    Yes, that's what I stated.

MR. LYNCH:  Okay.  Let's talk about permitting.  A little further.

BY MR. LYNCH:

Q.    So I didn't hear you mention -- well, let's start with this.  You've never applied for a building permit in Arlington County, correct?

A.    Myself?

Q.    Yes.

A.    No, sir.

Q.    And did I hear you correctly that you looked at 20 photos?

A.    Something of that nature.

Q.    Is that true sitting here today right now, that you've seen 20 photos?

A.    Of the work in progress.

Q.    Yes.

A.    Yes.

Q.    All right.  And then I think I also heard you say,

Mr. Deluca obtained an optimum number of permits and inspections.  Did I get that right?

A.      Yes.

Q.      Okay.  What I didn't hear you mention in your testimony is that anything about the carriage house permit.  Now, are you aware of what work Mr. Deluca performed in the carriage house?

A.      To some extent, yes, we did inspect the carriage house.

Q.      I'm sorry, what was that?

A.      We did inspect the carriage house.

Q.      Okay.  So what work did he do in the carriage house, major stuff?

A.      He put a beam over a new garage opening in the end wall of the carriage house.  He removed a staircase in the garage portion, and built a staircase in the other -- opposite end of the carriage house.

Q.      And what about the roof?

A.      I think he rebuilt the roof at that one end.

Q.      You're not sure, though?

A.      No, I'm not sure.

Q.      Now --

A.      The drawings show a roof structure, so I'm assuming that there was none or it was replaced.

Q.      Okay.  So I'm just wondering, when do you think approximately he applied for a permit for that work?

A.      Um, I'm not quite sure.

Q.      You agree that it requires a permit for that type of work, correct?

A.      Yes, sir.

Q.      And if I told you he applied for that permit in November 2019, and that work was done before closing -- or let's just say this, done before he applied for a permit, that would be unpermitted work, correct?

A.      Sounds like it.

Q.      Okay.  Did Mr. Deluca inform you that a tree struck the roof also?

A.      No.

Q.      Okay.  Okay.  I'd like to show you some more photos, if that's okay.  So there's another book called "Photo Highlights."

        MR. LYNCH:  And it's a skinny one, Mr. Marshal.  It's about this thick (indicating).

        MR. COUGHLIN:  Your Honor, may I interrupt for a second.  We have another expert waiting in the witness room.  We may discharge him for the day, correct?

        THE COURT:  Yes, please do.

        MR. COUGHLIN:  Mr. Burcher will take care of that.

        THE COURT:  I would like to finish Mr. Macdonald so he doesn't have to come back, so let's -- no repetition, please.

        MR. LYNCH:  Yes, sir.

BY MR. LYNCH:

Q.      And one other thing I would like to have handy for you

while you look at this.  Do you have that little summary chart of the permits, Exhibit 426?

A.     Yes, it's right here.

Q.     Okay.  Great.  Let's go to tab 5 of this book, and let's go to -- well, just look at the first tab, and I'll represent to you what's in this book.  These are stipulated exhibits.  Each tab is an e-mail from Mr. Deluca to his lender and then behind the e-mails, which are dated, are photos, and they start in November of 2018, and they end up in June 3rd, 2019.

       And if you'll recall, the very first building permit issued after the kitchen and bath permit was on what date?  June 4th, 2019 sound right?

A.     Yes, sir.

Q.     Okay.  So you can satisfy yourself of generally what's in tab 5 and I'll direct you to some specific photos, but -- so take a moment.

       THE COURT:  What tab is he looking at?

       MR. LYNCH:  Sorry.  It's tab 5, and then it's lettered tabs after the number 5.

       THE COURT:  Are you going to ask him about all of them?

       MR. LYNCH:  No, certainly not.

       THE COURT:  Then just direct him to A or B and C and then give him an opportunity to look at them and then ask your questions, please.

       MR. LYNCH:  Thank you.

BY MR. LYNCH:

Q.    Let's go to tab D, and there are little page numbers on the bottom right-hand corner, and these page numbers are Dashco 209.

A.    Okay.

Q.    Are you there?

A.    Yes, sir.

Q.    Okay.  So take a brief look at this cover e-mail.  It's dated Deluca -- from Doug Deluca dated June -- January 4th, 2019 to John Burns, and in his drawing it looks like here a bunch of money for plumbing, electric, HVAC, drywall, carpentry.

      Do you see that?

A.    Yes, sir.

Q.    Okay.  And as of January 2019, Mr. Deluca had no permit of any kind; is that correct?

A.    Could be.

Q.    And you're not even sure of the date when he first got a permit at all?

A.    The first permit listed on this list is B1803016, was issued on the 3rd of April, 2019.

Q.    That's right.  So, as of January 2019 he had no permit, right, of any kind, correct, Mr. Macdonald?

A.    Apparently.

Q.    So why don't you just -- so to the extent he's doing mechanical, electrical, and plumbing work on January 19, it's

*942*

all unpermitted, correct?

**A.**     It would be if he had been.

**Q.**     Okay.  So let's go to the next tab.  This is tab E, begins February 13, 2019, is the cover e-mail.

Are you there?

**A.**     Yes, sir.

**Q.**     Okay.  So you can see there, there's a number of draws: Electrical, structural steel, garage framing, garage stairs.

Do you see that?

**A.**     Yes, sir.

**Q.**     He did work of that description, and that would all be unpermitted, too, correct?

**A.**     If he did, yes.

**Q.**     Okay.  So turn to the next page and you can see the carriage house roof being framed in.  That was unpermitted work, correct?

**A.**     I don't know when that photograph was taken.

**Q.**     Well, it's attached to this e-mail that Mr. Deluca sent to his lender on February 13th.  These are stipulated to be accurate exhibits.

**A.**     Well, that's your testimony.

**Q.**     Okay.  Let's -- I'll ask you a hypothetical then.  If these photos were attached to that e-mail, that would be unpermitted work, correct?

**A.**     Possibly, yes.

**Q.**     It would be impossible to send photos of work on February 13th that had never been done, by e-mail; isn't that correct?

**A.**     Yes, it would be.

**Q.**     Okay.  Let's go to the next tab.  And this is an e-mail again, February 13th.  These are more photos.  And if you look at page 77, Dashco 284, do you see what appears to be brand-new mechanical work on that page?

**A.**     You mean 264?

**Q.**     I'm sorry, you're correct, 264.

**A.**     Yes, I do.

**Q.**     Okay.  And if that was done on February 13th, 2019, that would be unpermitted work, correct?

**A.**     Yes.

**Q.**     Okay.  So let's go to the next tab, tab G, and it begins with an e-mail dated March 7th, 2019.  Do you see that?

**A.**     Yes, sir.

**Q.**     Okay.  There's a sentence that says, the second sentence of this e-mail, "Have 3 inspections."  This is from Doug to Mr. Burns here.

Let me just ask you, since March 7th, 2019 predates his very first permit on April 3rd, there's no way the County could have done inspections on March 7th, 2019, correct?

**A.**     Yes, that's your testimony.

**Q.**     Do you agree with it?

**A.**     Possibly, yes.

Q.    Can you give a reason why that would be incorrect? Strike that question.  And then the next sentence says, "....will be going into full drywall and finishes."

Do you see that?

A.    Yes.

Q.    So if in March he's closing up work, like that new mechanical we just saw, that would conceal all this unpermitted work, wouldn't it?

A.    If in March he -- well, he states that he has "3 inspections and will be going into full drywall."

Q.    But you agree it's at least extremely unlikely he has had any inspections in March of 2019, correct?

A.    Yes.

Q.    Okay.  And if that statement that follows is true, then he's closing in unpermitted work, correct?

A.    Well, he says he's going to be doing it.

Q.    Okay.

A.    So I don't know that he said he had done it.

Q.    All right.  Fair point.  Let's look at some more photos. So let's look at page 275.

A.    Um-hmm.

Q.    Are you there?

A.    Yes, sir.

Q.    Does that look like new electrical work on the ceiling there?

A.    You know, it's hard for me to say if it's new or not, but it's exposed.

Q.    Yeah.  And there's an -- do you see that little orange sticker on the light receptacle?

A.    Yeah.

Q.    Does that indicate to you in any way a new electrical?

A.    No, sir.

Q.    Okay.  Are you aware that Mr. Deluca replaced all the mechanical, electrical, and plumbing in both buildings on this property?

A.    That's what I understood.  I think that's why he had those permits.

Q.    Okay.  So do you know one way the other if this is new or not new electrical?

A.    No, I don't know.

Q.    Okay.  All right.  Keep going.  Let's look at Dashco 280. Does that look like new plumbing or electrical on that page to you?

A.    It's hard for me tell from the photograph whether something is new or whether it's simply exposed.

Q.    You don't know one way or the other; is that correct?

A.    Not from a photograph.

Q.    Okay.  Let's look at 281 and 282.  Does that look like new plumbing to you?

A.    Not necessarily.

Q.    You don't know one way or the other, though; is that correct?

A.    Yes, sir.

Q.    All right.  Now, let's look at Dashco 284.  What's that, a closed in wall?  Is that what that is?

A.    That looks like some drywall that's been put up.

Q.    Okay.  Let's go ahead and move forward to April quickly, and that's tab H, April 17, 2019.

Now, as you testified earlier, the only inspection -- those inspection cards from April, they related to the kitchen and bath scope of work; isn't that right?

A.    Yes.

Q.    They did, right?  Those orange cards in April related to the kitchen and bath permit, correct?

A.    That's what I remember, yes.

Q.    Okay.  So wouldn't it make sense that -- and then the next building permit he got wasn't until about early June.  You agree with that?

A.    Yes.

Q.    Okay.  For the rear addition, right?

A.    Yes.

Q.    Okay.  So wouldn't it make sense to you, then, that the only work that was permitted between -- at lest for building permits, let's just say, between April 3rd and June 4th was the -- June 3rd -- April 3rd to June 3rd was the kitchen and

bath, correct?

A.     Yes.

Q.     Okay.  So any work outside that kitchen and bath is unpermitted, correct?

A.     It would be.

Q.     Okay.  And then let's look through tab H, and let's go to Dashco page 294.  Are you there?

A.     Yes, sir.

Q.     Okay.  If that work occurred in April 2019, it would be unpermitted, correct?

A.     If it did, yes.

Q.     Okay.  And now you're starting to see some closed-in walls in this time period, correct?  If you could look at the photos.

A.     Dash 295 is not closed-in walls.

Q.     Okay, but there are some where walls are now closed in?

A.     Dash 296 shows exposed brick on the exterior wall.

Q.     All right.  Let's go to the next tab, tab I.  We're in May.

       You would agree, based on your testimony a moment ago, he's only allowed to do work in the kitchen and bath at this time.  So at Dashco 317, that would be unpermitted work, right?

A.     317?

Q.     Dashco 317.  It appears to be some sort of foundation being dug out there, some rebar.  Do you see that?

A.      Yes, sir.

Q.      That would be unpermitted work in May -- if it was done in May of 2019, correct?

A.      I suppose you're right.

Q.      Okay.  And do you agree that on -- take a look at Dashco 334, please.

A.      Okay.

Q.      Are you there?

A.      Yeah.

Q.      That's freshly closed-in walls and ceilings you're looking at, correct?

A.      If you say so.

Q.      You can't tell whether that looks like freshly enclosed drywall or not?

A.      Well, the only thing you can tell is that it hasn't been painted yet.  When it was done or when it was going to be painted, that's not visible in the photograph, so no, I cannot tell.

Q.      Okay. All right.  And you think that -- we'll go to the next photograph.  But -- okay.  Well, let's assume that it wasn't --

        THE COURT:  Let's move on to the next --

        MR. LYNCH:  Sorry.  Sorry.

        THE COURT:  -- section.

BY MR. LYNCH:

Q.    Okay.  And then at the end of this, look at 154, 155.  There's spray foam, and it's the carriage house.  There's insulation, new mechanical in there.  That's all unpermitted, too, right?  If it was done any time prior to November 2019.

THE COURT:  You flipped from using the Dashco number in the far right to the page numbers, so he may be confused about that.

MR. LYNCH:  Yeah, I'm sorry.

BY MR. LYNCH:

Q.    So towards the tab that we were in, at the end of it, Dashco 349, Dashco 348, Dashco 347, Dashco 346, that is all -- that's showing unpermitted mechanical work and insulation work if it was done any time before November, correct?

A.    That's your testimony.

Q.    I'm asking you.

THE COURT:  In the carriage house; is that right?

MR. LYNCH:  That's correct.

THE COURT:  Okay.  Can you answer that question, Mr. Macdonald?

THE WITNESS:  Yes, if what he says is true.

THE COURT:  Okay.

MR. LYNCH:  No further questions.

THE COURT:  Okay.

MR. COUGHLIN:  I'll be as --

THE COURT:  Redirect.

MR. COUGHLIN:  Quick as possible, Your Honor.

Mr. Burcher, can you please pull up exhibit -- Defendant's Exhibit 146.  And go to the chart that was up earlier.

### REDIRECT EXAMINATION OF ANGUS WYMAN MCDONALD

BY MR. COUGHLIN:

Q.    Mr. Macdonald, could you please look at the screen, and Mr. Burcher is going to scroll through pages 1, 2, 3, 4, and 5, fairly quickly.  I'll just allow him to get it up there.

MR. COUGHLIN:  Next page, next page, next page.  Next page.  Okay.

BY MR. COUGHLIN:

Q.    Mr. Macdonald, in your direct testimony with me, you indicated that you came up with 67 builder action items, correct?

A.    I said that, but it looks like it's 64.

Q.    And --

A.    But I think we just added three today.

Q.    Okay.  And you have -- and this is the chart that reflects those action items, correct?

A.    Yes, sir.

MR. COUGHLIN:  Your Honor, I would like to move this into evidence.  This is Defendant's Exhibit 146, the page numbers 1, 2, 3, 4, 5 that follows the Macdonald report.

THE COURT:  Yeah, any objection?

MR. LYNCH:  No objection.

THE COURT:  Yeah, it's received.

(Defendant's Exhibit 146, five pages following report admitted into the record.)

BY MR. COUGHLIN:

Q.     Aside from the items that were discussed earlier with plaintiffs' counsel, are there any other -- that you can think of, any other corrections that you would like to make to your chart in terms of additional action items or subtraction to action items?

A.     No, I haven't done -- that would take a very detailed analysis.  So I'm not prepared to do that on the stand.

Q.     Okay.  Did you undertake a very detailed analysis before preparing this report?

A.     Yes.

Q.     Okay.  All right.  Let's go to Bowe -- this is Plaintiffs' Exhibit 58, 13.35.  Did you have any discussions with Mr. Deluca regarding why this condition might exist at the property?

A.     I don't remember anything like that, no, sir.

Q.     Is it possible that the copper pipe was actually being protected by the plastic pipe that you see in the screen?

A.     Quite possible.

Q.     Does the gas post look to be finished?

A.     No, sir.

Q.     Let's go to 13.6.  Earlier you testified about the trim,

and you acknowledge that the trim in the photos needed to be corrected.  This is Section 13.6.

A.     Yes, sir.

Q.     Was -- is what you see in this photo, or in these photos, something that you noticed as a pervasive condition throughout the entire house?

A.     Absolutely not.

Q.     What instead -- what did you notice about the trim that was actually installed in the house?

A.     I was amazed at the quality of the work, for instance, in the trim along the staircase going upstairs.  That quality was impeccable.  This may be -- these may be things that had not yet been attended to, is my opinion.

Q.     You mentioned the stairs.  You mean the stairs leading up to the -- from the first level to the second level?

A.     Yes, sir.  Yes, the top photo there, right.

Q.     We're going to pull up a photo.  Is this the stairway that you're referencing?

A.     Yes, it is.

Q.     Is this high-quality work in your opinion?

A.     Yes, it is, sir.

       MR. COUGHLIN:  Could we turn to Exhibit 169.

BY MR. COUGHLIN:

Q.     Where is this photo taking place?

A.     This photo is in one of the upper bedrooms on the third

floor.

Q.    Is this high-quality craftsmanship and workmanship in your opinion?

A.    Yes, it is.

MR. COUGHLIN:  If we could go to 170.

BY MR. COUGHLIN:

Q.    What are we looking at in this photograph?

A.    We're looking at a beautiful hand-built -- beautifully designed and executed hand-built bunk bed.

Q.    Is this --

A.    Very imaginative.

Q.    Is this an example of high quality workmanship in the house?

A.    Yes, sir.

MR. COUGHLIN:  Exhibit 171.

BY MR. COUGHLIN:

Q.    What are we looking at in this picture?

A.    The same sort of thing, high-quality finishes, beautiful trim, beautiful wood floors, and marble floors in the bathrooms.

MR. COUGHLIN:  Can we go to Exhibit 172.

A.    I was also impressed with the design of the trim, which was meant to honor the age of the house, such as the very big headers over the doors and the classical trim across the top, the small crown mouldings and stuff.

This is an example of a bathroom which I consider to be

very high-quality trim, fittings, and fixtures.

MR. COUGHLIN:   And this is Defendant's Exhibit 172.

Could we go to Exhibit 174.

BY MR. COUGHLIN:

Q.   What is Exhibit 174?

A.   This is looking from the top of the stairs down towards the front door, and following the staircase up to the bedrooms on the third level.

Q.   Is this an example of high-quality workmanship?

A.   Yes.  On the left-hand side where the stair turns the corner, you can see the kind of entablature that I'm talking about over the door, which is a very attractive way of making the door proportional with the high ceilings, and you can see the quality of the chair rail and moldings.  That's why I say that the problems noted by Mr. Furlong were probably not yet attended to.

Q.   Is it fair to take isolated photos of a builder's project that wasn't completed and claim that there's pervasive defects throughout the whole house, in your opinion?

A.   Of course it's not fair, but it is a tactic that owners use.  They hire these people to find mistakes or anomalies and come in with hundreds of complaints to scare a builder from taking action to get his final draw, and it's become very common in the industry.  I've been in the building business for 50 years, and I've seen it more and more.

Q.   As an architect, when you draft something, are you striving for perfection?

A.   Yes.

Q.   When you hand over the plans to a builder, does a builder always execute your plans, initially, to perfection?

A.   No.

Q.   Is the construction process an iterative process that ultimately, hopefully, leads to a high-quality product?

A.   It should be.

Q.   I want to go to some of the e-mails that you referred to. They referred to draws.  Let me ask you this before I ask you the question.  Are you familiar with the draw process that builders undertake for projects?

A.   Yes, sir.

Q.   Do builders draw for work that is sometimes planned well into the future?

A.   Oh, yes.

Q.   So if --

A.   Remember that the builder is not the financier, so the builder should not be expected to finance the project or come up with the money in advance of doing the work and buying the material.  That is the job of the bank or the owner.

Q.   So if a builder is drawing for structural steel, that doesn't mean that it's going to go in the next day, correct?

A.   No, it's not.  In fact, supply chain issues, structural

steel is now three or four months out for anybody's order.

Q.    As it relates to the addition to the back of the house, you saw some foundation work being put in in one of the photos, correct?

A.    Yes.

Q.    And it appeared to be before the building permit for the addition was actually issued, correct?

A.    I can't tell from the photo when it was.

Q.    Okay.  Well, so, looking at that board, what is your opinion of Arlington County's viewpoint of the project's compliance with the -- with the building code, as it relates to just the rough-in level of work for the main house for mechanical, electrical, and permitting -- and plumbing?

MR. LYNCH:  I object to that question as practically {indiscernible} --

THE COURT REPORTER:  I'm sorry.

MR. LYNCH:  I'm not even sure I know what's being asked in that question.

THE COURT:  He's reasking the question he asked two hours ago.  Does he think that it was timely and that there were a sufficient number of inspections and permits drawn for this project.

You may answer.

THE WITNESS:  In my opinion, the County was working with Mr. Deluca to repair the paper trail wherever necessary so that

he could finish the project, and what that means to me is they were confident in the quality of his work and the safety of his methods.

MR. COUGHLIN:  No further questions, Your Honor.

THE COURT:  All right.  All right.  Thank you, Mr. Macdonald, you're excused at this time.  Please don't discuss the testimony you've given with anyone until our trial is over, all right, sir?

THE WITNESS:  Yes, sir.  Yes, Your Honor.

THE COURT:  Have a good weekend and a safe trip home.

THE WITNESS:  Thank you, sir.

THE COURT:  All right.  So we're done for tonight.  So we're having an investiture tomorrow, and this courtroom is going to be used as a backup where people will be.  I don't think you have to move anything out --

MR. BURCHER:  We'll clean everything up.

THE COURT:  Yeah, clean up the desks.  I'm still scheduled for a 9:00 hearing in a criminal case, so just clear the tables and -- but you can leave your stuff over in the chairs if you want, and we'll get going again on Monday morning at 9:00.

What -- how many more witnesses do you have, Mr. Burcher?

MR. BURCHER:  We have two witnesses, Mr. Deluca and one expert witness, Your Honor.

THE COURT:  Expert.

MR. BURCHER:  I am concerned about being able to finish on

Monday, and I am not available on Tuesday.  I have a Navy assignment that I go on starting on Tuesday, and so I don't know how we -- how we're going to do it.  We're going to talk about which is the most efficient, you know, way to kind of accomplish it.

My goal would be to get Mr. Deluca done on Monday because Mr. Coughlin can handle the other witness, and if that needed to happen and I -- I would ask to not be able -- to not to have to come if you go into Tuesday, but --

THE COURT:  Right.

MR. BURCHER:  Or alternatively, we do have Mr. Fulambarkar that is potentially scheduled.  I don't know how you want to handle that, but we could combine those two, you know, on the same time period.  That's currently scheduled for the week of -- or at least we had discussed the week of July 25th.  I don't return from my Navy assignment until August 2nd, so -- but Mr. Coughlin could handle both of those things during that time period.

THE COURT:  If that's necessary.  Okay.  Well, my -- I had a trial scheduled for Monday, and the defendant declared bankruptcy, so I had to stay the case, so that helped relieve my anxiety that I displayed earlier in the week, and the case that I had for the 25th is going to be resolved on summary judgment after pleadings just came in, so I'm available during the week of the 25th, for your scheduling purposes.

And so why don't we -- so you want to put on Mr. Deluca first to try and finish him and then put the expert on so that Mr. Coughlin can handle it on Tuesday, if necessary?

MR. COUGHLIN:  That would be my thought.

MR. LYNCH:  I agree.

MR. COUGHLIN:  I'll move as fast as I can.  I'll try not to be repetitive, but --

THE COURT:  Obviously he's an important witness, so...

All right.  Then that's the way we'll proceed on Monday morning.  We'll see how far we get.

Okay.  Anything else before we break?

MR. COUGHLIN:  We'll start at 9 a.m. on Monday as well --

THE COURT:  Yes, 9:00.

MR. COUGHLIN:  Thank you.

THE COURT:  All right?

MR. LYNCH:  Thank you, Your Honor.

THE COURT:  Good.  All right.  You all have a good weekend, and we'll see you on Monday morning at 9:00.  We're in recess.

(Proceedings adjourned at 6:10 p.m.)

**C E R T I F I C A T E**

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Scott L. Wallace                          8/3/22
-----------------------------      -----------------
**Scott L. Wallace, RDR, CRR**              **Date**
**Official Court Reporter**