UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **JOHN E. HARRELL,** | ) |
| | ) |
| **et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) Civil Action |
| | ) No. 1:20-0087-LO-MSN |
| **v.** | ) |
| | ) July 18, 2022 |
| **DOUGLAS M. DELUCA,** | ) 9:00 a.m. |
| | ) |
| **et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**VOLUME 5 (Pages 961 - 1195)**
*TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE LIAM O'GRADY,
UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the Plaintiffs:     **Thomas Ryan Lynch, Esq.**
Bradley Arant Boult Cummings, LLP
(DC)
1615 L Street, N.W.
Suite 1350
Washington, DC 20036
202-719-8228
Fax: 202-719-8328
E-mail: Tlynch@babc.com

**Lee-Ann Christine Brown, Esq.**
Bradley Arant Boult Cummings LLP (DC)
1615 L Street, N.W.
Suite 1350
Washington, DC 20036
202-393-7150
Fax: 202-719-8312
E-mail: Labrown@bradley.com

APPEARANCES:   (Cont.)

For the Defendants:        **Michael John Coughlin, Esq.**
                          Walsh Colucci Lubeley & Walsh PC
                          4310 Prince William Parkway
                          Suite 300
                          Prince William, VA 22192
                          703-680-4664
                          Fax: 703-680-2161
                          E-mail:
                          Mcoughlin@pw.thelandlawyers.com


For the Defendants:        **Eugene A. Burcher, Esq.**
                          Walsh, Colucci, Lubeley & Walsh PC
                          4310 Prince William Parkway
                          Suite 300
                          Prince William, VA 22192
                          703-680-4664
                          Fax: 703-680-2161
                          E-mail: Eaburcher@thelandlawyers.com


Court Reporter:            **Scott L. Wallace, RDR, RMR, CRR**
                          Official Court Reporter
                          United States District Court
                          401 Courthouse Square
                          Alexandria, VA 2231-5798
                          202-277-3739
                          scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                    **Page**

DIRECT EXAMINATION OF DOUGLAS DELUCA                    967
BY MR. BURCHER
CONTINUED DIRECT EXAMINATION OF DOUGLAS DELUCA         1081
BY MR. BURCHER
CROSS-EXAMINATION OF DOUGLAS DELUCA                    1142
BY MR. LYNCH

## EXHIBITS

Defendant's Exhibit 35, Plaintiffs' Exhibits 684      965
and 714 admitted

Plaintiffs' Exhibits 1, 335, 432, 560, 561, 1025,     966
1027, 1030, 1065, and 1028 admitted

Possible Exhibit 1071 admitted                        981

Defendant's Exhibits 130, 131, 132, 133, 134, and     1030
136 admitted

Defendant's Exhibits 96, 137, 138, and 139 admitted   1030

Defendant's Exhibits 14 and 15 admitted               1030

Defendant's Exhibits 186 and 111 admitted             1031

Defendant's Exhibit 122 admitted                      1031

Defendant's Exhibits 123, 124, 125, and 126           1034
admitted

Plaintiffs' Exhibit 749 admitted                      1035

Defendant's Exhibit 141 admitted                      1038

Defendant's Exhibit 159 admitted                      1083

Defendant's Exhibit 160 admitted                      1083

Defendant's Exhibits 161 and 162 admitted             1084

Defendant's Exhibit 163 admitted                      1085

Defendant's Exhibit 164 admitted                      1085

| **EXHIBITS** | **Page** |
|---|---|
| Defendant's Exhibit 165 admitted | 1086 |
| Plaintiffs' Exhibit 166 admitted | 1087 |
| Defendant's Exhibit 167 admitted | 1087 |
| Defendant's Exhibit 168 admitted | 1088 |
| Defendant's Exhibit 169 admitted | 1088 |
| Defendant's Exhibit 170 admitted | 1089 |
| Defendant's Exhibits 171, 172, 173, 174, and 176 admitted | 1090 |
| Defendant's Exhibit 200 admitted | 1118 |
| Defendant's Exhibit 445 admitted | 1121 |
| Defendant's Exhibit 38 admitted | 1138 |
| Defendant's Exhibit 39 admitted | 1138 |
| Plaintiffs' Exhibit 4 admitted | 1138 |
| Defendant's Exhibit 42 admitted | 1139 |
| Defendant's Exhibit 41 admitted | 1139 |
| Defendant's Exhibit 43 admitted | 1139 |
| Defendant's Exhibit 144 admitted | 1139 |
| Plaintiffs' Exhibit 530 admitted | 1140 |
| Plaintiffs' Exhibit 427 admitted | 1140 |
| Plaintiffs' Exhibit 424 admitted | 1140 |
| Defendant's Exhibit 32 admitted | 1140 |
| Plaintiffs' Exhibit 690 admitted | 1141 |
| Plaintiffs' Exhibits 1006, 691, 432, 446, and 445, and Defendant's Exhibits 192, 40, and 54 admitted | 1141 |

**MORNING SESSION, JULY 18, 2022**

(9:05 a.m.)

THE COURTROOM CLERK:  Court calls Civil Case Number 1:20-cv-87, *John E. Harrell, et al. versus Douglas M. Deluca.* This case is on for trial by the Court.

THE COURT:  All right.  Good morning.  I see all counsel and the parties are here.  I hope you had a good weekend.

Good morning.

MR. BURCHER:  Good morning, Your Honor.

THE COURT:  Any preliminary matters?

MR. BURCHER:  Just a couple of administrative items.  When we had talked about the TruPlace plans, we had labeled that as Defendant's Exhibit 200, but it really should be 199, so I kind of corrected that.  I'll hand up a copy.

And then there are three exhibits that we just want to, at least from the defendant's side that we want to make sure have been admitted, and we've coordinated this with opposing counsel. It's Defendants' Exhibit 35, Plaintiff's Exhibit 684, and Plaintiffs' Exhibit 714.  Those three we would like to move, if they have not already been moved into evidence.

THE COURT:  All right.  Any objection?

MR. LYNCH:  No objection.

THE COURT:  All right.  They're all received.

(Defendant's Exhibit 35, Plaintiffs' Exhibits 684 and 714 admitted into the record.)

MR. LYNCH:  Good morning, Your Honor.  We had a couple to add as well.

THE COURT:  Okay.

MR. LYNCH:  Exhibit 1, Plaintiffs' Exhibit 1, Plaintiffs' Exhibit 355, Plaintiffs' Exhibit 432, Plaintiffs' Exhibit 560, Plaintiffs' Exhibit 561 -- and I have a note about that one -- Plaintiffs' Exhibit 1025, Plaintiffs' Exhibit 1027, Plaintiffs' Exhibit 1030, Plaintiffs' Exhibit 1065, and Plaintiffs' Exhibit 1028.

THE COURT:  Any objection to any of those, Mr. Burcher?

MR. BURCHER:  No, Your Honor.

THE COURT:  Okay.  They're all received.

(Plaintiffs' Exhibits 1, 335, 432, 560, 561, 1025, 1027, 1030, 1065, and 1028 admitted into the record.)

MR. LYNCH:  And just a note on 561.  This is the document that has the redacted and unredacted version of the TruPlace plans, and as we discussed with counsel, I wanted to clarify that pages 5707 to 5716 are an e-mail dated June 14th, 2019, and pages 5717 to 5724 are a separate e-mail from February 7th, 2019.  Those documents weren't attached to each other.  Just a clarification.

THE COURT:  Okay.

MR. LYNCH:  That's all, Your Honor.

THE COURT:  All right.  All right, then, Mr. Burcher.

MR. BURCHER:  Your Honor, we're ready to continue with our

case and our witnesses.

THE COURT:  All right.

MR. BURCHER:  My plan is today -- our plan is today to be focused on Mr. Deluca.  I don't expect -- I expect that we'll try and finish today with him.  We have not scheduled -- the only other witness that we have is our other expert witness, and our intention is to bring him first thing tomorrow morning because we expect Mr. Deluca to go all day today with direct and cross and redirect, so that's the plan, and so hopefully we can finish that up today.

THE COURT:  All right.  That's fine.

MR. BURCHER:  Okay, so Your Honor, the defense calls Mr. Deluca to the stand.

THE COURT:  Please come forward and be sworn.

(DOUGLAS DELUCA, DEFENDANT IN THE CASE, SWORN)

DIRECT EXAMINATION OF DOUGLAS DELUCA

BY MR. BURCHER:

Q.    Good morning, Mr. Deluca.  Could you state your name for the record, please.

A.    Douglas Matthew Deluca.

Q.    And where were you born and raised?

A.    I was born in Washington, D.C.  I was raised in Falls Church, Virginia and Vienna, Virginia, and I reside in McLean, Virginia now.

Q.    Okay.  And could you give the Court a little bit of your

educational background?

A.    Yes, I attended Hargrave Military Academy in Chatham, Virginia.  I graduated, moved to New York, and then came back to Arlington, Virginia to attend Marymount University.  Majored in communications with a minor in business major and graduated from Marymount.

Q.    Okay.  And could you give the Court a little bit of your employment background prior to becoming in the construction industry?

A.    Yes.  After graduating Hargrave Military Academy, I moved to New York City.  I worked for the Ralph Lauren Corporation.  I lived in New York for approximately five years and then came back and gained my degree.

I then worked for Westinghouse Engineering.  From Westinghouse Engineering I went to Lawson Software.  From Lawson Software I went to Oracle Corporation.  From Oracle corporation I went to Enterprise Solutions Group working on rollouts of large enterprise relationship systems.

Q.    And after that experience, what did you do next?

A.    Yes.  I was able to start my construction company, which at first was an exterior hardscape company.  My first license that I received from Virginia was a Class B license in masonry. Then I went to get a Class A license in structural comment and concrete.

After that, in 2006, our client base grew and I starred

doing interiors, and I sat and received my Class A license in general -- as a Class A builder as well as the CBC for commercial construction as well.

Q.    In addition to your contracting work, do you do other work for other organizations?

A.    Yes, sir.  I sit on boards.  I'm a trustee of Arlington House at Arlington Cemetery.  We've just done a major restoration of Arlington House through their Rubenstein family donation, as well as I was board member and trustee of the Washington Animal Rescue, which is now the Washington Humane Society.

Q.    Okay.  Could you explain in general what your -- outside of your licenses, what your general contracting experience is?

A.    Yes.  I was -- growing up throughout my life, we had to always work in the summer.  My mom was a builder, so every summer we would work as labor related until we got to 18.  At 18 we were able to pick a division within the office to work with, so growing up, anything from cleaning up trash, cleaning up curbs and gutters.  Then I would get into mobilizing materials at different places in the jobs.  That included drywall, wood, and then from there we went into carpentry, as well as installing actual drywall.

From that point I moved back into the office and spent time drafting and doing design work.

Q.    Okay.  And could you give the Court a summary of your

company and how your company has evolved over time, and what is your company?

A.     Yes.  My company is -- it started out as Federal Stone and Brick.  Federal Stone and Brick was the masonry division in which I would do hardscapes, exteriors, historic restoration of brick, any kind of facade work.

From there, Federal Home came to be -- Federal Home started out as kitchens and baths and renovations, then went to whole house renovations and restorations as well as basically handling all of our contracting needs.  It's a Class A company that can do exteriors, interiors, and restorations.

I also have a company, Reclaimed America, which holds a patent in reclaimed and repurposed materials just from barns throughout the country where we actually take that wood, restore it, and use it for properties.

Q.     Okay.  And how many employees does Federal Home have?

A.     We don't.  We rely on our subcontractors.  So I have two consultants who help run the actual business, and then each discipline, electrical, mechanical, plumbing, framing, carpentry is a subcontractor relationship.

Q.     And how does that vary between jurisdictions?

A.     It depends.  So, they often change.  I do the majority of my work in Fairfax County.  I have come out of working out of Washington, D.C. just because of the logistics of it, and then Arlington County.

So typically, we have relationships with subs and workers that have gone over 20 years. Some of them I've inherited through my mom's original business 30 years ago. Some of them are new folks. The majority is when we get into a jurisdiction like Arlington, we would find someone who would have the relationship in Arlington and the proximity to make it easier and be more attentive to a project.

Q. Okay. And could you explain to the Court what your typical project is?

A. Yes. My typical project nowadays is either I am doing a full restoration of a home. That would involve interior gut-outs and basically re-electrifying replumbing, new -- redoing the entire interior of the home. There's a lot of -- I've got life-long clients that I've worked with that are constantly adding things to their projects, as well as folks who have bought houses from me, and I continue to work with them and their families.

Again, it could be something as simple as a kitchen or a bath or it could go to a full restoration or adding a historic element to a house.

Q. Okay. And when did you become familiar with 6122 Lee Highway, the property that is in this particular dispute?

A. I grew up on flag maker -- Flagmaker Drive in Falls Church, Virginia with my mom, and I knew Lee Highway very well. I didn't really understand that until I got older to know what

that house meant on top of the hill.  I had known about the house for approximately ten years before it went on the market again.  It was constantly coming on the market and coming off the market with different real estate companies, and I've always had an interest in it because it was a historic -- one of the only historic structures on Lee Highway in Arlington.

Q.     Okay.  And you currently -- where do you currently live?

A.     I live in McLean, Virginia.  I live in the Langley Ordinary.  The Langley Ordinary is a 1840 farmhouse that was the headquarters for the Union general, General McCall from Pennsylvania.  The house has served as a cornerstone of Langley Forest, which is on Chain Bridge Road in Georgetown Pike.  It's a very significant area in regards to preservation.  Our house is the actual contributing structure for the entire neighborhood.

That triangle has the original toll house from Georgetown Pike, as well as the first church after the Civil War in which blacks were allowed to worship.  It's just a very historic corner, and our house is the contributing structure, 1842 federal farmhouse with clapboard and metal roof.

Q.     And what was your role in refurbishing that house, if any?

A.     I bought the house from the Potomac School Board of Trustees.  The Potomac School owned the house, and they were donated it by Mrs. Holdsworth who was the original teacher at

Potomac School.  It came to -- it came up for sale and there was talk about people taking it down because of the shape that the house was in, and I immediately looked at it and wanted to purchase it.

It was originally on over two acres, and we purchased the house, the side lot, and started our restoration.

Q.    Okay.  And did you fully restore that property?

A.    Yes.  The Langley Ordinary, it was taken completely down to stud with the exception of all the Civil War signatures that are up in the attic which we have preserved, but basically the entire house went down to stud and then it went back up and all mechanicals, MEPs, mechanical, electrical, plumbing, was completely revamped throughout the house.

The significance is, the 1842 floors were kept, the original hard pines, and they were replaced in place.

Q.    Have you done other old houses?

A.    Yes, sir.  My oldest house is 700 River Bend, which is the historic Jackson House.  It's a 1790 log cabin farmhouse that I completely restored and added a large great room/kitchen, as well as a -- as well as a bedroom and exteriors to that.

I've also done a historic house with the Fine Arts Commission of the United States in Georgetown on O Street, which was another full tear-out/restoration.

I've done exteriors in Washington, D.C. for developers for preservations of old churches and masonry, as well as a lot

of 1950 and 1940 -- that's kind of my specialty, the old ramblers and grabbing them and adding to them so they don't get demoed out and making them up to modern standards.

Q.    Could you explain to the Court briefly some of the differences between how approaching a restoration is done as opposed to new construction?

A.    Yes.  Restorations vary.  Very sensitive.  You have an existing structure that cannot typically be changed, especially when it's historic -- historic, there would be meetings and conversations and you would say, you cannot do anything to the exterior that is not like in kind, so basically the shell is untouched and then all the work and exploration begins inside.

The difficulty is you have an existing structure that typically has approximately an inch to two inches of horsehair plaster, lath plaster that is concealing the entire bones of the structure.

So we go in, we make a decision in regards to what is in good shape and what is in bad shape, where -- how we're going to get new mechanicals, electrical, and plumbing through the house, as well as being able to abate some old things.  Typically in an old house there could be cloth wire that's been buried in a wall, there's old cast plumbing that's rusted out, and it's just a completely different thing.

When it's a new construction, you end up with a fresh set of plans and you have basically -- you put your foundation in,

you then put your framing system in, and then you're able to start with a clean slate.

An old house, whether it's 1790s, whether it's a 1930 house, it has its own character and its own story that no one knows until you open those walls.

Q.   Are there plans of any sort related to these old houses with the jurisdiction in which they reside?

A.   No.  You -- well, sometimes there are and sometimes there are not.  There's a lot of research that takes place.  The said property that we're talking about today, that house was deemed historic by Arlington simply because of its age, as well as there were some ambassadors that had visits there during specific times in its history.

Arlington had no real plans on the house.  There was an existing plan that showed the side -- the side porch that is now the area -- that right side area where the mudroom exists, but it was basically a handwritten survey.  It was not stamped or verified.

Q.   So in these sort of circumstances, what is your approach to figuring out what you have and moving forward?

A.   I meet with historic -- I meet with the building group. It's typically a plan reviewer.  I then take the plan reviewer and they would give me guidance and say, "We need more information," or things like that.

So once that happens, we then go through a very extensive

time and very slow and laborious in regards to taking off the old plaster and revealing the actual skeleton or structure of the building.

Q.    Okay.  So turning back to this specific property, how did you decide to come to purchase it?

A.    I -- let's see.  Dan Lockard contacted me.  Originally Evergreene Homes was going to build four new homes there.  They were going to demo the old house out.  They were going to put four new houses up.  The county wouldn't allow them to do that, to get approval of the subdivision, so then they approached me and said, "We're not interested in the old house.  Do you want to restore the old house?"

So I started down a path of looking at the old house and trying to figure out what I could do with it.  I went back and forth as, do I make it my house?  Do I just clean up the old house?  We did some back-and-forth with Evergreene, and then apparently Evergreene backed out of the deal, and the house was still there.  I had met Hunter Hale, who was the owner that I purchased the home from and worked extensively with him to come up with some sort an agreeable idea of restoring the home and then building three close-to-historically correct new homes that would be surrounding it just so it looked like a cohesive -- a cohesive development.

Q.    Okay.  And was the property subdivided at the time that you purchased the property?

**A.**     Yes.  We made that a requirement.  Originally, the County approved the subdivision, but it hadn't actually been recorded. There were multiple lending issues that the owner had to take care of in regards to doing the actual subdivision, and they would not approve breaking up the -- or recording the subdivision until certain lenders allowed it to happen prior to closing.

**Q.**     Okay.  And how was your purchase of the property financed?

**A.**     Um, the Adler family, Adler Financial.

**Q.**     Okay.  They did what?

**A.**     They invested in me and believed in the project and allowed me to move forward.  I did not have the funds to acquire the project, so they came and allowed -- to do an investment with me in order to actually build out the project and do the development and restoration.

**Q.**     Okay.  At the time -- when did you purchase the property?

**A.**     I purchased the property three -- it was the -- 2018, the fall of 2018.

**Q.**     Okay.  And could you explain to the Court what the condition of the property was in when you purchased it?

**A.**     Yes.  It had the original interiors.  There was one addition that was done on the back of the house, as well as the side of the house, that was never documented in any County records.  It was a complete double brick structure, center hall

colonial, very federal structure.  It had interior plaster throughout.  Originally it had six bedrooms, including the carriage house.  They were renting the carriage house as an apartment, above the garage system and carriage house, and it was just kind of overgrown.

I know Mr. Hale had moved to North Carolina, and it was a burden for him to keep up, so the house was very overgrown, a lot of old trees and growth on the house and systems.

Q.    Okay.  And could you explain to the Court what your vision of the project was going forward after you purchased it?

A.    Yes.  I met with Arlington Historic, and my goal was to, again, save the house and make it a highlighted structure on Lee Highway.  It was -- my goal was to clean out all the old interiors, rebuild, refortify, rebuild structure, add additional brand-new systems, mechanical, electrical, and plumbing, as well as modernize it from a standpoint of better vapor barriers in regards to new windows, trim, things like that.  Basically just take care of this old structure and kind of bring it back to new, but make the interior scream and have like a very clean, aesthetic, but with new systems, just better lighting, low voltage, more green approach.

I'm a member of the green building council, so when we take on these older houses, it's really important for me to be able to make them more conducive to 2020 standards or whenever I'm building it.

Q.      Okay.  And what was your approach with Arlington County to start this work?

A.      Yes, I originally went in in October to pull a permit.  I met with Historic, I met with my original permit reviewer.  I submitted plans for the existing bathrooms that were in the house, as well as the existing kitchen.

The first comment we received back from the County was, "Well, how are the pipes running, how are the electrical running, how was this house put together," which we had no idea what was behind the wall, and as we do in any project, including Fairfax County or Washington, D.C., we end up with a -- like a renovation permit that would allow us to take interior walls down, allow us to do new plumbing, new electrical, new mechanical.  The issue becomes that you cannot know what you're going to replace unless you can open it up and actually inspect and visually see it, which we worked with the reviewer on.

Q.      And what did the reviewer want you to do.

A.      Find out where centerlines were, find out how a waste line ran through a house.  If you have a bathroom on the third floor, how does it end up making it to the County sewer.  Basically doing discovery -- discoverable areas to understand exactly how the house was originally put together, but then the difficulty becomes is, once you know where the house is being put together, you then have to see how your new modern infrastructure is going to play with the existing structure.

Q.      Okay.  And what does the building code authorize you to do in those sorts of circumstances?

A.      Every jurisdiction is different.  When I've done it in Fairfax County, there's -- basically, it's a remodeling permit. Every jurisdiction agrees that anyone, homeowner or a contractor, can take down interior walls down to studs to see what they have.

The gray area becomes once you start laying out mechanical systems and seeing issues that need to be replaced or abated.  That's where the coordination with the County is important.

Q.      Okay.

MR. BURCHER:  Your Honor, I would like to have Mr. Deluca refer to the Uniform Statewide Building Code.

(Discussion had off the record.)

THE COURT:  You'd like to have him refer to the building code?

MR. BURCHER:  Just real quick.  I want to point out one section.  I can highlight it on the ELMO, if that's the easiest way to probably deal with it.

THE COURT:  Is it an exhibit?

MR. BURCHER:  It's already been submitted as an exhibit by the plaintiff.

THE COURT:  Okay.  Identify it for the record, please.  I didn't hear you if you did.  You were walking away to get the

book, so we couldn't hear what you were saying.

MR. BURCHER:  I'm sorry.  I apologize Your Honor.  I apologize.  I'm not sure which exhibit number it is.  I think you took judicial notice of the Statewide Building Code --

THE COURT:  Okay.  Yes.

MR. BURCHER:  -- as part of the process.  It's not a specific exhibit.

MR. LYNCH:  I think that's right.  It may be 1071, but I'm not sure.  I have just one objection to state, see where this is going.  To the extent he's offering opinions about law or opinions about how the permitting process works, he was not disclosed as an expert.  So I think that's going to confine what he's able to say about this book, what the law allows, what the law doesn't allow.

THE COURT:  He can testify to what the code says and what he did and he believed it was in compliance with the code, and he just can't say, you know, "I know from speaking to Lawyer Jones that this is legal in Arlington County."  He can't give an opinion like that, okay?

MR. BURCHER:  All we're doing is having his -- what his knowledge is and what he understands it to be and how he acted as it relates to --

THE COURT:  And that will be admitted.

MR. BURCHER:  Okay.

(Possible Exhibit 1071 admitted into the record.)

BY MR. BURCHER:

Q.    Mr. Deluca, I would like you to focus on the section, 108.1, and it says, "When applications are required."

Do you see that?

A.    No, sir, I cannot.

Yes, sir, I can.

Q.    Okay.  Do you see that?  Are you familiar with that section of the code?

A.    Yes, I am.

Q.    Okay.  I'd like you to focus on the section that says, "In addition, the building official may authorize work."

Do you see that?

A.    Yes, sir.

Q.    Okay.  What is your understanding of that particular provision and how it relates to the work that you were undertaking?

A.    There was just a lot of coordination with Arlington County in regards to how the actual plans were being created because of the historical nature of the house.  It gives the building official the authorized work to commence pending receipt of the application or the issuance of a permit.

The issue in this regards is the application or the permit could not have been given without knowing exactly what was being put back into place.

Q.    Okay.  And how did you proceed with figuring out what the

status of the as-built property was?

A.    Basically in any project that we do of historic restoration or renovation, we would start from the top down because you're relieving the house of the pressure of the structure, and that would be wall coverings.  Honeysuckle Hill, which is the name of the house, the Lee Highway house we're talking about, had, again, plaster throughout, as well as metal lath backing on 4-by-4 and 2-by-4 construction with double brick exterior vapor barrier.

So what we did was we went up into the attic -- I believe we received a comment in October that said, "We need to see centerlines.  We need to know exactly where everything is going to go back into place and how it's going to come down."

We started top down.  It was probably a 60- to 70-day process in which we peeled the entire interior coverings of the property down to actual skeleton and structure.  I believe we had just finished the first floor in December, so we started in the attic, we went to the third -- the second floor, we went to the main level, and then we ended up in the basement.

Q.    Okay.  And I would like you to refer to Defendant's Exhibit 130, which I believe is also Plaintiffs' Exhibit 408, and identify what this document is.  We'll just call it up on the screen.

A.    The Adler family, again, invested in the property, so any time we had progress on the property, we would contact them and

give them status reports.

Q.    Okay.  And these were -- you did this approximately --
what was the period of these reports?

A.    This was very early on.  This was probably the first
report.  This was in November -- November 1st, 2018.

Q.    But the periodicity, did you do this on about a monthly
basis?

A.    Yes, sir, that's the goal.  It doesn't always happen that
way, but we try to.

Q.    And if you could, just explain to the Court the pictures
that are identified here in the status of the project at this
time.

A.    Yes.  Again, this is -- it's November.  We had just
started doing the main level in regards to taking off all the
plaster and bringing the house down to skeleton.  The mantels
were historic, so we saved all the mantels and then, again, got
rid of all the lath plaster and the weight that was on the
interior skeleton of the house.

Q.    Okay.  And I'd like you to turn to -- this is in the
Arlington County official binder, the Emad Elmagraby direct
exhibits.

A.    Yes, sir.

Q.    Could you pull that binder up?

    MR. BURCHER:  And, Your Honor, I'm going to do my best to
not re-create documents and other additional binders and rely on

the ones that we've already kind of utilized.

THE WITNESS:  Yes, sir.

BY MR. BURCHER:

Q.    Okay.  Could you turn to Plaintiffs' Exhibit 430 in that binder?

A.    Yes, sir.

Q.    And could you identify what this document and the attachments behind it are?

A.    This was the original permit that we applied for in October to start all the interior cleanups.  This was just taking the fixtures out and as well as the kitchen, but it led to the asks in regards to centerlines and how the infrastructure of the house was.

Q.    Okay.  And if you look at the bottom of the plans on each page, it has a -- it has "20181020" on it.  It that the date that those were kind of created?

A.    I think so, but I think I was in there two weeks prior putting everything together.  I understood through zoning that historic -- anything I did would either just do a nod to know that they saw it, but yes, this is the actual document that was created at that time.

Q.    Okay.  And could you turn to Exhibit 439, please, in that book.

A.    Yes, sir.

Q.    And what do you understand that document to be?

**A.**    This is one of the trade permits.  One thing that we do as a practice with our company as well as -- I just believe in electrical plumbing and mechanical should be done by the expert. It's also a code requirement in regards to --

**Q.**    Mr. Deluca, this is not the trade permit.  Can you look at the top and see what this -- are we looking at the same --

**A.**    No, sir, I'm looking at an electrical permit.  I'm sorry. Pardon me.  I'm looking now at the internal system of Arlington County for permits, inspections, and plan review records.

**Q.**    Okay.  So you're looking at Arlington page 286?

**A.**    Yes, I am.

**Q.**    And what date does it show you submitting those plans initially in October of 2018?

**A.**    October 29th, 2018.

**Q.**    And based on that, did you start a process of investigating and answering the building official's questions?

**A.**    Yes.  Basically when you go into Arlington you go in and give them a description of what you're doing or what the end result is going to be, and -- yeah, Sunny -- I guess we met with Sunny on that day, and then Sunny asked to clearly indicate all the existing infrastructure throughout the house.

**Q.**    Now, were you marketing the property at this time period?

**A.**    No, sir.

**Q.**    And why not?

**A.**    I had no idea what we were dealing with the house.  We

were just starting all of the restoration and how to put it back together.

Q.    Okay.  And who is Brendan Muha?

A.    Brendan Muha, I worked for his family for probably the last 14 years on all of their projects, construction related, and any of their properties or their children's properties.

Q.    Okay.  And what is his connection with this particular property?

A.    Brendan -- Brendan's father asked -- told me that Brendan wanted to be in real estate and would I help him as a builder or anything that I could do to introduce him or assist him in the process, which I was fine doing.  I -- again, I've known Brendan since he was in high school, and I wanted to help out the family.

At the time, Brendan was selling a house right across the street from my property, so originally he was directly across the street, and he asked what I was doing, and I said, "I'm restoring an old house," and that there are three additional lots.

Q.    Okay.  And did he become your real estate agent at this time?

A.    No, sir.

Q.    Okay.

A.    Can I clarify one thing?

Q.    Of course.

A.      When Mr. Muha contacted us, Mr. Muha's a large insurance executive.  He asked -- he would give me insurance advice from time to time, and then -- as well as business advice, but then in regards to the real estate, when he said Brendan became a realtor, my wife and I had a -- or my wife had a condo in Washington, D.C. that she was going to sell, and she was going to just sell it herself, but Brendan through I think one of his partners, Jeremy, or his vice president, ended up representing that transaction as a favor to Mr. Muha.

Q.      Okay.  But they were not your agent at this time?

A.      No, sir, no.

Q.      And so I'd like you to turn to Defendant's Exhibit 132, please.  I'll call it up on the screen.

A.      Yes, sir.

Q.      Could you identify this e-mail?

A.      Yes.  This is the December -- the December draw with the Adlers, and I'm just giving them an updated -- updated -- updated report on the project, what our thoughts are, what we have to do.

        At that time Brendan said that he had a partner from General Electric/PwC, wanted to take a look at what we were working on.

Q.      Okay.  And is that the Harrells that that --

A.      Yes, sir, it is.

Q.      All right.  So did you ultimately meet with the Harrells?

A.    Yes, I did.

Q.    Okay.  Could you explain to the Court -- and this was when?

A.    This was in the December time frame.

Q.    December of 2018?

A.    Yes, sir.

Q.    Okay.  And could you explain to the Court your recollection of that December meeting?

A.    Brendan brought the Harrells to my existing residence, which is the restored property, the Langley Ordinary.  The Harrells looked at the Langley Ordinary.  There was a time where they were even thinking about purchasing my existing property.

Q.    Mr. Deluca, please focus on what happened at this particular meeting.

A.    Yes.  We met and it was the first time meeting.  They said that they were moving to the area and they were looking for a house, a house to purchase.

Q.    Okay.  And did you show them your house?

A.    Yes, sir, I did.

Q.    Okay.  And did you go to 6122 Lee Highway?

A.    Yes, we did.

Q.    And what do you recall discussing with the Harrells at that time?

A.    Just what my plans were.  I was gutting the house out.  They were interested in finding a house that was close in.  They

did not -- they -- it was just a very simple walk-through of a project that was under way.  Again, we were gutted out.  I believe we had two floors left to go.  Windows were coming in, and it was just a very cordial walk-through.

Q.    What, if anything, do you recall discussing about the project and a particular building size?

A.    There was never any building size discussed on this project at all.

Q.    At this meeting?

A.    At this meeting.

Q.    And what, if anything, do you recall discussing with the Harrells regarding the roof of the property?

A.    There was no discussions about the roof.  There -- it was -- the roof was a -- the roof, how we found it, how we originally bought it, it was -- there was no specific discussions about a roof.

Q.    All right.  And what happened next after that meeting?

A.    We had a good meeting.  It was very positive.  I received a -- received a handwritten note from John Harrell, and that basically was it.  The holidays then happened and it was Christmas at that point.

Q.    Did you have a subsequent meeting with the Harrells?

A.    Yes, sir, I did.  Brendan informed me that the Harrells wanted to purchase Arlington and that would like to meet at the Ritz-Carlton and celebrate and discuss the further next steps,

and we ended up going -- I ended up going to the Ritz-Carlton to meet with the Harrells.

Q.    Okay.  I would like you to turn to Defendant's Exhibit 133, please.

MR. BURCHER:  Pull that up on the screen.

A.    Yes, sir.

BY MR. BURCHER:

Q.    Okay.  And could you go through what you told the lender at this time with regard to the Harrells and what was kind of going on?

A.    It was going back and forth.  We were looking at different scenarios in regards to what I was working on, as well as giving the -- kind of basically the Lee Highway -- the Lee Highway updates, and it basically broke out existing ideas of how a contract would come in and how it would look monetarily.

I also gave an update on my year-end close to the investor.

Q.    Okay.  And so you had this meeting with the Harrells. Can you describe what was discussed in the meeting with the Harrells at the Ritz-Carlton in January?

A.    Just that they felt that my existing house was too expensive, and that they liked the Arlington house and wanted to move forward with a contract.

Q.    Okay.  Did you discuss any particular size of the house --

A.    Never.  Size never came up until after the litigation started.

Q.    Again, I would like you to --

A.    I'm sorry, sir.

Q.    -- stay with the specific time that I'm asking the question about, Mr. Deluca.

A.    Yes, sir.

Q.    With regard to the -- do you recall any conversations with regard to the slate roof at this January meeting?

A.    I don't.  I keep looking back.  Apparently there was a conversation that Mr. Harrell thought or believed that I said it was an original slate roof, and I never had a conversation.  I had a conversation that it was an original roof, but there was no reference to slate at that time.

Q.    Okay.  So I don't understand what you just said.  Was that -- did that occur at that January meeting, or was that at another time?

A.    That was a different time.

Q.    So issues --

A.    At the January meeting, absolutely not.

Q.    All right.  And what, if anything, was discussed about measuring the property at this meeting?

A.    There were no discussions about measuring the property.  I was working on a bump-out addition that was going to be an owner suite on the back of the house, and that is all that

happened.

Q.    And so what happened after that meeting?

A.    I was under the belief that I was waiting on a contract.

Q.    And during the January time period, did you ever receive a contract from the Harrells?

A.    No, it became very silent, and it was Brendan -- Brendan was working on at that time some floor plans, but there were no discussions with the Harrells.  I would ask, "Is the contract coming?  Are we going to move forward?"

Q.    Okay.  And you mentioned that Brendan was working on some floor plans.  Could you explain to the Court your understanding of what was going on in that regard?

A.    I didn't know it until after the fact, but the Harrells had toured 15 properties or around -- an enormous amount of properties after the commitment to purchase Arlington, and Brendan never told me that it wasn't happening and that they were -- I had no idea that they were continually looking at other properties after I thought they were purchasing Arlington.  I believed Brendan was thinking about how to continue to show that he was working on the project.  He brought HomeVisit out to do floor plans of the house.

Q.    Okay.  And what do you recall was your interaction with Mr. Muha regarding the floor plans?

A.    None.

Q.    Okay.  You don't recall any interaction with Mr. Muha

regarding floor plans?

A.    Just that he would come out and do them.  It was a disaster.  They -- basically they brought a technology camera out to shoot a house that was completely open with all studs and walls.  There was just a lot of inaccuracies with this original company.

Q.    Okay.  I would like you to turn to Plaintiffs' Exhibit 560.

MR. BURCHER:  These are in the Muha binder, Your Honor.

THE COURT:  Okay.  Five-six-zero?

MR. BURCHER:  Five-six-zero, yes, Your Honor.

BY MR. BURCHER:

Q.    And I would like you to turn to the pages that are -- that start Harrell 11.

A.    Yes, sir.

Q.    Could you identify these pages for me, please?

A.    Yes.  This is the carriage house that -- well, which is one of the plans that they had began to work on.

Q.    Okay.  And there's handwriting throughout this portion of the exhibit.  Could you identify what was going on with this handwriting or do you even know?

A.    Yes, sir.  This was their attempt of creating plans for the house.  Multiple areas were labeled wrong.  They called the family room or great room a recreation room.  The kitchen wasn't properly laid out.  They put doors where there were cased

openings.  There was no symmetry, and they had just not done any work.  There are -- one, two, three, four, five -- five areas which are my handwriting, and there are two areas which are, I believe, Brendan Muha's writing.

Q.    Okay.  Where are you pointing out your handwriting, what pages?

A.    I'm on, I believe it's 19.

Q.    Okay.  How about on -- if you could turn to Harrell 21.

A.    Yes, sir.

Q.    Can you identify what floor that is?

A.    This would be the second floor.  Can I erase the green off?  I don't know how to do it.

Thank you.  Yes, sir.

Q.    And could you identify what this is describing?

A.    It was the same issue.  There was just interpretations that were done with their camera, as well as the representative who came to the house, as well as Brendan.  A perfect example, the one bedroom was labeled a living room when it was on the second floor of the house, and then, again, the plans had still not finalized for the owner suite, so they were taking stabs at what that would look like.

Q.    Are there any dimensions on the owner suite?

A.    No, sir, there's not.

Q.    Okay.  So how did you feel about the status of these plans at this stage?

A.     They were bad.

Q.     Were they accurate?

A.     No, sir.

Q.     All right.  And so what did you do with Mr. Muha as it relates to the particular plans over the course of January?

A.     I kept working with him.  I just said, "Whoever is doing these plans are terrible," and I questioned if anyone actually came out to the property.  I asked them if they could physically take tape measures and measure, and they said no, they relied on a technology system to do so, and that's it.  We just kept going down that path and still no discussion about the final contract for Lee Highway.

Q.     And ultimately did you ever see any plans that you thought were accurate?

A.     Not really, no.  They were always -- they were always very jumbled together and not very accurate.

Q.     And this wasn't something that you commissioned; is that right?

A.     No, no.  I -- my understanding now is, as Brendan was showing them other properties, that it was to prove that he could market the house to someone else or -- I don't know exactly what was going on.

Q.     But from your perspective, this is not something that you ordered, is that --

A.     No, sir.

Q.    All right.  If you could turn to Defendant's Exhibit 134, please.

Would you identify this exhibit?

A.    Yes, sir, it's just my typical monthly update.  A lot of developers are interested in lots.  The Harrells had completed a loan committee with a local bank, and that they had been approved for $4.5 million and that we're still waiting for a contract.

Q.    And who informed you that they'd been approved for lending?

A.    I believe it was Brendan.

Q.    All right.  And let's go through some of the pictures and explain to the Court the status of the project at this stage?

A.    Yes, sir.  This is the rear carriage house.  There had been an existing 2-by-4 roof that was built on it.  There was a subsequent tree to the left of it that had fallen onto the carriage house, and penetrating the roof and breaking the original ridge beam, so a new roof was being put on.

Q.    Okay.  And next.

A.    Yes.  This is an outdoor area that would later become the outdoor kitchen, and that is the carriage house with the original to when I bought it roof on it.

This is the rear yard being established and growing in. This is the lawn.  The walls have been pointed up.  The windows have been replaced, and just cleanup and progress.

Q.     Now, what is your understanding with respect to whether windows being replaced needs a building permit?

A.     It does not.

Q.     Okay.  Go to the next page.  Go up one.

What's going on in this particular picture?

A.     Yes.  The old side porch has been taken out.  The windows continue to go in.  The structural slab across the sidewalk has been installed.  Cleanup, windows are still being swapped out.  Just a lot of point-up and cleanups.

Q.     All right.  And what happened in February with regard to your understanding of the Harrells?

A.     I seem to recall from Brendan that the Harrells had decided that they weren't going to buy Arlington and that they were going to buy a house in Great Falls, and they felt awful and wanted to ask if I would still -- just that they were sorry and would I consider to still work with them because they loved my design and how I built things.

Q.     Okay.  And so what happened next?

A.     Brendan set up a phone call between myself and John Harrell.  John, again, apologized that they didn't buy the Lee Highway house and that -- would I still be willing to work with him and help design and make this other house their own house, and I said I would, and I said there were no hard feelings and how could we -- you know, anything I could do to help, I would be happy to help.  Also, he was -- that was it.  He was applying

to my daughter's school, which is across from our house, and I asked if there's anything else I could help him with, I would.

Q.    Did the Harrells ultimately buy the house in Great Falls?

A.    No.  Apparently -- and, again, this is secondhand information.  There was a bunch of inspections that took place at the property.  They also brought in the original builder of the house.  There was no -- the lists were just building and building and they ultimately decided not to move forward with the purchase of Great Falls because there was too many repairs that needed to take place.

Q.    Did you learn that at the time -- concurrent with?

A.    Soon after.  After I committed to helping them, I took a bunch of photographs offline and started drawing some conceptuals for them for the Great Falls house, and then they -- I guess it was the last day of the inspection period of their contract that they canceled the Great Falls house.

Q.    All right.  And did you ultimately reengage with the Harrells to discuss the 6122 Lee Highway property?

A.    Um, there was another period where it was quiet. Apparently they decided that they were then going to move into D.C. so there was approximately eight homes that they were considering in D.C.  None of them worked out and they ended up coming back to me.

Q.    Okay.  Could you explain to the Court what happened and how they reengaged with you as to the 6122 Lee Highway property?

**A.**    They said that they want to work with me and build this house on Lee Highway and that's what they would end up doing, and we got together with Brendan, and Brendan would come up with a contract.  He would come up with a cost of how much things costed [sic], and we would move forward with the Arlington house being their own house, their new house.

**Q.**    Did you have any meetings with the Harrells at this time?

**A.**    It was very -- everything as over the phone.  There was not a lot of meetings.  There was one meeting at the house where we kind of did a walk-through of where I was working-wise, but there still had been no new guidance.  It was basically where's the house right now, and just a walk-through.

**Q.**    Okay.  What, if any, specifics do you recall discussing with the Harrells at this March walk-through?

**A.**    Just kind of my vision for the house, how I wanted to do it, how I would do my interiors.  I was specific in regards to bathrooms or hardwood floors because of a warmth factor, mechanical systems, things that I wanted to do.  The owner suite was important because it represented an owner bedroom behind the house on the second floor, and that's all we basically discussed.  We just walked around the project.

**Q.**    Did you have any conversations regarding a specific building size that the Harrells were looking for?

**A.**    No, their only thing in specificity was there was a rear great room or a rear living room, and I was basically doubling

that and creating an owner suite behind the house.

Q.    So there wasn't a specific number that was discussed between you and the Harrells at this time period?

A.    No, never, no.

Q.    How about any discussions regarding the status of the roof or the roof slate being original?

A.    I don't believe so.  We had a discussion.  I said the house was -- I was very impressed with the strength of the house because of the double brick exterior, but I didn't have any discussions about specific materials.

Q.    Did you discuss with the Harrells the status of permits on the house at this time period?

A.    No, just that I would have all the permits that we would need to finish the project.

Q.    The Harrells testified that there was a conversation related to their house in Connecticut and permit issues with that.  Do you recall that conversation occurring?

A.    I believe there was something going on with a paving permit, and then after later research, I believe, you know, well after our stop, that there was a porch that they had been building for three years in Connecticut that never received its final permit until, I believe, October of 2019, so the open and close was about a three-year gap.

Q.    But do you recall having a conversation with the Harrells at this time regarding that particular issue?

A.      Just -- not that particular one, but I guess a paving contractor.  It wasn't in regards to the porch issue they were having.

Q.      So did you have a conversation in the March 2019 time period with the Harrells regarding that issue of theirs, or was that at another time?

A.      That was at a different time but -- I'm sorry if I'm mixing up dates.

Q.      When do you recall that conversation occurring?

A.      I would believe it would be around -- could be after closing that this was going on.  You know, again, after further research, we saw after closing that they originally closed their three-year porch project in October, November of 2019.

Q.      The Harrells contend that the statement that the main house was 6500 square feet and the carriage house was 1500 square feet, do you recall that statement ever being made by anybody?

A.      No.  There was once an insurance call that had taken place and there was a text message, and they -- Brendan, Mrs. Harrell, I'm not sure if John Harrell was on the text, but they were working with an insurance company prior to closing and getting just basic square footage of the house.

Q.      Mr. Deluca, I'm focused on the prior to signing.

A.      No, not at all.

Q.      All right.  And can you explain to the Court, you know,

what generally what your interaction was with Mr. Muha as compared with your interaction with the Harrells during this time period and working on specifications with regard to the contract?

A.    Mr. Muha asked me to put together a list of how I was delivering the house and how I'd come up to the purchase price. Again, there was specifics where I was putting hardwood floors in the bathrooms, I was doing certain millwork which was included.  It was a typical Wolf/Sub-Zero kitchen package.  It was just basically an outline specification of what was included and what I was selling with the house at that time.

Q.    Okay.  And what was the status of the plans at this time?

A.    Prior -- they were just -- they were still in development.  We were still making sure that if, in fact, we had the contract to move forward, we would move forward with all of our plans and bring the house to completion.

Q.    Okay.  I would like you to turn to -- I'll use the Plaintiffs' Exhibit 1, which is in the John Harrell binder, which is the same as Defendant's Exhibit 13, which is the contracts between the parties.  If you could turn to that, please.

MR. BURCHER:  Could we bring up the binder.  I think we're going to go through some things in which the written document may be helpful for him.  It's the John Harrell direct exhibits, Volume 1.

BY MR. BURCHER:

Q.    Could you turn to Exhibit 1 in this binder, please?

A.    Yes.

Q.    Okay.  Could you identify the first portion of Harrell -- of Exhibit 1?

A.    Yes.  This is the typical Residential Sales Contract for Virginia.

Q.    Okay.  What, if any, input did you have to this particular document?

A.    Just how much I wanted for the house the way I was delivering it, just the price.

Q.    Okay.  So if you could turn to page 3 of 16, which talks about the settlement date.  How is the settlement date determined?

A.    We discussed on how we were finishing the house and when we felt that it would be done, and it was just a date that Brendan and John, I guess, agreed on and came up with.

Q.    Okay.  And at that time were you -- what was your understanding of your ability to deliver the house, you know, by that date?

A.    Yes.  It would be substantially complete with no problems by June 26th, 2019.

Q.    Okay.  And if you could turn to paragraph -- page 7 of 16, please.  I'm focused on paragraph 10.  What was your understanding of the condition that the property was going to be

delivered at closing?

A.    Final walk-through.

Q.    What did that mean to you?

A.    It meant that we would develop a list and whatever was not done would be done, and we would, you know, basically have a walk-through and that list would become one of -- you know, a walk-through for the house.

Q.    Okay.  And at the bottom of that paragraph it says, the "Buyer waives the opportunity to make this Contract contingent upon home inspection."

       Do you see that?

A.    Yes, sir.

Q.    What, if any, involvement did you have in suggesting that the Harrells waive the home inspection contingency?

A.    I had no involvement with regards to the Harrells putting any of these things in the contract except for the price.

Q.    And if you could turn to Harrell 14204.

       No, no, no, it's the page number at the bottom.

A.    Can you repeat that?

Q.    Yes.  12404.

A.    Yes, sir.

Q.    Okay.  Was the sale contingent on an appraisal contingency and financing contingency?

A.    Yes, the bank would have to come out and inspect the property as-is.

Q.      And at any of this time, whether it was before the contract was signed or after the contract was signed, what, if any, restrictions did you place on the Harrells in touring the property or inspecting the property?

A.      The house was always open and anyone was always welcome to come in and out of the house at any time during this project.

Q.      All right.  So, I would like you to go to Exhibit B on this document, which is on page 14208.

A.      Yes, sir.

Q.      Okay.  What is Exhibit B and how did you understand Exhibit B to kind of work?

A.      Exhibit B would be basically what was being delivered with the house as we intended to finish it, how we were going to deliver the house, whether it be finishes, whether it be bathrooms, what kind of kitchen we would put in, and just try to create more specificity with what was delivered in the contract in written word.

Q.      And if you could turn to page 14212 of that document.

A.      Yes, sir.

Q.      What is this section of Exhibit B?

A.      These were upgrades that the Harrells wanted. Apparently, the original -- the original loan approval included additional dollars that they could use, and they could add additional things to what I was originally delivering.

Q.      And how did -- were these items that you would have done

to the property?

A.    No.

Q.    And so these were customizations by the Harrells?

A.    Yes.

Q.    Okay.  And why would you not have added these things, you know, to the -- to what you were doing?

A.    Because they were very specific to the Harrells on what they wanted to customize inside the house.  They would not -- it wouldn't change how I was delivering the house or how I was finishing it.  It would be just something very specific to themselves.

Q.    And how would that have impacted your sales price to somebody else?

A.    It wouldn't affect anything.  It would be probably a negative because it was specific to their desires.

       MR. LYNCH:  Your Honor, I never want to interrupt, but I need a break really soon, and I could just excuse myself.  I'm happy for it to go on, but --

       THE COURT:  Well, why don't you go ahead and excuse yourself and Ms. Brown is here.

       MR. LYNCH:  Thank you.  Thank you.

BY MR. BURCHER:

Q.    So, from your perspective as the seller of this property, would these additions have increased the sales price?

A.    No.

Q.      And why is that?

A.      Because they were specific to the Harrells.  These are directions that the Harrells wanted to make the house more custom to them and their family.

Q.      So the contract was ultimately signed; is that right?

A.      Yes, sir, they signed the contract and we were just waiting on the appraisal contingency.

Q.      A couple quick additional questions with regard to the contract.  Did the contract have any provision associated with the required building size?

A.      No, sir, there was never a building size discussed in this project except, again, in regards to insurance and homeowners insurance.

Q.      How -- if there was a specific building size that was put as a specification in the contract, how would you have approached the project differently?

A.      I would have added a deliverable into the contract to make sure that I met that contract requirement.

Q.      Similarly, is there any reference to the roof in any fashion in the contract?

A.      No, sir.

Q.      If there had been a reference in the contract to a specific requirement associated with the roof, how would you have approached that requirement?

A.      It would become a line item within Exhibit B to say, this

is what I'm delivering at the time of closing and this is the specific -- the specific item that they wanted in the contract.

THE COURT:  When you say the word "deliverable," it means you would put it in -- it would be a line item in the contract itself?

THE WITNESS:  Yes, sir, or it would show up in Exhibit B as an outline specification of how the finishes would be delivered.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Yes, sir.

BY MR. BURCHER:

Q.    And is there any reference in the contract as to permits in any fashion?

A.    No, sir.

Q.    Okay.  But as the developer of this project, you are still responsible for the permits that were needed to be obtained on this project?

A.    Of course.  I was responsible for the permits as well as the inspections, yes.

Q.    But you don't recall any specific requirement that the Harrells put in the contract as relates to permits in any fashion?

A.    No, sir.

Q.    All right.  So, from your perspective, what was happening at this beginning of April time period as it relates to permits?

A.      We got an actual contract on the project, we knew how we were going to deliver it, and now we were able to go into Arlington County and tell them exactly what we were going to build and how we were going to build it.

Q.      All right.  So I would like you to turn back to the exhibit that we looked at before, which was Plaintiffs' Exhibit 430, if you will.  It's in the Elmagraby binder.

A.      Can we bring it up on the screen?

Q.      Yes.

A.      Thank you.  Yes, sir.

Q.      Okay.  Was your -- it says, on page Arlington 1429, it says, "Approved April 3rd, 2019"; is that correct?

A.      Correct.

Q.      Okay.  So if you could explain to the Court the correlation between this time period, the demolition that you're doing, what Arlington County wanted, and your approach to the permits on the property.

A.      At this time, we knew exactly what we were doing and now that there was someone who was interested in buying the property, we knew exactly how we were going to deliver it.

There were two things.  One was the restoration, a cleanup of all the existing bathrooms as well as the kitchen in the property.  That involved being able to give them centerlines on how it acts with the the waste line or how infrastructure would be supported within the framework of the house.

In addition to that, it gave us the okay to have electrical, mechanical, and plumbing start once they were -- everyone was in alignment of how they were going to put it back together.

The addition to that, there was an addition that would be going on the house, which was the kitchen addition with the great -- with the owner suite behind the house which would then be a second permit.

Q.    So the fact that the permit issued on April 3rd of 2019 and you had been doing some things before this time period, based on the reference that you provided to the building code, do you feel you were authorized to be doing the work that you were doing at that time?

A.    Yes, I did.  And, again, there is an ability to find out exactly how infrastructure is running.  We are trying to figure out how a 4-inch waste line is going to line up with the wall and basically from the attic make it to the -- all of the critical systems, which would include electrical, the main sewer line that ran to Lee Highway through the house, as well as water and mechanicals.  Again, everything was open and nothing was concealed.

Q.    And so if you recall that some of the people that testified before you said that this was unpermitted work, it may have been unpermitted, but do you think that you were able to do the work that you were doing at this stage?

A.      Absolutely.  It's a historic structure.  Chapter 9 of the building code describes that a local official, whether it be an inspector or the actual building official, can make any determinations in regards to how code relates to the historic building.

Q.      And with regard to the work, there's also been a contention that you had started to close up some of the walls at this time period.  Do you recall that?

A.      Yes, I do.  I don't believe --

Q.      Let me ask you a question.

A.      Yes, sir.

Q.      Do you agree that you had started to close up the walls at this stage?

A.      Yes, certain areas.

Q.      Okay.  And explain to the Court why that was something that was --

A.      A perfect example, Your Honor, is if I'm inputting infrastructure behind a wall and one wall is -- a perfect example is the office.  We would sit in the office every day and it would be the middle of winter and there's no R-value, dust is flying everywhere, so in order to -- from a safety perspective, we put one side of drywall up and that would allow us to at least have our interior office protected.  The opposing wall would have been open and any inspector at any time could go in and see all of this.

There have been times where they gave pictures of ceilings.  Ceilings on one side were open, and the other side was not open.  It was done so so the County could come out and make any determinations on what they could.

There was another ceiling that one of their witnesses -- one of their experts came and said, "He closed this entire ceiling down."  There was no mechanical in the ceiling, there was only electric in the ceiling, and I did receive the concealment permit for the electrical at that time.

Q.    We'll get to that --

A.    Yes, sir.

Q.    -- point in a second.  But at this stage --

And let's go ahead and pull up Defendant's Exhibit 137.  If you could scroll through that exhibit with the pictures.

A.    Yes, sir.

Q.    I'm sorry, 138.  Keep scrolling.  So, with respect to this particular wall, did you even remove anything?

A.    That wall was never removed.  That is the original drywall that was in the house.  It was one of very few actual drywall walls versus plaster, so that wall was smoothed out.  Wood substrate was created as well as wainscoting, which is that chair rail that is running there, and that is a typical prairie box trim detail that I do up staircases.  The original rail is existing.  It does conform to modern standards, but, again, nothing was changed there except the application of wood.

Q.      Could you go to the next place, please?

A.      Yes, sir.  That's the entire wall -- all the walls open in the house.  This is looking from the family room, great room into the kitchen.  Beyond that, you see the office wall, and, again, one side of the wall is open and I believe they showed a photo of one side of the wall closed.

Q.      Could you go to the next page.

A.      Yes, sir.

Q.      And what's going on with the carriage house at this stage?

A.      This is installation of the carriage house door, which is a two-car garage, as well as decorative trim and pergola that goes over it to support a vine.

Q.      Okay.  And go to the next page.  Let's go to -- keep going.  Could you explain what's going on in the carriage house at this stage?

A.      Yes, we designed a New York City fire escape.  Living in New York, I wanted to do an industrial-looking fire escape in the rear gym and have that go up to the apartment above.

Q.      And are all the walls open at this stage in the carriage house?

A.      Yes, sir.  This is all mechanical in a rough state as well as electrical in a rough state as well as framing is still open.

Q.      Can you go to the next page.  Can you explain what's

going on with this wall?

A.    Yes.    This is an interior hallway that's being repainted. It's not part of a structural wall.  The structural walls would be the perimeter of the outside, and it's the wainscoting application, as well as crown molding above.

Q.    So is that something that requires a building permit?

A.    No, sir, nor a license.

Q.    Okay.

MR. BURCHER:  Go to the next page.

BY MR. BURCHER:

Q.    So this shows the entranceway.  What was going on with the ceiling, with the entranceway?

A.    This is a 1930 door surround, so it's an spider web transom above.  It's very -- it's an incredible architectural detail.  We kept that in place.  The existing radiators in the house were kept in place, and that existing ceiling was kept in place.

Q.    Okay.  If you could turn to Dashco 294 in that exhibit, please.  There's been some contention that this wall here was closed in prior to any inspections.  Do you agree with that contention?

A.    I do not.

Q.    And if you recall the picture that we showed of the other side of that wall that was in this exhibit, was it open?

A.    I don't recall on that one.

Q.    Well, if you could turn back to Dashco 287.  Is that the other side of that wall?

A.    No, sir, it's not.  That is the kitchen going into the dining room.

Q.    But if you were to look at the other side of the wall that we referred to on 294, would that be what you would see similarly, the wall being open?

A.    Um, not in that perspective.  You would see it in the ceiling as well as you would see it on the side.  Again, that one lead wall in the outside had not received any applications.  Meaning -- if I could restate.  Applications meaning of wood, paint, drywall, final coverings.

Q.    Okay.  And if you could turn to the last page of that exhibit, which is Dashco 305.

A.    Yes, sir.

Q.    Could you identify what this is?

A.    Yes, sir.  This is all my permits.  There were some permits that weren't listed in everything that was provided in discovery.  These are zoning recognitions in regards to fencing of just documents from the -- from the project that were placed in the window in case anyone needed to see what we were working on.

Q.    So what was your interaction with Arlington County at this stage now that you had the building permit issued?

A.    It constantly was -- it was fluid.  We pulled trade --

all of our trade permits and then we started doing all of our

inspections.

Q.     Okay.  And how did this building permit that you obtained

relate to the entirety of the project?

A.     From the standpoint of if you opened up the bathroom, you

would have to be able to inspect the pipe that went from the

bathroom to the termination site, all the way through the house

and be able to trace back to an inspector so they could see how

something was finished throughout the house.  In doing so, you

would take a 4-inch waste line from the attic and be able to

trace it all the way through the skeleton of the house to the

bottom where it meets the sewer and it connects to the public

facility that ran along Lee Highway.

Q.     Okay.  I would like you to turn to Defendant's Exhibit 96

for me, please.  We'll just call it up on the screen.

A.     Yes, sir.

Q.     Could you identify what this exhibit is?

A.     These are building plans for the addition, as well as

the -- the addition as well as the kitchen.

Q.     Okay.  And how did the issue -- what's the date -- what

date are these plans?

A.     April 17th, 2019.

Q.     Okay.  And so how did the finalization of these plans

relate to the contract signing and the status of going forward?

A.     Just, we knew exactly how the house was going to be

finished and what was going to be added, and we went down the course to complete the contract deliverable.

Q.    And how did these relate to your opening up and removing of plaster and all of those sorts of things?

A.    Just affirmed where all the centerlines were in the house and how a bathroom would relate to the existing infrastructure of the house, as well as all of the interior framing.

Q.    So would it be fair to say that you're now able to finalize the plans and submit them for approval?

A.    Yes.

Q.    So if you could turn to Defendant's Exhibit 139, please.

      And what is this document?

A.    It's another update that's just giving the investor progress on what we're working on.  This particular photo is a photo in regards to kitchen millwork, and the Harrells were confirming what color the kitchen cabinets would be.

Q.    What is the date of this e-mail?

A.    May 5th, 2019.

Q.    Okay.  And if you could turn to page 319 of that document.  What was going on with the selections of tile as it relates to the Harrells at this time period?

A.    Mrs. Harrell stated that she didn't want my hardwood floors in any of the bathrooms and that there were specific tiles she would like to select for each bathroom.  We went down a path where multiple selections would start being made for the

project.

Q.      Okay.  And what is this a picture of on May 5th?

A.      This is a picture of gold inlay tile, which is a waterjet tile, for their son's bathroom.

Q.      Okay.  And if you could turn to page 344 of that document, please.

A.      Yes, sir.

Q.      Could you identify what this document is?

A.      This is an approved concealment permit for all electrical throughout the renovation portion of the house.  There is some -- let's see, some additions that she wants, she would like to have two receptacles on the main level along the rear of the house, and then add a GFCI to a bathroom.

Q.      Could you explain to the Court what your personal involvement was with regard to the various different inspections that went on at the property?

A.      The inspectors would come out and each subcontractor would be responsible to walk through.  The electrician would walk through the electrical.  The mechanical would work the same way, as well as any kind of inspection that was there.  If the sub wasn't able to be there, then I would walk and do the inspections with them, but if I was there, I would always walk an inspection.

Q.      Okay.  With regard to this specific time period, this permit allows for concealment; is that correct?

A.      Yes, sir.

Q.      Okay.  And what do you understand you were allowed to conceal as of April 30th of 2019?

A.      All of my electrical walls that were open on the project.

Q.      Okay.  And did that include the carriage house?

A.      Yes.

Q.      Okay.  So from your understanding, did the inspector inspect the carriage house as well as the main house?

A.      Always.  The entire property -- every time an inspection was done, they -- both buildings, they're literally within 15 feet of each other, both would be inspected collectively.

        MR. LYNCH:  Objection, lack of foundation.  How does he know that?

        THE COURT:  He just said he walked the --

        THE WITNESS:  I would -- I'm sorry, sir.

BY MR. BURCHER:

Q.      If you could, explain a little bit more as to what your personal involvement was in that inspection?

        THE WITNESS:  Is it okay, Your Honor?

        THE COURT:  Yes, sir.

        THE WITNESS:  So I would walk -- when the inspector would be on the property, I would walk with them and with the subcontractor.  If the subcontractor was at lunch or if someone wasn't there, then I would walk them with them.  I believe there were two times on the project that we were at lunch and the

inspector would walk the project and leave our sticker on our work desk, which was in that office room, which ended up being the dining room.

BY MR. BURCHER:

Q.    What, if anything, did the inspector say with regard to the work being both in the carriage house and in the main house? Did they include all of those inspections as part of the process?

A.    They included all of those inspections.  Again, as electrical was inspected, as mechanical was inspected, there were multiple permits that were shared on both sides.  Again, both buildings are very close to each other in proximity, everything is wide open at this time.  Doors are open, workers are everywhere, everything would be inspected.

Q.    If in your experience there was work that was unpermitted going on and an inspector would come, what would generally happen if there was an issue with regard to unpermitted work at this stage?

A.    You would receive a stop work order.

Q.    Did you ever receive a stop work order from Arlington County?

A.    Never.

Q.    All right.  If you could turn to exhibit -- that same exhibit, page 345, please.

A.    Yes.

Q.      Okay.  What is this document?

A.      This is another inspection.  It's a rough inspection and it's for everything except for the addition, and it is approved as noted, full "mechanical," "rough" inspection, April 25th, 2019.

Q.      So, could you explain to the Court this practice of the inspectors carving out a particular section in terms of approving it or disapproving it and how that worked in terms of your approach to the project?

A.      It was a very open relationship, Your Honor.  The inspector would come.  There would be areas that we were working on, areas that we needed to close that were critical.  There were areas that weren't ready for the actual inspection and, in this example, the addition in the back of the house, but by no means did the inspector not walk through and note all of those things every time they inspected.

Q.      So, with regard to doing these sort of partial inspections, does the same inspector come out and relook at those sort of things?  Do you usually have a working relationship with that person?

A.      Absolutely.  There could be times, to, if you went back to the electrical when that inspector asked for that.  She asked me to take photos of it so they would be available when she came back, and she would clean up any permits.

        I think subsequently -- I don't want to jump ahead, but

there were multiple meetings with the County after this just so they could basically do an accounting and an audit of all the inspections that happened, and that was with the six times that Emad had visited the project with all of his inspectors and lead inspectors.

Q.    We'll get into that.

A.    Yes, sir, I'm sorry.

Q.    I'm focused on right now at this time period and your relationship.

A.    Sorry.

Q.    So you've got the rough-in for everything, mechanical on page 345, and then five days later you get the concealment for everything on page 344; is that correct?

A.    Correct.

Q.    Except the addition?

A.    Except the addition.

Q.    Right.  All right.  If you could turn to Defendant's Exhibit 15, please.

       MR. BURCHER:  I'm just going to call this up.  It's quick.

BY MR. BURCHER:

Q.    Could you identify what this document is?

A.    Yes.  It's a forward from John Harrell.

Q.    Okay.  And what is he forwarding to you?

A.    The bank had done an appraisal on the property, and the property was able to be approved for value for the loan.

Q.     Did you review the appraisal when he forwarded it to you?

A.     Yes, I did.

Q.     And what did you look at it for?

A.     The cost of the main house being 2.5 million or -- I don't recall the specific numbers, as well as what -- all the lots that surrounded the house, what those values were.

Q.     Okay.

MR. BURCHER:  Can you turn to Defendant's Exhibit 14, please.  Next page.

BY MR. BURCHER:

Q.     And is this a copy of the appraisal that was --

A.     Yes, sir, it is.

Q.     Okay.  Did you look at the square footage measurements that were in there in any fashion?

A.     Not really.  Again, I was really concerned on or interested on how much the main house was worth and how much the three lots around the main house and that lot interacted.

Q.     Had square footage been a topic of conversation or an important focus of this contract, would you have looked at the square footage?

A.     Yes, sir, I would have.

Q.     Okay.  And ultimately, was the appraisal contingency removed from the contract?

A.     Yes, the value, I think it exceeded what they were borrowing, and we were able to move forward or it could be

removed.

Q.    Okay.  And help me out with what was going on with the -- we're about a month into the contract now.  What's going on and how are you interacting with the Harrells during this time period?

A.    I guess they're going back and forth in regards to elements that they'd like to add to the house.  Their financing had approved for a certain amount, so they were adding things.  Typically it was through an e-mail or a text, but, again, a very fluid relationship, a back-and-forth of what they would like to add to the sales contract.

Q.    Were there additional customizations at this time period?

A.    Yes, sir.

Q.    Okay.  Could you characterize what those were?

A.    There was -- I mean, it changed constantly.  This -- I believe at this time a pool was added -- was added to the scope of work.  I'm sorry, interior customizations, the finishes, just throughout the entire house adds were coming in.

Q.    Okay.  And ultimately, did you document these changes in some fashion?

A.    Typically, John would write them, Brendan would -- I don't even think Brendan did the spreadsheet, so Brendan would take John's spreadsheet, I would put a value on what it would cost to do that, and then it would become part of their contract.

Q.    Okay.  And so I would like you to go back to Plaintiffs' Exhibit 1 in the John Harrell binder.  And if you could turn to page 14224, please.

And just real quick, this is what?

A.    The appraisal contingency being removed.

Q.    Okay.  And if you could good to the next page, please. And this is -- can you identify what this is?

A.    Yes.  This is an addition that the Harrells wanted to add to the contract.  Again, they wanted to add a pool.  They wanted to add an exotic wood deck around one side of it.  There was a water feature, which was a spa that spilled into the pool, as well as an outdoor shower.

Q.    Okay.  And how did this impact the project and these requests at this date?

A.    It just -- there were just more work and more scope that was being added to -- added to our work list.

Q.    Okay.  Did the closing date change as a result of this?

A.    I don't believe so.

Q.    And what was your general understanding of why the closing date didn't change as a result of these significant additions?

A.    It was a working relationship.  Everything was about being substantially complete and making sure to protect the loan and make sure that everything was just inspected by the bank. It was never about a specific date, it was always about being

substantially complete.

THE COURT:  Is this a good time to take our morning break?

MR. BURCHER:  Yes, Your Honor.

THE COURT:  All right.  Let's take 15 minutes then and we'll come back and continue with direct examination.  All right. We're in recess.

(Thereupon, a recess in the proceedings occurred from 10:56 a.m. until 11:21 a.m.)

THE COURT:  Please continue.

BY MR. BURCHER:

Q.    Mr. Deluca, we were in the May 2019 time period when we took a break, and I would like to turn your attention back to that time period.  And you were testifying about the contract and selections by the Harrells.

Did there come a time in which you discussed these tile selections with Mrs. Harrell?

A.    Yes, sir.  Mrs. Harrell came into town and we spent a time visiting vendors.  We went to Marble Systems Corporation as well as a gym store and a -- we spent time at the house, and then went out to lunch.

Q.    Okay.  I would like to turn your attention to Defendant's Exhibit 186, please.  Could you identify this document for me, please?

A.    Yes, this is a text message between -- I believe it's just myself and Mrs. Harrell.

Q.      And what's the date of this text message?

A.      It is May 3rd, 2019.

Q.      And what did you do with Mrs. Harrell on or about May 3rd, 2019?

A.      Again, we went to Marble Systems, we selected all of the tiles, we went to a gym store, we visited to the house and did walk-throughs, and we went to lunch.

Q.      And as a result of this meeting, did you feel that she had selected the tiles for the house?

A.      Yes, I did.

Q.      And what did you do as a result of that meeting?

A.      I ordered the tile.

        MR. BURCHER:  And I would like you to turn to Defendant's Exhibit 111, please.  And if you could scroll down to the May 10th payment, please.

A.      Yes, sir.

BY MR. BURCHER:

Q.      Do you see a May 10th payment for approximately $25,000 in that --

A.      Yes, sir, 25,726.

Q.      Well, first of all, what is this document?

A.      The payment for the tile.

Q.      What is the document?

A.      Oh, I'm sorry, it's my credit card that I share with my wife.

Q.    Okay.  And is this how you place orders for the company?

A.    Yes, I do.

Q.    And what is the $25,000 payment there?

A.    It's a payment to Marble Systems for the tile for Arlington.

Q.    And how did you come up with this particular number?

A.    It was given to me by José Shephard.

Q.    And who is José Shephard?

A.    José Shephard is the inside sales rep for Marble Systems.

Q.    Okay.  And how do you place orders with Marble Systems?

A.    I get a quantity count, an idea of what I need, and then I'm told from Marble Systems how much something costs, and then I make a payment.

Q.    Okay.  And in this particular instance, do you recall the specific conversations with Mr. Shephard?

A.    I don't.  We went through the entire house, and I needed a cost on all of the tile, and I provided -- he provided me with a number, and then I paid the amount.

Q.    Okay.

MR. BURCHER:  And Your Honor, I actually would like to clean up a little bit.  I need to move a few exhibits into evidence while we're here.  The ones that I've gone through, it's Defendant's Exhibits 130, 131, 132, 133, 134, 136.  They are also corresponding plaintiffs' exhibits as well, they're just the Dashco reports that we've gone through.

THE COURT:  All right.  Any objection?

MR. LYNCH:  No objection.

THE COURT:  All right.  They're all received.

(Defendant's Exhibits 130, 131, 132, 133, 134, and 136 admitted into the record.)

MR. BURCHER:  Defendant's Exhibit 96, which are the addition building plans, Exhibits 137, 138, and 139.

THE COURT:  Any objection?

MR. BURCHER:  More Dashco reports.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  They're received.

(Defendant's Exhibits 96, 137, 138, and 139 admitted into the record.)

MR. BURCHER:  Defendant's Exhibit 14 and 15, the appraisal and the appraisal e-mails.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  All right.  They're received.

(Defendant's Exhibits 14 and 15 admitted into the record.)

MR. BURCHER:  Okay.  And then Defendant's Exhibit 186, which is the text.

MR. LYNCH:  No objection.

MR. BURCHER:  And Defendant's Exhibit 111, which is the

credit card statement.

MR. LYNCH:  No objection.

THE COURT:  All received.

(Defendant's Exhibits 186 and 111 admitted into the record.)

BY MR. BURCHER:

Q.    All right.  I would like you to turn to Defendant's Exhibit 122, please.  Could you identify this exhibit?

A.    Yes.  It's an invoice from Marble Systems.

Q.    What's the date of this document?

A.    The date of the document is May 17, 2019.

Q.    And what is this for?

A.    Marble -- specialty marble, Snow White and Aspen marble for Arlington.

Q.    Was this one of the orders for tile that you had ordered on May 10th?

A.    Yes, sir.

Q.    Okay.  And I would like you to turn to Defendant's Exhibit --

MR. BURCHER:  I would like to move in Defendant's Exhibit 122.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 122 admitted into the record.)

BY MR. BURCHER:

Q.    I would like to move to Defendant's Exhibit 123, please. Can you identify this document?

A.    Yes.  It's another -- another order with a "ship to" to Arlington.

Q.    What's the date of this invoice?

A.    It is 5-17-2019.

Q.    I would like you to turn to Defendant's Exhibit 124, please.  Could you identify this document?

A.    Yes, it's another document from Marble Systems, so we made the payment or the main payment for the entire house, and as Marble Systems is fulfilling the order, what they're doing is they're shipping and deducting from the credit that had already been applied to my account.  It's an internal way that they do -- that they're doing this.

Q.    All right.  I would like you to turn to Defendant's Exhibit 125, please.

A.    Yes, sir.

Q.    Would you identify this document?

A.    Yes.  This is more, more marble for 6122 Lee Highway project, June 5th, 2019.

Q.    And I would like you to turn to Defendant's Exhibit 126, please.

A.    Yes, sir.

Q.    Could you identify this document?

**A.**     Yes.  This is again another deduction off of my account, and Marble Systems fulfilling -- this one was COD collection on -- so this came from, I believe, the warehouse in Miami, and then I went to the warehouse and I picked it up.

**Q.**     And Mrs. Harrell testified that she had sent you some spreadsheets, and ultimately approved the master bath tile.  Do you recall that testimony?

**A.**     Yes, she sent it to me.

**Q.**     Okay.  Had you already ordered the master bath tile at this time -- by the time that she had sent that?

**A.**     I had with the exception of the large slabs that she was looking at how the two interacted with each other.  How the floor interacted with the wall tile.

**Q.**     So, even though she confirmed this after the date that you ordered it, you had already ordered it by the time she confirmed it; is that a fair --

**A.**     Yes.

**Q.**     I would like you to turn to Plaintiffs' Exhibit 749, please.

        MR. BURCHER:  We'll just call this up on the screen for the ease of everybody.  749.

        While I'm waiting for him to call that up, I would like to move into evidence Defendant's Exhibits 123 through 126, Your Honor.

        THE COURT:  Any objection?

MR. LYNCH: No objection.

THE COURT: They're received.

(Defendant's Exhibits 123, 124, 125, and 126 admitted into the record.)

BY MR. BURCHER:

Q. All right. Could you identify what the Plaintiffs' Exhibit 749 is?

A. Yes, it's a spreadsheet, I believe, from Marble Systems showing debits and credits against my account, as well as my credit card statement.

THE COURT: Is this all one?

MR. BURCHER: It's all one exhibit, Your Honor. It's the credit card statements that also show those payments.

THE COURT: All right.

BY MR. BURCHER:

Q. So, Mr. Deluca, have you gone through the exhibits that I've just gone through -- Defendant's Exhibit 122 through 126 and determined where you were at about the time period of June 20th, 2019 in terms of the drawdowns on the $25,000 payment?

A. About half, Your Honor.

THE COURT REPORTER: Pardon?

THE WITNESS: About half, Your Honor -- sir.

BY MR. BURCHER:

Q. So of the $126,000, you had drawn down about $13,000?

A. Of the $25,000, I had drawn down about 13, is what is

shown on this document.

MR. LYNCH:  Your Honor, I would like to move into evidence Plaintiffs' Exhibit 749.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  Okay.

(Plaintiffs' Exhibit 749 admitted into the record.)

BY MR. BURCHER:

Q.    I would like to turn to Defendant's Exhibit 141, please. And while we're waiting for that exhibit to come up, could you explain to the Court what's going on generally in the beginning of June time period with regard to the project?

A.    We're just moving forward, getting as much done as possible. We have decided that there is no way that the pool is going to be substantially complete prior to closing. We have -- again, there's additions and memorializing different things within the contract. There's a bunch of addendums going back and forth from the Harrells and Brendan.

Q.    Okay. And who is funding these -- how were the customizations being funded?

A.    The Harrells were selling their house in Connecticut, and they didn't have the funds to pay for the upgrades. They asked me to go to my investor, the Adler family, and to increase an allonge to fund their improvements until they closed on the property.

Q.    And is that what you did?

A.    Yes, sir, it is.

Q.    And at this time with all of the additional additions and customizations, what, if any, discussions did you have regarding the closing date?

A.    None.  Just that -- if I could correct myself, just that there's no way the pool would be substantially complete before closing, and, again, there was all -- the biggest concern was -- is, if the bank was okay to close, we would be fine with closing, and things had to be substantially complete.

Q.    And with regard to the customizations, how did they play into your ability to close being substantially complete?

A.    They had just -- it would just leave open items at the time.  There was some specific gold and polished nickel fixtures that the Harrells wanted.  It was in -- in that time frame in Italy it's impossible to get anything done over the summer, so a lot of the factories shut down.  We were concerned that they weren't going to be open -- that the bathrooms would be substantially complete for them and for the bank, so we ordered Rohl fixtures in polished chrome to exactly match the gold fixtures and the polished nickel fixtures so we could install and have functional bathrooms working.

Q.    And for the record, how do you spell Rohl?

A.    R-O-H-L.

Q.    All right.  So we have Defendant's Exhibit 141 up.  Could

you identify this document?

A.      Yes.  This is the May 20th -- the May 20th e-mail to the investor, and it's -- you didn't see it on there, but these were like receipts that were attached to it, as well as specific items that were being worked on and added on for the project.

Q.      I'd like you to just scroll through some of the pictures to give the Court a sense of the status of the project as of this end-of-May time period.

A.      Yes, sir.  The front, the slate wall is coming to completion along Lee Highway.  Tile has been delivered, multiple bathrooms, everything is being staged on a protected floor within the house.

        The foundation -- the add-on, the new fireplace has been poured and is in place.

        The wall continues to be completed.  There is a new water meter that is added to the property.  As we were going through, we thought it was critical if we replaced all the infrastructure inside the house, that we would replace the water line as well as the sewer line to the project to ensure that it was new.

Q.      And did you get a permit for that process?

A.      Yes, I did.

Q.      What are these pictures of?

A.      Just the construction.  That's the water line coming into the property -- to the Arlington sillcock.

        This is the front motor court which would be in

pebblestone.  We installed an American flagpole and asphalting of the new prepping for the new driveway.

That is the new sewer line that's being run to the Arlington County sewer system.  Another photo of the sewer. That's just photos, documentations of stages of project.

This is a photo of their daughter's room.  We did extensive built-ins on this back wall.  I believe they're all with access doors and drawers across them, but, again, it was an add-on for a built-in that would be delivered, and millwork.

Q.    And what is the status of the addition portion of the project at this stage?

A.    We are just getting -- prepping and getting ready for full framing.

Q.    All right.

MR. BURCHER:  Pull up Defendant's Exhibit 19 for me, please.

And, Your Honor, I would like to move Defendant's Exhibit 141 into evidence.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  It's received.

(Defendant's Exhibit 141 admitted into the record.)

BY MR. BURCHER:

Q.    Mr. Deluca, could you identify Defendant's Exhibit 19 for me, please?

A.      Yes, it's a text message with myself, Mrs. Harrell, and Brendan Muha.

Q.      Okay.  Do you recall what this e-mail -- or this text exchange was about?

A.      Yes.  John had asked Dawn to get the homeowner's insurance, and there was a certain company that they could work with, and they were trying to figure out what's the insurable piece of the property.

Q.      And do you see at the second page of that text that Mrs. Harrell says, "My recollection was when we asked before buying was that the main house was going to be approximately 6500 and the carriage house was 1500."

        Did you see that?

A.      Yes, sir, I did.

Q.      Was that ever asked of you or was that asked of Mr. Muha or do you even know?

A.      I don't even know, but it didn't -- I don't know who, but it didn't alarm me at all.

Q.      Well, was it asked of you?

A.      No.

Q.      Okay.  And so did you feel that you needed to respond to this text?

A.      No.

Q.      Okay.  And correct Mrs. Harrell at all?

A.      No.

Q.      Why not?

A.      Because it was in the range of the square footage of the property.

Q.      Now, you respond that the Dawn's gym is approximately 350 square feet.  Why did you do that?

A.      I was working in the gym at the time and I was putting mirrors up, and it was an easy measurement for me to grab because I was in the gym, and I just wanted to be as helpful as I could while I was there.

Q.      All right.  I would like you to turn to Defendant's Exhibit 181, please.

A.      Yes, sir.

Q.      Could you identify what this exhibit is?

A.      Yes.  It's a rough approval.

Q.      And what did this relate to?

A.      This related to the addition where this important piece on the bottom is "Rough Including Shower Pan."

        Any time a shower pan is approved for rough, the entire shower pan is filled with water so it can be observed underneath, as well by the sides, to ensure that there's no leakage.

Q.      And we'll get into this later, but there's been some testimony by the plaintiffs' expert that the shower pans could potentially leak.  Do you recall that testimony?

A.      Yes, sir, I do.

Q.     And so how does this inspection relate to those shower pans?

A.     It shows that the shower pan, again, is filled completely -- it's plugged at the bottom with a bulb and filled completely to the rim and then the inspector looks underneath to ensure that everything is not leaking and there's no issues prior to closing.

Q.     I would like you to turn to Defendant's Exhibit 184, please.  And could you focus on the top inspection sheet?

A.     Yes.  It's an inspection for field disciplines.  It includes building, electrical, mechanical, and plumbing, and it's a "Partial as noted," and the note is "firestop all plumbing.  All framing okay less fireplace area and amend." Again it's "Mechanical," "Electrical," and "Plumbing."

Q.     And what was this related to?

A.     This was related to the addition, the owner suite.

Q.     And if you could look at the next inspection ticket that's below that?

A.     Yes, this is the inspection for insulation.  Again, after we received that inspection, the home was spray-foamed and insulated, and they came back to ensure that all of the insulation was in place.

Q.     And it mentions that foam certificate.  Do you see that?

A.     Yes, sir.

Q.     Okay.  Could you turn to Defendant's Exhibit 143, please?

A.    Yes, sir.

Q.    Could you identify this document for me, please?

A.    This is Energy One America from South Carolina.  This is from the main office as well as the field supervisor that certifies all of the spray foam insulation that went into the project.

Q.    There's been some testimony about this being signed versus unsigned.  What is your experience in that regard?

A.    It's a certificate of record from the company, so it's documented with the address, as well as each wall that received the insulation.

Q.    Do you know if this has been submitted to Arlington?

A.    It was reviewed when Emad did the six visits with all the inspectors.  I guess there were seven inspectors that worked on the project.  Everything was evaluated in the field on what people saw and what people documented, and it was part of that, just to ensure.  Originally the experts said there was no insulation in the house, and it wasn't true, so we submitted the insulation certificate.

Q.    All right.  So, we're in mid-June right now, and I'd like you to turn to Plaintiffs' Exhibit 496, and this is at page 58302.

      MR. BURCHER:  I believe that, Your Honor, this is in the John Harrell binder, which we can -- we'll have him call it up, but...

THE COURT:  Okay.

MR. BURCHER:  We have to go to page 58302.

BY MR. BURCHER:

Q.    Mr. Deluca, do you recognize this document?

A.    Yes, sir, I do.

Q.    What is it?

A.    This is a text message between myself and Dawn, and I think John Harrell is on it, but I can't -- I'm not sure.

Q.    And what is he asking you at this time?

A.    What are the roofs and what was new versus what was old and what -- the insurance company wanted to know how to insure the roofs.

Q.    And what did you tell him?

A.    I told him that the two additions were new, that the porch was new, three sides of the carriage house was new and that the front half, I wasn't sure, but they should come out and check for themselves.

Q.    Do you know if he came out and checked for himself?

A.    I don't -- I don't know.

Q.    Did Mr. Harrell any time after this text tell you that he was surprised of this report because you had told him that it was original 1930 slate?

A.    No.

Q.    Have you ever been told -- did you ever tell anybody that it was 1930s slate?

A.    No.

Q.    Is this 1930s slate?

A.    No.  There's no way.

Q.    Why do you say there's no way?

A.    Just because the 1930, you would have a much thicker version of slate.  You wouldn't have the thinner version of the product, of the slate product or the TruSlate, they called it, and it is not -- I only know it from when I bought it or from when I was a kid walking by the house.

Q.    Did you ever represent to Mr. Harrell that it was the 1930s slate?

A.    No, sir.

MR. BURCHER:  So I would like to turn back to Plaintiffs' Exhibit 1, if you could.

BY MR. BURCHER:

Q.    While he's pulling that up, what was going on with the contract and closing around the mid-June time period?

A.    Just that the contract was receiving additions, subtractions, updates, amendments, and there was a lot of documentation that was going on between Mr. Harrell and Brendan Muha.

Q.    If you could turn to Harrell 14242 on that exhibit.

A.    Those were drawings of the pool that I did.

Q.    So, I want you to look at the page that's on the screen right now.

A.      Yes, sir.

Q.      What's going on with the contract at this stage?

A.      I informed them that there's no way that the pool could be substantially complete by closing and, therefore, it should be taken out of the contract, and they agreed, and this is memorializing it.

Q.      And what is behind that exhibit?

A.      It's a revised Exhibit B to show where documentations and changes.  There's a black font there -- at this point there was black font, there was blue front, and there was red font.

Q.      Okay.  And then again if you could turn to Harrell 14255, please.  So what happens on June 20th?

A.      There's something technical that happened between Brendan and John and they said that they had to remove the exhibit completely out of the contract and that they would end up updating the contract at a certain time.

Q.      Okay.  And is this that update?

A.      Yes.

Q.      Okay.  So if you could turn to 14256, please.  What's going on on this page?

A.      The money that was saved by taking the pool out of the contract gave them more leeway to add more customizations, that which they ended up doing in this document.

Q.      Okay.  And look at paragraph 2.  What's going on in paragraph 2?

A.    They thought that -- we all thought that it was important to figure out what work remained and was there a value of it, also as well as document certain things that we would do to assist with after closing, hanging mirrors throughout.  They wanted to swap out the Sub-Zero refrigerator in the outdoor kitchen and make it refrigeration drawers.  All of that could have been -- if I could just read it for one second.  Correct.

Q.    If it's easier for you to read, this is Plaintiffs' Exhibit 1 in the John Harrell binder, so it may be easier to look at from a paper perspective.

A.    Yes, sir.  Sorry about that.

Q.    And this is at page 14256.

A.    Yes, sir.  So, "Seller to complete the list of check items post closing."

It was just saying there were items that there's no way they're going to be done before closing, and that there would be updates on times and room to do it.  Again, there was just multiple items that were not going to make it in closing in time.

Q.    I would like you to focus on the one that talks about "Master Bath final tile deposit is paid for."

A.    Yes.

Q.    Based on your review of those exhibits that we went through with marble tile and your credit card payment, how do those relate to this statement here?

A.      That Marble Systems had significant amount of deposit money for this tile and it was sitting on my account at Marble Systems.

Q.      Do you feel that that was an accurate statement at the time that you made it?

A.      Yes, I do.

Q.      Okay.  And what was the kind of status -- this other tile had been sort of delivered, and we'll go through some more in a minute, but what was the status of this particular tile?

A.      It was a very specific arabesque tile that had a black marble in it that was a black/gray that was very difficult for them to get.  They -- they were saying eight weeks at their warehouse.  I believe they were building it or constructing it in Chantilly, Virginia, but later I understood that it was coming from a Miami facility, and that it would take up to eight weeks to get.

Q.      What, if anything, did you do to try to get this, you know, moved forward?

A.      I pushed it along.  I contacted the Marble Systems rep, and I asked him, "Is there anything that I can pay as a premium to push this along, to help the Harrells?"

He replied to give him $7500 in cash and he would push the tile up in production.

Q.      Did you do that?

A.      No, sir.

Q.      Was it clear to you at the time that the tile -- the master bath tile was on order in these conversations?

A.      Yes, it was.

Q.      And again, with regard to ordering from Marble Systems, you didn't, like, fill out a form, did you?

A.      No.  It was -- when Mrs. Harrell was in town, we basically had photos and documents of what she selected.  Square footages were given.  It was either a phone call or an in-person order with José that initiated the order.

Q.      All right.  So I would like to go back to the defendant's exhibits regarding the tile.

        If you could turn to Defendant's Exhibit 127, please.  Could you identify this document?

A.      Yes.  It's a Marble Systems order deduction from my account.

Q.      And could you turn to Defendant's Exhibit 128, please.

A.      Yes, sir.

Q.      And what is this document?

A.      This is another Marble Systems deduction from my account from the 25,600 -- 700.

Q.      And what's the date of this invoice?

A.      June 26, 2019.

Q.      And it says, "Terms," "COD - Collect on the Del"?

A.      Yes.

Q.      How did it work with Marble Systems?

A.      Well, they say it's a cash-on-delivery system, but on specialty tiles, the money has to be paid in advance before they'll actually deliver it.  Marble Systems has different setups with regards to a slab warehouse, the marble warehouse, as well as a production facility that creates them, as well as tile in stock.  So in order to pick up any of the tile, whether it be in stock or a special order, you have to pay in advance.

Q.      And had you paid in advance for the master bath tile?

A.      Yes, sir, I did.

Q.      So, what other material orders were outstanding at this time?

A.      There was the -- the amendment memorialized the fact that we would purchase additional Rohl fixtures in lieu of the gold- and the nickel-plated fixtures so we could get the bathrooms up and running, which I believe the amendment did, as well as there could be -- nothing, really.  I mean, it really came down to the tile, the front gates, the front gate motors, and they were waiting for Arlington to complete the meter before they could install the sprinkler system.

Q.      And so could you describe for the Court in this June -- towards the end of June time period what the status of the project was?

A.      We were -- at that point we had every bathroom except the -- her son's -- the Harrells' son's bathroom, which was a specialty order blue for his cabinet.  We were also waiting for

the owner suite tile.  There was some confirmations going on back and forth on the owner suite with the closet.  Mrs. Harrell came in and there were adjustments being made to the owner suite, so we had to move some walls, and then again we were waiting for the gold-plated and nickel fixtures that were coming from Italy.

Q.    There was some testimony previously about you being concerned about closing.  Do you recall that testimony?

A.    Yes, sir.

Q.    Were you concerned about closing?

A.    I was.  Your Honor, I was very concerned that this house had been customized beyond an ability to close.  I was reminiscent of the house that they put a contract on in Great Falls and the list, and then pulling out of it, and I did have concern that at this point, the house was no longer a classic American restoration, it turned into a house full of marble, specialties, things that were so specific they were no longer the project that I started on.

Q.    And were you -- at this point about how much had you advanced for the customizations?

A.    I don't remember the exact numbers, but I know it was over $250,000.

Q.    And with regard to the status of the project, as the builder, did you feel that it was substantially complete around this time period?

A.      Yes, with the exception of what I noted.

Q.      Okay.  And so what was the status of permits and close-outs at this time period?

A.      Permits were continuing to close out.  We had one inspection where the head inspector had come.  It's my understanding that Mrs. Harrell had contacted the County on specific permits, so he came out and we went to close all of the bathrooms out with the exception of the owner suite, and he made the determination in the field not to close the permit until the owner suite was done.

Q.      So how did that impact closing out all of the various difference inspections for final?

A.      It kept it open because it was, again, the owner suite bathroom, and he wanted to wait until everything was done so the County could go top to bottom, and at the time it made sense to me because we still hadn't did our continuity, our quality checks, or anything on the house at that point.

Q.      So, what do you mean by "continuity" and "quality checks"?

A.      Just in regards to each subcontractor assumes a walk-through that's from top to bottom.  And we have a painter who goes from top to bottom of the house and ends up putting any touch-ups that need to happen.

There's one person who just does calk and silicone throughout the house.  He goes up from the top all the way to

the bottom.

There's another TacoBox on-site that has every switch plate that you would need for a project.  You go into each room. You ensure that all the switch plates are in order, and you work your way down.

Just things like that, just quality stuff.

Q.    So what was the bank doing at this time period?

A.    The bank -- I believe it was their second or third inspection on the property.  What they wanted to do was ensure the house was substantially complete before they would close the loan on the property.

Q.    Okay.  I would like you to turn to Defendant's Exhibit 29, please.  Would you identify this document?

A.    Yes.  This is the {indiscernible} that there's been lead paint.

Q.    You're not looking at the right exhibit.

A.    Oh, sorry.

Q.    I don't know what you're looking at, but on the screen is Defendant's Exhibit -- that's not Defendant's Exhibit 29.

A.    I'm sorry.  Yes.

Q.    What is this document?

A.    This is the "Appraisal Update and Completion Report" that the bank sent sending an inspector out to make sure that the property was in good enough completion to be -- to close.

Q.    Okay.  And what was your involvement in this process?

A.    None.

Q.    Did you influence his observations in any fashion?

A.    No, sir.

Q.    Did you interact with him when he came out to do the inspection?

A.    No, sir.  The only thing I could recall, I saw him walking while I was in the backyard.

Q.    So, what was your understanding of the process that was going to occur as it relates to closing?

A.    That the bank wanted to put a value against any work that hadn't completed and that it was an important step for them in order to close, and it gave an assurity [sic] that there was substantial money to complete anything that was open.

Q.    Okay.  And how were you to -- what was the process by which you were to go through closing as it relates to the -- to that June 20th amendment to the contract?

A.    That the inspector came out, he identified everything that needed to be completed, and that he applied a value to that, and that there would be an escrow applied that would not be disbursed until those items were complete.

Q.    And from your perspective, was that consistent with what you felt was necessary to complete the project?

A.    Yes.

Q.    Had all the subcontractors been paid up to that point?

A.    No.  So, each subcontract had approximately -- it

depends. It varied on contractor, but what we did is --
sometimes on projects we call it retention, and it's a hold-back
that we do to ensure that final inspections take place by the
contractor, and there was money owed until things would be
completed or inspected.

Since then, the majority of the contractors have been
paid because they're small, and I didn't want them to be hurt or
affected by this litigation.

Q.   Were any mechanic's liens ever placed on this property?

A.   No, sir.

Q.   As far as the parties go, what were the parties going to
do as it relates to closing?

A.   We were going to do a walk-through the day before
closing. We were going to identify anything that we wanted to
on the project. We were going to do a walk-through. That list
would end up being a list that would be memorialized and
something that would have to be completed on top of what the
bank identified.

Q.   So let's turn to Defendant's Exhibit 37, please.

A.   Yes, sir.

Q.   Could you identify this?

A.   That's the carriage house preconstruction.

Q.   Mr. Deluca, you are -- it's Defendant's Exhibit -- it's
not -- we'll call it up. I don't know what you're looking at.

A.   Exhibit 37.

Q.    Go ahead and close that binder.

A.    Okay.

Q.    That's plaintiffs' exhibits.

A.    I'm sorry.  Yes, sir.

Q.    Can you identify what this document is?

A.    It's a post-construction agreement that was created by Mr. Harrell.  Originally I sent him Federal Homes' contract, their standard contract.  But he said that the bank liked this one better so he created it.

Q.    Okay.  And what were you -- what is your understanding of what was going to happen once this was signed?

A.    Just that -- I mean, it just identified all the unfinished work and that the work would be done, and there'd be an escrow, and we would continue on working together.

Q.    And was there additional work that was added into this contract?

A.    Yes.

Q.    Could you explain what your understanding of that was?

A.    Could you scroll up, please?  Yes.  There was various new work.  It was never -- it was never memorialized in this except for 2.3, which is the contract price.  What they were doing was -- the outdoor living room and outdoor kitchen were to be expanded and pushed beyond its existing footprint.  Mr. Harrell wanted more space in the outdoor living room for sofas and chairs and things.

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

Q.    Okay.  So essentially, were there three categories of work that you were kind of going to be doing?

A.    Yes, so the extension of the screened-in porch.  We decided that the house would look better if it had an exterior -- if we moved the powder room outside of the footprint to the exterior, and then just that there would be extension of the porch with a specific cupola on top of it.

Q.    And that was all new work, correct?

A.    Yes, sir, this was all just added.

Q.    And then there was punch list work; is that correct?

A.    Yes, sir.

Q.    What did you understand punch list work to be?

A.    Punch list was work that was identified during walk-through, as well as any other subsequent lists.  I didn't -- I didn't deter either one of them.  It was a list of -- if someone was walking through the house and there was a ding on the wall, that was a punch list.  If there was a switch plate that needed to be added, that was a punch list.  There were multiple.

Q.    And with regard to the old work, what was that?

A.    The old work was what was originally delivered in the contract so we would end up having the original deliverables of the house, which is the owner suite -- anything that was done -- not done at closing, it was a document to capture those items.

Q.    And there's some dates in the post-closing construction

agreement for the old work and the new work.  Do you see those on page 3?

A.    Yes, sir.

Q.    Correction, page 2.

A.    Yes, sir.

Q.    What was your understanding of those dates?

A.    Just that it was a date that we put into place to be substantially complete, be under process.

Q.    What factored into your ability to deliver by those dates?

A.    There's multiple things.  We were waiting on the County for a permit for the porch extension, as well as the powder room bump-out, and in order to help in timing, we even had the pool intertwined in there, in which we removed the pool back out of that permit, so it was just for the porch extension as well as the powder room bump-out.

Q.    Were these, in your opinion, hard-and-fast dates that you were trying to --

A.    No, sir.

Q.    Why not?

A.    We had a wonderful working relationship.  We were working together, getting the house as close to complete as possible.

Their house in Connecticut still hadn't sold.
Mrs. Harrell went through a procedure where she wasn't -- didn't have any immediate plans of moving in.  I was going to do four

additional projects for them and just continually build the house and add customizations.  The pool was eventually going to be built.  It was -- it was just a constant work together on the project.

Q.    I would like you to turn to Defendant's Exhibit 38, please.  Could you identify what this exhibit is?

A.    Yes.  This is a punch list that was created by, I believe, Mr. Harrell given to Brendan Muha, and then that is my handwriting on the side of it.

Q.    And what are you doing?

A.    Just giving updates on what's going on with the project.  Originally the gates were installed.  They arrived from New England.  They were on-site primed, painted, and then were installed.

There's just updates throughout.  There's just -- just basically updates on what we're working on and how we're getting closer to completion.

Q.    How did you interact with the Harrells during this time period in terms of giving them updates and the status of where you were at with the punch list items and the old work and the new work?

A.    Constantly.  There was -- constantly punch list was being added at this point, and they were being either added to this document or there's another document with another set of punch lists.  I had no problem with any of these items.

Q.      Did you need any direction on any of these items?

A.      Yes.  There's specific direction -- the biggest thing was -- we had closets.  We had empty rooms that needed a closet detail.  I proposed a pop -- painted poplar shelving with a chrome bar to be the -- to be the closets.  The Harrells wanted to use their designer in Connecticut to make each closet specific, and that they would later be giving me those designs.  I believe there's a text from Mrs. Harrell that says, don't worry about the closets, we'll worry about them later, something to that effect.

Q.      Okay.  And how did this impact your ability to complete everything?

A.      It was just another item that we were waiting on direction on to complete the project.

Q.      What, if any, conversations did you have with the Harrells with regard to their ability to move into the house at this time?

A.      Just that we were under construction and we needed to get -- we needed to get direction on a couple items.  There was one, two, three, four -- there were four bathrooms at the time that were functional.  I had no problem with Mr. Harrell if he wanted to stay in the upper guest room, which I believe he did.  And, again, it was just a work in progress, and push forward as much as we can.

Q.      Did you -- what, if anything, did you represent to them

as to their ability to move the entirety of their household into the house at this time period?

A.     That really didn't come up because there was never a desire to come down and to move in to the house at that time. They knew it was under construction, there were customizations that they wanted to add, and, again, their house in Connecticut hadn't sold, and they weren't in a rush to do anything.

Q.     Did the Harrells ever represent to you that they intended to move in in the middle of August?

A.     No.

Q.     How did that impact your approach to the work?

A.     I just wanted to continually make it their house and make it as special as possible and give them the additions that they wanted, and finish the house as fast as I could, and, again, just keep trying to push the ball forward.

Q.     You mentioned that there were two bathrooms that were in flux at this time period.  One is the master bath suite, right?

A.     Yes, sir.  The owner suite hadn't been done because the tile hadn't arrived yet.

Q.     Okay.  And what was the other bathroom?

A.     Their son's bathroom.  It had a gold tile on the floors, and we special-ordered a vanity for that, but then prior to closing, the bathroom was complete and Mrs. Harrell didn't like how the white tile on the wall interacted with the white tile on the floor, how it interacted with the millwork, so they asked me

to demo that bathroom out so it was -- all the shower tile could be replaced.

Q.    What, if any, conversations did you have with the Harrells during this time period regarding permits and the status of permits and closing out the permits?

A.    Just that we were trying to close our permits out, that they wouldn't let us close the permits until the owner suite was complete, as well as giving them status that they still hadn't approved the powder room bump-out, which was the move from the inside of the building envelope to the exterior, as well as the bump-out of the screened-in porch.

Q.    Do you recall giving the Harrells any specific dates on when things would be complete during this time period?

A.    I did the best I could to provide as much update as I could.  I constantly was in contact with the County trying to push them along.  I don't believe, as we were given specific dates, I would know from a vendor when something would arrive.  The gold fixtures and the nickel fixtures hadn't arrived at that point, and I was just doing my best to give them as many updates as I could.

Q.    You ended up missing some of these dates.  By way of example, you missed the date with regard to which you thought some of the tile might be delivered.  Do you recall that?

A.    Yes, I do.

Q.    Do you feel at the time that you were making those

representations that you were not being as accurate as you could at the time?

A.    Absolutely not.  I didn't lie to them.

Q.    Why not?

A.    It would be pointless to in regards to what was closing and what the tile cost.  It meant nothing.

Q.    As a contractor, can you control suppliers' delivery times?

A.    I cannot.  I tried.

Q.    Can you control permit inspections and close-outs?

A.    No.  And the difficult time now is Mrs. Harrell has been in constant contact with Arlington County, so --

Q.    I'm focused on the July time period.

A.    Oh, the July time frame.  Okay.  No, just that it has to do a plan review.  Arlington has a very limited staff.  Amazon had just moved into Crystal City area, and had completely inundated the Building Department, so getting a standard permit through became very difficult.

Q.    Now, with regard to this idea of having the inspection done but have the master bath be separate, how did that play into your approach to delivery times?

A.    Always throughout the project and throughout the inspection process we were able to carve out areas.  To give you an example, when we received a permit or an inspection, it would say everything is approved except for the addition.  These were

documented, and it was my understanding that if I did a final on everything in the house, that the inspector would have come in and said, "Everything is approved except the owner suite," and that did not happen.  He came and he said, "Everything looks good, but I really want to do the bathrooms and close everything out at one time."

Q.    What was the status of the appliances in the house?

A.    They were installed.

Q.    And in what condition were they?

A.    They were brand new.  They came out of boxes.  They were installed by ABW Appliances, Builders Warehouse.  Everything was brand new at installation.

Q.    And what was the status of the warranty on those appliances?

A.    Binders were created throughout each area.  I'll give you an example.  The appliances.  The appliances had large volumes of binders that had each warranty information, instruction manuals, installation manuals on each product.  That was created and they were on the counters with the warranty card, which at any time the homeowners could activate.

Q.    Now, there was some discussion about a warranty and how it relates to the post-closing construction agreement.  Do you recall the warranty provisions in the Post Closing Construction Agreement?

A.    Yes, sir.

Q.      The what was your general understanding and what were you offering with respect to a warranty?

A.      A full homeowners warranty.

Q.      And what do you mean by that?

A.      Just that anything that I billed has a warranty and it could be a year, plus it extends any of the manufacture's expressed warranties on their products, the stove, so five-, ten-year different times, but basically it's an inspection -- it's a warranty that incorporates the entire project typically at the one-year mark.  A lot of builders do six months, but I do one year.  I would come back and address any cleanups, paint issues, pops, anything that they have.

Q.      So you had a meeting with the -- you had these regular meetings with the Harrells throughout the July time period.  Were they by phone or were they in person?

A.      Well, it's always over the phone.  It was just lots of phone calls, lots of text messages, a lot of Brendan acting as an intermediary.

Q.      This is in the July time period that I'm focusing on.

A.      Yeah, so it's more just phone calls and text messages.

Q.      What was the relationship with the parties from your understanding at this point?

A.      It was great.  We had no -- it was wonderful.  We were collaborating.

Q.      Okay.  Did you ever meet in person with either of the

Harrells during this time period?

A.    Yes.  I believe they came in.  John was in and out with different meetings, and he would come and stop by the house. Updates on text messages, things like that, and then prior to closing they were going to come in and do a walk-through.

Q.    We're beyond closing, and we're now at the end of July time period.  Did you meet personally with the Harrells at any time period?

A.    No, sir.

Q.    How about August 2nd, 2019?  Did you meet personally with Mr. Harrell on August 2nd, 2019?

A.    Yes, sir, I did.

Q.    What did you do at that meeting?

A.    Mr. Harrell came into town.  There had been a bunch of work that I did for him that was laid out, and it was after the closing that he wanted done.  He didn't at the time have his checkbook with him to do a proper deposit, but we continued and did the work, completed the work, and we presented him with an invoice.

Q.    Okay.  Could you go through Plaintiffs' -- could you turn to Plaintiffs' Exhibit 4, please?

A.    Yes, sir.

Q.    Is that the Plaintiffs' Exhibit that you're looking at?

A.    Yes, it is.

Q.    Okay.  Would you identify that document?

**A.**      Yes.   This is basically the change order billing on what we did and work in place that we had completed prior to the meeting on August 2nd.

**Q.**      Okay.   So I'm trying to understand this.   Is this -- how does this fit under the post-closing construction agreement?

**A.**      This is probably the fourth customization.   It's not the -- you've got -- it could be the fourth or the fifth.

These were just adds that were added, but this was something that they were going to pay for out of pocket that wasn't involved with the original -- with the original bank money.

**Q.**      So this was in addition to the work that was being done under the post-closing construction?

**A.**      Yes, this was probably the fourth add of work that they wanted done after closing.

**Q.**      So during the July time period, they were adding additional work that --

**A.**      -- yes, yes.

**Q.**      All right.   So, what happened after the August 2nd meeting?

**A.**      It just -- I can't even explain what happened.   It was -- everything just stopped.   Everything -- communications, everything went into a bad perspective, and we no longer -- it was night and day.

**Q.**      Okay.   So I'd like you to turn to Defendant's Exhibit 42,

please.  Could you identify this document?  It's a two-page document.  We'll scroll to the next page.

A.     Yes, sir.

Q.     What is this?

A.     It was a text from 2:13 in the morning from Mr. Harrell.

Q.     And what was this text telling you to do?

A.     It was basically a text just saying he had been walking around creating additional lists, and he sent it to me.

Q.     And I would like you to turn to Defendant's Exhibit 41, please.  Would you identify what this document is?

A.     Yes.  It's an e-mail from me to John and Mrs. Harrell.

Q.     At what time?

A.     6:12 a.m.

Q.     On what date?

A.     On August 6th.

Q.     What are you doing in this text or this e-mail?

A.     I was memorializing what happened that night or early in the morning when I received the text messages from John.  During our process of working together, Mrs. Harrell told me that there's a lot of times that whenever they would buy a house, that there would be a difficult time that they go through in regards to purchasing something.  I was concerned about Mr. Harrell at that point, so that's why I wanted to just document everything and reply, give assurance, and try to help.

Q.     What was he telling you to do on the morning of August

6th?

A.    To stop work.

Q.    Okay.  In this e-mail was he telling you to stop -- in these texts, he wasn't telling you to stop work at this stage was he?

A.    No, it was just the day before.  So at this phase he was just sticking with just lists of -- I mean, it could be a 5-by-5 wall, it could have 32 pieces of tape on it saying that there's -- you're going to point up all these areas, and it was just a complete documentation of the entire house.

Q.    So these were additional items that he's identifying on August -- the morning of August 6th that he wants you to work on; is that right?

A.    Correct.

Q.    Okay.  And you responded to those at 6:12 a.m.; is that correct?

A.    Yes, sir.

Q.    I would like you to turn to Defendant's Exhibit 43, please.  Could you identify this document?

A.    Yes.  It's an e-mail from Mr. Harrell.

Q.    And what date is it, and what time is it?

A.    It's on August 6th at 11:02 p.m.

Q.    And what is Mr. Harrell telling you on August 6th at 11:02 p.m.?

A.    To stop work.

Q.      Okay.  Let's go through the e-mail.  How did you take the e-mail?

A.      I was -- I was just shocked that everything -- that this was happening.  I had multiple, multiple subs scheduled for the following day.  He had asked for us to stop working, to take all of our tools, personal items and anything from the project.  He asked for the china cabinet to be taken out or the plate rack to be taken out, put in the garage.

        And then he asked for accountings of everything that we did in an update and anything that had not been delivered at the house at that time.

Q.      So what was your reaction to this?

A.      I was just shocked.  I couldn't believe that it happened, and that we had to stop work.  We had staff that was showing up the next day on the project.  We had to show up to make sure that no one went on the property or did anything that he didn't allow us to do, and just to stop work completely.

Q.      Okay.  So I would like you to look at the first paragraph of that e-mail and the last sentence.

A.      Yes.

Q.      It says, "...until such inspections are complete no further work of any kind should be performed by you or your agents or subcontractors."

A.      Yes, sir.

Q.      Do you see that?

How did you react to that?

A.    Just, again, I was shocked that we could not do any work, and we had to cancel everyone scheduled for work the following day.

Q.    All right.  And if you could turn to Defendant's Exhibit 32, please.  And if you could go to the -- this is a long e-mail chain and I'm just going to walk you through the different portions of the e-mail chain.

If you could turn to Deluca 3733, please.  And actually back up to 3732, please.  If you could look at the bottom of 3733, please.

A.    Yes.

Q.    What is that August 7th, 7:49 a.m. e-mail?

A.    I was just thanking Mr. Harrell for sending me an e-mail versus a text in the middle of the night, and I was documenting what had been done and what we were working on, everything that he asked for from different status perspectives and just giving him statuses.

THE COURT:  Did you tell him that this would cause a delay?

THE WITNESS:  Yes, I said there's -- this stop would be very difficult to remobilize all the teams and different subcontractors that were all scheduled and working on things.

BY MR. BURCHER:

Q.    Okay.  And did this ultimately cause a delay in the

process?

A.    Yes.  It was a huge delay.

Q.    Okay.  You say in the e-mail, "This 'Pause' will take weeks to remobilize"; is that correct?

A.    Yes, sir.

Q.    Why would it take weeks to remobilize?

A.    Because the contractors depend on each other.  There are certain disciplines that need some work completed prior to their completion of their work, and if certain contractors don't have access and it has to be scheduled, it would just become a scheduling nightmare of trying to get everyone to align for it to happen.

Q.    And how does -- how do your subcontractors earn work if they're not doing work for you?

A.    These guys rely on work.  They're weekly, daily, and they need to go work on another project to pay their bills.

Q.    So how does that impact your ability to schedule them?

A.    They start another job and then you're coordinating everybody and you're trying to get everyone back on to the site. There had been things that I did -- I provided lists of every subcontract, every worker, everyone's name, their phone numbers.

        At this time apparently someone named Don was contacting them and asking if they had been paid and what do they know about the project, and it created an enormous amount of confusion.

The mechanical contractor, Mr. Harrell started working with directly.

MR. LYNCH:  I'm going to object as --

THE COURT:  I'm sorry.  If you have an objection, say "Objection" --

MR. LYNCH:  Sorry.

THE COURT:  -- so that the witness will know to stop. What's your objection?

MR. LYNCH:  Thank you.  Objection.  It's hearsay testimony that we are hearing about that -- his subs

THE COURT REPORTER:  I'm sorry?

THE COURT:  It's his understanding of what was happening, and it was causing a problem with his subcontractors.  So overruled.

You may proceed.

THE WITNESS:  Yes, sir.  Again, it created an enormous amount of confusion amongst all the subcontractors.  There was a fear that was installed -- instilled in the subcontractors at that point where it came very difficult for them to feel comfortable coming back to the job site.

THE COURT:  Well, did they talk to you about that?

THE WITNESS:  Yes.  I received a phone call in regards to someone asked if they're allowed to go get their tools, and I told them that, "Please don't.  That would be trespassing unless you get permission."  He wasn't able to show up the day that they

stopped the work, but he needed his table saw to continue work.

Just items like that where this is a group of workers that were very concerned about the homeowner and especially with the phone calls that they were receiving.

BY MR. BURCHER:

Q.    So, Mr. Deluca, I would like you to turn to the bottom of that page, 3732.  You talk about the punch list and where you're at with regard to the punch list.  Could you explain that for me?

A.    Yes.  I was memorializing the punch list.  The punch list had turned twice in increasing to 93 items, of which we had -- I believe we had -- I was just giving updates on exactly what they were.  An example was there were 31 items related to paint, and I was just updating so they knew that there were 15 items left or what our statuses were on specific items of the -- of punch lists, edited 3.  So this is the third edit of the original punch list.

Q.    Okay.  And then you talk about the August 2nd change order; is that right?

A.    Yes, I do.

Q.    And what do you say with regard to that?

A.    I was trying to figure out why everything went bad, and I was worried that did I charge them for something that they did not expect?  What I understood later was the doorstops that Mrs. Harrell wanted, and there was -- again, my understanding

was they couldn't believe that I charged them for chrome doorstops behind the doors.

Q.     Okay.  And on the next page, page 3733, you -- what do you do in the remainder of this e-mail?

A.     Just try to give them assurances where the project actually stands, as well as documenting that these things are on hold until we could get things done.  Again, at this point the -- I believe Mr. Harrell had contacted the mechanical sub directly and was having issues with learning how to use the thermostat, and that mechanical sub had visited.

Q.     You list in the center of this e-mail "Items Needed From Owner to Complete Project."

Could you go through those things?

A.     Yes.  The closet layouts.  The tile layouts, when you have two walls, there's a certain procedure in regards to laying out tiles, and there will always be a cut area.  The cut area is the weakness in the design.  It's typically tucked behind something or put into a corner.  These layouts are important because the layouts will then dictate exactly how the tile setter begins to install the mosaics.

There's toilet paper holders.  There's simple directions, directions on desired doorstops.  When I originally bought, there was a different doorstop they wanted to switch to, but, again, there was no direction on that.

And then we kept the structural beam open in the kitchen

because we couldn't come up with a -- we couldn't come up with a decision on how we wanted to finish it; therefore, that beam was kept open.

Q.    So at this stage in the project, had you done a final walk-through with all the subs that you had talked about before?

A.    No, sir.

Q.    Okay.  So, there was still --

A.    There was -- I mean, again, none of our continuity had taken place, none of our walk-throughs, none of our critical eyes that we do on top of any inspection in regards to a little crack on a piece of trim, paint defect.  Again, this was just -- there were multiple lists and multiple walk-throughs that we were still in the process of completing.

Q.    So was the project, from a finishing perspective, complete?

A.    No.

Q.    By way of example, you hadn't put the plates on the electrical --

A.    There are metal plates that go on all of our electrical devices, whether a plug or a switch.  They cost less than $2, and these are the things that we do at the end.

Q.    Why do you do those at the end?

A.    Because you don't want to get paint or get them smudged. They should be crisp and new.

Q.    How about with regard to caulking, why do you do that at

the end?

A.    Same thing.  You want -- that's the frosting on the cake in regards to certain areas or how a tile is actually finished and translating to a baseboard.

Q.    So if, like sanding and finishing of drywall, or --

A.    It would get in the calk and make the calk dirty.

Q.    So you don't want to do that --

A.    No, sir.

Q.    -- until all of that is done?

       All right.  I would like you to turn to Defendant's Exhibit 39, please?

A.    Yes.

Q.    What is this document?

A.    This is, I believe, like punch list 5 or 6.  It's an updated -- it's an additional list, but then there's new stuff that they wanted to add to it beyond the punch list.

Q.    So, do you feel that you were making progress -- what progress were you making on all these lists that the Harrells were providing you as far as punch list goes?

A.    We were just trying to make as much progress as possible. As a list would come in, we would never refute it or do anything; we would just put it on to our list and try to get them complete as quickly as possible.

Q.    The Harrells have characterized your work during this time period as somewhat being absent.  Would you agree with that

characterization?

**A.**     No, sir.

**Q.**     So going back to Exhibit 32, we're going to walk through the remaining part of this e-mail chain.  So what's your status at this time period?  Were you, you know, there and doing things during this August 6th, August 7th time period?

**A.**     Yes.  We continued to try to get things done, even though the stop work order had happened.  I had a planned family vacation that had come up.  We were -- everyone had known about this for even the beginning of the year, that this was going to happen, and, again, it just became impossible to line up subs and get things done.

When we did get things done, we would get one point -- I believe at that point Brendan Muha would have to open up the house at that --

**Q.**     I'm focused on the week of August 6th right now.

**A.**     Week of August 6th, I'm sorry.  I'm jumping ahead.

**Q.**     What was going on during the week of August 6th, and you had a planned family vacation; is that correct?

**A.**     Yes, sir.

**Q.**     Okay.  When was that family vacation planned for?

**A.**     We were going to leave on that Friday.

**Q.**     Which was August 9th?

**A.**     Correct.

**Q.**     Okay.  Could you turn -- look at the top of Deluca 3732,

which is -- it looks like it's cut off a little bit at the top but it looks like an August 7th, 2019 e-mail from John Harrell to you, that says "Doug, Thanks."

Do you see that?

A.    Yes, yes.

Q.    Okay.  Could you look at paragraph 4?  What does Mr. Harrell tell you in paragraph 4?

A.    To cancel work again.

THE COURT REPORTER:  I'm sorry?

THE WITNESS:  To cancel work again.

BY MR. BURCHER:

Q.    Well, what does the first sentence of that say?

A.    "We do not agree that it would be acceptable for any work to continue while you are not there."

Q.    How do you run your business and -- are you there every day of the week when you do a project?

A.    No, most of the time I could start.  I'm there for critical times.  I have multiple subcontractors.  I have a project laborer that's always there kind of opening and closing and running everything.  During this time, we also -- Brendan volunteered to be there every day during any kind of work that would be done just to make sure it was documented and we were -- and the subs were all protected.

Q.    Mr. Deluca, I'm focused on this week.  Had Mr. Muha agreed to do that at this stage?

A.      Not at this stage, no.

Q.      Please focus on this week, sir.

A.      I'm sorry.

Q.      Okay.

A.      All of this stuff is very emotional, so I'm sorry if I'm bouncing around.

THE COURT:  Did you have a supervisor on-site who was overseeing the subcontractors or --

THE WITNESS:  I would be on-site the majority of the time, and then we would have -- individual trades would have their own super or their folks who owned the company running any workers that were being done.  There was two laborers at that time.  They were cleaning the job, opening the job, as well as maintaining any kind of egress or open and close of the project.

THE COURT:  But no employee of your company?  They were an employee --

THE WITNESS:  Just myself.

THE COURT:  Right.  Okay.  Thank you.

THE WITNESS:  Yes, sir.

BY MR. BURCHER:

Q.      Okay.  And I would like you to turn to Deluca 3731, please.  This is the next page, and you see on August 9th at 1:37, p.m., Mr. Harrell sends you an e-mail?  And what does that e-mail say?

A.      That they found a replacement contractor.

Q.      And how did you take the fact that they -- he says that they will have a possible replacement contractor at the house, and he says, "I reserve all rights under our contract with you and Virginia law"?

A.      That I was terminated and that if I or my subs walked on a project, we'd be trespassing.

Q.      All right.  So you respond to him in the e-mail that's just above that at 3:15 p.m.  Do you see that?

A.      Correct.

Q.      And what do you tell him?

A.      Just that it was -- I wanted to be as helpful as possible.  I wanted them to be able to go in any direction.  I didn't know exactly how to handle the situation and that I would just appreciate that they please stop contacting the subs because the subs became very confused.

        There was -- you know, again, there was one time I think we identified one of the roofer laborers that Mrs. Harrell had said was a convicted pedophile, and a week and a half later to find out that it was the wrong person, so there was subs that were terrified to come to this project at this point with everything going on.

        THE COURT:  Why don't we stop here for lunch?  Does that work?

        MR. BURCHER:  Yes, sir.

        THE COURT:  And let's take an hour for lunch, and we'll

continue at 2:00.  All right.  We're in recess.

(Thereupon, a luncheon recess was had beginning at 12:59 p.m.)

**AFTERNOON SESSION, JULY 18, 2022**

(2:06 p.m.)

THE COURT:  All right.  Please continue.

MR. BURCHER:  Your Honor.

CONTINUED DIRECT EXAMINATION OF DOUGLAS DELUCA

BY MR. BURCHER:

Q.    Mr. Deluca, before we jump back into the August time period, there are a couple of things I forgot to ask you, a couple small things in the June and July time period.

We discussed the e-mail text between you and Mr. Muha and Mrs. Harrell.  Do you recall that, regarding the square footage and furniture settings?

A.    Yes, the homeowners insurance.

Q.    Okay.  Do you recall that Mr. Muha testified, he said that you had in some fashion discussed with him the January plans and his giving them to the Harrells?

A.    Yes, I recall.

Q.    Okay.  And do you recall that he said that you had told him that they could be provided to them if it didn't have the square footage on them?

A.    No, sir.

Q.    Do you recall him saying that?

A.    I recall him saying that, yes, sir.

Q.    Did that conversation occur?

A.    No.  He said the plans were completely inaccurate, and the layouts were wrong, and it was not a proper representation of the house.

Q.    Did you ever direct him in any fashion to redact those plans?

A.    No, sir.  I said that the rooms were laid out improperly and they should not be shared.

Q.    I would like to go through a couple of pictures with you that are in the July time period, and I would like you to give the Court a sense of the status of the project in the July 2019 period.

A.    Yes, sir.

Q.    If you could open defendant's exhibit -- binder. Number 2 -- that's number 1, is down by the floor.  And I would like you to turn to Exhibit 159, please.

And if you could, confirm for me, when we go through these exhibits, that these are around the time of closing.  It might be slightly before or slightly after, but that's my understanding.

A.    Yes, sir.

Q.    Would you identify what Plaintiffs' [sic] 159 is?

A.    Yes.  This is the mud room on the right side of the house.  That is a cedar pergola that is running down the

walkway.  These are new copper gutters, and that's fresh paint or it looks like it's in the process of receiving a second coat.

Q.    Can you --

MR. BURCHER:  I would like to move for the admission of 159, Your Honor.

THE COURT:  Any objection?

MR. LYNCH:  No, Your Honor.

MR. BURCHER:  Defendant's 159.

THE COURT:  It's received.

(Defendant's Exhibit 159 admitted into the record.)

BY MR. BURCHER:

Q.    And turning to Defendant's 160.  What is this --

A.    Yes, sir.

Q.    What is in a picture of?

A.    This is the rear outdoor living room with outdoor kitchen.  It also has the bump-out for the future screened porch extension that was ultimately canceled.

MR. BURCHER:  I would like to move for the admission of Defendant's 160.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 160 admitted into the record.)

BY MR. BURCHER:

Q.    Defendant's Exhibit 161, what is that a picture of?

A.      That's a picture of the hidden in book shelves that lead into a private library off the living room that is a restored fireplace, and those are flags that I paint as a -- in my business.

Q.      Okay.  Defendant's 162.  What is that a picture of?

A.      This is another picture of the formal living room.

Q.      And does it show the bookcase doors closed now?

A.      Yes, sir, they're hidden book shelves that you would push open to go to a back library.

        MR. BURCHER:  I'd like for the admission of Defendant's Exhibit -- move for the admission of Defendant's Exhibits 161 and 162.

        THE COURT:  Any objection?

        MR. LYNCH:  No objection.

        THE COURT:  They're received.

        (Defendant's Exhibits 161 and 162 admitted into the record.)

BY MR. BURCHER:

Q.      Defendant's 163.

A.      This is a picture of the family room looking into the kitchen from the dry and cold pantry looking outward.  That's the reclaimed island, which a reclaimed piece, and that's herringbone red oak.

        MR. BURCHER:  I would like to move for the admission of Defendant's Exhibit 163, Your Honor.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

(Defendant's Exhibit 163 admitted into the record.)

BY MR. BURCHER:

Q.    Defendant's Exhibit 164, please.

A.    Yes, sir.

Q.    What is this a picture of?

A.    This is the kitchen looking back to the family room. That is the exposed beam that was left open that we were still waiting on direction on, herringbone floors with a reclaimed center island, and we have now applied -- I believe at this point we have applied built-ins which would have refrigeration drawers on the opposing side of it, and that is two pieces of our furniture and a dining table that are in the picture.

MR. BURCHER:  I would like to move for the admission of Defendant's Exhibit 164, please.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  It's received.

(Defendant's Exhibit 164 admitted into the record.)

BY MR. BURCHER:

Q.    Defendant's Exhibit 165.

A.    Yes, sir.  So this confirms that that work -- that second set of work was complete at this time, so we are looking across the kitchen over the reclaimed refrigeration drawers to a wine

chiller as well as a built-in shelving and a utility closet that was requested by the Harrells.

MR. BURCHER:  I would like to move for the admission of Defendant's Exhibit 165.

THE WITNESS:  Could I add one thing?

MR. BURCHER:  Let's finish --

THE COURT:  Yes, go ahead.

THE WITNESS:  Also, there's also an ice maker to the right of this.  We were -- I received a call from Mrs. Harrell one night and asked if there's any way we could do an ice maker for Mr. Harrell, so we provided one at no cost.

MR. BURCHER:  I would like to move for the admission of Defendant's Exhibit --

THE COURT:  Any objection?

MR. LYNCH:  None, sir.

MR. BURCHER:  -- 165.  Thank you.

(Defendant's Exhibit 165 admitted into the record.)

BY MR. BURCHER:

Q.    Defendant's Exhibit 166.

A.    This is a Wolf stove with a herringbone pattern on the right that is low-voltage under-counter lighting that had not been installed yet.

MR. BURCHER:  I would like to move for the admission of Defendant's Exhibit 166, please.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 166 admitted into the record.)

BY MR. BURCHER:

Q.    Defendant's Exhibit 167.

A.    This is the main formal staircase going into the center hall.  The left wall was existing, but we added additional trim work to it, and that's the original banister and staircase that had been refinished and redone.

On the right side you'll see a little niche that was created, and that was a place for the Harrells to place their keys when they walked in the house.

MR. BURCHER:  I would like to move for the admission of Defendant's Exhibit 167.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 167 admitted into the record.)

BY MR. BURCHER:

Q.    Defendant's Exhibit 168.  What is that?

A.    This is a custom reclaimed pine cupboard that was built -- it's referred to as the plate rack, and everything that was built for the Harrells prior to direction on stain or finish.  We never received a final decision on that, and it's in the garage at this time.

MR. BURCHER:  I move for the admission of Defendant's

Exhibit 168, Your Honor.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 168 admitted into the record.)

BY MR. BURCHER:

Q.    Defendant's Exhibit 169, please?

A.    Yes, this is their daughter's built-in bed bunk system. You have a queen-size bed below with a staircase that goes to a guest twin bed above.  It's built into the wall.

MR. BURCHER:  I would like to move for the admission of Defense Exhibit 169.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 169 admitted into the record.)

MR. BURCHER:  And Exhibit 170.

THE WITNESS:  This is their son's built-in bed system. This is representative of two twin beds with back shiplap we call nickel gap, which is a piece of trim that gives that shadow against the wall.

It has a staircase, a bookshelf, and then this is a rock climbing wall that we did for them.  On the right side, that is partially the built-in desk that was supposed to go into their daughter Harper's room.

MR. BURCHER:  I would like to move for the admission of

Defendant's Exhibit 170, Your Honor.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 170 admitted into the record.)

BY MR. BURCHER:

Q.    Briefly, there was a picture in Mr. Furlong's report that showed that one of these bed's legs was broken.  Do you recall that?

A.    Yes, I do.

Q.    Which one was that?

A.    It wasn't the bed itself.  I believe it was the staircase, and it was in their son's room.

Q.    Did you break that leg?

A.    No.  I asked if the inspector did because it looked like someone pulled it off of the wall.

Q.    Defendant's Exhibit 171, please.

A.    This is one of the attic guest bedrooms.  This would be on the north side of the house.

Q.    And Defendant's Exhibit 172, please?

A.    This is the opposing guest room in the attic.  This is where Mr. Harrell was staying after closing.

Q.    Defendant's Exhibit 173.

A.    Yes, sir.  This is the other guest bedroom on the right side with the marble details and the marble florets.

Q.    Defendant's Exhibit 174.

A.    This is the hallway leading up to the two children's rooms, left and right.  So this is coming from the new owner suite into the main hallway, and then you have a light system on the left side of the wall controlling the lights, the three-ways up and down, as well as a Nest system that runs the mechanical system for the second level.

Q.    And I jumped to Defense Exhibit 176, please.  What is this a picture of?

A.    This is the owner suite.  The Harrells had bought a specific reclaimed barn door that they wanted to switch, and we removed an existing door and added the barn doors so they would align up better with the washing and dryer machine.

Q.    And when was that work done?

A.    After closing.

Q.    Well, would this be during the July time period that that was being done?

A.    I believe so, but I can't be exactly correct.

MR. BURCHER:  Your Honor, I think I left off at Defendant's Exhibit 171.  I would like to move for the admission of Defendant's Exhibits 171 through 174 and Defendant's Exhibit 176.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  They're all received.

(Defendant's Exhibits 171, 172, 173, 174, and 176

admitted into the record.)

BY MR. BURCHER:

Q.    So after going through those pictures, did those pictures fairly represent the status of the home during this July 2019 time period?

A.    Yes.

Q.    I would like to turn back to the August time period, and we left off with around the August 9th time period in which -- you're on your way to your vacation on August 9th, right?

A.    Yes, sir.

Q.    And are you responding to e-mails even though you're on vacation?

A.    Yes.  When I took off and when I landed.

Q.    Okay.  If you could turn to Plaintiffs' Exhibit 690, and I believe that's in the John Harrell binder that's in front of you.

A.    Yes, sir.

Q.    Could you identify what's going on in this e-mail exchange?

A.    That's an e-mail from myself saying that we were going to, per his request, pause all work again for the week, and then I was just documenting that we're six days since the requested stop work, and then just updating on all of the subs have been stopped and then just trying to understand where he was with his replacement contractor and how we could help.

Q.    Okay.  And in the remaining portions of that e-mail, are you giving him updates that are in bold to the specific questions that he's asking?

A.    Yes.  There are still products that are being moved in, and things were trying to get done.  My hope was when they canceled all of the work that at least we could get the hardwood sub in.  There were two areas that I needed to touch up.

Q.    All right.  I'd like you to turn to Plaintiffs' Exhibit 1006, please.  I'm not sure if it's in the --

A.    Yes, sir.

Q.    What is that document?

A.    This is a letter from Tom Lynch when he was at Bradley.

Q.    And what's its date?

A.    August 15, 2019.

Q.    And what did -- what did this letter say -- what did you understand this letter to be saying?

A.    Just that we were in breach of contract and that the -- it was just very litigious, and I guess it was just saying that the -- saying that we were -- I was a fraud and that it was -- that -- it was just a very nasty legal letter.

Q.    And how did you react to that letter, and how did that impact your approach to the project at this stage?

A.    It continued to scare me and I didn't want to put any of the subcontractors at risk, myself at risk.  I didn't know if I was trespassing.  Again, I was in shock and I felt like we were

going down a path of litigation.

Q.     Okay.  Did you ultimately get a lawyer involved to assist you in this process?

A.     I had to.

Q.     At what point did you get counsel involved?

A.     I believe it was after -- I believe it was after this. There was some phone calls, some late evening phone calls from Tom Lynch.  There were, again, this letter.  There was some e-mails and then I believe I -- Mrs. Ferguson helped me with the case.

Q.     Would that be in the early September time period?

A.     Yes, sir.

Q.     Okay.  So during this late August time period, what are you trying to do and how are you reacting to trying to get this project back in order?

A.     Just to avoid litigation at all costs, doing anything I could to make this stop.

Q.     Okay.  I'd like you to turn to Defendant's Exhibit 192, please.  Is this more e-mails around the -- I'll let you get those.

A.     Yes, sir.

Q.     Are these more e-mails related to this time period?

A.     Yes, sir, it is.

Q.     Okay.  And what are you trying to communicate to Mr. Harrell at this time period?

**A.**      Just statuses and trying to update any open items that we had.

**Q.**      All right.  Sorry to keep jumping around, but if you could go to Defendant's Exhibit 40, please.

**A.**      Yes, sir.

**Q.**      Could you identify what this exhibit is?

**A.**      Yes.  I just wanted to give him an update.  It was the 23rd of August, and this was ten days after the requested stop.  We started getting into areas where we were trying to get direction, and we were just updating the list as well as asking which direction to complete certain items.

**Q.**      Okay.  So you've come back from your vacation at this point?

**A.**      Yes, sir.

**Q.**      Okay.  And how are you approaching trying to address these issues, and how are the issues being identified by the Harrells?

**A.**      They're just multiple -- there's just more lists after more lists.  I believe there was additional inspections done by third parties at this point, and I'm just updating on what has been completed and what we still need direction on.

**Q.**      Okay.  When you mention there are more lists, what was kind of going on?  Were the Harrells having people come in and inspect things?

**A.**      Yes.  They had the replacement contractor come up with a

list, I believe a list to complete, which ended up being my list, and then I believe there were some experts that started coming and creating lists as well.

Q.    Okay.  And how did you address handling all of these lists that were coming in?

A.    I just took them and tried to finish the project the best I could.

Q.    Okay.  And how was your access to the premises affected after August 6th now that you were back?

A.    I believe it was restricted in regards to supervision needed, as well as the locks had been changed at that point, I believe.

Q.    Okay.  Had cameras been placed on the premises?

A.    Yes, sir, cameras outside and on the inside.

Q.    How did you have to coordinate access to come in and do work?

A.    You would coordinate the subs, see what you had to do, call them, document every one.  I believe at that point Brendan -- Tom and Brendan were working together.  Brendan would come and open the house, and then the subs were allowed in to do the work.

Q.    And how did that impact your ability to get the job done quickly?

A.    It was -- it was very difficult.

Q.    So from this end-of-August time period through September,

what did you try and do?

**A.**    Get as much of the list as possible and avoid legal -- getting sued.

**Q.**    I would like you to turn to Defendant's Exhibit 47, please.

**A.**    Yes, sir.

**Q.**    What is this?

**A.**    They had hired an inspection from the folks who did the Great Falls inspection, the previous house that they had a contract on.

**Q.**    And is this one of the types of lists that you received in order to -- during this time period?

**A.**    It is.

**Q.**    And how did you approach trying to wrap your hands around these lists and move forward, if you will?

**A.**    Just tried to finish everything I possibly could.

**Q.**    Did you ever tell the Harrells you were not going to work on these lists?

**A.**    No.

**Q.**    I would like you to turn to Defendant's Exhibit 144, please.

**A.**    Yes, sir.

**Q.**    What is this document?

**A.**    I was trying to memorialize exactly what was going on on the project, and it became so distorted and confusing at one

point that I wanted to, with a clear head, document everything in time, how it all happened.

Q.   Was this created during the August/September time period?

A.   I believe so.

Q.   Let's go through some of these statements.  You say, "The Harrells have canceled contracted work during the permit phase."

     What do you mean by that?

A.   The Harrells got to the point where they said, "Don't do the powder room anymore.  Cancel that permit."

     Then the Harrells said, "Don't do the porch extension of the outdoor living room.  Cancel that permit."

Q.   And what did you do in those -- that regard in terms of trying to close up those things that were ongoing?

A.   So, we had -- we had the bump-out for the outdoor living room done, had all the panels for the roof delivered. Everything was sitting on-site stacked on the left side of the driveway.

     The powder room bump-out, the cradle was built for the -- for the under-the-crawl space portion of it, and it was awaiting final permit from Arlington County.

     And then we had roughed in and kept open the waste line which would be needed for the toilet, as well as the water facility, to be able to provide it once the permit -- once Arlington gave us the okay to do it.

     Plus the multiple engineering drawings and structural

calcs for the permit.

Q.    And let's talk briefly about wiring.  What the status of wiring and wiring leading to this outdoor extension of the porch?

A.    The wiring for the features were rolled up just like the -- where the -- a consultant depicted that the work was unfinished or was a hazard.  It was simply waiting for the extension and for the permit to be approved by Arlington County.

There was another picture that they shared that showed the window well coming out, and that had the future speaker system, as well as the extension of the wiring for outdoor heating that they asked for, which was -- which was present there as well, and, again, this was left there because our understanding at closing was they were going to extend these portions of the project, and it made no sense to rip up the house again once that permit came out.

Q.    Okay.  The next sentence on Exhibit 144, Defendant's Exhibit 144, you say that "The Harrells have created multiple hostile environment for all workers and subs every time Work is conducted."

What do you mean by that?

A.    Just every time that work would happen, people would come out, they would start working, it would become a hostile environment of what are they doing, what are they working on, watch them, here's the cameras.

We used to allow the subs to use the bathroom in the basement.  That had changed and they wanted a Jiffy John brought on for them to work outside.  There was, again, the false accusations of some of the folks were laborers and that -- are they licensed, do they -- who are they, the misrepresentation about the one having a conviction.  Just multiple instances.

Q.    Okay.  In the next paragraph you talk about six punch lists.  Is that how many different lists you were receiving at this time period?

A.    I went back and counted from closing to at that point where we were.  We were at six punch lists at that time, not including the expert or the home inspection report.

Q.    In the next sentence you say that the Harrells and a consultant "have damaged multiple parts of the house to create an appearance of unfinished items."

What do you mean by that?

A.    It just got really bad.  We continued to allow pest control to pay for the Harrells project because food would be left out and then they would take pictures of, saying, "This place is rat infested," so we kept our pest control on to keep it clean.

I don't believe the house had ever been cleaned once since construction stopped, and I believe it was -- the purpose of that was to give the appearance of unfinished material.  They had consultants stick a screwdriver in the side of a floor, pop

tiles, the bed issue.

No one had booties on, which we cover our feet when you're walking around on fresh hardwood.

Things like that.

Q.    And I'll go down to "Locks have been changed and the keys and access have been compromised by the Harrells' actions."

What do you mean by that?

A.    Yes, Arlington County came out multiple times, and there were multiple meetings out there.  The -- when it came time to have an actionable item, all of the locks on the house were changed.

Q.    Okay.  So in September of 2019, it is my understanding that Mr. Harrell started to create a log of people being on the premises.  Do you recall that?

A.    Yes, sir.

Q.    And you saw his testimony related to that log?

A.    Yes, sir, I did.

Q.    Do you agree with his characterization that you were rarely there or workers were rarely there during that September and October time period?

A.    I do not.

Q.    And why not?

A.    Just because there was still, even with all of this going on, we were still attempting to complete the project as best we can.  I believe Brendan testified to that as well.

Q.    Okay.  And I think you said this before, but I just want to make sure.  At this stage, what were you trying to do in order to move this project forward and close it out?

A.    I was trying to finish the project to avoid litigation, to get the Harrells moved in, and just tried to resolve as much as I could.

My understanding was a replacement contractor was coming in, and I wanted to finish as much of my project as I possibly could before that person took over.

Q.    And at some point the County became involved in the project.  How did that come about?

A.    Apparently -- my understanding from County officials is Mrs. Harrell went in to the County, and multiple permits were researched, opened, documented.  Meetings started to begin with the County.  I believe their experts -- I don't know exactly when it happened, but I received a call from the County, and the County just said, you know, "Let's get together and try to resolve all these -- all this issue."

Q.    And how did you approach dealing with the County at this time period?

A.    Anything they wanted I would do.

Q.    Did you have meetings with the County?

A.    Yes, I did.

Q.    Okay.  If you could turn to Plaintiffs' Exhibit 435.  I believe it is in the Elmagraby -- I don't think he has it in

front of him.  It's on the floor.

A.      And what was the exhibit?

Q.      435.

A.      Yes.

Q.      What is this e-mail?

A.      This is an e-mail from Emad Elmagraby, and this is in regards -- it's to Tom Lynch and it's copying John Harrell.

Q.      He says in the e-mail to you that we received the below list from Mr. Deluca.  "Please confirm that the list below is consistent with the County's understanding of the results from the meeting on Friday, October 18th."

        Do you see that?

A.      Yes, sir.

Q.      Did you have a meeting with the County on Friday, October 18th?

A.      I believe so, yes.

Q.      Okay.  And what was your understanding of what you needed to do in order to address the issues that were raised by the Harrells to the County?

A.      This list.

Q.      Okay.  One of the items says, "Plan Updates Requested."

        What do you understand was needed from the County's perspective with regard to plans being updated?

A.      Apparently there were meetings inside the County with the Harrells and the Harrells' consultant -- I believe Mr. Catlett.

There were open areas on the list that County said, "Doug, go back, give me one update, let's put all of this stuff on one plan, and let's have one document that has everything on it so we can satisfy the Harrells."

Q.    Okay.  And did you engage with your architect to update the plans accordingly?

A.    Yes.  I went to Soil & Structure, who was the construction engineer and architect of record, and we took everything that the County wanted memorialized and we put it on one set of plans.  We worked with the County for approximately 45 days to just update everything all in one construction document.

Q.    And how did this relate to final inspections?

A.    Final inspections were still on hold because once the County approved everything in their system, they would then release it and then we would go back in, do the work, and just close out the inspections.

Q.    And from your understanding, how does this interaction with the County at this time relate to the list that the Harrells' experts had then provided?

A.    They didn't agree with them, and I think the County at one point threw their consult out of the Arlington office.

Q.    But there was a reconciliation between their expert's items identified and the things that the County wanted done?

A.    Yes.  Besides our visit and walk-through with Emad and

Shahriar, who is the exact actual building official of Arlington County, there were multiple subsequent meetings in the County. Anybody who inspected the property who had been out there would come through, and I believe it was Emad and six different inspectors reviewed what was in place, recall what was inspected, and then come up with an overall approach to closing the project out.

Q.    And at any time during this process were you told that -- to stop work?

A.    By Arlington County?

Q.    Yes.

A.    No, they were very helpful.  They were wonderful.  I mean --

Q.    And at any time during this process were you cited for any form of code violations by Arlington County?

A.    I was not.

Q.    And in your experience with regard to the end stages of a project and bringing plans to as-built, is that a relatively common practice?

A.    It is on a historic renovation/restoration, it is.

Q.    And why is that?

A.    Because it's very -- it's impossible to know what you're going to be up ahead until you've opened everything up, until you've gone through the process.  You are constrained by not being allowed to change the front facade of the home, and it's

very difficult and tedious to try to get all of that at one time, so we always have a cleanup at the end that basically reconciles any openings that there are in a permit or in a set of plans.

Q.    So with regard to following the exactness of a plan and your leeway as a contractor to make alterations in the field and then close this back up at the end of a project, can you explain to the Court how that kind of works?

A.    Just as you would walk through, there are some inspection certificates that were, let's say, add two GFCIs to the rear wall of the property, and the inspector would say, "Doug, snap a picture of it, make sure it's documented, and move forward."

There would be -- another great example is it's means and methods when you're out on a project, so an exact electrical plan is never given to the County.  You basically know what the code calls for and that's a plug every 6 feet or every 10 feet as it's dictated.  You have switching devices as well as you have overhead cam lights; those are all done by means and methods in the field and not for interpretation of an exact plan.

Q.    Okay.  Could you turn to Defendant's Exhibit 53, please.

A.    Yes, sir.

Q.    Could you identify what this document is?

A.    Yes.  The County as part of our communications, they had an expert say that two of my installation of beams were

undersized and not proper.  I then --

MR. LYNCH:  Objection, objection.

THE COURT:  Hold on.  What's your objection?  Is this already in or is this not in?

MR. LYNCH:  It's not admitted for its truth.

MR. BURCHER:  It's not admitted for its truth, but he's not talking about the letter; he's talking about what their report says.  So he hasn't even gotten to this letter yet.

THE COURT:  Okay.

MR. BURCHER:  He's testifying what the --

THE COURT:  Overruled.  He can testify about what the letter says and what he did in response.

BY MR. BURCHER:

Q.    Okay.  So, Mr. Deluca, you were testifying about what the plaintiffs' expert's reports had said.

A.    Yes, sir.

Q.    And what did they say with regard to the beam?

A.    Just that they came in and inspected it in-field, installed, measured it, and that it was adequate.

Q.    No, no, no.  What did their expert say, not this letter.

A.    Oh, no.  Their expert said everything was undersized and it was poorly done and inadequate.

Q.    Okay.  And so what did you do as a result of that particular item?

A.    Contacted the structural engineer of record and had them

prove what we are -- built in field or what they've given us.

Q.    So did you have him come out?

A.    Yes.

Q.    Okay.  And look at the --

A.    I had them come out, look, measure -- there was a crack that was created during the installation of the garage lintel. It was 1930 masonry.  We inserted the opening lintel, and there -- there was that inspection.  They said that the steel was undersized and not adequate.  They confirmed that it was adequate.

Then there's the kitchen beam which was not closed up, which was open, that they measured again and they determined that it was adequate.

Q.    So what was -- what were you asking your expert -- or your architect or engineer to do in this process?

A.    To confirm what they dictated, what we built in the field.

Q.    Was acceptable?

A.    Yes, sir.

Q.    And is this letter a result of that inquiry?

A.    It is.

Q.    Okay.  And what did you do with this letter?

A.    Gave it to Arlington County.  I believe at this time I gave it to counsel who gave it to Arlington County.

Q.    But ultimately it was submitted to Arlington?

**A.**     Yes, sir.

MR. BURCHER:  Your Honor, I would like to move for the admission of Exhibit 53.  It doesn't need to be moved for the truth of the matter asserted.  It can be moved for what he did.

THE COURT:  Well, you sponsored it for the truth of the matter asserted, and I allowed you to -- allowed Mr. Deluca to testify to matters that he shouldn't have been allowed to testify to just a few moments ago, but I think the value of it is that he submitted it to the County, and I don't know whether the County made a decision on it or not.  Maybe you have a record of that, or not, but I'm not going to admit this document.  Its only relevance is the truth of it, and it's hearsay.

MR. BURCHER:  Okay.

BY MR. BURCHER:

**Q.**     All right.  Could you turn to Plaintiffs' Exhibit 435, please.  It's in the Elmagraby binder.

**A.**     445?

**Q.**     435.  I'm sorry, we've already gone over that.

THE COURT:  How much more do you have?

MR. BURCHER:  I'm just about done, Your Honor.  The only thing I have left to do is go through this time period until March, and it will be relatively quick, and then I'm going to go through the Furlong report and highlight those issues, and that's it.

THE COURT:  Well, then, you're not almost done.  Go ahead.

Let's move along.

MR. BURCHER:  I'm moving along.

BY MR. BURCHER:

Q.    All right.  Mr. Deluca, what happened in the December time period with regard to the Harrells and the project?

A.    We received a letter from the Harrells that they officially rescinded the contract and no longer owned the home.

BY MR. BURCHER:

Q.    Can you turn to Plaintiffs' Exhibit 424, please.  It's in the John Harrell binder.

MR. BURCHER:  I'm sorry, I missed that.  If we can just call it up on the screen.

BY MR. BURCHER:

Q.    It's missing from that binder.  I'm sorry.  Can you look at the screen for this one particular document?

A.    Yes, sir.

Q.    Is this the notice of rescission?

A.    Yes, it is.

Q.    What did you understand this to mean, and how did it affect your approach to the project?

A.    I didn't understand what "rescission" meant.  I had never heard that -- about rescission.  I -- I didn't understand what they were saying, that they did not own the house and that -- just that they don't own the house anymore.

Q.    And how did that impact your ability to go and work and

your understanding of what you were even trying to do in terms of getting this project to completion?

A.      That we were in a lawsuit and that there was no way to -- that it was litigation.

Q.      Okay.  I would like you to turn to Plaintiffs' Exhibit 1066, please, and that is in the John Harrell binder.

A.      Yes.

Q.      Could you identify this letter, please?

A.      This was a letter in regards to the Harrells saying that I had taken money from them -- or I had goods from them.

Q.      Okay.  Could you turn to page 2 of that letter?

A.      Yes.

Q.      I would like to go through these items and see if you agree or disagree with the amounts that are in here as to the Harrells' claims, and this is the Harrells' claims for Virginia Consumer Protection Act numbers.  Do you see those numbers?

A.      Yes, sir.

Q.      Okay.  What was the status of the porch extension as of this time period?

A.      All the stonework and cradle had been created, and then all of the roof system was sitting on the property.  John Harrell asked that it all be removed.  It's still sitting on my project on Old Dominion.

Q.      Okay.  Do you believe that you had provided $17,500 worth of services for that porch extension at this time period?

1111

A.   At close, I do.

Q.   Okay.  The "Built in desk for Harper's room," was that referencing?

A.   Yes, it was that built-in desk that we saw in the photo sitting on the right side, it was sitting inside the house and now I believe it's sitting in the garage.

Q.   "Door Stops," we discussed those already, but what was the status of those?

A.   We returned them and they had a restocking fee, and we gave them a credit back for them less the restocking fee.

Q.   Okay.  The "Loft Sink"?

A.   The loft sink had not been -- still I don't believe the loft sink still had been selected or a countertop for the loft.

Q.   It says, "Unused outdoor selection budget."  What do you understand that number to be for?

A.   I have no idea.  I -- they had an outdoor kitchen.  They had upgraded countertops.  They had outdoor speakers, an outdoor fireplace with reclaimed mantle.  I do not know.

Q.   Do you feel that you had provided $8,000 worth of outdoor selection budget to them at this stage?

A.   If not more.

Q.   There's no number next to "The unused garage customized budget," so I'll move to "The unfinished/ plate rack" of $4,500.  What do you understand that to be for?

A.   This was a custom piece of furniture that we made.  It

was in the house, and then at termination or at stop work they told us to take it out and put it in the garage.

Q.    And did we just go over a picture of that just recently, and that was the unfinished furniture piece?

A.    Yes, sir, we did.

Q.    All right.  "Overlee pool membership," what was going on with the Overlee pool membership?

A.    The interesting thing about Lee Highway is the pool membership, which is very valuable, transfers with an owner. There are things in the documentations that allow you to transfer it to a new owner.  We had transferred it to the Harrells, and I believe that this is asking for that money back since they're not using the pool.

Q.    The next one is "Outdoor subzero refrigerator drawers and trash."

What do you understand that number to be for?

A.    I'm not sure.  The outdoor trash can is about $750.  The Sub-Zero refrigerator was sitting there, and it was being swapped out for drawers versus having to bend down to open up a swinging door.

Q.    And so was that then being completed?  Is that something you owed them money for at that stage?

A.    No, no money, just to swap out.

Q.    "Tile for the owner suite / fireplace credit," what is that referring to?

A.      Giving them credits for the fireplace that they had stopped.  You remember when Inspector Tamika inspected the property, she approved everything and told us to update the plans to show that the fireplace no longer existed in the owner suite.  They did that to create more space inside the owner suite.  This is asking for a credit back for that.

Q.      Do you feel that you owe them any money for this $14,500 here?

A.      It's possible.

Q.      Okay.  "Heated floors in master," what it that referring to?

A.      The heated floor system that goes under the tile.  The tile setter never -- or the tile setter and the electrician never installed that, and I do believe that's a credit for them.

Q.      It would be a credit if you didn't install it?

A.      Yes, sir, it would be.

Q.      But you're waiting to install that.

A.      Correct.

Q.      All right.  "Gym Floor credit."

        What was going on with the gym floor?

A.      The gym floor is there on the property, and it's been there since closing, and it sits in rolls on the floor.

Q.      And all it needs to be is installed?

A.      Installed, yes, sir.

Q.      So do you owe them any money for that?

A.      Maybe installation of approximately a thousand dollars.

Q.      Okay.  13, "Amount Paid for change order Evan' Bath," $3,000?

A.      I'm not in agreement with this.  The bathroom was completely demoed for the installation of the new tile.  I had originally -- was going to purchase the new tile from Floor & Decor, then they used their designer in Connecticut to buy it directly from them.  The tile is on site.

Q.      I'm going to skip over the $250 one.

        15, "Cost to refinish floors," what's your understanding of the $19,921 that they want you to pay them back?

A.      They said all the floors were bad and that everything needed to be replaced in the house -- and refinished, excuse me.

Q.      Do you feel that you owe them money as to the cost to refinish floors?

A.      I do not.  There were two areas that we wanted to touch up.  They were approximately (indicating) 18 inches by 12 inches and needed to be sanded, touched up, and repolyurenthaned.

Q.      And you've seen some pictures from their expert report on certain areas that were unfinished.  Do you recall those?

A.      Yes.  But what they did is they took a built-in bed that had been built into the system, and I believe that's when they broke the post, and underneath of that it was not polyurethaned.  It was finished, but it was not polyurethaned.

Q.      All right.  "Loft refrigerator."

**A.**    "Loft refrigerator," I do not believe -- there was a time when we were going to take the existing refrigerator from the outdoor kitchen, take it, move it up to the carriage house to the apartment kitchen, and then make -- order the drawers for below.  This is open -- an open item.  If anything, probably an interior half-sized refrigerator would be about $500.

**Q.**    All right.  "Outdoor lighting" -- excuse me.

"Finish Painting," $60,000.  Do you feel that there's $60,000 owed to the Harrells for finish painting?

**A.**    I do not.

**Q.**    How much would it cost to repaint the whole house?

**A.**    Probably 30,000 interior.

**Q.**    Okay.  But do you feel that the whole house needs to be repainted?

**A.**    No, sir.

**Q.**    Okay.  Let's skip down to "Pine & Oak Master Closet / Laundry," $25,000.  What do you understand that item to be?

**A.**    These are -- their designer from -- their designer from Connecticut in August provided us with a set of plans that were for the owner suite.  They were towards the end of August we received the owner suite plans.  I believe it was -- I believe it was August at some point they came in, and everything we had discussed was painted poplar with chrome bars, very simple, elegant.  This came back as more of a finished -- like an oak library or a stained finish, like this room.

Q.      Do you feel that you owe them the $25,000 that they want here in the "Pine & Oak Master Closet / Laundry"?

A.      I do not, but I do feel that the closets aren't done, and it would probably be 2 to $5,000 to do them.

Q.      Okay.  23, "Mud Room Built ins/ Hooks," $4500.  Do you agree with that item?

A.      No, sir.

Q.      And why not?

A.      Because it would probably take less than a hundred dollars to do hooks and simple -- I would say $300 to do simple shelf with hooks.

Q.      And the last item, "Outdoor Sprinklers," what's the status of installing the outdoor sprinklers on the property?

A.      These had already been installed.

Q.      Okay.  Mr. Harrell testified that he didn't know whether they were installed.  Can you elaborate on their status and why they at the time -- in the fall of 2019 what their status was?

A.      They were installed and in place.  I believe he also gave them direction on the ten outdoor lights that he's footnoted at 11 as unknown.

        They -- they were definitely done.  I believe from what my understanding from the sprinkler contractor, he said, "It's going into winter.  You don't want us to fill these with water because then we're going to have to come back and service them and take all the water out so they don't freeze."

Q.    So based on all of that, with regard to the Virginia Consumer Protection Act numbers and the amounts that they were demanding back, do you feel that you owe them any large amount of money from the money that they want back?

A.    I don't, and still the Rohl fixtures that I was allowed to -- that I swapped for them, the new gold fixtures and the polished nickel fixtures have been locked in their refrigerator in the pantry, and I had not taken my old product out and swapped them, so there's two sets of fixtures that are sitting there.

Q.    And how much are those Rohl fixtures -- how much did you spend on those two sets?

A.    I don't have a line item for them.  Thousands.

Q.    How much did you say?

A.    Thousands of dollars.  I just --

Q.    All right.  And did your counsel respond to this letter?

A.    Yes, you did.

MR. BURCHER:  Your Honor, I would like to add an exhibit. I don't think there should be any issue.  It's a document that was sent to Mr. Lynch and is the counsel's response.  It wasn't in our exhibits, but for completeness and --

THE COURT:  Well, show it to Mr. Lynch, please.

MR. LYNCH:  No objection.

THE COURT:  Okay.  Can you give us a number or did you already number --

MR. BURCHER:  Yes, I've already labeled it, Your Honor, Defendant's Exhibit 200.

THE COURT:  All right.  Thank you.

BY MR. BURCHER:

Q.    And, Mr. Deluca, is this, what's been handed to you as Defendant's Exhibit 200, your counsel's response to that letter?

A.    Yes, it is.

MR. BURCHER:  Your Honor, I would like to move for admission of Defendant's Exhibit 200.

THE COURT:  I think he said he had no objection.  It's received.

(Defendant's Exhibit 200 admitted into the record.)

BY MR. BURCHER:

Q.    Okay.  So, during this December/January/February/March time period, what was your general approach -- after being told that the contract was rescinded, after having received this Virginia Consumer Protection Act letter, what was your general approach to trying to deal with this particular situation?

A.    Again, try to finish the project and avoid further damage or litigation or --

Q.    Okay.  Did you issue some change orders?

A.    Yes.  I -- ultimately, the County released the new set of plans which would become the owner set of every improvement that had been done on the project, what -- everything was in one document with the County that they finally approved in December.

During the meetings with the County, everyone advised me that they thought it would be in my best interest as well as the project's best interest to document everything that we were going to do on the project to remediate what the County deemed as correctable items.

So what -- between the suggestion from Arlington County, as well as the suggestion from my counsel, was to create an RFI that -- or a change order that had zero costs to it, but it identified how to finish something with the hope that the owner would -- or the Harrells would sign off on how we were remediating it.

Q.      So, could you turn to Defendant's Exhibit 54, please.

A.      Yes, sir.

Q.      Could you identify what these documents are?

A.      These are the no-cost change orders that have been reviewed.  It shows how much time it would take to complete the item, how to complete the item, as well as their approval to allow us to work on the work in the house and be given access.

Q.      All right.  And did the Harrells ever sign these?

A.      Not to my knowledge.

Q.      And how did that affect your ability to kind of move forward, you know, in finishing out this project?

A.      Legally I felt I couldn't finish the project unless I had direction on how to properly finish the house.

Q.      And ultimately, were there still discussions going on

with the County at this time period?

A.    Just with the County that, you know, there -- they, again, told me that it would be in my best interest to sign, get signed documents so we're not putting work in place that had not been approved.  There was the issue of getting access to the house and not, you know, not being in violation for coming in and doing the work.

Q.    I would like you to turn to Plaintiffs' Exhibit 445, please.  I believe that is in the Elmagraby binder.  Let's start with 446, please.  I'm sorry.

A.    446?

Q.    Yep.

A.    Yes.

Q.    What is this document?

A.    This is an e-mail from myself to Emad Elmagraby who has testified, and then the Arlington head official -- building official, Shahriar Amin.

Q.    And what's going on in this March 2020 time period?

A.    I'm confirming everything that they want us to do and telling them that our hopes are to get final inspections, and then just reiterating exactly what they needed -- needed to do in order to satisfy everyone.

Q.    Okay.  And could you turn to Plaintiffs' Exhibit 445, which is the previous document.

A.    Yes.

Q.      And what is this e-mail?  And you copied the Arlington County on it.  What is this e-mail?

A.      It's an e-mail to my counsel and it's copying -- excuse me -- the building official as well as Emad Elmagraby, and it's giving them updates on what it would take to finish the project and giving them status of how -- how to go in there -- this was during COVID -- and just asked for cleanups and protection of everyone.

Q.      So, you mentioned, "As you can imagine with the news of this weekend"; are you referring to COVID news and --

A.      I am.

Q.      Okay.  And you mention in the e-mail, "Working off the Falcon report," right?

A.      Correct.

Q.      Okay.

        MR. BURCHER:  Your Honor, I would like to move for the admission of Plaintiffs' Exhibit 445, which I think is already in evidence.

        MR. LYNCH:  No objection.

        MR. BURCHER:  Plaintiffs Exhibit --

        THE COURT:  It's received, if it's not already in.

        MR. BURCHER:  Okay.  446, I believe, would be in.

        (Defendant's Exhibit 445 admitted into the record.)

BY MR. BURCHER:

Q.      So, Mr. Deluca, you mentioned the Falcon report.  If you

could, pull up the binder that is the Matthew Furlong expert reports and rebuttal reports. It's a relatively thin binder with a yellow cover on it. It could be on the floor.

THE COURT SECURITY OFFICER: We don't have that on the floor.

MR. BURCHER: It's in the first binder of the plaintiffs' exhibits, Plaintiffs' Exhibit 58.

THE WITNESS: Yes, sir.

BY MR. BURCHER:

Q. Have you had a chance to review the plaintiffs' expert report?

A. Yes, I have.

Q. Okay. I'm going to go through some of these pages with you, and I would like you to, as we go through them, identify them as things that you agree with are code violations or is work that you feel you need to work on, but also highlight the status of these and whether or not these are a result of you being stopped from doing work, okay?

So if you could, turn to Section 9.3 -- correction, 9.4. Can you talk about the recessed boxes and how they kind of work and the wood overlay and what needs to be done on that regard?

A. Yes, sir, yes.

Q. Page 19 of the report. Are you there?

A. One second, sir. Yes, I'm there.

Q. Okay. Could you explain to the Court how -- first of

all, there aren't any covers on these; is that correct?

A.    Correct.

Q.    Okay.  And how does the wood overlay kind of go with this, what would you do to finish this, and why is this like this at this stage?

A.    Because these are -- have been installed and they have not received their final finish plate yet.  What they would receive is a small extension work box, which would slide in and which would bring the plug assembly forward, as well as with a switch plate.  Whenever you have surfaces that are added to additional drywall, it makes the -- it -- you want the plug, the light switch to be proud of, or in line with, the final wall covering.

In this instance they showed -- I believe this is nickel gap in the owner suite, and nickel gap in the -- again in the owner suite, as well as a receptacle that's on a baseboard.

Q.    So would this be something that you would be doing as your final close-out?

A.    Of course.

Q.    Okay.  I would like you to turn to page 22 and talk a little bit about what's going on with these wires in the fireplace?

A.    Again, these were -- the only reason these were there -- this had nothing to do with the County asking to open anything up in regards to framing.  This had to do with the Harrells

getting -- Mr. Harrell was moved in and we wanted -- he wanted his televisions hung. The televisions were hung, and then this was the extension for the futures on the back of the house which would provide in-line heaters and audiovisual outside, as well as additional lighting.

Q.    So how is the status of this impacted by you being told to stop on the porch extension?

A.    It couldn't be complete, and then this would need a simple gang box and a termination at that point, but it couldn't be complete.

Q.    So with regard to the project, this was something that you didn't finish because you were told to stop work?

A.    Correct, and cancel the permit.

Q.    If you could turn to page 28, 9.13.

A.    Yes.

Q.    It says, "Cover plates."

A.    Yes.

Q.    You already discussed the fact that cover plates would be installed later on at the last minute?

A.    Part of our close-out would be once all the final electrical inspections had taken place, we would then have a laborer with a toolbox full of switch plates and cover plates go through the house room by room and apply them.

Q.    Okay. If you could turn the page 30 with regard to "Lighting control."

A.      Yes.

Q.      How do you understand the lighting control and the -- you showed the light switch on the other side of the staircase?

A.      Correct.  In speaking with the County as well as multiple preservation folks, within the Virginia statewide code there's Chapter 9 which allows the local building official, as well as the official building official, to make calls on anything code related.

        What you don't see in this photo is on the left side of that stair is an actual switch that does turn on and off the lights in the hallway.

Q.      So minor variations like this are something that you would see in a historic home?

A.      Yes.

Q.      All right.  If you could turn to page 35.  It talks about "Crawl space wiring."  You mentioned this, I think, previously, but could you go in a little bit more detail about why this is at the status that it is?

A.      This was all for the future porch extension, which was never -- that never took place and was told to cancel.

Q.      On page 37, it talks about "Outdoor lighting outlets." What was going on with the outdoor lighting outlets?

A.      The Harrells were going to take copper fixtures from their Connecticut house before it sold and swap them with different outdoor fixtures.  They were then going to take the

copper fixtures and bring the copper fixtures down to Virginia and have them installed here.  We had not received them at that time.

Q.    And is that why they have not been installed at this time period?

A.    Correct.

Q.    All right.  If you could turn to page 51.

A.    Yes.

Q.    Could you identify what's going on here?

A.    It is a waste line that starts from, I believe, the third-floor attic and works its way all the way down to the basement to get into the main County sewer system.

Q.    And it says that the vent pipes for the floor is not sealed.  When in the process would you do this sealing?

A.    Part of our close-out is always -- besides the caulking around the toilet or caulking around a simple window, would be any penetrations from floor to floor with FireGuard gap spray, which is a pink foam that seals off an opening.

Q.    And would this be one of the things that you would do as one of the last things in closing up a project?

A.    Yes, and this is a 1930 structure that we are modernize [sic] and trying to take complete new construction and new remodelling all the way through it to the basement.

Q.    Okay.  Could you turn to page 54.  How does this page relate to the caulking?

**A.**    Again, this is something that would have closed out with the -- with the caulking that would take place.  You'd have clear for tile installations as well as white for toilet installations and it's a caulk application that's applied.

**Q.**    Okay.  If you could turn to page 59 and explain to the judge what's going on with the toilet and the vanity and why it was located the way that it was.

**A.**    Yes, sir.  The Harrells were in the process of approving a sink-mounted bowl that would be attached.  This is an existing condition that takes place in the carriage house apartment above the garage, and, again, it's a perfect example of replace in kind.  This toilet's been placed exactly where the toilet was before, and exactly where the vanity and tub were.  We have then asked direction for a mounted system that would go -- attach to the wall and leave any kind of legroom below.

**Q.**    Could you turn to page 62, please?

**A.**    Yes, sir.

**Q.**    And this highlights, "PVC joints in the crawl space are missing the required purple primer."

       Is there a reason why there isn't purple primer on those?

**A.**    Yeah, this is for the future powder room bump-out.  Apparently the consultants were told that this was the finished product and were not given construction photos as well, and this would have been easily rectified if they understood that we were -- we had a waste line in place for the future toilet of

the powder room bump-out.

Q.     So were you waiting on direction and how that powder room bump-out would play out?

A.     Correct, and it was canceled.  The permit was canceled.

Q.     All right.  I would like you to turn to page 64.  It talks about "Notching of studs."

A.     Yes, sir.  So this is -- the Harrells didn't like how the faucet for the tub was placed on the right side of the tub.  Part of that change order that they did is they had us move the plumbing to the opposing side of the tub, to the left side.  In doing so, we needed to notch out this 2 by 4 in order to get the plumbing to that side.

After that, we would have ended up putting studs in and finalizing its move.  There was a lot of back-and-forth with their designer in Connecticut on the exact dimensions of the spouts on that, and that's why this is an unfinished installation.  The plumber was simply getting the water lines out of the old location.

Q.     So this isn't how you turned over -- you would consider this a turned over finished product to the Harrells?

A.     No, sir.  We were told to demo it, we demoed it, and then stop work proceeded.

Q.     Page 66 and 67.  66 has some water-tight seal issues.

A.     Yes.  This would have been probably beating up the tile setter.  What we would have done in this regard is we would have

gotten a new escutcheon plate, which is that loose piece that is covering that one portion. We would have water-sealed that and then applied the new escutcheon plate to cover it.

Q.    And with regard to page --

A.    I would have also made them redo that piece of tile, the one single 4-inch by 6-inch piece of tile.

Q.    With regard to page 67, what's going on? You have -- they claim that "Incomplete plumbing"?

A.    Yes. This was the owner suite. Again, I think when the consultant wrote that, they thought this was a finished product, but, again, we were terminated. It was not complete.

Q.    All right. Could you turn to page 87 and -- let's try 86. With regard to the status of the outside kitchen, what was going on with that?

A.    Just that we were waiting for the trash drawers and we had not hooked up the gas line because it had not been inspected from the County. There was a previous photo where it showed all the gas lines coming to one single manifold in the house, and you'll see that you have each gas fixture is in one line and then it is then brought online and connected. This had not taken place.

Q.    All right. On page 87, 88, and 89 it talks about some flashing issues. What do you understand is needed to be done in that regard?

A.    I even think when we were talking, in order for this to

be end-capped or step flashing at the end, one piece of copper probably the size of 4 inches and 3 inches would be added to the end drip of this roof.  I think the picture makes it look like I put a roof right up against the house and the wood of the house, and that is a full copper line that's between the synthetic slate shingle and the house, so you actually do have the step flashing in place.  It is missing the little 4-inch piece, is what the expert said.

Q.    And on page 89 is an example of that little piece that would need to be put there?

A.    Yes, sir.  Yes.

Q.    Page 93.

A.    Yes, sir.

Q.    It says that the back patio doesn't have a rail on it. What is your understanding of why that is that way?

A.    Because it was supposed to be an extension of the porch and it would have received all of those rails that are installed, and the porch would have increased in size by, I think it was 150 square feet.

Q.    All right.  So there's been talk about collar ties.  Can you turn to page 119, please.

A.    Yes, sir.

Q.    Can you explain to the Court what's happening with collar ties and what you think you need to do in that regard?

A.    The one thing that we would do is -- I would get a piece

of reclaimed material so it's not a new piece of material, which would be a simple piece of wood that ran across.  At this point the reclaimed material was not installed, as well as there was no dictation of a very large fan that was going to be suspended from that ceiling, and it needed to be placed to not hit the fan, to install the collar ties across.

Q.    So is this something that you were planning to do in the finish-out phase?

A.    Yes.

Q.    Can you turn to 144, please.

A.    Yes, sir.

Q.    There was a lot of discussion associated with having a flexible joint.  Do you recall that discussion?

A.    Correct.

Q.    What do you understand that to be?

A.    Caulk.

Q.    Okay.  And this would be something that you would be doing as the last thing in the project?

A.    Yes, sir.

Q.    I would like you to turn to page 160, please.

A.    Yes.

Q.    These are some items that were identified as issues with interior trim.  How would you approach.  Is this a punch list item that you would clean up?

A.    Absolutely.  And, Your Honor, they picked four photos of

probably 3,000 cuts that occurred -- and joinery that occurred on this project that I would never leave that as a condition, and I'm sure there would be punch lists -- I'm sure there would have been punch lists six months after the fact to a year, which I would have had no problem of correcting or fixing. It was never about giving them a product that I wasn't proud of myself.

Q. All right. Could you turn to page 180 for me, please. What's going on with the exercise room floor. Is that something that you installed?

A. No. What it is is we felt that we had a go on installing the circular staircase. They never approved the circular staircase, so we couldn't go back and do the final installation. These voids would have been filled prior to the installation of the gym floor which would have occurred after the installation of the circular staircase if they would have approved it.

Q. Okay. So but this floor is cracked, and was this something that was in place before -- I mean, you didn't replace this floor, did you?

A. No, we floated it in regards to the existing floor that was down there, but it is a full concrete floor.

Q. Okay. And is this an example of something in which you left as existing?

A. Yes. This is a 1930 slab that was existing in the carriage house.

Q. Okay. And can you turn to page 195, please.

A.     Yes, sir.

Q.     The expert implied that you purposely left these slates here.  What's going on with the roof and what happened there?

A.     The roof was being patched for any broken slate that was needed to be replaced, was replaced.  The 1979 product is not available, so it was replaced with a synthetic material in order to conform.

Q.     The tiles were left on the roof.  Why were tiles left on the roof?

A.     I do not know.  I apologize.

Q.     Is that something that would have been cleaned up at a final walk-through?

A.     Yes.  That's unacceptable and I would have had my own roofing report if I had the opportunity.

Q.     And if you could turn to page 207.  There's been a lot of discussion about this lamp post and how bad it is.  Can you explain to the Court what's actually going on here?

A.     If you notice the damage above the lamp post -- and I don't know if it was a mover, I don't know who it was -- someone had backed into the existing lamp posts that were out there.  In order to protect the copper wire from being compromised, I put -- I instructed the plumber to put plastic caps over the existing copper.  If I would have tried to install a gas fixture to this plastic, it would have melted and wouldn't have even ignited.  This was simply to cover existing copper lines that

had come across the driveway and were keeping water and debris out of them, as well as someone from backing over them again.

Q.    And what was your intention with regard to fixing this, and why did it not get fixed at this stage?

A.    We didn't -- we never had the time to fix any of this.

Q.    Okay.  And what is the status of the --

A.    The lamps were in the garage, sitting there waiting for installation.

Q.    So after having gone through the Furlong report, would it be fair to say that are that there are a large number of things in this report that are in their condition that they are because you were kicked off the job?

A.    I -- yes.  I agree.

Q.    There are things in there that you agree need to be --

A.    Absolutely.

Q.    Okay.  And there are things in there that are cosmetic, and there are some things that are code, right?

A.    Absolutely.

Q.    And with regard to this particular project, you know, are these -- is this number of things from a punch list, you know, exceptional based on your experience?

A.    It is not.  It's a 1930 house that is an existing structure with multiple renovations and iterations to it.

       MR. BURCHER:  I'm just about done, Your Honor.

BY MR. BURCHER:

Q.     All right.  Plaintiffs' Exhibit 488.  If we can turn to that.

A.     Can you restate the binder again?

Q.     I'll tell you what, if you can just go to the plaintiffs' exhibit binder.  I don't think it's in that binder.  You need to pull the --

A.     -- direct exhibits or plaintiffs' exhibits?

Q.     Plaintiffs' exhibits.  They're on the wall there.

THE COURT SECURITY OFFICER:  What was the number again?

MR. BURCHER:  488.  It may be in the first binder.

THE COURT SECURITY OFFICER:  There you go.

MR. BURCHER:  Thank you.  Thank you.

THE WITNESS:  Yes, sir.

BY MR. BURCHER:

Q.     I would like to -- I would like to direct your attention to the "Unfinished Or Missing Upgrades" in this -- these are the damages spreadsheet that the Harrells claimed that you owed them.  Have you -- do you see where it says, "Gate Motor & Controls," $20,600?

A.     Yes, sir.

Q.     What's the status of the gate and motor controls?

A.     They are installed and on site.

Q.     Okay.  Are they operable?

A.     Yes, they are.

Q.     Okay.  So do you believe that you owe that $20,600 to the

Harrells?

A.     I do not.

Q.     "Outdoor Customization Budget."  We discussed that previously with the Virginia Consumer Protection Act.

The "Built in Desk," we talked about that as well.

"Dining Plate Rack," we talked about that.

The "Post Closing Construction Contract Porch Deposit," we talked about that.

So all of these other things, your position as to their damages in this particular case on all of those things, do you agree that they're owed those numbers?

A.     I do not.  Except for the $456, which represents those doorstops.

Q.     Okay.  And do you see that they're asking for $1.266 million as it relates to the damages associated with -- necessary to fix the house?  Do you agree with that number?

A.     I do not.

Q.     And why not?

A.     Because this house has been inspected, this house has received multiple inspections, this house has received subsequent inspections and a microscope from Arlington County that went beyond any kind of inspection that has been conducted in Arlington, the -- everything has been updated.  I do not -- I -- I don't know if I could build the actual house from scratch, but very close to it.

Q.    With regard to -- what would you need to do to finish the project?

A.    I would need 30 days to finish the work.

Q.    And how much would it cost for you to finish the work?

A.    Probably around 30 to $45,000.

Q.    All right.  Mr. Deluca, at any time in this project did you have the intent to defraud the Harrells as it relates to the building size of the project?

A.    Absolutely not.  I never tried to defraud anyone in this transaction.

Q.    At any time in this project did you have the intent to defraud the Harrells regarding the permits and the permits that were required on this project?

A.    No, I did not.

Q.    Okay.  And at any time in this project did you intend to defraud them or deceive them as it relates to the master bath tile and status of that?

A.    Never.

Q.    And with regard to the slate roof, do you feel you ever misrepresented anything to the Harrells regarding the slate roof?

A.    No, sir, I never did.

      MR. BURCHER:  Court's indulgence, Your Honor.  I might be done.

      (Brief pause in proceedings.)

MR. BURCHER:  I think I have a number of exhibits that I need to move in, Your Honor.  I might not have done so during the time period.  I think I have them circled here.  They're primarily related to the July and August time period.  If I haven't done so already, there's the Defendant's Exhibit 37, which is the Post Closing Construction Agreement, which is already in.

MR. LYNCH:  No objection.

MR. BURCHER:  Defendant's Exhibit 38, which is the July 7th punch list with handwritten notes.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 38 admitted into the record.)

MR. BURCHER:  Defendant's Exhibit 39, which is the August 16th -- excuse me, August 6, 2019 update with handwritten notes.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 39 admitted into the record.)

MR. BURCHER:  Plaintiffs' Exhibit 4, which is the change order at the beginning of August.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 4 admitted into the record.)

MR. BURCHER:  Defendant's Exhibit 42, which are the August 6th, 2 a.m. texts.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 42 admitted into the record.)

MR. BURCHER:  Defendant's Exhibit 41, which is the e-mail that combines the -- those texts, the August 6th e-mail to Mr. Harrell.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 41 admitted into the record.)

MR. BURCHER:  Defendant's Exhibit 43, which is the 11 p.m. e-mail from Mr. Harrell.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 43 admitted into the record.)

MR. BURCHER:  Defendant's Exhibit 144, which are Mr. Deluca's contemporaneous notes associated with the situation.

MR. LYNCH:  I think I might object to them.  I mean, it's totally unaccountable.  It has no date, but --

THE COURT:  He couldn't identify a date, but he identified it during that time period, I think is what he said, so I'm going to allow it in.

(Defendant's Exhibit 144 admitted into the record.)

MR. BURCHER:  Plaintiffs' Exhibit 530, if that's not already in, the August 27th e-mails.

MR. LYNCH:  Plaintiffs 530?

MR. BURCHER:  530.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 530 admitted into the record.)

MR. BURCHER:  Plaintiffs' Exhibit 427, which is communications with the County during that time period.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 427 admitted into the record.)

MR. BURCHER:  Plaintiffs' Exhibit 424, which is the letter of rescission.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 424 admitted into the record.)

MR. BURCHER:  Plaintiffs' Exhibit -- page 8 has disappeared, Your Honor.  Just a second.

Defendant's Exhibit 32, which is the lengthy e-mail chain running from August 7th to August 12th.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 32 admitted into the record.)

MR. BURCHER:  Plaintiffs' Exhibit 690, which is the August 12th e-mail exchange.

MR. LYNCH:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 690 admitted into the record.)

MR. LYNCH:  I have no objection to any of the {indiscernible} --

THE COURT REPORTER:  I'm sorry, I can't hear you.

MR. LYNCH:  I have no objection to any of the exhibits he just {indiscernible}.

MR. BURCHER:  Okay, then I move for admission of Plaintiffs' Exhibit 1006, Plaintiffs' Exhibit 691, Defendant's Exhibit 192, which is the -- an e-mail chain that we discussed. It's the August 12th e-mail chain.

MR. LYNCH:  Okay, no objection.

MR. BURCHER:  Defendant's Exhibit 40, which is the update to the punch list, which is dated 8-23.

MR. LYNCH:  No objection.

MR. BURCHER:  If they have not already been admitted, the December 19th plans, Plaintiffs' Exhibit 432.

MR. LYNCH:  No objection.

MR. BURCHER:  Defendant's Exhibit 54, which are the change orders.

MR. LYNCH:  No objection.

MR. BURCHER:  And then Plaintiffs' Exhibit 446 and 445, which I believe are already in.

MR. LYNCH:  No objection.

THE COURT:  They're all received.

(Plaintiffs' Exhibits 1006, 691, 432, 446, and 445,

and Defendant's Exhibits 192, 40, and 54 admitted into the record.)

MR. BURCHER:  No further questions, Your Honor.

THE COURT:  All right.  Then let's take our mid-afternoon break and we'll begin the cross-examination.

(Thereupon, a recess in the proceedings occurred from 3:51 p.m. until 4:11 p.m.)

CROSS-EXAMINATION OF DOUGLAS DELUCA

BY MR. LYNCH:

Q.    Good afternoon, Mr. Deluca.

A.    Good afternoon, Mr. Lynch.

Q.    So one thing I wanted to clear up that you testified to, is it your testimony that the Harrells had security cameras installed at this property?

A.    They requested security cameras, and they were installed. There were also two cameras installed that were Nest, one in the kitchen pointed to the door, and one in the owner bedroom pointing towards the bath.

Q.    You installed them or through your sub; is that correct?

A.    No, the Nest were something that they did after the fact. The main internal security system was installed out on the property as part of the house and upgrades.

Q.    Who installed the security cameras?

A.    Sam Iab {ph}.

Q.    And do you have a relationship with Sam?

A.    Yes, he does audio-visual.

Q.    Did you charge the Harrells for that work?

A.    I believe so.

Q.    Okay.  So just briefly on your building experience, at deposition you said you have done at least seven projects that were either whole-house renovations or brand-new home builds from scratch.  Is that correct, still?

A.    Yes, it is.

Q.    And if we expand that question to construction projects of all types, you've done over a hundred; is that right?

A.    Yes, sir.

Q.    I heard a lot of "we" and "us."  Your company is only one person, meaning you, right?

A.    Correct.

Q.    How much did you pay for the property when you bought it?

A.    Can you show me my settlement document?

Q.    I could but it's going to take some time.  Just within, you know, a hundred thousand, even half a million if you can.

A.    Over $2 million.

Q.    Right.  Under 2.5; is that correct?

A.    Yes, sir.

Q.    Okay.  You were required to do construction work under the April 3rd sales contract, correct?

A.    Correct.

Q.    And the construction work you were required to do was

listed in Exhibit B to the sales contract, correct?

A.    It was.

Q.    And you agreed that the work you did at this property had to comply with the building code, correct?

A.    I do.

Q.    All right.  You still have Mr. Harrell's direct exhibits there?

A.    I would have to locate them real quick.  I do.

Q.    Excellent.  We'll be using the screen a lot, but this one, please turn to tab 2.

A.    Yes, sir.

Q.    And look at clause 1.1?

A.    Yes, sir.

Q.    So do you see a reference to Exhibit A in that clause?

A.    Yes, I do.

Q.    Okay.  You said at deposition that Exhibit A to this post-closing contract was the sales contract and all of its exhibits, correct?

A.    I believe so.

Q.    Okay.  What level of effort do you put into verifying facts before you sign an affidavit with those facts?  Do you look at it closely, do you barely look at it, what level of effort?

A.    I've never been in this situation, so I don't know anything except how I did this -- what the attorney put in front

of me.

**Q.**    So not much effort then?

**A.**    I would read it, but I don't agree that I don't have experience with affidavits.

**Q.**    Okay.  Do you put any effort to verify the facts before you sign it or you just sign it?

**A.**    I -- again, I don't -- this was the first affidavit I ever did.  I think I did rely on counsel on how to -- I don't know.  Can I see my affidavit?

**Q.**    I'm just asking you --

**A.**    Okay.

**Q.**    -- generally speaking, before you sign one, do you check it or do you just sign it?

**A.**    I don't know and this was the first time ever signed an affidavit.

**Q.**    You don't know if you check --

         THE COURT:  Let's move on.

         MR. LYNCH:  All right.  Okay.  I'm sorry.

         So let's bring up Zulu 4, please, Walter.

BY MR. LYNCH:

**Q.**    This is one of your declarations in this matter.  This one is filed at Docket 1-30-1.

         MR. LYNCH:  And let's please zoom in on paragraph 7 of this.

         THE WITNESS:  Mr. Lynch, could I have the document in

front of me?

BY MR. LYNCH:

Q.    This one I don't have available.  I'm sorry.  All right.

A.    Thank you.

Q.    It says there, "Attached as Exhibit 1 is a true and accurate copy of what I understand was Exhibit A to the PCCA."

Do you see that?

A.    Yes, I do.

MR. LYNCH:  Okay.  And let's move forward to pull up Zulu 5.  These are the exhibits.  We'll see what that Exhibit 1 is.

All right.  Scroll down a page, please.  Okay.  And then keep scrolling to the next page.  And one more, I think.  Two pages.

BY MR. LYNCH:

Q.    So in your deposition you said Exhibit A to the PCCA was the wholesale contract and all the exhibits, and now you say in the declaration that it's only two pages; isn't that correct?

A.    No, sir.  Can I reiterate?

Q.    That's not correct?

A.    No, sir.

Q.    Okay.

A.    So my understanding was when I signed the sales contract there was the actual sales contract, which was the Virginia residential purchase agreement, which was the sales contract.

There was then a subsequent Exhibit B which outlined exactly what I was going to be delivering to the Harrells in that contract, so the A would have been the actual contract, and then there's Exhibit B, which would be the subsequent deliverables of how I would deliver the house.

Q.    All right.  Let's look at your deposition.

THE COURT:  What's the point of this?

MR. LYNCH:  Credibility.

THE COURT:  Move on.

MR. LYNCH:  Okay.

BY MR. LYNCH:

Q.    So let's look at Zulu 6, please.  This is a document filed in this case at Docket 84-1.

MR. LYNCH:  Can we scroll to page 4.  And let's zoom in a bit on paragraph 28 there, please.

BY MR. LYNCH:

Q.    Can you read paragraph 28, please, Mr. Deluca?

A.    Yes, sir.  "Among other payments made to suppliers, I paid Marble Systems of Fairfax $25,726.45 on May 10, 2019, as a deposit for the tile for the owner's bathroom.  I also ordered the driveway gates on June 6, 2019 and paid $12,725."

Q.    Now, in reality, you've never allocated a single dollar of that 25,000 amount there in that affidavit to the owner suite tile, correct?

A.    Not correct.

Q.    Okay.  So let's pull up Exhibit 737.  It's not in the book.

A.    It is.

Q.    Okay.  Good.  So that tile right there in Exhibit 737 --

A.    Yes, sir.

Q.    -- you paid -- you allocated money at Marble Systems for that piece of tile right there; is that your testimony?

A.    Yes sir, and their system shows it.

Q.    Okay.  And then in the last affidavit we just looked at it says, "Even though March 16, 2020, I was willing to close out permits as indicated in the March 16, 2020 letter to counsel."

      Do you recall saying that in your declaration?

A.    Can you bring up the document, please?

Q.    You bet.  Look at paragraph 35.  That says, "Even through March 16, 2020, I was willing to close out open permits as indicated in the March 16, 2020 letter to counsel."

      Do you see that?

A.    Yes, I do.

Q.    You haven't closed out the permits to this day, correct?

A.    I've attempted to.

Q.    Let's look at Exhibit 8.

A.    Can I see it?

Q.    Yes.  So at the top of page 1 it says, "Owner's Affidavit/Residential."

      Do you see that?

A.      Yes, sir.

Q.      And then right below that line it says, in parenthesis, "(to induce sale and/or loan on premises & title insurance coverage)."

        Do you see that?

A.      I do.

Q.      And still at the top of page 1 it says, "The undersigned, being dual sworn according to law, deposes and says."

        Do you see that?

A.      Yes, sir, I do.

Q.      Okay.  Let's go to the bottom of this and see who signed this.  Okay.  Is that your signature there, Mr. Deluca?

A.      Yes, sir, it is.

Q.      Let's go back up to page 1 of this document and then look at paragraph 2.

        MR. LYNCH:  Can you zoom in a bit on that paragraph, please, Walter.

BY MR. LYNCH:

Q.      So paragraph 2 says, "At no time within 123 days of the date hereof or the date of settlement, whichever date shall last occur, has any work been done, services rendered, or materials furnished in connection with repairs, improvements, development, construction, removal, alterations, demolition or such similar activity on or incident to the property described above."

        Do you see that?

A.      Yes, sir, I do.

Q.      And that's not a true statement, correct?

A.      I don't know when this document was signed, and I do not know who wrote "none."

Q.      That's a great point.  So let's go to the bottom and see when this document was signed.  It says July 3rd, 2019.

Do you see that?

A.      Yes, sir.

Q.      Okay.  So back to my prior question, paragraph 2 -- paragraph 2 was not a true statement, correct?

A.      Can you go back to paragraph 2?

Q.      (Nodded head affirmatively.)

A.      Correct.

Q.      All right.  Now, Mr. Elmagraby --

A.      Sir, I'm sorry, were you referencing the mechanic's liens or were you referencing that the insured in regards to construction?

Q.      No.  So, that -- I was referencing the part that said, "At no time within 123 days of the date hereof," July 3rd, "has any work been done."

Everyone in this room knows that there was work going on within 123 days of July 3rd.

A.      Correct.  I believe this document is only referring to insurance coverage and any claims.

Q.      Okay.  I didn't ask that question.

A.      I'm sorry, sir.

Q.      So let's look at Mr. Elmagraby's notebook, please.  And go to tab 439?

A.      Which one is that, Mr. Lynch?

Q.      439.

A.      Yes, sir.

Q.      So this was the kitchen and bath permit you were discussing earlier, is that familiar to you?

A.      Yes, it is.

Q.      Okay.  So under "Description" there at the top, there's a note, and it says, "Permit's scope of work does not include any structural work."

        Do you see that?

A.      I do.

Q.      Okay.  And then there's an entry that talks about -- you went into the County in October.  There's an entry here, October 29th, 2018, and the action was rejected, and the, I guess, action again -- they spell it out -- "Rejected."

        Do you see that?

A.      Yes, sir.

Q.      Okay.  And then now back down on April 3rd of 2019 there's an entry that says, "Approved."

        Do you see that?

A.      I do.

Q.      And they reiteration here at the end of that entry, "No

structural work with this permit."

Do you see that?

A.    I do.

Q.    You did structural work before April 3rd, 2019, correct?

A.    Yes.

Q.    You installed two structural members at the property, one at the lintel and the kitchen beam before April 3, 2019, correct?

A.    Yes, I did.

Q.    And you had no permit for either of those items, correct?

A.    We coordinated this with the County and under Section 9 of the Virginia building code it does say, a historic structure, that there are certain instance where the local building official can make the determination.

So in regards to safety and opening things up, there were members put in place to hold placeholders.  They were never concealed.

Q.    Okay.  There's no drawing on file with the County on April 2nd, 2019 for either structural member, correct?

A.    With a you're missing on this, Mr. Lynch --

THE COURT:  No, no, you answer his question "yes" or "no," if you can --

THE WITNESS:  Pardon me, Your Honor.

THE COURT:  -- and if you can't answer it "yes" or "no," tell him that.

THE WITNESS:  Yes, sir, sorry.

BY MR. LYNCH:

Q.    So --

A.    Pardon me.

Q.    -- as of April 2nd -- as of -- let's just say April 2nd, 2019, there was no permit drawings on file with the County for any structural members, correct?

A.    On file?

Q.    Yes.

A.    Can you define exactly what you mean?

Q.    You had not filed a permit application of any sort which said "structural members" being done at this property --

A.    No, because they were being identified.

Q.    I don't understand your answer.  You agree with me that there's no County record that shows any structural members for this property in any permit application before April 3rd, 2019. That's correct, right?

A.    Correct.

Q.    So you installed those members without a permit?

A.    I did.

Q.    Now we're going to stay in one book for a bit here.  This is called "Photo Highlights."

A.    I don't think we have a copy.

Q.    And if you can open your book to Tab 5D, as in dog?

A.    Yes, sir.

Q.      So, towards the bottom of this page there's a line that says, "Main house budget."

        Do you see that?

A.      I don't, sir.  I see, "Good bones."

Q.      Okay.  Are you in 5D?

A.      Yes, sir, now I am.

Q.      Okay.  Do you see a line there that says, "Main house budget"?

A.      Yes, sir, I do.

Q.      This is the budget for the -- to your lender for the main house, correct?

A.      Yes, this is a budget to our investor.

Q.      Okay.  And as of January, if you flip to the next page, there's a total.  The budget is 498,000.  Do you see that?

A.      Yes, sir, I do.

Q.      Okay.  And as of the date of this e-mail, January 4th, 2019, you had already drawn $162,000 and change, right?

A.      Yes, sir, I did.

Q.      Okay.  And if you subtract the 162,796 from the budget amount of 498, you get the balance of 335,204, correct?

A.      Yes, sir.

        THE COURT:  All right.  Let's look at Zulu 1, please.

        THE WITNESS:  Can you reference a binder?

        MR. LYNCH:  This one you don't have.  This is a joint stipulation of Dashco this is labeled, I believe, 1070 or it

might be 1071.

Let's look at page 4 of this PDF, please, at page 4.  And if you scroll down you'll see a schedule of draws.  There we go.

BY MR. LYNCH:

Q.    Okay.  So we just talked about the amount drawn to date was 176,296.  Does it look like that your draws to date match this draw schedule shown here in paragraph 7?

A.    I don't have a document with me to compare, but they seem correct.

Q.    So looking back at your book, there's a draw 3 summary at the bottom of page 2 of 411.  Do you see the draw 3 summary?

A.    Yes, sir, I do.

Q.    So you're requesting a draw there of 122,217.77, right?

A.    Yes, sir, I am.

Q.    And that matches draw 3 on the screen?

A.    It doesn't have the cents.

Q.    Right.

A.    It could have been round up to 218 because of the $0.77.

Q.    Right.  So the way draw 3 worked is you were listing items that were supposed to be complete at this time, January of 2019, and the bank would then give you loan funds for that completed work; is that right?

A.    No, sir.  If I could just clarify.  This was an investor who basically funded the entire project from start to finish.  I did not have any capital to put in it, but I had my workmanship,

my efforts, and everything that I would be giving to the project.  In return, they would loan me the money.

Internally, they would also receive interest payments which were kept within the company in which they received a 12 percent return on their money that they gave us for the purchase of the project as well as any advancements, which I think could be confusing.

So when this came through, this was simply a draw to the investor on what they -- what we needed to draw for that upcoming month.  It could have been something from the previous month, it could have been something in the next month, but at all times we were able to forward their investment to cover any expenses forward or backwards, recouping or putting out.

Q.    That's difficult to understand.

So was this forward looking?  When you send a draw request, you're saying, "I'm going to do this work in the future," or you've already done it or a mix?

A.    It could be both.  If it's something expensive -- I think Mr. Harrell testified that the millwork was $35,000 or something close to that, and he didn't understand it.  The millwork was actually $74,000; therefore, on something like a big ticket item that we didn't have the funds within the budget to do, we would go to the investor and say, "This is what we need to order the millwork cabinets," and then they would give us that money.  Then we would order the actual cabinets.

Q.      So when you got to the end, the bank had disbursed you all the loan funds and you hadn't completed the work?  Is that how your loan worked?

A.      This wasn't a loan, sir.  This was an investor.  This was a private family that's an Arlington family that invested in real estate projects.  So this was --

Q.      They weren't loaning you money, they were just giving it away; is that what you're saying?

A.      They were an investor, sir.  We both had a joint holding in the property.  I did all the work; they provided the money.

Q.      Would the investor give you the money before the work was done -- is that what you are saying -- by the time you reached the end?

A.      I don't understand where you're going.  Pardon me, Your Honor.  I don't understand.

Q.      Let's go to tab E.

A.      Yes, sir.

Q.      So now you're making a draw here in February, and the draw amount is 121,700 right?

A.      Yes, sir, it is.

Q.      Okay.  And that's going to match what we've got there on the screen for February 14th, 2019, correct?

A.      It does.

Q.      Okay.  So now I'm looking at these items and I just want to -- go on to tract 3, see what happens in these pictures.

A.   Yes, sir.

Q.   Let's look at "HVAC completion," "Electrical draw," and "Garage framing complete."

Do you see those three?

A.   Can you repeat them one more time, sir.

Q.   "HVAC completion."

A.   Yes, sir, I see it, 25,000.

Q.   Yeah.  "Electrical draw."

A.   Yes, sir, 15,000.

Q.   "Garage framing complete."

Do you see that?

A.   Yes, sir, I do.

Q.   Okay.  Those had all been done as of this time, or are you not sure?

A.   I'm not sure.  I would have to refer to a picture. Typically, when I do a draw request, I would show them progress of where I was in the project.

Q.   Okay.  Let's start with page 60 of your book, the very next page.

A.   Yes, sir.

Q.   This is page 2 of Exhibit 412, and you can see some garage framing there, right?

A.   Yes, sir, I do.

Q.   Looks complete too, doesn't it?

A.   No, sir, it's not.

Q.      Okay.  So let's keep going.  Page 67 of your book.

A.      Yes, sir.

Q.      And does that look like electrical?

A.      Yes, sir, it is.

Q.      Okay.  So this one checks out.  You had done electrical as of this date, right?

A.      Yes.  What was the date?

Q.      This one's from February of 2019.  This is attached to the draw e-mail we just looked at.

A.      Yes, this is rough wires that are providing electrical or temporary electric to the office.

Q.      New wiring, right?

A.      Yes, sir.

Q.      Let's go to Exhibit 413, which is tab 5 after your book, and this is just more pictures from February.

A.      Is I'm sorry, sir, where are we?

Q.      Tab F as in Frank.

A.      Yes, sir.  February 13th.

Q.      Yes.

A.      Yes, sir.

Q.      It's the same date as the draw e-mail we just looked at?

A.      Yes, sir, this is the fence going in.  So these are the fence posts, 6-by-6 privacy fence that was running against the west side of the property.

Q.      Okay.  So page 76 and 77 of your book, that's Dashco

263264.   That looks like completed HVAC, correct?

**A.**    Not completed, no, sir.

**Q.**    Okay.  But it's HVAC, right?

**A.**    Yes, sir, it is.

**Q.**    Okay.  So at least some of these three items we're tracking, again those items were HVAC completion, electrical draw, and garage framing, looks like some of that's already done, right?

**A.**    Well, we're blocking in critical systems, yes, sir.

**Q.**    Okay.  Let's go to tab G in your book, G as in golf.

**A.**    Yes, sir, another draw.

**Q.**    Okay.  So before we get into the draw part, this e-mail on the first page of Exhibit 414 says -- this is you to Mr. Burns, says, "Have 3 inspections."

      Do you see that?

**A.**    Yes, sir.

**Q.**    Those were not County inspections, correct?

**A.**    Three upcoming County inspections, yes, sir.

**Q.**    They hadn't happened yet?

**A.**    No, they had not.

**Q.**    You hadn't -- you didn't even have an issued permit as of this date, correct?

**A.**    I believe I did.

**Q.**    You believe you did?

**A.**    Yes.

Q.    Okay.

A.    Or it was being released at the same time.

Q.    Do you still have Mr. Elmagraby's book handy there?

A.    No, sir, I don't.

Yes, sir.

Q.    426?

A.    Yes, sir.

Q.    That's the chart of permits, right?

A.    No, it talks about --

Q.    You're on the wrong one.

A.    -- the County official coming out.

Q.    You're on the wrong one then.  426?

A.    There's no document, sir.

MR. LYNCH:  Okay.  So let's call it up on the screen.

BY MR. LYNCH:

Q.    You can see it on the screen.  Just, why don't you look at that first page and tell me if any permits were issued before April 3rd.

MR. COUGHLIN:  Objection, Your Honor, just -- there's -- we're on a different page on this document.

THE COURT:  You know, let's not double up on who's making objections here.  If you have an objection, you make it, Mr. Burcher.

THE WITNESS:  Can you scroll to the next page, and then scroll back up.  4-3-2' -- 4-3-2019 was the first official County

permit that was issued.

BY MR. LYNCH:

Q.     Thank you.

A.     Yes, sir.

Q.     So you definitely didn't have any inspection by the County on March 7th, correct?

A.     That's not what I was stating.

Q.     Well, that's the new question.  Do you have any inspections before -- by the County on March 7th?

A.     Can you give me that exhibit again?

Q.     You bet.  5G, as in golf.

A.     Page 11?

Q.     Um, this is tab 5 in that book, and then there's letter tabs after the 5.

A.     Yes, sir.

Q.     And you're looking for G, as in golf.

A.     Yes, sir.

Q.     Okay.  So the question there again is, March 7th, 2019, you had no County inspections at that time, correct?

A.     Yes, but we were waiting for our permit to be released the first week of the month.

Q.     Okay.

A.     The inspections never -- the -- I was not reporting that the inspections had occurred, that I had three inspections until I could start my drywall and closing everything up.

Q.    And the second part of that sentence, "going into full drywall and finishes," that was a true statement, correct?

A.    Not until after the three inspections occurred.

Q.    I see.  Well, you closed in work before -- or let's say in March of 2019 before April, correct?

A.    I don't believe that's accurate, Mr. Harrell -- excuse me, Mr. Lynch.

Q.    Let's look at tab 4 of this book.

A.    Yes, sir.

Q.    Okay.  Exhibit 479 depicts the existing main house in December of 2018, right?

A.    This was number -- which one was it, sir?

Q.    We're in tab 4.

A.    Yes.

Q.    Exhibit 479, the very first page there.

A.    Yes, it shows the formal living room in frame stage.

Q.    And this is the existing main house; is that right?

A.    Yes, sir, it is.

Q.    Okay.  What do you -- and, I'm sorry, what do you call this room?

A.    The formal living room.

Q.    The formal living room.  Okay.  Let's look at the next page, Exhibit 480.  That's the formal living room right?

A.    Formal living room looking into the library room.

Q.    And that's December of 2018, correct?

A.      Yes, sir, it is.

Q.      Okay.  And then on this next page, that's the formal living room again, right?

A.      Yes, sir, it is.

Q.      Okay.  And all that work is closed in, correct?

A.      I don't know what date this is.  This is on March 16th, 2019?

Q.      Yes.

A.      Yes --

Q.      Okay.

A.      -- it is.

Q.      Does that refresh your recollection of whether you closed in work in March of 2019?

A.      In this specific room, yes.

Q.      Okay.  And then we can see pictures of the structural steel you installed without a permit on the next two pages, 462 and 464, correct?

A.      Yes, sir, and I just want to --

THE WITNESS:  For the record, Your Honor, this structural member had to come in in order to preserve an opening.  When they allowed us to demo a bathroom out, it exposed the wall, which then this member was dictated.  This member then had been added to not only the kitchen renovation permit but also the addition permit because the addition was above it.

BY MR. LYNCH:

Q.    Okay.  Let's look at the screen for a moment, but stick with your book.  We'll keep using it.

MR. LYNCH:  PDF page 7, please.  Okay.  So scroll down so we can see the draw.

BY MR. LYNCH:

Q.    This is the draw e-mail from March 7th, 2019.

A.    Do I have that on paper, sir?

Q.    No, unfortunately.

A.    Okay.

Q.    So -- but this is the same date as the e-mail where you're saying you have three inspections?

A.    Yes, sir.

Q.    Okay.  This e-mail lists the amounts you're requesting for draw 5, right?

A.    Yes, sir.

Q.    Okay.  And that includes plumbing contracts.  Do you see that?

A.    Yes, sir, I do.

Q.    What's the amount?

A.    $26,000.

Q.    Okay.  And what about "Electrical Draw Completion," what's the amount for that one?

A.    $14,000.

Q.    And what about "Structural Steel"?

A.    $7,500.

Q.    Okay.  All that work was done on or about March 2019; is that right?

A.    No, sir.

Q.    Well, some of it was, though, right?

A.    Yes, some of it was.

Q.    Well, why don't you tell me.  How much plumbing?

A.    It would be hard to back into a number that way because this does not include materials and other items that we've done. It also includes exploratory demo, being able to open up walls so the plumber could actually do his work, so it's very difficult to say how much it was.

That's why I wanted to be really clear that when we make a draw, it could have been something in the future or something in the past.

Q.    Okay.  So I want to track these items, plumbing, electrical, and structural steel, with some pictures.  So let's go back to tab G, as in golf.

A.    Yes, sir.

Q.    So if my logic holds, we're about to see some pictures of electrical and plumbing.

A.    Sir, I'm sorry, I'm seeing the formal staircase, receiving trim, and applications.

Q.    Sure.  Flip forward to page 92.  And this is Dashco 281 of Exhibit 414.

A.    Yes, sir.

Q.    That's new electrical and plumbing, correct?

A.    They're rough-ins, yes, sir.

Q.    Okay.  So let's see -- so certainly the draw request, and I guess I give you credit for this, they're definitely backward looking to some degree, right?

In other words, you submitted draw requests after the work is done, and it seems like that would make sense because you're sending pictures of this work to Dashco when you ask for money?

A.    Correct, but I don't know what the point of that is.

Q.    Well, we'll see in a second.

A.    Okay.

Q.    All right.

MR. LYNCH:  So let's bring back up Zulu 1.

THE WITNESS:  Is it in my binder?

BY MR. LYNCH:

Q.    Sorry, no.  All the Zulus are on the screen.

A.    Yes, sir.

Q.    Okay.  So I want you to add up -- and I have a calculator here -- how much you drew as of March 12, 2019.  Again, as we said, that's before you had any permit.

A.    Mr. Lynch, to the 3rd of March or the March 12th?

Q.    March 12th, that's right.

A.    Yes, sir.  $577,014.

Q.    Thank you.  All right.  So I want to look just at two

more pictures in this book.

A.     Do I need that number again?

Q.     No.

       So two more pictures.  Let's go to tab H, please.

A.     Yes, sir.

Q.     And now we're in April 17, 2019.  That's the cover e-mail.  Do you see that?

A.     Yes, sir.

Q.     Okay.  And then go to page 105 of your book, which is Exhibit 415, Dashco 294.

A.     Yes, sir.

Q.     Do you remember mentioning this room in your testimony?

A.     I do.

Q.     Okay.  What do you call that room?

A.     This is Mr. Harrell's son's room.

Q.     Okay.  And just keep your thumb on that page, and then thumb forward to page 142.

A.     To page 142 on the subsequent draw --

Q.     Yeah.

A.     -- or the May draw?

Q.     Yep, 142 of your book, May draw, correct.

A.     Yes, sir.

Q.     Same room, right?

A.     Hold on one second.

       Yes, sir, that's the same room.

Q.      Okay.  And those walls are closed in, correct?

A.      Yes, they are.

Q.      And that's not a kitchen and bathroom, is it?

A.      No, that's a bedroom that had been inspected for electrical.

Q.      Yeah, that's what you say, but the only permit open of any kind before June 4th, all are kitchen and bath permits, correct?

A.      That's not correct, sir.

Q.      It isn't?  What part of that is not correct?

A.      That was the name of the permit, but this is -- this is a remodel permit where the entire house was brought down to shell and inspected by the County, and we did receive this.  There are yellow or orange inspection stickers that have all of these rooms documented.

        Now, if something within the County is calling a permit one thing or another, if we were in Fairfax County, this would be called a renovation permit.  In Arlington County, it's called a bathroom and kitchen renovation.  It still received the same scrutiny and same inspections.

Q.      Okay.  I'm glad you brought up Fairfax County.

A.      Yes, sir.

Q.      You received notice of violation in Fairfax County --

        MR. BURCHER:  Objection, Your Honor.

        MR. LYNCH:  -- twice.

MR. BURCHER:  It's irrelevant to this case because --

MR. LYNCH:  I have a good evidentiary argument on this.

THE WITNESS:  I believe, Mr. Lynch --

THE COURT:  Stop, stop.

THE WITNESS:  Sorry, sir.

THE COURT:  Stop.

So you want to know whether he's violated, in Fairfax County, the requirement to get permits in other similar situations?

MR. LYNCH:  Yes, subsequent to the filing of this case, that's correct, and I think --

THE COURT:  I'll allow it.

MR. BURCHER:  Subsequent to the filing of this case or prior to the filing of this case, because if it's subsequent to the filing of this case, it's irrelevant to this case, Your Honor.

THE COURT:  Well, no, it's not irrelevant because it goes to whether he cares whether he has a permit or not.

MR. LYNCH:  That's right.  This is for evidence of lack of mistake, lack of accident, motive.

THE COURT:  Your exception is noted.

BY MR. LYNCH:

Q.    So, you were cited with notice of violation in Fairfax County for doing work without a permit twice?

A.    Yes, sir.

Q.     Thank you.  All right.  So, let's go back -- and those were 2020; is that when that happened?

A.     I believe it was you who contacted Fairfax County and told them that I was working without a permit?

MR. LYNCH:  Gotcha.  And what's your basis for that?

THE WITNESS:  Fairfax County.

BY MR. LYNCH:

Q.     Okay.  You know we've subpoenaed Mr. Sanchez and Mr. Lupe in this case?  Did you know that?

A.     Yes, sir, I do.

Q.     Okay.  So anyhow, I guess I'll just stop with the questions on the book.  I mean, let me make sure I got your position is, you think that you had -- you were permitted to do mechanical, electrical, plumbing work outside of the kitchen and bath; is that your testimony?

A.     Yes, I do.

Mr. Lynch, I'm not sure if you are aware --

THE COURT:  Wait for a question.

THE WITNESS:  Sorry, sir.  Yes, sir.  Sorry.

THE COURT:  Explain to me why you then pulled electrical, plumbing, mechanical permits subsequently -- I don't know the dates, but you had permits for each one of those, which you testified already were required and that you fulfilled --

THE WITNESS:  Yes, sir.

THE COURT:  -- that you didn't need to do them back in

February and March and April?

THE WITNESS:  Well, when we were starting -- I believe what he's doing, Your Honor, is --

THE COURT:  I have a question.

THE WITNESS:  Pardon me, sir.

THE COURT:  So you did go and get inspections for the electrical and the mechanical and the plumbing --

THE WITNESS:  Yes, sir.

THE COURT:  -- and they, you know, made notations on their inspection forms about what areas were included and what wasn't included and what was going to be done in the future, but why wasn't that necessary in February, March, and April when you drew the kitchen and bath permit but, all of a sudden, is necessary later on during the construction?

THE WITNESS:  Well, what happened, Your Honor, was we ended up with a contract that we actually knew what we were building at that point, and that's when -- that was the critical step to go back to the County from that October meeting to give them exact centerlines and items that we were including in the house.

Throughout this process, the inspectors walked through the entire house, every floor, and then again if the plan was labeled "bathroom," "bathrooms," "all bathrooms and kitchen remodel," they -- each of those bathrooms, plumbing interacts with the rest of the house, and for exploratory situations, you have to

completely open things up and be able to make sure you can get

falls and rises with the plumbing.

THE COURT:  Sure.  Is there no permit that's called "demolition permit" in a renovation?

THE WITNESS:  No, sir.

THE COURT:  Okay.

THE WITNESS:  Unless the entire house was coming down. Yes, sir.

BY MR. LYNCH:

Q.    And you never obtained any permit for the carriage house until November, correct?

A.    No, sir.

Q.    Am I correct?

A.    You're not correct.

Q.    You actually got a permit for the carriage house before November; that's your testimony?

A.    The official permit was released when we went back to the County and they asked us to update all the plans.  We did the entire inspection program for the entire property, which included the main house and the carriage house, which are within 15 feet of each other, and as an inspector would walk through the main house, they would also walk through the carriage house to gain inspections.

Q.    Okay.  Is that inspector testifying or no?

A.    I don't know.  I know there's been multiple meetings

inside Arlington County to determine what is unknown that they would like us to reinspect.

Q.    Okay.  So anyways, you answered an inspection question. I asked a permit question.

A.    I'm sorry, sir.

Q.    You did not obtain a permit, you didn't even apply for a permit for the carriage house until November of 2019?

A.    That is not correct, sir.

Q.    Okay, when did you apply for a permit for the carriage house?

A.    In October.

Q.    In October.  Okay.  Let's look at Exhibit 4- -- it's either '38 or '39.  It's 438.

A.    The approved permit for the demo of all the bathrooms and the kitchen.

Q.    That's 439.  I want you to see 438, please.

A.    Yes, sir, I have it.

Q.    Okay.  What does it say for the "Applied" date there?

A.    "Approved."  "New Garage Door, Replace Second Floor Roof and to Rebuild the Stairs."

Q.    What is the date next to the "Applied" entry?

A.    11-20-2019, but this doesn't include the bathroom and the kitchenette, which wasn't part of my bathroom and kitchen permit.

Q.    I'm not sure I understand that.

**A.**     Sir, I'm sure you do.  You're --

**Q.**     I don't understand it.

**A.**     Okay.  Mr. Lynch, you're manipulating this --

THE COURT:  Stop, stop, stop.

THE WITNESS:  I'm sorry.

THE COURT:  You're both talking at the same time.

THE WITNESS:  Sorry, Your Honor.

THE COURT:  It doesn't work.  Wait for the next question.
And, Mr. Deluca --

THE WITNESS:  I'm sorry, sir.

THE COURT:  -- you can't argue with him.

THE WITNESS:  I'm sorry, sir.

THE COURT:  If your counsel wants, in redirect, to bring
up different areas, he may do so.

THE WITNESS:  Yes, sir.

THE COURT:  Listen to the question and answer the
question, all right?

THE WITNESS:  Yes, sir.  I'm sorry.

BY MR. LYNCH:

**Q.**     So, according to the County documents, you didn't apply
until November 20th, 2019, correct?

**A.**     That's not true.

THE COURT:  So this report is incorrect?

THE WITNESS:  No, sir.  This is -- this is correct --

THE COURT:  Okay.  That's correct.  Okay.  Then wait for

your counsel to straighten it out.

THE WITNESS:  Yes, sir.

THE COURT:  Go ahead.  Next question.

BY MR. LYNCH:

Q.    Let's go to Exhibit 458.

A.    Is it the swimming pool permit?

Q.    No.  I don't think this one's in your book.  This is four-five-eight.  This one is going to be on the screen.  We're looking at page 1, and this writing is small so we're going to be focusing on the top there.  And there's a sentence that begins, "The first set of permits revolve around."

On the screen now --

MR. LYNCH:  It's towards the bottom, but this is a good view, Walter.

A.    Yes, sir, I'm done reading it.  I'm done reading the first page of the exhibit.

BY MR. LYNCH:

Q.    So that's your writing in bold, correct?

A.    I believe so, yes.

Q.    Okay.  So in that e-mail you say, in bold, "The first set of permits revolve around all existing renovations to the existing structure."

Am I reading that correctly?

A.    "Structures," plural.

Q.    Right, "structures" plural.  Thank you.

So that was your statement, correct?

A.    Yes, sir, it was.

Q.    And the existing structures at the time you bought was the existing main house and the carriage house, correct?

A.    Yes, sir, it was.

Q.    Okay.  And then in the next sentence after the one we just read it says, "This was do [sic] so the existing 1930s structure could begin a renovation.  In doing so all existing electric, plumbing -- all existing plumbing and electric was removed and replaced."

Am I reading that correctly?

A.    No, you're not.

Q.    Okay.  Why don't you read it then?

A.    "This was due to the existing 1930s structures," plural, "could begin a renovation.  In so doing all the existing plumbing and electric was removed and replaced.  The second set of permits revolve around the 2nd story addition to the rear of the house."

Q.    Okay.  So what I think is going in that sentence is you're telling the Harrells, and I think this is truthful, you replaced all the electrical and plumbing in the existing main house and the carriage house, right?

A.    At the end of the permit, but not at the --

Q.    I'm not asking about permitting.  I'm asking, what did you do?  Did you replace all of the electrical and plumbing in

the existing main house and the carriage house?

**A.** Yes, I did.

**Q.** Okay. All right. So there's another statement on this page while we're here, and it's a question from Mr. Harrell that says, "I need to know that your insurance is still valid."

Are you able to see that?

**A.** Yes, sir.

**Q.** Okay. And that's a question for Mr. Harrell, right?

**A.** Yes --

**Q.** Or one of the Harrells?

**A.** I think so, yes, sir.

**Q.** Okay. And then there's a sentence that says, "Yes, confirmed this morning that the Builder's Risk is in effect until September 24th and can be extended any time."

Do you see that?

**A.** Yes, I do.

**Q.** Okay. So that you wrote that part, right?

**A.** I did.

**Q.** Okay. And you had been told by your broker prior to this date that your builder's risk insurance was not active, correct?

**A.** No, sir, he provided a -- part of the settlement I had to receive insurance, specific insurance that the Harrells gave me with a binder, in which I took and cut and pasted and sent to the insurance company. The insurance company then issued a policy exactly the way the lender, Mr. Harrell, PwC, dictated

it.

Q.   Okay.  You received an e-mail before closing that says once you go to closing and you're no longer an owner, you have no insurable interest for builder's risk.  Do you recall receiving an e-mail like that?

A.   I don't recall the e-mail, sir.

Q.   Okay.  Let's look at Zulu 2, please.  This is not in your book.  And page 33 of this document.  For the record, this is the Bender designation.

MR. BURCHER:  Your Honor, I'm going to note an objection to the relevance of this.  There's no insurance claim, there's no issue associated with insurance, there's been no claim in the complaint related to damages associated with insurance, and so, therefore, I believe that it's irrelevant to this.

THE COURT:  Yeah, what's the relevance?

MR. LYNCH:  The relevance, number one, is credibility.  He's saying that he has builder's risk insurance.  And number two, the PCCA requires him to have insurance.  That's also a material breach.

THE COURT:  I'll allow it.  Your exception is noted.

Let's focus in, though.

THE WITNESS:  You are aware that I did have --

MR. BURCHER:  Mr. Deluca.

THE WITNESS:  Yes, sir.

MR. BURCHER:  There's no question on the table.

THE WITNESS:  I'm sorry, sir.

BY MR. LYNCH:

Q.    So, I just would like you to focus in quickly at the bottom of this page.  There's a sentence from Mr. Garedew in an e-mail to you that says, "Okay, I have sent a request to extend the builder's risk coverage even though you do not have an insurable interest once the home is solid."  Do you that?

A.    Yes, sir.

Q.    Well, let's go to Exhibit 455.

A.    I'm missing that in my binder, sir.

Q.    Well, we'll look on the screen.

Let's go to page 4 of this document.  And this is a message from Dawn Harrell on September 3rd, 2019 at 1:03 p.m. Right there.

A.    Can I read -- can I read this?

Q.    Sure.

A.    Can I scroll down a little more, please?  If you could scroll down again, please.

Q.    And I will ask a couple of questions about page 5, so go ahead and take a look.

A.    If you could scroll down again, please.  I'm sorry. Could you scroll down again?

Again, please.

Q.    I'm not asking about any more of the rest of the document.

**A.**    I don't recall what this document was.  That's why I'm just trying to understand exactly --

**Q.**    Sure.

**A.**    If you could scroll down again, please.  And again.  I'm sorry, I just want to make sure I know what this is.

MR. COUGHLIN:  Your Honor, is there a question or...

MR. LYNCH:  I'm ready to ask a question.  He wants to look at the whole document.

THE WITNESS:  I'm sorry, sir, please ask the question.  I'm sorry about that, Mr. Lynch.

THE COURT:  Your client has been reading the documents in preparation for a question.

MR. COUGHLIN:  I missed that part, Your Honor.  I didn't know if --

THE WITNESS:  I'm sorry?

THE COURT:  No.  He wanted to make sure what it was.  He didn't recognize it immediately.

All right.  So, please, ask your question now.

BY MR. LYNCH:

**Q.**    All right.  Page 4, please.  There's an e-mail from Dawn Harrell dated September 3rd, 2019, 1:03 p.m.  So that e-mail begins, "Doug, We are trying to get a better understanding of the permits on our house."

Do you see that?

**A.**    Yes, sir, I do.

Q.    Okay.  Move down to item number 2 on this e-mail.
There's a sentence where Dawn says, "What permit is the Carriage
House under?"

Did I read that correctly?

A.    Correct, you did.

Q.    Okay.  And then you say, in bold, "The Renovation it is
all existing and replaced down to the exact bathroom."

Did I read that correctly?

A.    Yes, sir, you did.

Q.    Now, by "the renovation" -- I noticed Mr. Coughlin was
using that term as well -- that was a reference to permit number
B1803016, right?

A.    I don't know for certain, but I'm sure it is.

Q.    The kitchen and bath?

A.    It is the first permit that was issued by Arlington
County in junction with Lee Highway.

Q.    The kitchen and bathroom, right?  We've been calling it
the --

A.    The kitchen and baths, plural, bathrooms, yes.

Q.    All right.  And you told them that same thing before
closing, too, right, that the carriage house is covered under
some renovation permit; is that right?

A.    I don't believe so.

Q.    Okay.  Just after closing?

A.    No.  This is when -- in September when permits just

became an issue. August -- August, September, whenever Mrs. Harrell was in the County going through permit research.

Q.    Okay. But here on this date you're telling the Harrells that the carriage house is permitted under the kitchen and bath permit, right?

A.    Yes, the kitchens and baths permits, the renovations and replacements of the old ones, yes, sir.

Q.    And we looked at the drawings many times, including today. If you look at those drawings -- which are Exhibit 430, if you want to check that out.

THE COURT:  Ask your question and he'll decide.

BY MR. LYNCH:

Q.    Yeah. There is no carriage house in those drawings. In those permit drawings, that permit application which says, "No structural work." It had nothing to do with the carriage house, correct?

A.    That's not true. It was all the bathrooms on the property, as well as the two kitchens that were on the property. There was a kitchenette in the carriage house, there was a bathroom in the carriage house, and then there was the existing baths and kitchen in the main house.

Q.    So the County made you submit new drawings for the carriage house, correct?

A.    No. What we were doing is we were memorializing the entire project, and again, that roof became an issue where the

County wanted that roof stamped and sealed and put in the main overall permit of the property.

Q.    Okay.  And you did structural work on the carriage house that was never reflected in the kitchen and bath permit drawings, right?

A.    Correct, yes.  There was an emergency replacement of the roof that had failed in the back.

Q.    And what about the lintel?  That wasn't an emergency, correct?

A.    Correct, but we did not feel that was a structural -- that was moving of a door.

Q.    You don't think the steel lintel has any structural effect on the carriage house building?

A.    Not when it's approved -- not when it's approved and it's giving egress to an area in a historic building.

Q.    Who -- by who?

A.    We discussed items that were being worked on on the house, and again, chapter 9 within the Virginia code regards to historic structure, the local building official can make a determination of whether or not what is acceptable and what is not acceptable.

Q.    Okay.  So the County would have no idea -- you installed that lintel before April 2nd, before you had any payments, so there would be no inspection whatsoever of that lintel, correct?

A.    Can you rephrase the question?

Q.    When did you -- you installed the steel lintel on the carriage house before April 3rd, correct?

A.    Yes, I did.

Q.    Okay.  And you didn't have a permit until April 3rd, right?

A.    Correct.

Q.    So there would have been no inspections whatsoever of the steel lintel?

A.    It was an open -- they could have inspected it at any time.  It was an open -- it was never concealed.

Q.    Okay.

A.    It was simply a beam supporting the three-and-a-half feet of brick above it, four-and-a-half feet.

Q.    Okay.  So sticking with this Exhibit 458, let's look at item 3.  And there's a sentence at a says, "What permit is the mud room under?"

     Do you see that?

A.    I don't think I have the exhibit in my binder.

Q.    It's not.  It's on the screen.

A.    I'm sorry.

Q.    Item 3, "What permit is the mud room under?"

A.    Correct.

Q.    Okay.  And you respond in bold, "I was reduced and replaced from the original entrance that was on the house.  It was inspected with both the renovation and new construction."

Do you see that?

A.    Correct, yes, sir.

Q.    And were you here when Chief Elmagraby said the mud room work was unpermitted?

A.    Yes, sir, I was.  He asked me to build -- to dig two pilot holes just so he could verify the corner of it, and through all the photos that Arlington County went through, as well as the six inspectors that visited the property, it had been inspected with framing, and it had been inspected with close-in as well as the insulation.

Q.    And who's going to testify to that?

THE COURT:  All right.  Stop.

BY MR. LYNCH:

Q.    I'm sorry.  Strike the question.

So looking at tab 430, I think you were saying that this document, these claims show rooms in the carriage house.

A.    No, sir, I didn't.

Q.    This is the kitchen and bath permit?

A.    Correct, it is.

Q.    No portion of the carriage house is shown in these drawings; is that right?

A.    No, sir, it wasn't.

Q.    In other words, I'm correct when I say no portion of the carriage house was shown in these drawings?

THE COURT REPORTER:  I'm sorry, counsel, I couldn't hear

you.

BY MR. LYNCH:

Q.     In other words, I'm correct when I say no portion of the carriage house was shown in the drawings in Exhibit 430?

A.     No, sir.  You said that I did not receive a permit for the carriage house, and then you said I did not --

THE COURT:  No, listen to the question.

THE WITNESS:  I'm sorry.  Yes, sir, I'm sorry.

THE COURT:  Okay.  So ask the question again.

BY MR. LYNCH:

Q.     So do the drawings in Exhibit 430 show any portion of the carriage house or not?

A.     No, sir, it doesn't.

Q.     Okay.  And so the first drawings you ever submitted showing the carriage house at all was October of 2019, correct?

A.     Yes, sir, it was, with the exception of the -- I'm sorry, sir.

Q.     All right.  Discussing the powder room, you knew in April that the powder room was part of the contract, right?

A.     Yes, sir.

Q.     And then at some point I think your testimony was that it went from being a concept that was inside of the house to a concept that was outside of the house; is that right?

A.     Yes, sir.

Q.     Okay.  And you knew it was going to be outside of the

house before July 3rd, right?

**A.**     I believe so, yes, sir.

**Q.**     Okay.  And then you did not apply for a permit until August 6th, correct?

**A.**     That's not correct.

**Q.**     When did you apply for a permit?

**A.**     We originally put the permit together with the pool permit and the porch extension.  Everything was going to go together, and the original powder room was going to be in the corner of the great room in the back of the house, and then we decided because of symmetry it would look better if it was outside of the footprint.

**Q.**     Okay.  So is it your testimony that if I look at your pool permit application, I'm going to see a powder room in there?

**A.**     I would have to review it.  I believe the two permits that were collectively together was the porch extension and the powder room.  At the same time, the pool permit -- everything went collectively to the County.

**Q.**     Okay.  So what is your testimony, then, that you applied for the powder room with the pool?

**A.**     I would have to look, sir.

**Q.**     Okay.

**A.**     I don't recall.

**Q.**     Let's do that.  Let's take just a moment.  Okay.  Let's

turn to tab 450.

A.    Yes, sir.

Q.    Go ahead and look at those drawings and see if you see a powder room on there.

A.    This is the pool application.

Q.    Agreed.

A.    Do you have the actual building application?

Q.    Yes.  It's in the same tab, and the Bates label is 57366?

A.    Yes, sir, this is the pool application.

Q.    Do you see a powder room in those documents?

A.    I do not.

Q.    Exactly.  You didn't apply for a powder room permit with the pool, correct?

A.    Thank you for clarifying.  No.

Q.    So back to where we were, when did you apply for a permit for the powder room?

A.    I would have to go back to see when exactly that was applied for.  I don't -- I can't recall the exact date of when that was applied for.

Q.    Okay.  Would it ring a bell if I said August 6th?

A.    I don't know.  There was a lot of back-and-forth with the County with regards to structural and things like that.  It would help if I could see when the drawings were actually created.

Q.    Sure.  So go to tab 448.

**A.**      Yes, sir.

**Q.**      Okay.  Take a look through that.  Tell me if that's your powder room permit application.

**A.**      Yes, sir, and it was created on July 2nd.

**Q.**      What page are you looking at to see that?

**A.**      The first page of the cover sheet.

**Q.**      Okay.  I see on the bottom of that page August 6th, 2019.  Do you see that?

**A.**      No, sir, it says, "Project notes."  And then it says, "Date," July 2nd, 2019, "Scale as noted, drawn by Andy."

**Q.**      What tab are you in, 448?

**A.**      Yes, sir, the first page.

**Q.**      The first page of your Exhibit 448...

**A.**      Is the cover sheet to the plans.

**Q.**      Okay.  Well, maybe you have a different version than me.  So, why don't we look at the screen, then.  Can you see that on the screen?

**A.**      Yes, sir, I do.

**Q.**      Is that the same document in your book or no?

**A.**      No, this is the final application after we've listened to the County's -- the County's input.  The County also asked, I believe, for a survey to be conducted prior to the final submission, so this is -- the original plans were done July 2nd, 2019, and then the application with the County, once we'd gotten all of the information that the County wanted and went -- I

don't know if we reviewed with Historic at that point, but then it was applied for.

Q.    Okay.  And what was the date that it was applied for?

A.    August 6th, 2019.

Q.    Thank you.

THE COURT:  How much more do you have, Mr. Lynch?

MR. LYNCH:  I'd say it would be a challenge for me to finish in half an hour.

THE COURT:  Okay.  All right.  Then why don't we adjourn for tonight.  I've got an appointment.  I have an appointment at 8:00 that lasts about an hour or so.  So let's start tomorrow at 10, and you've got your expert.  When is he coming in or she coming in?

MR. BURCHER:  Your Honor, he'll be here tomorrow.

THE COURT:  Okay.

MR. BURCHER:  The one complicating factor is my flight to STRATCOM leaves at 4:35 tomorrow, and that's my Navy assignment that I mentioned to you before --

THE COURT:  Right.

MR. BURCHER:  -- as it relates to tomorrow.

I would be happy to come and stay until, you know, the lunch break at 1:00.  It's still going to be a challenge, but if -- if that doesn't happen, then Mr. Coughlin will have to do the redirect of Mr. Deluca.  That's the issue there.

THE COURT:  Well, Mr. Lynch is saying half an hour which

probably means an hour, so that will get us -- try to keep it to a half an hour, and then we'll get your redirect in and get you out of here, but let's try and get it done, and -- well, let's try and start at 9:30 instead of 10.  That will give us a half an hour extra.

I have a doctor's appointment, but it's -- if, God forbid, you know, the doctor's appointment actually goes off on time, I should be able to start at 9:30.  So let's start at 9:30 and continue with Mr. Deluca and then we'll see how we do.  All right?

MR. BURCHER:  Thank you.

THE COURT:  And I've read the designation from Mr. Bender, and I don't know whether you want to address that now or not. Mr. Deluca, you can go back and take your seat, sir.

THE WITNESS:  Yes, sir, Your Honor.

THE COURT:  So the question is relevance.  This is an insurance rider or whatever it is.  Why is it relevant, Mr. Lynch?

MR. LYNCH:  The PCTA required him to have this insurance, and we rendered performance, at least part performance, by paying $17,000 out of the 35 for the new porch extension?  He was in breach the moment the ink was dry, and if we are in a fight here about first material breach, then I think it's relevant to that.

THE COURT:  Okay.

MR. BURCHER:  Your Honor, with regard to whether or not

the insurance policy is valid or any of those sorts of things, I don't think that that is an issue, you know, at this stage. There are no damages, there's no insurance claim, there's nothing that relates to this, and you know, as far as going into whether or not an insurance policy is valid or not, there's a certificate that was obtained by Mr. Deluca that said it was valid until September 24th.  The issue of whether or not as a builder -- and it switches over from builder's risk to, you know, in this context, gets into I think an issue that is an extreme side issue in this -- you know, in this case, and I just don't think it's relevant, especially given the fact there's been no -- in order to be in breach you have to have a damages, and there are no damages associated with this because there's no insurance claim that relates to this in any fashion, Your Honor.  There's no claim in the -- you know, for damages in the complaint.  I don't even think -- I don't even know if this is referenced in the complaint -- I would need to go back and look at it -- but I just don't see that it is -- has any bearing on the case before the Court Your Honor.

THE COURT:  All right.  Thank you.

MR. LYNCH:  Just one more word.  So there's a Supreme Court of Virginia case -- I don't have the citation handy -- but it was an apartment building, and they required the lease must have insurance.  The tenant did not have insurance.  The Supreme Court says, "You can call them in breach and kick them out," and

we would have had the right the moment that was signed, if we knew it at the time, to call him in breach and kick him off the project.

So it was in breach, and I don't think the law is -- to bring a breach of contract case, yes, we have to have damages. For first material breach, I don't think you have to trace the first breach to damages. I think you have to have the first breach.

THE COURT: Well, I don't know how much relevance there is to it, but I'll allow you to -- I'll admit the deposition and in post-trial briefing you can -- you can both argue whether -- I mean, first breach may be important. It may be immaterial. I don't know the law, and especially the law in Virginia, on this well enough to make a call like that, so I'll admit it and we'll brief it down the road, okay?

MR. LYNCH: Thank you.

THE COURT: All right. Okay. Then let's get ready to go at 9:30. I'll do my best to be here and be ready to go as well. All right. We're in recess.

(Proceedings adjourned at 5:36 p.m.)

**C E R T I F I C A T E**

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace                                    8/3/22

-----------------------------              ----------------
**Scott L. Wallace, RDR, CRR              Date**
**Official Court Reporter**