UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **JOHN E. HARRELL,** | ) |
| | ) |
| **et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) Civil Action |
| | ) No. 1:20-0087-LO-MSN |
| **v.** | ) |
| | ) July 19, 2022 |
| **DOUGLAS M. DELUCA,** | ) 9:38 a.m. |
| | ) |
| **et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**VOLUME 6 (Pages 1196 - 1316)**
*TRANSCRIPT OF BENCH TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE LIAM O'GRADY,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the Plaintiffs:          **Thomas Ryan Lynch, Esq.**
                             Bradley Arant Boult Cummings, LLP
                             (DC)
                             1615 L Street, N.W.
                             Suite 1350
                             Washington, DC 20036
                             202-719-8228
                             Fax: 202-719-8328
                             E-mail: Tlynch@babc.com

                             **Lee-Ann Christine Brown, Esq.**
                             Bradley Arant Boult Cummings LLP (DC)
                             1615 L Street, N.W.
                             Suite 1350
                             Washington, DC 20036
                             202-393-7150
                             Fax: 202-719-8312
                             E-mail: Labrown@bradley.com

APPEARANCES:   (Cont.)

For the Defendants:        **Michael John Coughlin, Esq.**
                          Walsh Colucci Lubeley & Walsh PC
                          4310 Prince William Parkway
                          Suite 300
                          Prince William, VA 22192
                          703-680-4664
                          Fax: 703-680-2161
                          E-mail:
                          Mcoughlin@pw.thelandlawyers.com


For the Defendants:        **Eugene A. Burcher, Esq.**
                          Walsh, Colucci, Lubeley & Walsh PC
                          4310 Prince William Parkway
                          Suite 300
                          Prince William, VA 22192
                          703-680-4664
                          Fax: 703-680-2161
                          E-mail: Eaburcher@thelandlawyers.com


Court Reporter:            **Scott L. Wallace, RDR, RMR, CRR**
                          Official Court Reporter
                          United States District Court
                          401 Courthouse Square
                          Alexandria, VA 2231-5798
                          202-277-3739
                          scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                    **Page**

CONTINUED CROSS-EXAMINATION OF DOUGLAS DELUCA        1200
BY MR. LYNCH
CROSS-EXAMINATION OF JOHN DELUCA                     1246
BY MS. BROWN
REDIRECT EXAMINATION OF JOHN DELUCA                  1251
BY MR. BURCHER

DIRECT EXAMINATION OF KIET NGUYEN                    1263
BY MR. COUGHLIN
CROSS-EXAMINATION OF KIET NGUYEN                     1294
BY MR. LYNCH
REDIRECT EXAMINATION OF KIET NGUYEN                  1307
BY MR. COUGHLIN

REBUTTAL EXAMINATION OF DAWN HARRELL                 1311
BY MR. LYNCH

## EXHIBITS

Plaintiffs' Exhibit 419, 458, and 455 admitted       1200

Plaintiffs' Exhibit 998 admitted                     1211

Plaintiffs' Exhibit 791 admitted                     1213

Plaintiffs' Exhibit 1005 admitted                    1216

Plaintiffs' Exhibit 484 admitted                     1226

Plaintiffs' Exhibit 736 admitted                     1237

Plaintiffs' Exhibit 496, pages 78 to 105 and page    1239
156, admitted

Plaintiffs' Exhibit 720 admitted                     1243

Plaintiffs' Exhibit 721 admitted                     1244

Plaintiffs' Exhibit 1054, pages 4351, 4352, and      1245
4353, admitted

Plaintiffs' Exhibit 543 admitted                     1249

Plaintiffs' Exhibit 752 admitted                     1257

| **EXHIBITS** | **Page** |
|---|---|
| Plaintiffs' Exhibit 754 admitted | 1258 |
| Plaintiffs' Exhibit 422 admitted | 1260 |
| Defendant's Exhibit 145, last three pages, admitted | 1264 |
| Plaintiffs' Exhibit 542 admitted | 1311 |
| Plaintiffs' Exhibit 748, 500, pages 106 to 110, admitted | 1313 |

**MORNING SESSION, JULY 19, 2022**

(9:38 a.m.)

THE COURTROOM CLERK:  Court calls Civil Case Number 1:20-cv-87, *Darryl E. Harrell, et al. versus Douglas M. Deluca.* This case is marked for trial by the Court.

THE COURT:  All right.  Good morning to everyone.  I see all the counsel and parties are present.  Let's -- Mr. Deluca, let's take the witness chair again, please, sir.

MR. LYNCH:  So, Your Honor, just a very quick exhibit cleanup.  We would like to admit three exhibits, Plaintiffs' Exhibit 419, Plaintiffs' Exhibit 458, and Plaintiffs' Exhibit 455.

MR. BURCHER:  There are no objections, Your Honor.

THE COURT:  All right.  They're all received.  Thank you.

(Plaintiffs' Exhibit 419, 458, and 455 admitted into the record.)

MR. LYNCH:  So I want to start with the Dashco stipulation.  I handed up a copy to Judge O'Grady, and here is one for the witness.  We squared this away.  I believe this was admitted as Plaintiffs' Exhibit 1070.

CONTINUED CROSS-EXAMINATION OF DOUGLAS DELUCA

BY MR. LYNCH:

Q.    I want to direct your attention, Mr. Deluca, to paragraph 1 of this document.

A.    Yes, sir.

Q.    It says, "The parties stipulate to the facts set forth in the attached declaration of Daniel S. Adler and agree that such facts are true and accurate."

Do you see that?  Page 1, paragraph 1?

A.    Um, I'm seeing the declaration.  It says, "My name is Daniel Adler."

Q.    No, the very first page.  If you hold it like this.

A.    Yes, sir.  Sorry.

Q.    So paragraph 1 says, "The parties stipulate to the facts set forth in the attached declaration of Daniel S. Adler and agree that such facts are true and accurate."

Do you see that?

A.    Yes, sir.

Q.    And Mr. Adler is a member of the Adler family you were testifying about yesterday; is that correct?

A.    Yes, sir.

Q.    Let's go now to the declaration but paragraph 10, please.

A.    Yes, sir.

Q.    And can you just read that first sentence?

A.    "A true, correct and complete, although unexecuted copy of the Loan Agreement is attached as Exhibit B."

Q.    Okay.  And then let's turn to Exhibit B.

A.    Yes, sir.

Q.    The title of this document is "Loan Agreement," correct?

A.    Yes, sir.

Q.     So I guess you would agree that "loan" is an accurate term to describe the reason Dashco was providing you money for construction on this project, correct?

A.     Sure.

Q.     And it stands to reason you would agree that it's probably fair to call Dashco your lender?

A.     More of a partner and investor.

Q.     You never told the Harrells before closing that you had done work on the carriage house without a permit, correct?

A.     No, sir, I did not.

Q.     In other words, I'm correct in that you did not tell them?

A.     I did not tell them, no, sir.

Q.     Okay.  And you have no County document that says the kitchen and baths permit allowed to you work in the carriage house, correct?

A.     No, sir.

Q.     As in I'm correct?

A.     Can you state that again, sir?

Q.     You have no County document that says the kitchen and baths permit allowed to you work in the carriage house?

A.     Not at the time.  Now we do.

Q.     You do now?

A.     Yes.

Q.     What's that?

A.       The plans have been approved inside Arlington County.

Q.       Okay.  Right.  The plans approved under the carriage house permit in November of 2020?

A.       Yes, sir.

Q.       I misstated that.  November of 2019?

A.       '19, yes, sir.

Q.       Okay.  The pause of your work went into effect on August 6, 2019, correct?

A.       Yes, sir.

Q.       And you were directed to resume work on August 15, 2019, correct?

A.       No, sir.  We -- I don't believe we were directed to.  We attempted to.

Q.       Okay.  Let's look at your deposition transcript, page 137.

A.       Is it in a book?

Q.       This one isn't.

A.       Okay.

Q.       Yes, sir.  Okay.  So let's go to the bottom of page 137, line 22.  So it says there, "Okay.  And you were directed to resume work on August 15th, correct?"

         And what was your answer?

A.       "Yes, sir."

Q.       And it's your position that your contract was terminated prior to August 15th, 2019; is that right?

A.      That was a very confusing time.  When it happened I felt that we were told to stop work.

THE COURT:  Excuse me.  Go ahead.

BY MR. LYNCH:

Q.      Just, I guess start -- you would like me to ask again?

A.      Yes, sir, please.

Q.      Is it your position that your contact was terminated prior to August 15th, 2019?

A.      Yes.

Q.      Okay.  And you were talking yesterday about August disruption to your subcontractors after closing.  Do you recall that?

A.      Yes, sir, I do.

Q.      You only have two documents showing that you did any work after July 3rd, 2019; is that right?

A.      No, sir.

Q.      That's too broad.  You only have two --

A.      Yeah, I don't --

Q.      -- invoices or receipts showing that you did any work after July 3rd, 2019, correct?

A.      Can you restate that again?  Two receipts?

Q.      Receipts, invoices, anything showing you paid money for work after July 3rd.

A.      I don't know exactly.

MR. LYNCH:  Let's pull up Bravo 6, please.

A.    Yes.  Do I have a copy?

BY MR. LYNCH:

Q.    No.  But you and I share an affinity for paper, so I'm going to try to --

A.    Sorry about that, yeah.

Q.    -- do that as much as I can.

A.    Thank you.  Is this what I'm reading?

Q.    No.  It's not up yet.

A.    I'm sorry.

Q.    So this is an e-mail from your former attorney, Ms. Ferguson, to me dated September 24th, 2019.  Do you see that?

A.    Yes, sir.

Q.    Why don't you just read Ms. Ferguson's statement?

A.    "Mr. Lynch, Mr. Deluca would be willing to attend the meeting on the condition that your clients would not be present.  Please let me know at your earliest convenience whether they will agree to forego being at the meeting.  Thank you."

Q.    Okay.  So you recall a meeting in September between the County, Mr. Catlett, the Harrells, that you did not want to attend if the Harrells were there?

A.    I did not know Mr. Catlett was there at the same time I had been meeting with the County and in conversations with the County, but I did not know this exact meeting.  Meaning, I didn't know if Mr. Catlett was in it or what the meeting was

about.

Q.    Okay.  But you do recall that the parties wanted to meet at the property with the County to try to figure out the permits?

A.    Yes, sir.

Q.    And your position was, I'm not going if the Harrells are going?

A.    I was meeting with the County at the time, and I did not want to create an adversarial meeting.

Q.    So this one's in your book.  This is the Harrell book. Do you have the Harrell book handy?

A.    No, sir.

      Yes, sir.

Q.    So it's 791.

A.    Yes, sir.

Q.    So the sentence I want to direct you on is on page 2, but before that page 2 is part of an e-mail from me to Ms. Ferguson dated November 19, 2019 at 1:26 p.m.  Do you see that?

A.    Yes, sir.

Q.    Okay.  And then on the next page that e-mail continues and there's a line that says, "Second, regarding the meeting, my clients have been requesting a meeting for months.  We agree to the meeting.  Please set this up ASAP.  Also I am awaiting for a response to my October 4th, 2019 letter."

      Do you see that?

A.    Yes, sir.

Q.    All right.  Let's pull up Exhibit 511.  I don't believe this is in your book, at least this page anyhow.

A.    I think it is.  The text message?

Q.    Yeah, but we're looking for page 253.

A.    No, sir.

Q.    It's not in there, right?

A.    No, sir.

Q.    Okay.

A.    I don't think it is.

Q.    That's fine.  We have it on the screen.

So there's a fourth bubble from the top, and it says -- "Doug does have a key."

Do you see that?

A.    Yes, sir.

Q.    And then three bubbles down it says, "John told me I could give Doug a key for access after the week I was controlling access [sic]."

Do you see that?

A.    Yes, sir.

MR. LYNCH:  I move to admit page 253 of Exhibit 511.  And now that that's out of my mouth, I realize 511 is already in.  So strike that.  Sorry.

BY MR. LYNCH:

Q.    Exhibit 533, please.

A.      Yes, sir.

Q.      So at the top this is an e-mail from Ms. Ferguson to me dated January 14th, 2020.  Do you see that at the top?

A.      Yes, sir.

Q.      And then Ms. Ferguson in the second sentence of her e-mail says, "FYI, I just received the key."

        Do you see that?

A.      Yes, sir.

Q.      Okay.  So this was another key that was provided to you?

A.      I believe this is the same key.

Q.      Okay.  All right.  Let's go to Exhibit 998.  This is in your book.

A.      Yes, sir.

Q.      Okay.  So this is an e-mail from me to your former counsel dated October 22nd, 2019.  Do you see that?

A.      Yes, sir.

Q.      Okay.  Now, in the second paragraph right above the bold writing, there's a sentence that says, "Notwithstanding, our responses to the issues set forth on the list are below, in red writing."

        Do you see that?

A.      Yes, sir.

Q.      Okay.  And let's go to page 3 of this document which is labeled Bates 30730.

A.      Can you repeat that?

Q.      30730.  It's --

A.      Yes, sir, I'm getting there.  Sorry.

Q.      Okay.  And at the bottom of the page there's an item number 2, "Gym Stairs."

        Do you see that?

A.      Yes, sir.

Q.      Okay.  And then that item says, "The existing steel steps must have even risers as well as more head space clearance on landing 1."

        Do you see that?

A.      Yes, sir.

Q.      And then there's an entry that says, "Demo stairs and replace with a circular steel staircase kit.  They can also come with wood treads."

A.      Yes, sir.

Q.      And then -- and is that you writing there?

A.      I believe this is when I asked the question, "Please provide us with the specific -- specifications of the replacement."  And, "We can mutually agree on a selection."

        That's when we did the RFI showing the picture as well. We still didn't know where to exactly put it in the room, but yes.

Q.      Okay.  But that sentence that ends with the words "wood treads" that's your e-mail, right?  That's your words?

A.      It's hard for me to -- if I could just read this document

for one second to make sure.

Q.    Sure.

MR. BURCHER:  I'm just going to note an objection.  For the record, Your Honor, this is -- he's not the author of the e-mail and he's not a recipient or a sender, and this is from his counsel and so I just --

MR. LYNCH:  On page 1 it says --

THE COURT:  There's an objection.  I'm going to overrule it to the extent that he can testify about knowledge he personally has about the subject matter of the exhibit.

MR. BURCHER:  Thank you, Your Honor.

THE WITNESS:  So if you could -- I see my handwriting, like if we looked at -- or not my handwriting, my sentence.  We looked at number 1, "The Front Steps," and then the inset where it says, "Bring the entire stone landing up to flush with a short step."

BY MR. LYNCH:

Q.    Um-hmm.

A.    I believe that is what we decided would be acceptable with Historic and the County to correct it.  So I think I -- that is mine, but I don't know if these bolds are mine or Juanita or yours.

Q.    Okay.

A.    "Please provide us with a sketch or drawing."

Q.    Right.  So -- fair enough.

A.      I would think I would -- I would write -- I would do a drawing to send -- or an image to send to you guys.

Q.      Fair enough.  So to finish this item, somebody says, "We agree to demoing the stairs and replacing with a new circular steel staircase.  We can mutually agree on a selection," and then in bold it says, "Please provide us with the specifications of the replacement staircase and the proposed new location prior to commencing work."

Do you see that?

A.      Yes, sir.

Q.      Okay.  Let's go --

MR. LYNCH:  And I would like to admit Exhibit 998 to the extent not already admitted.

MR. BURCHER:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 998 admitted into the record.)

BY MR. LYNCH:

Q.      Now, in the construction world the acronym for request of information is RFI, correct?

A.      Correct, yes, sir.

Q.      Okay.  In November you sent an RFI requesting that the Harrells provide you information regarding the spiral staircase, correct?

A.      Yes, sir.

Q.      Okay.  So let's go back to 791 in your book.

A.      Yes, sir.

Q.      And I want you to turn to page 3 of this document, and there's an e-mail from Ms. Ferguson dated November 18th at 1:24 p.m.

        Do you see that?

A.      I see an e-mail to Juanita from Dawn, it says, "Thanks, Dawn."

Q.      Yeah.  Go to page 3 of Exhibit 791.

A.      The four photos with the trees fallen?

Q.      No, right before that.  It's Bates label 30860.

A.      Yes, sir, I have it.

Q.      Okay.  So Ms. Ferguson says, "Thomas, please find attached the existing RFIs for Lee Highway."

        Do you see that?

A.      Yes, sir, I do.

Q.      Okay.  So let's go to page 1, and there's an e-mail from me to Ms. Ferguson -- it's actually two e-mails from me on this page, but I want you to look at the one on November 19th at 1:26 p.m.

A.      The one written from Dawn?

Q.      No, it says, "From:  Thomas Lynch," "To:  Juanita Ferguson" --

A.      Yes, sir.

Q.      Okay.  So on item 3, it says, "More important than selecting a staircase, my clients would like to know whether the

carriage house is structurally sound.  We have already told Mr. Deluca that.  Our experts and the County have indicated it likely isn't.  Holding that aside, black metal staircase attached to RFI 3 is acceptable."

Do you see that?

A.    Yes, sir.

Q.    Okay.

MR. LYNCH:  And I'm sure this is repetitive, but I move to admit 791.

MR. BURCHER:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 791 admitted into the record.)

THE COURT:  All right.  Let's pull up Bravo 4, please, Walter.

THE WITNESS:  Do I have that one?

BY MR. LYNCH:

Q.    I don't think so, but this is Exhibit 200 that the -- Defendant's Exhibit 200 that they admitted yesterday.

A.    Yes, sir.

Q.    Do you have it?

A.    I'm seeing it on the screen.

Q.    Okay.  So what is the date of this document?

A.    December 24th, 2019.

Q.    Okay.  So let's look at the last full paragraph on page 1 beginning with the phrase, "According to Mr. Deluca."

Do you see that paragraph?

A.    Yes, sir, I do.

Q.    Okay.  That paragraph reads, "According to Mr. Deluca, Federal submitted the amended plans to Arlington County, parentheses, (the County), and the County has approved them. Federal is now ready to close out the plans and to prepare for a final inspection during the second week of January.  However, in order to do that, Federal is in need of the following."

Do you see that?

A.    Yes, sir.

Q.    Okay.  So let's go to page 2 of this document.  And in the middle of the page there -- it's actually the bottom, there is a sentence beginning "Federal requests."

Do you see that?

A.    "Federal has requested"?

Q.    No, "Federal requests"?

A.    Yes, sir.

Q.    Okay.  "Federal requests written approval of the black metal circular stairs provided in the RFI."

De read that correctly?

A.    Yes, sir.

Q.    And that question had already been answered prior to December 24th, right?

A.    It's not accurate because we gave you guys -- the County told us to do a contractual RFI where it had a sign-off from the

owners, and that's what was sent to you guys with the actual RFIs, so no one signed off on the photos, the dimensions, or anything in the RFI.

Q.    Okay.  Let's go to Exhibit 1005.  And this is in your book also.

A.    Yes, sir.

Q.    So this is an e-mail dated December 30th, 2019 from me to Ms. Ferguson.  Do you see that?

A.    Yes, sir.

Q.    And it begins, "I'm in receipt of your letter dated December 24th, 2019."

       Do you see that?

A.    Yes, sir.

Q.    And if you go to the next page, and there's a header that says, "Carriage House Stairs."  Item 4, "Carriage House Stairs."

       Do you see that?

A.    Yes, sir.

Q.    Okay.  So at the end of that sentence, it says, "The circular staircase is fine as long as it is fine with Arlington County."

       Do you see that?

A.    Yes, sir.

Q.    Okay.  So this answered your question about the stairs again, correct?

A.    It did, but it did not because no one would sign off on

the documents that we sent you.

Q.    You needed an actual signature before you would accept this information?

A.    With the style and the approval of what we were to install, yes, sir.

Q.    I see.

MR. LYNCH:  We move to admit Exhibit 1005.

MR. BURCHER:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 1005 admitted into the record.)

MR. LYNCH:  Okay.  Let's pull up Deluca Trial Exhibit 51.

BY MR. LYNCH:

Q.    This will be on the screen.

A.    Do I have a copy?

Q.    You do.  So look at change order 1.

A.    I stop at 48.

Q.    You don't have 54?

A.    No, sir.  48 and then it jumps to 418.

Q.    Okay.  So let's look up on the screen.  And please go to page 2 of this document.

A.    Yes, sir, that's the change order.

Q.    Right.

A.    Zero cost change order.

Q.    Right.  So in the middle of the page there you see, "Install new black metal spiral staircase."

Do you see that?

A.    Yes, sir.

Q.    And let's go to the next page, and that's the staircase you were proposing to install?

A.    Yes, they come in kits, and that's the rail detail that came with the specific kit.

Q.    Okay.  Let's go back to page 1.  And scroll down, please. And there's an entry there that says, "Time extension, 17 days after approval."

So you were -- somehow you wanted the owner to agree to give you more time to complete in this document; is that right?

A.    Well, I just think legally when you do a change order, you should tell the client how long it's going to take to actually do the work, and that's what I was trying to do, is saying, once you approved it, it would take this amount of time to correct it -- or to install it, excuse me.

Q.    Okay.  And the Harrells had already sent a letter rescinding the contract before January 20th, 2020, correct?

A.    Yes, sir.

Q.    Okay.  So let's go to 1010.  It's in your book.  It should be, anyhow.

A.    Yes, sir, I have it.

Q.    Okay.  So now we're looking at an e-mail on February 5th, 2020 from me to Ms. Ferguson.  Do you see that?

A.    Yes, sir.

Q.      Okay.  Now, at the bottom of this first page of Exhibit 1010, there is a paragraph that begins "CO1"?

A.      Yes, sir.

Q.      Okay.  And that says, "The Harrells have already stated that they do not object to the proposal to install the pictured black metal circular staircase in a code-compliant location."

A.      Yes, sir.

Q.      Do you see that?

A.      Yes, sir.  Is there an attachment to these e-mails.

Q.      I'm not sure.  You can scroll through that tab.

A.      I have.

Q.      Okay.  So, even after this e-mail, you continued to claim you did not have enough information to finish the stairs, correct?

A.      I didn't feel legally if they didn't sign off on it that I didn't have complete agreement, and the County and everyone, including Juanita, told me to make sure everything's signed off on before I exposed myself to more work.

Q.      And I think I heard you testify yesterday that you needed more information from the Harrells to close in the steel beam in the kitchen; is that right?

A.      Yes, sir.  It was an open item.

Q.      Okay.  At your deposition your position was, quote, "All of the work remaining at this house to pass final inspection requires further direction from the Harrells."  And -- let me

strike that question.  Let me restate it.  Those weren't your words; those are my words, but I --

A.    Yes, sir.

Q.    -- but I believe you agreed with this statement.  "All of the work remaining at this house to pass final inspection requires further direction from the Harrells."

That was your position, right?

A.    Yes, sir, it was.

Q.    Okay.  And that includes the Falcon report, all of it, right?

A.    I don't agree with the Falcon report, sir.

Q.    Okay.  But it's your position that you need more information from the Harrells for every item in there, right?

A.    In the Falcon report?

Q.    Correct.

A.    No, sir.

Q.    All right.  And the cracked masonry appears in the crawl space, that's -- you need more information from the Harrells to fix that; is that right?

A.    No, sir, and that was -- I believe it was repaired.

Q.    Okay.  And then, you know, the missing collar ties in the carriage house, you need more information from the Harrells to do that?

A.    Yes, sir.

Q.    Okay.  And it was also the Harrells' fault that the

County required to you amend your drawings; is that right?

A.     No, sir.

Q.     Okay.  So let's look at Exhibit 425, which I think is in your book.  It is, I believe.

A.     Yes, sir.

Q.     So this is a letter dated March 16th, 2020, correct?

A.     Yes, sir.

Q.     And on this first page there's an item that says -- item A, and it says, "Install a steel staircase at the Property."

       Do you see that?

A.     Yes, sir.

Q.     And that's listed as item A here, correct?

A.     Yes, sir.

Q.     Okay.  And then go to page 2 in the first full paragraph of that letter, "With respect to."

A.     Yes, sir.

Q.     Okay.  And that paragraph says, "With respect to items A and F, Mr. Deluca has no alternative but to use his discretion as towards the type of staircase or railing as Mr. and Mrs. Harrell have opted against providing direction on the materials for the staircase or railing."

       Do you see that?

A.     Correct, yes, sir.

Q.     So even after being told three times that the black

circular stairs were fine, you were still claiming in this letter that the Harrells have, quote, "opted against providing direction" on the stairs, correct?

A.    Yes, sir, they wouldn't sign the document.

Q.    And this the letter was actually copied to Arlington County there at the bottom, correct?

A.    Correct.

Q.    And to complete the story, you still have not installed stairs at the carriage house to this very day, correct?

A.    They have not signed off on the document with the image of the rail and the staircase, correct.

Q.    But if one walks into the carriage house today, there's no stairs at all, correct?

A.    Correct.

Q.    And one has to access the upper level by a ladder, correct?

A.    Yes, sir.

Q.    Okay.  So sticking with this letter, in the second to last paragraph, it says -- begins, "It will take Mr. Deluca 14 days to mobilize."

      Do you see that?

A.    Yes, sir.

Q.    And then the same paragraph goes on to state, "Once the above-listed work is completed, it will take approximately 21 days for the first inspections to occur, and then another 30

days for all final inspections."

Do you see that?

A.      Yes, sir.

Q.      Okay.  There is still no completed final inspection on this property to this very day, correct?

A.      Correct.

Q.      And then the last sentence of this letter says, "Should" -- yes, the last sentence says, "Should Mr. or Mrs. Harrell take exception with any of the labor provided or materials furnished for items A through E, Mr. Deluca reserves all rights to seek a setoff for all associated costs given that he is proceeding without cooperation or input in concluding what would otherwise be mostly homeowner approved selections."

Did I read that correctly?

A.      Yes, sir, you did.

Q.      So, I -- you could have taken that position earlier, right?  I mean, if you were waiting on the Harrells to select the light fixture, you could put in the Home Depot special and then -- and finish, get it inspected, and if they wanted a super-nice light fixture, you could charge them a change order, right?

A.      Well -- yes.

Q.      Okay.  All right.  Let's look at Exhibit 445.

THE WITNESS:  Can I answer that -- can I add something to that, Your Honor?

THE COURT:  No, your counsel will follow up if they believe it's appropriate.

THE WITNESS:  I'm sorry.  Yes, sir.

BY MR. LYNCH:

Q.    445 is in your book.

A.    Yes, sir.

Q.    Okay.  So the second paragraph there begins, "Working off the Falcon report."

Do you see that?

A.    Yes, sir.

Q.    And this is an e-mail dated -- from you to Ms. Ferguson and Shahriar and Emad dated March 30th.  Do you see that?

A.    Yes.

Q.    So whose idea was it for you to work off the Falcon report, was that your idea or the County's.

A.    I don't recall.  Did think there were some items inside the Falcon report that were accurate and were part of our close-out, but we did not agree with the report as a whole, nor did Arlington County.

Q.    And you don't recall whose idea it was to work off that report?

A.    I don't.  At that point we had, I think, three reports. Maybe the Falcon report was the largest report.  I don't know exactly why.

Q.    Okay.  So in the -- there's a sentence beginning, "Lastly

would be finishes."

Do you see that paragraph?

A.      Yes, sir.

Q.      And that says, "Lastly would be finishes, but I would not want to start until the County Rough in/Close in inspections and their third party."

Do you see that?

A.      Yes, sir.

Q.      So you're saying to the County that there's going to need to be additional rough-in and closing inspections in this e-mail, correct?

A.      The County saw two areas where they wanted to open up a -- I believe it was like a 1-foot by 18-inch area, one in the mud room.  They wanted us to dig two holes to verify a footer, and that was all the County asked us to do at the time.

Q.      All right.  Let's look at Plaintiffs' Exhibit 484.  I think this is screen, Mr. Deluca.

A.      It's not in my book.

MR. LYNCH:  Okay.  Let's go to page 2 of this document, Walter.  So scroll down to the e-mail at 10:40 a.m. -- no, no, I'm sorry.  This -- there you go.

BY MR. LYNCH:

Q.      So this is an e-mail from you to andy@soilandstructure.com, and another person.  Who is andy@soilandstructure.com?

A.    Andy Fulambarkar or Amol Fulambarkar is the principle structure engineer at Soil & Structure in Reston, Virginia.

Q.    And he was the engineer of record on this project?

A.    Yes, sir, he was.

Q.    And you say in this e-mail, "Hi Andy can I get a letter for this?  It has been like this for 7 months and was cracked prior.  There is now an active crack."

       Do you see that?

A.    Yes, sir.

       MR. LYNCH:  Can you go to the next page, please.

       THE WITNESS:  Could you scroll down.  Thank you.

       MR. LYNCH:  And zoom out, please, Walter so we can see the picture.

       THE WITNESS:  Yes, sir.

       MR. LYNCH:  There you go.

       THE WITNESS:  Yes.

BY MR. LYNCH:

Q.    And your e-mail that we just read was referring to that crack there, right?

A.    Correct.  When we installed the lintel, there was a shift in the front facade.

Q.    Okay.  So your e-mail says, "7 months prior," and let's go back up and see the date on that.

       So seven months prior to November 15th, 2019 is roughly April 2019?

**A.**      I would think so, around April, March.

**Q.**      Yeah.  Thank you.

          MR. LYNCH:  We move to admit Exhibit 484.

          THE COURT:  Any objection?

          MR. BURCHER:  No objection, Your Honor.

          THE COURT:  It's received.

          (Plaintiffs' Exhibit 484 admitted into the record.)

BY MR. LYNCH:

**Q.**      Okay.  Let's look at Exhibit 560.  And --

**A.**      I have 562 -- there we go.  Laura [sic] Beers -- "from Lauren Beers" e-mail?

**Q.**      Yes.  Okay.  So on Bates label Harrell 005 --

**A.**      Yes, sir.

**Q.**      -- there's some handwriting.  One of them says "laundry" at the top right?

**A.**      Yes, sir.

**Q.**      This is your handwriting on this page, correct?

**A.**      Yes, I've already -- we've already testified to this.

**Q.**      Okay.  And then page 30 -- and the total, are you able to make out the total on this page 5?

**A.**      I cannot.

**Q.**      Okay.

**A.**      If they blow it up I could, I think.

**Q.**      That's okay.

**A.**      I could see it better now.

Q.      It's about -- it's 5675, does that sound right?

A.      Excluding areas.  There's something that's -- you can't see on the bottom that's been copied over or whited out.

Q.      Fair enough.  The total does say 5675, right?

A.      Yes, sir, but excluding the garage and something with head room.

Q.      Okay.  Let's go to Harrell 31, please, in the same -- Bates label 31.

A.      And, I'm sorry, Tom, did that include interior walls or was that just -- we don't -- okay.  Sorry.

        Which one was that?

Q.      It's Bates label 31 in Exhibit 560.

A.      Yes, sir.

Q.      And this floor plan shows the owner suite at the -- on the drawing, correct?  It's either on the right-hand side or the top, depending on how you look at it?

A.      Okay.  Let me just go back one.  So I'm looking at Exhibit 00560, and 31 of the Harrell -- yes.

Q.      Correct?  So it does show the owner suite, right?

A.      Yes, sir, it does.

Q.      And what's the -- just the total line on that page, what does that say?

A.      Which total?

Q.      The one -- the numbers next to the words "Total" and a colon.  There's a "6049."

Do you see that?

A.    Yes, sir, 6,049 excluding the garage and the head room, and I don't think it includes the basement.

Q.    Okay.  Let's look at Exhibit 562.

A.    Or it does.  I'm sorry.

Q.    562.  It's in your book also.

A.    Yes, sir.

Q.    Okay.  This is an e-mail from you to mquackenbush at Main Street Bank dated April 5th, 2019.  Do you see that?

A.    Yes, sir, I do.

Q.    Who is mquackenbush?

A.    She is the -- I believe she was a vice president at the bank.  She did all of the loan committee for the Harrells.  She also conducted all of the inspections, or her team did the inspections, as well as the two or three appraisals that the bank did.

Q.    Okay.  So on the second paragraph of this e-mail there's a sentence that begins, "I'm heading out of town tomorrow."

Do you see that?

A.    Yes, sir.

Q.    And it says, "I feel very good with the value given the four lots and a 7,000 square foot plus main residence."

Do you see that?

A.    Yes, sir.

Q.    Okay.  You had no measurement showing the house was that

large, correct?

A.    Not at the time, no.

Q.    Now, Exhibit 561, it's not in this book, but that's the document that shows one set of plans where the total was redacted and another set of plans where the square footage total was not redacted.  Do you remember that exhibit?

A.    Could I see it again, please?

Q.    Sure.  Do you recall this e-mail?  I'm just going to ask a very big picture question about it.

A.    Am I on this e-mail?

Q.    I don't recall.  Just a question --

A.    I don't know this e-mail --

Q.    -- that I have --

A.    Can I just see if I'm on this e-mail?

Q.    Sure.

A.    Okay.  I'm sorry, go ahead.

Q.    So I think you testified that Brendan redacted the square footage total on his own before it was sent to the Harrells?  Do I have that right?

A.    I don't know exactly what Brendan did or if it was someone from the HomeVisit place, but yes, something -- something must have been redacted.

Q.    Okay.  And was it your testimony that you told him not to send the plans at all?  Is that right?

A.    Yes, sir.

Q.      Okay.

A.      They were completely inaccurate.

Q.      So, we've got -- I want to talk a little bit more about the owner suite tile.  The owner suite tile was never delivered to the project, correct?

A.      That's my understanding.

Q.      And you have no invoice for that particular tile, correct?

A.      There's an invoice within Marble Systems where they gave us a $6,000 debit on our account and then a $6,000 credit refund on our account that shows up.  I'm not sure if that is what it is.  There's multiple texts with José in regards to my refund. I also saved an uncashed check from Marble Systems that is additional refund.  It's very confusing, that -- and still to this day I think the last text from José was, Waiting for the big boss to come in, I'll get your refund to you.

Q.      Okay.  As to an invoice saying you paid for the owner suite tile that we were looking at in Exhibit 787, you don't have an invoice showing that you paid for that tile, right?

A.      Yes, I do.

Q.      You do have an invoice?

A.      Yes, I was charged like $25,700.  All of the tile was delivered to the project and there was a balance of $13,000 that had not been delivered to the project.

Q.      Right, but none of those things you just described show

like the item number --

A.      It does.  The original invoice shows the total -- well, the original charge -- there's a very complex internal system inside Marble Systems that has labor categories for specialty, custom tile, as well as what is in-stock tile.

You can clearly see that the deposit was made.  You can see that there was a balance of material that was never sent to the project, and then you can see that there's an attempt -- Marble Systems gave us 6,000, but then there's subsequent e-mails and text messages with José, as well as accounting, asking for the remaining balance that they owe me --

Q.      Okay.

A.      -- after this litigation start -- or I guess I was a little -- I didn't understand if the tile had made it to the project.  All the Rohl fixtures from Italy, after the stop work was issued, come to the project.  One day I came and saw all of the Rohl -- the final Rohl fixtures locked in a refrigerator in the pantry, and still to this day we have not swapped the gold fixtures out for the preliminary fixtures we put in for closing.  So we --

Q.      Thank you.  So let's look at Exhibit 787.  This one is in your book.  The picture of the tile.  I'm sorry, I have the number wrong.

A.      I only have 764 to 791.

Q.      I had the number wrong.

**A.**    Okay.

**Q.**    737.

**A.**    Yes, sir.

**Q.**    Okay.  So this is a picture of the tile for the owner suite bath, right?

**A.**    Yes, sir.

**Q.**    Now, are you able to see the item number on there?

**A.**    I cannot.

MR. LYNCH:  Let's pull it up on the screen.  So Zoom in on the lower right-hand corner, please, Mr. Fitzhugh.

**A.**    156 --

**Q.**    Right.

**A.**    Yeah.  So even if you pull up one of the --

THE COURT:  Wait, wait.

THE WITNESS:  I'm sorry.

THE COURT:  Wait for a question, please.

THE WITNESS:  Pardon me, Your Honor.  Sorry.

MR. LYNCH:  Just Zoom in a little bit more, please, Mr. Fitzhugh on that very -- there you go.

BY MR. LYNCH:

**Q.**    All right.  So that the item number here that I see is NW90741.  Do you see that?

**A.**    Yes, sir.

**Q.**    Okay.  So, all right, I want to take a look at the invoices we have and see how much they add up to and whether

that item number is on it.  So --

MR. LYNCH:  And, Your Honor, we're getting close to -- I don't have much more.

So we need to look at Exhibit 736, please.

THE WITNESS:  I don't believe I have 736.  I go from 729 to 737.

BY MR. LYNCH:

Q.    You're right.  This is on the screen.

MR. LYNCH:  May I pass up a calculator, please?

THE WITNESS:  Yes, sir.

BY MR. LYNCH:

Q.    So you can take your time with these.  It's only eight pages, but --

MR. LYNCH:  Give us a bigger view, Mr. Fitzhugh.  Zoom out a little bit, please.  Maybe one more.

BY MR. LYNCH:

Q.    Okay.  And then you can scroll down, and there's a total amount due that we can see, and then you can see all the item numbers also.

A.    Yes, sir.

Q.    So we're going to go through these one by one.  If you see that item number we just saw, the NW90741, you let me know.

A.    Yes, sir.

Q.    And then as you go, just add up what each of these pages say and the total amount due.

A.      Yes, sir.

Q.      And Walter will flip whenever you want to flip?

A.      And the -- can I get the owner suite tile number again?

Q.      Yeah.  NW90741.

A.      Okay.  Hold on one second.  One second.  You can flip.

Q.      Okay.

A.      These are two refunds to the account.

Q.      There's still a total amount due, right?

A.      No.  This is going back to the master -- the owner account.

Q.      So, total amount due of -- I mean, there is a number next to a line that says "Total Amount Due," am I right?

A.      In their system, the subtraction happens on the back side of it, so it's showing in their internal system that they're crediting me back for something that was not delivered.

Q.      Okay.  So this is a minus 241 then?

A.      No, sir, it's a minus -- well, it's -- I think they discounted it out to wipe it away, and then they only gave me a $213 return, and they must have charged a restocking fee for the tile of $1,429.

Q.      So, I might have it all wrong, but all I want you to do is add up the total amount due numbers.

A.      There's a negative.

Q.      It's a negative, then you can do minus on this one?

A.      Yes, sir.  Yes, sir.

Q.    Next page, please.

A.    Oh, can I check to see if it's --

Q.    Yes, and the number is NW907 --

A.    Yes, sir.

Q.    -- 90741.  That's not on there, right?

A.    Except for the "Irene Allure/Snow White/Avenza."  That's the description of the owner tile.

Q.    I think if we look, you might be mistaken, but you don't see the item number that matches, correct?

A.    No.  I see the "Y," but then I see the "NR."

Q.    So the number doesn't match.

A.    Okay.

Q.    So let's go to page 3.

A.    Yes, sir.

Q.    Okay.  So you got your calculator going?

A.    I do.

Q.    And there's no NW90741 on this page, right?

A.    No, sir.

Q.    Okay.  Let's go to the next one.

A.    Hold up.  Can I get the number, please?  I'm sorry.

Q.    NW --

A.    No, sir, the amount.  I'm just running this calculator for you --

Q.    Sure.

A.    -- for us.  It went back to zero.  Can we go back to the

first one?  Or can somebody else take a running that --

MR. LYNCH:  Well, I don't need it.  Yeah.

THE COURT:  Yeah.  Let's just stop --

BY MR. LYNCH:

Q.    I won't do this exercise.  Just look through them for the item number, please.

A.    Yes, sir.

THE COURT:  Thank you.

THE WITNESS:  We're at around $7,000 now.

BY MR. LYNCH:

Q.    Okay.  We're going to not do the math.  So you were on page 3, and so far you haven't seen NW90741, right?

A.    No, sir.

Q.    Okay.  Let's go to page 4.

A.    And I'm sorry, Mr. Lynch, you know these are the deliveries, not the actual order.  Okay.

Q.    So on page 4 do you see NW90741?

A.    No, sir, this is the mortar for the stone setters.

Q.    Okay.  The next page.  Do you see NW90741?

A.    No, sir, this is, I believe, their daughter's bathroom.

Q.    Okay.  Let's go to the next page.  Do you see NW90741 on this page?

A.    No, sir, I do not.

Q.    Okay.  Next page, do you see NW90741 on that page?

A.    No, sir.

Q.    And then the last page.  Do you see NW90741 on that page?

A.    Yes.  Could you scroll up for a second?  So this isn't at all anything going to -- this is giving Chain Bridge as the "Ship To," so this is, I believe -- this is a completely different tile.  This is a black-and-white checkerboard that I did for a different project, so any time something shipped from Marble Systems, whether it's New Jersey, Miami, or any of their facilities, they have a ship to date -- that ship to date is what's determining where the actual -- what the actual project is for, and, again, this is not an invoice; this is an internal document that's chipping away from the original 25,700 that was paid to Marble Systems.  So this is not related to this project.

Q.    All right.

A.    I think it's very critical to look at the address of the ship to on these internal documents.

MR. LYNCH:  I'd like to admit Exhibit Plaintiffs' Exhibit 736, please.

THE COURT:  Objection?

MR. BURCHER:  No objection, Your Honor.

THE COURT:  It's received.

(Plaintiffs' Exhibit 736 admitted into the record.)

BY MR. LYNCH:

Q.    So I've got your deposition transcript in front of me, and I want to make sure you agree that the master bath tile was never delivered to the project; is that correct?

**A.**     To my knowledge, it was not, but there were subsequent deliveries after we were stopped.

**Q.**     Okay.  All right.  So let's look at Trial Exhibit 496.

**A.**     I don't have it.

**Q.**     Yeah, this is the text messages.

MR. LYNCH:  So, Your Honor, I think I can cut some time here.  There is a section of these -- and we can look at page 156.  There's a section of these messages where the parties are going back and forth about tile selections, there's pictures of the tile, and I have a page range, and I would just like to admit that page range.

THE COURT:  All right.  Why don't you -- it's Exhibit 496.  What pages?

MR. LYNCH:  78 to 105, and then page 156.

THE COURT:  And this is between Mr. Deluca and the Harrells?

MR. LYNCH:  Yes.  Yes, sir.  It's either Mr. Deluca and Dawn or Mr. Deluca and both Harrells.

THE COURT:  Okay.  Any objection?

MR. BURCHER:  Your Honor, I just want to be clear for the record.  Are those the Bates numbers or are those the PDF numbers?

MR. LYNCH:  Those are -- this one has a little page number at the bottom that matches the PDF.

MR. BURCHER:  So it's the PDF numbers that we're talking

about.

THE COURT:  Right.

MR. BURCHER:  I got 78 to 105.  I didn't get the next number.

MR. LYNCH:  78 to 105 and then 156.

THE WITNESS:  Do I have those here?

MR. LYNCH:  We're not even going to ask about them, honestly.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  They're received.

(Plaintiffs' Exhibit 496, pages 78 to 105 and page 156, admitted into the record.)

MR. LYNCH:  Thank you.

BY MR. LYNCH:

Q.    All right.  Now, let's talk about the roof.  I think you testified yesterday that you never told the Harrells that the roof was original slate; is that right?

THE WITNESS:  Correct.

BY MR. LYNCH:

Q.    Okay.  Let's pull up Yankee 1, please.

A.    Do I have that?

Q.    No.  This is the complaint -- amended complaint.

MR. LYNCH:  Let's go to paragraph 81.  That's on page 23 of the PDF.  And can you Zoom in on paragraph 81, please, just a little bit.

BY MR. LYNCH:

Q.    Can you read paragraph 81, Mr. Deluca?

A.    Yes, sir, I can.  "Several times prior to April 3rd, 2019, Deluca represented that the main house roof was the original slate roof and committed to ensuring that the original slate roof was properly refurbished."

Q.    Okay.  And did you admit that in your answer?

A.    Yes, sir.

Q.    Okay.  All right.  Let's go to -- that's all we need in this document.

      In the Elmagraby binder, which -- let's take a quick look at that, please.  And it's Exhibit 449.

A.    Yes, sir.

Q.    So the very -- go to page 2 of that document and you'll see a trade permit for Mr. Ellenberger.

A.    I see -- so page 2 is Renovations Expert?

Q.    So you're in 449?

A.    Yes, sir, I am.

Q.    Okay.  So the very first page is an electrical permit that says, "United Electrical [sic]," right?

A.    Yes, sir.

Q.    Okay.  And then the very next page is a mechanical permit that says "Contractor," appears to be Donald Ellenberger?

A.    It's the back of the first page.

Q.    Right.

A.     Okay.  Yes, sir.

Q.     Okay.  So Mr. Ellenberger never set foot on this project site; is that true?

A.     I do not know.

Q.     Okay.  And with respect to the first page of this exhibit, there's a company called United Electrical [sic] Services.  Do you see that?

A.     Yes, sir.

Q.     And the electrical work on this project was actually performed by a person named Dimetrio Hernandez, correct?

A.     Yes, an authorized worker for United Electric.

Q.     Okay.  Did Mr. Hernandez pay cash to United Electric to use their electrical permit?

A.     I do not know.

       MR. LYNCH:  Okay.  So let's look at -- let's pull up Plaintiffs' Exhibit 1054.

       THE WITNESS:  Do I have that?

BY MR. LYNCH:

Q.     No, it's up on the screen.

       So let's go to page 4351 of this document.

A.     Yes, sir.

Q.     4351.

A.     I can't.

       MR. LYNCH:  So the second bubble in blue, let's focus in on that, please.

THE WITNESS:  Yes, sir.

BY MR. LYNCH:

Q.    So this is a text exchange between you and Dimetrio Hernandez, correct?

A.    Yes, sir.

Q.    And there's a line that says, "I also will need some cash so I can pay these permit.  $1200."

Do you see that?

A.    Yes, sir.

Q.    And then let's go to page 4352, and the first green bubble says, "He charged you $1200 for a $200 permit?"

Do you see that?

A.    Yes, sir.

Q.    Okay.  And then let's go to 4353.  And in the top blue bubble it says -- Dimetrio states, "I know I wish I would have my Master's.  I had another guy who pulled my permits for $1,000 in DC, but he was saying it was more expensive in Arlington."

Do you see that?

A.    Yes.

Q.    Okay.

MR. LYNCH:  There are two exhibits I would like to admit that I have not pulled up on the screen, but in the interest of time, they're 720 and they are 721.  These are two e-mails from Mr. Hernandez to Mr. Deluca regarding what electrical work was being performed on the property.

THE WITNESS:  Can I just look at these dates really quick?  Okay.  And then what was the -- what were the other ones?

THE COURT:  720 and 721.  Do you have them there with you?

THE WITNESS:  I'm just trying to see right now, Your Honor.

MR. BURCHER:  There's no question.

THE WITNESS:  Oh.  I'm sorry, sir.

I'm sorry, Your Honor.

MR. BURCHER:  I do not have them, Your Honor, but they're clearly hearsay, and out-of-court statement.

THE COURT:  Well, they're between Mr. Hernandez and Mr. Deluca, so certainly Mr. Deluca's statements are not hearsay.

MR. LYNCH:  We can bring them on the screen very quickly.

THE COURT:  Put them on the screen.  Thank you.

BY MR. LYNCH:

Q.    And, you know, I'm going to have the same question about these text messages we just read.

A.    Yes.

Q.    So anyhow, we'll get to admitting that.  This is the first one.

MR. LYNCH:  And scroll so everyone can see it, please, Walter.

MR. BURCHER:  I have no objection to 720.

THE COURT:  All right.

(Plaintiffs' Exhibit 720 admitted into the record.)

MR. LYNCH:  And let's look at 721, please, Walter.  Just one page.

MR. BURCHER:  No objection to 721, Your Honor.

THE COURT:  They're received.

(Plaintiffs' Exhibit 721 admitted into the record.)

BY MR. LYNCH:

Q.    And then with respect to the text messages we were just looking at --

A.    Could we go --

Q.    I'm sorry, Mr. Deluca, your counsel can do that.

A.    Okay.  All right.

MR. LYNCH:  So we're Plaintiffs' Exhibit 1054, and I would like to admit pages 4351, 4352, and 4353.

THE COURT:  Those are the ones we just looked at?

MR. LYNCH:  Yes.

THE COURT:  All right.  Any objection?

MR. BURCHER:  They're hearsay, Your Honor, as far as what Mr. Hernandez is saying.  If they're being admitted for what Mr. Deluca, you know, received them for, that's fine, but as far as the truth of the matter and what Mr. Hernandez is saying, that would be hearsay, Your Honor.

MR. LYNCH:  Your Honor, they're adoptive admissions.  I think they're -- you know, it's his -- it's arguably his agent and, in that sense, could be a party admission.  I think they're present sense impressions.

THE COURT:  I'm going to receive them, and I'll look at it to see what use I make of them, but these clearly are admissible for purposes of what Mr. Deluca had to say, and they may be clearly as mental impressions of what he knew, and I'm not sure how that would fit in the relevance of the case otherwise.  So I'll receive them and your exception is noted.

(Plaintiffs' Exhibit 1054, pages 4351, 4352, and 4353, admitted into the record.)

MR. LYNCH:  Ms. Brown has one question -- one area of questioning, which should be short.

THE COURT:  Good morning, Ms. Brown.

MR. LYNCH:  Good morning, Your Honor.

MR. BURCHER:  Your Honor, I -- are we doing --

THE COURT:  I'm allowing this because they're -- as they did in their earlier witness, they have different subject matters, so I'm going to allow it.

MR. BURCHER:  I think that's kind of --

THE COURT REPORTER:  Sorry?

MR. BURCHER:  I think that's kind of tag-teaming, especially when it relates to one witness, as the issue before with the expert witness, not an individual witness.

THE COURT:  Ms. Brown clearly has the better knowledge about the report, and I would assume that's where she's going with this.

Is that correct?

MR. LYNCH:  Yes, Your Honor.

THE COURT:  Okay.  I'm going to allow it.  Let's be focused.

MR. LYNCH:  Yes, Your Honor.

CROSS-EXAMINATION OF JOHN DELUCA

BY MS. BROWN:

Q.    Let's go to Mr. Furlong's report which is Exhibit 58, and we're going to go to page 69, talk about insulation.

MS. BROWN:  We can just throw it up on the screen, I think.

BY MS. BROWN:

Q.    Mr. Deluca, do you agree --

MS. BROWN:  Page 69, Exhibit 58.

BY MS. BROWN:

Q.    I would like to look at the photo on the top right.

MS. BROWN:  Can you Zoom in on that, Walter?

This is -- for the record, this is Plaintiffs' Exhibit 196 which has been entered into evidence.

BY MS. BROWN:

Q.    Mr. Deluca, do you agree that this photo shows the condition of the insulation in the attic at this location?

A.    Yes, ma'am.

Q.    Okay.  And the photo at the top left of this page, which is Plaintiffs' Exhibit 195, do you agree this photo shows the condition of the insulation in the attic?

A.    I don't know if this has been corrected since then, but at the time of termination, yes -- or the stop.

Q.    Okay.  Now, let's go to page 71, the bottom left photo, which is Plaintiffs' Exhibit 189.  Do you agree that this photo shows the condition of the insulation in the crawl space at this location?

A.    I can't confirm exactly where this is on the property. It could be on the side where the mudroom addition was going in. Could you give me further direction?

Q.    I'm just going to ask another question.

A.    Yes, ma'am.

Q.    Okay.  I'm going to look at Exhibit 543.

MS. BROWN:  Walter, go ahead and pull it up.  I'll give you a hard copy.

THE WITNESS:  Thank you, sir.

BY MS. BROWN:

Q.    This is Plaintiffs' Exhibit 543.

A.    Yes.

Q.    Okay.  So the top right of this document references the 6122 Lee Highway property, correct?

A.    Yes ma'am.

Q.    And this document is dated September 2nd of 2020?  Do you see that in the top right-hand corner.

A.    September 2nd, 2020, yes, ma'am.

Q.    And Energy One was your foam insulation supplier and

supplier, correct?

A.    On the foam side, yes, ma'am, as well as weather seal as well.

Q.    Okay.  Thank you.  And this document --

MS. BROWN:  Walter, if you could show the whole --

BY MS. BROWN:

Q.    This document contains the photos that we looked at in Mr. Furlong's report, correct?

A.    Yes, ma'am.

Q.    Okay.  And this document acknowledges that the spray foam was not installed in those areas, correct?

A.    Correct.

Q.    And this document was signed by Jonathan Warner of Energy One America?

A.    Yes, ma'am.

Q.    And you never provided this document to Mr. Macdonald, did you?

A.    I don't know if I did or not.

Q.    You never provided this document to the County, did you?

A.    Yes, this was shared with the County.

Q.    Is there any documentation showing that this was provided to the County?

A.    This was observed in the field, that we all agreed that there was no insulation in that left corner and that right side of that facing attic along Lee Highway.

MS. BROWN:  I'd like to admit Exhibit 543 into evidence.

MR. BURCHER:  No objection, Your Honor.

THE COURT:  Received.

(Plaintiffs' Exhibit 543 admitted into the record.)

BY MS. BROWN:

Q.    Let's go to exhibit -- this is Defendant's Exhibit 143. And this document in the top left references the 6122 Lee Highway property, correct?

A.    Yes, ma'am.

Q.    And it references a date of insulation, 5-6 to 7, 2019 "main," correct?

A.    Yes, ma'am.

Q.    And that refers to the main house?

A.    I believe so.

Q.    And this document does not have a date showing when it was prepared nor when it was submitted to you, correct?

A.    There's an e-mail that goes along with this document.  I don't know if that was provided, but it came from their local office, and I believe the headquarters is in South Carolina.

Q.    Okay.  And again this is Energy One America?

A.    Yes, ma'am.

Q.    And that's the same contractor that prepared Exhibit 543 that we just looked at?

A.    Yes, ma'am.  I don't know if -- yes, ma'am.

MS. BROWN:  I'd like to admit Defendant's Exhibit 143 into

evidence.

MR. BURCHER:  It's already been admitted.

THE COURT:  It's been admitted and --

MS. BROWN:  Thank you.

THE COURT:  -- we've already gone over the same testimony.

BY MS. BROWN:

Q.    All right.  Exhibit 542.

THE COURT:  Is that Plaintiffs' Exhibit 542?

MS. BROWN:  Yes, Your Honor.

THE WITNESS:  I go from 39 to 00444.

THE COURT:  It's on the screen.

THE WITNESS:  I'm sorry, sir.

BY MS. BROWN:

Q.    This document, Plaintiffs' Exhibit 542, this also references the -- this also references the 6122 Lee Highway --

MS. BROWN:  If you'd scroll down, Walter.

BY MS. BROWN:

Q.    Right there, "Job Name"?

A.    Yes, ma'am.

Q.    And this is an invoice from Energy One, correct?

A.    Yes, ma'am.

Q.    Now, if we go back quickly to 143, this states that the "closed cell foam" was installed in the "main house crawl space," correct, up at the top?

A.    Yes, ma'am.

Q.   And then if we -- you just testified that didn't occur?

A.   Excuse me?

Q.   You just testified that the crawl space did not get insulation; is that correct?

A.   No, I did not testify to that.

Q.   Okay.  Let's go to Exhibit 542.  Line item number 1 states, "Main House Crawl Space Was Not Done."

     Do you see that?

A.   Now I do.

Q.   Okay.

     MS. BROWN:  No further questions.

     THE COURT:  Thank you.  Do you want to take a couple of minutes before we -- you do redirect?

     MR. BURCHER:  Yes.

     THE COURT:  Okay.  Is ten minutes enough time?

     MR. BURCHER:  Yes.

     THE COURT:  Okay.  All right.  Let's take a ten-minute recess and we'll come back with redirect.

     (Thereupon, a recess in the proceedings occurred from 10:56 a.m. until is 11:08 a.m.)

     THE COURT:  Please, proceed.

           REDIRECT EXAMINATION OF JOHN DELUCA

BY MR. BURCHER:

Q.   Mr. Deluca, you were asked some questions on cross-examination related to insulation and the status of

insulation in that one missing spot.  Do you recall that?

A.     Two missing spots.

Q.     Would you consider that a punch list item?

A.     Yes, I would.

Q.     You were asked some questions on cross-examination related to the relationship between Dimetrio Hernandez and United Electric.  Do you recall that?

A.     Yes, sir.

Q.     What is your understanding of the relationship between Dimetrio Hernandez and United Electric?

A.     Dimetrio works with United Electric and under United Electric on multiple projects.

Q.     Okay.  Is he an authorized agent?

A.     Yes.

Q.     And what are Mr. Hernandez's qualifications and why did you select him as a subcontractor?

A.     Mr. Hernandez, Dimetrio Hernandez, is a wonderful electrician.  He is a journeyman within the union.  He's a supervisor within the electrical union.  He has done work in all of my children's rooms, and he's a wonderful person, and a great electrician.

Q.     All right.  You were shown Plaintiffs' Exhibit 562, which was an e-mail to the -- between you and Main Street mortgage related to the premises, and you referenced that it was a 7,000 plus residence.

A.      Yes.

Q.      What did you mean by "residence"?

A.      There are four lots on the property.  There's one lot, the largest lot, on the far upper corner, which has the main house, the main structures, everything, on the right side.

Q.      Did you include the carriage house and the main house?

A.      Anything that I was working on, the entire totality of my project.  Again, the -- of the four lots, the lot that had everything on top of -- from a residence perspective.

Q.      And do you feel that was a misrepresentation to the bank as to the approximate square footage of all of this?

A.      No.  I believe it's over that number.

Q.      You were asked some questions on cross-examination related to the security cameras on the premises.  Could you describe to the Court the difference of what you installed and what the Harrells added as -- you know, after the August 6th time period?

A.      Yes.  There were security cameras installed throughout the perimeter of the property.  They were turned on by the Harrells after we started trying to do work.  I believe that's when we set the exterior bathroom and stopped allowing workers to use the interior bathrooms.

In -- as well as in -- when you walked in the house, they had a Nest camera facing the door, so anyone who walked in the kitchen would be videoed, as well as if you went upstairs to the

owner suite, they had another Nest camera facing the interior of the owner suite that they installed, so they installed, I believe two, if not three, internal cameras to photograph workers or video all of us.

Q.    Okay.  All right.  You were shown some pictures of trade work that was being done prior to April 3rd.  Was this allowed under your understanding of the building code?  And why?

A.    What they pulled up was basically a coffered ceiling that was the entire living room.  As you're laying out a coffered ceiling, the framing of the coffered ceiling must go in first, then all subsequent trim be built around it.

Once that subsequent trim's built around it, you are then able to decide where the centerline of the light fixture is, which is a simple light fixture that pulls down and goes back up.

There's then an application of the final -- the final ceiling, which, in order to take that down, you would move -- you would move the crown molding and you would take the panel back down.

In order to get the centerline in each one of the coffers, you have to have the trim detail up in order to determine where that is.  At any time, an inspector, an observer, a homeowner, a worker could like sideways, horizontally, to observe any wiring, as well as remove that upper piece to see anything behind it.

There's a mantle installation, so the wings of the mantle were still open while they showed that picture that it was -- the mantle had been closed with the two sconce lightings.  Those two sconce lightings are centered off the historic mantle and centered between the ceiling and the top of that.  If you look sideways, you could observe any wiring or any wire connection or rough-in at any time.

Q.    So were all of those items still open for observation?

A.    When the -- when Inspector Tomika gave the "all clear," or close-in, for the electrical, yes.

Q.    With regard -- so you were shown some pictures of an HVAC unit and some rough-in plumbing that was done prior to April 3rd.  Do you recall those pictures?

A.    Yes.

Q.    Do you believe that that was allowed under what you were doing?  And why?

A.    I do.  It was very complex and we were trying to build mechanical rooms to see how something would fit.  We would take the unconnected unit and slide it back into corners and try to adjust it so in the future, if it ever needed to be maintained, a human being could get behind it and get to it.

These systems were simply roughed in and not connected and not running until they received their inspections.

Q.    And you were the -- who was the owner of the property?

A.    I was.

Q.    And so is there anything wrong with you putting an unconnected HVAC unit into a piece of property at this stage?

A.    No, as long as you don't hook it up and start running it and closing it up without the inspections.

Q.    You were asked some questions related to insurance, as it relates to the post-closing construction agreement.  Do you recall those questions?

A.    Yes, sir, I do.

Q.    And what did you do in order to obtain insurance in accordance with the terms of the Post Closing Construction Agreement?

A.    I believe I originally had a builders risk policy.  I then had for my company -- because I do work other places, I have a general liability policy.  The Harrells, through their -- I believe it was their lender, their insurance company, gave me specific language which they e-mailed to me and said, "This is the language that I need the certificate for."

I cut-and-pasted that language and sent it to my insurance agent.  Subsequently, my insurance agent said, "You don't need this insurance," and I instructed my insurance agent, "No, this is what the Harrells want, this is what their lender wants and their insurance company.  Please provide it."

I paid the amount for the policy, and they issued a certificate for me; therefore, at closing or after closing, I gave that certificate to the Harrells and I believe that I was

in compliance with everything that they wanted.

Q.    Can you turn to Plaintiffs' Exhibit 752, please.

MR. BURCHER:  Pull it up on the screen.

THE WITNESS:  I don't have it here.

MR. BURCHER:  We're going to call it up on the screen.

THE WITNESS:  Yes.

MR. BURCHER:  If you can scroll down to the next page on that.

THE WITNESS:  Yes.

MR. BURCHER:  And scroll down one more page.

THE WITNESS:  Yes.

BY MR. BURCHER:

Q.    Okay.  On the bottom of that page, what is the cut and paste there?

A.    This is what Mr. Harrell sent to me and said that I can't do any work on the property unless I provide this policy.

Q.    Okay.  And who are you communicating with in this particular e-mail exchange?

A.    My insurance executive.

MR. BURCHER:  Your Honor, to the extent that Plaintiffs' Exhibit 752 has not been admitted, I would like to move for its admission.

MR. LYNCH:  No objection.

THE COURT:  It's received.

(Plaintiffs' Exhibit 752 admitted into the record.)

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

BY MR. BURCHER:

Q.    And could you turn to Plaintiffs' Exhibit 754, please. Could you identify this document for me, please?

A.    Yes.

Q.    What is this?

A.    This is what was issued to me -- yes, this is what was issued to me for the builders risk policy, on the bottom, as well as they had my general liability and other insurance that was listed above.

So you see two different policies.  One's my general liability that I always keep whenever I'm doing work for anybody.  The bottom one is the builders risk with the language that was required by the Harrells and their agents.

Q.    And did you provide this insurance certificate to the Harrells eventually?

A.    Yes, I had to.  What was the date of issue?

Q.    No, there's no question.

A.    Okay.

MR. BURCHER:  Your Honor, I would like to movement for the admission of Plaintiffs' Exhibit 754, please.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 754 admitted into the record.)

BY MR. BURCHER:

Q.    Mr. Deluca, you were asked a number of questions related to Dashco and the loan and your investor.  Do you recall those questions?

A.    Yes, sir.

Q.    I would like you to turn to Plaintiffs' Exhibit 422, please.

A.    I don't have it.

Q.    He's going to pull it up.

A.    Okay.

Q.    Could you identify what this document is?

A.    This is the Harrell settlement statement.

Q.    This is the settlement statement for the closing with the Harrells.  Is that --

A.    Yes, their title company was Franklin Title, or the bank's was Franklin Title.

Q.    Can you scroll down to the next page?

A.    Yes, sir.

Q.    Is the final payment to Dashco listed on there as the total amount that you paid Dashco for this loan?

A.    3.54378 -- $3,543,578.48.  I don't know if that includes all the fees up to date, but that is what was paid to them at closing.

Q.    Okay.  In addition to that amount, you had a separate loan with Dashco?

A.    An additional $200,000 because we didn't have the funds

to purchase Lee Highway, so Dashco provided another investment loan to hold us over during due diligence of the project.

Q.    And, Mr. Deluca, I'll -- you mentioned $200,000, but in the joint stipulation of facts, it says that Dashco lent Deluca $260,417?

A.    Yes, sir.

Q.    Is that a more accurate figure?

A.    Yes, it is.  It includes the interest, what -- it's not a hard number that they give.  The 12 percent is handled inside of Dashco's accounting, and that is constantly accruing as they're doing a draw or they're allowing us to purchase a project. That's their 12 percent return.

Q.    In addition to the amounts that you paid Dashco, did you pay all the amounts on the left-hand side of the ledger on the closing statement as part of closing in this matter?

A.    Yes.  I had to pay Sotheby's $268,000 because they represented the Harrells and they represented myself.

MR. BURCHER:  Your Honor, I would like to move for the admission the Plaintiffs' Exhibit 422, please.

THE COURT:  Any objection?

MR. LYNCH:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibit 422 admitted into the record.)

BY MR. BURCHER:

Q.    Mr. Deluca, can you unwind this transaction?

A.      I don't understand.

Q.      Can you -- can you just go back and give the Harrells back their money and take the house?

A.      If I could, I would try to.  I can't.

Q.      Why not?

A.      There -- there's over $500,000 in customizations in this classic American home that now has tile running throughout it. There's specific customizations that I can't get back.  I've paid Sotheby's $260,000 of transactional fees that I can't get back.  I think they got it back because they threatened fraud against Sotheby's and Sotheby's gave them the commission back of their seller's side.

There's multiple things on this project that make it impossible.  I have a pending lawsuit where I can't even get a basic equity loan on my house to pay legal bills because I have a fraud case being against me -- three counts of fraud for a house that I sold to these folks, and I have not committed fraud.  I cannot get additional loans or financing with this hanging over my head.

I've tried to settle.  I've tried to talk to them.  I've tried to buy just the house back, and it's an impossibility, that that cannot happen.

Besides lenders, jurisdictions have been contacted.  I've been -- it's just been a very difficult time for me, and I have tried to do everything I can to do -- to make this right, and I

did not commit fraud in any of these things I've said about a roof or about the -- that I lied about a roof to go to closing or I induced somebody about square footage.  None of these things came up until after this lawsuit was filed in order to make fraud and to think that I would just buy everything back to make it go away.  It's impossible at this point, Your Honor.

Q.    What would you like the Court to do in this case?

A.    I would like 30 days to go in and fix this job and finish it and make the County happy, make them happy, and move on with my life.

        MR. BURCHER:  No further questions, Your Honor.

        THE COURT:  All right.  You may take your seat, Mr. Deluca.  Thank you.

        THE WITNESS:  Thank you.

        MR. BURCHER:  While we're going getting the other witness, Your Honor, I'm going to try and stay until about 12:45, and then that's like my drop-dead time that I have to leave to be able to get to the airport.

        THE COURT:  You leave whenever you're comfortable doing so.  I appreciate it, and I hope it all goes well.

        Good morning, sir.

        THE WITNESS:  Good morning.

        THE COURT:  Please, Mr. Coughlin, go ahead.

        MR. COUGHLIN:  Your Honor, I'm calling Kiet Nguyen to the stand.

(KIET NGUYEN, DEFENDANT'S WITNESS, SWORN)

DIRECT EXAMINATION OF KIET NGUYEN

BY MR. COUGHLIN:

Q.    Mr. Nguyen, could you please state your full name for the record and spell your name as well?

A.    My name is Kiet Nguyen.  First name is spelled K-I-E-T.  Last name spelled N-G-U-Y-E-N.

Q.    Thank you.

MR. COUGHLIN:  And at Defendant's 145, the last three pages are Mr. Nguyen's curriculum vitae.  I would like to have it pulled up.

BY MR. COUGHLIN:

Q.    Mr. Nguyen, while we're getting this up, could you please just state your current profession.

A.    I'm a principal forensic engineer for NTK -- for TKDI Forensic Engineering.

Q.    Okay.  And if you could turn to the screen and just briefly review the document that's pulled up.

A.    Yes, sir.

Q.    And let me know when you're through reviewing this page.

A.    Yes.

Q.    Next page.

A.    Yes.

Q.    Are the last three pages of Exhibit 145 you're current curriculum vitae?

A.      Yes, sir.

Q.      And is it, as far as you can tell, an accurate reflection of your professional and courtroom experience?

A.      Yes, sir.

MR. COUGHLIN:  I would like to move into evidence Defendant's Exhibit 145, the last three pages.

THE COURT:  All right.  Any objection?

MR. LYNCH:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 145, last three pages, admitted into the record.)

BY MR. COUGHLIN:

Q.      Let's go back a little bit.  Did you graduate from college?

A.      Yes, sir.

Q.      You can turn this way now.

A.      I graduated -- I have a B.S. degree in physics, and I graduated in 1986 from University of New York at Oneonta, and I also have a B.S. in civil engineering, major in structure, at University of New York at Buffalo, 1988.

Q.      And do you have any licenses?

A.      Yes, sir.  I'm licensed in -- professional engineer license in Virginia, Maryland, D.C., Texas, Florida, Delaware, and West Virginia.

Q.      Do you have any other licenses or does your company have

any licenses?

**A.**     I'm also a Class A contractor in Virginia.

**Q.**     And what's the name of your company that does contracting?

**A.**     It is under NTK Development, Inc.

**Q.**     And did you actually work as a structural engineer in your career?

**A.**     Yes, sir.

**Q.**     For roughly how many years?

**A.**     About 32 years of experience.

**Q.**     And have you worked as a civil engineer as well?

**A.**     Yes, sir.  When I graduate, they don't have a curriculum called structural engineering, so you're civil engineering, but you major and concentrate.  Today it's a different state.  They changed.

**Q.**     Okay.  And so I think you mentioned at the beginning that you're a -- you do forensic engineering.  Could you please describe for the Court what that entails.

**A.**     I -- basically, I investigate cases that involve a catastrophe, fatal, a building collapse, a house collapse, due to both human errors, construction defects, and natural disaster.

**Q.**     And have you -- when did you start doing that specific type of specialty?

**A.**     I start the first case sometime in 1995, and it get

pretty much full time since 1999.

Q.    And have you testified as an expert witness before in court cases?

A.    Yes, sir.

Q.    Roughly how many times have you actually testified in court?

A.    I would say more than ten times.

Q.    And describe your construction experience, please.

A.    I design and build homes and light commercial facilities, and some of my own projects that I have physically managed, construction management from beginning to finish.

Q.    Have you ever built a single-family residence?

A.    Yes, sir.

Q.    What are the size ranges of the houses that you've worked on?

A.    It ranges between a 1500-square foot to 10,000-square foot home.

Q.    And have you ever done renovation work where, you know, a project starts with an existing structure and you renovated and expanded?

A.    Yes, sir, as what I call custom renovation projects.

Q.    And has this work familiarized you with the building code of Virginia?

A.    Yes, sir.

Q.    Is that something that you're somewhat familiar with or

very familiar with?

A.    I would say I'm an expert.  Because I'm a professional engineer, I have to know these international residential code, international building code, mechanical, electrical, plumbing, and energy code, all combined.

Q.    Have you done any work for homeowners in your forensic engineering work where they're dissatisfied with a contract?

A.    Yes, sir.

Q.    And have you done any work for a contractor where a homeowner is dissatisfied with their work?

A.    Yes, sir.

Q.    And between the two, who do you do more work for?

A.    I would say more on the homeowners' side than contractors and builders.

Q.    Do you have any familiarity with the costs to build residential projects, whether they be renovation or new construction?

A.    Yes, sir.  As an engineer and a builder, you must because every project has a budget.  And even though when I do for myself a project, I have to know how much the budget is, and for homeowners and builders and developers, they also need to know how much so they can earmark the budget.

Q.    And how do you become familiar with the costs that are actually being charged in the marketplace?

A.    Through experience and it depends on what kind of

project, sir.  You use different types of estimates, protocols. For example, if the building, you know, from scratch, you develop a site, then you would use American Institute of Architects estimate guidelines.

For restoration projects, you tend to use the acceptable kind of estimate.  For example, restoration, the general industry uses estimate called Xactimate.  Insurance industries use that a lot.  Homeowners use it a lot.

For small projects, basically you use labor and material costs based on the specific area.

For federal and state projects, that's different because they have their own state specifications and different divisions, so you have to use a different kind of estimate guidelines.

Q.    Do you -- have you recently bid on a project that a homeowner wants a contractor to construct?

A.    I don't bid on projects.  I develop estimates for a lot of restoration projects and for my own projects.  So, I develop the cost estimate after the project design, as well, for the contractor to bid on.

Q.    Okay.

MR. COUGHLIN:  Your Honor, I would like to have Mr. Nguyen accepted by the Court as an expert in the field of engineering, general contracting, and construction cost estimating.

THE COURT:  Any objection?

MR. LYNCH:  Um, I want to make sure we're not going to be hearing permitting opinions today; is that right, Mr. Coughlin?

MR. COUGHLIN:  I may touch on permits, but I will restrict my questions as it relates to permitting.

THE COURT:  All right.  Well, you can make objections at the time that the question is asked, and I'll accept him for those -- in those areas for testimony today.

Go ahead.

MR. COUGHLIN:  Thank you, Your Honor.

BY MR. COUGHLIN:

Q.    Prior to this case, Mr. Nguyen, had you ever met Mr. Deluca before?

A.    Yes, sir.

Q.    Not prior to today, but prior to this --

A.    Oh, I'm so sorry about that.  No, I have not.  The first time I met him is on June 7th -- June 17th of 2020.

Q.    And had you been retained as an expert witness in this case already at that time?

A.    No, sir.

Q.    Okay.  Who introduced you to Mr. Deluca?

A.    Ms. Juanita Ferguson from Kinney, Bean, Korman [sic].

Q.    And is it your understanding that she was his counsel at the time?

A.    Yes, sir.

Q.    Okay.  And ultimately, did you prepare reports in this

matter?

**A.**    Yes, sir.  I prepare first engineering investigation report, and then there's an addendum after that.

**Q.**    Did you also prepare a cost estimate?

**A.**    Yes, sir.

**Q.**    So, when -- state again when you first visited the property?

**A.**    I visited the property on June 17 of 2020.

**Q.**    Okay.

**A.**    And --

**Q.**    And did you visit the property a second time?

**A.**    Yes, sir.  That was on December 12, 2020.

**Q.**    And did you have any discussions with Mr. Deluca regarding the work that was undertaken at the property?

**A.**    Yes, sir.  I met him the first time at the inspection because any kind of engineering investigation work I would like to know the background and the basic understanding of the case. And everything states in the report of my understanding and the evidence obtained from the field work.

**Q.**    What's your understanding of the work in general categories that Mr. Deluca undertook at the property?

**A.**    My understanding was, and I state in the report that the project is a custom home renovation project.  It was ongoing but at the very final stage, and when I was there I collect a lot of evidence, 122 photographs, and I rendered my opinions in the

stage of the construction progress at that time, and I rendered my opinion.  There's a lot of unfinished items, didn't have a chance to complete, and there's a lot of items that I would classify as a punch list item because it's a special real estate transaction, the way I understood, so I published a report.

Q.    And did you review the plans that were prepared by the engineer for the design of the work?

A.    Yes, sir.  I review the plans and I cite in the report that there's many revisions, I think an extraordinary amount of revisions for the projects [sic], and that's why -- that's why I document everything, and the method of cost estimating is based on the evidence that I collect as well.

Q.    Did you review the building permits that were issued for the project?

A.    I looked at -- I reviewed the permits, what was made available to me, but it become an evolution because -- first I get some, and then later on I get more, and I get more at the end after even the addendum was issued.  So there are -- at first I understood there was ten permits and I documented the report, and later on it's more than 20 permits has been pulled.

Q.    Did you review the report from Matthew Furlong dated February 25th, 2020?

A.    Yes, sir.  That was the Falcon -- the Falcon report.  The original report was 123 pages, and I read every page of it, and every item.  Many items are very repetitive in nature, and it's

getting really boring after reading, but I really developed a cost matrix based on that report. And if you read my estimate, there's a reference and page number from the Falcon report.

Q.    And did you review a later Falcon report prepared by Matthew Furlong dated November 16th, 2020?

A.    Yes, sir. And that report has been elongated from 173 pages to 221 pages, with photographs providing very specific details. Again, I reviewed that and it remains my opinion that it's still repetitive in nature. So the cost estimate that I developed remained, and I didn't change the cost.

Q.    Did you also review a report prepared by -- or reports prepared by Matthew Bowe?

A.    Yes, sir.

Q.    And did you prepare -- or review a report prepared by J.D. Catlett Consulting?

A.    Yes, sir.

Q.    And did you review a report prepared by Shayan Amin of Falcon Group?

A.    Yes, sir. He's an engineer.

Q.    Do you know why the work was complete -- oh, I'm sorry, why the work was left incomplete?

A.    I put that in the report. It was my understanding that the contractor was not able or not allowed to go back to work, so there is a restriction of him go back and finish the work.

Q.    Have you had to manage subcontractors in your experience?

**A.**      Yes, sir, all the time.

**Q.**      What happens to a contractor's schedule when work is stopped by an owner?

**A.**      Well, when they're not allowed to work, they will not go to work and they will looking for jobs somewhere else because they have to put food on the table, and when you turn around and you looking for them to finish the job, they not available.  So every time you stop the subcontract's work, there's a lot of delay and consequentials effects after that.

**Q.**      What did you observe about the quality of the construction when you inspected the property?

**A.**      I think that -- again, I call it a custom home renovation.  It has good taste.  It has a lot of existing material and new ones trying to blend it in, and I can appreciate that, and I can understand that this is not easy, but my report and still -- my report documents a lot of incompleted -- uncompleted items and items that are classified as punch list that need to be finished.

**Q.**      Is it necessary to completely gut the home and the carriage house and basically start over?

**A.**      In my opinion, no, because of -- and I did render the opinion in the report that because this is an existing home, the work -- the incompleted item and the punch list items that I saw, and I put in the report, that can be corrected and move forward.  It does not need to be demolished and rebuilt.

Q.     Do you agree with Mr. Furlong's continuous characterization of the work constituting building code violations?

A.     Again, my report documents the evidence of the true and I call that as incomplete item.  In order to assess the code, you have to do a destructive testing and I had to do further investigations.

Q.     So, what did you do in order to determine what work was necessary to be completed at the stage that you saw the property?

A.     A lot of unfinished item that need to be complete.  A lot of punch list item that need to be complete.

And any kind of requirements from the County in regards to permitting work that has to be finished, basically it's just a final inspection.

Q.     Okay.  I mean, did you come up -- you said you reviewed the Furlong report, right?

A.     Yes.

Q.     Did you come up with a list based on that report?

A.     Yes, I developed a list from that report, and what I call is the punch list item and the cost matrix, I developed to mitigate.

Q.     And did you use that list to create an overall cost estimate?

A.     Yes, sir.

*Scott L. Wallace, RDR, CRR, Official Court Reporter*

**Q.**    And did you agree with everything that was in the Furlong report?

**A.**    Almost all of it -- almost -- a lot of it rely on the evidence and it's consistent with the Furlong report, and that's why I developed that cost matrix based on that.  There's a certain part that need to do -- you know, go through the final inspection.

**Q.**    Right.  Did you also in your cost estimate account for items that were in the Shayan Amin report, the civil engineer?

**A.**    Yes, yes, sir.  Again, when I developed this estimate, I took -- I took a lot of things into consideration, including the construction engineering report, and I allocate budget for the stuff that's not even in there, like the garage lintel, the modifications of all the stuff in the exterior, so I did allow that in the budget.

**Q.**    Okay.  And your punch list, it was derived from the original Furlong report, correct?

**A.**    Yes, sir.

**Q.**    And it had -- you used page numbers to reference the Furlong -- the original Furlong report, didn't you?

**A.**    Yes, sir.

**Q.**    After reviewing the November 17th, 2020 report, the later report by Matthew Furlong, did you feel it necessary to update your punch list?

**A.**    No, and that's why I did not update the punch list,

because the 221 report -- 221-page report basically focused on the original report with further explanations of -- photographic evidence and showing more detail.

Q.   Mr. Nguyen, so then moving on to the costs, how did you come up with the actual cost estimate for each particular category like electrical?

A.   Yeah.  Again, the Furlong report and my collected evidence -- many, many item was very repetitive in nature, so that's why I grouped them together in disciplines.  MEP, which is mechanical electrical and plumbing, those are really trades that come to the final stage of construction, and then some, there are some in exteriors that has some deficiency that I allow for a budget in the engineer's comments and the accessory structure, which is the garage.

Basically, for those kind of work, the first focus is what kind -- as an engineer and the builder, what kind of estimate protocol or guideline that you would use.  I defined and I use labor and man-hours, estimate method, very similar to exactly -- exact estimate guidelines that are used for restoration projects.

So I allowed specialist electrician, HVAC specialist, special trimming guy, painting and general good labor to finish these items.

Q.   How did you come up with the labor rate?

A.   The labor rate is based on my construction experience in

this area.  For example, I allow $160,000 for plumbing salary, basically $85 an hour.  The trim guys, for example, special trim guy, I pay him a hundred thousand a year, that's $50 an hour. And for an electrical -- electrician, I allow $150,000 a year, which is $65 an hour.  Labor and painter, $50 an hour.

Q.    Okay.  And then how did you come up with the number of hours that would be needed for each task?

A.    Based on the number of items.  For example, if you have a receptacle and you read the electrical section and how much, basically it's just -- is it two weeks, is it three weeks, so I usually, anywhere between half a week to two or three weeks, and I add them up.

Q.    And did you account for material costs as a part of the work?

A.    Yes.

Q.    Okay.  Did you prepare -- you know, did you do all this in your head, or is it reflected --

A.    Oh, no, sir.  Every job that we do, we have to do cost analysis.  I mean, basically just pencil and try to think how many hours and laborers and pencils for us and then put in the Excel a format to come up with the actual cost for an error-free calculations.

Q.    What is your opinion of the total cost to finish the work at 6122 Lee Highway?

A.    Based on the collect evidence and the lists of items in

the Falcon report, I came up with $108,000 for subtotal cost and I allowed 25 percent for other stuff, including overhead and profit, and come up to $137,000.

Q.    So, we're going to show you your cost estimate that is toward the end of the report, Exhibit 145.

A.    135,000, yes, sir.

Q.    Could you -- after looking at this document, does this refresh your recollection as to the total cost of the work that you -- what needs to be done at 6122 Lee Highway?

A.    Yes, sir.

Q.    And what is that amount?

A.    The total is $135,125.

Q.    All right.  Thank you.  We're going to go back to the beginning of this.

MR. COUGHLIN:  And, Your Honor, before I forget, I would like to move into evidence the cost estimate.  This is at the end of the -- at the end of Exhibit 145.  They're unnumbered.  It's titled "Punch List (Real Estate Closing) Mitigation Cost Matrix."

THE COURT:  The five pages that follow it.  Is there any objection to those?

MR. LYNCH:  No objection, Your Honor.

THE COURT:  All right.  And if you all decide that you want the experts' reports to go in to the record, no objection if you all agree to it.  You know, they've been used, they've been pretty much -- the testimony has reflected what's in the reports

themselves, and so you can talk about that after today, okay?

MR. COUGHLIN:  Okay.

BY MR. COUGHLIN:

Q.    So what is shown on the first page, and if you could just walk the Court through how to interpret this document.

A.    Yes, sir.  Again, the item number on this page reflects, again, my collective evidence and also I read the Falcon report, and, you know, there are many of them repetitive so I won't -- I don't want to repeat every item there is, but on this particular section we have 27 items, and --

Q.    And what trade is this for?

A.    Pardon me?

Q.    What trade is this work for?

A.    This is electrical.  "Section I:  Electrical Comments and Repairs."

Q.    All right.  Could we turn to Defendant's Exhibit -- I'm sorry, Plaintiffs' Exhibit 58.  That will be page 28 in the lower right-hand corner.

So, could you please -- are you familiar with the document on your screen?

A.    Yes, sir.

Q.    This is Exhibit 58.  This is the Falcon report dated November 17, 2020.

A.    Yes.

Q.    Page 28.  Do you see the picture on the right-hand side,

upper right-hand side?

A.    Yes, sir.

Q.    Was this an item that you accounted for in your report as an example?

A.    Yes.

Q.    And what would be necessary in order to remedy this condition?

A.    Those -- it's a kickplate, and the picture doesn't show if the kickplate is there or not.  It's not very clear.  But if it's there, then --

Q.    Take your time.  Do you need to review the document first?

A.    The upper right-hand side.  Also they talk about a cover plate.  Sorry about that.  So "missing and required cover plate," and there's also "missing cover plates in the second-floor children's room, shown below."

      So I'm reading all the comments from three pictures that they're talking basically cover plates.

Q.    So seeing the pictures, are these things that you took into account in your cost estimate?

A.    Yes, sir.

Q.    Okay.  And so using any of these pictures as an example, what would you -- what would be necessary in order to remedy this condition?

A.    Well, they say the issue and the problem is that there's

no -- there's no missing plate [sic], and you'd buy a cover plate and put them -- and cover them.

Q.     Okay.

A.     Just labor and material.

Q.     Okay.  Let's move on to page 65.

       Take a moment to review this page.

A.     So --

Q.     Let me ask a question first.  Are you through reviewing the page?

A.     Yes, sir.

Q.     What is the item that's identified in this -- on this page?

A.     It say that the "water supply pipes for the master shower are missing protection against physical damage."  So...

Q.     And is this something that you took into account in your cost estimate as an example?

A.     Yes.

Q.     Moving on to page -- well, let's pause that.

       What would be necessary in order to remedy this condition?

A.     You just have to -- it's missing a protection and you have to put a kickplate to -- to prevent -- So again, labor and material.

Q.     Moving on to page 127.  Take your time and review this page, please.

A.      There, "The exhaust fan for the new bathroom above the garage terminates within 3 feet of this operable window. Additionally, the termination is missing the required protection."

I agree with that.  And what needs to be done is that needs to be -- go out and go up with a elbow.

Q.      Could you describe that a little further, what would -- what someone would install in order to remedy this condition?

A.      They need to extend the pipe further and go up to the roof.  It doesn't look very good, but it has to meet code, and that involves labor and material costs, and -- and, you know, I allow plenty of plumbing for this and HVAC people and pay them well, so I think the estimate that I provide covered these kind of items.

Q.      Okay.  Moving on to page 155, and this will be the last reference to the Furlong report.  Could you please look at page 155.

A.      Yeah.  This is a door -- this is unacceptable hardware installations, and I agree with that, and I allow a carpenter and special trimming guy to take care, mitigate this thing, and again, hourly wage is very generous in my estimate.

Q.      Okay.

MR. COUGHLIN:  Could we turn back to Mr. Nguyen's spreadsheet?

BY MR. COUGHLIN:

Q.    So moving on to "Plumbing and Gas," is this a page where you included a cost for the missing plate for the water supply line?

A.    Yes, sir.

Q.    Moving on to page -- the next page.  Is this page where you accounted for relocating the exhaust for the bathroom?

A.    Yes.

Q.    And then moving on to the next page, is this page where you accounted for repairing the door trim?

A.    Yeah, "Carpentry and Trim," yes, sir.

Q.    Okay.  And turning to the next page, where would one find an accounting for items like correcting the stair riser, replacing the collar tie or, if needed, to rebuild the deck?

A.    Yeah.  Recognizing these item is not even in the Falcon report, I make sure we have enough budget for that based on my collective evidence and allow these things the amount of lump sum cost to be in there.

Q.    And which line item, if you could just -- and the total cost that's accounted for?

A.    These items I cost -- in Section V, it doesn't have a number because there's no reference in the Falcon report, there's no page.  It's from my collective evidence.

Q.    What was the total amount you included for all of those items and others?

A.    4,000, 7,200, add 15,000, 6,000, 6,200, 2,600 and 28,000.

It doesn't have a sub item for that.

Q.    Okay.  There's some miscellaneous items that you accounted for that weren't included in the --

A.    Yes, sir.

Q.    -- Falcon report?

A.    Yes, sir.

Q.    And those are found at the end of your report?

A.    Yes, sir.

Q.    Okay.  What was the subtotal of all of the labor and material costs?

A.    $108,100.

Q.    And did you include any allowance for supervision?

A.    Yes, sir.

Q.    And what rate did you use for that?

A.    I believe I used 5 percent for supervision.  I don't have the next page, not exact, but the total is -- yeah, 5 percent for supervision; 10 percent for overhead and profit, and then admin, 3 percent, and general condition, 7 percent.

These are tough to gauge because, again, the contract -- the project is almost finished.  It's little unfinished items and a lot of punch list items, so I know in my head when I analyze a cost it would be 25 percent for everything.

And the distribution here might not be correct.  I can shift.  For example, contract overhead and profit, I can call that 20 percent and then reduce the other general condition,

because the general conditions already almost complete.  You don't need that budget anymore, so you can shift it to overhead profit.

Q.    Okay.  What is the approximate time it would take to -- once you're able to mobilize your workers from start to finish to run through the --

A.    Yeah, it depends on the available subcontract.  The way I look it, you can finish this thing in three to four weeks.

Q.    Did you review -- I think you testified earlier, you have reviewed Matthew Bowe's report and his estimate?

A.    Yes, sir.

Q.    Do you have any opinions related to Mr. Bowe's cost estimate to finish the work?

A.    Yes, sir.  I did dissect that estimate to be finished. In my opinion, Mr. Bowe, he used American Institute of Architects format, and from -- in my opinion for every project, the estimate guideline methodology needs to be defined first, because you -- if you use the wrong one, the number could be out of whack, and or what can happen, you can ruin proportion.

So he used the -- in my opinion, Mr. Bowe used that format; therefore, the cost is way high because basically you start a project from the begin [sic].

For example, if you use division site cost, site costs mean that you -- that's a side development cost.  It does not apply for this project, for example.

So I -- in fairness, I just look at it, I dissect, and I say reasonable, and I render my opinion in the addendum, and I say I couldn't -- I couldn't support that.

Q.    When would one use the American Institute of Architects, or AIA, estimating format?

A.    Usually for new projects.

Q.    And do you believe Mr. Bowe's estimate is a replacement contractor estimate for this particular job?

A.    Yes, similar, very similar.  That means that when the building plan was done and they give to the contractor, that's how he estimates.

Q.    What I'm saying is, is it an appropriate replacement contractor estimate for this job?

A.    In my opinion, no.  That's why I use labor costs for my estimate.

Q.    Okay.

       MR. COUGHLIN:  Could we go to Plaintiffs' Exhibit 902?

BY MR. COUGHLIN:

Q.    I'm going to pull up Mr. Bowe's estimate and have you review some of the divisions that will need to be expanded.

A.    Yeah.

Q.    So let's start with "Division 1."  Do you agree or disagree with elements within Division 1, what is Division 1, and what's the --

A.    Yes, sir.  And, again, I said it before, this is for

newly constructed project or when the building plan is finish and you do take off.  And this is even before.  So the cost of general conditions -- Division 1 is $250,000 -- $250,300.  That is a lot, and I don't know how we get to that number.

The general condition alone is 20, almost 21,000.

The project supervision management is 151,000, almost. That's a salary of a person, so this is a new project.  It doesn't -- I couldn't support that.  That's why I rendered my opinion.  It's too much, too high, way too high.

Q.    Can you go to the next page.  You referenced site work earlier.  Is that found in Division 2?

A.    Yes, sir.  Again, this is a typical AIA format, American Institute of Architects.  $73,000 for site work, and usually site work involves you demolish the old house and excavate and build a new foundation, but that has been modified.

And the "Demolition," what he calls $62,000 for demolition, that's interior.  Basically remove all of the drywall, all, one by one, and start from the beginning.

Q.    Did your cost estimate include removing the drywall?

A.    I allowed for some of the drywall and painting work for unfinished items and, you know, unexpected miscellaneous work, yes, I do.

Q.    But do you allow for all of the drywall to be removed?

A.    No, sir.

Q.    Why not?

**A.**      Because there's no evidence to support that.

**Q.**      Why not?  How do we know there's no evidence?

**A.**      The -- the rough-in inspection has been passed by the County, there's a -- concealment has passed by Arlington County, and I don't see the compelling reason to remove these drywall when the inspection has been passed.

**Q.**      I'll move on to Division 6.

What was Division 6 for in Mr. Bowe's report?

**A.**      That's a division of "carpentry," and there's $273,000.

**Q.**      Why would you not --

**A.**      And then he -- well, he allowed 70,000 -- almost $70,000 "Rough Carpentry," mean that he basically demolish the whole house and rebuild it.

**Q.**      Can we move on to Division 7?  Using Division 7 next as an example --

**A.**      Yeah.

**Q.**      -- what is that for?

**A.**      It is basically AIA, "Thermal & Moisture," mostly insulation.  Mr. Bowe came up with $128,800, roughly, and you know, basically he remove and replace all of the roofing.

And then another big item is the "Cedar Lap Siding and Trim," 24,000, that's existing.

So in the EPDM membrane roof, I agreed with him.  I allowed for that, so -- to be redone.  But the $128,800 for thermal and moisture, I couldn't -- I couldn't justify, and

that's why I render my opinion -- and I apologize for use strong language, but I used the word "excessive."  It was.

And the more I go through this, in each item, I couldn't agree with that.

Q.    Do you account for replacing the roof on the main house, the entire roof?

A.    I allow the -- the EPDM members in the back of the home.

Q.    What about the remainder of the house?

A.    No, I did not allow for that.

Q.    Why not?

A.    Because there's no evidence to support that, to remove and replace.

Q.    Moving on to Division 9, what is Division 9 in Mr. Bowe's report, and do you agree or disagree with it?

A.    Yeah, this is -- Division 9 is typical finish, drywall and all that.  $206,800, which all of the drywall of 38,000, and then interior painting, almost 50,000, and then tile installation, $88,000.

Again, when I come to these, every item of Mr. Bowe's report, I couldn't agree because the evidence doesn't support it.  If the evidence doesn't support it, I'm struggling with my conscience to support it, so that's why I wrote what I wrote, sir.

Q.    If we could move to Division 10.  What is Division 10 in Mr. Bowe's report?  And do you agree or disagree with it?

**A.**    Division 10 is "Specialties," and he allowed 83,000, and appliances, he allowed almost $78,000 for.

The appliances were there at the time of the inspection. I documented in my report, 122 pages, and it shows appliances. I don't know why you need to remove or dispose of the new appliances and buy new one.  That is the reason why I wrote what I wrote.

**Q.**    If we can move to Division 15.  So, Division 15 is "Plumbing HVAC Mechanical."

**A.**    Yeah.

**Q.**    Do you believe that all the plumbing, HVAC, mechanical in the property needs to be removed can replaced?

**A.**    $168,000 almost.  Basically he removed and replaced everything, plumbing, HVAC, mechanical.  That's what it entails.

**Q.**    Do you agree or disagree with --

**A.**    Again, sir, I --

**Q.**    -- all of those -- let me finish my question.

**A.**    Yeah.

**Q.**    Do you agree or disagree with having all of those items removed from the house?

**A.**    Again, sir, I come to every item and I couldn't agree because there's no evidence to support that.  That's why I wrote what I wrote.

**Q.**    All right.  And then Division 16.  It's on this page already.  Division 16 is for "Electrical."  What's your

understanding of what he's proposing you do in the house as far as electrical?

A.    Mr. Bowe, he allowed almost $42,300 almost for that, and the main house, he basically put lump sum and demolished everything in, $39,000.

Q.    Do you agree or disagree whether the electrical needs to be removed from the house?

A.    Again, sir, the evidence and the critical path of Arlington County approval, I couldn't agree.  That's why I wrote what I wrote.

Q.    Okay.  Going to the end --

MR. COUGHLIN:  Oh, I'm sorry, go back up.

BY MR. COUGHLIN:

Q.    Do you know what he included in terms of his profit and markup?  And if you --

A.    I don't --

Q.    -- and we need to give you a calculator, we can.

A.    I don't see -- I don't see an item of overhead and profit on this page.  Is that on the first page somewhere or the bottom page?

Q.    Do you see a column that isn't attributed to anything, doesn't have --

A.    It --

Q.    -- it doesn't have a label associated with it?

A.    I don't see it, sir, and I don't remember that I see

it -- that I saw it when I reviewed this.

Basically, just "Unit Cost" and "Selection Total Price" and then "Category Total Price."

Q.    If you can't find it, that's fine.

Going back to the general conditions, do those costs generally relate to the scope of the project?

A.    For the new -- mostly for the new home, yes, you include those items in there.

Q.    And are they -- is the overall cost dependent somewhat on how much work you're doing?

A.    Yes.

Q.    So if you're doing less work, the general conditions costs come down?

A.    Absolutely, proportionately, yes.

Q.    So his overall estimate exceeds $1,200,000.  You already said that's excessive.  Is that your opinion, that that's excessive?

A.    Yes.

Q.    Let's go back to 5000-A.  Do you see in 5000-A a line item for "Beam at Kitchen"?

A.    Yes, sir.

Q.    What's your understanding of what needs to be done as it relates to that beam?

A.    My understanding was that beam was calculated and approved by a license engineer.  All it needs is a final

inspection from the County.

Q.    And then -- so do you believe that any of the items that have been identified in the main house need to be addressed are outstanding still because of a missing County rough-in or concealment inspection?

A.    My understanding was that all of the rough-in inspection has been passed for the main house, MEP, which is mechanical, electrical, and plumbing.  And the concealment also has passed by the County, but again, because it's extraordinary number of revisions and permits that come to site, it's basically just like an evolutions of these things, and I understand more and more and more and more, but my understanding now is the rough inspections for MEP, mechanical, electrical, plumbing, has been approved by the County, and the concealment -- the concealment which has been approved by the County.

Q.    In your opinion are there any -- in your opinion, based on the inspection report and your report, is the main house safe to occupy?

        MR. LYNCH:  Objection.  Objection, Your Honor.  He --

        THE COURT:  Objection -- foundation?  What's the objection?

        MR. LYNCH:  My objection is foundation.  He was not disclosed on structural integrity of the building.  I asked him at deposition, "Are you offering an independent opinion on the lintel or the beam?"

"No, I'm just looking at this letter from Mr. Fulambarkar," and now he's offering an opinion on what he did and --

THE COURT: Yeah. What's your response, Mr. Coughlin?

MR. COUGHLIN: The question was: Is it safe to occupy? He testified that he has extensive experience in the building code because he's an engineer. So I'm not asking him on specific items and to give a structural opinion on --

THE COURT: Doesn't that incorporate all of what you said, you've raised, before he can give that kind of opinion that hasn't been identified in his report?

MR. COUGHLIN: Well, I think he has in his report identified and agreed or disagreed with, you know, a whole host of items in the Mr. Furlong report, and the Mr. Furlong report relates to the building code, which relates to safety. So...

THE COURT: I'm going to sustain the objection. Ask your next question.

MR. COUGHLIN: I have no other question for Mr. Nguyen.

THE COURT: All right. Thank you.

                   CROSS-EXAMINATION OF KIET NGUYEN

BY MR. LYNCH:

Q.    Good afternoon, Mr. Nguyen.

A.    Good afternoon.

Q.    So you've never worked for a construction company, correct?

*1295*

**A.**    Correct.

**Q.**    In your cost matrix, you only --

**A.**    Sir, may I?  NTK Development is a design/build.  It is classified as a construction Company.  It's Class A, yes.

**Q.**    In that construction company you don't do work for third parties, you do work on your own properties, correct?

**A.**    We develop plans -- and I want to correct that.  We develop plans and set up the budget, which is estimate, for various projects.

**Q.**    Okay.

**A.**    Thank you.

**Q.**    So -- thank you.  In your cost matrix, you only priced items in Mr. Furlong's report, correct?

**A.**    And based on the evidence that I collected, the sum -- the end item in blue color are not in the Furlong report.  That came from my own.

**Q.**    And so what are those items that are not -- would you say collar ties?  Is that one of them?

**A.**    Yes, I -- I don't have it in front of me, so...

**Q.**    Let's get it front of you.  Do you have your report in front of you?

**A.**    No, sir.

**Q.**    Do you have a hard copy?

**A.**    No, sir, not here.

**Q.**    All right.  Well, let's change that.

A.    Okay.

Q.    All right.  So tell me what items you have in your cost matrix for items that are not in the Furlong report?

A.    Okay, sir.  "Correct stair riser, collar tie, missing unit, rebuild deck, reinstallation of pergola, removal and reinstallation of cabinet, mirror, knobs, hardware, cedar trim, and siding, remove existing window flashing approximately 600 square foot."

I have that items in there.  I have, "Masonry: Gable End, Garage Lintel, Pavers, Front Porch, CMU under roof," 15,000.

I have, "Concrete item:  Resurface garage slab, the pergola footing, cut and flash exterior wall."

I also have, "Roof Repair:  New EDPM and cricket, metal roof flashing and finish slate."

And then, "Metal roof flashing" --

Q.    Can I interrupt you for a second, Mr. Nguyen?

A.    Yes, sir.

Q.    The question is items that are not in the Furlong report but that are in your number.  I think the roof and the flashing, things like that are in Furlong, right?

A.    They overlap, but they don't have specific page number and all that, so if you -- you can see if there's no page numbers in there, it means that it's -- the overlap, and it's based on the evidence I've collected.

Q.    All right.

*1297*

A.      Thank you, sir.

Q.      But you did not include items like missing materials from the contract?  For example, if the contract had something like a subzero refrigerator, you don't have a subzero refrigerator in this, right?

A.      I did not look at that.  I know that the appliances were there at the time of the inspection.  The special type, and stuff, I didn't look into that, Mr. Lynch.

Q.      And so another item from the contract, let's say, marble tile in the owner alleys suite, that's not in here, right?

A.      Again, I don't have the change order or revisions and details, so I cannot testify on those items.

Q.      Did you make any effort to look at the items in the contract, the specific material upgrades, and price them if they weren't at the property?

A.      Sir, I did not review the real estate contract in detail, sir.  I did not do that.

Q.      Okay.

A.      And that was not the scope of work.

Q.      Okay.  And all of the items in your cost matrix require repair.  You would agree with that, right?

A.      Yes, sir.

Q.      Okay.

A.      That's why I call it mitigation.

Q.      All right.  And that includes the lintel, the garage

lintel, right?

A.     Yes.

Q.     Okay.  And that includes putting in collar ties in the carriage house roof, correct?

A.     Yes.

Q.     Okay.  And that includes replacing in this line here, "Ceramic" for 28,000, "Remove and replace" 1600 square feet of tile?

A.     Yes.

Q.     Okay.  And then your tile number, you're pricing that at $18 per square foot for ceramic tile, right?

A.     Yes, sir.

Q.     Okay.  Are you aware that there was tile in this building that runs $150 a square foot plus?

A.     I'm not aware of that.  I don't have, again, the real estate contract, but based on my collect evidence of the ties that really replace in kind, Mr. Lynch, $18 I think -- based on the evidence that I collected, is very, very good number.

Q.     Right.

A.     Yeah.  So again, I have not reviewed a real estate contract.

Q.     All right.  Marble tile is more expensive than ceramic tile, right?

A.     Yes, sir.

Q.     You did not get any labor or material quotes in

determining what amounts to include on the mitigation cost matrix, right?

A.    Pardon me?

Q.    Labor and material quotes, like, you know, if you have plumbing on here, did you ever -- did you go to a plumber and say, "Here's, you know, what work I think needs to be done.  Can you tell me a number?"

Did you get a quote from a third-party plumber, a third party --

A.    No.

Q.    Okay.

A.    No, no, sir, I have not done that, but I went in length about the methodology of cost estimating for this particular --

Q.    Right.

A.    Yeah.

Q.    So this cost matrix, when we discussed it at your deposition -- so let's take tan example, and let's start with plumbing -- or I'm sorry, electrical.  That's the very first one on your matrix, $7100.

A.    Yes, sir.

Q.    Now, the breakdown to get to 7100, I see there are items of work, but in terms of how much each of those items costs -- in other words, item 3, "Disconnect from circuit," item 5, "Install flush mount" --

A.    Yes, sir.

Q.    -- the breakdown for those numbers, that only exists in your own mind, right?

A.    Sir, I remember when we -- we talked with ajada {ph} on Zoom, and I remember we talked.  And when I talked with you, there is, as I mentioned, when I do -- come up with this number, there's a cost analysis to that.  I don't have it in front of me, but I did talk with you through our conversations, and I think it reflects in the record of how I come up with that number.

Q.    Okay.

MR. COUGHLIN:  Let's call up Mr. Nguyen's deposition transcript, please.  And then go to page 1 -- I'm sorry, I lost it here -- 103.  And then to line 2.

BY MR. COUGHLIN:

Q.    So, can you see that, Mr. Nguyen?

A.    Yes, sir.

Q.    Okay.  So it says on line 2, "Again, the breakdown of these numbers is not written down anywhere, it's just in your head, correct?"

And then you say, "Yes."

Do you see that?

A.    Yes, I did say that during deposition.  What I meant by that is that when you do it too many -- many, many estimates, the end dies out for a restoration project, but it is in your head.

Q.    Okay.

A.    But when you come up with the number, methodology, sir, is basically multiplications and summations, and then round up.

So I apologize if I -- if I told you the word "yes," but the word "yes" means that really in my head is like I know how much the electrician that I pay, the plumber how much I pay, the trimming guy, the carpenter, the laborer, it's all in my head.

Q.    Okay.

A.    Per hour.

Q.    All right.

A.    Thank you, sir.

Q.    So at the time you didn't even write down the breakdown of how much for each of these items.  I see you write down what you have to do, but you didn't write down how many labor hours, you didn't write down how much for materials, right?

A.    Sir, I have a cost analysis back in my office.

Q.    Okay, so let's look --

A.    But you didn't ask for it.  If you did, I would give it to you.

MR. COUGHLIN:  Okay.  So let's look at page 69 of Mr. Nguyen's deposition transcript and go to line 20.

BY MR. COUGHLIN:

Q.    Okay.  The question there says, "Do you have any of this written down, or are you just going from memory to provide me how many labor hours and labor rates or did you write this down

somewhere?"

A.     Sir, I had the cost analysis.

Q.     One moment.  We'll see your answer --

A.     Yeah, yeah.

Q.     -- and then you can explain it.

And then on page 70, it says, "I didn't write it down, did not -- didn't.  Mr. Lynch, this is like to me really many, many small items, but it needs to be done, it needs to be done right."

So do you see that?

A.     Yes.

Q.     All right.  Let's test your memory.  So, you had mechanical.  There's a number in your matrix for $11,000 for HVAC.  That's Section {indiscernible}.  And how many labor hours make up that number?

A.     This one is based on a tonnage, so if you replace the system, and if you call -- right -- and if you sort of shop around for the special HVAC to replace the HVAC system, it ranges between 6,000 to $12,000.  It depends on the tonnage.

Q.     Right.

A.     So -- so this is not labor material cost; this is based on the unit.

Q.     So at your deposition you were -- you had -- you said that this number was based on a certain number of labor hours.  Are you saying now that it wasn't?  And I'm looking at

"Mechanical," $11,000.

A.    Sir, there's two sections in mechanical.

Q.    Okay.

A.    Section {indiscernible} is based on the item.  Those are small items that need to be corrected, okay.  And the cost of mechanical, ductwork installation and the HVAC installation, they are separate.

Again, because of the nature of the items that is presented at the job, it's very, very tough to pick out what kind of estimate you use.  Some of the items -- most of them are labor and material, but for HVAC unit, you basically have to do lump sum.

Q.    Okay.

A.    So --

Q.    So you're saying that at deposition you never tried to ballpark a number for labor hours for this item?

A.    Sir, I have cost analysis.  I'm trying to explain to you.  For example, in Section II -- Section {indiscernible} of "Mechanical Ductwork," and then there's a specific items for the HVAC system, so -- not every -- not every item are labor and materials.  Not -- not all --

Q.    I'm talking about Section {indiscernible}, $11,000.

A.    Yes.

Q.    Did you assume any labor?  Did you come up with the number of labor hours to get to $11,000?

A.     Yes, sir.

Q.     How many hours?

A.     I don't have it in front of me, but there is a cost analysis to that.

Q.     Yeah.  You --

A.     And if you ask, I would have provided it to you.  So when we talk with each other, Mr. Lynch, you go through every item, per item, and you test me, what -- "Mr. Nguyen, what do you think the labor is involved here," and basically --

Q.     I remember that.  You were doing math -- you were doing math, sitting there while we were on Zoom, is what I recall.

All right.  Let's go to the next item.  So your number has no money for correcting any work in concealed spaces, right?

A.     Pardon me?

Q.     Your number of 135 grand and change has no money in it for correcting work in concealed spaces, or is that an overstatement?

A.     I did not look in the wall cavity, so I did not allow a budget for the -- "concealment" mean that the -- the wall cavity, you mean, right?

Q.     Yes.  Concealed --

A.     No, I did not allow for that.

Q.     Okay.  In deposition I believe you said you have no idea whether the work behind the walls is defective or not, correct?

A.     That's correct.  I still -- if you need it, I have to do

further investigation, and I stand firm on the evidence that I collect.

Q.   All right.  Your cost to repair number assumes there have been satisfactory closing inspections in all parts of the project, correct?

A.   Based on the approval process from the County and the permits that they obtained in the inspection, yes.  As I mentioned before, the rough-in inspections, Mr. Lynch, has been passed.  Concealment has been passed.  So yes, based on those facts.

Q.   All right.  And you said at deposition, "You must be crazy to close up walls if you don't have permission from the County to do that," correct?

A.   That is a true statement, and I said that, yes.

Q.   Okay.  There's been a book of photographs used in this trial.  Is that -- have you heard about that at all?

A.   What photographs, sir?

Q.   The in-progress photos, have you heard of that at all?  Let's take a look.  Let's see if you have seen that.

Take a look at tab 5 of this book and see -- I just generally want to know if you've seen --

A.   Which page is that, Mr. Lynch?

Q.   Tab 5.

A.   Tab 5.  Okay.

Q.   And the first two pages of tab 5 are Instagram photos.

You may have seen those.  Have you seen those or not?

**A.**     No, I took -- you know, I have 122 photographs so I took some elevations of the home.  And this looks familiar, but not from -- not from my source.

**Q.**     Okay.  So, anyway, just quickly -- you know, quickly, what is in here are some progress photos that are attached to dated e-mails.  Does that ring a bell as something you've ever seen or no?

**A.**     No.

**Q.**     All right.  Thank you.  Your total number includes no design costs, correct?

**A.**     Correct.

**Q.**     And you did not like some of the things you saw on the roof during your roof inspection, correct?

**A.**     I couldn't hear you well, Mr. Lynch.  I'm sorry.

**Q.**     I'm sorry.  You didn't -- strike the question.

**A.**     Okay.

**Q.**     You have no money in your 135,000 for correcting the kitchen beam, correct?

**A.**     Correct.

**Q.**     Okay.  And it costs more to do work with licensed companies than unlicensed companies, correct?

**A.**     General, yes.

**Q.**     And you can depend on a licensed contractor being qualified, but you can't depend on an unlicensed contractor

being qualified, correct?

A.     Yes.

     MR. LYNCH:  No further questions.

     THE COURT:  Redirect?

     MR. COUGHLIN:  A couple quick questions.

              REDIRECT EXAMINATION OF KIET NGUYEN

BY MR. COUGHLIN:

     Mr. Nguyen, when you were preparing your cost estimate and you were --

     MR. COUGHLIN:  And if you could pull up Exhibit 145.

BY MR. COUGHLIN:

Q.     -- you were arriving at the total number, were you engaged in guesswork?

A.     No, sir.  Again, the methodology is labor, material, and based on the quantity, which is listed in the Furlong report.  I wish I can bring the cost analysis to you and show Mr. Lynch and both you today.  That's not -- you cannot do an estimate, come up with a number, without knowing that the -- how many hours it takes, a week or two or half a week, and the worker that's involved, licensed electricians and helper and how much they pay for it, and the reason I say to Mr. Lynch in the back of my head does not mean I pulled it out from my hat because I don't assume any time and I know how much I pay people.  It's become very second nature to me.

     But how can you give Mr. Lynch a cost with a calculator

when I talk with him?  I think we have misunderstanding.  If I told him something that he misunderstood, I apologize, but I do have cost analysis for that.  That's why I come up with the cost.  That's why I call it a matrix.

Q.     So for each one of these categories, did you come up with a total number of hours before coming up with the total costs?

A.     Absolutely.

Q.     And did you come up with, based on your experience, a labor rate before coming up with the total cost?

A.     Yes, sir, and then knowing the quantity, based on the Falcon report and my collected evidence.

Q.     Okay.  Do you believe that your cost estimate is a reliable estimate of the costs to finish the project at 6122 Lee Highway?

A.     Yes, sir, I stand firm on my report based on the collected evidence and my understanding of the facts, always.

        MR. COUGHLIN:  No further questions, Your Honor.

        THE COURT:  All right.

        MR. COUGHLIN:  The defense rests.

        THE COURT:  Okay.  Mr. Nguyen, thank you for your testimony, sir.  You're excused at this time.

        THE WITNESS:  You're welcome, Your Honor.

        THE COURT:  And have a good day.

        THE WITNESS:  Thank you.  You, too.

        THE COURT:  Mr. Lynch, do you have a rebuttal case that

you --

MR. LYNCH:  Yeah.  So, a comment about that, Your Honor.  Michael Young, he's the Marble Systems witness.

THE COURT:  He's the what?

MR. LYNCH:  The Marble Systems, he's the witness from the tile place.

THE COURT:  Right.

MR. LYNCH:  I had subpoenaed him to come on Friday.  That was the return date.  Over the weekend, I tried to reach out to him, and yesterday, and I have not heard back.  And, you know, I informed him he wasn't being called, but it seems he's been a little non-responsive since the subpoena return date has passed.

THE COURT:  Yeah.

MR. LYNCH:  So I would like to bring him in, but I think that I will need some time to arrange that, and I think he will be -- very short.

THE COURT:  Okay.  And we have one other witness who's on vacation and we reached out, and do we know whether he's available.

MR. LYNCH:  So Mr. Fulambarkar, that's the engineer of record.  We don't need to call him.

MR. COUGHLIN:  No, we weren't planning on calling him, Your Honor.

THE COURT:  So is that witness would be excused?

MR. LYNCH:  Yes, sir.

THE COURT:  And you did subpoena the marble employee?

MR. LYNCH:  Yes, sir.

THE COURT:  And did he appear on -- oh, he was --

MR. LYNCH:  His return date was Friday.  He was scheduled to come at the end of the day on Friday, and I let him know that Friday was off, and since then I haven't been able to get in touch with him.

THE COURT:  And you've tried to get in touch with him and he hasn't responded?

MR. LYNCH:  Correct, by e-mail.

THE COURT:  All right.  Well, I'll give you the opportunity to bring him in and testify in light of the fact that he was subpoenaed.  And I'm the one that caused the change in the trial schedule, so I think that I'm responsible for that one.  So let's get in touch with him.  Would that be your only witness in rebuttal?

MR. LYNCH:  I believe so.  And honestly, before I walked up to this podium, I had one question about whether we were calling Ms. Harrell, and I think that the answer to that question is no.  So --

THE COURT:  Do you want to --

MR. LYNCH:  Could we --

THE COURT:  Okay.  Do you want to take a short break and discuss that?

MR. LYNCH:  Yes, please.

THE COURT:  Yeah, okay.  Let's take ten minutes and we'll come back and go from there.

MR. LYNCH:  Thank you.

THE COURT:  All right.  We're in recess.

(Thereupon, a recess in the proceedings occurred from 12:49 p.m. until 1:02 p.m.

MR. LYNCH:  Thank you.  Your Honor, we're going to have some very brief testimony from Mrs. Harrell.  I would also like to admit Exhibit 542.

MR. COUGHLIN:  No objection, Your Honor.

THE COURT:  All right.  It's received.  All right.

(Plaintiffs' Exhibit 542 admitted into the record.)

THE COURT:  Please, come forward to the witness stand. You've been previously sworn.

<u>REBUTTAL EXAMINATION OF DAWN HARRELL</u>

<u>BY MR. LYNCH</u>:

**Q.**    Good afternoon.

MR. LYNCH:  Let's pull up Exhibit 748, please.

While he's pulling that up, Your Honor, on Mr. Young, if he goes in person, may the Harrells be excused from attending for that witness?

THE COURT:  Yes, absolutely, yes.

BY MR. LYNCH:

**Q.**    What is Exhibit 748, Ms. Harrell?

**A.**    This is the tile that I selected for my son's bathroom.

**Q.**    Okay.  Let's --

MR. LYNCH:  And can we Zoom in?

BY MR. LYNCH:

**Q.**    Is there a specific number you want to see on this page?

**A.**    There's a SKU number, which I believe is the item number.

**Q.**    There we go.  We can see it now.  So, NW90740, right?

**A.**    Correct.

**Q.**    Okay.

MR. LYNCH:  So, let's look at Exhibit 736, please.  And the last page of that exhibit, Mr. Fitzhugh.

BY MR. LYNCH:

**Q.**    Does the SKU number for the gold and black one match the SKU number on this invoice?

**A.**    Yes, it does.

**Q.**    Okay.

MR. LYNCH:  Last exhibit is Trial Exhibit 500.  Okay.  And go to page 106, please.  And scroll -- and this is 106, right?  Scroll until you see a date.  You don't -- right there.

BY MR. LYNCH:

**Q.**    Okay.  What's the date there?

**A.**    6-26-2019.

**Q.**    Okay.  Let's go to page 109.  And what do you see on this page, Ms. Harrell?

**A.**    This is the tile that was on the invoice in the photograph that's being installed in my son's bathroom.

Q.     Okay.

MR. LYNCH:  So, Your Honor, I'd move to admit Exhibit 748, which was the picture that we saw, and also Exhibit 500, pages 106 to 110.

THE COURT:  Any objection?

MR. COUGHLIN:  No, Your Honor.

THE COURT:  They're received.

(Plaintiffs' Exhibit 748, 500, pages 106 to 110, admitted into the record.)

MR. LYNCH:  No further questions.

THE COURT:  Cross-examination?

MR. COUGHLIN:  No cross-examination, Your Honor.

THE COURT:  Okay.  Then, please, you may resume your seat.

All right.  I don't know when you want to get -- when do you want to try and get this other witness in for his brief testimony?  Until you can locate him and he communicates -- why don't you take the next 24 hours and see what you can do about connecting with him.  And if you do, tell him he was under subpoena and hasn't been excused, and he doesn't want to be in a position where the Court wants to command him to appear through the Marshal Service's assistance.

So, let him know.  And you and Mr. Coughlin can work out a time.  I have some availability later this week.  I've got general availability on the week of the 25th.  As I think I told you, that case has settled, so let's -- that case ended.  So get

in touch with him, find out what his availability is, get in touch with Mr. Coughlin, and call the Court and let's see whether we can get that done in the next -- as soon as we possibly can.

How do you want to brief this?  Have you discussed whether you want simultaneous briefs or whether you want to go first, second, back?  How do you want to do that?

MR. COUGHLIN:  Our preference would be to have simultaneous briefs for opening and then in reply, and then schedule, I was thinking, was we get the transcript, first brief within 30 days of receipt of transcript, and then the reply within 21 days.  Why don't we do 21 and 21.

And, Mr. Wallace, how long will it take to get the transcript, do you think?

THE COURT REPORTER:  Not too long.

THE COURT:  All right.  Then, I'm pushing a little bit, but -- so, I'm sorry, when we say simultaneous briefs, you're each going to file your facts and Conclusions of Law, and then respond.  Okay.  All right.

MR. LYNCH:  Is there page limits on -- set a page limit.

THE COURT:  Yeah, let's set a page limit.  I mean, 30 pages is the standard.  I don't think there should be any need to go beyond that.

MR. COUGHLIN:  Same for both briefs, so 30, 30?

THE COURT:  You know, do you need more than 20 on the response or...

MR. LYNCH:  I would be okay with 20.

MR. COUGHLIN:  30, 20.

THE COURT:  Yeah, let's do 30, 20.

MR. LYNCH:  Just thinking down the road, I guess we're briefing liability but not remedy?

THE COURT:  Yeah, we didn't finish -- well, no.  Yeah, you've got -- you're briefing liability and remedy.  I carved out attorneys' fees because that's just -- that's something that happens if and when I decide attorneys' fees are proper, and all of that can be put in by declarations.  I don't need a hearing on that.  So that's why I carved that portion out, but we're doing both liability and remedy.

MR. LYNCH:  The only reason I raise that is, you know, if, for example, rescission is one of our remedies, there's some nuts and bolts to that potentially.  So --

THE COURT:  If that -- that's a decision that -- we may have to have a subsequent hearing on it to explore that further.  I agree with you on that.

MR. LYNCH:  That's it, Your Honor.

THE COURT:  All right.  Anything else today?

MR. BURCHER:  It's been a pleasure being before you the last several days, Your Honor.

THE COURT:  You've all handled the, you know, little bits of variances in the schedule that I've caused.  I appreciate your working with me over the last week and a half.  We'll get you out

a decision after we get the -- your written pleadings and try and do that pretty quickly so that we're not waiting too much longer.

As I've said in every case, you know, keep talking. You've heard the evidence now.  You can have a better idea about the strengths or weaknesses of your cases, and you're always better resolving the case among yourselves, making business decisions, than letting somebody like myself who's gotten six days' worth of information about a case where you've been living with it for three years, so keep that in mind.  Keep talking.  I know you're communicating and you've handled -- you've communicated well during the course of the trial, so let's keep it up.

I enjoyed having you all in the courtroom.  Safe trip back to Hilton Head, and we'll -- we'll get something to you when -- after you get something to us, and let us know if there's anything that you need, all right?  Thank you.  We're in recess.

(Proceedings adjourned at 1:13 p.m.)

## C E R T I F I C A T E

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace                 8/3/22
----------------------------      ----------------
**Scott L. Wallace, RDR, CRR**              **Date**
**Official Court Reporter**