**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

JOHN HARRELL AND DAWN HARRELL,           )
                                         )
                    *Plaintiffs,*        )
                                         )
         v.                              )         Civil Action No. 1:20-cv-87
                                         )         Hon. Liam O'Grady
DOUGLAS DELUCA,                          )
                                         )
                    *Defendant.*         )
                                         )
                                         )
                                         )

## MEMORANDUM OPINION

### 1. Introduction

The Plaintiffs, John and Dawn Harrell, are married individuals and citizens of the District of Columbia. The Plaintiffs have brought the current civil action against the Defendant, Douglas Deluca, who is a citizen of the Commonwealth of Virginia. The dispute between the Parties originated when the Plaintiffs entered into a contractual agreement with the Defendant to renovate a property (hereinafter "the Property") located in Arlington, Virginia. Pursuant to the agreement the Plaintiffs paid approximately 4.5 million dollars for construction on the Property. In the above captioned civil action, the Plaintiffs allege four counts against the Defendant: 1) fraud in the inducement, 2) constructive fraud, 3) violations of the Virginia Consumer Protection Act, and 4) breach of contract. Both Parties have presented evidence during a bench trial and subsequently filed memorandum detailing their positions and the applicable law. This matter is ripe for disposition.

## 2. Factual Background

The Property is located on a large parcel of land off Lee Highway in Arlington, Virginia. The Property consists a six-bedroom house originally constructed in the 1930's and a separate two-level garage, which is also referred to as a carriage house. The Property was purchased by the Defendant in the fall of 2018. In or around the beginning of 2019, the Plaintiffs decided to relocate to the Northern Virginia area. The Plaintiffs were introduced to the Defendant through Brendan Muha. Muha is a real estate agent who represented both Parties during the sale of the Property (Muha also testified at trial). The Defendant is a general contractor who specializes in renovating residential properties. On April 3, 2019, the Plaintiffs entered into a Sales Contract to purchase the Property from the Defendant.

Over the next several months, the Parties signed multiple addendums to the Sales Contract. The addendums made several changes to the work to be completed on the Property. At trial, the Parties testified that they remained in communication about the status of the construction project. The Parties eventually moved to close on the sale of the Property on July 3, 2019. At closing, the Parties entered into a Post-Closing Construction Agreement (the "PCCA"). Like the addendums to the original sales contract, the PCCA detailed the work that needed to be finished on the Property and outlined new work that the Plaintiffs wished to be completed. The PCCA required that all outstanding construction work was to be completed by August 1st, 2019 and all new construction work was to be completed by August 15, 2019.

The Defendant continued to work on the renovation of the property through the summer of 2019. In the beginning of August of that year, the relationship between the Parties began to sour and then quickly deteriorated completely. Through their testimony, the Plaintiffs assert that they began to have doubts about the Defendant's performance of the contract. For his part, the

Defendant testified that the Plaintiffs continued to make changes to the plans for construction on the Property, failed to provide inputs necessary to complete construction, and began to interfere with the subcontractors who were working at the Property. Undisputed testimony at trial did indicate that the Plaintiffs began to further investigate both the status of the Property as well as the subcontractors, going so far as to falsely accuse one of the subcontractors of being a registered sex offender. The tensions came to a head on August 6, 2019, when John Harrell sent an e-mail to the Defendant telling him to stop work on the property and to remove all construction equipment. The Plaintiffs also indicated that they intended to hire a replacement contractor to complete construction on the Property and that legal action was forthcoming.

Eventually the Defendant was asked to resume work on the property, possibly because the Plaintiffs assessed the difficulty in finding a replacement subcontractor. However, it appears clear from the record that the relationship between the Parties had become irreconcilable and construction on the house was never completed. The Plaintiffs initiated the instant civil action on January 27, 2020. After a contentious discovery process, the Plaintiffs proceeded to a bench trial on July 11, 2022. The Plaintiffs have asked the Court that they be awarded the remedy of rescission or, in the alternative, consequential and actual damages. The Defendant has asserted several affirmative defenses to the claims, among them the defense that the Plaintiffs failed to mitigate damages and the defense that damages are inappropriate based on an application of the prevention doctrine. The Court will now discuss the evidence adduced at trial to appropriately resolve the dispute between the Parties.

### 3. Fraudulent Inducement

The Plaintiffs have identified four statements that they claim indicate that Deluca fraudulently induced them to sign the Final Sales Agreement. These statements are that: 1) all work on the property was appropriately permitted, 2) the roof was an "original slate roof", 3) a deposit had been made for the custom tile for the master bathroom and 4) statements made regarding the square footage of the house. As the Court is sitting in diversity jurisdiction, it will apply Virginia substantive law to the dispute between the Parties. *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013) (citations omitted).

To prove a claim for common law fraud in Virginia, a plaintiff must show the elements of: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) damages resulting from that reliance." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826 (4th Cir. 1999) (applying Virginia law) (citations omitted). Generally, fraud can only be asserted when the circumstance of the fraud indicates "the misrepresentation of present pre-existing facts, and cannot be predicated on unfulfilled promises or statements as to future events." *Id.* (quoting *Lloyd v. Smith*, 150 Va. 132, 145 (Va. 1928)). Virginia also follows the economic loss rule where a claim based on the contractual obligations of a party does not create a civil action based in tort. *See Filak v. George*, 267 Va. 612, 618 (Va. 2004) ("Thus, when a plaintiff alleges and proves nothing more than disappointed economic expectations, the law of contracts, not the law of torts, provides the remedy for such economic losses.")

An exception to this rule is when a Defendant commits a fraudulent act to induce the formation of a contract. *Abi-Najm v. Concord Condominium, LLC*, 280 Va. 350, 362 (Va. 2010) (The Virginia Supreme Court found the economic loss rule did not apply when the Defendant

allegedly had knowledge of a false material fact before a contract was formed) (citing *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 220 Va. 109, 111-112 (Va. 1979)). The Virginia Supreme Court has also held that fraud claims can be brought when the fraud induces the performance of a contract, such as the payment by one party to another. *Devine v. Buki*, 289 Va. 162, 175 (Va. 2015) ("Therefore, unlike fraudulent inducement to contract, where the concealment must necessarily precede the formation of the contract, the concealment at issue in a fraudulent inducement to perform claim may occur either before or after the contract has been entered into.")

For fraud to be found in a breach of contract case, there must be a finding that the defendant "did not intend to perform at the time of contracting." *Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 537 (4th Cir. 1988) (applying Virginia law). The Court therefore must considers whether the Plaintiffs have met their burden by clear and convincing evidence to demonstrate that they have stated a claim for fraudulent inducement to enter the Sales Agreement or to complete performance on their agreement with the Defendant (i.e. offering full payment for the Property). *See Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (Va. 1994) (citations omitted).

The Plaintiffs argue that there is sufficient circumstantial evidence to find that the Defendant never had an intent to perform the contract. *See Flip Mortgage Corp.*, 841 F.2d at 537 ("Circumstantial evidence is not only sufficient, but in most cases of fraud is the only proof that can be adduced.") (quoting *Cook v. Hayden*, 183 Va. 203, 209 (Va. 1944)). The Plaintiffs point to several pieces of evidence and testimony from trial to support their argument. The Plaintiffs argue that the Defendant's extensive construction experience and his purported failure to apply for building permits are indicative of an "intent to mislead." Dkt. 218 at 12. The Plaintiffs also

argue that the affidavit submitted with an insurance application and signed by the Defendant contains a false statement that is indicative of the Defendant's intent to defraud.[1] *Id.* The Plaintiffs also point to statements that they believe are indicative of the Defendant's intent to defraud: 1) that the marble tile had been ordered for the master bathroom and the statement that the roof of the main house was an original slate when it was not. In addition, the Plaintiffs argue that the representations made to them that underestimated the future square footage of the house are indicative of the Defendant's overall fraudulent behavior.

The Court weighs this evidence against the evidence introduced by the Defendant at trial that the Defendant always had the intent to perform his contractual obligations. Throughout his testimony, the Defendant maintained that he wished—even to this day—to complete construction on the house. Dkt. 213 at 67 ("I would like 30 days to go in and fix this job and finish it and make the County happy, make [the Plaintiffs] happy, and move on with my life.") Defendant's testimony is reinforced by the actions he undisputedly took after signing the contract. It is undisputed that the Defendant performed some work on the property, although the Parties and their experts dispute to what degree the work was completed and if the work was undertaken with a reasonable amount of diligence. The Defendant signed a warranty with the PCCA which demonstrates his intent to be legally bound to complete his obligations and address any problems with the construction for up to a year after the closing on the Property. (Plaintiffs' Exhibit 1). Even after the relationship between the Parties broke down, the record unequivocally shows that the Defendant continued to be in contact with local county officials to continue the permitting process. The e-mails introduced as evidence which were sent between the Defendant and

---

[1] The affidavit in question was entered into the record as Plaintiffs' exhibit 8. The affidavit contains a representation that no work was done within 123 days that would result in a right or claim against the property. The Plaintiffs appear to be trying to incorrectly represent that this statement is false by only referring to a partial excerpt of the affirmation. *See* Dkt. 212 at 189-190 (cross-examination of Deluca).

Brendan Muha also demonstrate that Deluca's intent was always to perform his obligations under the contract.

After weighing the evidence presented at trial, the Court finds that the Plaintiffs have not clearly and convincingly demonstrated that the Defendant possessed the requisite intent to find that there was fraud in the inducement. *See JTH Tax, Inc. v. Aime*, 744 Fed. Appx. 787, 794 (4th Cir. 2018) ("Avoiding contractual responsibilities may be lamentable, but it does not a fraud claim make.") An assessment of the evidence shows that the Defendant was incredibly unorganized, did not communicate effectively, and may have possibly cut corners in the building permitting process. However, the Plaintiffs have not met their burden to demonstrate that the Defendant had the intent not to complete performance on the contract or intended to defraud the Plaintiffs. For this reason, the Defendant cannot be found liable for fraudulent inducement.

### 4. Constructive Fraud

The Plaintiffs have advanced a claim for constructive fraud. Unlike claims for fraudulent inducement, claims for constructive fraud may be barred by the application of the economic loss rule. *See Filak*, 267 Va. at 618 ("losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contracts."); *Blair Constr. v. Weatherford*, 253 Va. 343, 348 (Va. 1997) (statements made with the intention not to perform a contract are actionable as actual fraud, but not constructive fraud). Related to the economic loss rule is the source-of-duty rule. This rule prevents the transformation of regular breach of contract claims into fraud claims sounding in tort. *Tingler v. Graystone Homes, Inc.*, 299 Va. 63, 82-83 (Va. 2019) (citing *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446, 458 (Va. 2017)). The source-of-duty rule indicates that "a putative tort can become so

7

inextricably entwined with contractual breaches that only contractual remedies are available." *Id.* at 86. For instance, in *Dunn Constr. Co. v. Cloney* the Virginia Supreme Court held that a contractor's misrepresentations about a construction project were so entwined with the breach of contract claims that the plaintiff was precluded from bringing an action for fraud. 278 Va. 260, 268 (Va. 2009).

Both the economic loss rule and the source-of-duty rule bar the Plaintiffs' claims for constructive fraud. Evidence at trial conclusively shows that all the damages purportedly resulting from the supposed fraud are damages from the Plaintiffs' "disappointed economic expectations" in the result of contractual relationship. *Filak*, 267 Va. at 618. The only common-law duty the Defendant possessed to the Plaintiffs was on account of the Parties' contractual relationship. Further, the misrepresentations attributed to the Defendant are so entwined with the Parties contract that the misrepresentations cannot support a claim for constructive fraud. For these reasons, the Plaintiffs cannot bring a tort claim for constructive fraud in the instant case.

**5. Claims under the Virginia Consumer Protection Act**

The VCPA was enacted to "promote fair and ethical standards of dealings between suppliers and the consuming public." Va. Code §59.1-197. The Parties do not dispute that the VCPA applies to the sale of the Property. The VCPA creates a private right of action against a defendant who makes misrepresentations "related to the provision of goods or services, including using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." *Marcus v. Dennis*, 2022 U.S. Dist. LEXIS 87149 at *23-24 (E.D. Va. May 13, 2022) (quoting Va. Code §59.1-200(A)(14)). Like a claim for common law fraud, for a misrepresentation to be actionable under the VCPA, that allegation

"must be of existing fact, not merely an opinion or an unfulfilled promise or statement to future events." *Id.* at 24 (quoting *Kerlavage v. America's Home Place, Inc.*, 101 Va. Cir. 301, 306 (Va. Cir. Ct. 2019)).

There are several features of the VCPA claims which differentiate those claims from common law fraud claims. The Virginia Supreme Court has recognized that the VCPA creates statutory duties beyond any contractual duties that exist between a consumer and a supplier. *Kaltman v. All Am. Pest Control*, 281 Va. 483, 493 (Va. 2011). A plaintiff who brings a civil action under the Statute must prove their claim by a preponderance of the evidence. *Ballagh v. Fauber Enters.*, 290 Va. 120, 128 (Va. 2015). Also, unlike claims for common law fraud, a plaintiff does not need to demonstrate the defendant's intent to deceive to succeed on a claim brought pursuant to the VCPA. *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (Va. 2014).[2]

In their post-trial memorandum, the Plaintiffs argue that "the evidence introduced at trial regarding Deluca's false misrepresentations and false promises regarding permits, inspections, OS tile, square footage, the roof and promissory construction fraud...establish a violation of the VCPA pursuant to Va. Code §59.1-200(A)(14)." The Court must therefore now consider these representations in relation to the VCPA.

### A. Promissory Construction Fraud

The Virginia criminal code prohibits a person, who receives money from another, to promise to perform construction with fraudulent intent and then to refuse to perform that

---

[2] The Defendants rely on *Padin v. Oyster Point Dodge* to argue that claims under the VCPA require a plaintiff to demonstrate a defendant's fraudulent intent to deceive. 397 F. Supp. 2d 712 (E.D. Va. 2005). The district court in *Padin* announced its decision 9 years before the Virginia Supreme Court's decision in *Owens*. The Virginia Supreme Court's decision on Virginia law is binding on the Court in this case. *See Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016).

promise. Va. Code § 18.2-200.1. For the reasons discussed in relation to the claims for actual fraud, the Court finds that the Defendant did not have the requisite fraudulent intent regarding the completion of construction on the property to be liable under this statute. Further, there is zero evidence that the Defendant ever *refused* to complete construction until the Plaintiffs prevented his performance (as discussed below) and threatened legal action to rescind the contract. For this reason, the Defendant cannot be found liable for a VCPA violation on the theory that he committed promissory construction fraud.

### B. Square Footage

Evidence introduced at trial indicates that on June 10, 2019, the Defendant informed the Plaintiffs through text message that the property would be "roughly" 6500 square feet. (Plaintiff's exhibit 500 at 20). The Plaintiffs argue that this number was false and that the Defendant obscured actual measurements for the Property by omitting the measurement from floor plans that were subsequently sent to the Plaintiffs. However, testimony at trial clearly indicates that the Parties never reached a consensus as to what needed to be included in the measurement of the square footage of the property. For instance, in the June 10, 2019 conversation the Plaintiffs never indicated if they wished for a measurement of the main property that included the garage. The Plaintiff, John Harrell, later admitted during his testimony that he learned that the square footage of a property (for insurance purposes) normally does not include measurements of a basement. Further, the testimony at trial indicates that the Parties never discussed whether a measurement of the square footage should include a proposed outdoor porch or the garage in the carriage house.

The context of this representation demonstrates that the representation was a general estimate of a future condition. The evidence at trial does not show that any of the representations

made by the Defendant regarding the square footage of the house were supposed to indicate an exact measurement of the interior space of the main house on the Property. As the statement was general and indefinite, the evidence at trial does not show that the statement was an actionable false representation. Further, the representation was of a future condition—the final square footage of the structure when it was finished. As the statement was also about a future condition it cannot be a misrepresentation for purposes of the VCPA. For this reason, any statements about the square footage of the Property was not a violation of the VCPA.

### C. Building Permits and Inspections

In the post-trial briefing, the Plaintiffs argue that the Defendant made a representation that he "had a permit for the main house and that the carriage house was under the same permit" and that "the permits had been filed other than the owner suite addition" on March 22, 2019. The Plaintiffs also argue that several other statements the Defendant made should be considered misrepresentations, "Everything is taken care of, everything's been inspected…" (Dkt. 218 at 11), "I always follow the permit laws" (Dkt. 208 at 141), and that the Plaintiffs "would be able to live in the house, no problem. It didn't—there was no requirement that we have to have a finalized permit to live in the house and that the house was habitable." Dkt. 211 at 91.

The Parties have spent an extensive amount of time introducing evidence regarding what permits were or were not obtained by the Defendant throughout the process of renovating the Property. After reviewing the evidence, it would be improper to award judgment for the Plaintiffs on the VCPA claims based on statements regarding the housing permits or inspections. The unrebutted testimony of the Arlington County building inspector, Emad Elmagraby, demonstrated that the relevant permitting authorities were working with the Defendant to obtain the necessary inspections and permits for the property, and that those permits could be obtained.

For this reason, the only damages resulting from the general misrepresentations about the permitting process would be damages that result from not being able to move into the house as quickly as the Plaintiffs wished. As discussed below in section 7B, the Plaintiffs are not entitled to consequential damages. Further, Virginia law does not permit double recovery of actual damages for VCPA claims that are the same as the claimed damages for breach of contract. *Wilkins v. Peninsula Motor Cars*, 266 Va. 558, 561 (Va. 2003) ("We had previously stated the trial court must assure that a verdict, while fully and fairly compensating a plaintiff for loss, does not include duplicative damages.") (citing *Tazewell Oil Co. v. United Virginia Bank*, 243 Va. 94, 113 (Va. 1992)). As the Plaintiffs are not entitled to damages resulting from misrepresentations about the permitting status of the Property, they will not be found liable for this misrepresentation under the VCPA.

### D. The master bathroom (OS) tile

The Plaintiffs have argued that the Defendant made a misrepresentation when he made the statement that he had placed a deposit for the custom tile the Plaintiffs had picked out to go into the master bathroom. Like the representations made about the permits, the only damages that resulted from this misrepresentation are damages associated with not being able to move into the Property by the dates contemplated in the PCCA. As the Plaintiffs are not entitled to these consequential damages, it is not appropriate to award judgment on their VCPA claim based on misrepresentations made about the deposit on the order of bathroom tile.

### E. The main house roof

Plaintiff John Harrell testified that the Defendant told him in March of 2019 that the main house on the property had an "original slate roof." Dkt. 208 at 145. The Plaintiff also testified that the Defendant represented that the roof was a "charcoal slate roof." *Id.* Plaintiff Dawn

Harrell testified that she did not recall the specifics of this conversation because she was not paying attention. Dkt. 211 at 86-87. The Defendant states that during the March meeting there were no discussions about the roof or the material the roof was made of. Dkt. 212 at 41. The Plaintiffs' expert testified that the roof on the main house is not a slate roof but is instead composed of an imitation material—called "TruSlate"—that is not as valuable or durable. The Plaintiffs argue that based on the material the roof is made of, the Defendant made a misrepresentation regarding the quality of the roof.

It is difficult to resolve the conflicting and self-serving testimony of the Parties. However, the documentary evidence of the text messages between the Parties seems to support the Defendant's recollection of the Parties' conversations regarding the roof. Text messages in June of 2019 reflect that Plaintiff John Harrell made inquiries about the roof to the Defendant. The Plaintiff asked, "Doug. The insurance company needs to know how old the roof is. Any idea?" Plaintiffs Exhibit 496 at 288. To which the Defendant responds, "2 additions new. 1 porch new. 3 side of carriage house new. The front half of front not sure. They should come out." *Id.* The description of the roof as "new" contradicts that the Defendant characterized the existing roof as "original" to the main house, as the main was constructed in the 1930's.

Further, a Plaintiff must demonstrate that they reasonably relied on a misrepresentation made by the Defendant to support a claim made pursuant to the VCPA. *Arardrour v. American Settlements, Inc.*, 2009 U.S. Dist. LEXIS 56675 at *7 (E.D. Va. July 2, 2009) (citations omitted) ("Virginia courts have consistently held that reliance is required to establish a VCPA claim."). The evidence does not demonstrate that the Plaintiffs reasonably relied on the statements about the roof when the Defendant clearly communicated that the roof was "new" and not "original." Further, it is uncontradicted that the Plaintiffs visited the Property multiple times and had

unfettered access to the Property. The roof was readily observable—as it's in the open—and there is no evidence or argument that explains why the Plaintiffs relied on the Defendant's statement when the roof material could be observed with a minimal amount of effort.

For these reasons, the Court finds that the Plaintiffs have not established by a preponderance of the evidence that the statement about the roof composition was ever made or that the Plaintiffs reasonably relied on such a statement. Judgment will not be awarded on the VCPA claims based on the statements about the roof of the Property's main house.

### F. Willfulness

The VCPA allows for "[a]ny person who suffers a loss as a result of a violation of this chapter shall be entitled to initiate an action to recover damages, or $500, whichever is greater." Va. Code §59.1-204(A). The VCPA also allows for the damages to be increased up to the three times the amount awarded for violations that are "willful." *Id.* "Willful violations are those that involve knowing and intentional disregard for the protections afforded consumers." *Reynolds v. Reliable Transmission, Inc.*, 2010 U.S. Dist. LEXIS 64485 at *15 (E.D. Va. June 29, 2010) (quoting *Synergistic Intern., LLC v. Korman*, 402 F. Supp. 2d 651, 666 (E.D. Va. 2005)). As discussed regarding the Plaintiffs' claims for common law fraud, the evidence at trial did not support a finding—even by a preponderance of the evidence—that the Defendant acted with intent to make a fraudulent misrepresentation. Therefore, the Plaintiffs have not demonstrated that the Defendant acted with the required intent to violate the protections in the VCPA. Without a showing of willfulness, the Plaintiffs could only potentially recover an amount equal to the actual damages suffered. As the Plaintiffs will be awarded actual damages for their breach of contract claims as discussed in the next section, they cannot also recover actual damages for the VCPA claims. *See Wilkins*, 266 Va. at 562 (defendant was only entitled to one award of

compensatory damages under either his VCPA or common law fraud claim). Therefore, it would not be appropriate to enter judgment in favor of the Plaintiffs on their claims made under the VCPA.

### G. Attorney's fees and costs

The Plaintiffs' in this case have requested that they be awarded attorney's fees and costs pursuant to the VCPA. A plaintiff who is awarded damages under the statute "may be awarded reasonable attorney's fees and court cost." Va. Code §59.1-204(B). The Virginia Supreme Court has enumerated several factors to consider when evaluating a request for attorney's fees and costs:

> [T]he fact finder may consider, inter alia, the time and effort expended by the attorney, the nature of the services rendered, the complexity of the services, the value of the services to the client, the results obtained, whether the fees incurred were consistent with those generally charged for similar services, and whether the services were necessary and appropriate.

*Schlegel v. Bank of America, N.A.*, 271 Va. 542, 556 (Va. 2006) (quoting *Chawla v. BurgerBusters, Inc.*, 255 Va. 616, 623 (Va. 1998)).

A review of these factors indicate that an award of attorney's fees and costs would not be appropriate in this case, even if the Plaintiffs had prevailed on the claims made under the VCPA. The Plaintiffs' attorneys did not achieve the desired results as the amount of damages that will be awarded in this case are far less than the damages the Plaintiffs have requested. In addition, throughout discovery and even after trial the Parties have engaged in excessive and unnecessary litigation tactics, including filing a frivolous and unfounded Motion for a temporary restraining order. *See* Dkt. 223. The conduct of both Parties in this case indicate that it would not be appropriate to award attorney's fees.

**6. Claims for Breach of Contract**

To state a claim for breach of contract, the Plaintiff must show that there was "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak*, 267 Va. at 614. It is undisputed that a written agreement existed between the Parties. One of the operable documents demonstrating the written agreement is the PCCA, entered into evidence as Plaintiffs' Exhibit 2. In relevant part, this document contains the following language:

**Article 1. Incomplete Work.**

1.1 **Scope**. Contractor will perform the construction services identified in Exhibit "A" in accordance with the Purchase and Sale Agreement to the extent not already on or before July 3, 2019, including all exhibits thereto. The Parties also attach a "Punch list" as Exhibit B, describing most, but not all, of these items.

1.2 **Completion date.** The Incomplete Work will be completed on or before *August 1st, 2019* ("Incomplete Work Completion Date").

Plaintiffs' Exhibit 2 at 3. This contract unambiguously demonstrates that the Parties intended and agreed that certain items would be completed by the specified deadline. Testimony at trial established that "Exhibit B" is a punch list of uncompleted work that was admitted into evidence as Plaintiffs' Exhibit 1022. The Court finds that based on the testimony of the Parties and the documentary evidence at trial—such as e-mail conversations with Brendan Muha—that the Parties intended the items listed on Plaintiffs' Exhibit 1022 to be completed by August 1st, 2019.

At trial, expert witnesses and the Parties all agreed that several of the items that were encompassed in the "incomplete work" contemplated in the PCCA were not complete by August 1st, 2019. Photographic evidence also demonstrates that some of these items have still not been completed. Among these items that were not completed are the powder room, the kitchen stoves, the bathroom floors in the children's rooms, the master bathroom, and the carriage house floor. The Plaintiffs have shown by a preponderance of the evidence that completing these items by

August 1st, 2019—as expressly agreed to by the Parties—was material to the contractual agreement as unambiguously defined in the PCCA. As these items were not complete by the deadline, the Defendant breached the contract.


### 7. Damages

As the Court has found that the Defendant has breached the contract existing between the Parties, an appropriate remedy must be established. The Plaintiffs have requested rescission of the agreement between the Parties, or in the alternative, actual and foreseeable damages resulting from breach of the contract.

#### A. Recission

The Plaintiffs have argued that recission is the proper remedy in this case and that the Plaintiffs should be awarded the entire purchase price of the contract as well as pre-judgment interest. However, the Plaintiffs have premised this argument on the assumption that there was a fraudulent act by the Defendant. As already discussed, the evidence at trial has not supported a finding that the Defendant fraudulently induced the Plaintiffs into entering the contract. For this reason, a remedy of recission based on fraud is not appropriate.

The Virginia Supreme Court considers recission—or the annulment of a contract—to be "the highest and most drastic exercise of the power" of a court. *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 115 (Va. 2008) (quoting *Bonsal v. Camp*, 111 Va. 595, 599 (Va. 1911)). To award recission, the Court must "be able substantially to restore the parties to the position they occupied before entering into the contract." *Devine v. Buki*, 289 Va. 162, 173 (Va. 2015) (emphasis in original) (quoting *Millboro Lumber Co. v. Augusta Wood Products Corp.*, 140 Va. 409, 421 (Va. 1924)). Generally, recission is not granted for a breach of contract "which is not of

such substantial character as to defeat the object of the parties in making the contract…" *Neale v. Jones*, 232 Va. 203, 207 (Va. 1986) (quoting *Boiling v. King Coal Theatres*, 185 Va. 991, 996 (Va. 1947)). In addition, recission will not be granted unless a defendant's failure of performance is "total or substantial." *Drummond Coal Sales, Inc. v. Norfolk Southern Railway Co.*, 2020 U.S. Dist. LEXIS 33328 at *19 (W.D. Va. February 26, 2020) (quoting *Sternheimer v. Sternheimer*, 208 Va. 89, 97 (Va. 1967)).

The evidence at trial undisputedly shows that the Defendant performed a substantial amount of work on the Property. Testimony showed that much of the construction work was completed on customized projects at the request of the Plaintiffs. Although not dispositive of the issue of rescission, the Defendant estimates that these customizations amount to roughly a half million dollars that would not have been expended in renovating the Property. The testimony of the Arlington county building inspectors shows that the Defendant was applying for permits and working with the county to receive several different inspections. The evidence at trial plainly established that the performance that was completed by the Defendant was not insignificant. Based on this record, an equitable remedy would not be appropriate after the time and effort expended by the Defendant, especially in consideration of the amount that the Defendant's performance was substantially hindered by the Plaintiffs (as discussed below). Based on the evidence received by the Court, a legal—rather than equitable—remedy must be awarded to the Plaintiffs for their breach of contract claim.

### B. Consequential Damages

The Plaintiffs have requested consequential damages that they argue flow from the Defendant's breach of contract. Plaintiff John Harrell offered testimony about the costs he believes he incurred because of being unable to move onto the Property by September 1st, 2019.

*See* Dkt. 208 at 170. The Plaintiffs also created and entered into evidence a summary document of the costs that they calculated for consequential damages. *See* Plaintiffs' Exhibit 488. The Plaintiffs argue that they should be compensated for these costs associated with having to rent a second residence and the cost of purchasing insurance for the Property when it could not be occupied. Consequential damages—or damages which do not flow directly from the breach of contract—are only recoverable if the special circumstances leading to the damages "were within the contemplation of all contracting parties at the time the contract was made." *Long v. Abbruzzetti*, 254 Va. 122, 127 (Va. 1997) (citations omitted). In this case, the Plaintiffs argue that the Defendant was aware that the Plaintiffs needed to move to Virginia and live on the Property by September 1st, 2019.

However, consequential damages are not appropriate in this case because of the application of the prevention doctrine. The prevention doctrine is a well-recognized principle of contract law that prevents the recovery of damages for a party who interferes with the completion of performance of a contract. *Rastek Constr. & Dev. Corp. v. Gen. Land Commer. Co., LLC*, 294 Va. 416, 426 (Va. 2017) ("if one party to a contract hinders, prevents or makes impossible performance by the other party, the latter's failure to perform will be excused.") (quoting 13 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 39:3, at 569 (4th ed. 2013)); *see also Boggs v. Duncan*, 202 Va. 877, 882 (Va. 1961)[3] ("If the impossibility of performance arises directly or even indirectly from the acts of the promisee, it is sufficient excuse for nonperformance.") For the prevention doctrine to apply, the party invoking

---

[3] In *Boggs*, a plaintiff contracted with a defendant to remove timber from land owned by the plaintiff. The plaintiff became dissatisfied with the pace of performance and through his attorney, instructed the defendant that he could no longer enter the land where the timber was located. The Virginia Supreme Court upheld a jury verdict which reflected that denial of access to the land effectively prevented the defendant from performing his obligations under the contract. *Boggs*, 202 Va. at 882.

the doctrine needs to show that the act of the offending party "materially contributed to the non-occurrence of the condition." *Cox v. SNAP, Inc.*, 859 F.3d 304, 308 (4th Cir. 2017) (applying Virginia law) (citing *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000)). The Fourth Circuit has also interpreted Virginia Supreme Court precedent to find the existence of "the implied agreement not to impede the occurrence of a condition…" *Id.* at 309 (citing *Parrish v. Wightman*, 184 Va. 86, 92 (Va. 1945)).

The evidence in the case clearly demonstrates that the Plaintiffs impeded the performance of the Defendant when a letter was sent telling the Plaintiff to cease work on the Property.[4] This letter was sent on August 6, 2019. Both the Defendant and the Defendant's expert witness offered unrebutted testimony that stopping progress on the construction had more wide-ranging effects than merely ceasing the work for a week. Subcontractors may find new work and become unavailable. Inspections that were scheduled cannot necessarily be rescheduled immediately. These facts show that the interference by the Plaintiffs with the performance of the Defendant was the direct cause of the delay in completing the construction of the Property.

The application of the prevention doctrine in this case is also very closely tied to the Plaintiffs' failure to mitigate. Although the Plaintiffs may have correctly believed the Defendant was in breach of the contract on August 1st, 2019, they still were required to mitigate any damages flowing from this breach. *See Stohlman v. S & B Ltd. Partnership*, 249 Va. 251, 256 (Va. 1995) ("plaintiff must do what a reasonable man would have done to limit damages") (citing *CSX Transp. Inc. v. Casale*, 247 Va. 180, 185-186 (Va. 1994)). The evidence introduced by the Defendant in this case very convincingly demonstrates that the easiest and most common-sense steps the Plaintiffs could have taken would have been to allow the Defendant to finish construction on the Property. It would not make sense to award consequential damages based on

---

[4] This letter was entered into evidence as Defendant's Exhibit 43.

the facts of this case when the Plaintiffs directly created the conditions that lead to the incurrence of those damages and then failed to mitigate the damages. *See Forbes v. Rapp*, 269 Va. 374, 380 (Va. 2005) (An injured party who does not take reasonable steps to mitigate damages cannot "recover additional damages incurred.") (citations omitted). For this reason, the Plaintiffs will not be awarded consequential or foreseeable damages.

### C. Offset

In the Answer to the Amended Complaint, the Defendant has argued that any damage award should be offset by costs incurred during the Defendant's attempt to complete performance on the Parties' agreement. The Defendant's testimony lacks supporting evidence— such as receipts or invoices—that establish the Defendant is entitled to these costs. The Defendant has not met his burden to demonstrate that these costs should be considered by the Court. For this reason, these costs will not be factored into the award of damages to the Plaintiffs.

### D. Actual Damages

Under Virginia law a plaintiff must "prove the extent of damages with a reasonable certainty." *Gertler v. Bowling*, 202 Va. 213, 215 (Va. 1960). The Plaintiffs are not required to demonstrate their loss with "mathematical precision," but must instead provide evidence that allows an "intelligent and probable estimate of the amount of damages or loss sustained." *Id.* (citations omitted). Both Parties have introduced the testimony of expert witnesses[5] who attempted to quantify the damages in this case. Both experts proposed a model of damages that attempted to assess the cost of materials for certain items that need to be completed on the property. Both experts then multiplied the costs of each individual item by a percentage. This

---

[5] Both of the experts' reports were also entered into evidence at the end of trial without objection.

percentage represents the cost of hiring a contractor and labor to perform the construction. The costs of materials and the costs of labor were then added together to arrive at a total measure of damages. As both Parties have taken a similar approach to quantifying damages, the Court finds that this method is a proper assessment of the damages in this case. The damages in this case will reflect the actual costs that it would take to finish construction on the Property, which is an appropriate legal remedy.[6] *See Nichols Constr. Corp. v. Machine Tool Co., LLC*, 276 Va. 81, 89 (Va. 2008) ("We have also observed that cost of correction or completion rather than loss in property value ordinarily affords the proper basis for measuring the damages which result to the owner from the breach of a building or construction contract,...") (quoting *Green v. Burkholder*, 208 Va. 768, 773 (Va. 1968)). The Court therefore is tasked with reconciling the vast difference in the sum of damages calculated by the two experts.

Both Parties' experts have created enumerated lists in this case that reflect specific items which need to be completed for the Property to pass a final inspection from the county. The Plaintiffs' expert, Matthew Bowe, calculated damages by taking the expert report of Matthew Furlong, and assigning a value to every item identified in Furlong's report that needed to be corrected. The summary of these totals was entered into evidence as Plaintiffs' Exhibit 901. Bowe testified that he came up with the values for individual items based on an "internal cost database" and a software application called "National Estimator." Dkt. 210 at 125. Bowe then took the values for the raw materials necessary to complete a particular item, and then added 30% of each items' value to reflect the labor costs needed to hire a contractor. Bowe testified that 30% was a standard cost of labor in the industry. Based on his calculations, Bowe arrived at total estimate to complete the construction on the Property of $1,266,155.00.

---

[6] As the Court found that the breach occurred before the Plaintiffs halted construction work on the Property, the prevention doctrine does not bar the recovery of actual damages.

There are several problems with Bowe's calculation which lead to a conclusion that the total estimate is not reasonable or accurate. They include several assumptions that Bowe relies upon to estimate his costs. The first is the assumption that the sheer number of deficiencies identified in the Furlong report indicate that all the work performed by the Defendant is defective. As the evidence at trial conclusively demonstrated, the Defendant was prevented and hindered from completing the work on the Property. Therefore, the construction was unfinished as opposed to inherently defective or of poor quality. The other faulty assumption is that all the work completed by the Defendant needs to be demolished in its entirety and completely replaced. Bowe supports this assumption with conclusory testimony regarding Bowe's own practices with his contracting company. However, this assumption is directly rebutted by the testimony of the Arlington county building inspector who explained the process the county had been working on to finalize building permits for the Property—which did not require a total demolition of the Property's existing internal structures. In short, Bowe's assumption underlying the damages testimony is directly contradicted by a witness with no interest in the outcome of the case and with direct familiarity with the process necessary to complete the permitting process on the Property. As the Plaintiffs bear the burden of proving damages by "reasonable certainty," it would not be appropriate to adopt Bowe's estimation in its entirety. *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154 (Va. 2009) (citations omitted).

However, the Court does find that Bowe's estimation of labor costs at 30% of the price of materials is more credible and reasonable than the Defendant's estimation at 10% of those same costs. This is because the 30% estimate contemplates the general contractor making a profit, while the Defendant's estimate of these costs only factors in the cost of the subcontractor's labor

without allotting any profit to a general contractor. It is reasonable to assume that a general contractor would expect to make some profit for completing construction on the Property.

The Defendant also introduced the testimony of an expert on damages, Kiet Nguyen. Nguyen's report was introduced into evidence as Defendant's exhibit 145. Nguyen began his calculation by identifying items in the Plaintiffs' expert's (Matthew Furlong) report as well as additional items based on the report of Defendant's expert, Shayan Amin. Nguyen then grouped the identified items together to identify work that would be redundant. Nguyen assigned a cost to each of the categories of items grouped together. The Plaintiffs' have challenged Nguyen's methodology because he did not provide a cost breakdown of each single item presented in the damages report. However, this is essentially the same method used by the Plaintiffs' own expert. Both experts used estimates based on their experience from past projects to gauge the costs of materials for each of the items necessary for construction. Nguyen's reliance on his own experience does not indicate that his testimony is inherently unreliable or inaccurate. Further, Nguyen testified that he estimated the damages based on the costs to fix the items identified in the report—rather than the costs to demolish and completely replace each item. For this reason, Nguyen's testimony establishes a much more reliable and accurate estimate of the damages suffered by the Plaintiffs in this case.

However, the Court does find that the testimony of the Plaintiffs' expert, Shayan Amin, establishes the need to demolish and replace the brick masonry in the carriage house that was identified as cracked. Amin testified that the masonry was installed above a lintel, which is a type of steel beam. Based on his expertise, Amin identified that the lintel did not have the correct properties to support the masonry above it. As the lintel had the incorrect amount of stiffness, the installation caused the entirety of the masonry above it to deflect (or move) and eventually crack.

This testimony establishes that both the garage lintel and the masonry above it need to be completely demolished and replaced. Nguyen's testimony and the notes in Nguyen's expert report do not indicate that Nguyen accounted for the costs of completely replacing the brick masonry. For this reason, the Court will adopt the estimate of those costs from the report of Matthew Bowe and add that estimate to the total award of damages. The estimate of those costs is $17,253.70.

The Plaintiffs have established by a preponderance of the evidence that they are entitled to damages for the items identified by the experts who testified at trial. Several of the witnesses at trial establish that the best and most reasonably certain estimate of those damages is taken from the expert report of Nguyen with the addition of the line item damages for the costs to replace the masonry and garage lintel in the carriage house. The actual damages in this case will be estimated as follows:

- $125,353.70 for the costs of materials to complete construction.

- 30% of the costs of materials for labor and to compensate a general contractor equal to $37,606.11.

- 15% of the costs of materials to represent costs of administration, supervision, and general condition of a future construction project at $18,803.06.

## 7. Prejudgment Interest

As the prevailing party, the Plaintiffs are presumptively entitled to prejudgment interest. *Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207, 210 (4th Cir. 2000). Virginia law provides for a six percent interest rate when a contract does not specify the amount of interest to be awarded.

Va. Code. Ann. §6.2-302. For this reason, the Plaintiffs will be awarded a total remedy of $181,762.87 with prejudgment interest of 6% accruing as of August 1st, 2019.

**8. Conclusion**

Judgment will be entered in favor of the Plaintiffs and against the Defendant on Count IV of the Amended Complaint for breach of contract and entered in favor the Defendant on the remaining counts. A separate Order will issue along with this Opinion.


November ___, 2022
Alexandria, Virginia

Liam O'Grady
United States District Judge